<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   SOLAS OLED LTD.,            )(    CIVIL ACTION NO.
                                )(    2:19-CV-152-JRG
 4        PLAINTIFF,            )(
                                )(
 5        VS.                   )(
                                )(
 6   SAMSUNG DISPLAY CO., LTD., )(
     SAMSUNG ELECTRONICS CO.,    )(    MARSHALL, TEXAS
 7   LTD., SAMSUNG ELECTRONICS  )(    MARCH 1, 2021
     AMERICA, INC.,             )(    2:09 P.M.
 8                              )(
          DEFENDANTS.           )(

 9

10                 TRANSCRIPT OF JURY TRIAL

11       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12          UNITED STATES CHIEF DISTRICT JUDGE

13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:

16   MR. MARC FENSTER
     MR. REZA MIRZAIE
17   MR. ADAM S. HOFFMAN
     MR. NEIL A. RUBIN
18   MR. JACOB R. BUCZKO
     MR. JAMES S. TSUEI
19   RUSS AUGUST & KABAT
     12424 Wilshire Boulevard, 12th Floor
20   Los Angeles, CA 90025

21   MR. T. JOHN WARD, JR.
     MS. CLAIRE ABERNATHY HENRY
22   MS. ANDREA L. FAIR
     WARD, SMITH & HILL, PLLC
23   1507 Bill Owens Parkway
     Longview, TX 75604
24

25
</pre>

```
 1   FOR THE DEFENDANTS:

 2   MS. MELISSA R. SMITH
     GILLAM & SMITH, LLP
 3   303 South Washington Avenue
     Marshall, TX 75670
 4

 5   MR. JEFFREY H. LERNER
     MR. JARED R. FRISCH
 6   MR. DANIEL E. VALENCIA
     MR. DANIEL W. CHO
 7   MR. TAREK J. AUSTIN
     MR. ERIC T. O'BRIEN
 8   MR. DAVID J. CHO
     MR. JORDAN V. HILL
 9   COVINGTON & BURLING LLP
     One CityCenter
10   850 Tenth Street, NW
     Washington, DC 20001-4956
11

12   MR. ROBERT T. HASLAM
     COVINGTON & BURLING LLP
13   3000 El Camino Real
     5 Palo Alto Square, 10th Floor
14   Palo Alto, CA 94306-2112

15

16

17

18   COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
19                       United States District Court
                         Eastern District of Texas
20                       Marshall Division
                         100 E. Houston
21                       Marshall, Texas   75670
                         (903) 923-7464
22

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

01:18:25  1                    P R O C E E D I N G S

01:18:25  2              (Jury out.)

01:18:27  3              COURT SECURITY OFFICER:  All rise.

01:18:28  4              THE COURT:  Be seated, please.

02:09:16  5              Counsel, this morning, I met with you in chambers

02:09:51  6    in advance of jury selection, and we discussed certain

02:09:57  7    overnight disputes regarding intended demonstratives that

02:10:03  8    were going to be used for opening statements or as a part

02:10:07  9    of opening statements this morning.

02:10:08  10             And with regard to at least some of those, I gave

02:10:20  11   you instructions, at least in my mind, to be followed up

02:10:26  12   on.

02:10:26  13             We discussed what was identified as DDX-1.008,

02:10:35  14   DDX-1.009, and DDX-1.011 this morning.

02:10:45  15             I instructed the parties to -- with regard to

02:10:52  16   demonstrative ending in an 8 and a 9, to pull out the

02:10:58  17   figures from the text of the '45 -- '450 patent and either

02:11:05  18   substitute appropriate claim language or tell me they were

02:11:12  19   going to forego those demonstratives altogether.  And I

02:11:17  20   directed you all to meet and confer on that.

02:11:19  21             Where are we in that regard?  Are these

02:11:21  22   demonstratives still intended to be used, are they in a

02:11:25  23   satisfactory form, or is there any remaining objection?

02:11:28  24             MR. HASLAM:  We've modified them according to the

02:11:30  25   Court's guidance.  I think we've circulated them to Solas,

02:11:34  1   and I believe they're -- the new demonstratives are agreed

02:11:36  2   to.

02:11:40  3          MR. MIRZAIE:  That's correct, Your Honor.

02:11:41  4          THE COURT:  All right.  With regard to the

02:11:43  5   demonstrative ending in 11, I also directed to change some

02:11:54  6   of that.  And I have not seen the end result after we

02:11:56  7   discussed it, particularly the not equal to sign was going

02:11:59  8   to come out, and I wasn't completely clear on how it was

02:12:02  9   going to otherwise be restructured.

02:12:04  10         Have you all met and conferred over DDX-1.011 and

02:12:11  11  is there any --

02:12:12  12         MR. HASLAM:  We have deleted the equal sign, and I

02:12:15  13  thought the Court just said two and seven -- I will not say

02:12:18  14  two equals seven.  I'm going to be consistent with what the

02:12:21  15  Court's instructions were and how that point fits into the

02:12:27  16  claims that are at issue in the case.

02:12:28  17         THE COURT:  Okay.  That -- that, Mr. Haslam, is, I

02:12:34  18  think, the critical comment, how this fits into the claims

02:12:37  19  at issue.

02:12:38  20         I have no problem -- and I want to be clear about

02:12:46  21  this as a continuation of our discussion this morning.  I

02:12:52  22  have no problem with you telling the jury that your accused

02:12:55  23  products have seven transistors, and the embodiments in the

02:13:03  24  patents have two or three transistors, and then there's the

02:13:10  25  claim language, and the claim language is what the claim

02:13:11  1   language is.

02:13:13  2         But at the end of the day, the message I

02:13:16  3   understand you're going to impart is that the functionality

02:13:21  4   of your seven transistors is different than the

02:13:25  5   functionality of the transistors called for in the claims

02:13:29  6   so that your products do not do what the claims call for.

02:13:33  7   That's got to be your argument.

02:13:34  8         It can't be two is not seven.  Their number is

02:13:38  9   different than our number.  We don't infringe, end of

02:13:44  10  story.  I can't have a bell rung with the jury that can't

02:13:48  11  be unrung like that that I can't correct, and that's why

02:13:52  12  I'm going over this with you one more time.

02:13:54  13        I understand.  And it's no secret, I think they

02:13:56  14  can tell, because we have seven, we have configured them in

02:14:04  15  a way that doesn't meet the claim language, and some of

02:14:06  16  them don't do the functions called for in the claim

02:14:09  17  language.

02:14:09  18        THE COURT:  And these are comprising claims, so

02:14:11  19  they can have more to them than what's called for.

02:14:17  20        It can't be that all seven transistors have to be

02:14:19  21  reflected in the claims, and it can't be that all seven

02:14:28  22  have to be accounted for in the claims.  Really, the

02:14:31  23  numbers don't have anything to do with it.  It's the

02:14:33  24  functionality of your accused products compared to the

02:14:35  25  requirements of the claim language, and either they line up

02:14:38   1   and match, or they don't line up and match.

02:14:41   2        MR. HASLAM:  They don't line up and match.  And

02:14:43   3   the argument --

02:14:43   4        THE COURT:  As -- as long as you present it like

02:14:47   5   that, I'm okay with it.

02:14:48   6        MR. HASLAM:  But I just want to be very clear,

02:14:50   7   because if the Court doesn't want me to do this, I won't do

02:14:52   8   it.

02:14:53   9        Because we had to use seven transistors to make

02:14:56  10   this work, that's what caused some of the -- the relevant

02:15:00  11   transistors not to be located like the claims require and

02:15:06  12   not to be connected the way the claims require.

02:15:09  13        And so the point I want to make is because we had

02:15:12  14   to use seven transistors, you will not be able to match up

02:15:17  15   what the claim language requires these transistors be

02:15:21  16   located -- the Court's claim construction knows that what

02:15:25  17   the electrode covers was one of the elements of the claim

02:15:29  18   construction.  There's no dispute.  We disagree that they

02:15:34  19   mapped it onto the right claim -- onto the right

02:15:37  20   transistors, because the claim calls for two, but it calls

02:15:40  21   for two that specifically do something or are specifically

02:15:43  22   located at a place.

02:15:45  23        And the point is going to be that we, because we

02:15:46  24   had seven, we had to move things around and assign

02:15:50  25   different functionalities, and that's what doesn't meet the

148

02:15:53  1  claim language.  Not just so we've got seven, but that the

02:15:56  2  way they're configured and the way they're located and

02:15:59  3  where they're located does not meet what the claim

02:16:02  4  requires.

02:16:03  5       And, ultimately, our case will be, when you look

02:16:05  6  at this claim, it requires X, and what they're pointing to

02:16:09  7  doesn't do X.

02:16:14  8       THE COURT:  Well, the numbers of the transistors

02:16:16  9  really are in large part a red herring that have a greater

02:16:22  10  probability of confusing than they do of enlightening the

02:16:26  11  jury.

02:16:27  12       It should be that whether because you used seven,

02:16:30  13  we had to reconfigure or whatever.  It should be here's our

02:16:33  14  accused products.  This is what it is.  This is how it's

02:16:36  15  configured.  This is how it works.  Here's the claim

02:16:40  16  language that the Plaintiffs say we infringe.  It requires

02:16:43  17  A, B, and C.  Our accused products don't do A or don't do B

02:16:50  18  or don't do C or don't do A, B, and C.

02:16:53  19       And whether that's because it's two versus seven

02:16:56  20  or some other reason, the key point's got to be a

02:17:01  21  divergence between the requirements of the claim and the

02:17:05  22  functionality of the accused products.  And that's why I'm

02:17:07  23  very concerned that if you flash this two and seven number

02:17:10  24  around, we're going to leave an impression with the jury

02:17:13  25  that it's simply a matter of two versus seven, they're not

02:17:18  1   the same, that's the end of the story.

02:17:20  2        And that's not -- that's not appropriate, and I

02:17:25  3   have real concerns at a basic 403 level that the probative

02:17:28  4   value of talking about two versus seven is far outweighed

02:17:34  5   by the potential confusion and prejudice.  If that's clear.

02:17:38  6        MR. HASLAM:  The jury -- the jury is going to

02:17:40  7   see -- because their expert uses our diagrams, the jury is

02:17:46  8   going to see we have seven transistors.  And the story is

02:17:49  9   how did -- how -- I mean, it goes to the story of what our

02:17:53  10  innovation was.

02:17:54  11       And I think it -- to prejudice us and say, well,

02:17:58  12  it's two and we only look at two and ignore the fact that

02:18:01  13  we had to do seven transistors to make this work goes to

02:18:04  14  the value of the patents.  But the seven transistors is the

02:18:09  15  causation to make it work, which is why we don't make -- we

02:18:16  16  don't meet the limitations of the claims.

02:18:18  17       So it's -- I'm going to say, unless the Court says

02:18:21  18  I can't say that we have seven transistors, when one of

02:18:25  19  their first experts is going to get up and show them a

02:18:29  20  seven-transistor circuit.

02:18:31  21       THE COURT:  What I don't want and what I'm going

02:18:33  22  to preclude you from arguing is that seven versus two or

02:18:36  23  two versus seven is some kind of shortcut for the

02:18:40  24  technicalities of infringement and whether they do or don't

02:18:43  25  infringe reflect each and every element of the asserted

| | | |
|---|---|---|
| 02:18:45 | 1 | claims. |
| 02:18:45 | 2 | MR. HASLAM:  I don't intend to. |
| 02:18:46 | 3 | THE COURT:  Okay.  I just wanted to be crystal |
| 02:18:48 | 4 | clear. |
| 02:18:48 | 5 | MR. HASLAM:  Okay. |
| 02:18:49 | 6 | THE COURT:  Because this is -- this is something I |
| 02:18:51 | 7 | have a concern could be extremely confusing at the very |
| 02:18:55 | 8 | front end of the trial. |
| 02:18:56 | 9 | MR. HASLAM:  And I'm going to ask for the Court's |
| 02:18:58 | 10 | guidance.  I mean, I would assume I could use the slide |
| 02:19:02 | 11 | that the Court has concerns about.  But given what the |
| 02:19:07 | 12 | Court has said, I do not want to use that slide if the |
| 02:19:10 | 13 | Court at this point thinks that I'm going over the line. |
| 02:19:13 | 14 | THE COURT:  I think it'd be better if you forego |
| 02:19:15 | 15 | 1.011, all right? |
| 02:19:18 | 16 | MR. HASLAM:  Will do. |
| 02:19:19 | 17 | THE COURT:  Okay.  Anything else we need to take |
| 02:19:21 | 18 | up before I bring in the jury? |
| 02:19:24 | 19 | I understand Mr. Ward and Mr. Fenster are going to |
| 02:19:28 | 20 | split their time. |
| 02:19:29 | 21 | MR. WARD:  Yes, Your Honor. |
| 02:19:30 | 22 | THE COURT:  Mr. Ward, you're welcome to sit in one |
| 02:19:32 | 23 | of the chairs against the wall behind the podium.  You're |
| 02:19:35 | 24 | welcome to sit where you are and go around.  I do not want |
| 02:19:38 | 25 | Plaintiffs walking between the Defense table and the jury |

02:19:38  1    during the trial.

02:19:38  2            MR. WARD:  I'll just start out over there.

02:19:38  3            THE COURT:  Are there other housekeeping matters

02:19:45  4    we need to talk about?

02:19:45  5            MR. DANIEL CHO:  Yes, Your Honor.  Daniel Cho on

02:19:47  6    behalf of Defendants.

02:19:47  7            We'd like to preserve a record of our objection to

02:19:50  8    a document that was the subject of our motion to strike,

02:19:55  9    Docket No. 318 denied as Docket No. 329, which we

02:20:02  10   understand is a Plaintiff's trial Exhibit No. 745.  And

02:20:04  11   I've conferred with Mr. Mirzaie, lead counsel for Plaintiff

02:20:09  12   Solas.  We'd just like to preserve our objections for the

02:20:13  13   record to that PTX-745 for the reasons stated in our

02:20:15  14   briefings.

02:20:16  15           THE COURT:  Ordinarily, counsel, the last thing I

02:20:18  16   want to do is stand between a lawyer of preserving

02:20:22  17   something they think is important in the record, but it is

02:20:24  18   not lost on the Court that exhibit disputes were taken up

02:20:27  19   in September of last year and this is March of 2021, and

02:20:31  20   I've heard nothing from anybody from September to March.

02:20:34  21           So do you have an explanation as to why this

02:20:36  22   wasn't done as a part of the pre-trial conference --

02:20:38  23           MR. DANIEL CHO:  Yes.

02:20:39  24           THE COURT:  -- in the fall of last year?

02:20:41  25           MR. DANIEL CHO:  Yes, Your Honor.  This document,

02:20:42   1   if you may recall, was disclosed to us after the September

02:20:46   2   pre-trial conferences.  It was produced in December and was

02:20:49   3   the subject of our motion to strike which was filed --

02:20:52   4          THE COURT:  Is this the LG license?

02:20:54   5          MR. DANIEL CHO:  Yes, Your Honor.

02:20:55   6          THE COURT:  Okay.  Is there objection to

02:20:56   7   preservation of this matter?

02:20:58   8          MR. FENSTER:  No, Your Honor.

02:20:59   9          THE COURT:  Okay.

02:21:00  10          MR. DANIEL CHO:  Thank you, Your Honor.

02:21:01  11          THE COURT:  All right.  So noted in the record.

02:21:03  12          Anything further?

02:21:07  13          MR. FENSTER:  Not from Plaintiff, Your Honor.

02:21:08  14          THE COURT:  Okay.  Let's bring in the jury then.

02:21:39  15          (Jury in.)

02:21:39  16          THE COURT:  Please be seated, ladies and

02:21:50  17   gentlemen.

02:21:50  18          Welcome back from lunch, members of the jury.

02:21:58  19          I have some preliminary instructions that I now

02:22:05  20   need to give you on the record before we start with opening

02:22:08  21   statements from the lawyers and then get on to the

02:22:11  22   evidence.

02:22:11  23          You've now been sworn as the jurors in this case,

02:22:16  24   and, as such, and as I indicated to you earlier, you are

02:22:19  25   the sole judges of the facts.  And, as such, you will

02:22:23  1  determine all the facts in this case.

02:22:25  2       As the Judge, I will give you instructions on the

02:22:30  3  law, I will address and decide any questions of law that

02:22:34  4  arise during the course of the trial, I'll handle all

02:22:38  5  matters related to evidence and procedure, and I'm

02:22:40  6  responsible for maintaining an efficient flow of the

02:22:43  7  evidence and maintaining the decorum of the court.

02:22:47  8       At the end of the evidence, I'll give you detailed

02:22:50  9  instructions about the law to apply in deciding this case,

02:22:54  10  and I'll give you a list of questions that you are then to

02:22:57  11  answer.

02:22:59  12       This list of questions is called the verdict form.

02:23:02  13  And your answers to those questions will need to be

02:23:07  14  unanimous.  And your answers to those questions will

02:23:11  15  constitute the jury's verdict in this case.

02:23:13  16       Now, I want to tell you briefly what this case is

02:23:19  17  about.

02:23:19  18       As you know, this involves a dispute regarding

02:23:21  19  three certain United States patents.  I know that each of

02:23:26  20  you saw the patent video film this morning, but I need to

02:23:29  21  give you some additional instructions now and on the record

02:23:32  22  about a patent and how one is obtained.

02:23:34  23       Patents are either granted or denied by the United

02:23:39  24  States Patent and Trademark Office, sometimes simply

02:23:43  25  called, for short, the PTO.

02:23:45  1        A valid United States patent gives the holder of
02:23:49  2  the patent the right for up to 20 years from the date the
02:23:52  3  patent application is filed within the United States --
02:23:58  4  excuse me, to prevent others from making, using, or
02:24:02  5  offering to sell or selling the patented invention within
02:24:04  6  the United States or from importing it into the United
02:24:09  7  States without the patentholder's permission.
02:24:11  8        A patent is a form of property called intellectual
02:24:14  9  property.  And like all forms of property, a patent can be
02:24:18  10  bought or sold.
02:24:19  11        A violation of the patentholder's rights is called
02:24:24  12  infringement.  A patentholder may try to enforce a patent
02:24:28  13  against persons it believes to be infringers by filing a
02:24:32  14  lawsuit in a United States District Court.  And that's what
02:24:36  15  we have before us in this case.
02:24:37  16        The process of obtaining a patent is called patent
02:24:41  17  prosecution.  To obtain a patent, one must first file an
02:24:47  18  application with the PTO, the United States Patent and
02:24:49  19  Trademark Office.
02:24:50  20        The PTO is an agency of the United States
02:24:56  21  Government, and it employs trained examiners who review
02:24:59  22  patents and applications for patents.
02:25:02  23        The application submitted to the PTO includes
02:25:06  24  within it what is called a specification.  The
02:25:09  25  specification contains a written description of the claimed

02:25:13  1  invention telling what the invention is, how it works, how

02:25:17  2  to make it, and how to use it.

02:25:20  3      The specification concludes, or ends, with one or

02:25:23  4  more numbered sentences.  These numbered sentences are the

02:25:28  5  patent claims.

02:25:30  6      When a patent is granted by the Patent and

02:25:34  7  Trademark Office, the claims, ladies and gentlemen, define

02:25:38  8  the boundaries of the patent's protection and give notice

02:25:42  9  to the public of those boundaries.

02:25:44  10      Patent claims may exist in two forms, referred to

02:25:48  11  as independent claims and dependent claims.

02:25:50  12      An independent claim does not refer to any other

02:25:56  13  claim in the patent.  It is independent.  It's not

02:26:00  14  necessary to look at any other claim to determine what an

02:26:04  15  independent claim covers.

02:26:06  16      However, a dependent claim refers to at least one

02:26:10  17  other claim in the patent.  A dependent claim includes each

02:26:16  18  of the limitations of that other claim or claims to which

02:26:20  19  it refers, or as we sometimes say, from which it depends,

02:26:26  20  as well as the additional limitations recited within the

02:26:33  21  dependent claim itself.

02:26:35  22      Therefore, to determine what a dependent patent

02:26:38  23  claim covers, it's necessary to look at both the dependent

02:26:41  24  claim itself and the independent claim or claims to which

02:26:46  25  it refers or from which it depends.

02:26:49  1          The claims of the patents-in-suit in this case use

02:26:53  2  the word "comprising."  Comprising means including or

02:26:58  3  containing.

02:27:01  4          A claim that includes the word "comprising,"

02:27:06  5  ladies and gentlemen, is not limited to the methods or

02:27:09  6  devices having only the elements that are recited in the

02:27:12  7  claim but also covers methods or devices that add

02:27:16  8  additional elements.

02:27:17  9          Take, for example, a claim that covers a table.

02:27:23  10  If a claim recites a table comprising a tabletop, legs, and

02:27:29  11  glue, the claim will cover any table that contains these

02:27:34  12  three structures, even if the table also contains other

02:27:38  13  structures, such as a leaf to expand the size of the

02:27:43  14  tabletop or wheels to go on the ends of the legs.

02:27:45  15          Now, that's a simple example using the word

02:27:49  16  "comprising" and what it means.  In other words, it can

02:27:52  17  have other features in addition to those that are covered

02:27:55  18  by the patent.

02:27:56  19          Now, after the applicant files an application with

02:28:01  20  the PTO, the PTO assigns an examiner, and the examiner

02:28:06  21  reviews the application to determine whether or not the

02:28:10  22  claims are patentable, that is to say, appropriate for

02:28:15  23  patent protection, and whether or not the specification

02:28:19  24  adequately describes the invention claimed.

02:28:22  25          In examining a patent application, the examiner

02:28:27  1  reviews certain information about the state of the

02:28:30  2  technology at the time the application was filed.  The PTO

02:28:35  3  searches for and reviews this type of information that was

02:28:39  4  publicly available or that was submitted by the applicant.

02:28:43  5  And this type of information is called prior art.

02:28:47  6       The examiner reviews this prior art to determine

02:28:51  7  whether or not the invention is truly an advance over the

02:28:55  8  state of the art at the time.

02:28:57  9       Prior art is defined by law, and I'll give you at

02:29:01  10 a later time specific instructions as to what constitutes

02:29:04  11 prior art.

02:29:07  12      However, in general, ladies and gentlemen, prior

02:29:09  13 art includes information that demonstrates the state of the

02:29:16  14 technology that existed before the claimed invention was

02:29:18  15 made or before the application for a patent was filed with

02:29:22  16 the PTO.

02:29:22  17      A patent contains a list of certain prior art that

02:29:28  18 the examiner has considered.  The items on this list are

02:29:32  19 called the cited references.

02:29:35  20      Now, after the prior art search and the

02:29:38  21 examination of the application by the examiner, the

02:29:42  22 examiner informs the applicant in writing of what the

02:29:45  23 examiner has found and whether the examiner considers any

02:29:51  24 claim to be patentable, in which case it would be allowed.

02:29:57  25 This writing from the examiner to the applicant is called

02:29:59  1  an Office Action.

02:30:00  2          If the examiner rejects the claims, the applicant

02:30:04  3  has an opportunity to respond to the examiner to try to

02:30:08  4  persuade the examiner to allow the claims.  The applicant

02:30:12  5  also has a chance to change or amend the claims or to

02:30:17  6  submit altogether new claims.

02:30:19  7          Now, these papers generated during these

02:30:23  8  communications back and forth between the examiner and the

02:30:25  9  applicant are called the prosecution history.

02:30:30  10         Now, this process may go on back and forth between

02:30:34  11  the applicant and the examiner for some time until at some

02:30:38  12  point the examiner is satisfied that the application meets

02:30:41  13  the requirements for a patent.  And in that case, the

02:30:46  14  application issues as a U.S. patent.

02:30:49  15         Or in the alternative, if the examiner ultimately

02:30:53  16  concludes that the application should be rejected, then no

02:30:56  17  patent is issued.

02:30:58  18         Sometimes patents are issued after appeals within

02:31:02  19  the PTO or to a court.  The fact that the PTO grants a

02:31:07  20  patent does not necessarily mean that any invention claimed

02:31:11  21  in the patent, in fact, deserves the protection of a

02:31:15  22  patent.

02:31:15  23         While each United States patent that is issued by

02:31:19  24  the PTO is presumed to be valid under the law, a person

02:31:24  25  accused of infringement has the right to argue in federal

02:31:29  1    court that a claimed invention in a patent is invalid.

02:31:35  2            It's your job, ladies and gentlemen, as the jury,

02:31:38  3    to consider whether the evidence presented by the parties

02:31:42  4    and to determine independently and for yourselves whether

02:31:46  5    or not the Defendant has proven that a patent is invalid.

02:31:51  6            Now, to help you follow the evidence, I'll give

02:31:54  7    you a brief summary of the positions of the two parties.

02:31:56  8            Of course, there are more than one Defendant.

02:32:00  9    There are three Defendants, as I called out earlier.  We

02:32:03  10   will call them collectively Samsung, even though there are

02:32:06  11   three of them.  And when I say two parties, I mean Samsung

02:32:11  12   as the Defendant and Solas as the Plaintiff.

02:32:12  13           Now, as you know, the party that brings a lawsuit

02:32:17  14   is called the Plaintiff.  In this case, the Plaintiff is

02:32:20  15   Solas OLED Limited, which is referred to as either Solas or

02:32:25  16   simply the Plaintiff.

02:32:25  17           And as you know, the party against whom a lawsuit

02:32:29  18   is brought is called the Defendant.  And in this case, we

02:32:32  19   have three Defendants.  They are Samsung Display Company,

02:32:38  20   Limited; Samsung Electronics Company, Limited; and Samsung

02:32:43  21   Electronics America, Inc.  And these three Defendants will

02:32:48  22   either be called collectively the Defendants over the

02:32:52  23   course of the trial, or they may also be referred to

02:32:55  24   collectively simply by being called Samsung.

02:32:58  25           Now, as I told you during jury selection, this is

02:33:00  1    a case of alleged patent infringement.  And as I mentioned,

02:33:07  2    there are three separate United States patents that have

02:33:09  3    been asserted in this case.

02:33:10  4          The first asserted patent in this case is United

02:33:14  5    States Patent No. 6,072,450.  And as you may have been

02:33:20  6    told, patents are commonly referred to by the last three

02:33:23  7    digits of their patent number.

02:33:26  8          So in this case, Patent No. 6,072,450 will

02:33:32  9    probably in all likelihood be called throughout the trial

02:33:36  10   the '450 patent.  You may hear it called the '450 patent.

02:33:39  11   But the last three digits will be the identifying name for

02:33:43  12   that particular patent.

02:33:44  13         The second patent at issue in this case is United

02:33:49  14   States Patent No. 7,446,338, which you'll hear referred to

02:33:56  15   in the same way as the '338 or the '338 patent.

02:33:59  16         And the third and final United States patent at

02:34:03  17   issue and which has been asserted in this case is United

02:34:06  18   States Patent No. 9,256,311, which you'll hear referred to

02:34:12  19   throughout the case as the '311 or the '311 patent.

02:34:15  20         Now, these patents can be referred to and will be

02:34:20  21   referred to at various times over the course of the trial

02:34:22  22   collectively and together as the patents-in-suit.  They're

02:34:28  23   sometimes also called the asserted patents.  And these

02:34:33  24   patents generally relate to mobile phone screens.

02:34:38  25         Now, the Plaintiff in this case, Solas, contends

02:34:41   1   that the Defendants, Samsung, are willfully infringing

02:34:46   2   certain claims of one of the three patents-in-suit by

02:34:50   3   importing, making, or selling products that include their

02:34:54   4   patented technology.

02:34:55   5          Solas also contends that Samsung has induced or

02:35:01   6   contributed to or continue -- and continues to induce or

02:35:06   7   contribute to infringement by others.

02:35:07   8          Solas also contends that it's entitled to money

02:35:11   9   damages as a result of such infringement.

02:35:15  10          Now, the Defendants, Samsung, deny that they are

02:35:22  11   infringing any of the claims of the patents-in-suit

02:35:24  12   asserted by the Plaintiffs, and they contend that the

02:35:27  13   asserted claims of two of the three patents-in-suit are

02:35:30  14   invalid as either being anticipated or obvious in the light

02:35:34  15   of prior art.

02:35:35  16          Samsung also contends that the asserted claims of

02:35:41  17   one of the patents-in-suit is invalid because the patent

02:35:49  18   specification does not contain a sufficient written

02:35:52  19   description of the invention and does not enable a person

02:35:56  20   skilled in the art to make and use the invention.  That is

02:36:01  21   the '450 or the '450 patent.

02:36:03  22          Finally, the '338 patent is not alleged to be

02:36:08  23   invalid by the Defendant, Samsung, for any reason.

02:36:12  24          Now, I know there are new words, and I know there

02:36:15  25   are a lot of new concepts that have been thrown at you

02:36:18  1  today, ladies and gentlemen.  I'm going to define a lot of

02:36:21  2  these words and concepts for you as we go through my

02:36:25  3  instructions.  The attorneys are going to discuss many of

02:36:28  4  these in their opening statements.  The witnesses are going

02:36:32  5  to help you through their testimony to understand these

02:36:35  6  terms and concepts.

02:36:36  7       So, please, ladies and gentlemen, do not feel

02:36:39  8  overwhelmed at this point.  I promise you, it will all come

02:36:43  9  together as we go through the trial.

02:36:45  10      Now, one of your jobs in this case is to decide

02:36:50  11  whether or not the asserted claims of the three asserted

02:36:53  12  patents have been infringed and whether they are invalid.

02:36:59  13      If you decide that any claim of the

02:37:01  14  patents-in-suit has been infringed by the Defendants and is

02:37:05  15  not invalid, then you'll need to decide whether or not the

02:37:10  16  infringement has been willful.

02:37:13  17      You will also then need to decide what amount of

02:37:16  18  money damages should be awarded to the Plaintiff as

02:37:20  19  compensation for that infringement.

02:37:23  20      Now, my job in this case is to tell you what the

02:37:27  21  law is, to handle matters and rulings on evidence and

02:37:30  22  procedure, and to oversee the conduct of the trial as

02:37:33  23  efficiently as possible, and to maintain the proper decorum

02:37:38  24  of this court.

02:37:40  25      In determining the law, it's specifically my job

02:37:42  1  to determine the meaning of any of the claim language from

02:37:46  2  the asserted claims of the patents-in-suit that needs

02:37:49  3  interpretation.

02:37:51  4       I have already determined the meanings of the

02:37:55  5  claims of the patents-in-suit, and you must accept the

02:37:58  6  meanings or constructions that I give you and use those

02:38:02  7  meanings when you decide whether any particular claim has

02:38:05  8  or has not been infringed and whether or not any particular

02:38:09  9  claim is invalid.

02:38:12  10       And you're going to be given a document, ladies

02:38:14  11  and gentlemen, in a few moments that will reflect these

02:38:18  12  meanings or constructions that the Court has already

02:38:20  13  reached.

02:38:20  14       Now, for any of the claim language or claim terms

02:38:23  15  that I have not provided you with a specific definition or

02:38:26  16  construction, you should apply the plain and ordinary

02:38:29  17  meaning.  But if I've provided you with a definition,

02:38:35  18  sometimes called a construction, you are to apply my

02:38:38  19  definition to those terms throughout the case.

02:38:42  20       However, my interpretation of the language of the

02:38:46  21  claims should not be taken as an indication by you that I

02:38:50  22  have a personal opinion or any opinion at all regarding the

02:38:54  23  issues of infringement and validity.  Those issues, ladies

02:38:58  24  and gentlemen, are yours as the jury to decide, and they're

02:39:01  25  yours to decide alone.

02:39:02   1          Now, I'll provide you with more detailed

02:39:06   2   instructions on the meanings of the claims before you

02:39:08   3   retire to deliberate and reach your verdict.

02:39:11   4          In deciding the issues that are before you, you

02:39:15   5   will be asked to consider specific legal rules, and I'll

02:39:18   6   give you an overview of those rules now, and then at the

02:39:22   7   conclusion of the case, I'll give you more detailed

02:39:25   8   instructions.

02:39:25   9          The first issue you're asked to decide is whether

02:39:29   10   the Defendants, Samsung, have infringed any of the asserted

02:39:34   11   claims of the patents-in-suit.

02:39:37   12          Infringement, ladies and gentlemen, is assessed on

02:39:39   13   a claim-by-claim basis.  And Solas, the Plaintiff, must

02:39:45   14   show by a preponderance of the evidence that a claim has

02:39:49   15   been infringed.  Therefore, there may be infringement as to

02:39:53   16   one claim but no infringement as to another claim.

02:39:57   17          There are also a few different ways that a patent

02:40:03   18   can be infringed, and I'll explain the requirements for

02:40:06   19   each of these types of infringement to you in detail at the

02:40:09   20   conclusion of the case.

02:40:11   21          But, in general, a Defendant may infringe an

02:40:14   22   asserted patent by making, using, selling, or offering for

02:40:17   23   sale in the United States or importing into the United

02:40:22   24   States a product meeting all of the requirements of a claim

02:40:25   25   of the asserted patent.

02:40:27  1          As I say, I'll provide you with more detailed

02:40:29  2   instructions on the requirements for infringement at the

02:40:36  3   conclusion of the case.

02:40:37  4          Now, the second issue that you'll be asked to

02:40:40  5   decide is whether any of the asserted patents are invalid.

02:40:42  6          Invalidity, ladies and gentlemen, is a defense to

02:40:46  7   infringement.  Therefore, even though the United States

02:40:51  8   Patent and Trademark Office has allowed the asserted claims

02:40:55  9   and issued a patent and even though an issued patent is

02:41:00  10  presumed under the law to be valid, you, the jury, must

02:41:04  11  decide whether those claims are invalid after hearing the

02:41:08  12  evidence presented in this case.

02:41:10  13         Now, you may find that a patent claim is invalid

02:41:15  14  for a number of reasons, including because it claims

02:41:19  15  subject matter that is not new or because it is obvious.

02:41:23  16         For a patent claim to be invalid because it is not

02:41:30  17  new, the Defendant must show you by clear and convincing

02:41:33  18  evidence that all of the elements of the claim are

02:41:36  19  sufficiently described in a single previously printed

02:41:42  20  publication or patent.

02:41:43  21         If a claim, ladies and gentlemen, is not new, it

02:41:46  22  is said to be anticipated.

02:41:49  23         Now, another way that a claim can be found to be

02:41:52  24  invalid is that it may have been obvious.  Even though a

02:41:57  25  claim is not anticipated because every element of the claim

02:42:01  1   is not shown or sufficiently described in a single piece of

02:42:05  2   prior art, the claim may still be invalid if it would have

02:42:10  3   been obvious to a person of ordinary skill in the field of

02:42:15  4   technology of the patent at the relevant time.

02:42:18  5        Now, you will need to consider a number of

02:42:21  6   questions in deciding whether the inventions claimed in the

02:42:25  7   asserted patents is obvious.  And I'll provide you with

02:42:28  8   more detailed instructions on those questions at the

02:42:31  9   conclusion of the trial.

02:42:34  10       Another way that a claim can be found to be

02:42:37  11  invalid is there may have been a lack of an adequate

02:42:40  12  written description.

02:42:42  13       A patent may be -- excuse me.  A patent may be

02:42:45  14  invalid if its specification does not describe the claimed

02:42:49  15  invention in sufficient detail so that one skilled in the

02:42:54  16  art can reasonably conclude that the inventor actually had

02:42:57  17  possession of the invention that they are claiming.

02:43:01  18       If you decide that any claim of the

02:43:03  19  patents-in-suit has been infringed and that claim is not

02:43:08  20  invalid, then you'll need to decide whether the

02:43:13  21  infringement by the Defendants has been willful.

02:43:17  22       You will also need to decide what amount of money

02:43:21  23  damages should be awarded to the Plaintiff, in this case

02:43:24  24  Solas, to compensate it for that infringement.

02:43:28  25       A damage award, ladies and gentlemen, must be

02:43:30  1  adequate to compensate the patentholder for the

02:43:34  2  infringement, and in no event may a damage award be less

02:43:40  3  than what the patentholder would have received if it had

02:43:42  4  been paid a reasonable royalty for the use of its patent.

02:43:47  5       However, the damages that you award, if any, are

02:43:53  6  meant to compensate the patentholder and they're not meant

02:43:57  7  to punish the Defendant.

02:43:58  8       You may not include in any damages award an

02:44:01  9  additional amount as a fine or penalty above what is

02:44:04  10  necessary to fully compensate the patentholder for any

02:44:07  11  infringement that you have found.

02:44:13  12       Moreover, damages cannot be speculative, and the

02:44:15  13  Plaintiff, Solas, must prove the amount of its damages for

02:44:19  14  the alleged infringement by a preponderance of the

02:44:22  15  evidence.

02:44:22  16       I'll give you more instructions on the calculation

02:44:26  17  of damages for the Defendants' alleged infringement of the

02:44:32  18  patents-in-suit at the conclusion of the trial, including

02:44:34  19  by instructing you on the specific instructions regarding

02:44:37  20  the calculation of a reasonable royalty.

02:44:39  21       However, ladies and gentlemen, the fact that I am

02:44:43  22  instructing you about damages does not mean that Solas is

02:44:48  23  or is not entitled to recover damages.

02:44:52  24       Now, over the course of the trial, you're going to

02:44:56  25  be hearing from a number of different witnesses, and I want

02:45:00   1   you to keep an open mind while you're listening to the

02:45:03   2   evidence and not decide any of the facts until you have

02:45:07   3   heard all of the evidence.

02:45:08   4          And this is important, ladies and gentlemen.

02:45:13   5   While the witnesses are testifying, remember, you, the

02:45:17   6   jury, will have to decide the degree of credibility and

02:45:20   7   believability to allocate to each of the witnesses and the

02:45:26   8   evidence that they give.  So while the witnesses are

02:45:29   9   testifying, you should be asking yourselves things like

02:45:31   10   this:

02:45:32   11          Does the witness impress you as being truthful?

02:45:36   12   Did he or she have a reason not to tell the truth?  Does he

02:45:39   13   or she have any personal interest in the outcome of the

02:45:42   14   case?  Does the witness seem to have a good memory?  Did he

02:45:47   15   or she have the opportunity and ability to observe

02:45:50   16   accurately the things that they testified about?  Did the

02:45:54   17   witness appear to understand the questions clearly and

02:45:57   18   answer them directly?  And, of course, does the witness's

02:46:01   19   testimony differ from the testimony of other witnesses?

02:46:06   20   And if it does, how does it differ?

02:46:09   21          These are some of the kinds of things that you

02:46:11   22   should be thinking about while you're listening to each

02:46:14   23   witness during the trial of this case and while each

02:46:17   24   witness testifies from the witness stand.

02:46:18   25          Also, ladies and gentlemen, I want to talk to you

02:46:23  1  briefly about expert witnesses.

02:46:25  2      When knowledge of a technical subject that may be

02:46:30  3  helpful to you, the jury, a person who has special training

02:46:34  4  and experience in that particular field, we call them an

02:46:39  5  expert witness, that witness is permitted to testify to you

02:46:42  6  about his or her opinions on technical matters.

02:46:48  7      However, you're not required to accept an expert's

02:46:52  8  or any other witness's opinions at all.  It's up to you to

02:46:55  9  decide who to believe and who not to believe and whether an

02:47:02  10 expert witness or any witness, for that matter, is correct

02:47:04  11 or incorrect about what they tell you.

02:47:06  12      Now, I anticipate that there will be expert

02:47:09  13 witnesses testifying in support of both the Plaintiff and

02:47:12  14 the Defendants, but it will be up to you, when an expert

02:47:17  15 witness testifies, to listen to their qualifications, and

02:47:20  16 when they give you an opinion and explain the basis for

02:47:24  17 that opinion, you will have to evaluate what they say,

02:47:28  18 whether you believe what they say, and to what degree, if

02:47:32  19 any, that you want to give that opinion weight.

02:47:35  20      Remember, ladies and gentlemen, judging and

02:47:38  21 evaluating the credibility and believability of each and

02:47:42  22 every witness is an important part of your job as jurors.

02:47:47  23      Now, during the course of the trial, it's possible

02:47:52  24 that there will be testimony from one or more witnesses

02:47:55  25 that are going to be presented to you through what's called

02:47:57   1   a deposition.

02:47:59   2            In trials like this, it's difficult and sometimes

02:48:03   3   almost impossible to get every witness physically present

02:48:07   4   in court to testify at the same time.

02:48:10   5            Therefore, before the trial begins, the lawyers

02:48:14   6   for both sides take the depositions of the witnesses.  In a

02:48:18   7   deposition, the witness is present and sworn and placed

02:48:23   8   under oath, a court reporter is present, and the lawyers

02:48:26   9   for both Plaintiff and Defendants are present.

02:48:30   10           The witness is asked questions and gives answers

02:48:33   11   to those questions under oath, and those answers to the

02:48:37   12   questions and the questions asked are taken down and

02:48:41   13   transcribed and recorded.

02:48:43   14           Often in these depositions, in addition to taking

02:48:45   15   down the written version of the questions and answers, the

02:48:49   16   actual deposition is recorded by video so that you can see

02:48:53   17   the witness, hear the question asked, and hear the answer

02:48:57   18   given.

02:48:58   19           These depositions generally, ladies and gentlemen,

02:49:05   20   go on for several hours at a time.  If a witness is going

02:49:09   21   to be presented at trial through a deposition and they

02:49:12   22   cannot appear in person, then portions of that deposition

02:49:17   23   will be selected by the parties to be played to the jury as

02:49:20   24   that witness's testimony.

02:49:24   25           And you will not have to listen to a seven-hour

02:49:27  1   deposition.  You may hear a few minutes or some portion of

02:49:30  2   it that has been selected by Plaintiff and Defendant to be

02:49:35  3   presented to you from that witness.

02:49:36  4        So when you see deposition testimony that will be

02:49:40  5   played to you, if it looks like there are places where it

02:49:44  6   is spliced together or joined together, that's so the part

02:49:49  7   that's not important for you to hear is cut out, and you

02:49:52  8   don't have to listen to seven hours straight to get 20 or

02:49:55  9   30 minutes' worth of important testimony before you.

02:49:58 10        So if you see areas in deposition witnesses that

02:50:00 11   look like they're spliced or there's a transition, they

02:50:04 12   are.  But that's to save you a lot of time and effort.  The

02:50:08 13   important part, the part that the Plaintiff and the

02:50:09 14   Defendants believe that you should hear as evidence in this

02:50:11 15   case, will be played to you as that deposition testimony.

02:50:15 16        And I want to remind you, ladies and gentlemen,

02:50:20 17   that deposition testimony is entitled to the same

02:50:23 18   consideration and, to the extent possible, is to be

02:50:27 19   evaluated by you, the jury, in the same way as if the

02:50:30 20   witness had appeared in Court and testified live from the

02:50:33 21   witness stand.

02:50:34 22        Now, during the course of the trial, it's possible

02:50:44 23   that the lawyers will periodically make certain objections,

02:50:46 24   and when they do, I will give rulings on those objections.

02:50:51 25        It's the duty of an attorney to object on each

02:50:54  1  side of the case if the other side purports to offer

02:50:57  2  testimony or other evidence that the objecting attorney

02:51:00  3  believes is not proper under the rules of the Court or the

02:51:05  4  orders of the Court.

02:51:06  5        Now, upon allowing the testimony or other evidence

02:51:09  6  to be introduced over an objection of an attorney, the

02:51:13  7  Court does not, unless expressly stated, indicate an

02:51:16  8  opinion about the weight or effect of that testimony.  As

02:51:21  9  I've said before, you are the sole judges of the

02:51:24  10  credibility and believability of all the witnesses and the

02:51:27  11  weight and effect, if any, to give to the testimony that's

02:51:30  12  presented through the course of this trial.

02:51:32  13        Now, I want to compliment all the parties in this

02:51:37  14  case and their counsel in this case because prior to this

02:51:41  15  trial today, both sides have worked with the Court very

02:51:44  16  diligently to go through the exhibits that will be

02:51:47  17  presented in this trial.

02:51:49  18        And any exhibits proposed by either party that the

02:51:52  19  other side has objected to, the Court has considered those

02:51:56  20  objections in earlier pre-trial hearings before you were

02:52:00  21  selected and seated.

02:52:04  22        And I've heard all the arguments, I've seen all

02:52:07  23  the documents, and I've already decided what is admissible.

02:52:09  24  And in those cases, the objections have been overruled and

02:52:13  25  the document has been considered to be an exhibit.

| | | |
|---|---|---|
| 02:52:16 | 1 | Or in those cases where I think the document is |
| 02:52:18 | 2 | not admissible under the Rules of Evidence, then I have |
| 02:52:22 | 3 | sustained the objection, and the exhibit is not a part of |
| 02:52:25 | 4 | this case -- the document is not a part of this case, and |
| 02:52:28 | 5 | you'll never see it. |
| 02:52:30 | 6 | That means, ladies and gentlemen, that from that |
| 02:52:33 | 7 | list of pre-admitted exhibits that the Court's already |
| 02:52:36 | 8 | acted on and approved as to its admissibility, you don't |
| 02:52:40 | 9 | have to sit through all those arguments, and you don't |
| 02:52:43 | 10 | hear -- have to hear the back-and-forth between the lawyers |
| 02:52:45 | 11 | about whether it is or isn't admissible under the Rules of |
| 02:52:50 | 12 | Evidence.  I've already done that.  And with their effort |
| 02:52:53 | 13 | and my effort together, we have saved you hours and hours |
| 02:52:55 | 14 | of time listening to all of that. |
| 02:52:57 | 15 | We are now in a position where all those documents |
| 02:53:01 | 16 | have been dealt with, and either side can show you any item |
| 02:53:04 | 17 | from the list of exhibits that I've already approved and |
| 02:53:07 | 18 | simply show it to you and use it over the course of the |
| 02:53:10 | 19 | trial without a formal offer, without a predicate, without |
| 02:53:13 | 20 | an argument, without a dispute. |
| 02:53:16 | 21 | So I don't know if you understand it, but there |
| 02:53:19 | 22 | are many hours that we've already expended that have saved |
| 02:53:23 | 23 | you from sitting there and listening to that.  The exhibits |
| 02:53:26 | 24 | that are shown to you have already been pre-admitted by the |
| 02:53:29 | 25 | Court through these pre-trial procedures, which means I've |

02:53:32  1    already made a decision about the admissibility of those

02:53:35  2    exhibits, and a lot of time has been saved on your part

02:53:38  3    because of that work that the parties and their counsel

02:53:41  4    have done with the Court in advance.

02:53:43  5          So if the parties show you an exhibit over the

02:53:45  6    course of the trial, if either side does, it means that

02:53:48  7    I've already determined it's admissible, and they can

02:53:51  8    simply show it to you and ask such questions as they choose

02:53:56  9    and put it in a proper context with any witness.

02:53:58  10         I just want you to understand there's been a lot

02:54:02  11   of work to streamline that before today.  And I think it

02:54:06  12   will become apparent to you as we go forward with the

02:54:10  13   trial.  However, that being case -- that being the case,

02:54:12  14   it's still possible that objections will arise during the

02:54:15  15   course of the trial.

02:54:19  16         If I should sustain an objection to a question

02:54:21  17   addressed to a witness, then you must disregard the

02:54:24  18   question entirely, and you may draw no inference from its

02:54:29  19   wording or speculate in your own mind about what the

02:54:31  20   witness would have said if I had permitted them to answer

02:54:35  21   the question.

02:54:39  22         On the other hand, ladies and gentlemen, if I

02:54:41  23   overrule an objection to a question addressed to a witness,

02:54:43  24   then the witness will answer the question, and you should

02:54:46  25   consider the answer and the question just as if no

02:54:49   1   objection had been made.

02:54:51   2        Now, you should know that the law of the United

02:54:54   3   States permits a United States District Judge to comment to

02:54:57   4   the jury regarding the evidence in the case, but such

02:55:00   5   comments from the Judge on the evidence are only an

02:55:05   6   expression of the Judge's opinion.

02:55:07   7        And the jury can disregard those comments in their

02:55:09   8   entirety, because as I've said before, you, the jury, are

02:55:12   9   the sole judges of the facts.  You are the sole judges of

02:55:16   10   the credibility and believability of the witnesses and how

02:55:19   11   much weight, if any, to give to all of the testimony that's

02:55:23   12   presented to you over the course of the trial.

02:55:25   13        So even though the law of the United States

02:55:28   14   permits me to offer comments on the evidence, as I told you

02:55:32   15   during jury selection, I'm going to work very hard not to

02:55:35   16   do that and not to indicate to you what I think about any

02:55:38   17   of the evidence presented over the course of the trial.

02:55:42   18   Evaluating and considering the evidence and from that

02:55:45   19   determining what the facts are in this case is your job,

02:55:49   20   ladies and gentlemen.  It's not my job.

02:55:51   21        Now, the court reporter in front of me,

02:55:56   22   Ms. Holmes, is taking down everything that's said in the

02:55:59   23   courtroom.  And the transcription of everything that's said

02:56:02   24   over the course of the trial is being prepared in case

02:56:06   25   there is an appeal of this case or for other purposes, but

02:56:09  1    I want you to understand it is not being prepared so that

02:56:13  2    you will have it to use as a resource during your

02:56:15  3    deliberations after you've heard all the evidence.  You're

02:56:21  4    not going to have a written version of all this testimony.

02:56:24  5    You're going to have to rely on your memories of the

02:56:27  6    evidence over the course of the trial.

02:56:29  7          Now, in a moment, each member of the jury is going

02:56:31  8    to be given a juror notebook.  And in the back of those

02:56:34  9    notebooks, you'll find legal pads, and you'll find a pen in

02:56:38  10   the front pocket where you can make notes as the witnesses

02:56:41  11   testify over the course of the trial.

02:56:42  12         It's up to each member of the jury to decide

02:56:45  13   whether you want to make notes, and if you want to take

02:56:48  14   notes, how extensively or not you want those notes to be.

02:56:53  15         But, remember, any notes taken by any member of

02:56:56  16   the jury are for that juror's personal use only.  You still

02:56:59  17   have to rely on your memory of the evidence.  And that's

02:57:03  18   why you need to pay close attention, as I'm sure you will,

02:57:06  19   to the testimony of each and every witness.

02:57:08  20         You should not abandon your own recollection

02:57:12  21   because some other juror's notes indicate something

02:57:17  22   differently.  The notes that you take are to refresh your

02:57:20  23   recollection, and that's the only reason you should be

02:57:22  24   taking them.

02:57:23  25         I'm going to ask our Court Security Officer at

02:57:25  1  this time to pass out these juror notebooks to the members

02:57:28  2  of the jury.

02:57:29  3          Thank you, Mr. Johnston.

02:58:44  4          Ladies and gentlemen, in these notebooks, you'll

02:58:47  5  see that you each have a copy of each of the three

02:58:50  6  patents-in-suit.  You're also going to find a section for

02:58:55  7  the witnesses that may testify in this case.  And for each

02:58:59  8  witness that may testify, there should be a separate tabbed

02:59:02  9  page for that witness with their picture superimposed at

02:59:08  10 the top of the page and their name there, as well,

02:59:11  11 identifying them.  The remainder of those pages have ruled

02:59:14  12 lines on there for note taking if you choose to do that at

02:59:18  13 that juncture.

02:59:19  14         You'll also find a chart in there that provides

02:59:22  15 you with the Court's construction or definitions of certain

02:59:26  16 parts of the language from the asserted claims.  Those are

02:59:29  17 the definitions or constructions that I told you I have

02:59:33  18 already reached, and you must apply my constructions or

02:59:36  19 definitions to that claim language in deciding the issues

02:59:40  20 that you are required to decide.

02:59:42  21         You should find a chart with on one side the

02:59:47  22 language from the claims that needed to be construed or

02:59:50  23 interpreted by the Court, and directly across from it the

02:59:54  24 actual construction or definition that the Court has

02:59:56  25 already reached and given to you.  You must use my

02:59:59   1   definitions or constructions as you discharge your duty as

03:00:03   2   jurors.

03:00:03   3          And, again, you should find a new three-hole

03:00:08   4   punched legal pad in the back for additional note taking.

03:00:10   5          Now, ladies and gentlemen, these notebooks should

03:00:14   6   be in your possession throughout the trial.  They're not to

03:00:18   7   be left around loosely.  They should either be with you in

03:00:21   8   the jury box where you are now, or they should be on the

03:00:24   9   table in the jury room.

03:00:27  10          At the end of each day, I'm going to ask you to

03:00:29  11   leave them on the table in the jury room as you exit the

03:00:33  12   courthouse and go to your respective homes.  They'll be

03:00:38  13   there in the morning when you come back.

03:00:40  14          There may be one slight exception to this rule,

03:00:43  15   and that is over the course of the trial, we may take a

03:00:45  16   short recess or break where I will simply say, because I

03:00:48  17   know you're not going to be out of the jury box very long,

03:00:51  18   I may say, ladies and gentlemen, you can simply close and

03:00:54  19   leave your notebooks in your chairs.  And in that case, you

03:00:58  20   can simply close them, put them where you're seated, and

03:01:00  21   they'll be there when you get back.

03:01:03  22          But unless I give you those kind of instructions,

03:01:06  23   they either need to be in your hands in your possession, or

03:01:10  24   they need to be on the table in the jury room and not left

03:01:14  25   out in the courtroom.

03:01:15   1          Now, in a moment, we're going to get to the

03:01:18   2   lawyers' opening statements.  These opening statements,

03:01:20   3   ladies and gentlemen, are designed to give you a roadmap of

03:01:23   4   what each side expects that their evidence will show you.

03:01:30   5          You should remember throughout the trial, ladies

03:01:32   6   and gentlemen, that what the lawyers tell you is not

03:01:33   7   evidence.  I'll say that again.  What the lawyers tell you

03:01:38   8   is not evidence.

03:01:40   9          The evidence in this case will be the sworn

03:01:44  10   testimony from the witnesses from the witness stand who

03:01:47  11   testify to you subject to cross-examination, and that

03:01:50  12   includes any witnesses who present testimony through a

03:01:53  13   sworn deposition where you see and hear the testimony, but

03:01:57  14   the person is not physically present in the courtroom.

03:02:00  15          They've nonetheless been sworn and are under oath

03:02:02  16   and are subject to cross-examination, and that deposition

03:02:05  17   testimony and the live testimony of the witnesses who

03:02:09  18   appear and testify under oath in this courtroom and the

03:02:12  19   exhibits that you are shown that the Court has admitted

03:02:16  20   into evidence, those are the evidence in this case, nothing

03:02:20  21   else, and certainly not what the lawyers tell you.

03:02:23  22          Now, what the lawyers tell you is their impression

03:02:29  23   of what they believe the evidence is, and they have a duty

03:02:32  24   to try and point out to you where they believe the evidence

03:02:35  25   supports their side of the case.

03:02:37   1          But, remember, what they're telling you is not

03:02:40   2   evidence itself.

03:02:42   3          Now, after the lawyers present their opening

03:02:45   4   statements, the Plaintiff will go forward with its evidence

03:02:49   5   and its case.  This is called the Plaintiff's

03:02:52   6   case-in-chief, and the Plaintiff will call its witnesses

03:02:55   7   and present its testimony.

03:02:56   8          After the witnesses have been called and

03:03:00   9   testified, cross-examined, and released by the Court and

03:03:04  10   all the Plaintiff's witnesses have been called, the

03:03:07  11   Plaintiff will rest its case-in-chief.

03:03:10  12          And when the Plaintiff rests its case-in-chief,

03:03:12  13   then we will transition to the Defendants' case-in-chief,

03:03:16  14   and the Defendants will call their witnesses and present

03:03:18  15   their testimony, and their witnesses will be cross-examined

03:03:22  16   by the Plaintiff.

03:03:23  17          And when all the Defendants' testimony and

03:03:25  18   witnesses have been presented, then the Defendants will

03:03:28  19   rest their case-in-chief.

03:03:32  20          At that point, the rules allow for the Plaintiff

03:03:35  21   to present what are called rebuttal witnesses to rebut what

03:03:38  22   the Defendants have shown in their case-in-chief.  The

03:03:41  23   Plaintiff is not required to present rebuttal witnesses.

03:03:44  24   We won't know until we get to that point if the Plaintiff

03:03:47  25   chooses to.

03:03:48   1         But if the Plaintiff calls rebuttal witnesses,

03:03:51   2   then those witnesses will testify in the same way and will

03:03:54   3   be subject to cross-examination by the Defendants.

03:03:57   4         And when all the Plaintiff's rebuttal witnesses,

03:04:01   5   if any, have testified, then at that point, ladies and

03:04:03   6   gentlemen, you will have heard all the evidence in this

03:04:06   7   case.

03:04:06   8         Once you've heard all the evidence in this case,

03:04:11   9   then I will present to you my final instructions on the law

03:04:15   10  that you are to apply -- are to apply.  Those instructions

03:04:19   11  from the Court to the jury are sometimes called the Court's

03:04:22   12  charge to the jury.

03:04:24   13        Once I've given you my charge, my final

03:04:26   14  instructions, then the lawyers for both sides will present

03:04:29   15  their closing arguments to you.

03:04:32   16        And once the closing arguments have been completed

03:04:35   17  by both sides, then I will instruct you to retire to the

03:04:39   18  jury room, I will send with you the verdict form that

03:04:44   19  contains the questions in it that you are to answer, and at

03:04:48   20  that magic moment, you go from being precluded from talking

03:04:52   21  to each other about the evidence, to being obligated to

03:04:55   22  talk to each other about the evidence as a part of

03:04:58   23  addressing those questions and doing your best to come to a

03:05:01   24  unanimous conclusion and answer to each of those questions

03:05:04   25  in the verdict form.

03:05:04   1          As I've said earlier, you are not to discuss the
03:05:09   2   case and you are not to communicate about the case with
03:05:12   3   anyone in any way, including the eight of yourselves, until
03:05:17   4   such time as all the evidence has been heard, you've
03:05:20   5   received my final instructions, you've heard counsel's
03:05:23   6   closing arguments, and I instruct you to retire to the jury
03:05:26   7   room and to deliberate and consider your verdict in this
03:05:32   8   case.
03:05:32   9          That's when it all changes.  That's when you must
03:05:35   10  discuss the evidence with each other in attempting to
03:05:37   11  answer those questions and come to a unanimous decision
03:05:40   12  about the proper answers to those questions.
03:05:43   13         Let me also remind you, as I did earlier, that
03:05:46   14  throughout this trial, there are going to be unavoidable
03:05:49   15  times when you are in close proximity or pass right by one
03:05:53   16  or more of these lawyers, one or more of these party
03:05:55   17  representatives, one or more of these witnesses, or some
03:05:59   18  support person from each trial team.
03:06:01   19         You can look out in this courtroom.  Most of the
03:06:04   20  people out there are not spectators.  Most of the people
03:06:08   21  out there are associated with one side or the other in this
03:06:10   22  case.
03:06:12   23         And when you come in close proximity to one or
03:06:15   24  more of these folks, they're not going to speak.  They're
03:06:18   25  not going to be friendly.  They're not going to stop and

03:06:21  1   start a conversation with you.  And when that happens,

03:06:23  2   don't hold it against them.  Don't think they're being rude

03:06:25  3   or unfriendly or penalize them in any way.  They are simply

03:06:29  4   doing what I have instructed them they have to do.  And

03:06:32  5   please keep that in mind.

03:06:34  6            Now, with these instructions, ladies and

03:06:36  7   gentlemen, we will proceed to hear opening statements from

03:06:39  8   the parties.  We'll begin with the Plaintiff's opening

03:06:42  9   statement.

03:06:42  10            Mr. Fenster, you may present Plaintiff's opening

03:06:52  11   statement.  Do you want some warning or direction on your

03:06:57  12   time, sir?

03:06:58  13            MR. FENSTER:  No, Your Honor.  Thank you.

03:06:59  14            THE COURT:  All right.  I understand Mr. Ward will

03:07:00  15   also be sharing the time with you.  But you may proceed

03:07:04  16   with the beginning portion of your opening statement,

03:07:06  17   Mr. Fenster.

03:07:06  18            MR. FENSTER:  May it please the Court.

03:07:33  19            Good afternoon, ladies and gentlemen.  My name is

03:07:36  20   Marc Fenster, and together with Mr. Ward and our team, we

03:07:39  21   have the pleasure of representing the Plaintiff in this

03:07:41  22   case, Solas OLED.

03:07:43  23            On behalf of Solas OLED and Mr. Gerry Padian, the

03:07:50  24   co-founder, first, I want to thank you.  I want to thank

03:07:53  25   you for your sacrifice.  This is, as Judge Gilstrap told

| | | |
|---|---|---|
| 03:07:57 | 1 | you, an important case, and we understand, especially in |
| 03:08:00 | 2 | these extraordinary times, the extraordinary sacrifices |
| 03:08:05 | 3 | that each of you are making to be here to help decide this |
| 03:08:09 | 4 | important matter. |
| 03:08:09 | 5 | Our job in opening, as Judge Gilstrap told you, is |
| 03:08:14 | 6 | to give you a roadmap of what the evidence will show in |
| 03:08:17 | 7 | this case.  As you've heard, this is a patent case, and the |
| 03:08:22 | 8 | technology in this case is complicated, but the issues are |
| 03:08:26 | 9 | pretty simple. |
| 03:08:28 | 10 | You may have heard of that book, All I Really Need |
| 03:08:31 | 11 | to Know I Learned in Kindergarten.  Play fair.  Don't take |
| 03:08:36 | 12 | what doesn't belong to you.  Take responsibility for your |
| 03:08:40 | 13 | own actions. |
| 03:08:42 | 14 | Well, this case is about Samsung's infringement of |
| 03:08:47 | 15 | Solas's patented inventions.  Samsung took what didn't |
| 03:08:53 | 16 | belong to them and used it without permission for years, |
| 03:08:58 | 17 | and that's what we're going to prove to you over the course |
| 03:09:01 | 18 | of this case. |
| 03:09:01 | 19 | It's undisputed that Sam -- Solas owns the three |
| 03:09:09 | 20 | patents at issue in this case.  It's also undisputed, |
| 03:09:12 | 21 | ladies and gentlemen, that Samsung does not have permission |
| 03:09:16 | 22 | or a license to use these patents. |
| 03:09:20 | 23 | This case is about Samsung's infringement of |
| 03:09:25 | 24 | Solas's patents and how much Samsung owes Solas for its use |
| 03:09:30 | 25 | of those patents in its best-selling phones for years and |

```
03:09:34   1   years.
03:09:34   2          As you heard -- as you saw in the patent video
03:09:39   3   this morning, our founding fathers believed that patent
03:09:45   4   rights were so fundamental to the success of our country
03:09:49   5   that they wrote the patent system right into the very first
03:09:53   6   article of the Constitution of the United States.  The
03:09:56   7   driving principle of our patent system is that awarding
03:10:04   8   patents to inventors is the best way to encourage
03:10:06   9   innovation.  Abraham Lincoln, I think, said it best.  He
03:10:14  10   said that patents added the fuel of interest to the fire of
03:10:18  11   genius.
03:10:18  12          Now, fundamentally patents are property rights, no
03:10:23  13   different than owning your homestead or a piece of land.
03:10:26  14   And just like someone can't trespass on your property
03:10:30  15   without your permission, no one can use your patented
03:10:33  16   invention without your permission.
03:10:34  17          Now, Mr. Padian is the co-founder and director of
03:10:40  18   Solas.  He's going to be here throughout trial representing
03:10:44  19   Solas, and he will testify live for you.  He will explain
03:10:48  20   Solas's mission, how Solas came to own the patents-in-suit,
03:10:54  21   and he will explain the investment and hard work that Solas
03:10:57  22   and its employees had to make to be here.
03:10:59  23          Now, Solas's patents cover inventions related to
03:11:08  24   flexible touchscreen displays.  These are the advanced
03:11:12  25   touchscreen displays that are in Samsung's mobile phones.
```

03:11:16  1        AMOLED, you'll hear that term, it's called

03:11:19  2   Active-Matrix Organic Light-Emitting Diode.  We're going to

03:11:22  3   explain all this.  You'll learn what that is.  It's

03:11:26  4   basically the latest and greatest in the displays that we

03:11:29  5   have.

03:11:30  6        You need two things to make a touchscreen display.

03:11:35  7   First, you need a display to make the image underneath.

03:11:39  8   And on top of that, you need the touchscreen sensor, the

03:11:43  9   touch sensor.  So you need two things to make a touch

03:11:48 10   sensor display.  You need the display and the touch sensor.

03:11:50 11        This case is about Samsung's infringement of three

03:11:55 12   of Solas's patents.  One of Solas's patents, the '311

03:12:00 13   patent, relates to the touch sensor part of that

03:12:03 14   touchscreen display.  That's the Atmel flexible touch

03:12:08 15   sensor patent.  And the other two patents relate to the

03:12:11 16   display itself and how those are made.

03:12:14 17        First, we'll talk about the '311 patent.  You'll

03:12:18 18   hear testimony from the inventors of the '311 patent.

03:12:23 19        First, you'll hear from Mr. Jalil Shaikh.  He was

03:12:26 20   an engineer at Atmel.  He was in charge of the project that

03:12:31 21   became the '311 patent, and he will testify and will --

03:12:35 22   you'll also hear from Mr. Yilmaz, who was an inventor on

03:12:40 23   the patent, as well.

03:12:40 24        You will learn that Atmel was a pioneer in

03:12:47 25   flexible touch sensor display technology at the relevant

| | | |
|---|---|---|
| 03:12:49 | 1 | time. |
| 03:12:49 | 2 | Mr. Shaikh and Mr. Yilmaz will tell you how and |
| 03:13:00 | 3 | why Atmel developed a flexible touch sensor made of metal |
| 03:13:02 | 4 | mesh, which you'll learn about, that is configured to wrap |
| 03:13:08 | 5 | around the edge of a curved display. |
| 03:13:10 | 6 | They'll testify that they had the original idea |
| 03:13:13 | 7 | back in January 2011.  That's an important date because |
| 03:13:17 | 8 | that's the date of invention for the '311 patent. |
| 03:13:20 | 9 | And they will tell you that they diligently worked |
| 03:13:23 | 10 | to reduce that to make a working prototype of that, which |
| 03:13:27 | 11 | they did by July of 2011. |
| 03:13:29 | 12 | Atmel then filed a patent application for its |
| 03:13:37 | 13 | invention in October of 2011.  The United States Patent |
| 03:13:41 | 14 | Office reviewed that patent application for four and a half |
| 03:13:44 | 15 | years and finally determined that it was worthy of a |
| 03:13:49 | 16 | patent, that it met all of the requirements necessary for a |
| 03:13:52 | 17 | patent, and that a patent should be awarded, and that a |
| 03:13:56 | 18 | patent was awarded in February 2016. |
| 03:14:01 | 19 | Now, it is not necessary for us to show that |
| 03:14:04 | 20 | Samsung knew about the patent to show infringement.  You |
| 03:14:08 | 21 | don't have to know about a patent to infringe it.  All you |
| 03:14:12 | 22 | have to do is infringe the claims. |
| 03:14:13 | 23 | But in this case, we're going to show you evidence |
| 03:14:16 | 24 | that Samsung knew about the '311 invention and even knew |
| 03:14:22 | 25 | about the '311 patent itself before they started infringing |

03:14:26  1   the '311 patent.

03:14:27  2           Now, how is that so?

03:14:32  3           Samsung was a customer of Atmel's throughout the

03:14:36  4   time period of 2011 to 2016.  And Mr. Shaikh and Mr. Yilmaz

03:14:43  5   will testify that as Atmel was developing their flexible

03:14:48  6   touch sensor, they made regular presentations to Samsung

03:14:53  7   showing them what they came up with.  All of these

03:14:56  8   presentations were marked confidential.

03:15:00  9           This is PTX- -- Exhibit PTX-650, and it's an

03:15:07  10  example of one of the presentations that Mr. Shaikh will

03:15:12  11  testify about that they gave to their customers, including

03:15:15  12  Samsung.

03:15:16  13          It was about their flexible touch sensor display,

03:15:22  14  which they called XSense, and they made these presentations

03:15:24  15  to show some of the things that you can do with the

03:15:28  16  flexible touch sensor that they came up with.

03:15:31  17          This is one of the examples from one of the pages

03:15:37  18  in the '650 [sic] patent.  This is an actual working sample

03:15:44  19  that the Atmel engineers made of a flexible touch sensor

03:15:47  20  that curved around the edge that goes -- that is made to go

03:15:51  21  on a display.  And they even showed what a phone made with

03:15:54  22  that display could look like.

03:15:59  23          So Atmel made lots of presentations to Samsung

03:16:06  24  throughout this time.  Starting in 2011, in 2012, in 2013,

03:16:13  25  all the way through 2016 when the patent issued, Atmel was

03:16:19   1   making these presentations to Samsung.

03:16:22   2          The patent issued then in February 2016.  We will

03:16:28   3   show you evidence that Samsung found out about the '311

03:16:32   4   patent right after it issued.  This is Exhibit PTX-103.

03:16:38   5   It's one of the exhibits that you'll see and hear in this

03:16:41   6   case.

03:16:42   7          And this is an internal confidential Samsung

03:16:44   8   document where Samsung made a search for patents relevant

03:16:49   9   to metal mesh displays.

03:17:03  10          So Samsung -- this is the -- this is PTX-103,

03:17:07  11   excuse me.  And it shows that Samsung made -- did a search

03:17:12  12   for patents.  And look what comes up at No. 3.  It's the

03:17:17  13   '311 patent.  This document is dated March 2016.

03:17:21  14          Your Honor, may I pause for a second?

03:17:43  15          THE COURT:  We're going to take about a

03:17:45  16   five-minute recess.

03:17:47  17          Ladies and gentlemen, if you'll just leave your

03:17:49  18   notebooks in your chairs, we'll be back shortly to continue

03:17:53  19   with Plaintiff's opening statement.

03:17:55  20          The jury is excused for recess.

03:17:57  21          COURT SECURITY OFFICER:  All rise.

03:17:59  22          (Jury out.)

03:18:26  23          THE COURT:  Be seated, please.

03:18:39  24          Let me explain to you, counsel, why I just

03:19:09  25   recessed the jury in the middle of Plaintiff's opening.

03:19:12    1          Juror No. 3, I believe it is, Ms. Carpenter,

03:19:17    2   handed a note to the Court Security Officer, who brought it

03:19:20    3   to me, that she was feeling sick.  I understand she's

03:19:23    4   nauseated.  I'm going to get -- give her a minute in the

03:19:26    5   restroom to see if things don't clear up.  I don't know if

03:19:29    6   it's -- I don't know what the cause of it is.  That's all I

03:19:33    7   know.  But given that it was an immediate situation that

03:19:39    8   couldn't wait, I felt like I had no alternative but to

03:19:43    9   recess the jury.

03:19:44   10          We're going to stand in recess.  I'm going to ask

03:19:46   11   the Court Security Officer and the clerk's office to

03:19:49   12   monitor Ms. Carpenter's situation in the next few minutes,

03:19:53   13   keep me up-to-date on where we are, and as soon as I know

03:19:56   14   whether we have a continuing problem or a temporary problem

03:20:00   15   that's over with, I'll let counsel know, and we'll

03:20:03   16   reconvene.

03:20:04   17          We stand in recess.

03:20:04   18          COURT SECURITY OFFICER:  All rise.

03:20:05   19          (Recess.)

03:20:07   20          (Jury out.)

03:20:07   21          COURT SECURITY OFFICER:  All rise.

03:45:24   22          THE COURT:  Be seated, please.

03:48:44   23          Counsel, as I mentioned before I left the bench,

03:48:53   24   one of our jurors, Ms. Carpenter, No. 3, sent me a note in

03:48:59   25   the middle of Plaintiff's opening statement saying, I am

03:49:02  1  getting sick.

03:49:05  2          In response to that note, I recessed, allowed her

03:49:09  3  an opportunity to go to the jury room and the restroom

03:49:14  4  adjacent thereto and see how things were.

03:49:16  5          I directed the Court -- the deputy in charge for

03:49:19  6  this division, Ms. Clendening, to talk to Ms. Carpenter,

03:49:23  7  see what her situation is, and my understanding from

03:49:28  8  Ms. Clendening's report is that Ms. Carpenter has a certain

03:49:31  9  level of anxiety that she believed caused her to become

03:49:36  10 nauseated.  And it is not something that probably is a

03:49:41  11 one-time situation, and we have no real assurance that it

03:49:46  12 won't repeat itself over the course of the trial.

03:49:50  13         That being the case, I met with counsel for

03:49:53  14 Plaintiffs and Defendants in chambers, relayed that

03:49:55  15 information to them, and the consensus of the parties and

03:50:00  16 the Court was that we would probably be better served by

03:50:03  17 excusing Ms. Carpenter to prevent the possibility, and it

03:50:11  18 seems to be a pretty good possibility, that this would be,

03:50:13  19 at least to some extent, a recurring situation.

03:50:16  20         My understanding from counsel is they've talked

03:50:20  21 with their corporate representatives, and both

03:50:24  22 Plaintiffs -- Plaintiff and Defendants are agreeable that

03:50:26  23 Ms. Carpenter should be excused.

03:50:29  24         Is that -- does that comport with your

03:50:32  25 understanding, Mr. Fenster, for Plaintiff?

| | | |
|---|---|---|
| 03:50:34 | 1 | MR. FENSTER:  Yes, it does, Your Honor. |
| 03:50:35 | 2 | THE COURT:  Mr. Haslam, for Defendants? |
| 03:50:37 | 3 | MR. HASLAM:  Yes, it does. |
| 03:50:38 | 4 | THE COURT:  All right.  Thank you. |
| 03:50:38 | 5 | Mr. Latham, I'm going to ask you as the Court |
| 03:50:42 | 6 | Security Officer to go to the jury room and ask |
| 03:50:45 | 7 | Ms. Carpenter by herself to come in and just have a -- ask |
| 03:50:49 | 8 | her to have a seat right there on the front, first chair of |
| 03:50:53 | 9 | the jury box, all right? |
| 03:50:55 | 10 | Leave the other members of the jury in the jury |
| 03:50:58 | 11 | room, please. |
| 03:51:09 | 12 | COURT SECURITY OFFICER:  All rise, please. |
| 03:51:14 | 13 | (Juror in.) |
| 03:51:18 | 14 | THE COURT:  Just have a seat right there, please, |
| 03:51:20 | 15 | Ms. Carpenter. |
| 03:51:21 | 16 | Be seated, please. |
| 03:51:22 | 17 | Ms. Carpenter, I asked Ms. Clendening to visit |
| 03:51:27 | 18 | with you during the recess, and she's reported the |
| 03:51:31 | 19 | conversation the two of you had, and I relayed that to |
| 03:51:34 | 20 | counsel.  And we've discussed it, and the consensus is that |
| 03:51:37 | 21 | it would be best for all parties if I excuse you from |
| 03:51:41 | 22 | serving on this jury, and that's what I'm going to do.  I'm |
| 03:51:44 | 23 | excusing you. |
| 03:51:47 | 24 | I'm going to ask you in just a minute to go back |
| 03:51:50 | 25 | in the jury room.  Ms. Clendening is here in the courtroom, |

| | | |
|---|---|---|
| 03:51:52 | 1 | and she's going to meet you back there.  Any questions you |
| 03:51:55 | 2 | have, she'll answer them for you.  Any information you |
| 03:51:59 | 3 | need, she'll furnish it to you.  And she'll make sure you |
| 03:52:02 | 4 | have all your personal belongings and escort you to your |
| 03:52:07 | 5 | vehicle so that you can go home and get better. |
| 03:52:09 | 6 | JUROR:  Thank you very much. |
| 03:52:11 | 7 | THE COURT:  And then we'll proceed with the |
| 03:52:12 | 8 | remaining seven members of the jury.  I would just ask that |
| 03:52:15 | 9 | you not have a big discussion with the rest of the jury |
| 03:52:18 | 10 | when you go back. |
| 03:52:19 | 11 | JUROR:  No, no. |
| 03:52:20 | 12 | THE COURT:  And we wish you well and hope that |
| 03:52:22 | 13 | this is not a problem that causes you any inconvenience in |
| 03:52:27 | 14 | the future.  Thank you for being here.  You are excused. |
| 03:52:28 | 15 | JUROR:  Sir, I'm sorry this happened, but I don't |
| 03:52:31 | 16 | never know when a panic attack is going to hit me and |
| 03:52:35 | 17 | everything.  And I'm very sorry for -- you know, it |
| 03:52:39 | 18 | happened. |
| 03:52:40 | 19 | THE COURT:  I understand, and there's no need to |
| 03:52:42 | 20 | apologize.  We're just dealing with it as best we can. |
| 03:52:45 | 21 | JUROR:  Thank you. |
| 03:52:46 | 22 | THE COURT:  We appreciate your attitude. |
| 03:52:48 | 23 | JUROR:  Thank you. |
| 03:52:48 | 24 | THE COURT:  But, Ms. Carpenter, please travel |
| 03:52:50 | 25 | safely.  You're excused. |

03:52:53   1          If you'll take her back to the jury room, please,
03:52:57   2   Mr. Latham, Ms. Clendening will meet you there.
03:52:59   3          And if you'll come back to the courtroom,
03:53:02   4   Mr. Latham, when you're finished depositing her.
03:53:09   5          (Juror out.)
03:53:10   6          THE COURT:  If you, Mr. Latham, will give her just
03:53:10   7   a minute to meet Ms. Clendening, and as soon as she and
03:53:13   8   Ms. Clendening have met in the jury room, if you'll bring
03:53:14   9   the other seven members of the jury into the courtroom and
03:53:17  10   put them in the jury box.
03:53:19  11          Everybody just remain standing.
03:53:26  12          Go ahead and see about that for me, please.
03:53:37  13          Mr. Fenster, you were at 10 minutes your time.
03:53:39  14   I'm going to give you 10 minutes and 30 seconds.
03:53:43  15          MR. FENSTER:  Thank you.
03:53:43  16          THE COURT:  Give you 30 seconds extra.
03:53:47  17          MR. FENSTER:  Thank you.
03:53:53  18          (Jury in.)
03:53:53  19          THE COURT:  Please be seated.
03:54:15  20          Ladies and gentlemen of the jury, I have excused
03:54:23  21   Ms. Carpenter.  She has some issues that I'm not going to
03:54:27  22   discuss in detail with you.  But I will simply tell you
03:54:30  23   that consulting with both the Plaintiffs and the
03:54:33  24   Defendants, the Court reached the conclusion that the best
03:54:36  25   thing to do was to excuse her, and we'll proceed just as we

03:54:40  1   were.  Instead of eight, we'll have seven.  And everything

03:54:43  2   that I've told you so far still applies.

03:54:45  3           Mr. Fenster was about 10 minutes into the

03:54:48  4   Plaintiff's opening statements.  I'm going to allow him to

03:54:50  5   continue.  He's going to hand off at some point to Mr. Ward

03:54:54  6   who will finish the Plaintiff's opening statement.

03:54:57  7           And so that you can briefly recap where you were

03:54:59  8   and get back into your opening statement, Mr. Fenster, I'm

03:55:02  9   going to afford you an additional 30 seconds on your time.

03:55:05 10           MR. FENSTER:  Thank you, Your Honor.

03:55:05 11           THE COURT:  Please proceed when you're ready.

03:55:06 12           MR. FENSTER:  Welcome back, ladies and gentlemen.

03:55:11 13           So just to recap, we were talking about how Atmel

03:55:15 14   had a relationship with Samsung, how Atmel, after coming up

03:55:19 15   with the '311 Flexible touch sensor, had disclosed that in

03:55:24 16   presentations to Samsung, and then Samsung's internal

03:55:28 17   document actually showed that it learned about the '311

03:55:31 18   patent right after it issued.

03:55:32 19           So the patent issues on February 9, 2016.  Samsung

03:55:38 20   internal documents show that they learned about the '311

03:55:42 21   patent and -- in March 2016, and Samsung releases its first

03:55:46 22   infringing phone, the S8, in 2017.

03:55:52 23           Even though it knew about the patent, after

03:55:55 24   learning all of the information from Atmel, Samsung decided

03:55:59 25   to go ahead and do it alone without Atmel, even though it

03:56:03  1  didn't have permission.

03:56:04  2      Now, knowledge of a patent is not required for

03:56:10  3  infringement.  You can infringe a patent even if you've

03:56:14  4  never heard of it.  But knowledge of the patent is relevant

03:56:19  5  to the question of whether that infringement was willful.

03:56:22  6      And in addition to finding that Samsung is liable

03:56:27  7  for infringement, at the end of the case, after we've done

03:56:31  8  the hard work of showing you that their phones meet every

03:56:33  9  single element of the asserted claims, in addition to

03:56:41  10 finding Samsung liable for infringement, we're going to ask

03:56:44  11 you to find that that infringement was also willful.

03:56:47  12     Now, we bear the burden of proving infringement by

03:56:55  13 a preponderance of the evidence, as Judge Gilstrap

03:56:59  14 explained.  To show infringement, we will present the

03:57:01  15 expert testimony of Mr. Thomas Credelle.  Mr. Credelle is

03:57:09  16 an independent expert in display and touch sensor

03:57:13  17 technology.  He'll explain that he has over 40 years of

03:57:16  18 real-world experience making, designing displays and touch

03:57:20  19 sensors.

03:57:22  20     Mr. Credelle analyzed all of the confidential

03:57:25  21 documents that Samsung had to give to us during discovery

03:57:28  22 before this case that described exactly how all of their

03:57:31  23 phones work, the precise design documents that show exactly

03:57:35  24 how they're made.

03:57:36  25     He reviewed all of the deposition testimony in

03:57:39   1   this case.  And he went through and analyzed every single

03:57:43   2   phone, compared it to the claims, every single element.

03:57:51   3   And he will show you step-by-step, element-by-element, that

03:57:54   4   the accused phones infringe the asserted claims.

03:57:56   5        First, Mr. Credelle will show you how Samsung is

03:58:01   6   infringing the '311 patent.  That's the Flexible touch

03:58:06   7   sensor configured to wrap around the curved edge of a

03:58:09   8   display.  He will show you -- this is an example from the

03:58:16   9   S8, one of the infringing products.  He will show you that

03:58:20   10  the Flexible touch sensor and the substrate are configured

03:58:23   11  to wrap around the curved edge of a display.

03:58:27   12       And he will show you, using Samsung's confidential

03:58:31   13  documents, that there is an intersection between the flat

03:58:34   14  surface on top and the curved surfaces on either side, and

03:58:39   15  that that display, the touch sensor, wraps around that

03:58:44   16  intersection, which is what the claim requires.

03:58:45   17       Now, this is the claim, Claim 7 of the '311

03:58:52   18  patent.  There's a lot of words, and Mr. Credelle is going

03:58:56   19  to do the hard work to show you element-by-element that

03:58:59   20  every single one of these things is met.  I don't have time

03:59:02   21  to do it now.

03:59:03   22       But I do want to point out 7d says:  The

03:59:08   23  substantially flexible substrate and the touch sensor are

03:59:12   24  configured to wrap around one or more edges of the display.

03:59:16   25       Just -- I just wanted to point that out to you

03:59:21   1   because that's where the action is going to be regarding

03:59:23   2   the '311 patent.

03:59:25   3          And let me tell you about the two other patents,

03:59:29   4   and these relate to the AMOLED display.  So the last patent

03:59:34   5   was about the touch sensor, and these two are about the

03:59:37   6   AMOLED display itself.

03:59:38   7          Now, these phones that we have in our pockets and

03:59:44   8   take -- take for granted every day are actually pretty

03:59:48   9   amazing.  Samsung's display on a phone this size has 4.2

03:59:54  10   million pixels.

03:59:56  11          So this display is actually made up of 4.2 million

04:00:01  12   tiny points of light.  They're called pixels.  And every

04:00:05  13   one of those pixels has what they call an OLED, which is an

04:00:09  14   Organic Light-Emitting Diode.  That's just a piece of

04:00:12  15   material that shines up -- that lights up when you pass an

04:00:16  16   electric current behind it.

04:00:18  17          And active matrix is kind of special because

04:00:22  18   behind every single one of those tiny points of light is a

04:00:28  19   teeny tiny circuit that controls how much current goes

04:00:32  20   through it and how bright that particular light is.

04:00:35  21          And this case is about the improvements to these

04:00:38  22   pixels and the tiny circuits, so small you can't even see

04:00:42  23   them, behind each and every one of those tiny points of

04:00:47  24   light or pixels.

04:00:49  25          Now, the '338 covers the improvement to the little

04:00:55  1   circuit behind each pixel.  This is Claim 1.  We're

04:01:03  2   asserting Claim 5, which is dependent on Claim 1, and

04:01:06  3   Mr. Credelle will go step-by-step.  But I do want to point

04:01:09  4   out a couple of things about this claim.

04:01:12  5          All of our claims that are being asserted in this

04:01:14  6   case are what they call comprising claims.  A display panel

04:01:18  7   comprising.  And Judge Gilstrap explained that comprising

04:01:22  8   means includes.  If it has these things, it infringes, even

04:01:26  9   if it has other things, as well.

04:01:28  10          So this claim is a display panel comprising.  And

04:01:36  11   in 1a, it shows a plurality of transistors for each pixel.

04:01:42  12          So what is a plurality of transistors?  We'll tell

04:01:46  13   you what a transistor is.  You don't have to worry about

04:01:48  14   that yet.  But a plurality is just two or more.  It's not

04:01:51  15   limited to two.  It's not limited to three.  It's two or

04:01:54  16   more, a plurality.

04:01:55  17          And then if you go down to 1f, it says:  Wherein

04:01:58  18   the plurality of transistors for each pixel includes three

04:02:03  19   particular pixels -- transistors, a driving transistor, a

04:02:07  20   switch transistor, and a holding transistor.

04:02:09  21          So we will show you that Samsung's products have a

04:02:15  22   plurality of transistors and that that plurality includes

04:02:19  23   these three transistors.  It is not limited to only three.

04:02:23  24   It's a plurality.

04:02:25  25          And just like you all are a plurality of now seven

| | | |
|---|---|---|
| 04:02:28 | 1 | jurors, that includes Jurors 1, 2, and 3, so, too, is |
| 04:02:37 | 2 | Samsung's circuit.  So you'll hear that Samsung's circuit |
| 04:02:41 | 3 | actually has seven transistors.  They have a plurality of |
| 04:02:44 | 4 | seven transistors that include, Mr. Credelle will show you, |
| 04:02:48 | 5 | a driving transistor, a switch transistor, and a holding |
| 04:02:53 | 6 | transistor. |
| 04:02:55 | 7 | And Samsung infringes the '338 patent because its |
| 04:03:00 | 8 | plurality -- because it has a plurality of seven |
| 04:03:03 | 9 | transistors that include these three. |
| 04:03:05 | 10 | Let me go quickly to the '450 patent. |
| 04:03:13 | 11 | So the '450 patent has to do with how the pixel is |
| 04:03:16 | 12 | actually made.  So before, there's a circuit and then |
| 04:03:22 | 13 | there's the OLED.  And before they used to be made on the |
| 04:03:24 | 14 | same level of the circuit board, and they'd be sort of |
| 04:03:28 | 15 | side-by-side.  And what Casio discovered is a particular |
| 04:03:32 | 16 | way to build them on top of each other, to build them |
| 04:03:37 | 17 | vertically, so to -- so as to improve the AMOLED display. |
| 04:03:43 | 18 | And that's what the '450 is about, and it's -- we call it |
| 04:03:46 | 19 | the stacking patent because it stacks up. |
| 04:03:48 | 20 | And you'll see in the claim, this is the '450, |
| 04:03:51 | 21 | Claim 4.  Again, we'll go through every single one of these |
| 04:03:57 | 22 | elements.  But what you'll see is that it has a bunch of |
| 04:04:00 | 23 | layers that are formed one on top of the other.  It's got a |
| 04:04:04 | 24 | substrate.  It's got active elements that are formed on |
| 04:04:06 | 25 | that.  Others formed on top of that, et cetera.  That's why |

04:04:09  1  we call it the stacking patent.  And we'll teach you all of

04:04:12  2  that.  Mr. Credelle will go through that, and he'll do the

04:04:15  3  hard work.

04:04:15  4         We have the burden of proof, and I'm going to warn

04:04:18  5  you, Mr. Credelle's testimony is going to take a few hours

04:04:23  6  because he has to go through and show you, prove to you

04:04:27  7  that every one of the infringing phones really does meet

04:04:30  8  every one of the elements of the asserted claims.  And

04:04:32  9  we're going to go through and walk you through his analysis

04:04:35 10  and the evidence for every one of those claims.

04:04:38 11         So I'm going to apologize and warn you upfront,

04:04:40 12  it's going to take some time.  But we take our burden of

04:04:43 13  proof seriously, and we're going to show that to you.

04:04:46 14         Now, these are the infringing phones that are at

04:04:49 15  issue in this case.  And there's a lot of them.

04:04:52 16  Mr. Credelle will show you that he went through and studied

04:04:56 17  every single one and compared them carefully to the claims.

04:04:59 18         And what you'll see at the end of this case, we

04:05:01 19  believe, is that Samsung is using Solas's patented

04:05:06 20  inventions in each of these models of its best selling

04:05:10 21  phones, and it has been in model after model, year after

04:05:14 22  year, taking advantage of Solas's inventions without paying

04:05:17 23  for the right to do so.

04:05:18 24         Now, we have the burden of proof on infringement,

04:05:22 25  so that's what I've been talking about.

04:05:25    1           Samsung has the burden of proof on validity.  So

04:05:28    2    we'll let them talk about that, but we're confident that

04:05:30    3    they will not be able to show you by clear and convincing

04:05:33    4    evidence, the higher standard, that the Patent Office made

04:05:37    5    a mistake here.

04:05:37    6           In addition to infringement, we also bear the

04:05:41    7    burden of -- burden of proof on damages.  And I'm going to

04:05:45    8    turn it over to Mr. Ward to talk to you about damages now.

04:05:48    9           But I thank you very much for your attention so

04:05:50   10    far.

04:05:51   11           MR. WARD:  Your Honor, could you let me know how

04:05:56   12    much time I've got left?

04:05:58   13           THE COURT:  11 minutes.

04:05:59   14           MR. WARD:  11 minutes?

04:06:01   15           THE COURT:  Yes.

04:06:02   16           MR. WARD:  Okay.  In the next 11 minutes I'm going

04:06:11   17    to talk to you about damages.  I told you during voir dire

04:06:14   18    that this case is about $88 million of damages.  That's

04:06:17   19    what Solas intends to prove to you.  In the next 10

04:06:21   20    minutes, I'm going to tell you briefly what evidence is

04:06:24   21    that supports that and why that evidence supports damages

04:06:28   22    of that amount and not the 1.6 million that Samsung says

04:06:31   23    they owe which corresponds to the amount of money that

04:06:34   24    Solas paid for these patents.

04:06:35   25           So where do we start?  It's where I ended during

04:06:39  1   voir dire when I asked y'all if you could follow the law in

04:06:43  2   damages.  Upon a finding of infringement, the Court shall

04:06:47  3   award the claimant damages adequate to compensate for the

04:06:51  4   infringement, but in no event less than a reasonable

04:06:54  5   royalty for the use made of the invention by the infringer.

04:06:57  6         It doesn't say limited to how much they paid for

04:06:59  7   the patents.  It said limited -- or for the use made of the

04:07:03  8   invention.

04:07:03  9         We're going to bring you an expert, and he's going

04:07:06  10  to walk you through the evidence that supports his finding,

04:07:10  11  and he's going to talk about the use.  It's Mr. Stephen

04:07:14  12  Dell.  He's the founder of a company called NOVUM.  Went to

04:07:19  13  the University of Texas.  He's a certified valuation

04:07:22  14  analyst.  He's got almost 20 years of experience.  He's

04:07:26  15  been recognized as a leading expert in his field, and he's

04:07:30  16  done exactly what he's going to do in this case, a number

04:07:32  17  of times.  He'll tell you about that experience.

04:07:35  18        He relied upon Mr. Credelle -- Dr. Credelle --

04:07:39  19  Mr. Credelle who told him about the benefits of the '311

04:07:42  20  patent invention.  And you'll see this, and Mr. Credelle

04:07:44  21  will go through this in a lot of detail, what the benefits

04:07:47  22  of that invention were.

04:07:49  23        This is the touchscreen configured to wrap around

04:07:52  24  the edge.

04:07:53  25        And I want to talk to you about this document,

04:07:55  1   PTX-522, and it's blurred out because it's a confidential

04:07:59  2   Samsung document, and we can't show you these numbers in

04:08:02  3   open court, but we will.

04:08:04  4         But what I want to point out is that this is the

04:08:07  5   type of evidence that Mr. Dell relied upon when he figured

04:08:13  6   out what does this invention have?  What is the value to

04:08:17  7   Samsung?

04:08:18  8         And this document talks about cost savings.

04:08:21  9   There's a percentage number about metal mesh.  It's not

04:08:25  10  something we invented, but metal mesh sensors that wrap

04:08:28  11  around the edge is the invention, compared to something

04:08:32  12  called an ITO P1S sensor.

04:08:38  13        And you'll actually see they put this new sensor,

04:08:40  14  this new touch screen in the Galaxy S8.  You can lay them

04:08:43  15  right next to each other and you won't be able to tell any

04:08:46  16  difference.

04:08:47  17        But they could tell the difference to their bottom

04:08:48  18  line, because you'll find that after the S8 and S8 Plus

04:08:53  19  where they were using these two different ones, everything

04:08:56  20  after that uses the metal mesh sensor configured to wrap

04:08:59  21  around the edge.  And he'll tell you about those cost

04:09:02  22  savings.

04:09:03  23        I want to talk to you about a concept that you

04:09:06  24  probably have never heard of, I had never heard about it,

04:09:10  25  something called a hypothetical negotiation because that's

04:09:11   1   what Mr. Dell is going to do, that's what the Defendants'
04:09:14   2   damages expert is going to do.
04:09:15   3           They have to do that, because to figure out what
04:09:22   4   damages are owed, they set up something called a
04:09:22   5   hypothetical negotiation.  It's hypothetical because at the
04:09:23   6   negotiation, Samsung is there, and actually Atmel, the
04:09:26   7   owner of the patent because that's -- they owned the patent
04:09:29   8   when the infringement started.
04:09:31   9           And they sit down across the table, and you know
04:09:34  10   what Samsung says during this hypothetical negotiation?
04:09:37  11   They say:  We admit that we infringe, and we admit that
04:09:41  12   your patents are valid.  Let's talk about what we owe.  Not
04:09:45  13   what happens in the courtroom, because they deny those
04:09:48  14   things, but in the hypothetical negotiation, those things
04:09:50  15   are admitted.
04:09:52  16           There's something else that's called the book of
04:09:55  17   wisdom.  You'll hear about that from Mr. Dell.  You'll hear
04:09:57  18   about it from the Defendants' expert.  It's like a crystal
04:10:00  19   ball.  These parties get to know about all the future
04:10:03  20   sales, how well the product does, what are their profits,
04:10:07  21   how much money do they save up until the time of January
04:10:11  22   20 -- or January 31 of 2021 is when the damage period ends
04:10:17  23   for this patent, because there's still 11 years left on the
04:10:21  24   patent.  We're not talking about the next 11 years.  We're
04:10:24  25   talking about only up to January 31st of 2021.

04:10:31 1        And he will tell you that after looking at those
04:10:32 2   cost savings, he came up with a royalty rate of 1 percent.
04:10:35 3   What does that royalty rate apply to?  You're going to hear
04:10:37 4   the term smallest salable patent practicing unit.  And
04:10:42 5   what's coming up there is something called the OLED display
04:10:47 6   module, and he applies that 1 percent to that OLED display
04:10:51 7   module.
04:10:51 8        And, remember, infringement for importing, making
04:10:55 9   or selling.  Samsung Display makes, they sell it to Samsung
04:11:01 10  Electronics who then sells it to Samsung America which
04:11:06 11  imports those phones.  That's why we've accused them all of
04:11:09 12  infringement.
04:11:09 13       What he does, he'll show you how many sales there
04:11:12 14  are.  Over 40 million displays using the '311 invention.
04:11:17 15  That's just up until January 31st.
04:11:21 16       At the average price, it's a big number, lots
04:11:24 17  of -- lots of revenue generated times a royalty rate.
04:11:28 18  He'll tell you that the damages owed up until January 31st
04:11:32 19  of 2021 are 35.4 million.
04:11:37 20       Mr. Dell is going to do the same thing with
04:11:40 21  respect to the '450 and the '338.  He'll look at the
04:11:43 22  benefits that Mr. Credelle told him that he found from
04:11:48 23  those inventions, and, again, I don't have time to walk you
04:11:51 24  through all of these, but we're going to take the time,
04:11:53 25  we'll do the hard work, as Mr. Fenster told you, we'll look

04:11:56  1   at those benefits.

04:11:57  2          Samsung touted the benefits.  These are brighter

04:12:04  3   displays.  Now, we didn't invent AMOLED displays.  Don't

04:12:09  4   let anyone say we're claiming that.  But we did make them

04:12:13  5   better.  These inventions from the patents that we

04:12:14  6   purchased from Casio do make the displays brighter.

04:12:18  7          And you'll learn that the '450 is actually

04:12:20  8   expired, so they can use it.  And they don't have to pay

04:12:23  9   anything for it, but they have to pay for the last six

04:12:27  10  years that they did use it, and you'll see they used it a

04:12:30  11  lot.

04:12:30  12         The '338 patent is a patent that they stopped

04:12:32  13  using, but remember what the damages statute says, paid for

04:12:36  14  the use made of the invention.  And that's what Mr. Dell

04:12:38  15  will calculate.

04:12:39  16         And the way he calculates is a little bit

04:12:41  17  different.  He didn't look at cost savings.  He didn't have

04:12:44  18  those type of documents.  What he had were similar licenses

04:12:48  19  that Samsung had entered into.  And this is a license with

04:12:51  20  a company called UDC, and we'll talk a lot about this.

04:12:55  21  Mr. Dell will tell you about it.  And there were specific

04:12:59  22  license rates that Samsung agreed to pay, and it was

04:13:02  23  actually an OLED patent license agreement.

04:13:05  24         I want you to remember that when we talk about UDC

04:13:07  25  because Samsung says, don't rely upon this license, even

| | | |
|---|---|---|
| 04:13:14 | 1 | though this license was renewed repeatedly by Samsung. |
| 04:13:21 | 2 | They want to rely upon an LCD -- or a license that |
| 04:13:24 | 3 | primarily dealt with LCD technology that was entered into |
| 04:13:29 | 4 | between Casio and Samsung. |
| 04:13:30 | 5 | THE COURT:  You have three minutes remaining, just |
| 04:13:32 | 6 | for your benefit. |
| 04:13:33 | 7 | MR. WARD:  Thank you, Your Honor. |
| 04:13:33 | 8 | So if we go back to our friend, the hypothetical |
| 04:13:37 | 9 | negotiation, right, and -- and, again, you assume |
| 04:13:41 | 10 | infringement and validity.  Samsung sits across the table |
| 04:13:43 | 11 | from Casio, and they say:  We admit that we infringe your |
| 04:13:47 | 12 | valid patents.  What do we owe?  Mr. Dell will rely upon |
| 04:13:52 | 13 | that UDC license agreement, the OLED.  And he says, 50 -- |
| 04:13:56 | 14 | .5 percent per patent. |
| 04:14:00 | 15 | Same kind of math.  Over 80 million displays sold |
| 04:14:06 | 16 | that infringe the '450 times that half percent rate.  Over |
| 04:14:10 | 17 | 84 million that infringe the '338 patent.  And the numbers |
| 04:14:13 | 18 | are big because their sales are big.  The numbers are big |
| 04:14:16 | 19 | because they used this property without permission. |
| 04:14:20 | 20 | Let me talk to you real briefly about a couple of |
| 04:14:24 | 21 | license agreements that the experts don't look at because |
| 04:14:27 | 22 | they were entered into after the expert report deadline. |
| 04:14:31 | 23 | So Mr. Padian is going to tell you about these. |
| 04:14:35 | 24 | One is with a company called eMagin, and this license is |
| 04:14:39 | 25 | for less than $100,000.  That's because their use is low. |

| | | |
|---|---|---|
| 04:14:47 | 1 | You'll recall during voir dire, we talked -- or |
| 04:14:50 | 2 | Ms. Smith talked about a horse auction and maybe someone |
| 04:14:54 | 3 | bought an old mangy mare, an old mangy nag.  I want you to |
| 04:15:00 | 4 | think about this license when Mr. Padian talks to you.  I |
| 04:15:03 | 5 | can't tell you the amount.  It was entered into just two |
| 04:15:06 | 6 | months ago with LG.  I can't tell you the amount in open |
| 04:15:09 | 7 | court.  But when he tells the amount for a license to the |
| 04:15:12 | 8 | Casio patents, including these three patents, but the |
| 04:15:16 | 9 | entire portfolio, you tell me if you think we're talking |
| 04:15:19 | 10 | about an old mangy mare. |
| 04:15:23 | 11 | Those are the total damages, $88 million.  And I |
| 04:15:27 | 12 | don't tell you 88 million thinking you'll -- you should |
| 04:15:30 | 13 | give us 44 million or 40 million.  I tell you 88 million |
| 04:15:34 | 14 | because that's what the evidence is going to support. |
| 04:15:37 | 15 | And we look forward to presenting that evidence to |
| 04:15:39 | 16 | you all during the course of this week. |
| 04:15:41 | 17 | Thank you for your time. |
| 04:15:42 | 18 | THE COURT:  All right.  Defendants, you may now |
| 04:15:47 | 19 | present your opening statement to the jury. |
| 04:16:04 | 20 | Would you like a warning on your time, Mr. Haslam? |
| 04:16:06 | 21 | MR. HASLAM:  Please.  Seven minutes. |
| 04:16:11 | 22 | THE COURT:  I'll tell you when you have seven |
| 04:16:13 | 23 | minutes remaining.  You may proceed when you're ready. |
| 04:16:16 | 24 | MR. HASLAM:  I'll push start, and I'm off. |
| 04:16:18 | 25 | Well, Mr. Ward and Ms. Smith had the opportunity |

04:16:21  1   to answer the questions that you had to answer, so I'm

04:16:24  2   going to start off by telling you a little bit about

04:16:27  3   myself.

04:16:27  4          I come from California, I guess unfortunately, but

04:16:31  5   I've been there since 1969 when the Air Force stationed me

04:16:35  6   there.  I've never lived in Texas, so my connections to

04:16:42  7   Texas I'm going to sort of stretch.  But when I was in the

04:16:46  8   Air Force in California, the first two years I was there,

04:16:50  9   Gregg Popovich, who is the coach of the San Antonio Spurs,

04:16:55  10  was stationed at the same station, and I had the

04:16:58  11  opportunity to play basketball with him, although he was on

04:17:01  12  the court and I was on the bench.

04:17:03  13         I also -- my aunt and uncle moved to Marshall in

04:17:08  14  1970.  He was with Alcoa.  Unfortunately, they both passed

04:17:13  15  away, but they lived down on Bergstrom Circle.  And I

04:17:20  16  remember coming down to a daughter -- a cousin's wedding in

04:17:23  17  1972.  So I'm an interloper, but I've been here before, and

04:17:28  18  I've got some minor connection to Texas.

04:17:32  19         If I believed everything that Mr. Ward and

04:17:35  20  Mr. Fenster said they could prove, I'd get my checkbook out

04:17:39  21  right now.  But, thankfully, the evidence that you're going

04:17:44  22  to see isn't going to lead you to where they want you to

04:17:47  23  go.

04:17:48  24         Now, they mentioned the Constitution.  And, yes,

04:17:52  25  patents are in the Constitution to promote the progress of

| | |
|---|---|
| 04:17:57 | 1 |
| 04:18:03 | 2 |
| 04:18:07 | 3 |
| 04:18:13 | 4 |
| 04:18:18 | 5 |
| 04:18:20 | 6 |
| 04:18:23 | 7 |
| 04:18:30 | 8 |
| 04:18:32 | 9 |
| 04:18:36 | 10 |
| 04:18:41 | 11 |
| 04:18:46 | 12 |
| 04:18:52 | 13 |
| 04:18:57 | 14 |
| 04:19:00 | 15 |
| 04:19:06 | 16 |
| 04:19:08 | 17 |
| 04:19:15 | 18 |
| 04:19:18 | 19 |
| 04:19:23 | 20 |
| 04:19:31 | 21 |
| 04:19:34 | 22 |
| 04:19:38 | 23 |
| 04:19:41 | 24 |
| 04:19:45 | 25 |

the science and the arts.  Their assumption is every patent has great and beneficial use, but that's not the case.  Not every idea is a great idea.  Some patents lead to dead ends, and it's our belief that the three patents in this case are of that type.

And you're going to find out that for the Casio patents, they never used them.  And nobody ever came to them and said:  Can we use them?

But notwithstanding what we think about the Casio and Atmel patents, this case is about the Constitution.  It is about the progress of the arts and sciences.  And the progress here are the innovations that the three Samsung Defendants made to bring all of us OLED displays which are the brightest and the best on the market.

And they innovated a brand-new touch sensor in 2017, and I'll get to that in a moment.

Samsung Display, one of the companies and one of the Defendants, is the company which makes the displays.  They're also responsible for building the touch sensor into the display.  They spent almost 20 years of research and development trying to develop an OLED display that worked.

We're going to bring you two experts, Dr. Fontecchio and Dr. Sierros, who will talk to you about the Casio patents and the Atmel patent, and they'll explain them to you, and they will explain the technology that's in

04:19:49  1   these products.

04:19:51  2           Samsung Display has also brought Mr. Kwak.

04:19:57  3   Mr. Kwak was the leader of the group of engineers and

04:20:01  4   support staff that pioneered the award-winning OLED

04:20:08  5   displays that Samsung sells.  And he will tell you about

04:20:12  6   the trials and tribulations that he and his group went

04:20:18  7   through to bring all of us the touch -- the touch sensor

04:20:22  8   phones on the Samsung Galaxy phones from the Samsung

04:20:27  9   Galaxy 8 Plus forward.

04:20:30  10          Now, I want to talk to you about the two other

04:20:33  11  companies that are involved here.  Samsung Electronics is

04:20:38  12  the company that buys the displays from Samsung Display and

04:20:42  13  makes the phones that we all use and like who have Galaxy

04:20:48  14  phones.

04:20:51  15          Samsung Electronics America is a U.S. company.  It

04:20:56  16  has facilities in Plano, and it is in charge of taking the

04:21:00  17  phones that Samsung Electronics makes and commercializing

04:21:06  18  and selling those in the United States.

04:21:08  19          Mr. Joe Repice is here as a representative, and

04:21:17  20  you'll hear him testify later.  And he will tell you, and I

04:21:20  21  believe that the work that Samsung Display did does not

04:21:27  22  borrow from or is not based upon the Casio patents.

04:21:32  23          Now, it's easy for me to sit here and talk about

04:21:40  24  what Samsung has done or not done, but let me put up a

04:21:45  25  little slide here, it's DDX-1.002.

04:21:50  1          2007, the first Active Matrix OLED display was put

04:21:59  2  in a smartphone.

04:22:00  3          In 2009 before the Atmel patent, they had the

04:22:04  4  first flexible AMOLED display.

04:22:07  5          June 2010, the Galaxy S1 was released with an

04:22:12  6  AMOLED display.

04:22:12  7          2014, the first mass-produced curved edge display

04:22:20  8  panel.  It won an award at the Society for Information

04:22:25  9  Display.

04:22:25  10         And here's something you may not have known.  When

04:22:28  11 Apple first introduced an OLED smartphone in 2017, Samsung

04:22:37  12 Display's OLED display was in that phone, and it is in that

04:22:42  13 phone today, iPhones that are OLED.

04:22:44  14         The Google Pixel phones, which are OLEDs, also

04:22:48  15 have Samsung Display's products in them.

04:22:57  16         Let me just tell you a little bit about the

04:22:59  17 Samsung products that Samsung Electronics makes and that

04:23:04  18 SEA sells.  They've got phones, and you'll see the Z Flip

04:23:07  19 there, one of their newest models, on the top left.

04:23:08  20 There's a tablet.  There's notes, and there's phones.  They

04:23:13  21 also sell one other, the Galaxy S20, which is the phone

04:23:18  22 that I believe is involved in this case.  They have a

04:23:21  23 tactical edition that they sell to the U.S. military, and

04:23:24  24 that's because the displays that they make are rugged

04:23:28  25 enough and the phones are rugged enough to be used in a

04:23:32  1   hostile environment.

04:23:33  2        Make no mistake, Samsung is not here saying they

04:23:45  3   have all the good ideas.  They don't.  In the past, Samsung

04:23:51  4   has paid others for the use of their patents and

04:23:54  5   technology, and I'm going to go over that a little bit

04:24:01  6   later.

04:24:01  7        But what they don't do is to pay for technology or

04:24:05  8   patents that they don't use, and that is what we believe

04:24:08  9   this case is about.

04:24:09  10       Now, who are the other -- who are the other

04:24:14  11  players?  Casio and Atmel?  Both of those were

04:24:20  12  multi-billion dollar companies.  They made products.  Some

04:24:22  13  of you said -- some of the people said this morning they

04:24:25  14  had Casio calculators or Casio watches.  But Casio never

04:24:31  15  made an OLED display.  And no one came to them and asked to

04:24:38  16  license the '450 and '338 patent.

04:24:42  17       And so when they say they want 88 -- 60 million

04:24:47  18  approximately for those two patents, ask yourself why

04:24:49  19  didn't Casio become the world leader in OLED displays if

04:24:55  20  these are such foundational patents, if you can't make OLED

04:25:02  21  displays without these?

04:25:04  22       And why did Atmel ultimately sell its touch sensor

04:25:09  23  business to Uni-Pixel, which two years later went bankrupt?

04:25:14  24  Because their products weren't the market leader.  They

04:25:17  25  weren't the novel approach that's been hyped here in the

04:25:20  1   opening.

04:25:21  2          Now, you heard the Judge say that in order to

04:25:32  3   prove infringement, you will have to find that every

04:25:36  4   element of the claim, which is a series of elements, and

04:25:39  5   you saw Mr. Fenster put up some of those, you have to find

04:25:44  6   each and every one of those in the accused products.  If

04:25:49  7   one element is missing, there is no infringement.

04:25:53  8          We believe the evidence is going to show for these

04:25:56  9   products that there are several of the requirements of the

04:26:01  10  claims which are not found in the Samsung products.  And

04:26:05  11  the reason for that is because in developing their displays

04:26:12  12  with the built-in integrated touch sensors, they had to do

04:26:16  13  things that are not taught or claimed in the '450, the

04:26:24  14  '338, or the '311 patent.

04:26:27  15         I want to briefly touch -- we are going to argue

04:26:30  16  that the claims are invalid.

04:26:34  17         And I want to sort of correct one thing I think

04:26:39  18  Mr. Fenster said.  We are not saying that the Patent Office

04:26:44  19  made a mistake.  You will be the first people to see

04:26:55  20  patents that the Patent Office did not have.

04:27:00  21         Casio and Atmel didn't provide them to the Patent

04:27:06  22  Office.  I'm not saying that's wrong.  The patent examiner

04:27:08  23  didn't find them, and so the patent examiner did what he

04:27:12  24  could with the information he had.

04:27:19  25         You will see information that the patent examiner

04:27:22   1    did not.

04:27:23   2          So we're not asking you to second-guess a decision

04:27:26   3    that the patent examiner made.  Effectively, we're going to

04:27:29   4    ask you to do what the patent examiner, we believe, would

04:27:32   5    have done had he seen these prior patents about what other

04:27:38   6    people had invented which made the patents invalid or, as

04:27:44   7    the Judge told you, obvious in light of what somebody else

04:27:49   8    had.  That the improvement that they may claim in the

04:27:52   9    patent wasn't sufficiently inventive that you're entitled

04:27:56   10   to a patent.

04:27:57   11         And the invalidity based on anticipation and

04:27:59   12   obviousness is in the statute that Congress, pursuant to

04:28:08   13   the Constitution, passed and put in the patent laws.

04:28:12   14         So they put a brake on attempting to claim

04:28:18   15   innovations that you didn't actually make and deserve.

04:28:25   16         THE COURT:  Let's move on, Mr. Haslam.  You're

04:28:27   17   getting argumentative here.  This needs to be informative,

04:28:32   18   not argumentative.

04:28:33   19         MR. HASLAM:  Okay.  Let me talk a little bit then

04:28:35   20   about how Atmel -- Samsung made its touch sensors.  I'm

04:28:41   21   going to start with the '311.

04:28:43   22         The fact is Samsung came out with its first OLED

04:28:52   23   phone in 2009.  It had a touch sensor on it.  The original

04:28:59   24   iPhone in 2007 had a touch sensor on it.  As a matter of

04:29:04   25   fact, I don't know if you know about the BlackBerry, which

04:29:07  1  had the mechanical buttons, but BlackBerry said:  Well, the

04:29:12  2  iPhone will never be successful because it doesn't have

04:29:15  3  mechanical buttons.  It had a touch sensor instead.  And

04:29:19  4  since then, those phones and the Galaxy phones have had

04:29:23  5  touch sensors.

04:29:24  6       And I want to just show you, these are two

04:29:27  7  physical exhibits that you will have before you when you

04:29:31  8  retire.  And hopefully we'll be able, if we can manage the

04:29:39  9  health issues, that you may see it when it's passed around

04:29:43  10  as a result of the evidence.

04:29:44  11       But in my right hand I have -- and you can see the

04:29:47  12  wiring on it -- a touch sensor, and it is on a flexible

04:29:51  13  base to support the touch sensor.  And what Samsung did is

04:29:58  14  it bought this kind of external touch sensor from other

04:30:02  15  companies.  And it would take that touch sensor, and it

04:30:07  16  would glue it on to a display.

04:30:13  17       So it was an external touch sensor that had a

04:30:16  18  separate base or substrate and the touch sensor on top of

04:30:24  19  it.  And that's important, because that is, we believe,

04:30:27  20  what the Atmel '311 patent claims.

04:30:30  21       And the external touch sensors that Samsung used

04:30:39  22  were made by other companies, and the touch sensors and the

04:30:46  23  phones and the displays on which those touch sensors were

04:30:52  24  placed had the same kind of bend that the edge of the

04:30:57  25  display that they claim infringes the '311.

04:31:01   1          Those phones are not accused of infringement

04:31:04   2   because of the kind of material that was used for the touch

04:31:07   3   sensor.  It wasn't a metal mesh touch sensor.

04:31:12   4          In 2007 -- 2017, what is now accused of

04:31:18   5   infringement is just this.  It looks like the display.  It

04:31:23   6   is the display.  But the touch sensor no longer is a

04:31:31   7   separate piece that Samsung Display has to buy from some

04:31:35   8   other company.  They innovated and put the touch sensor

04:31:44   9   directly into the display.

04:31:47   10          This is thinner than this kind of touch sensor

04:31:53   11   that the Atmel claim covers.  It's less expensive, and it

04:32:00   12   is easier to manufacture.  And it eliminates the need to

04:32:07   13   have somebody else in your supply chain, like an Atmel or a

04:32:10   14   3M or somebody else.

04:32:12   15          That's what they accuse of infringement.  And we

04:32:17   16   believe the evidence is going to show you that this kind of

04:32:20   17   a display that has an integrated touch sensor does not

04:32:25   18   infringe.

04:32:25   19          So you were shown the claim.  Mr. Fenster pointed

04:32:33   20   to the issue of wrap around the edge of the display.  And I

04:32:39   21   want to show you what the -- an example of what the '311

04:32:44   22   patent says is an example of what wrapping around the edge

04:32:49   23   of the display means.

04:32:51   24          What I've got here on the left is the face page of

04:32:59   25   the '311 patent.  And on the right, I have Figure 7 of the

04:33:03  1  patent.  This is Figure 7.  And it is described in Column 7

04:33:09  2  of the patent.

04:33:12  3       You have the patents in your book, and patents do

04:33:16  4  not have page numbers.  They have -- if you look at the top

04:33:21  5  of the page after the -- after the figures, you'll find two

04:33:26  6  columns that are labeled 1, 2, the next page will label it

04:33:31  7  3, 4, 5, 6.  And then down the page, you will have line

04:33:37  8  numbers, and, generally speaking, there are 65 lines in

04:33:40  9  each column.

04:33:42  10       But if at some point you want to look at the

04:33:45  11  patent, look at Column 7, beginning about halfway down, and

04:33:49  12  that paragraph describes what the patent says about the

04:33:57  13  touchscreen and how it relates to the flexible substrate

04:34:01  14  and how it relates to a display.

04:34:03  15       But Figure 7 is described as an example of what

04:34:07  16  wrapping around the edge of a display is.

04:34:10  17       There's a clear cover on the top, and that's just

04:34:13  18  the glass panel.

04:34:15  19       One thing I want you to notice is you notice on

04:34:19  20  the side of the clear cover panel --

04:34:22  21       MR. WARD:  Your Honor, I object.  He's comparing

04:34:24  22  an embodiment to -- for infringement.  He ought to be

04:34:30  23  looking at the claim.  This is improper.  It violates the

04:34:33  24  Court's rules in three different ways.

04:34:35  25       THE COURT:  Well, the purpose of opening

04:34:37    1    statement, which is not opening argument, is to tell the

04:34:39    2    jury what you expect the evidence will show.  And I'm

04:34:46    3    having a hard time following you, Mr. Haslam, if this is

04:34:49    4    what you believe the evidence is going to show.

04:34:52    5            I'm going to overrule the objection.

04:34:58    6            But you need to move on.

04:35:00    7            MR. HASLAM:  The touch sensor is just the middle

04:35:03    8    part, and that's what the -- what we believe the evidence

04:35:07    9    is going to show was Atmel's invention.

04:35:09   10            Now, there were some statements made that they

04:35:17   11    believe that, based on the relationship that Atmel and

04:35:21   12    Samsung had, that Samsung somehow took Atmel's confidential

04:35:28   13    information.  That's not true.

04:35:33   14            Beginning in 2012, Samsung began looking for an

04:35:39   15    alternative supplier for the external touch sensor that it

04:35:44   16    was using.

04:35:45   17            Among the companies it evaluated was Atmel.  It

04:35:50   18    also evaluated external touch sensors from 3M, LG, and

04:35:57   19    other companies.  And the notion that the technology that

04:36:04   20    Atmel showed Samsung was what somehow Samsung took and used

04:36:10   21    in its phones I think is -- isn't borne out by the

04:36:14   22    evidence.

04:36:14   23            And I put up on the screen some of the excerpts

04:36:18   24    from an Atmel XSense evaluation in 2015.  It's DTX-1148,

04:36:26   25    Pages 4 and 6.

04:36:28  1       And these are some of the things that Samsung told

04:36:33  2  Atmel that in evaluating its touch sensors it found.  There

04:36:39  3  was a drawing defect in all areas.  The mesh pattern is

04:36:44  4  reflected by outside light to become visible.

04:36:48  5       A metal mesh touch sensor has metal wires which

04:36:52  6  you can't see through.  So one of the problems with a metal

04:36:57  7  mesh touch sensor is you have to make sure that the touch

04:37:01  8  sensor mesh is such that when it goes on the screen, you

04:37:06  9  see the display but not the wires.  And this indicates that

04:37:10  10  there was an issue with the wiring becoming visible.

04:37:13  11       Is it possible to design around Moire?  That's

04:37:20  12  just an issue, and you'll hear about that.  It's a problem

04:37:23  13  that can be caused by something on top of the screen that

04:37:25  14  makes the picture look a little hazy.

04:37:28  15       And they were also asked if they can put their

04:37:30  16  touch sensor on a different material.

04:37:32  17       So, far from taking Atmel's confidential

04:37:42  18  information, Samsung actually, after this evaluation, did

04:37:49  19  go with a new touch sensor, but it was not -- that touch

04:37:54  20  sensor was not accused of infringement because didn't use

04:37:59  21  the same kind of metal mesh that Atmel did.  It was bought

04:38:01  22  from a Japanese company.

04:38:13  23       Now, I want to go on to the Casio patents.

04:38:15  24       The '450 patent -- I put Claim 4 up here.  Claim 4

04:38:25  25  is dependent on Claim 1, which means you would look to

04:38:29  1  Claim 1 to find the other information that you would need

04:38:35  2  to figure out whether it's infringed.  You would have to

04:38:38  3  find everything in Claim 1, plus everything in Claim 4.

04:38:44  4       And you'll see that Claim 4 talks about a

04:38:47  5  selection transistor, a drive transistor forming a pair.

04:38:52  6  And the selection transistor has a certain function, and

04:38:57  7  the drive transistor has a certain function.

04:39:02  8       And Claim 1 of the '450 patent requires that those

04:39:05  9  transistors be placed in the circuit in specific relation

04:39:11  10 to other elements in the circuit.  And we believe the

04:39:16  11 evidence is going to show that in the Samsung OLED

04:39:21  12 displays, those two transistors do not perform -- the two

04:39:25  13 transistors that they believe infringe this claim --

04:39:29  14      THE COURT:  You have seven minutes remaining.

04:39:31  15      MR. HASLAM:  -- are not the same functions and not

04:39:34  16 in the same location as the claim requires.

04:39:37  17      Now, the '338 is a three-transistor circuit, they

04:39:43  18 said.  One of the inventors on the '450 is the same as one

04:39:50  19 of the inventors on the '338.  That inventor recognized the

04:39:54  20 problems with the '450's two-transistor circuit.

04:40:00  21      They developed a three-transistor circuit,

04:40:03  22 which -- which required, as he said, a plurality of

04:40:08  23 transistors that included three specific ones.  And that's

04:40:10  24 in the bottom of the claim here.

04:40:14  25      A driving transistor connected in a certain way; a

04:40:19   1   switch transistor which causes something to flow, called a

04:40:25   2   write current; and a holding transistor which must hold the

04:40:29   3   voltage between two specific connections.

04:40:32   4        Again, because of Samsung's innovation and the

04:40:34   5   need to use more transistors than just those three and

04:40:41   6   those three in their system, the ones they point to, do not

04:40:46   7   perform those functions.  And that's what the evidence will

04:40:48   8   show.

04:40:49   9        And here is just the -- Samsung Display's

04:41:01  10   seven-transistor structure.  And you'll be -- our experts

04:41:04  11   will explain and Mr. Kwak will explain how this transistor

04:41:08  12   circuit operates and why the transistors in here do not

04:41:11  13   perform the functions or are not located in the places that

04:41:18  14   the claims require.

04:41:18  15        Now, I want to just touch just briefly on the

04:41:20  16   invalidity issue.  I want to show you two of the things

04:41:24  17   that you're going to see, we believe in this case, that we

04:41:27  18   believe the Patent Office hadn't seen it, would not have

04:41:32  19   issued the '311 patent.

04:41:34  20        This is a United States patent, the Chen, it's a

04:41:37  21   touch sensor.  Apple is the assignee who owns this patent.

04:41:41  22   And here on the left-hand side is -- the gray is what we

04:41:50  23   see on the right-hand side.  A display, an OLED display

04:41:53  24   with red, green, and blue pixels that make all the colors,

04:42:00  25   a glue layer, a flexible substrate, and a touch sensor.

04:42:04  1        And that touch sensor on the display is on the

04:42:08  2  top, goes around the edge, and down the side.  And the

04:42:10  3  virtual button there was intended to take the place of a

04:42:15  4  mechanical button.  They were going to have the display.

04:42:18  5  You would be able to touch the display instead of having to

04:42:24  6  use a mechanical button.

04:42:25  7        The next is a patent, the Joo, published in 2008,

04:42:30  8  cover for a mobile device and a mobile device having the

04:42:33  9  same.  And, again, you have a display, a base cover or a

04:42:39  10  substrate, and a touch portion that is on the top of the

04:42:43  11  display, goes around the edge and down the side.  And,

04:42:47  12  again, had a virtual button, a button you could press on

04:42:51  13  the display rather than a mechanical button.

04:42:53  14        Now, I want -- I do want to talk briefly about the

04:43:01  15  value of these patents.

04:43:04  16        You heard about the hypothetical negotiation that

04:43:07  17  the experts will talk about.  For the '450 and the '338

04:43:14  18  patents, the hypothetical negotiation would take place in

04:43:17  19  2013.  I want to show you what the evidence is going to

04:43:24  20  show about the relationship between Casio and Samsung at

04:43:26  21  that very time.

04:43:27  22        2008, Casio sold eight display patents to Samsung

04:43:36  23  Electronics for 12 and a half million.

04:43:38  24        2012, Casio sold 85 patents to Samsung for 1.35

04:43:44  25  million.

04:43:44   1          2012 again, Casio licensed 169 display patents and
04:43:52   2   applications to Samsung Display for 2.1 million.
04:43:57   3          And in 2013, both companies cross-licensed their
04:44:03   4   patents, and the hypothetical negotiation was 2013.
04:44:08   5          Samsung's displays were on the market at this
04:44:13   6   point in time.  If Casio, the owner of these patents,
04:44:18   7   knowing and licensing Samsung at the very time of the
04:44:24   8   hypothetical negotiation, had they thought these patents
04:44:30   9   were worth $60 million, don't you think they would have put
04:44:33  10   them on the table at this point in time and asked for that
04:44:36  11   $60 million?
04:44:40  12          But Casio knew those patents weren't valuable.
04:44:44  13   They weren't being used.  Casio had never made any OLED
04:44:50  14   displays with those patents.
04:44:51  15          Similarly, so they sold the 724 patents and patent
04:44:57  16   applications for 1.15 million, for about $16,000.00 a
04:45:03  17   patent.
04:45:04  18          Similar situation with Atmel.  Atmel had been
04:45:08  19   bought by a company called Microchip.  Microchip decided to
04:45:14  20   sell a bunch of patents, and it hired brokers and experts
04:45:23  21   to value, the portfolio they were trying to sell.  They
04:45:25  22   went around to more than 50 companies, including Samsung,
04:45:28  23   to try to sell that portfolio.
04:45:30  24          And on the right-hand side of this slide, you'll
04:45:32  25   see some of the reason -- some of the feedback that

04:45:37  1   Microchip got when they were trying to sell these patents.

04:45:42  2   Risk of technology obsolescence as a reason to pass or

04:45:49  3   reduce bids, obsolescence.

04:45:52  4          Ease of design around.  You don't need to use them

04:45:55  5   if you can come up with other ways to do it.

04:45:58  6          High cost of maintenance, and the overall value

04:46:00  7   was pegged at 2.4 out of 5.  So Microchip ultimately sold

04:46:07  8   500,000 patents to Solas -- sold 12 patents for

04:46:11  9   $500,000.00, which is about $41,000.00 per patent.

04:46:18  10         So at the end of the day, I'm going to ask you to

04:46:22  11  reward Samsung for its innovation, for the fact that we all

04:46:26  12  have, as even Plaintiff's counsel said, the bright, vivid,

04:46:32  13  great contrast, energy-saving OLED displays we have.

04:46:36  14         THE COURT:  Your time is expired, counsel.  Take a

04:46:39  15  few seconds and wrap up.

04:46:41  16         MR. HASLAM:  I'm going to ask you at the end of

04:46:43  17  the case not for a monetary award, but to reward the

04:46:49  18  innovation of Samsung with a finding of non-infringement.

04:46:54  19         Thank you.

04:46:55  20         THE COURT:  All right.  Is Plaintiff prepared to

04:47:00  21  go forward with its case-in-chief?

04:47:02  22         MS. FAIR:  Yes, Your Honor.

04:47:03  23         THE COURT:  Call your first witness.

04:47:05  24         MS. FAIR:  Your Honor, Solas calls Mr. Gerry

04:47:09  25  Padian.

04:47:09   1          THE COURT:  All right.  You'll come forward,

04:47:11   2   Mr. Padian, and be sworn.  Our courtroom deputy will swear

04:47:16   3   you in right here.

04:47:17   4          (Witness sworn.)

04:47:25   5          THE COURT:  Thank you, sir.  Please come around,

04:47:28   6   and have a seat here at the witness stand.

04:47:36   7          There's water there if you'd like it.  Once you're

04:47:40   8   situated, please take off your mask, and situate the

04:47:43   9   microphone so you can be heard.

04:47:46   10         All right.  Ms.  Fair, you may proceed with your

04:47:50   11  direct examination.

04:47:51   12         MS. FAIR:  Thank you, Your Honor.

04:47:51   13            GERRY PADIAN, PLAINTIFF'S WITNESS, SWORN

04:47:51   14                     DIRECT EXAMINATION

04:47:52   15  BY MS. FAIR:

04:47:52   16  Q.  Mr. Padian, would you introduce yourself, please?

04:47:58   17  A.  Yes, my name is Gerry Padian.  I'm a co-founder of

04:48:02   18  Solas OLED.  And I am a director on the board of directors

04:48:07   19  of Solas OLED.

04:48:08   20  Q.  What do you do as a director of Solas OLED?

04:48:10   21  A.  We -- I plan the strategy of the company.  I assist in

04:48:16   22  the licensing and generally oversee the management of the

04:48:18   23  company.

04:48:19   24  Q.  I want to talk about Solas OLED's business in just a

04:48:22   25  minute.  But could you tell us a little bit about yourself

04:48:26   1   first?

04:48:26   2   A.  Yes.  I'm married for 24 years.  My wife is Patricia.

04:48:31   3   We live in Katonah, New York -- it's about an hour north of

04:48:35   4   New York City -- with our kids and my in-laws.  I have two

04:48:38   5   children, Luke and Katherine, both are in college.  My son,

04:48:42   6   Luke, just started freshman year.  My daughter is about to

04:48:46   7   graduate.

04:48:46   8   Q.  So could you tell the jury what is Solas OLED?  What

04:48:50   9   type of business is it?

04:48:51  10   A.  Solas OLED is a display technology company.  It has

04:48:55  11   purchased patents in the display area, primarily OLED

04:49:00  12   technology and touch sensor technology.

04:49:03  13        Solas OLED seeks to license those patents, and

04:49:07  14   that's how it generates its revenue.

04:49:09  15        THE COURT:  Let me interrupt you just a minute,

04:49:11  16   counsel.

04:49:11  17        Does either party wish to invoke the Rule?

04:49:18  18        MR. LERNER:  We do, Your Honor.

04:49:20  19        THE COURT:  All right.  Defendants wish to invoke

04:49:22  20   the Rule.

04:49:22  21        Am I correct in assuming that that would apply to

04:49:26  22   fact witnesses but exclude expert witnesses?

04:49:32  23        MR. HASLAM:  Your Honor, I'm going to take the

04:49:34  24   prerogative of being old and senile and overrule my

04:49:38  25   partner, and we're not going to invoke the Rule.  I

04:49:42  1   apologize.

04:49:42  2          THE COURT:  All right.  Defendants have changed

04:49:44  3   their position.

04:49:44  4          Do Plaintiffs wish to invoke the Rule?

04:49:48  5          MR. FENSTER:  Yes, Your Honor.  I apologize for

04:49:57  6   that.  Yes, we would like to invoke the Rule, Your Honor.

04:50:00  7          THE COURT:  And am I right, Mr. Fenster, that you

04:50:02  8   would propose it be invoked to exclude experts and to

04:50:07  9   include fact witnesses?

04:50:09  10          MR. FENSTER:  That's correct, Your Honor.

04:50:10  11          THE COURT:  All right.  Either party has the right

04:50:12  12   to invoke the Rule, ladies and gentlemen.  The Rule

04:50:15  13   requires that if you are a witness in this case, that you

04:50:18  14   be excluded from the courtroom until you are called into

04:50:22  15   the courtroom to testify.

04:50:24  16          The exceptions in this case will be witnesses

04:50:26  17   designated as experts, who will be permitted to stay in the

04:50:30  18   courtroom and hear the testimony of the other witnesses.

04:50:33  19   It also excludes the designated representatives of the

04:50:38  20   corporate parties to the case.

04:50:39  21          So corporate representatives and expert witnesses

04:50:42  22   are excluded.  All other witnesses, particularly fact

04:50:46  23   witnesses, are subject to the Rule.  And if you are such a

04:50:49  24   fact witness intended as a witness in this case, you should

04:50:53  25   excuse yourselves and remain outside the courtroom until

04:50:55   1   such time as you're called to testify.

04:50:57   2          The Rule is invoked.

04:50:59   3          Ms. Fair, my apologies for not taking that up

04:51:02   4   earlier.  Please continue with your direct examination.

04:51:04   5          MS. FAIR:  Thank you, Your Honor.

04:51:06   6   Q.  (By Ms. Fair)  Mr. Padian, you told us that Solas

04:51:09   7   OLED's business, you own a patent portfolio, and you seek

04:51:12   8   to license it.  As a company with this technology, do you

04:51:18   9   have a technical background?

04:51:19  10   A.  I do not.  I have a degree in economics and a law

04:51:23  11   degree.

04:51:23  12   Q.  How is it that you got into a business that owns

04:51:26  13   technology?

04:51:26  14   A.  I was representing a friend of mine from college, and

04:51:31  15   he had a satellite company.  We represented him in the sale

04:51:35  16   of that company.  After he had sold the company, he was

04:51:38  17   looking to start up a new company.  He had this idea to

04:51:41  18   apply what he'd learned in the satellite industry to what

04:51:46  19   was then becoming the Internet, the boom of the Internet,

04:51:49  20   1997.  And we decided to invest with him, and that's how I

04:51:52  21   got involved with technology for the first time.

04:51:54  22   Q.  What was the business plan of this venture with your

04:51:57  23   friend from college?

04:51:58  24   A.  So Jay was a genius.  He was always the smartest --

04:52:02  25   Mr. Fallon was always the smartest person that I knew going

04:52:06  1  to college.  He had invented a way of compressing and

04:52:09  2  decompressing data on the fly so that it would speed up the

04:52:13  3  delivery of data over the Internet and -- and -- and the

04:52:19  4  capacity of the pipeline over the Internet.

04:52:21  5          This is what he learned from the satellite

04:52:23  6  business where you have a transponder and you're increasing

04:52:26  7  the bandwidth to a satellite, he applied that technology

04:52:29  8  and those ideas to the Internet.

04:52:32  9          So we developed products, hardware products,

04:52:35  10  software products, and fortunately also applied for patents

04:52:38  11  on those inventions.

04:52:39  12  Q.  What did you plan to do with the products that you had

04:52:42  13  made?

04:52:42  14  A.  We initially went out to -- with the products and

04:52:47  15  demonstrated them to larger companies, some of the largest

04:52:50  16  technology companies in the world.  We showed them the

04:52:52  17  products, we showed them the concepts, the inventions, the

04:52:55  18  software.  And our hope was to partner with one of these

04:52:58  19  companies so that they would be able to do the

04:53:00  20  manufacturing, and we would be able to provide them with

04:53:03  21  the patent cover and the ideas.

04:53:06  22  Q.  Did it work out?

04:53:07  23  A.  Not that part of the business, no, it did not.

04:53:09  24  Q.  So where did you go from there?

04:53:11  25  A.  We found that many of the companies we had demonstrated

04:53:15  1  and shown the products to a few years later were actually

04:53:18  2  utilizing them without ever contacting us, so much as even

04:53:23  3  a phone call.

04:53:24  4  　　　As I said before, fortunately we had patents that

04:53:26  5  had issued at that time.  The patents were taking a while

04:53:30  6  to issue, about five years.  But when they issued, we

04:53:34  7  pivoted and we changed our business to essentially go out

04:53:37  8  and license -- essentially attempt to get those companies

04:53:39  9  using our technology to pay for it.

04:53:41  10  Q.  What did you learn from negotiating with these

04:53:43  11  companies when you were seeking to license patents?

04:53:45  12  A.  We were six guys in a room, and they were very large

04:53:50  13  corporations, and what we realized was it's not that

04:53:53  14  simple.  You can't just send a letter or give them a call

04:53:55  15  and say, hey, this is what you're using, here's our patent,

04:53:59  16  and pay.  You have the door closed in your face.  They will

04:54:03  17  not pay you by simply going to them.  Unless you're an

04:54:06  18  equally large company or you bring them to a place like

04:54:10  19  this, a court of law, and they're told that they have to

04:54:12  20  pay.

04:54:13  21  Q.  Were you able to negotiate licenses and execute

04:54:15  22  licenses?

04:54:16  23  A.  We were.  Took a long time and it took a lot of time

04:54:23  24  money and effort, but we were able to do that and we were

04:54:26  25  able to obtain licenses, pay back our investors, people

04:54:30  1   that stood by us all those years.

04:54:30  2   Q.  Is this a new business model to own patents and

04:54:33  3   negotiate licenses and not actually make a product?

04:54:35  4   A.  No.  It goes back to really the founding of the patent

04:54:39  5   system, the Constitution.  Thomas Edison was one of the

04:54:42  6   biggest inventors, as we all know, but made most of his

04:54:46  7   money by simply licensing his inventions, not selling the

04:54:50  8   products.  So it's as old as the system itself.  It's a

04:54:54  9   very, very important part of the system because it creates

04:54:57 10   a market for inventions.

04:54:58 11        So if you're not fortunate enough to be able to

04:55:00 12   make the product or simply don't want to make the product,

04:55:02 13   perhaps you're an idea person and you're not a

04:55:05 14   manufacturer, this gives you the market to benefit and

04:55:08 15   receive money for it so you can continue to monetize -- you

04:55:12 16   can continue to invent and innovate.

04:55:15 17   Q.  How is it that you became a director of Solas OLED?

04:55:19 18   A.  Well, we were still -- the company that we had found

04:55:22 19   with my friend from college was called Realtime Data.  We

04:55:23 20   were working at Realtime Data, and we started to get notice

04:55:26 21   from a lot of other companies, some operating companies who

04:55:29 22   had great inventions but weren't necessarily producing them

04:55:33 23   that wanted to sell their patents, some brokers who deal in

04:55:37 24   that market, as I said before.  And we were being

04:55:39 25   approached by a lot of people to do the same with their

04:55:42  1   patents as we were doing with ours.

04:55:44  2   Q.  Was there a particular set of patents that piqued your

04:55:49  3   interest?

04:55:49  4   A.  Yes.  We receive hundreds of patents every year, and

04:55:53  5   when we saw the Casio patent portfolio, I had not heard of

04:55:57  6   OLED at that time, it was 2016, but one of my business

04:55:59  7   partners had.  And he had been following it very closely.

04:56:02  8   He had previously been in the display industry, and he was

04:56:05  9   very excited and said we should look at it.

04:56:07  10  Q.  Was that enough?  You have a business partner who says:

04:56:10  11  I love these patents.  Let's go buy them.  Is that the next

04:56:13  12  step?

04:56:13  13  A.  No, not at all.

04:56:14  14  Q.  What do you do from there?

04:56:16  15  A.  We had to spend a lot of time, money, and effort to

04:56:20  16  investigate the patents.  We wanted to see, number one,

04:56:23  17  were the patents valid?  Were they -- did they encompass a

04:56:28  18  unique idea?  Were they truly inventive?  Were they used in

04:56:33  19  the marketplace?  There's a lot that you have to do to --

04:56:36  20  you have to decide how big the marketplace is.  Is it

04:56:40  21  worthwhile while buying and spending the million of dollars

04:56:42  22  it takes to monetize it, to license it.

04:56:44  23        So we looked at the patents.  We hired expert

04:56:48  24  patent counsel.  We hired OLED experts.  And we just spent

04:56:52  25  a lot of time looking over the patents to prove those

04:56:54  1   things that they were valid, they were infringed.

04:56:57  2   Q.  And this is all before you bought the patents?

04:57:00  3   A.  Correct.

04:57:00  4   Q.  So you invest the time and energy looking at the

04:57:04  5   patents.  I guess you ultimately decided to buy them?

04:57:07  6   A.  We did.

04:57:08  7         MS. FAIR:  Can we pull up, please, Mr. Wietholter,

04:57:12  8   PTX-550?

04:57:16  9   Q.  (By Ms. Fair)  What are we looking at, Mr. Padian?

04:57:22  10  A.  This is the patent purchase agreement dated April

04:57:27  11  16th -- I'm sorry, dated April 11th, 2016, between Casio

04:57:31  12  and Solas OLED, our company.

04:57:33  13  Q.  And we heard earlier today about what type of business

04:57:37  14  Casio was.  In your -- in your looking into this patent

04:57:42  15  portfolio, what did you learn about Casio in the OLED

04:57:44  16  space?

04:57:44  17  A.  Casio was actually an early innovator in the OLED

04:57:50  18  space.  They had looked at it.  They were -- you had the

04:57:54  19  Casio watches.  You also had the Casio cameras, the small

04:57:58  20  Casio cameras.  And they were looking to put OLEDs on those

04:58:01  21  cameras.

04:58:01  22         So they were very early on looking at the

04:58:04  23  possibility of OLEDs.  They had a lot of smart engineers,

04:58:08  24  and they focused their engineers into developing OLED

04:58:11  25  technology, which they did successfully.

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 04:58:13 | 1  | Q.  So do you think because Casio doesn't actually make                   |
| 04:58:18 | 2  | displays today, their inventions must not be worth                       |
| 04:58:20 | 3  | anything?                                                                 |
| 04:58:21 | 4  | A.  Not at all.  Kodak, which is really another very large               |
| 04:58:27 | 5  | pioneer in the OLED space, doesn't currently make OLEDs,                 |
| 04:58:30 | 6  | and yet they're highly regarded as one of the innovators.               |
| 04:58:35 | 7  | Casio, another camera company, was the same --                          |
| 04:58:38 | 8  | THE COURT:  Wait a minute.  Mr. Padian, nobody                           |
| 04:58:40 | 9  | asked you about Kodak.  You need to limit your answers to                |
| 04:58:44 | 10 | the questions asked.  Ms. Fair is perfectly capable of                  |
| 04:58:48 | 11 | asking you anything she wants you to talk about.  But the                |
| 04:58:50 | 12 | fact that you talk about Casio cameras doesn't open the                 |
| 04:58:53 | 13 | door to talking about Kodak or Nikon or any other camera                |
| 04:58:57 | 14 | manufacturer.  Try to limit your answers to the questions               |
| 04:59:00 | 15 | asked, sir.                                                               |
| 04:59:00 | 16 | THE WITNESS:  Yes, sir.                                                   |
| 04:59:01 | 17 | THE COURT:  Let's continue.                                               |
| 04:59:03 | 18 | MS. FAIR:  Mr. Wietholter, if we go to Page 2,                           |
| 04:59:06 | 19 | Paragraph 2.                                                              |
| 04:59:07 | 20 | Q.  (By Ms. Fair)  What was the purchase price for your                  |
| 04:59:10 | 21 | portfolio that you bought from Casio?                                    |
| 04:59:11 | 22 | A.  $1,150,000.00.                                                        |
| 04:59:14 | 23 | Q.  And what did you get for that?                                        |
| 04:59:16 | 24 | A.  We got the patent portfolio of 725 patents and patent                |
| 04:59:22 | 25 | applications.  It was several patent applications.                      |

04:59:24  1   Q.  Does it make a difference if some of what's in the mix

04:59:28  2   of what you buy are patents versus patent applications?

04:59:31  3   A.  Yes.

04:59:31  4   Q.  Why is that?

04:59:32  5   A.  Patent applications are applications to the Patent

04:59:34  6   Office that have not yet been issued.  So you're taking the

04:59:38  7   risk that they may never be issued.

04:59:40  8   Q.  When you're looking at a portfolio like this and you've

04:59:43  9   done all of the work on the front end before you buy the

04:59:46  10  patents, can you know for sure that you're getting a lot of

04:59:49  11  value in the portfolio?  You know you've got a good deal

04:59:52  12  here?

04:59:53  13  A.  No.

04:59:53  14  Q.  Why not?

04:59:53  15  A.  You don't know really until you begin to look at the

04:59:57  16  products in the marketplace whether or not they're using

05:00:00  17  the patents that you just purchased.

05:00:01  18  Q.  Why can't you know that until you go look further into

05:00:05  19  it?

05:00:05  20  A.  Because it takes millions of dollars to actually do

05:00:09  21  that.  You need to buy the products.  You need to tear them

05:00:13  22  down.  You need to determine whether or not what's inside

05:00:15  23  those products is actually what is represented in your

05:00:19  24  patents.  It's a high risk/high reward business.

05:00:24  25  Q.  And so did you do that after you bought this portfolio?

| 05:00:27 | 1 | A.  We did. |
| 05:00:27 | 2 | Q.  What -- tell us who you engaged, what you did to look |
| 05:00:30 | 3 | into these patents. |
| 05:00:31 | 4 | A.  So we built a business around these patents.  We hired |
| 05:00:35 | 5 | really smart engineers.  We set up in Ireland where I knew |
| 05:00:41 | 6 | a lot of really good engineers, particularly in this space. |
| 05:00:46 | 7 | And we also went out and hired labs.  There's a |
| 05:00:47 | 8 | few labs in the world that were particularly good at doing |
| 05:00:50 | 9 | this.  We hired two of them.  One was in Ireland, and one |
| 05:00:52 | 10 | was in the Ukraine. |
| 05:00:55 | 11 | Q.  And what do those labs do? |
| 05:00:58 | 12 | A.  So using the one in Ireland, a lab called Tyndall, they |
| 05:01:02 | 13 | take the phone -- in this case Samsung phone -- and they |
| 05:01:06 | 14 | delayer it.  They take it apart layer by layer and look at |
| 05:01:09 | 15 | each layer with microscopes and analyze the circuitry of |
| 05:01:13 | 16 | those -- of those -- of the phone and compare it |
| 05:01:19 | 17 | claim-by-claim to your patent, and it has to match. |
| 05:01:21 | 18 | Q.  So is use of an invention, like some of what we're |
| 05:01:24 | 19 | talking about in this case, something that's readily |
| 05:01:26 | 20 | apparent when you just -- you know, you got a smart |
| 05:01:29 | 21 | engineer can look at the device and see it? |
| 05:01:31 | 22 | A.  Absolutely not. |
| 05:01:32 | 23 | Q.  Is the 1.15 million that you paid for these patents, is |
| 05:01:37 | 24 | that the true price that it takes when you're investing in |
| 05:01:40 | 25 | something like this? |

05:01:41  1   A.  No, ma'am.

05:01:42  2   Q.  How much more goes into it?

05:01:43  3   A.  Even before we bought it, we had spent hundreds of

05:01:47  4   thousands of dollars just looking at the patents.  And as I

05:01:50  5   just mentioned before, after we purchased it, we literally

05:01:53  6   spent million of dollars tearing down the products and

05:01:56  7   looking and analyzing the products to see if, in fact, they

05:01:59  8   did infringe.  So the real price was millions.

05:02:02  9   Q.  Did anyone else look at these patents?

05:02:04  10  A.  Yes.

05:02:04  11  Q.  Who?

05:02:05  12  A.  We never learned the names, but we knew there were

05:02:09  13  other competitors who were bidding to purchase these

05:02:13  14  patents.

05:02:14  15  Q.  What about after you bought them?  Was there anyone

05:02:16  16  else who looked at them then?

05:02:19  17  A.  Yes.

05:02:20  18  Q.  Who was that?

05:02:20  19  A.  We had investors that came in -- sophisticated

05:02:24  20  investors who looked at the patents to invest with us.

05:02:27  21  Q.  Are all 700 patents and patent applications -- 725, I

05:02:33  22  think, it was you said?

05:02:35  23  A.  Yes.

05:02:35  24  Q.  Are they all worth the same amount?

05:02:38  25  A.  No.

05:02:38  1  Q.  Can you tell us what do you expect when you buy a

05:02:44  2  portfolio of this size to find in it in terms of where the

05:02:49  3  value lies?

05:02:50  4  A.  It's difficult.  When you first get it, you're

05:02:54  5  presented here with a few patents they showed us out of the

05:02:56  6  725 that they thought had the value.  And we had to look at

05:03:00  7  725 patents.  Generally, it's less than 10 percent of those

05:03:03  8  patents that you'll find that hold the true value of what

05:03:06  9  you own.

05:03:07 10  Q.  When you did all of this technical analysis, you really

05:03:10 11  looked into it, spent -- by the way, how long did you spend

05:03:13 12  looking at the patents before you bought them?

05:03:15 13  A.  Months.  We started looking at this in 2015, and we

05:03:18 14  purchased it in April of 2016.

05:03:22 15  Q.  And how long did you spend looking into potential use

05:03:26 16  of this portfolio after you bought it?

05:03:28 17  A.  Years.

05:03:29 18  Q.  After all of this work, spent the money, spent the

05:03:35 19  time, spent the energy, what was the ultimate conclusion?

05:03:39 20  A.  We were very happy with what we found.  We were -- it

05:03:44 21  exceeded our expectations.  There was far more infringement

05:03:48 22  and far more use of these patented technologies than we had

05:03:51 23  ever hoped when we first bought the portfolio.

05:03:54 24  Q.  Why would a company like Casio, a sophisticated

05:04:00 25  electronics company, you said innovator in the OLED space,

05:04:02  1  why would they sell a portfolio like this of $1.15 million

05:04:09  2  if there's tens of millions of dollars of revenue out there

05:04:14  3  for the use of these patents?

05:04:16  4  A.  We don't believe they knew what they had.  They had --

05:04:20  5  since the time they sold it to us, they had left the OLED

05:04:25  6  marketplace, and they really didn't know what they had.

05:04:27  7       And at the point they left the marketplace, that

05:04:29  8  patent portfolio went from being an asset to a liability

05:04:32  9  because it's carried then on their books.  They have to pay

05:04:35  10  several hundred thousand dollars a year in just maintenance

05:04:39  11  fees, paying all the different Patent Offices around the

05:04:41  12  world to maintain the patent.

05:04:43  13       So they then took a liability off their books.  We

05:04:47  14  bought it for $1,150,000.00.  We don't believe they ever

05:04:51  15  really knew the amount of infringement that was out there.

05:04:54  16       And, in addition, it's not what they do.  Casio

05:04:57  17  manufactures products.  We do this.  We find the value in

05:05:01  18  the patents.  We go out and find where that's being

05:05:04  19  utilized in the marketplace.  Our engineers are

05:05:07  20  specifically skilled at doing that.  That's not Casio's

05:05:11  21  business.

05:05:11  22  Q.  Did Casio have the confidential information that

05:05:16  23  Samsung has produced in this lawsuit?

05:05:19  24       MR. LERNER:  Objection, Your Honor.  Calls for

05:05:21  25  speculation.

05:05:23  1          THE COURT:  Unless he has personal knowledge of
05:05:24  2  what Casio had, I'll sustain that.
05:05:29  3  Q.  (By Ms. Fair)  Is the confidential information that
05:05:30  4  Casio produced in this lawsuit publicly available, that
05:05:33  5  anybody can go find it and know?
05:05:35  6  A.  No.  We certainly couldn't find it.
05:05:37  7  Q.  What about the detailed financial sales information of
05:05:41  8  Samsung's products that's been produced in this lawsuit, is
05:05:44  9  that just out there for anyone who wants to know about it?
05:05:47  10  A.  No.
05:05:47  11  Q.  So can you really know about the true extent of the use
05:05:50  12  of the technology?
05:05:52  13  A.  No.  It's not available.
05:05:55  14  Q.  So we've heard that two of the patents in this lawsuit
05:06:03  15  come from the Casio portfolio.  There's a third one, the
05:06:07  16  touch sensor patent, the '311.  How did Solas come to own
05:06:11  17  the '311 patent?
05:06:11  18  A.  The '311 patent was part of a group of patents, about
05:06:16  19  12 patents, that a company called Microchip was selling.
05:06:20  20  We saw it, and we thought that those particular patents
05:06:26  21  were uniquely compatible to what we had already at Solas
05:06:32  22  with the Casio patent.
05:06:32  23  Q.  And how did you find out about Microchip selling these
05:06:35  24  patents?
05:06:35  25  A.  A broker from a company called Houlihan Lokey, Pallavi

05:06:41    1    Shah, she contacted us.

05:06:42    2    Q.  Why are the brokers that are trying to sell these

05:06:45    3    patents, the Casio portfolio, you said hundreds of others

05:06:46    4    had approached you, the Microchip portfolio, why are these

05:06:48    5    brokers approaching you and your business partners?

05:06:52    6    A.  We have been able to successfully find infringement and

05:06:55    7    to monetize it, to get licenses from those who infringe.

05:06:59    8    So it takes their clients, which would be in this case,

05:07:03    9    Microchip, can generate money for their inventions.

05:07:07   10    Q.  Did you, when you were looking at the Microchip

05:07:11   11    portfolio, look at the patents before you bought them, like

05:07:13   12    had you done with Casio?

05:07:14   13    A.  Yes.

05:07:14   14    Q.  And did you have others who looked at the patents, as

05:07:19   15    well, when you were considering purchasing them?

05:07:21   16    A.  We did.

05:07:22   17    Q.  Who was that?

05:07:22   18    A.  Again, we hired experts, patent experts, and also

05:07:27   19    experts in this particular technology to look at it.  We

05:07:30   20    also hired financial experts, experts to examine the

05:07:33   21    market, the size of the market, and what we thought we

05:07:36   22    could recover based on -- for this investment.

05:07:38   23    Q.  What about your investors?

05:07:40   24    A.  And we also had the same group of investors came in and

05:07:44   25    looked at it.  And when they did, they hired their own

05:07:48  1   experts and their own attorneys to look at it completely

05:07:51  2   independent from us.

05:07:52  3          MS. FAIR:  Mr. Wietholter, could we have PTX-549,

05:07:58  4   please?

05:07:58  5   Q.  (By Ms. Fair)  If we look at the first paragraph here,

05:08:00  6   Mr. Padian, can you tell us what we're looking at?

05:08:02  7   A.  This is the patent and sale -- sorry, patent sale and

05:08:06  8   assignment agreement between Microchip and Solas OLED.

05:08:11  9          MS. FAIR:  And, Mr. Wietholter, could we go to

05:08:14  10  Page 7, please, Paragraph 5.1?

05:08:22  11  Q.  (By Ms. Fair)  What was the purchase price of the

05:08:24  12  portfolio you bought from Microchip?

05:08:25  13  A.  $500,000.00.

05:08:26  14  Q.  And what did you get for that?

05:08:28  15  A.  12 patents, and I believe there were a couple of

05:08:30  16  applications for this, as well.

05:08:32  17  Q.  When you spend 1.15 million for the purchase price of

05:08:37  18  Casio, 500,000 for the purchase price of the Microchip

05:08:40  19  portfolio, is that all you expect the portfolio to generate

05:08:45  20  in licensing revenue?

05:08:46  21  A.  No, ma'am.

05:08:46  22  Q.  What are your expectations?

05:08:49  23  A.  We're expecting -- we're entrusted with our investors'

05:08:53  24  money.  We're expected to make a return on that money.  So

05:08:56  25  what we're trying to do is we're trying to get a return to

05:08:58  1  find who's using it and to be compensated fairly for that

05:09:01  2  use, plus certainly an amount far in excess of what we pay

05:09:04  3  for the patents and what we invest to determine the

05:09:07  4  infringement.

05:09:08  5  Q.  You pay $500,000.00 for a portfolio -- by the way, did

05:09:14  6  you tell us how much -- how many patents and patent

05:09:17  7  applications you got for this?

05:09:18  8  A.  12.

05:09:19  9  Q.  Pay $500,000.00 for 12 patents, patent applications.

05:09:23  10  You're here seeking just for the '311 over $35 million from

05:09:27  11  Samsung; is that fair?

05:09:29  12  A.  Yes, it all comes back to usage.  If -- if Samsung is

05:09:34  13  using it, to the extent that they are, then they pay

05:09:38  14  according to usage.  They don't pay according to what you

05:09:41  15  bought the patent for or what it cost you to invent the

05:09:46  16  product.  They pay you based on usage.

05:09:48  17  Q.  Has Solas been able to license its portfolio yet?

05:09:52  18  A.  Yes.

05:09:52  19  Q.  When did you get your first license?

05:09:55  20  A.  September of last year.

05:09:57  21       MS. FAIR:  And, Your Honor, at this time, we're

05:09:58  22  going to have to go into some license agreements, and so

05:10:01  23  I'd asked if we could seal the courtroom, please.

05:10:04  24       THE COURT:  All right.  Based on, counsel's

05:10:07  25  request, I'll order the courtroom sealed.  Those present

| | | |
|---|---|---|
| 05:10:10 | 1 | not subject to the protective order in this case should |
| 05:10:12 | 2 | excuse themselves and remain outside the courtroom until |
| 05:10:14 | 3 | the courtroom is reopened and unsealed. |
| 05:10:25 | 4 | THE COURT:  Let's use the backdoor in the |
| 05:10:31 | 5 | courtroom, not the side door, please. |
| 05:10:33 | 6 | (Courtroom sealed.) |
| 05:10:33 | 7 | (This portion of the transcript is sealed |
| 05:10:33 | 8 | and filed under separate cover as |
| 05:10:42 | 9 | Sealed Portion No. 1.) |
| 05:19:37 | 10 | (Courtroom unsealed.) |
| 05:20:08 | 11 | THE COURT:  All right.  For the record, the |
| 05:20:10 | 12 | courtroom is unsealed. |
| 05:20:11 | 13 | Counsel, you may proceed with cross-examination. |
| 05:20:13 | 14 | MR. LERNER:  Thank you, Your Honor. |
| 05:20:13 | 15 | CROSS-EXAMINATION |
| 05:20:13 | 16 | BY MR. LERNER: |
| 05:20:19 | 17 | Q.  Good afternoon, Mr. Padian. |
| 05:20:20 | 18 | A.  Good afternoon. |
| 05:20:21 | 19 | Q.  My name is Jeff Lerner, counsel for Samsung Display and |
| 05:20:24 | 20 | Samsung Electronics.  I want to talk to you about what |
| 05:20:25 | 21 | Solas is and what it isn't.  You said, if I got it down |
| 05:20:28 | 22 | right, that Solas is -- if -- is a display technology |
| 05:20:31 | 23 | company; is that right? |
| 05:20:32 | 24 | A.  We own display technologies. |
| 05:20:34 | 25 | Q.  Did you say, sir, that Solas is a display technology |

05:20:37  1  company?

05:20:38  2  A.  I -- well, Solas is -- I don't recall, sir.  I -- Solas

05:20:42  3  owns display technologies.  It is a licensor of display

05:20:45  4  technologies.

05:20:46  5  Q.  Okay.  And you talked about Thomas Edison.  Do you

05:20:49  6  recall that?

05:20:50  7  A.  Yes, sir.

05:20:50  8  Q.  Thomas Edison invented the light bulb?

05:20:53  9  A.  He did.

05:20:54  10  Q.  Solas hasn't invented any of its own technology that's

05:20:57  11  patented?

05:20:57  12  A.  It has not.

05:20:58  13  Q.  Solas didn't develop any of the technology at issue in

05:21:01  14  this case; is that correct?

05:21:02  15  A.  That's correct.

05:21:03  16  Q.  Solas has never made an Organic Light-Emitting Diode

05:21:09  17  display?

05:21:09  18  A.  No, sir.

05:21:10  19  Q.  Solas has never made any display at all, correct?

05:21:12  20  A.  No.

05:21:13  21  Q.  Solas has never made a touch sensor?

05:21:15  22  A.  No.

05:21:15  23  Q.  Solas has never manufactured any products?

05:21:18  24  A.  Correct.

05:21:19  25  Q.  Solas has never made any prototypes?

05:21:22   1   A.  Correct.

05:21:22   2   Q.  You're an investor in Solas, correct?

05:21:24   3   A.  I am.

05:21:25   4   Q.  And, actually, you have a personal financial stake in

05:21:29   5   the outcome of this case; is that correct?

05:21:30   6   A.  As an investor, I do.

05:21:31   7   Q.  You're not an employee of Solas?

05:21:34   8   A.  No.

05:21:34   9   Q.  In fact, Solas has no employees, correct?

05:21:37  10   A.  I don't believe that is correct.

05:21:38  11   Q.  Solas doesn't have any employees on its payroll,

05:21:42  12   correct?

05:21:42  13   A.  There may be one or two, but, primarily, the employees

05:21:46  14   that work for Solas work for a different company, and the

05:21:49  15   services are run through that different company.

05:21:51  16   Q.  Do you know Mr. Ciaran O'Gara?

05:21:55  17   A.  Yes, sir.

05:21:56  18   Q.  And when he was asked during discovery --

05:21:59  19           MS. FAIR:  Objection, Your Honor.  This is

05:22:01  20   improper impeachment.  He's trying to use a statement of

05:22:03  21   another witness against Mr. Padian.

05:22:06  22           MR. LERNER:  He's the director of the company,

05:22:09  23   Your Honor.

05:22:09  24           MS. FAIR:  It's hearsay.

05:22:11  25           THE COURT:  We're not there yet, Ms. Fair.  You

05:22:13  1   can reurge your objection if we get there.  But we're not

05:22:16  2   at -- I don't see that there's been an attempt to impeach

05:22:19  3   the witness.

05:22:19  4        Go ahead, Mr. Lerner.

05:22:21  5   Q.  (By Mr. Lerner)  Mr. O'Gara testified when asked:  So

05:22:24  6   currently there's no --

05:22:24  7        MS. FAIR:  Objection, Your Honor.  This is

05:22:27  8   hearsay.  It's an out-of-court statement being offered for

05:22:29  9   the truth of the matter asserted.  Otherwise, he's trying

05:22:32 10   to impeach him, which is improper.

05:22:34 11        THE COURT:  All right.  What's your response,

05:22:35 12   Mr. Lerner?

05:22:36 13        MR. LERNER:  Your Honor, it's an admission by an

05:22:38 14   officer of the company.

05:22:39 15        MS. FAIR:  It's deposition testimony, Your Honor.

05:22:41 16   They can designate it for their case.

05:22:43 17        THE COURT:  As -- was this witness designated as a

05:22:49 18   30(b)(6) witness when he was deposed as a 30(b)(6) witness

05:22:53 19   of the Plaintiff?

05:22:57 20        MR. LERNER:  He was not.

05:22:58 21        THE COURT:  All right.  Then I'll sustain the

05:23:00 22   objection.

05:23:01 23        Let's move along.

05:23:02 24   Q.  (By Mr. Lerner)  Now, Mr. Padian, you mentioned you're

05:23:06 25   not an engineer?

05:23:07  1   A.  No, sir.

05:23:08  2   Q.  You're an attorney?

05:23:09  3   A.  I am an attorney.

05:23:10  4   Q.  And you still practice law at a law firm in New York?

05:23:12  5   A.  No, sir.

05:23:13  6   Q.  And do you understand there's a law firm, Davidoff

05:23:22  7   Hutcher & Citron that still has your web bio as an attorney

05:23:23  8   at that firm?

05:23:23  9   A.  Yes, sir.

05:23:24  10  Q.  But you're an attorney there actually?

05:23:26  11  A.  No, sir.  We merged our firm when I stopped practicing

05:23:29  12  law with that firm, and they maintained my information for

05:23:32  13  my clients that went there.

05:23:34  14  Q.  And you've personally never designed any OLED displays

05:23:37  15  or touch sensors?

05:23:38  16  A.  No.

05:23:38  17  Q.  You don't have any expertise in the patents at issue?

05:23:41  18  A.  I have no technical background.

05:23:42  19  Q.  You're not offering any opinions on infringement?

05:23:44  20  A.  No, sir.

05:23:45  21  Q.  You didn't analyze any prior art?

05:23:47  22  A.  No.  We hired experts for that, sir.

05:23:51  23  Q.  And you're not offering opinions on the validity or

05:24:00  24  invalidity of the patents in this case, correct?

05:24:02  25  A.  I will not, no.

05:24:03   1   Q.   Now, if we can turn to the asserted patents.

05:24:06   2         Can you remind us, I'm not sure we heard it today,

05:24:10   3   who are the named inventors of the '450 and '338 patents?

05:24:12   4   A.   The -- there are several different Defendants.  So the

05:24:15   5   four -- the '331 and -- sorry, the '311 and the '338 come

05:24:22   6   from Casio.  There is Mr. Yamada who is on one of them, and

05:24:29   7   Mr. Shirasaki who is on two of them.

05:24:32   8   Q.   Okay.

05:24:32   9   A.   There is a Mr. Shaikh who was on the '450.  And there

05:24:36   10  were a couple of other inventors, as well, but those are

05:24:40   11  the primary.

05:24:40   12  Q.   None of the people who are named as inventors ever

05:24:43   13  worked for Solas, correct?

05:24:44   14  A.   They did not, sir.

05:24:45   15  Q.   And the '450 patent, that was filed by Casio in 1997?

05:24:49   16  A.   I believe that's correct.

05:24:51   17  Q.   And it expired in 2017?

05:24:53   18  A.   It did.

05:24:54   19  Q.   That's more than three years ago?

05:24:56   20  A.   Yes, sir.

05:24:56   21  Q.   Casio is a big company, right?

05:24:58   22  A.   Casio is a big company.

05:25:00   23  Q.   In Japan?

05:25:01   24  A.   Yes.

05:25:01   25  Q.   Has a lot of engineers?

| | | |
|---|---|---|
| 05:25:02 | 1 | A.  It does. |
| 05:25:03 | 2 | Q.  Lot of resources? |
| 05:25:05 | 3 | A.  I assume. |
| 05:25:06 | 4 | Q.  And they make good products, right? |
| 05:25:09 | 5 | A.  I believe so. |
| 05:25:09 | 6 | Q.  So from 1997 to 2016, Casio had the '450 patent, |
| 05:25:16 | 7 | correct?  For 19 years? |
| 05:25:17 | 8 | A.  Until -- I'm sorry, I didn't hear, what's the second |
| 05:25:20 | 9 | date? |
| 05:25:20 | 10 | Q.  From 1997 until 2016, Casio had the '450 patent? |
| 05:25:24 | 11 | A.  Correct. |
| 05:25:25 | 12 | Q.  19 years? |
| 05:25:26 | 13 | A.  Yes. |
| 05:25:26 | 14 | Q.  It's a long time in the electronics industry, isn't it? |
| 05:25:29 | 15 | A.  I don't have an opinion one way or the other. |
| 05:25:33 | 16 | Q.  And in all those years, 19 years Casio had the '450 |
| 05:25:38 | 17 | patent, Casio never offered OLED display technology using |
| 05:25:42 | 18 | the technology described in that patent, correct? |
| 05:25:44 | 19 | A.  I don't know that.  They had formed a joint venture |
| 05:25:50 | 20 | with Toppan in 2012, and I don't know what came out of |
| 05:25:54 | 21 | that. |
| 05:25:54 | 22 | Q.  Do you know a Mr. O'Riordan at -- who used to be |
| 05:25:58 | 23 | Solas's chief technology officer? |
| 05:26:01 | 24 | A.  He is Solas's -- oh, he is a chief technology officer. |
| 05:26:05 | 25 | Q.  He's not an employee of Solas, right? |

05:26:07  1   A.  Not a direct employee.

05:26:08  2   Q.  And you understand he was deposed in this case as a

05:26:12  3   corporate representative of Solas?

05:26:12  4   A.  I don't know what capacity, but he was deposed.

05:26:14  5   Q.  He was asked:  Does Solas contend that Casio ever

05:26:18  6   manufactured or sold any products that practice the

05:26:20  7   invention of the '338 patent?

05:26:22  8            And he answered:  We're not aware, no.

05:26:24  9            Is that accurate?

05:26:25  10  A.  That's Casio.  I was speaking of the joint venture

05:26:29  11  between Toppan and Casio.

05:26:30  12  Q.  And he was asked:  Is Solas aware of any Casio products

05:26:33  13  that practice the invention of the '450 patent?

05:26:35  14            And he said:  No.

05:26:36  15            Is that correct -- is that accurate?

05:26:38  16  A.  I assume.  I don't have the transcript.

05:26:40  17  Q.  Solas isn't aware of Casio ever using the technology of

05:26:43  18  the '450 patent?

05:26:44  19  A.  I am not.

05:26:44  20  Q.  And you're here as the corporate representative of

05:26:46  21  Solas, correct?

05:26:46  22  A.  Yes, sir.

05:26:47  23  Q.  And you said that Solas investigated these patents for

05:26:51  24  many months, if not years, before purchasing them?

05:26:53  25  A.  We did.

05:26:53   1   Q.   The '338 patent was filed for by Casio in 2005; is that

05:27:00   2   right?

05:27:00   3   A.   I believe so.  I don't have the patent in front of me.

05:27:02   4   Q.   And, again, it was sold in 2016?

05:27:05   5   A.   Yes, sir.

05:27:06   6   Q.   And in all those years, Casio never offered an OLED

05:27:10   7   product using the technology of the '338 patent, correct?

05:27:14   8   A.   I don't believe so.

05:27:14   9   Q.   Now, you understand that Samsung Galaxy phones with

05:27:19   10   OLED displays were released in the U.S. in 2009, right?

05:27:23   11   A.   I believe so.

05:27:24   12   Q.   And that was before Solas existed?

05:27:26   13   A.   Correct.

05:27:28   14   Q.   Casio owned the patents for seven years while Samsung

05:27:33   15   was selling its Galaxy phones with OLED displays, correct?

05:27:36   16   A.   Yes.

05:27:39   17   Q.   From 2009 to 2016?

05:27:41   18   A.   That sounds correct, yes, sir.

05:27:43   19   Q.   And Solas was formed in March 2016?

05:27:45   20   A.   Yes, sir.

05:27:45   21   Q.   And it bought the patents from Casio in April of 2016?

05:27:48   22   A.   It did.

05:27:49   23   Q.   And you understand that Casio had a patent broker

05:27:52   24   helping to advise it on the marketing and sale of its

05:27:55   25   portfolio of patents?

| | | |
|---|---|---|
| 05:27:56 | 1 | A.  It did. |
| 05:27:57 | 2 | Q.  And it was selling some 724 patents relating to OLEDs? |
| 05:28:01 | 3 | A.  Yes. |
| 05:28:02 | 4 | Q.  Patent broker was a company called Quinn Pacific? |
| 05:28:05 | 5 | A.  Yes. |
| 05:28:06 | 6 | Q.  They're well respected, right? |
| 05:28:08 | 7 | A.  They are. |
| 05:28:08 | 8 | Q.  You're familiar with them? |
| 05:28:09 | 9 | A.  I am. |
| 05:28:10 | 10 | Q.  And their job was to help Casio get the best deal they |
| 05:28:13 | 11 | could for that 724 patents, correct? |
| 05:28:16 | 12 | A.  Yes. |
| 05:28:16 | 13 | THE COURT:  Let's make sure that the question is |
| 05:28:18 | 14 | complete before the answer is given and the answer is given |
| 05:28:20 | 15 | before the next question is asked.  You all are crowding |
| 05:28:23 | 16 | each other a little bit, all right? |
| 05:28:25 | 17 | THE WITNESS:  Sorry, Your Honor. |
| 05:28:27 | 18 | MR. LERNER:  Thank you, Your Honor. |
| 05:28:27 | 19 | THE COURT:  Let's continue. |
| 05:28:29 | 20 | Q.  (By Mr. Lerner)  Patent brokers generally get paid a |
| 05:28:33 | 21 | commission on the sales price, kind of like real estate |
| 05:28:35 | 22 | brokers, correct? |
| 05:28:35 | 23 | A.  They do. |
| 05:28:36 | 24 | Q.  And there were attorneys for Solas given access to |
| 05:28:38 | 25 | Casio confidential information as part of that process? |

05:28:40  1    A.   Yes.

05:28:41  2    Q.   You had experts helping you out?

05:28:43  3    A.   At what point in time?

05:28:47  4    Q.   In the valuation of the Casio portfolio?

05:28:48  5    A.   Yes.

05:28:49  6    Q.   And, in fact, you had Mr. Stephen Dell, who we heard

05:28:51  7    about this morning, your damages expert in this case, he

05:28:55  8    was advising Solas at that time on the value of Casio's

05:28:58  9    patents, correct?

05:28:58  10   A.   I'm not sure at what point in time, but he did advise

05:29:03  11   us.

05:29:03  12   Q.   You recall that he advised you in connection with the

05:29:07  13   purchase of that portfolio, correct?

05:29:09  14   A.   I believe so.

05:29:11  15   Q.   Mr. Dell has been advising Solas since all the way back

05:29:15  16   in 2016, correct?

05:29:16  17   A.   Yes, sir.

05:29:17  18   Q.   And Casio had its expert advisors, too, right?

05:29:22  19   A.   I don't know.

05:29:23  20   Q.   They had Quinn Pacific?

05:29:25  21   A.   They're the broker.

05:29:27  22   Q.   And they were working for Casio?

05:29:28  23   A.   They were.

05:29:29  24   Q.   And Casio with all the information it had, with its own

05:29:33  25   experience in the industry and its technology, it sold the

05:29:36  1   entire set of 724 patents for $1.15 million?

05:29:41  2   A.  Correct.

05:29:41  3   Q.  And if you do the math, that's an average of a little

05:29:46  4   under $1600.00 per patent, correct?

05:29:49  5   A.  Yes.

05:29:49  6   Q.  Now, in 2013, did you hear that date mentioned in the

05:29:55  7   opening by your counsel?

05:29:56  8   A.  I did.

05:29:57  9   Q.  Solas didn't exist then, did it?

05:29:59  10  A.  It did not.

05:30:00  11  Q.  In May 2013, Casio was the owner of the '450 and '338

05:30:05  12  patents?

05:30:05  13  A.  Yes.

05:30:06  14  Q.  And we know that Casio was willing to not just license

05:30:10  15  but sell those patents with 722 more in 2016 for $1.15

05:30:19  16  million, correct?

05:30:20  17  A.  Correct.

05:30:20  18  Q.  Now, in 2018, a company called Microchip was auctioning

05:30:26  19  off a different set of patents, correct?

05:30:28  20  A.  Yes, sir.

05:30:29  21  Q.  And those related to touch sensors, correct?

05:30:32  22  A.  Yes.

05:30:33  23  Q.  Microchip is also a big company?

05:30:35  24  A.  They are.

05:30:35  25  Q.  And they had patent brokers helping them, too?

05:30:38   1   A.   Yes, they did.

05:30:39   2   Q.   You mentioned Houlihan Lokey, I believe?

05:30:43   3   A.   Correct.

05:30:43   4   Q.   And Houlihan Lokey went around to try to create

05:30:46   5   interest in this portfolio for Microchip, right?

05:30:48   6   A.   I believe so.

05:30:49   7   Q.   There was a competitive bidding process in which Solas

05:30:53   8   participated?

05:30:54   9   A.   We bid on the patents.  I -- we didn't have visibility

05:30:59  10   as to who the other bidders were.

05:31:01  11   Q.   Do you know if there were other companies that were

05:31:03  12   interested in purchasing the portfolio?

05:31:05  13   A.   We were told there were.

05:31:06  14   Q.   And in late December of 2018, Microchip sold Casio --

05:31:12  15   or sold Solas that portfolio of 12 patents for $500,000.00?

05:31:16  16   A.   Correct.

05:31:18  17   Q.   And that's -- if you do the math -- under $42,000.00

05:31:22  18   per patent, correct?

05:31:24  19   A.   Correct.

05:31:24  20   Q.   And it's five months after buying those patents that

05:31:29  21   Solas is asking for -- Solas filed this lawsuit in which

05:31:35  22   you're asking for more than $35 million on just one, the

05:31:39  23   '311 patent, correct?

05:31:40  24   A.   I believe that's correct.

05:31:42  25   Q.   You filed this lawsuit about five months after you

05:31:45  1  bought the patents, right?

05:31:46  2  A.  Yeah, I'm not sure of the timing, but I'll take your

05:31:49  3  representation as true.

05:31:50  4  Q.  Solas has a website, correct?

05:31:52  5  A.  We have a website, sure.

05:31:55  6       MR. LERNER:  And, actually, Your Honor, I'm going

05:31:56  7  to talk now about licensing.  This may be a good time to

05:32:00  8  seal the courtroom.

05:32:00  9       THE COURT:  If you're going to ask questions about

05:32:03  10  licensing, I'll seal the courtroom.

05:32:05  11       MR. LERNER:  Thank you, Your Honor.

05:32:06  12       THE COURT:  All right.  I'll order the courtroom

05:32:07  13  sealed and direct those present not subject to the

05:32:09  14  protective order to excuse themselves and remain outside

05:32:12  15  the courtroom until it's reopened and unsealed.

05:32:16  16       (Courtroom sealed.)

05:32:16  17       (This portion of the transcript is sealed

05:32:16  18       and filed under separate cover as

05:32:20  19       Sealed Portion No. 2.)

05:44:37  20       (Courtroom unsealed.)

05:44:38  21       THE COURT:  All right.  For the record, the

05:45:02  22  courtroom is unsealed and reopened.

05:45:05  23       Please continue, counsel.

05:45:06  24       MS. FAIR:  Thank you, Your Honor.

05:45:08  25  Q.  (By Ms. Fair)  We talked a little bit earlier -- we

05:45:10  1  heard you talking about some of the licenses that existed

05:45:13  2  to the Casio portfolio before you had it.  We saw that

05:45:16  3  Solas was talking about OLED displays, smartphones, you

05:45:21  4  know, other companies and other spaces.  Can you tell us

05:45:23  5  some examples of some of those companies?

05:45:26  6  A.  Yes.  Actually, if you pull up the license agreement --

05:45:31  7  sorry, the sale agreement, it's in the back of the sale

05:45:34  8  agreement.  But there were a host of companies, Qualcomm,

05:45:38  9  Microsoft.  There were just many, many companies that they

05:45:41  10  had licenses to in all those areas in the phone, in the

05:45:45  11  camera market.  Almost every major camera manufacturer was

05:45:49  12  licensed.

05:45:50  13  Q.  And so -- I'm sorry, go ahead, Mr. Padian.

05:45:52  14  A.  No.  There were many, many companies.  What we put in

05:45:55  15  the website, we try to be accurate as to the areas in which

05:45:59  16  the portfolio had been licensed.  You probably should have

05:46:04  17  been a little bit -- you know, that they were previously

05:46:06  18  licensed or licensed by Casio.

05:46:10  19  Q.  What does it tell you that companies like Qualcomm and

05:46:13  20  some of those others who had already licensed the Casio

05:46:17  21  portfolio, what does that tell you about the strength of

05:46:19  22  the portfolio itself, even before it got to your hands?

05:46:22  23  A.  It validates the strength of the portfolio.  It says

05:46:26  24  that these companies who have also great engineers see the

05:46:31  25  need to take a license and to utilize that technology.

| | | |
|---|---|---|
| 05:46:35 | 1 | Q.  I want to talk a little bit about the sale of the Casio |
| 05:46:39 | 2 | portfolio to Solas. |
| 05:46:41 | 3 | We heard some questions about Quinn Pacific, and |
| 05:46:44 | 4 | they were trying to get the best deal for Casio.  Do you |
| 05:46:48 | 5 | know whether Quinn Pacific had access to all of the |
| 05:46:53 | 6 | confidential information that Samsung has provided here? |
| 05:46:56 | 7 | A.  They did not. |
| 05:46:57 | 8 | Q.  Do you know whether Quinn Pacific had spent millions |
| 05:47:01 | 9 | doing teardowns that Solas did? |
| 05:47:02 | 10 | A.  They certainly did not. |
| 05:47:04 | 11 | Q.  Do you know whether Casio knew of Samsung's use of |
| 05:47:11 | 12 | their technology? |
| 05:47:12 | 13 | A.  They did not. |
| 05:47:14 | 14 | MR. LERNER:  Objection, Your Honor, calls for |
| 05:47:15 | 15 | speculation. |
| 05:47:17 | 16 | THE COURT:  Well, he answered based on his own |
| 05:47:20 | 17 | personal knowledge, and your objection is untimely.  It's |
| 05:47:24 | 18 | overruled. |
| 05:47:25 | 19 | Let's continue. |
| 05:47:27 | 20 | Q.  (By Ms. Fair)  How do you know that Casio didn't know |
| 05:47:28 | 21 | about Samsung's use of their technology? |
| 05:47:30 | 22 | A.  Two reasons.  The first is they presented no evidence |
| 05:47:34 | 23 | of infringement by Samsung.  So when we first looked at it, |
| 05:47:38 | 24 | all this showed was infringement by LG.  It was very |
| 05:47:42 | 25 | cursory infringement.  We really had to dig. |

05:47:44  1      We purchased these patents really not knowing for
05:47:48  2  sure that Samsung had infringed them.  We believed, but we
05:47:52  3  didn't really know until we had spent the amount of money
05:47:54  4  we had spent.
05:47:56  5      The second reason is we spoke to one of the
05:47:58  6  inventors.  We presented to them what we thought was the
05:48:01  7  Samsung infringement, and he was shocked.  He had no idea.
05:48:04  8  Q.  When was that?
05:48:05  9  A.  That was prior to -- that was just after purchasing the
05:48:08  10  patents, maybe a few months after purchasing the patents.
05:48:12  11  Q.  We heard some criticism of Solas business model because
05:48:17  12  you don't make a product?
05:48:18  13  A.  Correct.
05:48:23  14  Q.  Is this business model of buying patents and then
05:48:28  15  pursuing licensing revenues for those patents, are there
05:48:33  16  other companies that do that?
05:48:34  17  A.  Yes.
05:48:35  18  Q.  Can you give us an example?
05:48:37  19  A.  Samsung.  Samsung does the same exact thing.  In fact,
05:48:41  20  they have a company called Intellectual Keystone Properties
05:48:48  21  that they funded that goes out and buys patents to seek to
05:48:51  22  license those patents and enforce those patents.
05:48:53  23  Q.  So do you think it's fair for Samsung to stand up here
05:48:57  24  and minimize the inventions in this case because Solas
05:49:03  25  doesn't make a product?

05:49:04   1   A.   No.

05:49:05   2           MR. LERNER:   Objection, Your Honor, argumentative.

05:49:07   3           THE COURT:   Calls for an opinion, and it's

05:49:09   4   sustained.

05:49:10   5   Q.   (By Ms. Fair)  Mr. Padian, does Solas own the property

05:49:14   6   right, do they own the deed to the inventions in this case?

05:49:17   7   A.   Yes, we do.

05:49:17   8   Q.   Do you own it any less because you don't make a

05:49:21   9   product?

05:49:21  10   A.   Absolutely not.

05:49:22  11           MS. FAIR:   I'll pass the witness.

05:49:23  12           THE COURT:   Additional cross, Mr. Lerner?

05:49:25  13           MR. LERNER:   Very briefly, Your Honor.

05:49:30  14           THE COURT:   Go ahead.

05:49:34  15           MR. LERNER:   Thank you.

05:49:34  16                       RECROSS-EXAMINATION

05:49:35  17   BY MR. LERNER:

05:49:35  18   Q.   Mr. Padian, you mentioned Casio had licensed some

05:49:39  19   patents in its portfolio?

05:49:40  20   A.   Yes, sir.

05:49:40  21   Q.   For selling it?

05:49:41  22   A.   Yes.

05:49:42  23   Q.   And Casio was aware of the value of those patents -- of

05:49:44  24   those licenses?

05:49:45  25   A.   I don't -- I can't speculate to what Casio knew.

05:49:50  1   Q.  They were licenses that Casio had entered into,

05:49:53  2   correct?

05:49:53  3   A.  Correct.

05:49:53  4   Q.  So Casio, of course, is aware of those licenses,

05:49:56  5   correct?

05:49:56  6   A.  Yes.

05:49:57  7   Q.  And with that knowledge and its knowledge of the

05:49:59  8   market, it sold the entire set of 724 patents to Solas for

05:50:04  9   $1.15 million, correct?

05:50:06  10  A.  No, sir.

05:50:07  11  Q.  Solas --

05:50:08  12  A.  You said knowledge in the market.  They didn't have

05:50:11  13  knowledge in the market.  Knowledge in the market would

05:50:13  14  have been Samsung's -- the extent of Samsung and LG's

05:50:16  15  infringement.  They had no idea of Samsung's infringement.

05:50:19  16  Q.  Sir, it's your testimony that Casio did not know the

05:50:22  17  OLED market?

05:50:24  18  A.  They did not know the market as it existed that

05:50:28  19  companies such as Samsung, to the extent they were using

05:50:31  20  the technology.  No, they did not know.

05:50:33  21  Q.  And am I right that you said Casio presented no

05:50:37  22  evidence to you or others that Samsung had infringed?

05:50:37  23  A.  That's correct, they had no idea of Samsung's

05:50:42  24  infringement.

05:50:42  25  Q.  They had presented no evidence to you that they

| | | |
|---|---|---|
| 05:50:45 | 1 | infringed, that there was any infringement, correct? |
| 05:50:47 | 2 | A.  Correct. |
| 05:50:48 | 3 | MR. LERNER:  Thank you, Your Honor.  That's all I |
| 05:50:51 | 4 | have. |
| 05:50:51 | 5 | THE COURT:  All right.  Is there redirect -- |
| 05:50:53 | 6 | further redirect? |
| 05:50:54 | 7 | MS. FAIR:  No, Your Honor. |
| 05:50:55 | 8 | THE COURT:  All right.  Mr. Padian, you may step |
| 05:50:57 | 9 | down. |
| 05:50:58 | 10 | THE WITNESS:  Thank you, Your Honor. |
| 05:50:59 | 11 | THE COURT:  Ladies and gentlemen, I'm not going to |
| 05:51:12 | 12 | have the Plaintiffs call their next witness.  It's almost |
| 05:51:15 | 13 | 6:00 o'clock. |
| 05:51:15 | 14 | We're going to stop for the day at this point. |
| 05:51:18 | 15 | If you will, members of the jury, when you leave |
| 05:51:21 | 16 | the courtroom in a few minutes, please take your notebooks |
| 05:51:24 | 17 | with you and leave them on the table in the jury room. |
| 05:51:29 | 18 | You're welcome to take your face shields with you or leave |
| 05:51:33 | 19 | them there and have them there in the morning.  It's |
| 05:51:36 | 20 | strictly up to you. |
| 05:51:37 | 21 | As you leave this evening, I want to remind you of |
| 05:51:41 | 22 | a few things.  Unless you live alone, you're going to get |
| 05:51:46 | 23 | asked when you walk through the door, what happened today? |
| 05:51:46 | 24 | Remember my admonition to you.  Blame it on me.  But don't |
| 05:51:51 | 25 | even try to answer that question. |

| | | |
|---|---|---|
| 05:51:52 | 1 | It is critical that you not communicate with |
| 05:51:55 | 2 | anyone in any way about what's happened in this trial and |
| 05:51:59 | 3 | that you follow all the other instructions I've given you. |
| 05:52:02 | 4 | I'm going to ask you to be back in the jury room assembled |
| 05:52:06 | 5 | and ready to go by 9 -- excuse me, by 8:30 in the morning. |
| 05:52:10 | 6 | We'll try to follow more of the schedule I talked about |
| 05:52:13 | 7 | tomorrow and through the remainder of the week.  Please |
| 05:52:17 | 8 | travel safely to your homes. |
| 05:52:19 | 9 | And with that, the jury is excused for the |
| 05:52:21 | 10 | evening. |
| 05:52:21 | 11 | COURT SECURITY OFFICER:  All rise. |
| 05:52:25 | 12 | (Jury out.) |
| 05:53:03 | 13 | THE COURT:  Be seated, please. |
| 05:53:05 | 14 | Counsel, let me remind you of your meet-and-confer |
| 05:53:07 | 15 | obligations.  Let me remind you of the discussion we had in |
| 05:53:12 | 16 | chambers this morning about a more accurate, fulsome, and |
| 05:53:16 | 17 | complete rendition of disputes that remain overnight by way |
| 05:53:20 | 18 | of both sides' positions being set forth in any notebook |
| 05:53:25 | 19 | that's delivered to chambers, and speaking with a single |
| 05:53:29 | 20 | joint voice to the Court rather than multiple, |
| 05:53:33 | 21 | individualized emails overnight at various wee hours of the |
| 05:53:41 | 22 | morning. |
| 05:53:42 | 23 | If there are disputes that have not been able to |
| 05:53:44 | 24 | be resolved, we will take them up, and I will be in |
| 05:53:47 | 25 | chambers not later than 7:30 in the morning.  And we'll do |

05:53:51   1   our best to start with the jury at 8:30 tomorrow.

05:53:53   2        Remember, before I bring the jury in tomorrow, I

05:53:57   3   will first ask outside of their presence for a

05:54:00   4   representative of each side to go to the podium and read

05:54:03   5   into the record those items from the list of pre-admitted

05:54:05   6   exhibits that have been used during today's portion of the

05:54:09   7   trial.  And I'll follow that practice on a rolling basis

05:54:12   8   throughout the remainder of the trial.

05:54:14   9        Short of a few seconds, we have used one whole

05:54:19   10  hour of trial time this afternoon, which is allocated 35

05:54:24   11  minutes to Plaintiff and 25 minutes to Defendant, averaging

05:54:32   12  and rounding just a little bit.

05:54:35   13       Plaintiffs, tell me who you intend to call as your

05:54:39   14  first witness tomorrow.

05:54:41   15       MS. FAIR:  Mr. Jalil Shaikh.

05:54:43   16       THE COURT:  And what's your estimated time for

05:54:45   17  direct?

05:54:46   18       MS. FAIR:  45 minutes.

05:54:47   19       THE COURT:  All right.  Am I correct, counsel,

05:54:52   20  that the disputes over deposition designations that you

05:54:57   21  brought me this morning still remain, or have you had an

05:55:01   22  opportunity to work those out during the course of the day?

05:55:05   23       MR. MIRZAIE:  I believe they still remain,

05:55:07   24  Your Honor.

05:55:07   25       THE COURT:  All right.  I'm not going to keep you

05:55:12  1    here this evening.  We'll take those up first thing in the

05:55:15  2    morning.  When do you anticipate putting on that deposition

05:55:18  3    witness.

05:55:19  4             MR. MIRZAIE:  Right after Mr. Shaikh.  So second

05:55:21  5    witness tomorrow morning.

05:55:21  6             THE COURT:  Well, we'll resolve them before we

05:55:25  7    begin with the first witness.  Hopefully, any adjustments

05:55:29  8    can be done during that intervening period of time.

05:55:32  9             MR. MIRZAIE:  I'm sure they can.

05:55:33  10            THE COURT:  Is there anything else that the

05:55:35  11   parties are aware of that the Court needs to know about

05:55:37  12   before we recess for the evening?

05:55:39  13            MR. FENSTER:  Your Honor, we'd like some guidance

05:55:44  14   as to physical demonstratives and handing them to the

05:55:47  15   witness, COVID protocols, what -- what can we do?  Is

05:55:53  16   there --

05:55:54  17            THE COURT:  It's going to depend on what you're

05:55:56  18   talking about, Mr. Fenster.

05:55:58  19            MR. FENSTER:  If we want to hand an actual device

05:56:00  20   or physical device to the jury to allow them to touch it,

05:56:05  21   to see it, not necessarily a phone, but a physical

05:56:09  22   demonstrative, are there any -- one, is that allowed given

05:56:13  23   COVID protocols?  And, two, how can we make arrangements to

05:56:18  24   have some kind of sanitizer or something?

05:56:21  25            THE COURT:  All right.  With regard to a tangible

05:56:25  1  demonstrative, it is not my practice to allow that to be

05:56:28  2  handed to the jury and passed around.  It's a jury aid.

05:56:33  3  It's a demonstrative for use with the witness.  If you want

05:56:36  4  to use a demonstrative with the witness and you need to

05:56:39  5  approach the witness and deliver up the demonstrative,

05:56:42  6  that's fine, assuming it's your witness.

05:56:46  7       You need to make sure your witness knows about

05:56:48  8  your intention to use that.  If the witness wants to have

05:56:51  9  on gloves or some other precaution, your witness can

05:56:55  10  provide for their own protection in that regard.

05:56:57  11       I assume we're talking about smartphones or

05:57:00  12  something of that size?  You're not talking about an axle

05:57:05  13  off an 18-wheeler as a demonstrative.

05:57:08  14       MS. FAIR:  I was specifically thinking of the

05:57:09  15  patent itself.

05:57:11  16       THE COURT:  Well, the patent itself, I assume, is

05:57:13  17  an exhibit and not a demonstrative.  But if you'd like to

05:57:18  18  approach and hand it up to a witness, I see no problem with

05:57:20  19  that.

05:57:22  20       Again, just make sure your witnesses know what you

05:57:24  21  intend to do in that regard.  If there are going to be

05:57:29  22  similar demonstratives used on cross, then Defendants need

05:57:33  23  to disclose that so the witness is not surprised or put off

05:57:37  24  by hand -- by being handed something they don't know to

05:57:40  25  expect.  You just need to be upfront with each other about

| | | |
|---|---|---|
| 05:57:42 | 1 | what's going to happen in that regard, all right? |
| 05:57:45 | 2 | Are there other questions from Plaintiff? |
| 05:57:46 | 3 | MR. FENSTER:  No, Your Honor. |
| 05:57:48 | 4 | THE COURT:  Anything from Defendants? |
| 05:57:49 | 5 | MR. LERNER:  Your Honor, we may have some physical |
| 05:57:51 | 6 | exhibits, not demonstratives, but actual exhibits.  Would |
| 05:57:56 | 7 | those be treated the same way as you mentioned for |
| 05:57:59 | 8 | demonstratives? |
| 05:57:59 | 9 | THE COURT:  Treated the same way. |
| 05:58:01 | 10 | MR. LERNER:  Thank you. |
| 05:58:02 | 11 | THE COURT:  All right.  Hearing nothing further, I |
| 05:58:03 | 12 | will see you in the morning, counsel.  Have a good evening. |
| 05:58:06 | 13 | Be diligent and professional and unrelenting in your |
| 05:58:10 | 14 | meet-and-confer efforts this evening. |
| 05:58:11 | 15 | The Court stands in recess. |
| 05:58:13 | 16 | COURT SECURITY OFFICER:  All rise. |
| 05:58:16 | 17 | (Recess.) |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1                              CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                        3/1/2021
      SHELLY HOLMES, CSR, TCRR                  Date
10    FEDERAL OFFICIAL REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25