IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SOLAS OLED LTD., | )( | CIVIL ACTION NO. |
| | )( | 2:19-CV-152-JRG |
| PLAINTIFF, | )( | |
| | )( | |
| VS. | )( | |
| | )( | |
| SAMSUNG DISPLAY CO., LTD., | )( | |
| SAMSUNG ELECTRONICS CO., | )( | MARSHALL, TEXAS |
| LTD., SAMSUNG ELECTRONICS | )( | MARCH 2, 2021 |
| AMERICA, INC., | )( | 8:22 A.M. - 6:12 P.M. |
| | )( | |
| DEFENDANTS. | )( | |

<u>TRANSCRIPT OF JURY TRIAL</u>

<u>BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP</u>

<u>UNITED STATES CHIEF DISTRICT JUDGE</u>

APPEARANCES:

FOR THE PLAINTIFFS:

MR. MARC FENSTER
MR. REZA MIRZAIE
MR. ADAM S. HOFFMAN
MR. NEIL A. RUBIN
MR. JACOB R. BUCZKO
MR. JAMES S. TSUEI
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025

MR. T. JOHN WARD, JR.
MS. CLAIRE ABERNATHY HENRY
MS. ANDREA L. FAIR
WARD, SMITH & HILL, PLLC
1507 Bill Owens Parkway
Longview, TX 75604

```
 1   FOR THE DEFENDANTS:

 2   MS. MELISSA R. SMITH
     GILLAM & SMITH, LLP
 3   303 South Washington Avenue
     Marshall, TX 75670
 4

 5   MR. JEFFREY H. LERNER
     MR. JARED R. FRISCH
 6   MR. DANIEL E. VALENCIA
     MR. DANIEL W. CHO
 7   MR. TAREK J. AUSTIN
     MR. ERIC T. O'BRIEN
 8   MR. DAVID J. CHO
     MR. JORDAN V. HILL
 9   COVINGTON & BURLING LLP
     One CityCenter
10   850 Tenth Street, NW
     Washington, DC 20001-4956
11

12   MR. ROBERT T. HASLAM
     COVINGTON & BURLING LLP
13   3000 El Camino Real
     5 Palo Alto Square, 10th Floor
14   Palo Alto, CA 94306-2112

15

16

17

18   COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
19                       United States District Court
                         Eastern District of Texas
20                       Marshall Division
                         100 E. Houston
21                       Marshall, Texas   75670
                         (903) 923-7464
22

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

274

```
08:19:18    1                  P R O C E E D I N G S
08:19:18    2           (Jury out.)
08:19:19    3           COURT SECURITY OFFICER:  All rise.
08:19:20    4           THE COURT:  Be seated, please.
08:22:23    5           Are the parties prepared to read into the record
08:22:31    6   those items from the list of pre-admitted exhibits that
08:22:33    7   were used during yesterday's portion of the trial?  If so,
08:22:37    8   please go to the podium and make your offerings.
08:22:40    9           MS. HENRY:  Plaintiff is ready, Your Honor.
08:22:42   10           THE COURT:  Please proceed.
08:22:43   11           MS. HENRY:  Plaintiff reads into the record
08:22:47   12   PTX-549, PTX-550, PTX-742, and PTX-745.
08:22:54   13           THE COURT:  Any objection from Defendants to that
08:22:58   14   rendition?
08:22:59   15           MR. VALENCIA:  No, Your Honor.  Dan Valencia for
08:23:02   16   the Defendants.  We do have PTX-642, as well.
08:23:07   17           MS. HENRY:  Your Honor, that was one that was
08:23:09   18   offered by Defendants, so I was going to let them read it
08:23:12   19   into the record.
08:23:13   20           THE COURT:  All right.  Let me hear a rendition
08:23:15   21   from Defendants as to what they used during yesterday's
08:23:17   22   portion of the trial.
08:23:19   23           MR. VALENCIA:  Good morning, Your Honor.  We've
08:23:20   24   got.  I think it's DTX-642, which was used with Mr. Padian
08:23:25   25   yesterday.
```

275

08:23:25  1        THE COURT:  Anything further?

08:23:28  2        MR. VALENCIA:  No, Your Honor.

08:23:28  3        THE COURT:  Also, the Plaintiff's exhibit that was

08:23:30  4  mentioned?  Or did I misunderstand?

08:23:39  5        MR. VALENCIA:  No, Your Honor.  I -- with the

08:23:41  6  Court's indulgence for a minute.

08:23:47  7        MS. HENRY:  If that's what you say, I'm sure

08:23:49  8  that's right.

08:23:50  9        MR. VALENCIA:  Your Honor, it is DTX-642.

08:23:52  10        THE COURT:  Okay.

08:23:53  11        MR. VALENCIA:  And nothing further beyond that.

08:23:55  12        THE COURT:  All right.  Then no objection from

08:23:57  13  Plaintiff, Ms. Henry?

08:23:59  14        MS. HENRY:  She's telling you that's not right.

08:24:04  15        THE COURT:  Hang on.

08:24:04  16        Mr. Valencia, consult with your co-counsel.

08:24:07  17        MR. VALENCIA:  Thank you, Your Honor.  Will do.

08:24:28  18        Thank you for your patience, Your Honor.  It

08:24:30  19  actually is PTX-642, I misspoke.

08:24:34  20        THE COURT:  All right.  Anything further from

08:24:36  21  Defendants?

08:24:37  22        MR. VALENCIA:  No, Your Honor, just the issue we

08:24:38  23  talked about this morning.

08:24:39  24        THE COURT:  And I'll take that up in a minute.

08:24:41  25        MR. VALENCIA:  Thank you.

08:24:42  1          THE COURT:  And I gather Plaintiff has no

08:24:45  2    objection to Defendants' rendition, Ms. Henry.

08:24:47  3          MS. HENRY:  No objection, Your Honor.

08:24:49  4          THE COURT:  All right.  Thank you.

08:24:50  5          Mr. Valencia, we'll transition to what you alluded

08:24:53  6    to.  There was a request in chambers this morning for

08:24:56  7    Defendants to make a notation in the record regarding the

08:24:58  8    preservation of an exhibit-related issue.

08:25:01  9          Please proceed.

08:25:02  10          MR. VALENCIA:  Thank you, Your Honor.

08:25:02  11          So in view of the Court's denial of Defendants'

08:25:05  12    Daubert motion to exclude the opinions of Stephen Dell,

08:25:08  13    that's Docket No. 138, and Defendants' motions in limine

08:25:12  14    relating to non-comparable license agreements, that's

08:25:16  15    Docket No. -- excuse me, 224, both of which the Court

08:25:20  16    denied in its order in Docket No. 279, Defendants would

08:25:24  17    like to preserve their objections to the following

08:25:26  18    documents on Plaintiff's exhibit list.  PTX-506, 509, 517,

08:25:33  19    534, 535, 536, 537, 539, 540, 541, 542, 543, 645, 646, 647,

08:25:48  20    648, 649, 743, 744 for the reasons set forth in Defendants'

08:25:55  21    briefings.  And, again, those are all PTX exhibits.

08:25:59  22          THE COURT:  Duly noted.

08:26:03  23          MR. VALENCIA:  Thank you, Your Honor.

08:26:05  24          THE COURT:  All right.  Is Plaintiff prepared to

08:26:07  25    call their next witness?

08:26:09   1            MS. FAIR:  Yes, Your Honor.

08:26:09   2            THE COURT:  All right.  Let's bring in the jury,

08:26:11   3   please, Mr. Johnston.

08:27:00   4            COURT SECURITY OFFICER:  All rise.

08:27:03   5            (Jury in.)

08:27:20   6            THE COURT:  Please be seated.

08:28:22   7            Welcome back, ladies and gentlemen of the jury.

08:28:29   8   We'll proceed with the next Plaintiff's witness.

08:28:32   9            Plaintiff, call your next witness.

08:28:34  10            MS. FAIR:  Your Honor, the Plaintiff calls

08:28:38  11   Mr. Jalil Shaikh.

08:28:40  12            THE COURT:  All right.  The witness will come

08:28:42  13   forward and be sworn, please.

08:28:54  14            (Witness sworn.)

08:28:59  15            THE COURT:  Please come around, sir.  Have a seat

08:29:04  16   here at the witness stand.

08:29:08  17            There's water there if you'd like to pour some,

08:29:18  18   and if you'll adjust the microphone so that it's at a good

08:29:22  19   position, then we'll proceed.

08:29:28  20            All right.  Counsel, you may proceed with your

08:29:34  21   direct examination of the witness.

08:29:36  22            MS. FAIR:  Thank you, Your Honor.  And I realized

08:29:39  23   yesterday I forgot to introduce myself.  I'm Andrea Fair.

08:29:42  24   I'm partners with Johnny Ward out in Longview -- over in

08:29:47  25   Longview, if you will.

08:29:47  1          <u>JALIL SHAIKH, PLAINTIFF'S WITNESS, SWORN</u>

08:29:47  2                  <u>DIRECT EXAMINATION</u>

08:29:47  3  BY MS. FAIR:

08:29:47  4  Q.  Would you introduce yourself to the jury, please?

08:29:50  5  A.  My name is Jalil Shaikh.

08:29:51  6  Q.  And what do you have to do with this case?

08:29:54  7  A.  I'm one of the co-inventors in this patent '311.

08:29:59  8  Q.  Have you ever testified in front of a jury before?

08:30:01  9  A.  No, I have not.

08:30:03  10  Q.  Are you a little nervous?

08:30:05  11  A.  Yes, I am.

08:30:06  12  Q.  I want to talk to you a little bit about the patent and

08:30:09  13  your invention in a minute, but, first, could you tell us a

08:30:13  14  little bit about yourself?  What do you do for a living?

08:30:17  15  A.  I'm engineer by profession.  I worked in the computer

08:30:23  16  industry for about 35 years, computer chip industry, just

08:30:27  17  small electronics which is the brains of computers, cell

08:30:32  18  phones and so on.

08:30:32  19          THE COURT:  Let me stop just a minute.

08:30:35  20  Mr. Shaikh, pull the microphone a little closer to you,

08:30:38  21  sir.  It's a big courtroom.  I'd like to make sure

08:30:41  22  everybody even in the back row is able to hear you.

08:30:44  23          THE WITNESS:  Okay.

08:30:45  24          THE COURT:  Thank you.  Let's proceed.

08:30:48  25  Q.  (By Ms. Fair)  And are you still working?

08:30:50  1  A.  I stopped working last year to take care of my mother

08:30:54  2  and wife.

08:30:55  3  Q.  Do you and your wife have children?

08:30:56  4  A.  Yes, we have four children.

08:30:58  5  Q.  Tell us about them.  How old are they?  What do they

08:31:01  6  do?

08:31:01  7  A.  My eldest one is 35 years old, daughter.  She has MBA.

08:31:06  8  And my second daughter is 31 years old.  She has Master's

08:31:16  9  in healthcare, occupational therapy.  And my son is 24 --

08:31:20  10  28 years old.  He is engineer.  He works for Johnson &

08:31:24  11  Johnson.  My youngest one is 26 years old, daughter.  She

08:31:30  12  finished her Bachelor's, and she's trying to decide what to

08:31:33  13  do next.

08:31:33  14  Q.  Now, you don't sound like you're from around here.  Can

08:31:40  15  you tell us where you're from?

08:31:41  16  A.  I was born and raised in Pakistan.

08:31:45  17  Q.  When did you come to the U.S.?

08:31:46  18  A.  1981.

08:31:47  19  Q.  What brought you here?

08:31:48  20  A.  I wanted to do my Master's in electrical engineering.

08:31:55  21  That's why I came to U.S.

08:31:56  22  Q.  What was your plan when you came to the U.S.?

08:32:00  23  A.  I bought one-way ticket to come to U.S. to do my

08:32:08  24  Master's in electrical engineering.

08:32:10  25  Q.  Why is it that you wanted to come to the U.S. to

08:32:15   1   further your education?

08:32:16   2   A.  Well, at that time, early '80s, U.S. was the best place

08:32:24   3   to do engineering, and especially electrical engineering.

08:32:28   4   So I was very motivated to come to U.S.

08:32:31   5   Q.  Where did you end up going to school here?

08:32:33   6   A.  I went to Rutgers, New Jersey.

08:32:38   7   Q.  And what degree were you working on?

08:32:40   8   A.  Master's in electrical engineering.

08:32:42   9   Q.  So I take it you'd studied some electrical engineering

08:32:47  10   before?

08:32:47  11   A.  Yes.  I have Bachelor's in electrical engineering from

08:32:54  12   Pakistan.

08:32:54  13   Q.  Was it intimidating to have studied electrical

08:32:58  14   engineering in Pakistan, come to a brand new country to

08:33:02  15   continue your studies?

08:33:03  16   A.  Yes, it was.  My books -- engineering books in Pakistan

08:33:09  17   were in English, so that was okay.  But coming thousands of

08:33:14  18   miles away, away from family and all, that was hard.

08:33:20  19   Q.  When did you graduate from Rutgers with your Master's

08:33:25  20   in electrical engineering?

08:33:26  21   A.  1983.

08:33:27  22   Q.  Where did you go from there?

08:33:28  23   A.  I went to California, San Francisco Bay area to work

08:33:37  24   for company -- National Semiconductor, which is now part of

08:33:41  25   Texas Instruments.

08:33:43   1    Q.   And they do the chips like it was you mentioned a

08:33:46   2    little bit earlier, you had spent your career working on?

08:33:49   3    A.   That is correct.   They worked on small semiconductor

08:33:55   4    chips which were in different applications like computers,

08:33:59   5    cell phone, automotive, appliances.

08:34:02   6    Q.   What did you learn while you were at National?

08:34:05   7    A.   Well, I learned a lot of things.   As an example,

08:34:14   8    design, manufacturing, marketing, new product definition,

08:34:19   9    customer presentations, and several basic things.   And I

08:34:24  10    also did my MBA while I was working at National

08:34:29  11    Semiconductor.

08:34:29  12    Q.   The '311 patent that we're talking about in this case

08:34:33  13    is the touch sensor patent.   When did you start working on

08:34:37  14    touch sensors?

08:34:37  15    A.   Well, around 2007, I was hired by company Validity

08:34:49  16    Sensors as a CEO, which was in fingerprint reader

08:34:58  17    technology.   That's when I got introduced to touch sensor

08:35:01  18    area.

08:35:01  19    Q.   And you said fingerprint reader technology.   Can you

08:35:04  20    tell us what it was you were working on at Validity

08:35:09  21    Sensors?

08:35:09  22    A.   So, as I said, it is a fingerprint reader, meaning to

08:35:13  23    recognize that it is you.   They were part of -- actually

08:35:18  24    even Samsung phone, HP computers.   It was identification to

08:35:24  25    make sure it is you.

| | | |
|---|---|---|
| 08:35:31 | 1 | Q.  What ended up happening to Validity Sensors? |
| 08:35:36 | 2 | A.  Well, eventually that company was sold to another |
| 08:35:40 | 3 | company after I left. |
| 08:35:40 | 4 | Q.  Where were you when you came up with the invention with |
| 08:35:43 | 5 | your co-inventors on the '311 patent? |
| 08:35:44 | 6 | A.  I was at Atmel. |
| 08:35:48 | 7 | Q.  How did you end up at Atmel? |
| 08:35:50 | 8 | A.  Well, when I was at Validity Sensors, company was a |
| 08:36:03 | 9 | turnaround for me.  And company was making very good |
| 08:36:06 | 10 | progress in technology and customer base and so on.  I was |
| 08:36:10 | 11 | able to attract multiple buyers for that business, and one |
| 08:36:17 | 12 | of the offer was from Mr. Steven Laub, who was CEO of Atmel |
| 08:36:25 | 13 | at that time. |
| 08:36:25 | 14 | Q.  So when did he invite you to join Atmel? |
| 08:36:29 | 15 | A.  It was late 2009 when we interacted, and I started at |
| 08:36:35 | 16 | Atmel February 1st, 2010. |
| 08:36:38 | 17 | Q.  What was it that you were going to be working on when |
| 08:36:41 | 18 | you joined Atmel? |
| 08:36:42 | 19 | A.  Well, it was a very secretive project, and I was not |
| 08:36:50 | 20 | even told what I'll be working on.  Only thing I was told |
| 08:36:56 | 21 | is, hey, Jalil, it fits your background of taking the |
| 08:37:01 | 22 | concept and commercializing it, so we want you to come |
| 08:37:03 | 23 | over. |
| 08:37:03 | 24 | Q.  Why would you go work somewhere if you don't even know |
| 08:37:06 | 25 | what you're going to be working on? |

08:37:08  1  A.  Well, since I interacted with Mr. Steven Laub before

08:37:11  2  when I was CEO of Validity Sensors, I was very comfortable

08:37:18  3  with him.  We became good friends.  So I was sure it would

08:37:22  4  be something good for me.

08:37:23  5  Q.  What did you learn you would be working on once you got

08:37:28  6  hired?

08:37:28  7  A.  Once I got hired, it was secret project even within

08:37:32  8  Atmel.  Very few people knew what was going on, and I

08:37:36  9  learned that I would be working on a new concept, which is

08:37:41  10  touch sensors based on metal.

08:37:45  11  Q.  What type of company was Atmel that it was so

08:37:51  12  confidential and top secret that you would be starting a

08:37:55  13  touch sensor business for them?

08:37:56  14  A.  Well, Atmel was also, like I mentioned previously, a

08:38:01  15  National -- like National Semiconductor.  They were making

08:38:05  16  small computer chips to, again, power cell phone,

08:38:11  17  computers, and so on.

08:38:12  18       But they also had a very large business in touch

08:38:20  19  controllers.

08:38:21  20  Q.  And how does a touch controller relate to a touch

08:38:25  21  sensor?

08:38:25  22  A.  Well, we are all familiar with cell phones.  So when we

08:38:33  23  touch on cell phone, we are touching a touch sensor, which

08:38:37  24  is behind the glass, and that is a touch sensor.

08:38:44  25       And once we touch, the signal goes to the

08:38:48  1   controller, which is behind -- underneath the display or
08:38:54  2   some other place, which processes the information,
08:38:56  3   depending on where you touch the touch sensor.  So touch
08:39:02  4   sensor signal goes to the computer chip, which is called
08:39:05  5   touch controller.
08:39:06  6   Q.  How does the touch sensor itself work?
08:39:08  7   A.  Well, in a very, very simplistic way.  There are
08:39:18  8   vertical lines and there are horizontal lines, and wherever
08:39:23  9   they crisscross, it -- because of the electricity forced
08:39:30 10   into the wires, it holds a charge.
08:39:35 11        And when we touch with our finger, that charge
08:39:43 12   disappears through our body to the ground, and the touch
08:39:47 13   controller recognizes that location, and says, okay, I need
08:39:50 14   to do something about it.
08:39:51 15   Q.  So you're saying that when you touch a touch sensor,
08:39:54 16   the electricity comes into your finger and runs through you
08:39:58 17   to the ground?
08:39:58 18   A.  Yes, that is correct.
08:39:59 19   Q.  How is it that we don't get shocked when we touch touch
08:40:03 20   sensors?
08:40:03 21   A.  It's very small electricity, very small.
08:40:07 22   Q.  What are the -- what makes up a touch sensor?  You said
08:40:11 23   there's these crisscross lines.  How are they put together?
08:40:17 24   A.  Yeah.  So, as I mentioned, there are X and Y lines, and
08:40:24 25   they -- the intersections on how you make those different

08:40:30  1   technologies.  What I was working on was a plastic

08:40:34  2   substrate -- I'm going to continue to use very simple

08:40:37  3   words -- plastic substrate, and we printed X line --

08:40:41  4   horizontal lines and vertical lines on both sides of that

08:40:45  5   phone, which created that capacitance when the computer

08:40:52  6   chip pushed the electricity to those intersections.

08:40:56  7   Q.  Can you remind us, in 2010, what was the touchscreen

08:41:03  8   industry like?

08:41:04  9   A.  Well, it was very early on of touch technology.  I

08:41:10  10  remember Apple introduced their first phone around 2007 or

08:41:13  11  so.  Cell phone screens were very, very small.  And that

08:41:23  12  took off the capacitive touch technology, and the race was

08:41:27  13  on to add more capacity and so on.  So it was very infancy.

08:41:33  14  Q.  When you're saying "it was infancy," you're meaning --

08:41:36  15  I mean, we had track pads on computers and laptops.  What

08:41:40  16  was different about the touch sensors, the touchscreens

08:41:46  17  that were going on in 2007, 2010 and onward?

08:41:48  18  A.  Well, track pads and all that, they don't require the

08:41:51  19  very clear plastic film.  They can be black or white or

08:41:55  20  whatever.  Doesn't matter.  But if it has to be on a

08:41:58  21  computer, on a cell phone display, it has to be very clear.

08:42:03  22  Q.  So what was it that was being used in the industry at

08:42:07  23  the time when you started working on the touch sensor

08:42:11  24  business at Atmel for the crisscross lines that would run

08:42:16  25  the current through it?

08:42:18  1   A.  Well, even at that time, yes, it was a clear plastic

08:42:22  2   film or similar thing.  But the lines, conductive lines,

08:42:26  3   horizontal/vertical lines were made of indium tin oxide,

08:42:33  4   which is see-through material.  It's some kind of paste you

08:42:36  5   paste on that, and those were conductive lines.

08:42:39  6   Q.  And what material -- you told us when you joined Atmel

08:42:43  7   they were working with metal.  Can you explain what the

08:42:47  8   metal was they were working with at Atmel to run the

08:42:50  9   electrical current through for the touch sensors?

08:42:52  10  A.  Atmel was working -- the technology was, they were

08:42:56  11  working with copper --

08:42:58  12          THE COURT:  Just a minute.  Just a minute.

08:43:00  13      Somebody's cell phone ringing in the middle of the

08:43:02  14  trial?  I heard a cell phone.  Whose was it?

08:43:20  15      Is somebody going to tell me?

08:43:25  16      I don't think I dreamed it.  All right.  There'll

08:43:32  17  be no further disruptions.  If that happens again, I'll

08:43:36  18  take appropriate action.  If you've got a device with you,

08:43:39  19  make sure it's silenced.

08:43:41  20      As you heard me tell the jury yesterday, they

08:43:43  21  don't get to bring their cell phones in the courtroom.  So

08:43:47  22  if you're going to take the advantage that they don't have,

08:43:50  23  you're going to have to make sure it's silent.  I'll have

08:43:52  24  no more such interruptions.

08:43:54  25      All right.  Counsel, please continue.

08:43:56  1         MS. FAIR:  Thank you, Your Honor.

08:43:57  2   Q.  (By Ms. Fair)  Mr. Shaikh, you were telling us about

08:44:00  3   the metal that Atmel was using to run the current through

08:44:03  4   as compared to the clear indium tin oxide.  Could you tell

08:44:07  5   us what Atmel was working with?

08:44:09  6   A.  So Atmel was working at that time with, again, clear

08:44:12  7   plastic film, and they were working with copper lines,

08:44:15  8   horizontal and vertical lines printed on both sides.

08:44:20  9   Q.  You're telling this jury that you were putting copper

08:44:23  10  in front of a display and expecting someone to see through

08:44:26  11  it?

08:44:27  12  A.  Yes, that was a common reaction I got from the

08:44:32  13  customers in the very beginning.  But the lines were so

08:44:37  14  thin, they were about 20 times narrower and thinner than

08:44:44  15  human hair so that we cannot see with naked eye.

08:44:47  16  Q.  Why was it that Atmel was looking to work with metal,

08:44:52  17  copper, metal mesh I think you had said, instead of the

08:44:57  18  clear indium tin oxide?

08:45:00  19  A.  Well, there were -- there are many, many advantages

08:45:04  20  against indium tin oxide.  One very important one -- there

08:45:09  21  are several -- I will start from the first one -- is that

08:45:13  22  indium tin oxide is very high resistance, meaning you have

08:45:18  23  to push lot of power or the computer chip has to push lot

08:45:23  24  of force to move the electrons into indium tin oxide.

08:45:29  25  Whereas a copper, you don't have to put so much pressure

08:45:32  1   and force or voltage to push the electrons.  So that made

08:45:37  2   it very, very efficient.

08:45:40  3           To give you a reference, it was 10 times --

08:45:46  4   probably more -- 10 times better with copper.

08:45:50  5   Q.  What advantages are there when you're using a material

08:45:53  6   that has a lower resistance so you can push the electrical

08:45:57  7   current through it faster?

08:45:59  8   A.  Well, the first -- the most important thing I will say

08:46:05  9   as a computer user, also a cell phone user, let's think

08:46:10  10  about it that we are using a 10-year old computer versus

08:46:14  11  today's computer.  When you're working, how slow it is

08:46:18  12  booting up and how slow it is doing things, it is same

08:46:22  13  thing.

08:46:22  14          With indium tin oxide, you touch, and it is a slow

08:46:28  15  response.  With copper, since it is so much faster,

08:46:34  16  electrons move so much faster, reaction is fast.

08:46:38  17  Q.  You said there were other advantages to the metal mesh

08:46:42  18  over the indium tin oxide.  Can you tell us about that?

08:46:44  19  A.  Sure.  So once we had this performance that you can

08:46:47  20  touch it very fast and so on, the other big advantage was

08:46:52  21  my customers were pushing me that, look, there is a big

08:46:56  22  border around the display.  How can you help us to do it

08:47:00  23  narrow and narrow and narrow?

08:47:01  24          And so since we printed the whole thing with X and

08:47:08  25  Y lines and those connecting lines going to the computer

08:47:11  1  chip, at same time, as opposed to indium tin oxide, which

08:47:17  2  had to have some connectors, there was no way they could

08:47:22  3  compete with us to reduce the borders so that the display,

08:47:29  4  the body visual, is the maximum.

08:47:30  5  Q.  If metal mesh has these advantages, why didn't the

08:47:34  6  industry just switch from indium tin oxide to metal mesh?

08:47:37  7  A.  I wish it was that easy, but it was not.

08:47:44  8         One of the big reasons was that we wanted to put

08:47:48  9  copper lines so that they are very, very, very, very thin.

08:47:53  10  And sticking very narrow lines on a plastic film on both

08:48:01  11  sides was very, very difficult, and that's where -- was the

08:48:05  12  differentiation.

08:48:06  13  Q.  Can you -- what makes it difficult?  What happens when

08:48:09  14  you try and put these really thin metal lines on a clear

08:48:14  15  surface?

08:48:14  16  A.  Well, when you put those narrow lines on the film, then

08:48:21  17  the concern is during the downstream manufacturing process

08:48:26  18  and so on, the copper lines will just rub off, and they

08:48:30  19  won't stick and stay on the plastic film.

08:48:34  20  Q.  And were you able to figure out a way to get the copper

08:48:37  21  lines to stick and not have this mesh rub-off problem?

08:48:42  22  A.  That is very correct.  Yes, we had to figure it out,

08:48:45  23  how we could hold those thin copper lines so that they

08:48:48  24  don't rub off, yes.

08:48:50  25  Q.  And so tell us how you and your supplier were able to

08:48:53  1   figure out how to get those metal lines to stick?

08:48:56  2   A.  Again, in a very simplistic way, there was a glue which

08:49:03  3   we used, chemical glue, which we were able to work and

08:49:07  4   perfect with our partner so that thin copper lines stay.

08:49:13  5   Q.  Were others in the industry trying to make this switch

08:49:16  6   from indium tin oxide to metal mesh?

08:49:18  7   A.  That is correct.

08:49:18  8   Q.  Can you tell us about what you're aware of from being

08:49:22  9   in the industry about that?

08:49:22  10  A.  Well, I know for sure there was a very large company by

08:49:28  11  the name 3M.

08:49:31  12  Q.  The Post-it note company?

08:49:33  13  A.  Excuse me?

08:49:33  14  Q.  The Post-it note company?

08:49:36  15  A.  Yes, the Post-it note company, yes.

08:49:38  16  Q.  What were they working?

08:49:39  17  A.  Well, they were also working on metal mesh.  And there

08:49:42  18  was another Japanese company, Fuji Film, was working on

08:49:46  19  that.  And 3M specifically was also -- I believe they were

08:49:51  20  working on same copper material.  The problem they had was

08:49:55  21  they were printing on two films, just a copy of ITO-type of

08:50:04  22  technology.

08:50:05  23       But with copper, two films, they just don't work

08:50:08  24  because X and Y lines don't align properly.  So they were

08:50:11  25  not able to go to production.

08:50:13    1    Q.  What about Fuji Film?  You told us you knew they were

08:50:16    2    also working on it.  What were they working on?

08:50:18    3    A.  So Fuji film, another Japanese company, so they were

08:50:24    4    work on metal, but they were working with silver as opposed

08:50:28    5    to copper.  But silver had longevity issue, what I will

08:50:36    6    call reliability issue also when you use that for a while.

08:50:39    7    The lines were breaking.

08:50:41    8    Q.  Why would the lines break with silver?

08:50:44    9    A.  Well, let me put it this way, that the material

08:50:50   10    composition of copper is they are very tightly coupled.

08:50:59   11    The cells or small things that makes the metal, they are

08:51:03   12    very tightly coupled.  They are much more strong --

08:51:06   13    stronger together, and silver is a little bit loose, or

08:51:10   14    they were -- it broke easily.

08:51:15   15    Q.  Do you remember the time that you were sitting with

08:51:17   16    your co-inventors and you had the idea that led to this

08:51:20   17    invention?

08:51:20   18    A.  Yes.  That was a very important moment, and so I

08:51:27   19    remember that.

08:51:27   20         I was able to convince my technologist, Mr. Esat

08:51:36   21    Yilmaz, to move his family from U.K. to U.S. so that we can

08:51:42   22    be in same room, same office, and work together to develop

08:51:45   23    this technology.

08:51:46   24         It was right after new year that I took him to my

08:51:53   25    boss, Mr. Steven Laub's office, who is CEO of company, for

08:52:01   1   a pep talk and welcome and so on.  That's where we were

08:52:06   2   talking about how we were going to create differentiation,

08:52:09   3   what is different about indium tin oxide versus copper and

08:52:12   4   so on, just like the questions you already asked me.

08:52:15   5          And right there and then I said, you know,

08:52:17   6   customer are pushing me for narrow border, narrow border.

08:52:21   7   I said, you know, we can do zero border, just bend it

08:52:25   8   around.

08:52:25   9          And, of course, Mr. Steven Laub being lawyer and I

08:52:27  10   being technologist and Mr. Esat Yilmaz being a circuit

08:52:32  11   design expert and so on, we pooled our resources and we

08:52:37  12   figured it out, how we can make it happen, how we can bend

08:52:41  13   it, how it will bring value to the industry.  So it was

08:52:44  14   great moment.

08:52:45  15   Q.  So you had your big idea moment in January 2011?

08:52:49  16   A.  That is correct.

08:52:50  17   Q.  Wouldn't it have been, you know, pretty obvious to just

08:52:59  18   take what's already flexible and wrap it around a display?

08:53:03  19   A.  Well, it looks very simple now that we know it, but

08:53:09  20   there was a lot of work went behind it.  My own 35 years of

08:53:14  21   knowledge.  It is not easy to just bend it.  The lines will

08:53:17  22   break and how do you improve the circuit?  How do you

08:53:21  23   improve the quality?  And how you continue to have the

08:53:25  24   capacitance which I talked about, when you bend, how much

08:53:28  25   you're going to bend.  It was not that easy.

08:53:31   1   Q.  So once you and your co-inventors came up with your

08:53:36   2   invention, with your idea, did you go out and market it to

08:53:40   3   your customers?

08:53:40   4   A.  Absolutely.

08:53:44   5         MS. FAIR:  Mr. Wietholter, can we please have

08:53:47   6   PTX-524?

08:53:52   7   Q.  (By Ms. Fair)  And, Mr. Yilmaz, [sic] is this one of

08:53:56   8   the presentations that you took to customers to show them

08:53:58   9   your invention?

08:53:59  10   A.  Yes.  I -- this is one of the -- yes, this is the

08:54:04  11   presentation that I took to customers, yes.

08:54:05  12   Q.  Who were you presenting this to?

08:54:07  13   A.  Well, any time I develop new technology, I create a

08:54:14  14   partnership with key customers, work back and forth, and it

08:54:18  15   was Nokia -- Nokia, Motorola, Samsung were the key partners

08:54:23  16   at that time.

08:54:24  17   Q.  And what was the date of this presentation?

08:54:26  18   A.  March '11.

08:54:31  19         MS. FAIR:  If we could go to Page 2, please.

08:54:34  20   Q.  (By Ms. Fair)  At the top, we see FLM Technology

08:54:46  21   Advantages.

08:54:46  22         What is FLM?

08:54:48  23   A.  FLM is the name we used to use at that time.  That

08:54:56  24   means fine line metal.

08:54:59  25   Q.  And can you tell us --

08:55:03  1        MS. FAIR:  Mr. Wietholter, if we could see the

08:55:06  2   whole slide, please.  Thank you.

08:55:07  3   Q.  (By Ms. Fair)  Could you tell us what advantages you

08:55:09  4   were touting to your customers that your invention offered?

08:55:13  5   A.  Well, keeping indium tin oxide in mind, we wanted to

08:55:17  6   present to them that it is a flexible material, and it is

08:55:22  7   much thinner, and it is lighter, it is faster, and

08:55:28  8   manufacturing advantages, all kinds of advantages that

08:55:32  9   they're all listed here.

08:55:33 10   Q.  And we see the slim or no border that it was --

08:55:36 11   A.  Yes.

08:55:37 12   Q.  -- that your customers were looking for?

08:55:40 13   A.  That's where the whole thing started.

08:55:42 14        MS. FAIR:  If we could go to Page 3, please,

08:55:44 15   Mr. Wietholter.

08:55:45 16   Q.  (By Ms. Fair)  At the top here, we see, sleek, edgeless

08:55:50 17   tablet design concept.  What did you mean by edgeless?

08:55:53 18   A.  Well, again, as I mentioned earlier, is that people

08:55:57 19   were pushing me that, okay, we need to bring the borders

08:56:01 20   narrow and narrow and narrow.  And knowing the weakness of

08:56:04 21   indium tin oxide material and its technology, how it was

08:56:07 22   made and so on, we said, we'll give you zero border.

08:56:11 23   Q.  How was it that your invention of wrapping around the

08:56:16 24   edges of a display gives you zero borders around the phone

08:56:20 25   or tablet?

08:56:20   1    A.  Well, as I mentioned earlier, is that it is the
08:56:24   2    capability of the manufacturing.  We print the whole thing,
08:56:30   3    including the lines and signal lines and metal mesh, which
08:56:34   4    is in the middle, everything at one time as opposed to ITO
08:56:38   5    which had connectors.  You just cannot bend those, and they
08:56:43   6    will break.  Again, I'm talking about at that time.  And in
08:56:46   7    our case, it was very easy, so we were able to bend.
08:56:49   8    Q.  So bending it around moves all of the lines that run
08:56:52   9    the current to the controller behind the display?
08:56:55   10   A.  That is correct.
08:56:57   11        MS. FAIR:  Mr. Wietholter, could we go to Page 17,
08:57:01   12   please?
08:57:02   13   Q.  (By Ms. Fair)  You told us earlier that the lines had
08:57:04   14   to be printed -- I forget -- how much narrower than a human
08:57:10   15   hair?
08:57:10   16   A.  About 20 times.
08:57:12   17   Q.  And what is the measurements of the lines that you
08:57:14   18   figured out it needed to be?
08:57:16   19   A.  You know, when we started, we were at about seven
08:57:21   20   micron wide, but my customers complained that they can see
08:57:25   21   it.  So we kept on working and bringing it down narrow and
08:57:29   22   narrow.  It was not until five micron that they said, okay,
08:57:34   23   we like it now.
08:57:35   24   Q.  And what do we see from this timeline of when five
08:57:39   25   micron was something Atmel had in its manufacturing?

08:57:42  1  A.  We were at five micron on -- in around March 2010.

08:57:47  2  Q.  You gave this presentation to customers in March 2011.

08:57:50  3  Did you get to start working on a project with one of your

08:57:53  4  customers?

08:57:53  5  A.  That is correct.

08:57:55  6  Q.  Who was that?

08:57:55  7  A.  Nokia.

08:57:57  8  Q.  And can you tell us the name of the project?

08:58:00  9  A.  Jolle.

08:58:02  10         MS. FAIR:  Mr. Wietholter, can we please have

08:58:05  11  PTX-703?

08:58:06  12  Q.  (By Ms. Fair)  Can you tell us what we're looking at

08:58:12  13  here?

08:58:12  14  A.  Yes.  In our industry, this is called the price

08:58:17  15  quotation.  And that happens when they have looked at my

08:58:23  16  technology, they are comfortable enough, and then they say,

08:58:26  17  okay, let's get a project started on this one.  And it was

08:58:30  18  Nokia who named it Jolle.

08:58:32  19         So that was Jolle project we started working, and

08:58:35  20  we -- by that time, we had to have all the mechanical

08:58:38  21  specification from customer to us and back and forth, lots

08:58:41  22  of meeting and drawings and circuit design and all kind of

08:58:46  23  things.  And then gave them the pricing.

08:58:48  24  Q.  And when you say circuit design and the things that the

08:58:50  25  customer had to evaluate to get to the price quote, you had

08:58:54  1   a 3D model?

08:58:55  2   A.   That is correct.

08:58:56  3   Q.   When was it that you had this in order and had your

08:58:59  4   price quote provided to Nokia?   What's the date here that

08:59:03  5   we see on the price quote?

08:59:04  6   A.   It's May 18, 2011.

08:59:07  7   Q.   Did you end up making and shipping to them sensors?

08:59:13  8   A.   Yes.   Once we received this price quote agreement, we

08:59:18  9   worked with them and agreed that, yes, we did manufacture

08:59:22  10  samples and shipped it to them.

08:59:24  11          MS. FAIR:   Mr. Wietholter, can we please have

08:59:28  12  PTX-690?

08:59:29  13  Q.   (By Ms. Fair)   Can you tell us what we're looking at

08:59:32  14  here, Mr. Shaikh?

08:59:34  15  A.   Yes.   So this is what we call a project tracking

08:59:42  16  spreadsheet in which we list all the projects we were

08:59:46  17  working on, where the projects are, what the status is and

08:59:51  18  so on.

08:59:52  19          So if you look at Row No. 5 -- actually Row No. 3,

08:59:58  20  it shows -- 3A, actually, it shows what is a priority.   And

09:00:12  21  you can see that Jolle was a number one priority in my

09:00:13  22  organization to get going.

09:00:14  23  Q.   And if we scroll over to Column T, can you tell us when

09:00:26  24  it was that you shipped the samples that you mentioned

09:00:30  25  earlier that you provided to Nokia?

| | | |
|---|---|---|
| 09:00:30 | 1 | A.  We shipped about 800 samples to them at their request |
| 09:00:35 | 2 | on July 8th, 2011. |
| 09:00:36 | 3 | Q.  And -- I'm sorry. |
| 09:00:38 | 4 | A.  July 2011. |
| 09:00:39 | 5 | Q.  And these are working samples -- |
| 09:00:43 | 6 | A.  Yes. |
| 09:00:43 | 7 | Q.  -- of touch sensors that you provided to Nokia? |
| 09:00:45 | 8 | A.  That is correct. |
| 09:00:46 | 9 | Q.  Did Nokia ever incorporate these touch sensors into a |
| 09:00:51 | 10 | product? |
| 09:00:51 | 11 | A.  Well, when you say a product which was commercially |
| 09:00:58 | 12 | available in the market, no. |
| 09:00:59 | 13 | Q.  What's your sense -- what's your understanding of why |
| 09:01:04 | 14 | that didn't happen? |
| 09:01:06 | 15 | MR. HASLAM:  Objection. |
| 09:01:07 | 16 | THE COURT:  State your objection. |
| 09:01:08 | 17 | MR. HASLAM:  Lacks foundation, calls for hearsay. |
| 09:01:12 | 18 | THE COURT:  What's your response, Ms. Fair? |
| 09:01:21 | 19 | MS. FAIR:  He has an understanding of being in the |
| 09:01:23 | 20 | industry of what the different customers are and knows his |
| 09:01:28 | 21 | sense -- his understanding of why the project failed.  He |
| 09:01:31 | 22 | doesn't know -- you know, what Nokia told him or didn't |
| 09:01:33 | 23 | tell him isn't part of what he's being asked, just his |
| 09:01:37 | 24 | understanding of why the project didn't proceed. |
| 09:01:40 | 25 | THE COURT:  Mr. Haslam. |

09:01:42 MR. HASLAM: I thought the question was, why did Nokia not proceed. He's just going to say why he thinks Nokia didn't proceed, but he's not going to testify about why Nokia actually did.

09:01:51 THE COURT: He can answer from what knowledge he has.

09:01:54 Restate the question on that basis, please.

09:01:56 Q. (By Ms. Fair) Could you tell us based on your knowledge, your understanding of why the project didn't proceed?

09:02:01 A. So it is my understanding that they looked at the project, and Nokia was a very conservative company, and they -- this was a big leap for them to create a technology and product which is curved and so on. So I think it did not fit their culture. That's number one.

09:02:30 Number two, it is my understanding at that time they were having very tough competition from Samsung, and they were having financial difficulties. So that's my understanding.

09:02:41 Q. Did you and your co-inventors seek patent protection for your invention?

09:02:46 A. That is correct.

09:02:49 MS. FAIR: Mr. Wietholter --

09:02:51 Q. (By Ms. Fair) Well, let me ask, why? Why did you seek patent protection?

09:02:56   1    A.  Well, you know, all three of us, we were very excited,

09:03:00   2    and I was very excited, and I wanted to have the patent

09:03:05   3    protection because I felt down the road people will need

09:03:10   4    this kind of technology.

09:03:12   5         It was a very common feeling that everybody would

09:03:15   6    like to have a smaller and smaller and smaller phone but

09:03:18   7    bigger and bigger screen.  So there's no other way but to

09:03:21   8    wrap around these.  And this was for things to come.

09:03:27   9    Q.  And were y'all granted a patent?

09:03:29   10   A.  Yes.

09:03:30   11        MS. FAIR:  Your Honor, may I approach the witness?

09:03:35   12        THE COURT:  You may.

09:03:49   13   Q.  (By Ms. Fair)  Mr. Shaikh, what are you holding in your

09:03:52   14   hands?

09:03:52   15   A.  I'm holding my patent.

09:03:58   16   Q.  What does having patents like this one mean to you?

09:04:03   17   A.  Sorry.

09:04:24   18        I was very passionate to get higher education.

09:04:51   19   Due to financial difficulties, I was not able to do Ph.D.

09:05:03   20   This my Ph.D.

09:05:08   21        Sorry.

09:05:12   22   Q.  Did Atmel continue to market your invention?

09:05:15   23   A.  Yes.

09:05:16   24   Q.  And you at Atmel continued to market your invention?

09:05:20   25   A.  Yes.

09:05:22   1          MS. FAIR:  Mr. Wietholter, could we please have

09:05:24   2   PTX-650?

09:05:27   3   Q.  (By Ms. Fair)  Is this another one of the presentations

09:05:29   4   that you were out showing your customers?

09:05:30   5   A.  Yes.

09:05:31   6   Q.  What is XSense?

09:05:35   7   A.  In the very beginning when we started marketing of a

09:05:40   8   product, we said it is fine line metal, and we wanted to

09:05:46   9   have some marketing name, and so we came out with a

09:05:51  10   marketing name, which is called XSense, but basically the

09:05:54  11   same technology.

09:05:57  12          MS. FAIR:  And, Mr. Wietholter, if we could go to

09:05:59  13   Page 5, please.

09:06:01  14   Q.  (By Ms. Fair)  What are these pictures that we're

09:06:05  15   seeing on Page 5?

09:06:07  16   A.  You know, it is one thing to say, this is your concept,

09:06:14  17   and you present the concept that you can bend it and so on,

09:06:18  18   but next thing, there's nothing like having a real thing

09:06:22  19   available to show to customer.  They can feel and touch and

09:06:27  20   say, that curved sensor does work.

09:06:30  21          So, yes, these are the working samples we had.

09:06:34  22   Q.  And this is in 2012 was this particular presentation?

09:06:39  23   A.  Yes.

09:06:39  24   Q.  Is this what phones looked like in 2012?

09:06:42  25   A.  Not at all.

```
09:06:46   1   Q.  What did the displays in 2012 in commercially available
09:06:49   2   phones, what did they look like?
09:06:50   3   A.  Well, at that time, they were just very -- just flat
09:06:55   4   phones and with big, wide borders around it.
09:07:00   5   Q.  You mentioned earlier that you had showed your March
09:07:03   6   2011 presentation to Samsung.  Did you continue to show
09:07:05   7   Samsung presentations like this?
09:07:07   8   A.  Yes.
09:07:08   9   Q.  Who all at Samsung were you telling about your
09:07:12  10   technology?
09:07:13  11   A.  Well, I don't remember the names, but certainly at
09:07:20  12   which time I went over there, I met with different groups.
09:07:25  13   Two groups I remember for sure.  One group was making the
09:07:30  14   phones, flat phones, we'll call it at this time.  Then
09:07:34  15   there was another department which was working on flexible
09:07:40  16   display.  So I used to go to both departments.
09:07:45  17   Q.  What was your thought in showing your technology to
09:07:50  18   Samsung?
09:07:50  19   A.  Well, you know, at that time, since Samsung was a
09:07:58  20   rising star and it was our biggest customer, so we wanted
09:08:02  21   them to go and adopt our touch sensor also which had all
09:08:08  22   kinds of advantages.  So hoping to win their business.
09:08:13  23   Q.  So they were one of Atmel's biggest customers for the
09:08:17  24   touch controller side of the business, and you were hoping
09:08:20  25   to complement that offering with the touch sensor?
```

09:08:26  1   A.   That's correct.

09:08:27  2   Q.   What was Samsung's reaction when you were over there

09:08:29  3   showing them your technology over the years?

09:08:31  4   A.   So I believe I started going there early 2011, and I

09:08:41  5   was working with them for almost two years very

09:08:44  6   aggressively.   And every time I went over there,

09:08:50  7   performance was they were just very, very happy.

09:08:53  8            In fact, the very first time I took the sensor

09:08:55  9   with me and so on, we just -- after the meeting we went to

09:09:01  10  the lab.   They wanted to verify my claim that I had less

09:09:06  11  than 10 on -- the push, very, very low.   And they

09:09:10  12  immediately went to the lab and tested.   I was there.   They

09:09:13  13  said, oh, you are wrong, it is even better than what you

09:09:17  14  were saying.

09:09:17  15  Q.   How long did you continue meeting with Samsung and

09:09:23  16  showing them your technology?

09:09:24  17  A.   Well, as I mentioning that I -- for about two years or

09:09:30  18  so, I was working very aggressively with them that it's a

09:09:34  19  great technology and so on.   Yes, it was early stages and

09:09:38  20  so on.

09:09:39  21           And I went over there many times.   I wanted to win

09:09:42  22  their business.   I bent backward.   They were big gorilla,

09:09:48  23  you know, anything they said, yes, sir, we will do this,

09:09:51  24  yes, sir, we'll do that.   Give us the samples, okay.   Oh,

09:09:54  25  well, you know, you have border problem, okay.   We'll fix

| | | |
|---|---|---|
| 09:09:57 | 1 | it.  Oh, you have, you know, a line with a problem, okay. |
| 09:10:00 | 2 | We'll fix that.  Okay.  You have reflection problem. |
| 09:10:04 | 3 | Anything they asked us to do, we did.  And then also any |
| 09:10:09 | 4 | samples they asked us to make, we did. |
| 09:10:14 | 5 | But after two years, I said, you know, I have to |
| 09:10:17 | 6 | generate the revenue for my company and my people.  I had |
| 09:10:21 | 7 | 110 or people or so, employees.  So I started slowing down |
| 09:10:26 | 8 | and let my sales people handle, and I changed my attention |
| 09:10:29 | 9 | to other customers. |
| 09:10:30 | 10 | Q.  Do you remember when the last time was that you -- you |
| 09:10:33 | 11 | said you slowed down, but did you continue to go talk to |
| 09:10:36 | 12 | them about your technology? |
| 09:10:38 | 13 | A.  That is correct.  Most of the time, I sent my VP of |
| 09:10:42 | 14 | marketing over there. |
| 09:10:43 | 15 | Q.  Do you remember when the last time was that you went |
| 09:10:46 | 16 | over to talk to Samsung about the technology?  You or |
| 09:10:51 | 17 | someone at Atmel had gone over and talked to them? |
| 09:10:53 | 18 | A.  Well, I remember personally going there last time. |
| 09:10:57 | 19 | That was 2016, when I was not part of Atmel at that time. |
| 09:11:01 | 20 | But that was 2016, I believe. |
| 09:11:04 | 21 | Q.  Were you aware of what Samsung's goal was with their |
| 09:11:11 | 22 | touch sensors when you were meeting with them over these |
| 09:11:14 | 23 | years? |
| 09:11:14 | 24 | A.  Well, to best of my knowledge, I felt that they |
| 09:11:24 | 25 | genuinely wanted to use my touch sensor and they wanted to |

09:11:28   1   get more and more information and understanding how do we

09:11:30   2   fix moire, how do we do this.  And we provided all the

09:11:35   3   information we could.

09:11:36   4   Q.  Did you have an awareness that they were wanting to

09:11:40   5   bring their manufacturing in-house?

09:11:41   6   A.  Not at all.

09:11:44   7   Q.  Did you start working on a joint development project

09:11:48   8   with them, where you would help them get their

09:11:51   9   manufacturing up to speed?

09:11:52  10   A.  Well, while we were -- a different group, which was

09:11:57  11   doing the flexible display technology development, yes, we

09:12:01  12   were working with them, and they asked us that if we can

09:12:07  13   license the technology and they can build it in part of

09:12:12  14   their flexible display.  Very understandable.

09:12:15  15        And -- but I remember telling them that, look, you

09:12:18  16   know, in the very beginning, let me supply sensors to you.

09:12:22  17   In the meantime, we'll work with you, and it is very

09:12:25  18   understandable that if you make that part of your

09:12:28  19   manufacturing, your manufacturing cost will also go down.

09:12:32  20   As part of your manufacturing, when you bend it, the radius

09:12:35  21   will be very, very thin because when the thickness goes

09:12:39  22   down, you can bend it more.  But I don't think we went to

09:12:46  23   the end to have or sign joint agreement.

09:12:50  24   Q.  What ended up happening with Atmel's touch sensor

09:12:54  25   business?

| | | |
|---|---|---|
| 09:12:54 | 1 | A.  Well, we were making very good progress with such |
| 09:13:05 | 2 | customers like HP and Dell and so on.  We, in fact, had |
| 09:13:10 | 3 | design win with ASUS and so on. |
| 09:13:11 | 4 | I was told later on -- I was told at that time |
| 09:13:14 | 5 | that, well, you know, as much as we wanted to have a bigger |
| 09:13:19 | 6 | revenue and business, a touch controller and touch sensor |
| 09:13:22 | 7 | and one-stop shop, we want customer to come on or to us, |
| 09:13:29 | 8 | but the fundamental technology to make the chemicals and |
| 09:13:34 | 9 | chemistry and plastic and film and metal and all that is |
| 09:13:38 | 10 | very different from the computer chips.  So it does not fit |
| 09:13:44 | 11 | together.  So we would like to spin it off.  So I said, |
| 09:13:49 | 12 | okay, then I started looking for new buyers. |
| 09:13:51 | 13 | Q.  So as head of the touch sensor business unit, were you |
| 09:13:55 | 14 | able to find a buyer? |
| 09:13:56 | 15 | A.  Yes, I did. |
| 09:13:57 | 16 | Q.  Who did you sell to? |
| 09:13:58 | 17 | A.  My fierce competitor, Uni-Pixel. |
| 09:14:05 | 18 | Q.  What ended up happening -- well, when you sold to |
| 09:14:10 | 19 | Uni-Pixel, did it change the day-to-day operations for you |
| 09:14:16 | 20 | and the engineers? |
| 09:14:17 | 21 | A.  Well, as I mentioned, Uni-Pixel was my competition, and |
| 09:14:23 | 22 | they were working on very similar technology.  So it was |
| 09:14:27 | 23 | very easy for me to sell it to them because they knew the |
| 09:14:30 | 24 | market, they knew the good and bad and ugly, everything. |
| 09:14:33 | 25 | So it was easy to sell to them. |

| | | |
|---|---|---|
| 09:14:35 | 1 | So their own technology was not working.  So when |
| 09:14:43 | 2 | they looked at my technology, they said, well, you have |
| 09:14:47 | 3 | customers, you have purchase orders, and you are a |
| 09:14:51 | 4 | manufacturing, you have a factory, you're shipping for |
| 09:14:54 | 5 | revenue and so on. |
| 09:14:57 | 6 | So the second CEO, I recall, Mr. Jeff Hawthorne, |
| 09:15:03 | 7 | he had no fear with it.  Their own technology looked very |
| 09:15:05 | 8 | old.  He made a business decision.  He decided to acquire |
| 09:15:08 | 9 | my business and shut down his own business. |
| 09:15:11 | 10 | Q.  When Uni-Pixel acquired the Atmel business, do you know |
| 09:15:14 | 11 | whether they acquired the patents? |
| 09:15:15 | 12 | A.  Yes, they licensed the patents. |
| 09:15:19 | 13 | Q.  So the patents stayed with Atmel and the business went |
| 09:15:22 | 14 | to Uni-Pixel? |
| 09:15:22 | 15 | A.  That is correct.  The manufacturing, the employees, |
| 09:15:27 | 16 | factory, everything. |
| 09:15:28 | 17 | Q.  What ended up happening with Uni-Pixel?  What became of |
| 09:15:33 | 18 | them? |
| 09:15:33 | 19 | A.  Well, I will take you back a little bit.  When I was |
| 09:15:41 | 20 | Atmel and it was Uni-Pixel, both were working on similar |
| 09:15:46 | 21 | technology.  At that time, this -- the executives of |
| 09:15:52 | 22 | Uni-Pixel told their investors that they have technology |
| 09:15:58 | 23 | all figured out, they have orders, and they're ready to |
| 09:16:02 | 24 | ship, lots of volume, the market is big and so on.  And |
| 09:16:10 | 25 | that stock kept on growing very fast, and yet they were not |

| | | |
|---|---|---|
| 09:16:14 | 1 | able to deliver, especially to their own microchip |
| 09:16:21 | 2 | investors, like Intel and Dell.  And I was able to deliver, |
| 09:16:26 | 3 | "I" meaning Atmel, I was able to deliver. |
| 09:16:29 | 4 | And public found out because they were a public |
| 09:16:31 | 5 | company.  So their stock crashed and CEO was removed.  New |
| 09:16:37 | 6 | CEO came in.  And the litigation -- SEC filed a suit |
| 09:16:43 | 7 | against the management.  And that kept on going even after |
| 09:16:48 | 8 | they acquired Atmel. |
| 09:16:49 | 9 | Q.  Mr. Shaikh, are you getting anything out of this case? |
| 09:16:59 | 10 | A.  I'm being paid for my time only. |
| 09:17:02 | 11 | Q.  How are you being compensated?  How much? |
| 09:17:05 | 12 | A.  I'm being paid $330 an hour for the time I'm spending. |
| 09:17:12 | 13 | Q.  Are you here for $330 an hour?  Is that why you came? |
| 09:17:17 | 14 | A.  It is less than 5 percent of my income.  No. |
| 09:17:27 | 15 | Q.  Why is it that you're taking time away from your family |
| 09:17:31 | 16 | to be here? |
| 09:17:31 | 17 | A.  This is the reason.  I am here to protect my invention. |
| 09:17:43 | 18 | MS. FAIR:  Pass the witness. |
| 09:17:44 | 19 | THE COURT:  Cross-examination by the Defendants? |
| 09:18:00 | 20 | MR. HASLAM:  Your Honor, can I hand the binders to |
| 09:18:03 | 21 | the witness? |
| 09:18:03 | 22 | THE COURT:  You have leave to distribute binders. |
| 09:18:33 | 23 | Did opposing counsel get a binder? |
| 09:18:39 | 24 | MR. HASLAM:  I apologize. |
| 09:18:52 | 25 | THE COURT:  All right.  Mr. Haslam, you may |

| | | |
|---|---|---|
| 09:18:53 | 1 | proceed when you're ready. |
| 09:18:53 | 2 | CROSS-EXAMINATION |
| 09:18:55 | 3 | BY MR. HASLAM: |
| 09:18:55 | 4 | Q.  Mr. Shaikh, you were talking in your direct examination |
| 09:19:02 | 5 | about your visits to Samsung, correct? |
| 09:19:04 | 6 | A.  That is correct. |
| 09:19:05 | 7 | Q.  And I believe you said -- you were asked a question, |
| 09:19:11 | 8 | did Samsung -- did you know whether Samsung was going to |
| 09:19:16 | 9 | take the project in-house? |
| 09:19:18 | 10 | THE COURT:  Mr. Haslam, pull the mic a little |
| 09:19:20 | 11 | closer to you.  You're a little taller than Ms. Fair.  It |
| 09:19:23 | 12 | probably needs to be readjusted. |
| 09:19:28 | 13 | MR. HASLAM:  Sometimes I forget that. |
| 09:19:30 | 14 | Q.  (By Mr. Haslam)  You were asked on direct examination |
| 09:19:33 | 15 | this question:  Did you have an awareness that they were |
| 09:19:38 | 16 | waiting to -- wanting to bring the manufacturing in-house? |
| 09:19:43 | 17 | Your answer was:  Not at all. |
| 09:19:46 | 18 | Do you recall that testimony? |
| 09:19:47 | 19 | A.  That is correct. |
| 09:19:48 | 20 | Q.  Okay.  In fact, you knew that Samsung wanted to take |
| 09:19:56 | 21 | the manufacturing of the touch sensor in-house; isn't that |
| 09:19:56 | 22 | correct? |
| 09:20:05 | 23 | A.  The cell phone team no flexible display people were |
| 09:20:13 | 24 | working with me at that time. |
| 09:20:14 | 25 | Q.  That wasn't -- the display people told you that they |

310

09:20:22   1   wanted to take the manufacturing of the touch sensor

09:20:26   2   in-house; isn't that correct?

09:20:29   3   A.   That was very later on.

09:20:30   4   Q.   They told you that they wanted to print the touch

09:20:36   5   sensor directly on the display, correct?

09:20:38   6   A.   Partially, correct.

09:20:45   7   Q.   They told you that they wanted to print the display

09:20:50   8   directly -- to print the touch sensor directly on the

09:20:53   9   display; is that true or not?

09:20:56  10   A.   True.

09:21:04  11   Q.   So the answer you gave on direct examination wasn't

09:21:09  12   quite right, correct?

09:21:10  13        MS. FAIR:   Objection, Your Honor.   That

09:21:12  14   mischaracterizes it.   He explained that there were two

09:21:15  15   Samsungs.   He knew one was --

09:21:16  16        THE COURT:   Just a minute, Ms. Fair.   I'm going to

09:21:19  17   allow the question.   You can address it on redirect, if

09:21:23  18   necessary.   We're not going to have a jury speech in front

09:21:26  19   of the jury.   We're just going to go on with the next

09:21:29  20   question.

09:21:29  21   Q.   (By Mr. Haslam)   You want me to reask the question?

09:21:32  22   A.   Please.

09:21:33  23        THE COURT:   I want you to reask the question.

09:21:35  24        MR. HASLAM:   That makes it mandatory.

09:21:38  25   Q.   (By Mr. Haslam)   Samsung Display, which you knew made

09:21:41  1   the displays that were used in the Samsung Galaxy phones,

09:21:45  2   correct?

09:21:45  3   A.  Samsung flexible display wanted to bring manufacturing

09:21:53  4   in-house, to my knowledge.

09:21:55  5   Q.  And they told you they wanted to print the touch sensor

09:21:58  6   directly on that display?

09:22:01  7   A.  They told me very late that they would be doing that

09:22:07  8   in-house, and they wanted to license my technology.

09:22:10  9   Q.  And they did not license your technology, did they?

09:22:15  10  A.  That is correct.

09:22:16  11  Q.  Because your technology embodied in the '311 patent

09:22:23  12  doesn't -- you print the touch sensor directly on the

09:22:26  13  display, does it?

09:22:28  14         MS. FAIR:  Objection, Your Honor.  That's expert

09:22:29  15  testimony of what the claims call for and whether or not it

09:22:32  16  requires the metal be printed on -- what surface it's

09:22:36  17  required to be printed on.  That's for an expert to opine

09:22:40  18  on.  It's comparing the claims to a product.

09:22:42  19         THE COURT:  Well, he's the inventor of the '311.

09:22:47  20  He can answer as to what he understands.  That's not going

09:22:52  21  to prevent other expert witnesses later in the trial from

09:22:56  22  offering their opinions.

09:22:57  23         I'll overrule your objection.

09:23:01  24  A.  If you could please repeat the question.

09:23:04  25  Q.  (By Mr. Haslam)  Your invention, as claimed in the

09:23:08  1   claim that the jury has to consider, has a flexible touch

09:23:14  2   sensor, correct?

09:23:18  3   A.  Correct.

09:23:18  4   Q.  And that flexible touch sensor you put on a, as you

09:23:24  5   called it, a substrate or a support, correct?

09:23:27  6   A.  Correct.

09:23:27  7   Q.  Now, Atmel did not make displays, did it?

09:23:33  8   A.  Did not.

09:23:33  9   Q.  So you had this separate touch sensor and this separate

09:23:40  10  flexible substrate, and that's what you were selling to

09:23:46  11  different companies?

09:23:48  12       MS. FAIR:  Objection, Your Honor.  He's trying to

09:23:51  13  compare the specific embodiment that Atmel produced with

09:23:56  14  the Samsung product of how the metal is printed on the

09:23:59  15  substrate.  Comparing how Atmel produced the product to how

09:24:06  16  Samsung makes its products is not the proper comparison.

09:24:08  17  The comparison is the claims to the accused products.

09:24:11  18       THE COURT:  Overruled.  This is the inventor.  He

09:24:18  19  can answer questions as to how he understands his invention

09:24:22  20  worked.  Overruled.

09:24:24  21       MR. HASLAM:  Could we have Exhibit 3, Claim 7, put

09:24:28  22  up on the screen?

09:24:30  23  Q.  (By Mr. Haslam)  Now, do you know that this is the

09:24:41  24  claim that is being asserted in this case?

09:24:43  25  A.  That is correct.

09:24:44  1   Q.  Okay.  And this is the claimed invention that this jury

09:24:49  2   is going to have to match to the accused Samsung products,

09:24:54  3   correct?

09:24:54  4   A.  Understand.

09:24:56  5   Q.  So let's talk about what the elements of the claim are.

09:25:01  6         The first thing is a substantially flexible

09:25:06  7   substrate, correct?

09:25:08  8   A.  Correct.

09:25:08  9   Q.  And you were using a plastic substrate called PET?

09:25:12  10  A.  That is correct.

09:25:12  11  Q.  The next element is a touch sensor, and I'm just going

09:25:19  12  to go through some of it to highlight it for the jury.  If

09:25:24  13  you think you need to talk about more of what's in the

09:25:27  14  claim, feel free to do so.

09:25:28  15        The touch sensor was on the flexibly -- the

09:25:33  16  substantially flexible substrate, correct?

09:25:35  17  A.  That is correct.

09:25:37  18  Q.  And the touch sensor had a bunch of drive and sense

09:25:44  19  electrodes.  Those are the wires that you were talking

09:25:47  20  about, correct?

09:25:47  21  A.  That is correct.

09:25:49  22  Q.  And the flexible touch sensor was configured so it

09:25:54  23  would bend with the flexible display, correct?

09:25:58  24  A.  Correct.

09:25:58  25  Q.  You then require -- required that the flexible

| | | |
|---|---|---|
| 09:26:05 | 1 | material, the copper lines that you were describing, had to |
| 09:26:10 | 2 | form a mesh grid, correct? |
| 09:26:13 | 3 | A.   That is correct. |
| 09:26:13 | 4 | Q.   And the substantially flexible substrate and the touch |
| 09:26:22 | 5 | sensor are configured to wrap around one or more edges of a |
| 09:26:26 | 6 | display, correct? |
| 09:26:27 | 7 | A.   That is correct. |
| 09:26:28 | 8 | Q.   The claim does not require a display, does it? |
| 09:26:33 | 9 | A.   Touch sensor has to be used with a display.  That was |
| 09:26:45 | 10 | the main application. |
| 09:26:46 | 11 | Q.   The claim does not require that there be a display; |
| 09:26:51 | 12 | isn't that right?  It only requires that the flexible touch |
| 09:26:57 | 13 | sensor and the flexible substrate themselves be configured |
| 09:27:05 | 14 | to bend around a display? |
| 09:27:07 | 15 | A.   That is correct. |
| 09:27:07 | 16 | Q.   And then the last element is you have the chip, the |
| 09:27:12 | 17 | computer chip, correct? |
| 09:27:13 | 18 | A.   That is correct. |
| 09:27:14 | 19 | Q.   And because Atmel didn't sell displays, this claim |
| 09:27:22 | 20 | covered your Atmel embodiment of the touch sensor, which |
| 09:27:27 | 21 | was a touch sensor that was -- had copper drive and sense |
| 09:27:34 | 22 | electrodes that was put on this plastic PET substrate, |
| 09:27:37 | 23 | correct? |
| 09:27:37 | 24 | A.   That is correct. |
| 09:27:39 | 25 | Q.   And that was your invention? |

315

09:27:41    1    A.  Correct.

09:27:42    2    Q.  So what -- you never considered -- you never at Atmel

09:27:56    3    attempted to print the touch sensor directly on the

09:27:59    4    display, did you?

09:28:00    5           MS. FAIR:  Objection, Your Honor.  Whether or not

09:28:01    6    he tried to make the embodiment --

09:28:04    7           THE COURT:  Overruled, counsel.  You're not going

09:28:05    8    to make a jury speech in lieu of an objection.  If you have

09:28:10    9    a legal basis to object, give me that legal basis.  Don't

09:28:10   10    start with a speaking argument.  Now, if you have a legal

09:28:13   11    objection to that question, give it to me.

09:28:15   12           MS. FAIR:  It's an improper comparison, and it's

09:28:17   13    expert testimony.  It calls for expert testimony.  This is

09:28:19   14    a fact witness.

09:28:20   15           THE COURT:  Overruled.  He asked this inventor

09:28:23   16    what the inventor did with his invention.  He has personal

09:28:27   17    knowledge of that.  He's entitled to testify to it.  Your

09:28:30   18    objection is overruled.

09:28:33   19    Q.  (By Mr. Haslam)  Did you ever try to print a touch

09:28:36   20    sensor directly on a display?

09:28:38   21    A.  No.

09:28:38   22    Q.  And you couldn't have tried that because you didn't

09:28:43   23    make displays at Atmel, correct?

09:28:44   24    A.  That is correct.

09:28:49   25    Q.  So when Samsung Display told you that they were going

09:28:53  1  to try to print the touch sensor directly on the display,

09:29:01  2  you knew that that was something you hadn't tried, correct?

09:29:04  3  A.  That is correct.

09:29:05  4  Q.  And you knew that your invention embodied in Claim 7

09:29:12  5  didn't address whether or not the touch sensor and the

09:29:16  6  substrate that were separately sold could somehow be

09:29:21  7  printed directly on the display, correct?

09:29:26  8  A.  As we discussed, and I mentioned earlier, we were --

09:29:34  9  Atmel was not in display, so we could not print on a

09:29:38 10  display.  But that's where we were looking for partnership

09:29:44 11  with Samsung, flexible group to work together.

09:29:47 12  Q.  Well, the Samsung Display is the one that came up with

09:29:51 13  the idea that they wanted to print the touch sensor

09:29:55 14  directly on the display, correct?

09:30:01 15  A.  I partially agree.

09:30:02 16  Q.  And you partially disagree?

09:30:04 17  A.  Yes.

09:30:04 18  Q.  Do you know that Samsung had documents before your

09:30:14 19  invention that described an integrated touch sensor where

09:30:19 20  the touch sensor was printed directly on the display?

09:30:22 21  A.  Using copper lines, no.

09:30:30 22  Q.  Are you aware of documentation that Samsung, before the

09:30:38 23  '311 invention, had --

09:30:40 24  A.  No.

09:30:40 25  Q.  -- had planned or had developed the ability to print

| | | |
|---|---|---|
| 09:30:47 | 1 | touch sensors directly on displays? |
| 09:30:50 | 2 | A.  No, I don't. |
| 09:30:50 | 3 | Q.  Would it surprise you if there were such documents? |
| 09:31:00 | 4 | A.  Yes. |
| 09:31:02 | 5 | Q.  Now, you recognized when Samsung told you that they |
| 09:31:11 | 6 | wanted to print the touch sensor directly on the display, |
| 09:31:17 | 7 | that that would have certain advantages, correct? |
| 09:31:23 | 8 | A.  Yes. |
| 09:31:23 | 9 | Q.  And what you recognized is it would eliminate a |
| 09:31:28 | 10 | supply -- another supply chain, correct? |
| 09:31:29 | 11 | A.  In addition to other benefits, yes. |
| 09:31:31 | 12 | Q.  And by eliminating another supply chain meant that |
| 09:31:36 | 13 | Samsung wouldn't have to buy external touch sensors, such |
| 09:31:40 | 14 | as Atmel's or Alps, which is the one they were using, but |
| 09:31:45 | 15 | instead they could take that all in-house, correct, so |
| 09:31:51 | 16 | simplify the supply chain? |
| 09:31:53 | 17 | A.  Correct. |
| 09:31:53 | 18 | Q.  You also recognized that when Samsung told you -- |
| 09:32:00 | 19 | Samsung Display told you they were going to print directly |
| 09:32:02 | 20 | on the display, that that would eliminate having to put |
| 09:32:08 | 21 | another layer on top of the display, the touch sensor and |
| 09:32:11 | 22 | the substrate that Atmel or Alps or other such companies |
| 09:32:15 | 23 | were selling, correct? |
| 09:32:16 | 24 | A.  Correct. |
| 09:32:18 | 25 | Q.  And you knew that if Samsung could do that, it would |

09:32:23    1  make the display narrower, very, very narrow, and it would

09:32:29    2  eliminate the glue, which was necessary to glue the Atmel

09:32:34    3  type of external sensor, which was the substrate and the

09:32:39    4  touch sensor that Samsung would have bought and then glued

09:32:43    5  on the display, correct?

09:32:44    6  A.  Correct.

09:32:45    7  Q.  While I'm at it, let me just ask you a few questions

09:32:55    8  about pricing.

09:32:56    9        In 2012, right, when you were out marketing the

09:33:00   10  Atmel products, your competitor was ITO, correct?

09:33:08   11  A.  That is correct.

09:33:09   12  Q.  And in order to be competitive with the ITO touch

09:33:13   13  sensors that were out there, your CEO told you that you had

09:33:17   14  to price your product at a dollar per inch, correct?

09:33:22   15  A.  Correct.

09:33:23   16  Q.  And so if it was a four-inch screen, the touch sensor

09:33:26   17  would be $4, correct?

09:33:29   18  A.  Correct.

09:33:30   19  Q.  And that included not only the touch sensor on the --

09:33:34   20  on the flexible substrate, it also included the controller,

09:33:40   21  correct?

09:33:40   22  A.  No.

09:33:40   23  Q.  At one point -- anyway.  I withdraw that.

09:33:54   24        I think you testified before, in your deposition,

09:34:00   25  that by 2015 or 2016, you thought you could make a profit

| | | |
|---|---|---|
| 09:34:05 | 1 | selling your sensor at $1 per inch, correct? |
| 09:34:12 | 2 | A.  Correct. |
| 09:34:12 | 3 | Q.  And was ITO at that time still around $1 an inch? |
| 09:34:17 | 4 | A.  I don't remember exactly, but I knew that I was |
| 09:34:26 | 5 | price-competitive. |
| 09:34:28 | 6 | Q.  So companies that wanted to use ITO would buy touch |
| 09:34:33 | 7 | sensors for about $1 an inch or they could buy, for |
| 09:34:39 | 8 | example, your product for about $1 an inch? |
| 09:34:42 | 9 | A.  Correct. |
| 09:34:42 | 10 | Q.  So on a phone with a six-inch screen, that would be |
| 09:34:45 | 11 | about $6, correct? |
| 09:34:48 | 12 | A.  Correct. |
| 09:34:48 | 13 | Q.  Now, I think you said it in your testimony -- direct |
| 09:34:58 | 14 | testimony, in 2012, ITO was brittle and they couldn't bend, |
| 09:35:06 | 15 | correct? |
| 09:35:06 | 16 | A.  Correct. |
| 09:35:06 | 17 | Q.  At some point in time, were there products with ITO |
| 09:35:10 | 18 | that did bend? |
| 09:35:12 | 19 | A.  To my knowledge later on, not at that time. |
| 09:35:18 | 20 | Q.  When later on? |
| 09:35:19 | 21 | A.  The first product I'm familiar with, S7 Edge. |
| 09:35:29 | 22 | Q.  And that was a Samsung product? |
| 09:35:31 | 23 | A.  That is correct. |
| 09:35:32 | 24 | Q.  That used ITO? |
| 09:35:34 | 25 | A.  Correct. |

09:35:35   1   Q.   Now, you said you were involved in the sale of the
09:35:43   2   Atmel touch sensor business at Uni-Pixel?
09:35:46   3   A.   That is correct.
09:35:47   4   Q.   And you negotiated that on behalf of Atmel?
09:35:51   5   A.   That is correct.
09:35:53   6   Q.   And you told Mr. Dell, correct, that the principal
09:36:03   7   value in the patent portfolio that went to Uni-Pixel was
09:36:09   8   the '311 patent, correct?
09:36:15   9   A.   Well, there were a lot of other patents, too.
09:36:21  10   Q.   Was the '311 patent fundamental to the Uni-Pixel deal?
09:36:32  11   A.   Our focus was manufacturing first and then other
09:36:40  12   patents.
09:36:41  13   Q.   So you were more concerned with the equipment and the
09:36:46  14   employees and the ability to manufacture the Uni-Pixel
09:36:53  15   deal?
09:36:53  16   A.   At that time, yes.
09:36:54  17   Q.   So did you tell Mr. Dell that the technology covered by
09:36:58  18   the '311 patent was fundamental to the importance of the
09:37:03  19   license agreement being executed and that if that patent or
09:37:09  20   its application at the time were not to have been included,
09:37:12  21   that he, you, would not have executed the license?  Is that
09:37:19  22   a correct statement?
09:37:26  23   A.   Could you please repeat the question?
09:37:29  24   Q.   Yes.
09:37:30  25          Based on my discussions with Mr. Shaikh, I

09:37:33  1  understand it was his position that the technology covered

09:37:36  2  by the '311 patent was fundamental to the importance of the

09:37:41  3  license agreement being executed and that if that patent or

09:37:45  4  its application at the time were not to have been included,

09:37:50  5  that he would not have executed the license.

09:37:54  6          THE COURT:  Is that a question?  You're reading

09:37:56  7  from Mr. Dell's deposition?

09:37:57  8          MR. HASLAM:  Yes.  I'm reading from his report and

09:38:00  9  asking if he had that discussion with Mr. Dell.

09:38:03  10         THE COURT:  All I heard is you read a statement

09:38:05  11  from his report.  Let's put it in the form of a question.

09:38:08  12  Q.  (By Mr. Haslam)  Did you tell Mr. Dell what I just read

09:38:11  13  to you?

09:38:11  14  A.  I don't remember.

09:38:16  15  Q.  At the time of the Uni-Pixel deal, which was March

09:38:22  16  2015, the '311 patent didn't exist; isn't that right?

09:38:30  17  A.  We had filed for this thing.

09:38:32  18  Q.  The '311 patent didn't exist at the time of the

09:38:37  19  Uni-Pixel transaction, did it?

09:38:39  20  A.  It was awarded after.

09:38:47  21  Q.  It was awarded in 2016.

09:38:49  22  A.  Correct.

09:38:50  23  Q.  And at the time of the Uni-Pixel deal, for the fourth

09:38:53  24  time, the Patent Office had rejected the claims that Atmel

09:38:56  25  was presenting and trying to patent; isn't that true?

09:39:00   1    A.   I am not aware of that.

09:39:04   2            MR. HASLAM:   Your Honor, the issue we talked about

09:39:07   3    yesterday, I'd like to go to the prosecution history.

09:39:12   4            MS. FAIR:   I don't know that this is a discussion

09:39:13   5    that we should have in front of the jury, Your Honor, given

09:39:16   6    the Court's instruction earlier.

09:39:17   7            THE COURT:   I agree.

09:39:18   8            MS. FAIR:   I hate to interrupt but --

09:39:21   9            THE COURT:   That's all right.

09:39:21   10           Ladies and gentlemen of the jury, I've got a

09:39:23   11   matter I need to take up with counsel outside of your

09:39:25   12   presence.   In the old days pre-pandemic, I'd bring them up

09:39:30   13   here to the side of the bench, and we would talk about it

09:39:33   14   quietly, and you could stay where you are.   I can't do that

09:39:37   15   today.

09:39:37   16           So I'm going to ask you to retire to the jury

09:39:39   17   room.   I'll be as brief with them as I can be and have you

09:39:42   18   back in here shortly to continue.   This is one of those

09:39:45   19   opportunities where you can simply just close and leave

09:39:48   20   your notebooks in your chairs, and we'll have you back here

09:39:50   21   shortly.

09:39:51   22           The jury is excused to the jury room at this time.

09:39:53   23           COURT SECURITY OFFICER:   All rise.

09:39:54   24           (Jury out.)

09:39:54   25           THE COURT:   Be seated, please.

09:40:24   1            All right.  Mr. Haslam, what's your request?  You

09:40:30   2    want to use prosecution history by way of --

09:40:34   3            MR. HASLAM:  I want to show the claim --

09:40:36   4            THE COURT:  Let me ask my question before you

09:40:40   5    start talking.

09:40:41   6            MR. HASLAM:  I'm sorry.  I apologize, Your Honor.

09:40:43   7    I know I'm not supposed to do that.

09:40:43   8            THE COURT:  Well, It's impossible, even as

09:40:46   9    excellent a court reporter as I have, to write two people

09:40:48  10    speaking at the same time.

09:40:49  11            So, as I understand it, you want to refer to

09:40:52  12    prosecution history as a means to impeach this witness in

09:40:56  13    light of his last answer?

09:40:57  14            MR. HASLAM:  Yes.

09:40:57  15            THE COURT:  Specifically, what in the prosecution

09:41:00  16    history are you talking about?

09:41:02  17            MR. HASLAM:  I want to show the claim as it

09:41:04  18    existed in March of 2015 and the rejection before -- after

09:41:14  19    that, just that.

09:41:20  20            THE COURT:  What's the response from Plaintiff?

09:41:22  21            MS. FAIR:  Two things, Your Honor.

09:41:23  22            First, that's not an impeachment.  It's not

09:41:26  23    inconsistent with what this witness has said.  He said he

09:41:29  24    doesn't remember.  He doesn't have a foundation.

09:41:31  25            And the second is this witness was not personally

09:41:34  1    involved in the claims.

09:41:35  2         As you know, that's a process that happens between

09:41:38  3    the prosecuting attorneys and the examiners at the Patent

09:41:41  4    Office.  And to confront the inventor in front of the jury

09:41:44  5    with the claims that were rejected, is incredibly

09:41:46  6    prejudicial.

09:41:47  7         THE COURT:  Well, in light of the fact that the

09:41:51  8    witness told the jury in response to your question,

09:41:54  9    Mr. Haslam, that he wasn't aware, I do agree with

09:41:58  10   Plaintiff's counsel.  It would be improper impeachment for

09:42:02  11   you to show him prosecution history that he was not

09:42:04  12   involved with.

09:42:10  13        Now, we can take up at a later date what's

09:42:13  14   appropriate for your case-in-chief when we get to it, but

09:42:16  15   at this point I'll order -- or find that it's improper

09:42:19  16   impeachment.

09:42:19  17        MR. HASLAM:  Okay.  Thank you, Your Honor.

09:42:20  18        THE COURT:  Let's bring the jury back in.

09:42:21  19        We'll charge this time to the Defendant.

09:44:00  20        COURT SECURITY OFFICER:  All rise.

09:44:04  21        (Jury in.)

09:44:04  22        THE COURT:  Please be seated.

09:44:27  23        Thank you for your indulgence, ladies and

09:44:31  24   gentlemen.

09:44:31  25        Mr. Haslam, ask your next question.

09:44:35   1            MR. HASLAM:  Can we go back to Exhibit 3 of the

09:44:41   2    '311 patent?  Can we put up Figure 7?

09:44:45   3    Q.  (By Mr. Haslam)  Now, this is a drawing that's in the

09:44:49   4    patent, and this depicts what we -- part of what we saw in

09:44:56   5    Claim 7, correct, the touch sensor and the substrate?

09:45:00   6    A.  Correct.

09:45:02   7            MS. FAIR:  Objection, Your Honor.  I don't want to

09:45:04   8    have to interrupt again and excuse the jury, but I need to

09:45:09   9    make arguments about this that I know the Court doesn't

09:45:12  10    want us to do in open court.

09:45:14  11            Normally, I would just come up there, but that's

09:45:16  12    why I felt compelled to make the argument without

09:45:19  13    disrupting.  But may we have another bench conference?

09:45:29  14            MR. HASLAM:  It's an exhibit.

09:45:30  15            THE COURT:  I understand that.

09:45:31  16            MR. HASLAM:  It's in the jury's binder.

09:45:32  17            THE COURT:  I understand that, counsel.  She's

09:45:34  18    talking to me.  She's not talking to you.

09:45:38  19            All right.  Ladies and gentlemen, I'm going to ask

09:45:41  20    you to retire to the jury room one more time.  I promise

09:45:43  21    you, we will get to the bottom of this, and you won't have

09:45:46  22    to go back and forth again.

09:45:47  23            The jury is excused to the jury room.

09:45:51  24            COURT SECURITY OFFICER:  All rise.

09:45:52  25            (Jury out.)

```
09:46:18   1              THE COURT:  Be seated.
09:46:23   2              Mr. Haslam, when opposing counsel is speaking to
09:46:27   3    the Court, it is not incumbent upon you to respond for the
09:46:31   4    Court to opposing counsel.  If I want your help in
09:46:34   5    answering her, I will ask for it.  Don't do that again.
09:46:38   6              MR. HASLAM:  I will not.
09:46:38   7              THE COURT:  It shows disrespect for the Court, and
09:46:41   8    it's not to be tolerated.
09:46:43   9              MR. HASLAM:  I apologize.
09:46:43  10              THE COURT:  And, Ms. Fair, I don't know why we
09:46:47  11    didn't have whatever it is you're about to tell me
09:46:49  12    discussed and out on the table while I had the jury out
09:46:52  13    just moments ago.
09:46:53  14              You and I all know we've got an elderly gentleman
09:46:57  15    with a cane.  It's hard for him to come and go from the
09:47:00  16    jury box.  And to send them back out seconds after they
09:47:03  17    came back in, is burdensome on this jury, and I'm not going
09:47:07  18    to countenance that.  And there's no reason whatever it is
09:47:10  19    you're going to tell me shouldn't have been told to me
09:47:12  20    while they were out the first time.
09:47:14  21              So we're going to get to the bottom of this, and
09:47:17  22    we're going to move on.
09:47:18  23              This exhibit is an admitted exhibit in the case.
09:47:20  24    If he wants to question this witness as to his personal
09:47:23  25    knowledge about this patent, he's entitled to do that on
```

09:47:26   1   cross-examination.  So tell me what your problem is.

09:47:30   2        MS. FAIR:  My issue, Your Honor, is what I fear

09:47:33   3   this is going to -- and I apologize for not handling this

09:47:36   4   while the jury was out before.  I didn't know we were going

09:47:39   5   to go here.

09:47:40   6        I have no problem with them showing the jury an

09:47:42   7   admitted exhibit.  The problem is when you pull up a

09:47:45   8   specific figure of the patent -- and this is where we know

09:47:49   9   this case is going -- their display is more curved than

09:47:54  10   Figure 7 of the patent.

09:47:56  11        It's an issue that came up in claim construction.

09:47:59  12   It's -- what they're going to do is take the picture, the

09:48:03  13   Figure 7 from the patent, with the more pronounced corners

09:48:08  14   of the display and then show what their display is, which

09:48:12  15   is curved, not the same pronounced 90-degree angle, and try

09:48:15  16   and make an argument to this jury that there's not more --

09:48:19  17   more than one surface, multiple surfaces that the touch

09:48:22  18   sensor is wrapping around.

09:48:23  19        And what that is doing is comparing the preferred

09:48:27  20   embodiment that is depicted in the patent to an accused

09:48:30  21   product, which is absolutely improper.

09:48:32  22        And so going into this specific figure with the

09:48:36  23   inventor, while there's not normally an issue with talking

09:48:39  24   about content of a pre-admitted exhibit, the only reason

09:48:43  25   they're going to be doing it is for a prejudicial argument

09:48:45  1  that's improper.

09:48:46  2        THE COURT:  All right.  Ms. Fair, first of all,

09:48:48  3  it's an admitted exhibit, and every page of it is an

09:48:52  4  admitted exhibit.  And I can't tie the Defendants' hands

09:48:57  5  from asking this witness about a patent-in-suit that's in

09:48:59  6  evidence.

09:49:00  7        You can address this on cross -- on redirect.

09:49:03  8  You've got an expert witness who's coming on shortly

09:49:06  9  hereafter, who I expect whatever Mr. Haslam alludes to is

09:49:09  10  going to be able to address it and correct it within the

09:49:12  11  confines of their report.

09:49:15  12        You may be afraid that's where the Defendant is

09:49:19  13  going.  I can't keep the Defendant from going there with

09:49:23  14  this exhibit and this witness on the witness stand without

09:49:26  15  putting a thumb on the scales I'm not prepared to do.

09:49:29  16        So your objection is overruled.

09:49:34  17        Now, is there anything else about the continued

09:49:36  18  cross-examination and redirect of this witness that I need

09:49:39  19  to know about before I bring the jury back in?

09:49:43  20        Are you aware of anything else, Ms. Fair?

09:49:45  21        MS. FAIR:  I'm not at this time, Your Honor.

09:49:47  22        THE COURT:  Okay.  Mr. Haslam?

09:49:50  23        MR. HASLAM:  I'm not aware, and I don't believe

09:49:52  24  there will be anything.

09:49:53  25        THE COURT:  Is there any reason I shouldn't bring

09:49:55  1   the jury back in?

09:49:58  2           And while the jury is out, I want to say one other

09:50:01  3   thing.  There was a cell phone that went off in the middle

09:50:04  4   of this trial and nobody would fess up to it, and that's

09:50:06  5   fine.

09:50:07  6           If I hear another device interrupt this trial, I

09:50:10  7   will exclude every electronic device from everybody in this

09:50:17  8   courtroom that's inside the bar and outside the bar in the

09:50:19  9   gallery.  So don't let it happen again.

09:50:23  10          It's bothersome enough that it happens.  Most

09:50:26  11  everybody in this courtroom is either an officer of the

09:50:28  12  Court or they're somebody that works for a recognized law

09:50:33  13  firm.  And when I ask a question and nobody will even admit

09:50:35  14  what I've clearly heard, it causes the Court a great bit of

09:50:40  15  consternation.

09:50:41  16          So the only thing I can tell you is, if it happens

09:50:45  17  again, everybody in this courtroom is going to lose their

09:50:48  18  devices.  All right?

09:50:49  19          Anything else before I bring the jury back?

09:50:54  20          Let's bring the jury back, Mr. Johnston.

09:51:23  21          COURT SECURITY OFFICER:  All rise.

09:51:24  22          (Jury in.)

09:51:24  23          THE COURT:  Please be seated, ladies and

09:51:34  24  gentlemen.

09:51:34  25          Members of the jury, thank you for your

| | | |
|---|---|---|
| 09:51:39 | 1 | cooperation.  Trials are not an exact science.  Sometimes I |
| 09:51:43 | 2 | have to take things up outside your presence.  Thank you |
| 09:51:45 | 3 | for your understanding. |
| 09:51:46 | 4 | Let's proceed with the Defendants' |
| 09:51:48 | 5 | cross-examination. |
| 09:51:50 | 6 | Q.  (By Mr. Haslam)  Looking again at Figure 7, the -- |
| 09:51:53 | 7 | you'll see three separate structures, correct? |
| 09:51:57 | 8 | A.  Correct. |
| 09:51:58 | 9 | Q.  And the one that is labeled 601 is the cover or the -- |
| 09:52:04 | 10 | would be a glass cover typically, correct? |
| 09:52:07 | 11 | A.  Correct. |
| 09:52:07 | 12 | Q.  The one that is labeled 602 depicts the flexible |
| 09:52:13 | 13 | substrate, correct? |
| 09:52:14 | 14 | A.  Correct. |
| 09:52:15 | 15 | Q.  And then there's a number on the right-hand side, 612, |
| 09:52:21 | 16 | which appears to be pointing up to perhaps some line |
| 09:52:26 | 17 | that's -- light line that's going across the substrate? |
| 09:52:31 | 18 | A.  I see that.  I don't remember it, yes. |
| 09:52:35 | 19 | Q.  Yeah.  And that is depicting the touch sensor on the |
| 09:52:38 | 20 | substrate -- on the substrate, correct? |
| 09:52:41 | 21 | A.  Correct. |
| 09:52:41 | 22 | Q.  And then down below, 603 is the display, correct? |
| 09:52:47 | 23 | A.  Correct. |
| 09:52:48 | 24 | Q.  And if we go back up to the cover on the right-hand |
| 09:52:52 | 25 | side, you've got, you know, in the front what looks like a |

| | | |
|---|---|---|
| 09:53:00 | 1 | light-colored oval shape, and if we go back along, there's |
| 09:53:04 | 2 | two oval shapes and then what looks like a series of bars |
| 09:53:08 | 3 | that get -- go from small to big; is that correct? |
| 09:53:11 | 4 | A.  Volume control, yes. |
| 09:53:13 | 5 | Q.  Yeah.  So this depicts being able to put the touch |
| 09:53:18 | 6 | sensor on the side of the phone so you could do the volume |
| 09:53:21 | 7 | control using a touch sensor rather than a mechanical |
| 09:53:26 | 8 | button, correct? |
| 09:53:27 | 9 | A.  Correct. |
| 09:53:27 | 10 | Q.  And in this particular picture, this example -- this is |
| 09:53:35 | 11 | just an example, correct? |
| 09:53:36 | 12 | A.  Correct. |
| 09:53:37 | 13 | Q.  The substrate and the touch sensor have a flat part, |
| 09:53:48 | 14 | the top, correct? |
| 09:53:49 | 15 | A.  Okay. |
| 09:53:50 | 16 | Q.  And then the substrate and the touch sensor go over |
| 09:53:58 | 17 | something that's close to a right angle and go down the -- |
| 09:54:02 | 18 | continue down the side, correct? |
| 09:54:03 | 19 | A.  Understand. |
| 09:54:04 | 20 | Q.  And then the display would have a display on the top |
| 09:54:10 | 21 | and then a display on the side as depicted in this picture, |
| 09:54:13 | 22 | correct? |
| 09:54:13 | 23 | A.  Understand. |
| 09:54:14 | 24 | Q.  And this is just an example, correct? |
| 09:54:17 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 09:54:17 | 1 | Q.  And the touch sensor and the substrate, as depicted |
| 09:54:25 | 2 | here, are configured to wrap around the edge of the |
| 09:54:29 | 3 | display, correct? |
| 09:54:29 | 4 | A.  Correct. |
| 09:54:31 | 5 | Q.  And you've labeled in here 613.  That's the edge |
| 09:54:37 | 6 | between the top of the display and the side of the display? |
| 09:54:42 | 7 | A.  Understand. |
| 09:54:42 | 8 | Q.  Thank you. |
| 09:54:45 | 9 | MR. HASLAM:  I have no further questions. |
| 09:54:47 | 10 | THE COURT:  You pass the witness, counsel? |
| 09:54:48 | 11 | MR. HASLAM:  I pass the witness. |
| 09:54:49 | 12 | THE COURT:  Is there redirect from the Plaintiff? |
| 09:54:51 | 13 | MS. FAIR:  Yes, Your Honor. |
| 09:54:52 | 14 | THE COURT:  All right.  Let's proceed with |
| 09:54:53 | 15 | redirect examination. |
| 09:55:16 | 16 | Please proceed. |
| 09:55:17 | 17 | MS. FAIR:  Thank you, Your Honor. |
| 09:55:17 | 18 | REDIRECT EXAMINATION |
| 09:55:18 | 19 | BY MS. FAIR: |
| 09:55:18 | 20 | Q.  Mr. Shaikh -- |
| 09:55:27 | 21 | MS. FAIR:  Mr. Wietholter, can we pull up PTX-003, |
| 09:55:32 | 22 | please, and go to Claim 7?  Sorry, Claim 7.  So it should |
| 09:55:56 | 23 | be, I think, on the last page. |
| 09:56:32 | 24 | THE COURT:  You can use the document camera. |
| 09:56:35 | 25 | MS. FAIR:  Yes, Your Honor, if I may. |

09:56:47   1         I'm sorry, I threw my graphics team a little bit

09:56:51   2    of a curve ball.

09:57:08   3    Q.  (By Ms. Fair)  Mr. Shaikh, in Claim 7, is there

09:57:20   4    anywhere there where it says PET substrate?

09:57:28   5    A.  No.

09:57:28   6    Q.  Is there anywhere there where it says copper is

09:57:33   7    required?

09:57:33   8    A.  No.

09:57:34   9    Q.  Do you have -- well, let me --

09:57:42   10        MS. FAIR:  Mr. Wietholter, can we go to PTX-650?

09:57:52   11        Ms. Brunson, if we may switch the display?  I'm

09:57:56   12   sorry.

09:57:57   13        Page 5, please.

09:58:02   14   Q.  (By Ms. Fair)  Is this another example of what you were

09:58:04   15   showing Samsung, in the 2012 time period, of what your

09:58:09   16   technology was?

09:58:10   17   A.  That is correct.

09:58:11   18   Q.  And when you were showing them this technology in 2012,

09:58:18   19   did you have access to their confidential information?

09:58:22   20   A.  No.

09:58:22   21   Q.  Do you have access to their confidential information

09:58:26   22   today to know how they're making their touch sensors?

09:58:31   23   A.  No.

09:58:31   24   Q.  Have you spent hours of time looking at the claim and

09:58:36   25   the confidential information of Samsung to know whether or

```
09:58:40   1   not they're using your invention?
09:58:41   2   A.  No.
09:58:42   3   Q.  But when you were showing this to them in 2012, 2013,
09:58:48   4   2014, 2015, 2016, were you concerned about showing them
09:58:55   5   your technology?
09:58:56   6   A.  Yes.
09:58:58   7   Q.  Why?
09:58:58   8   A.  Because it was a novel idea, and we truly believed in
09:59:08   9   2011 that this thing would happen, things to come.  And,
09:59:13  10   yes, I was concerned that this idea would leak out.
09:59:19  11           MS. FAIR:  I pass the witness, Your Honor.
09:59:20  12           THE COURT:  Further cross-examination?
09:59:28  13           MR. HASLAM:  No, Your -- no, Your Honor.
09:59:32  14           THE COURT:  All right.  Mr. Shaikh, you may step
09:59:35  15   down, sir.
09:59:35  16           MS. FAIR:  Your Honor, may this witness be
09:59:38  17   excused?
09:59:38  18           THE COURT:  Is there any objection from Defendant?
09:59:40  19           MR. HASLAM:  No, Your Honor.
09:59:41  20           THE COURT:  Mr. Shaikh, you're excused, sir.  That
09:59:43  21   means you're welcome to stay with us, but you're also free
09:59:47  22   to leave.  It's your choice.
09:59:49  23           THE WITNESS:  Thank you.
09:59:50  24           THE COURT:  Thank you.
09:59:51  25           Am I correct, counsel, the next witness is a
```

09:59:54  1    witness by deposition?

09:59:55  2            MR. MIRZAIE:  Correct, Your Honor.

09:59:56  3            THE COURT:  And it's a lengthy deposition?

09:59:59  4            MR. MIRZAIE:  It is, Your Honor.

10:00:00  5            THE COURT:  Well, ladies and gentlemen of the

10:00:02  6    jury, even though you've had a couple trips to the jury

10:00:04  7    room so far, they haven't been very long, and none of the

10:00:07  8    rest of us have been out of the courtroom, so we're going

10:00:10  9    to take a short recess before we start this lengthy

10:00:12  10   deposition.  And I expect to be back in about 10 or 12

10:00:15  11   minutes, and we'll continue.

10:00:17  12           With that, the jury is excused for recess at this

10:00:19  13   time.

10:00:19  14           COURT SECURITY OFFICER:  All rise.

10:00:24  15           THE COURT:  Remember to follow all the

10:00:26  16   instructions I've given you.

10:00:28  17           (Jury out.)

10:00:29  18           THE COURT:  The Court stands in recess.

10:00:54  19           (Recess.)

10:24:50  20           (Jury out.)

10:24:53  21           COURT SECURITY OFFICER:  All rise.

10:24:53  22           THE COURT:  Be seated, please.

10:24:54  23           Counsel, before I bring in the jury, I want to

10:25:01  24   visit with you briefly about demonstratives for use with

10:25:07  25   Mr. Credelle that were objected to overnight that we did

10:25:11  1  not have an opportunity to talk about before we started

10:25:14  2  today's portion of the trial.

10:25:17  3          Over the recess, I finished my review of your

10:25:20  4  objections and those demonstratives, and I'm going to give

10:25:24  5  you my rulings.  And over the course of this deposition,

10:25:31  6  any adjustments to these demonstratives can be made so that

10:25:34  7  we should not have a delay in proceeding directly with

10:25:37  8  Mr. Credelle after the deposition witness is complete.

10:25:40  9          On Demonstrative -- and these are page numbers in

10:25:47  10  the bottom right-hand corner for reference.

10:25:50  11          On Demonstrative 166, which has a reference to

10:25:54  12  PTX-135 on it, the heading of this slide now reads:

10:26:05  13  Samsung phone Include Emitting Layer and Upper Electrode

10:26:11  14  Over Transistors.  That heading needs to be modified to

10:26:15  15  say:  Emitting Layer and Upper Electrode Over Transistors.

10:26:20  16          The photograph in the left-hand margin of

10:26:24  17  Samsung's cell phone needs to be deleted.

10:26:27  18          Otherwise, the remainder of that slide is

10:26:29  19  acceptable as a demonstrative.

10:26:30  20          Then on slide, numbered in the bottom right-hand

10:26:37  21  corner 205, the identifier of Samsung Galaxy S8 in orange

10:26:47  22  on top of the greenish block should be deleted.  The same

10:26:54  23  thing on 207.  And the same thing on 209 where it

10:26:59  24  references a Samsung gallery -- Galaxy, I'm sorry, Galaxy

10:27:04  25  Note 5.

| | | |
|---|---|---|
| 10:27:05 | 1 | Those orange headings should be deleted. |
| 10:27:11 | 2 | Otherwise, those three slides are permissible as |
| 10:27:14 | 3 | demonstratives. |
| 10:27:16 | 4 | Considering the remaining objections and those |
| 10:27:19 | 5 | slides that have been resolved where objection has been |
| 10:27:21 | 6 | resolved, the remainder of the demonstratives for use with |
| 10:27:24 | 7 | Mr. Credelle are permissible as they stand without further |
| 10:27:27 | 8 | change or modification. |
| 10:27:29 | 9 | All right.  Is Plaintiff prepared to present its |
| 10:27:35 | 10 | next witness by deposition? |
| 10:27:37 | 11 | MS. FAIR:  Yes, Your Honor. |
| 10:27:38 | 12 | THE COURT:  Are you going to go to the podium and |
| 10:27:40 | 13 | introduce the witness for the jury? |
| 10:27:43 | 14 | MS. FAIR:  Yes, Your Honor. |
| 10:27:44 | 15 | THE COURT:  All right.  Let's bring the jury in, |
| 10:27:47 | 16 | please. |
| 10:27:47 | 17 | MS. FAIR:  Did you want me go now, Your Honor, or |
| 10:27:53 | 18 | did you want me to wait -- |
| 10:27:54 | 19 | THE COURT:  You can go to the podium. |
| 10:27:56 | 20 | COURT SECURITY OFFICER:  All rise. |
| 10:27:57 | 21 | (Jury in.) |
| 10:28:30 | 22 | THE COURT:  Welcome back, ladies and gentlemen. |
| 10:28:46 | 23 | Please be seated. |
| 10:28:46 | 24 | All right.  Plaintiff, call your next witness. |
| 10:28:50 | 25 | MS. FAIR:  Your Honor, the Plaintiff calls |

```
10:28:53   1  Mr. Esat Yilmaz by deposition, a co-inventor on the '311
10:28:58   2  patent.
10:28:59   3          And, for the record, the time counted -- to be
10:29:01   4  counted against Solas is 40 minutes, and Samsung's portion
10:29:05   5  of the clips are 42 minutes.  And there are some exhibits
10:29:09   6  used to correlate the Yilmaz exhibit number with the
10:29:15   7  PTX-number, if I may for the record?
10:29:16   8          THE COURT:  Go ahead.
10:29:17   9          MS. FAIR:  Yilmaz Exhibit No. 4 is PTX-003.
10:29:24  10  Yilmaz Exhibit 18 is PTX-701.  Yilmaz Exhibit 32 is
10:29:31  11  PTX-702.  Yilmaz Exhibit 33 is PTX-692.  Yilmaz Exhibit 34
10:29:39  12  is PTX-694.
10:29:42  13          THE COURT:  All right.  Proceed with the witness
10:29:47  14  by deposition.
10:29:49  15          MS. FAIR:  Thank you, Your Honor.
10:29:49  16              ESAT YILMAZ, PLAINTIFF'S WITNESS
10:29:49  17              PRESENTED BY VIDEO DEPOSITION
10:29:51  18          (Videoclip played.)
10:29:51  19  Q.  Good morning.  Can you state your current address?
10:29:54  20  A.  Good morning.  681 Nobel Drive, Santa Cruz, California,
10:30:03  21  95060.
10:30:04  22  Q.  Okay.  How long has the firm of Russ Kabat been
10:30:11  23  representing you individually?
10:30:12  24  A.  We have been communicating about a year, I believe.
10:30:22  25  Q.  Now, you said you'd been communicating with them for
```

10:30:27  1   about a year.  And I want to make clear, have you been

10:30:31  2   communicating with them as your individual counsel, as

10:30:36  3   opposed to have you been communicating with them in their

10:30:39  4   capacity as counsel for Solas?

10:30:41  5   A.  I've signed a contract with them.

10:30:47  6   Q.  And is that a consulting agreement?

10:30:50  7   A.  Yes.

10:30:53  8   Q.  Okay.  Okay.  You're one of the named inventors on a

10:30:58  9   patent that the last three numbers of which are the '311;

10:31:02  10  is that correct?

10:31:02  11  A.  That's correct.

10:31:02  12  Q.  If I refer to that patent as the '311 patent, will you

10:31:06  13  understand I'm referring to that -- that patent?

10:31:11  14  A.  Yes.

10:31:11  15  Q.  And who are the other inventors on that; do you recall?

10:31:15  16  A.  Jalil Shaikh and Steve Laub.

10:31:17  17  Q.  Okay.  Did -- did you review the '311 patent?

10:31:22  18  A.  Not recently.

10:31:27  19  Q.  So you did not do so within the last two or three

10:31:31  20  weeks?

10:31:31  21  A.  No.

10:31:32  22  Q.  Let me clarify.  My question is simply whether since

10:31:37  23  you received the subpoena, you have, in fact, reviewed the

10:31:40  24  '311 patent?

10:31:40  25  A.  I'm sorry, my memory is not so clear whether I did or

| | | |
|---|---|---|
| 10:31:59 | 1 | not or when I did last time.  But at some point, I did, but |
| 10:32:08 | 2 | it was not recently, you know.  Not in the last, you know, |
| 10:32:14 | 3 | period, as far as I can remember. |
| 10:32:17 | 4 | Q.  Did you get a plaque from Atmel for the patents that |
| 10:32:24 | 5 | you had issued? |
| 10:32:25 | 6 | A.  I did, a few. |
| 10:32:28 | 7 | Q.  Okay. |
| 10:32:28 | 8 | A.  Probably about 20 or so. |
| 10:32:29 | 9 | Q.  And you still have those? |
| 10:32:33 | 10 | A.  I have them somewhere.  I have not seen them for a |
| 10:32:37 | 11 | while, but -- |
| 10:32:39 | 12 | Q.  Not up on the -- they're not up on the wall in your |
| 10:32:42 | 13 | office there? |
| 10:32:43 | 14 | A.  They should be.  They should -- yeah. |
| 10:32:45 | 15 | Q.  Okay.  You should have in front of you a copy of |
| 10:32:50 | 16 | Exhibit 4, the '311 patent. |
| 10:32:53 | 17 |          Do you recognize this patent? |
| 10:32:55 | 18 | A.  Yes. |
| 10:32:55 | 19 | Q.  And is it your understanding that this patent is the |
| 10:33:04 | 20 | reason you're here today? |
| 10:33:08 | 21 | A.  Yes. |
| 10:33:10 | 22 | Q.  Can you generally describe for me, in your own words, |
| 10:33:17 | 23 | the individual contributions that you, Mr. Laub, and |
| 10:33:24 | 24 | Mr. Shaikh contributed to this patent -- to the claimed |
| 10:33:29 | 25 | inventions in the patent? |

| | | |
|---|---|---|
| 10:33:33 | 1 | ATTORNEY:   Objection as to form. |
| 10:33:44 | 2 | A.  I don't remember clearly what the individual |
| 10:33:49 | 3 | contributions were.  We were in a meeting. |
| 10:33:52 | 4 | Q.  Who was in the meeting? |
| 10:34:09 | 5 | A.  It -- it would have been at least the three of us, but |
| 10:34:14 | 6 | I can't remember exactly who was in the meeting. |
| 10:34:17 | 7 | Q.  You and Mr. Laub and Mr. Shaikh were in a meeting; is |
| 10:34:26 | 8 | that correct, at some point? |
| 10:34:27 | 9 | A.  Yes, I believe that that was how the three of us ended |
| 10:34:39 | 10 | up on this patent. |
| 10:34:39 | 11 | Q.  And am I correct that you're not sure whether there may |
| 10:34:43 | 12 | have been other people in attendance at that meeting? |
| 10:34:47 | 13 | A.  Yeah, it would have been in the board room, if I |
| 10:34:51 | 14 | remember correctly.  There might have been other people, as |
| 10:34:57 | 15 | well, but I -- I cannot remember. |
| 10:34:58 | 16 | Q.  And -- and what was discussed at that meeting? |
| 10:35:05 | 17 | A.  I mean, it would have been technology, but I can't |
| 10:35:20 | 18 | remember the details so far back. |
| 10:35:23 | 19 | Q.  If you recall approximately, when did this meeting that |
| 10:35:31 | 20 | you're referring to take place in relation to the October |
| 10:35:34 | 21 | 28, 2011, date? |
| 10:35:36 | 22 | A.  I -- I couldn't tell you.  I'm not sure. |
| 10:35:47 | 23 | Q.  Did the meeting that you previously testified about, |
| 10:35:53 | 24 | where you, Mr. Laub, and Mr. Shaikh and possibly others |
| 10:35:58 | 25 | were present, relate at all to any of the subject matter of |

| | | |
|---|---|---|
| 10:36:03 | 1 | Claim 1? |
| 10:36:04 | 2 | A.  We were discussing technology at the time.  I remember |
| 10:36:13 | 3 | there was a meeting, but I can't remember exactly what was |
| 10:36:18 | 4 | discussed -- discussed in that.  I might have given an |
| 10:36:22 | 5 | update about, you know, our progress from technology point |
| 10:36:26 | 6 | of view.  Because Steve and Jalil are -- well, Jalil is a |
| 10:36:38 | 7 | marketing person, and Steve is the CEO of the company, or |
| 10:36:44 | 8 | was the CEO. |
| 10:36:45 | 9 | Q.  With respect to this -- to Claim 1 of the '311 patent, |
| 10:36:49 | 10 | what would you say was your contribution to the subject |
| 10:36:53 | 11 | matter of that patent -- of that claim? |
| 10:36:55 | 12 | A.  So I'm the technology guy.  So I've helped develop the |
| 10:37:03 | 13 | technology, the flexible touch sensor that is, you know, |
| 10:37:12 | 14 | capable of, you know, flexing and bending around displays |
| 10:37:20 | 15 | or -- or not.  You know, it's a versatile material. |
| 10:37:27 | 16 | Q.  And what -- what, if anything, do you recall Mr. Shaikh |
| 10:37:32 | 17 | contributing to the subject matter of Claim 1? |
| 10:37:35 | 18 | A.  I can't recall exactly.  We would have been discussing, |
| 10:37:54 | 19 | you know, what -- what can we do with -- what kind of |
| 10:37:58 | 20 | applications we can do with this kind of technology. |
| 10:38:00 | 21 | Q.  Do you recall what contribution Mr. Laub made to the |
| 10:38:10 | 22 | subject matter of Claim 1 of the '311 patent? |
| 10:38:13 | 23 | A.  No, for the same reason. |
| 10:38:15 | 24 | Q.  Okay.  Well, let me ask you to go back and look at the |
| 10:38:20 | 25 | lines between Column 7, Line 60 and Line 65. |

10:38:28   1          And that reads, quote, as an example and not by

10:38:32   2   way of limitation, touch-sensitive apparatus 612 may be

10:38:38   3   wrapped over surfaces that are substantially perpendicular

10:38:42   4   to each other, or if there is no substantial distinction

10:38:49   5   between surfaces, paren, such as, for example, a

10:38:54   6   pebble-shaped or curved device, close paren, an angle of

10:38:59   7   deviation between the surfaces of 45 degrees or greater,

10:39:03   8   close quote.

10:39:04   9   A.   Uh-huh.

10:39:06  10   Q.   If you'd like, you can take as much time, again, to go

10:39:09  11   back and read that or read it in the context of -- of the

10:39:13  12   entire patent, if you want, or this paragraph.  But --

10:39:17  13   A.   Yeah.

10:39:17  14   Q.   -- would you agree with me that that sentence is

10:39:21  15   drawing a distinction between what it calls curved or

10:39:26  16   pebble-shaped surfaces on the one hand and surfaces that

10:39:33  17   are substantially perpendicular to each other?

10:39:50  18   A.   So pebble-shaped -- I'm just trying to remember why it

10:39:57  19   was written this way.  It might have been for irregular

10:40:07  20   shapes, perhaps, where we could not distinguish the edge.

10:40:17  21   That's why we talk about pebble-shaped.

10:40:22  22   Q.   Well, you're saying a pebble-shaped wouldn't have an

10:40:30  23   edge?

10:40:32  24   A.   That's right.

10:40:33  25   Q.   There's a distinction being drawn between surfaces

| | | |
|---|---|---|
| 10:40:40 | 1 | which have edges and surfaces which have no distinct -- |
| 10:40:45 | 2 | substantial distinction between the surfaces? |
| 10:40:47 | 3 | A.  Yeah. |
| 10:40:48 | 4 | Q.  And a -- can we go on to Exhibit 5? |
| 10:40:55 | 5 | Do you recognize this document? |
| 10:40:58 | 6 | A.  Yeah.  Looks familiar as my contract. |
| 10:41:19 | 7 | Q.  Is that your signature on the third page? |
| 10:41:21 | 8 | A.  Yes. |
| 10:41:26 | 9 | Q.  Okay.  Is this consulting agreement still in effect? |
| 10:41:33 | 10 | A.  I believe so, yes. |
| 10:41:37 | 11 | Q.  And since the date of this agreement, have you been |
| 10:41:42 | 12 | providing consultation to Russ Kabat? |
| 10:41:48 | 13 | A.  Yes. |
| 10:41:53 | 14 | Q.  Okay.  Can you tell me just a little bit about your |
| 10:42:03 | 15 | educational background, and briefly your work experience |
| 10:42:10 | 16 | from the time -- from high school or after, up until the |
| 10:42:14 | 17 | time you joined Atmel? |
| 10:42:14 | 18 | A.  Uh-huh.  I went to university in the U.K. |
| 10:42:25 | 19 | Okay.  So I went to high school in Turkey.  And I |
| 10:42:33 | 20 | went to -- to university in the U.K., University of |
| 10:42:40 | 21 | Southampton.  And I did Bachelor's and Master's of computer |
| 10:42:52 | 22 | engineering. |
| 10:42:52 | 23 | Q.  And can you then briefly outline for me your work |
| 10:42:57 | 24 | experience up to the time you joined at Atmel? |
| 10:43:00 | 25 | A.  Yes.  So I started working for a local company in the |

10:43:05   1   same city, Southampton, a company called Electron Dynamics.

10:43:12   2   I work there until 2006.

10:43:17   3            And in 2006, I joined the company called Quantum

10:43:32   4   Research Group.  So this is a company that is related to

10:43:35   5   touch technology, one of the, you know, leaders, original

10:43:39   6   leaders of the technology.

10:43:48   7            So I worked there until 2008, and Atmel acquired

10:43:53   8   that company.

10:43:54   9   Q.  Okay.  At Quantum Touch, can you just -- can you

10:43:58  10   generally tell me when you first began working on anything

10:44:01  11   that you would consider to be related to touch sensors and

10:44:05  12   generally what that work was?

10:44:08  13   A.  So my initial work was working on chips, touch

10:44:15  14   controller chips.  But right away, pretty much right away,

10:44:23  15   I got into also touch sensor design.  Yeah.  Initial

10:44:30  16   coding.  And that coding and algorithm development,

10:44:34  17   et cetera, that -- I continued to work on that, as well as

10:44:38  18   working on touch sensors, as well, you know, design of the

10:44:42  19   touch sensor.

10:44:43  20   Q.  Okay.  When did you first begin working with copper as

10:44:49  21   a substance to use in the touch sensor circuitry?

10:45:03  22   A.  It must have been around 2007, I think.

10:45:07  23   Q.  What led you to begin working with copper as a material

10:45:13  24   for the circuitry of the touch sensor?

10:45:14  25   A.  At the time, we were looking for better materials.  We

10:45:31  1   knew the resistance of ITO was very high.  So we started,

10:45:40  2   you know, investigating what options we have.

10:45:45  3   Q.  And copper, I take it, had less resistance than ITO?

10:45:52  4   A.  That's correct.

10:45:52  5   Q.  Was there anything else about copper that led you to

10:45:55  6   begin working with copper as a possible material to use for

10:46:00  7   the circuitry of the touch sensor?

10:46:02  8   A.  Resistance and flexibility were the two very key

10:46:11  9   components.

10:46:11  10  Q.  And -- and the -- the flexibility that copper gave

10:46:20  11  you at that time, did you consider or realize that it would

10:46:23  12  allow you to flex a touch sensor in some fashion or bend

10:46:30  13  it, curve it?

10:46:32  14  A.  Yes.

10:46:37  15  Q.  Yeah.

10:46:38  16  A.  Yes, we -- that was one of our initial thoughts.  As

10:46:42  17  well as -- there are two aspects to it that -- two aspects

10:46:46  18  to it.  There is the yield aspect, which is, you know,

10:46:50  19  handling of the material and the processing.  If the

10:46:53  20  material is less brittle and more flexible, then the yields

10:46:57  21  can be higher.

10:46:57  22  Q.  Well, when is the first time at anywhere that you were

10:47:03  23  involved in a project where you could make a flexible touch

10:47:08  24  sensor using copper?

10:47:08  25  A.  I -- I can't remember the exact date, but it would have

| | | |
|---|---|---|
| 10:47:34 | 1 | been after the acquisition.  I believe we used copper to |
| 10:47:38 | 2 | make a touch sensor. |
| 10:47:39 | 3 | Q.  And at the time that you made this touch sensor, was it |
| 10:47:48 | 4 | just on a flat display, or was it on a flat display that |
| 10:47:53 | 5 | had curvature at the edges? |
| 10:47:56 | 6 | A.  I think the first samples were on flat -- |
| 10:48:02 | 7 | Q.  Okay. |
| 10:48:02 | 8 | A.  -- flat displays. |
| 10:48:09 | 9 | Q.  And who did you work with on making those first |
| 10:48:17 | 10 | displays using copper? |
| 10:48:18 | 11 | A.  The manufacturing was done in the U.K. by a U.K. |
| 10:48:29 | 12 | company, CIT.  And I think we would have just made the |
| 10:48:42 | 13 | prototypes ourselves at that time initially. |
| 10:48:44 | 14 | Q.  What -- what did U.K., the CIT company, do? |
| 10:48:52 | 15 | A.  They were the manufacturing partner for us, for our |
| 10:48:55 | 16 | technology. |
| 10:48:57 | 17 | Q.  So CIT could print copper lines on substrates? |
| 10:49:03 | 18 | A.  Yes. |
| 10:49:03 | 19 | Q.  And what was the substrate that you used for the first |
| 10:49:14 | 20 | touch sensor, flexible touch sensors using copper that you |
| 10:49:18 | 21 | came up with? |
| 10:49:21 | 22 | A.  It would have been PET. |
| 10:49:23 | 23 | Q.  PET? |
| 10:49:24 | 24 | A.  PET. |
| 10:49:26 | 25 | Q.  Okay.  Do you recall whether they -- whether CIT had |

10:49:31   1   the ability to print copper lines on flexible substrates,

10:49:36   2   whether they were clear or not?

10:49:37   3   A.   Yes, I think they -- they could.

10:49:41   4   Q.   And was that one of the attractions to CIT for Atmel?

10:49:46   5   A.   That's correct.

10:49:46   6   Q.   And why was being able to print on flexible substrates

10:49:52   7   an attraction?

10:49:55   8   A.   You know, we wanted roll-to-roll manufacturing.  You

10:50:01   9   know, we wanted to be a flexible material.  So that's why

10:50:10   10  we -- you know, we sampled these companies.

10:50:14   11  Q.   Okay.  And that was before -- at some point with Atmel,

10:50:17   12  you transferred to the U.S.; is that correct?

10:50:20   13  A.   Yes.  That's correct.

10:50:21   14  Q.   So this -- let me focus now on the time you were still

10:50:25   15  in the U.K.

10:50:27   16  A.   Okay.

10:50:27   17  Q.   If -- what I'm asking, for example, is if I -- if I

10:50:33   18  have a piece of paper in front of me, and if -- if I

10:50:36   19  printed copper lines on it to make a touch sensor, did you

10:50:40   20  ever pick up the thing and -- and it just sort of bent or

10:50:46   21  flexed sort of like I'm doing with the paper?

10:50:50   22  A.   Yes.

10:50:50   23  Q.   If you recall.

10:50:52   24  A.   Yes, of course, we had -- yeah, we handled material.

10:50:56   25  Yes.

| | | |
|---|---|---|
| 10:50:56 | 1 | Q.  And it could flex, it curved? |
| 10:51:01 | 2 | A.  That's right. |
| 10:51:02 | 3 | Q.  All right. |
| 10:51:03 | 4 | A.  It's like a piece of paper when it's manufactured. |
| 10:51:05 | 5 | Q.  Okay.  And that was one of the benefits of copper, that |
| 10:51:08 | 6 | it wouldn't peel off when you -- when it flexed like that, |
| 10:51:14 | 7 | correct? |
| 10:51:14 | 8 | A.  It is correct.  But ITO can also flex when it's handled |
| 10:51:21 | 9 | before it's manufactured like that on a piece of sheet. |
| 10:51:25 | 10 | Q.  What I -- what I was asking is, at the time that you |
| 10:51:30 | 11 | were working with CIT on these flexible copper touch |
| 10:51:37 | 12 | sensors where the copper wiring was put on PET -- |
| 10:51:40 | 13 | A.  Right. |
| 10:51:41 | 14 | Q.  -- did you or anyone working with you consider the |
| 10:51:46 | 15 | possibility of being able to use that kind of a flexible |
| 10:51:58 | 16 | touch sensor and sort of curve it at the edges or curve it |
| 10:52:00 | 17 | in the middle or curve it somehow and use it in that curved |
| 10:52:04 | 18 | sense? |
| 10:52:05 | 19 | A.  I don't think so, no. |
| 10:52:12 | 20 | Q.  Well, let me ask you this:  Just from a technical |
| 10:52:18 | 21 | sense, once you have a flexible substrate where you can |
| 10:52:25 | 22 | print copper wires, that, as you said, when you would pick |
| 10:52:29 | 23 | it up would flex like a piece of paper, would it -- would |
| 10:52:33 | 24 | it be relatively obvious that one of the things you could |
| 10:52:38 | 25 | do with it is to wrap it around surfaces?  From a technical |

| | | |
|---|---|---|
| 10:52:45 | 1 | standpoint.  That's not a great technological leap, is it? |
| 10:52:49 | 2 | A.  Yeah, I'm not sure.  I can't quantify whether it's a |
| 10:52:54 | 3 | big leap or not. |
| 10:52:54 | 4 | Q.  And what were the line widths, if you recall, |
| 10:53:01 | 5 | approximately, that the copper lines were? |
| 10:53:03 | 6 | A.  It would have been quite wide at the time.  7 micron, |
| 10:53:16 | 7 | you know, 9 micron initially. |
| 10:53:24 | 8 | Q.  And by -- was that approximately the size of the PET |
| 10:53:29 | 9 | and the copper lines that you were working with at the time |
| 10:53:32 | 10 | you left England to come to the United States? |
| 10:53:37 | 11 | A.  I think we might have already reduced it by that time. |
| 10:53:41 | 12 | Q.  Based on your overall experience with flexible touch |
| 10:53:51 | 13 | sensors, was -- is there anything about the copper-based |
| 10:53:55 | 14 | flexible touch sensors you were working on in England for |
| 10:53:57 | 15 | Atmel, was there anything about them, in your view, that |
| 10:54:05 | 16 | would have made them unusable to wrap around a curved |
| 10:54:10 | 17 | surface of a display? |
| 10:54:12 | 18 | A.  That would have made them unusable?  No. |
| 10:54:27 | 19 | Q.  It wouldn't have been -- you couldn't have used what |
| 10:54:35 | 20 | you were working with when you left England to wrap around |
| 10:54:39 | 21 | a curved surface, in your view? |
| 10:54:43 | 22 | A.  I think they could be wrapped, but we never checked -- |
| 10:54:47 | 23 | we never qualified that process.  Yeah. |
| 10:54:49 | 24 | Q.  When you transferred to Atmel in the U.S., was that at |
| 10:54:55 | 25 | their headquarters in San Jose? |

| | | |
|---|---|---|
| 10:54:58 | 1 | A.  Yes. |
| 10:54:59 | 2 | Q.  And it was flexible, the substrate? |
| 10:55:05 | 3 | A.  Before it was -- yeah, during manufacturing, it was |
| 10:55:09 | 4 | roll-to-roll manufacturing.  So it was flexible. |
| 10:55:13 | 5 | Q.  Actually, when you say roll-to-roll, can you describe |
| 10:55:17 | 6 | the process that -- that the copper wiring was put on the |
| 10:55:24 | 7 | rolls of PET? |
| 10:55:25 | 8 | A.  Oh, sure.  Sure. |
| 10:55:27 | 9 | So our process was, we had a roll of PET.  But it |
| 10:55:41 | 10 | was a special-treated PET, not just bare PET, but had some |
| 10:55:46 | 11 | special treatment.  And we would put a -- a base coat on |
| 10:55:53 | 12 | the PET. |
| 10:55:55 | 13 | So it's a coated material, coated PET.  Then we |
| 10:55:59 | 14 | would expose the circuit pattern using an exposure machine. |
| 10:56:11 | 15 | And -- and then we would develop.  And where -- where we |
| 10:56:15 | 16 | did not expose the circuit, we would wash away during the |
| 10:56:22 | 17 | develop process. |
| 10:56:23 | 18 | So we would end up with -- after the develop |
| 10:56:30 | 19 | process, we would end up with -- you know, you could say |
| 10:56:32 | 20 | like pedestals where we wanted the circuit to be. |
| 10:56:37 | 21 | And then in the next process, we would plate with |
| 10:56:47 | 22 | copper on those pedestals.  Then we would test and apply a |
| 10:56:54 | 23 | further coating, a protective coating, as the roll-to-roll, |
| 10:57:00 | 24 | yeah. |
| 10:57:00 | 25 | Q.  And the PET, when you say it was a roll, was it a roll |

| | | |
|---|---|---|
| 10:57:05 | 1 | like a roll of toilet paper -- not toilet paper, but paper |
| 10:57:10 | 2 | towels? |
| 10:57:10 | 3 | A.  Yes. |
| 10:57:12 | 4 | Q.  Okay. |
| 10:57:13 | 5 | A.  Yes, yes. |
| 10:57:14 | 6 | Q.  And that would unroll and go through the machine that |
| 10:57:17 | 7 | printed the circuit on it, correct? |
| 10:57:18 | 8 | A.  Exactly, yes. |
| 10:57:19 | 9 | Q.  And -- and then when it was finished, would it be |
| 10:57:23 | 10 | re-rolled up with the circuit on it? |
| 10:57:25 | 11 | A.  That's correct. |
| 10:57:25 | 12 | Q.  Okay.  So it went from roll-to-roll? |
| 10:57:31 | 13 | A.  That's correct. |
| 10:57:32 | 14 | Q.  So -- and when did you first begin using that kind of |
| 10:57:41 | 15 | roll-to-roll process?  Was that something you did in |
| 10:57:43 | 16 | England? |
| 10:57:43 | 17 | A.  We did. |
| 10:57:44 | 18 | Q.  At CIT? |
| 10:57:45 | 19 | A.  Yes.  Right from the beginning, it had to be |
| 10:57:48 | 20 | roll-to-roll for it to be mass-produceable. |
| 10:57:58 | 21 | Q.  So in that case, the printed circuit on the PET would |
| 10:58:03 | 22 | actually be in a circle, so to speak? |
| 10:58:09 | 23 | A.  Yeah.  Wrapped, yes. |
| 10:58:14 | 24 | Q.  We can take that down. |
| 10:58:16 | 25 |         Okay.  Before the break, I'd asked you some |

10:58:25   1   questions about the -- how the copper was printed on the
10:58:29   2   PET substrate, and you said it went from one roll through a
10:58:34   3   lithography.  Can I call it a lithography process, and then
10:58:39   4   rolled up again?
10:58:40   5   A.  Correct.  Right.
10:58:41   6   Q.  Yeah.  Okay.  When -- when the printed PET was
10:58:47   7   delivered to Atmel, in what form was it delivered?  Rolls
10:58:51   8   of some sort?
10:58:51   9   A.  This is at the time of CIT?
10:59:01  10   Q.  Yeah, at the time of CIT first.
10:59:05  11   A.  Okay.  So I'm not hundred percent because at some point
10:59:27  12   it was cut into panels.  At the beginning, it might have
10:59:38  13   been delivered in a roll form.
10:59:41  14   Q.  And do you recall just approximately what the size of
10:59:45  15   the roll was, like what the inner radius of what it was and
10:59:50  16   the outer radius?
10:59:59  17   A.  It's multiple inches.  I -- I don't know.  It's -- it
11:00:06  18   might have been 5-inch, something like that, the inner
11:00:10  19   radius.  Sorry, inner diameter?
11:00:15  20   Q.  Yeah.
11:00:15  21   A.  I shouldn't -- yeah, I shouldn't guess that.  It's
11:00:20  22   multiple inches, but I -- I'm not sure exactly.
11:00:29  23   Q.  Okay.  And the -- the copper wiring, whatever that
11:00:33  24   inner diameter was, didn't crack or peel away from the PET,
11:00:37  25   correct?

11:00:37   1   A.   No, that was our standard product.  If it did, this

11:00:46   2   would have been a defect.

11:00:48   3   Q.   If it had cracked or peeled, correct?

11:00:50   4   A.   If it -- if it cracked or peeled, this would be a

11:00:55   5   defect.

11:00:57   6   Q.   Okay.  And I'm just going to ask you from a -- I guess

11:01:03   7   a technical or maybe a non-technical standpoint, just

11:01:07   8   looking at that 6-inch roll, it would be pretty clear that

11:01:13   9   the copper-coated flexible substrate could at least wrap

11:01:20   10   around a curved surface of that dimension, correct?

11:01:24   11   A.   That's -- that's how it was manufactured.

11:01:27   12   Q.   Yeah.  And it would be pretty clear you could wrap it

11:01:31   13   around the same thing in use, correct?

11:01:33   14   A.   It was -- yeah, it was manufactured in that form.

11:01:39   15   It's -- it's meant to be robust during manufacturing at

11:01:43   16   high yield.

11:01:43   17   Q.   And also meant to be robust when it's used in a

11:01:51   18   finished product, correct?

11:01:53   19   A.   It is.

11:01:53   20   Q.   And it -- it was pretty robust when it was wrapped

11:01:59   21   around a 6 -- a 6-inch core, correct?

11:02:02   22   A.   Yes.

11:02:03   23   Q.   Mr. Yilmaz, you can see that this is a patent

11:02:09   24   application for a capacitive position sensor?

11:02:14   25   A.   Yes.

| | | |
|---|---|---|
| 11:02:15 | 1 | Q.  And this was filed, I believe, in 2009. |
| 11:02:26 | 2 | If we can go down. |
| 11:02:32 | 3 | A.  Yeah. |
| 11:02:32 | 4 | Q.  Correct?  April 10, 2009? |
| 11:02:37 | 5 | A.  Yes. |
| 11:03:11 | 6 | Yeah, I remember this one. |
| 11:03:13 | 7 | Q.  Is -- is there a particular reason you remember this |
| 11:03:15 | 8 | one? |
| 11:03:16 | 9 | A.  It was a clever idea. |
| 11:03:20 | 10 | Q.  It was a what idea? |
| 11:03:24 | 11 | A.  Clever. |
| 11:03:25 | 12 | Q.  Okay.  And what was the clever idea about it? |
| 11:03:28 | 13 | A.  It was actually quite neat.  It's -- it's a way of |
| 11:03:34 | 14 | spatial interpolation on the sense lines. |
| 11:03:41 | 15 | Q.  And it -- it was -- it's talking about using the touch |
| 11:03:46 | 16 | sensor that's described in this patent on top of a display |
| 11:03:52 | 17 | panel, correct? |
| 11:03:53 | 18 | A.  The touch sensor on to a display module. |
| 11:04:03 | 19 | Q.  Well, Paragraph 21 is -- in the patent is saying, one |
| 11:04:08 | 20 | important combination -- |
| 11:04:09 | 21 | A.  Yes. |
| 11:04:11 | 22 | Q.  -- of a touch sensor is to use it with a display |
| 11:04:14 | 23 | module, correct? |
| 11:04:15 | 24 | A.  Yes, I see that.  Yes. |
| 11:04:16 | 25 | Q.  And it then says it can likely be made of ITO, correct? |

| | | |
|---|---|---|
| 11:04:21 | 1 | A.  Yes. |
| 11:04:21 | 2 | Q.  Let's look at Paragraph 24. |
| 11:05:03 | 3 | A.  Okay. |
| 11:05:04 | 4 | Q.  There it's talking about the touch sensor with the |
| 11:05:08 | 5 | drive and sense electrodes, correct? |
| 11:05:11 | 6 | A.  Yes. |
| 11:05:11 | 7 | Q.  Why don't we look at Paragraph 75. |
| 11:05:20 | 8 | And you'll see there that one of the substrates on |
| 11:05:54 | 9 | which the touch sensor could be -- that the circuitry of |
| 11:05:59 | 10 | the touch sensor could be mounted was PET? |
| 11:06:03 | 11 | A.  Yes, I see that. |
| 11:06:05 | 12 | Q.  And was the PET at this time period flexible? |
| 11:06:11 | 13 | A.  Yes. |
| 11:06:16 | 14 | Q.  Okay.  Why don't we go down and look at Paragraph 120. |
| 11:06:26 | 15 | In the middle of that paragraph -- you can take |
| 11:06:43 | 16 | your time to review the whole paragraph if you'd like -- |
| 11:06:47 | 17 | there's a statement that says:  The electrodes comprising |
| 11:06:52 | 18 | the electrode pattern.  And that's the sense and drive |
| 11:06:56 | 19 | electrodes, correct? |
| 11:06:57 | 20 | A.  Electrodes comprising the electrode pattern.  Yes. |
| 11:07:04 | 21 | Q.  Could be indium tin oxide, ITO? |
| 11:07:08 | 22 | A.  Yeah. |
| 11:07:09 | 23 | Q.  And it also says the substrate could be used with |
| 11:07:14 | 24 | materials such as copper, correct? |
| 11:07:17 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:07:19 | 1 | Q.  Okay.  And both ITO and copper are flexible, but copper |
| 11:07:24 | 2 | is -- is more flexible than ITO, correct? |
| 11:07:28 | 3 | A.  Correct. |
| 11:07:30 | 4 | Q.  Okay.  Let's look at 155 and 156. |
| 11:08:12 | 5 | Let me know when you've finished reviewing that. |
| 11:08:18 | 6 | A.  Okay. |
| 11:08:18 | 7 | Q.   And in there, it's -- it's talking again about the |
| 11:09:16 | 8 | touch sensor, correct?  Generally? |
| 11:09:21 | 9 | A.  Yeah. |
| 11:09:23 | 10 | Q.  And in -- in that paragraph, it's -- it's talking about |
| 11:09:26 | 11 | the drive and sense electrodes are made up of thin wires or |
| 11:09:31 | 12 | a mesh of wire, correct? |
| 11:09:32 | 13 | A.  Yes, I see that. |
| 11:09:38 | 14 | Q.  Is Figure 17 a mesh pattern? |
| 11:09:40 | 15 | A.  I mean, yeah, you could call it mesh, yeah. |
| 11:10:00 | 16 | Q.  Well, in fact, in the paragraph we read, it was |
| 11:10:03 | 17 | referred to as a mesh, correct? |
| 11:10:04 | 18 | A.  Yes. |
| 11:10:07 | 19 | Q.  Okay.  Let's look at Figure 18 a moment while you're |
| 11:10:10 | 20 | there. |
| 11:10:11 | 21 | And that mesh pattern, as examples there, could be |
| 11:10:26 | 22 | used as a touch sensor on a laptop computer? |
| 11:10:34 | 23 | A.  Yes. |
| 11:10:34 | 24 | Q.  And do you recall that in -- in the Exhibit 22, that |
| 11:10:42 | 25 | this patent application, this published patent application, |

| | | |
|---|---|---|
| 11:10:45 | 1 | that you also described a -- a way for providing circuitry |
| 11:10:56 | 2 | that would be able to control or read the output from the |
| 11:11:02 | 3 | touch sensor? |
| 11:11:06 | 4 | A.  The touch controller chip? |
| 11:11:11 | 5 | Q.  Yes. |
| 11:11:12 | 6 | A.  Yes. |
| 11:11:13 | 7 | Q.  Well, this patent described a -- an overall system that |
| 11:11:18 | 8 | included a touch sensor on a flexible substrate with copper |
| 11:11:26 | 9 | wiring in a mesh pattern, correct? |
| 11:11:31 | 10 | A.  Yes. |
| 11:11:31 | 11 | Q.  That could be used on a cell phone or a computer |
| 11:11:36 | 12 | display? |
| 11:11:37 | 13 | A.  Yes. |
| 11:11:38 | 14 | Q.  And it says that copper metal mesh can be used on a PET |
| 11:11:46 | 15 | substrate, correct? |
| 11:11:47 | 16 | A.  That's correct. |
| 11:11:48 | 17 | Q.  And at the time that this was filed, 2009, PET on which |
| 11:11:57 | 18 | you were putting copper metal mesh was flexible, correct? |
| 11:12:00 | 19 | A.  Yes. |
| 11:12:08 | 20 | Q.  And -- and the metal mesh had sense and drive |
| 11:12:15 | 21 | electrodes on opposite sides of that substrate, correct? |
| 11:12:18 | 22 | A.  Yes. |
| 11:12:24 | 23 | Q.  But -- but what you -- just -- what kind of a touch |
| 11:12:29 | 24 | sensor in a general sense that's being described in |
| 11:12:31 | 25 | Exhibit 22 and in the '311 patent is a copper-based touch |

11:12:37   1   sensor that can be printed on a flexible PET substrate,

11:12:45   2   correct?

11:12:45   3   A.   Yes.

11:12:52   4   Q.   The technical description -- one of the technical

11:12:56   5   descriptions in Exhibit 22, the patent application, is the

11:13:00   6   use of a copper-based touch sensor on a flexible PET

11:13:04   7   substrate with drive and sense electrodes on opposite sides

11:13:08   8   of the substrate.

11:13:13   9   A.   Uh-huh.

11:13:14  10   Q.   And in the Figures 18, 19, and 20 of Exhibit 22, you're

11:13:20  11   showing the use of that touch sensor on flat surfaces,

11:13:24  12   correct?

11:13:24  13   A.   Right.   Yes.

11:13:25  14   Q.   And is the idea of wrapping it around technologically

11:13:35  15   the difference between what's described and shown in

11:13:38  16   Exhibit 22 and what's described in the '311 patent, from a

11:13:44  17   technical standpoint?

11:13:46  18   A.   So this -- this -- what do you call it, this -- this

11:13:58  19   document that we are reviewing right now --

11:14:00  20   Q.   It's a published patent application.

11:14:02  21   A.   Yeah.   It is describing an invention on a metal mesh

11:14:12  22   touch sensor, but a very early version of that.

11:14:17  23   Q.   Right.

11:14:18  24   A.   It's not identical to what we did at a later time.

11:14:23  25   This would have been very low yield and might not have

11:14:28    1    qualified for flexible -- or wrap-around application.

11:14:35    2    Q.  Okay.  But did -- when you touched the sensor in the

11:14:39    3    proto -- the -- the ones that you were -- you were making

11:14:47    4    at the time that you filed Exhibit 22, would the sensor

11:14:53    5    pick up the touch enough to be able to control some device

11:14:56    6    or some -- to control something?

11:14:58    7    A.  So we might not have made this prototype, even, for --

11:15:19    8    with metal mesh.  So I would be guessing if I said it

11:15:29    9    would -- you know, this particular design would work.

11:15:33   10         But what -- what we were doing or what -- you

11:15:37   11    know, what was done here is that they've taken ITO design

11:15:43   12    and created a metal mesh version of it.

11:15:45   13         And I don't know if that makes sense.

11:15:50   14    Q.  Yeah.  Using copper, correct?

11:15:51   15    A.  Using copper, basically just traced around and then

11:15:57   16    just did some in-fill -- filling -- filling the -- you

11:16:01   17    know, the areas of the electrode with some --

11:16:05   18    Q.  Let me ask you -- okay.  I'm sorry.  Go ahead.

11:16:08   19    A.  Some diagonal lines.

11:16:10   20         So I -- I don't think we -- we ever tested this

11:16:14   21    particular design with -- with, like, actual physical

11:16:19   22    sensor.

11:16:20   23    Q.  Well, did you make any -- did you make the sensor

11:16:27   24    itself and a controller on a flexible PET substrate enough

11:16:31   25    to know that it would detect a touch, and the touch could

| | | |
|---|---|---|
| 11:16:36 | 1 | then be used to control something? |
| 11:16:38 | 2 | A.  So I think we might not have made this particular |
| 11:16:47 | 3 | sensor, this is a metal mesh, and with this kind of design. |
| 11:16:54 | 4 | Q.  Okay.  The -- the embodiment -- an embodiment described |
| 11:16:58 | 5 | in the -- in Exhibit 22 is a copper touch sensor with sense |
| 11:17:02 | 6 | and drive electrodes on opposite side of a PET flexible |
| 11:17:14 | 7 | substrate for use in a mobile phone, correct? |
| 11:17:18 | 8 | That's an embodiment that we just saw was |
| 11:17:22 | 9 | described in various places in the patent, correct? |
| 11:17:25 | 10 | A.  Yes. |
| 11:17:26 | 11 | Q.  Atmel produced a product called XSense at one point, |
| 11:17:33 | 12 | correct? |
| 11:17:33 | 13 | A.  Yes. |
| 11:17:33 | 14 | Q.  That's what they went to market with? |
| 11:17:38 | 15 | A.  That's correct. |
| 11:17:43 | 16 | Q.  All right.  The XSense sensor was a copper-based touch |
| 11:17:49 | 17 | sensor on a flexible PET substrate, correct? |
| 11:17:51 | 18 | A.  Yes. |
| 11:17:53 | 19 | Q.  And you had -- by the time you were commercializing, |
| 11:18:03 | 20 | the XSense technology had used that flexible touch sensor |
| 11:18:09 | 21 | to -- to go around the curved edges of the -- to go -- to |
| 11:18:15 | 22 | cover the curves of a curved display, correct? |
| 11:18:19 | 23 | ATTORNEY:  Objection as to form. |
| 11:18:23 | 24 | A.  Of a curved display? |
| 11:18:29 | 25 | Q.  Had you done so? |

11:18:33   1   A.  I don't think there were any curved displays at the

11:18:40   2   time.

11:18:40   3   Q.  Okay.  And was that up through the time that Atmel sold

11:18:43   4   the XSense technology to Uni-Pixel?

11:18:55   5   A.  Yes, I think I've not -- I had not seen that curved

11:19:01   6   display up to that point.

11:19:03   7   Q.  And is it correct that XSense hadn't made a flexible

11:19:09   8   copper-based touch sensor that -- that it had placed over a

11:19:22   9   curved display?

11:19:24  10           ATTORNEY:  Objection as to form.

11:19:29  11   A.  Yes, I -- I don't think we had seen a curved display at

11:19:43  12   the time.

11:19:43  13   Q.  And am I correct that up until the time that Atmel sold

11:19:47  14   the XSense technology to Uni-Pixel, Atmel had not actually

11:19:54  15   taken a copper-based touch sensor on a PET flexible

11:20:03  16   substrate and wrapped it around the edge of a mobile phone

11:20:10  17   display?

11:20:11  18   A.  We certainly created prototypes and wrapped -- wrap

11:20:25  19   around multiple demo systems, mobile phones.  So we have --

11:20:32  20   we have that.

11:20:33  21   Q.  And how -- how long after the patent application was

11:20:39  22   filed did you have those prototypes?

11:20:41  23   A.  I mean, the curve -- curved, we -- we started with very

11:20:48  24   early, even maybe before the patent application, we had put

11:20:53  25   actually curved sensors around a display.

11:20:57  1   Q.  And was it after the patent was filed, which is October

11:21:03  2   28, 2011, that Atmel first made a prototype that wrapped

11:21:13  3   around the edges, for example, of a perpendicular display?

11:21:18  4   A.  We had prototypes, I believe, in July 2011, July or

11:21:34  5   August, of -- of our touch sensor wrapped around.

11:21:40  6   Q.  And you think that was July or August?

11:21:43  7   A.  Yes.  That was the -- the prototyping we did to develop

11:21:48  8   the technology.

11:21:48  9   Q.  And did the -- did that prototype work?

11:21:58  10  A.  Yes, we test it.

11:22:00  11  Q.  And -- and when I say -- when you say it worked, what

11:22:05  12  do you mean?

11:22:05  13  A.  Functionally.  We did functional testing.

11:22:11  14  Q.  And by that, you mean you could touch the sensor and --

11:22:15  15  and get a readout as to where that touch occurred?

11:22:19  16  A.  Yes.

11:22:19  17  Q.  And were you able -- after developing the flexible

11:22:30  18  touch sensor of the type described in the '311 for a curved

11:22:35  19  surface, were you later able to develop a working model of

11:22:44  20  a touch sensor of the type described in the '311 for a

11:22:46  21  display that had perpendicular sides, where the touch

11:22:54  22  sensor covered the top and over the edge and down the side?

11:22:57  23  A.  Yes.

11:22:57  24  Q.  And when was that?

11:22:59  25  A.  I'm not hundred percent sure of the date.

11:23:16   1   Q.   Was it a -- if you've completed the first project near

11:23:23   2   the end of June or early July, did -- was the project of

11:23:29   3   trying to wrap it around a display that was flat and

11:23:36   4   extended down the sides done two months later, three months

11:23:42   5   later, one month later?  Do you know, anything other than

11:23:46   6   would be a guess?

11:23:46   7   A.   I think it would be a guess.

11:23:49   8   Q.   At any time after June 21st, did you have a -- a

11:23:53   9   working device that had a display that was curved, the

11:24:02  10   display itself was curved, where the touch sensor overlaid

11:24:10  11   the curved display?

11:24:12  12   A.   No.

11:24:13  13   Q.   Did you have such a prototype prior to the time October

11:24:19  14   28th, 2011, that you filed the patent application for the

11:24:24  15   '311?

11:24:24  16   A.   With a curved display?

11:24:29  17   Q.   Yes.

11:24:30  18   A.   No, we did not have access to curved display.

11:24:33  19   Q.   When was the first time you had a working model of a

11:24:37  20   flexible substrate of the type described in the '311 patent

11:24:41  21   that was able to fit over a curved display?

11:24:47  22   A.   So the -- the touch sensor, or the touch panel that we

11:24:59  23   created, could have fit over a curved display.  We made a

11:25:07  24   demo, in fact, for it, as well.

11:25:10  25            But -- yeah, but we never actually built it into a

11:25:14   1   system with a curved display.  We did not have access.

11:25:17   2   Q.  So you never had access to a curved display?

11:25:22   3   A.  That's correct.

11:25:23   4   Q.  But you -- you -- you could -- you tested the flexible

11:25:34   5   touch sensor as it was flexed, being flexed; is that

11:25:39   6   correct?

11:25:39   7   A.  That's correct.  Over a -- over a curved display or

11:25:43   8   even a flat display.

11:25:44   9   Q.  Well, you said -- I think you said you didn't have a

11:25:47  10   curved display?

11:25:48  11   A.  That's correct.  It's as if -- so we -- we tested our

11:25:51  12   technology of it, you know, bending, you know, over -- in

11:26:00  13   actual -- you know, it doesn't actually make a difference

11:26:04  14   whether it's a flat display or curved display.  From our

11:26:08  15   point of view that we are able to bend our sensor, the

11:26:14  16   difference would be we extend the viewable area.  If it was

11:26:18  17   a curved display, we extend the viewable area to the edge.

11:26:22  18   Q.  Okay.  Let me see if I understand now.

11:26:28  19        So -- so the work you were doing up to the time

11:26:30  20   you filed the '311 patent was with a flat display, correct?

11:26:36  21   A.  That's correct.

11:26:36  22   Q.  And you made touch sensors that went from one edge of

11:26:43  23   the touch display on the top to the other edge, correct?

11:26:47  24   A.  One edge -- one edge of the display to the other edge.

11:26:56  25   Q.  Yeah.

11:26:57  1    A.   You mean the flat area?

11:26:59  2    Q.   The flat area.

11:27:00  3    A.   That and -- yes, but also over the edge, as well.

11:27:05  4    Q.   Okay.   And am I correct that prior to the time you

11:27:12  5    filed the '311 patent, you did not have access to a curved

11:27:17  6    display, correct?

11:27:18  7    A.   Yes.

11:27:19  8    Q.   And so you never made a touch sensor which covered the

11:27:30  9    top of a display and the side of a display, correct?

11:27:35  10             ATTORNEY:   Objection, form.

11:27:38  11   A.   It -- I mean, our sensor -- we did not have the curved

11:27:55  12   display.

11:27:55  13   Q.   Well, you were making touch sensors that were

11:27:59  14   flexible --

11:28:00  15   A.   Yes.

11:28:01  16   Q.   -- when you were -- when you were working for Atmel in

11:28:05  17   England, right?

11:28:06  18   A.   They were -- they were flexible.

11:28:10  19   Q.   Okay.   But -- but looking back at it, it's true, isn't

11:28:14  20   it, that the touch sensors that you were working on in

11:28:18  21   England for Atmel were flexible enough that you could have

11:28:23  22   wrapped them around the edges of a flat display?

11:28:30  23   A.   The designs that we had might not have been optimized

11:28:36  24   for that.   So we -- we didn't further optimize it.   But it

11:28:42  25   was flexible.

11:28:42   1   Q.  I'm not asking if you optimized it.  I'm asking you if,

11:28:50   2   looking back at it now, given the work you did at Atmel

11:28:56   3   with flexible touch sensor substrates, that, in fact, the

11:29:08   4   flexible touch sensor substrates that you were working on

11:29:11   5   in England with Atmel, you could have done the same thing

11:29:17   6   that you did later on, as we've discussed in the context of

11:29:21   7   Exhibit 18, and taken that flexible display and extended it

11:29:27   8   beyond the edges of the flat display?

11:29:34   9       It may not have been as optimum, but it would have

11:29:39  10   worked?

11:29:40  11   A.  We did not test the functionality, but it is -- it is

11:29:45  12   probable.

11:29:46  13   Q.  At some point, did you consult for a company, Houlihan

11:29:54  14   Lokey?

11:30:04  15   A.  Houlihan Lokey?  Yes.  Yes, I did.

11:30:09  16   Q.  Do you recall speaking with a patent attorney working

11:30:14  17   on behalf of the company regarding the filing of the

11:30:18  18   application that led to the '311 patent?

11:30:23  19   A.  To the patent attorney.  At the time?

11:30:31  20   Q.  Yes, sir.

11:30:31  21   A.  Speaking to them at the time?

11:30:36  22       No, I -- I could not remember.  It's too far back.

11:30:42  23   Q.  Mr. Yilmaz, earlier today, you discussed some of the

11:30:48  24   prototypes that you were involved with in creating on

11:30:54  25   behalf of Atmel's customers, specifically Nokia.

11:30:57  1          Do you remember that?

11:30:58  2  A.  Yes.

11:31:00  3          ATTORNEY:  And, for the record, this is the

11:31:01  4  document marked as Yilmaz 18.

11:31:09  5  Q.  Do you remember talking about the project that's

11:31:11  6  discussed in the first paragraph of this email that we're

11:31:14  7  looking at on the screen right now?

11:31:17  8  A.  Today?

11:31:18  9  Q.  Yes.

11:31:19  10  A.  Yes.

11:31:19  11  Q.  The project that is being discussed in this first

11:31:29  12  paragraph is the Jolle project.  Would that be fair to say?

11:31:32  13  A.  Yes.

11:31:32  14  Q.  And how can you tell?

11:31:37  15  A.  That was the curved cover that we were working on.

11:31:47  16  Q.  Do you see in the middle part of the screen right now

11:31:53  17  there's some information there about who sent the email and

11:31:58  18  what time, subject, and then the attachments to the email?

11:32:02  19          Do you see that?

11:32:03  20  A.  Yes.

11:32:03  21  Q.  Under the -- well, next to the term "attachments," what

11:32:11  22  do you see there?

11:32:12  23  A.  Jolle glass touch, et cetera, zip file.

11:32:15  24  Q.  I'd like to ask you about the number that appears right

11:32:20  25  after Jolle glass touch.  I'll read it as 20110428.

11:32:27   1          Do you see that?

11:32:28   2   A.  Yes.

11:32:28   3   Q.  Does that indicate to you that the date of the -- at

11:32:34   4   least the file that's being attached is, let's say,

11:32:40   5   April 28th, 2011?

11:32:42   6   A.  Yes.

11:32:44   7   Q.  I'd like to show you a document that has a Bates stamp

11:32:47   8   of Yilmaz_00000002.  And I'll bring it up on the screen

11:32:59   9   right now.

11:33:13   10  A.  Okay.

11:33:13   11  Q.  Mr. Yilmaz, do you see what I'm looking at on the

11:33:17   12  screen right now?  It's in Adobe Acrobat.  It's a document

11:33:21   13  with some blue text and some black text?

11:33:25   14  A.  Yes.

11:33:25   15  Q.  Mr. Yilmaz, you now have some control.

11:33:28   16          And I'd like to ask you first, do you recognize

11:33:30   17  this document?

11:33:31   18  A.  Yes.

11:33:31   19  Q.  What is it?

11:33:32   20  A.  It is a data sheet we created to give to customers.

11:33:41   21  Q.  So, Mr. Yilmaz, do you recognize the same document on

11:33:45   22  the screen right now, just in native format?

11:33:48   23  A.  Yes.

11:33:52   24  Q.  I'd like to scroll down to a particular portion of the

11:33:54   25  document and just ask you to confirm something.  And, for

| | | |
|---|---|---|
| 11:33:59 | 1 | the record, I am scrolling down to Page 2 of the PDF.  And |
| 11:34:22 | 2 | I'll zoom in right now. |
| 11:34:24 | 3 | And ask you, Mr. Yilmaz, to take a look at the |
| 11:34:29 | 4 | description -- or, rather, the text underneath the words, |
| 11:34:34 | 5 | Product Description and Applications, which should be |
| 11:34:38 | 6 | roughly near the middle of your screen. |
| 11:34:40 | 7 | Do you see that? |
| 11:34:41 | 8 | A.  Yes. |
| 11:34:41 | 9 | Q.  Can you just take a moment to read through that |
| 11:34:44 | 10 | paragraph and let me know what it's saying. |
| 11:34:50 | 11 | A.   So it's describing roll-to-roll process with PET |
| 11:35:22 | 12 | substrates.  It is describing that it can be bent or |
| 11:35:29 | 13 | laminated on curved surfaces.  2.5D product designs.  Yeah. |
| 11:35:45 | 14 | Q.  My question to you now is, what exactly does 2.5D mean? |
| 11:35:50 | 15 | If you could give me a quick answer? |
| 11:35:54 | 16 | A.  Right.  2.5D, as opposed to 3D, is something -- a |
| 11:36:02 | 17 | surface that you can laminate without stretching -- or, |
| 11:36:12 | 18 | actually, let me try this way. |
| 11:36:14 | 19 | It's a -- it's a curvature in one direction, as |
| 11:36:23 | 20 | opposed to multiple directions where you would have, like |
| 11:36:28 | 21 | on a ball, for example, where you can laminate a sheet. |
| 11:36:33 | 22 | Q.  Was the Jolle project you were working on with Nokia a |
| 11:36:42 | 23 | 2.5D design or 3D? |
| 11:36:47 | 24 | A.  2.5. |
| 11:36:48 | 25 | Q.  Mr. Yilmaz, I'd like to show you another document, |

| | | |
|---|---|---|
| 11:36:51 | 1 | which I'll mark as Yilmaz Exhibit 32. |
| 11:36:55 | 2 | I'd like to you take a look at this document, sir. |
| 11:37:00 | 3 | And I'll share control with you right now, and ask you once |
| 11:37:04 | 4 | you know, what is it? |
| 11:37:08 | 5 | A.  Yeah.  This would have been number of sensors we |
| 11:37:25 | 6 | delivered for a particular project and a particular |
| 11:37:28 | 7 | customer. |
| 11:37:29 | 8 | Q.  Could I ask you to take a look at Row 5, which is |
| 11:37:35 | 9 | Priority 1 in Column A? |
| 11:37:38 | 10 | A.  Yes. |
| 11:37:38 | 11 | Q.  Do you see that? |
| 11:37:40 | 12 | Do you see in Column C on Row 5, the project name |
| 11:37:44 | 13 | is Jolle? |
| 11:37:45 | 14 | A.  Yes. |
| 11:37:45 | 15 | Q.  So this row relates to the Jolle project that you were |
| 11:37:50 | 16 | discussing earlier today in -- in the deposition? |
| 11:37:55 | 17 | A.  That's correct. |
| 11:37:55 | 18 | Q.  And do you recall saying that prototypes were, in fact, |
| 11:38:01 | 19 | fabricated and delivered in the Jolle project? |
| 11:38:05 | 20 | A.  Yes. |
| 11:38:06 | 21 | Q.  Can you just take a look at the rest of the information |
| 11:38:09 | 22 | in the row and just confirm that for me.  And let me know |
| 11:38:13 | 23 | if your answer changes. |
| 11:38:16 | 24 | A.  Sorry.  Can you ask your question again? |
| 11:38:19 | 25 | Q.  Sure.  Can you just confirm what you just said, after |

| 11:38:24 | 1 | having looked at the rest of the information in Row 5 of |
| 11:38:28 | 2 | the Excel document? |
| 11:38:31 | 3 | A.  Yes.  Yes, we have got layouts, we have got number of |
| 11:38:40 | 4 | samples that we are shipping.  Layout complete, mask |
| 11:38:46 | 5 | delivery.  And this is the shipment date. |
| 11:38:49 | 6 | Q.  Under Column F, which has I believe a label CAD |
| 11:38:55 | 7 | Engineer, you can see the name Carl. |
| 11:38:57 | 8 | Do you see that? |
| 11:38:57 | 9 | A.  Yes. |
| 11:38:58 | 10 | Q.  Who is Carl? |
| 11:39:00 | 11 | A.  This is a CAD engineer in the U.K. |
| 11:39:08 | 12 | Q.  Does he have a last name? |
| 11:39:10 | 13 | A.  Carley. |
| 11:39:13 | 14 | Q.  Carl Carley? |
| 11:39:16 | 15 | A.  Yes. |
| 11:39:16 | 16 | Q.  Did he work for Nokia? |
| 11:39:17 | 17 | A.  No.  Atmel. |
| 11:39:24 | 18 | Q.  Carl Carley worked for Atmel? |
| 11:39:27 | 19 | A.  That's correct. |
| 11:39:27 | 20 | Q.  And, just for the record, the term "CAD," C-A-D, what |
| 11:39:39 | 21 | does that stand for? |
| 11:39:40 | 22 | A.  Computer-aided design. |
| 11:39:44 | 23 | Q.  I'd like to show you that document -- or, rather, let |
| 11:39:47 | 24 | me first just say, let me pull up on the screen what's been |
| 11:39:53 | 25 | Bates stamped as Yilmaz 21. |

11:39:55   1        So, Mr. Yilmaz, I've pulled up that native

11:39:59   2   document -- I've opened it, rather, in a free step file

11:40:04   3   viewer called Step Viewer.

11:40:07   4        Well, first, let me ask a foundational question.

11:40:10   5        Do you know what a step file is?

11:40:13   6   A.  Yes.

11:40:13   7   Q.  And what is a step file?

11:40:15   8   A.  It's a -- a 3D file, a 3D design file, one of the

11:40:21   9   formats.

11:40:22  10   Q.  Have you -- or, rather, have you seen this -- have you

11:40:31  11   seen this document before?

11:40:32  12   A.  Yes.

11:40:32  13   Q.  And can you tell me when you have seen the document

11:40:35  14   before?

11:40:35  15   A.  You provide it to me.  Yes, I believe that was the

11:40:42  16   case.

11:40:42  17   Q.  And do you know if this was -- this step file was

11:40:46  18   created by Mr. Carley?

11:40:47  19   A.  I'm not sure.  I think part of it might have been.  Or

11:40:58  20   at least co-created.

11:41:00  21   Q.  Starting from the bottom, actually, with Jolle Display

11:41:07  22   Foam, can you just tell me what that is?  What does it

11:41:11  23   refer to?

11:41:11  24   A.  It is the foam that seals this piece to the display.

11:41:20  25   So there's the seal between this piece and the display.

374

| | | |
|---|---|---|
| 11:41:23 | 1 | Q.  And by "this piece," what do you mean? |
| 11:41:29 | 2 | A.  You know, what we are seeing here.  This is the touch |
| 11:41:36 | 3 | panel. |
| 11:41:36 | 4 | Q.  Okay.  Moving to this layer where -- where my cursor is |
| 11:41:48 | 5 | hovering, where it reads, Jolle touch, is that assembly, |
| 11:41:54 | 6 | A-S-S-Y? |
| 11:41:54 | 7 | A.  It is. |
| 11:41:54 | 8 | Q.  I'm going to expand that just so that you can see what |
| 11:41:57 | 9 | it is. |
| 11:41:58 | 10 | A.  Yeah. |
| 11:41:59 | 11 | Q.  Can you just tell me what the Jolle Touch Assembly |
| 11:42:04 | 12 | layer refers to? |
| 11:42:05 | 13 | A.  That would be the touch sensor.  It will be the FPC. |
| 11:42:13 | 14 | Yeah.  It's -- it's the sensor and the FPC, and it looks |
| 11:42:17 | 15 | like there's a connector, as well, in there. |
| 11:42:20 | 16 | Q.  What is the FPC? |
| 11:42:22 | 17 | A.  FPC is another -- it's basically a connect -- |
| 11:42:36 | 18 | connecting piece of flexible printed circuit board between |
| 11:42:48 | 19 | the touch sensor and could be the motherboard, for example. |
| 11:42:51 | 20 | Q.  Okay.  And I'll come back to -- to this layer.  I'd |
| 11:42:56 | 21 | like to first ask you about the first layer in the list, |
| 11:42:59 | 22 | Jolle Glass Window. |
| 11:43:02 | 23 | A.  Right. |
| 11:43:03 | 24 | Q.  Do you see that? |
| 11:43:03 | 25 | A.  Yes. |

11:43:03   1   Q.  Can you tell me what the Jolle Glass Window is?

11:43:08   2   A.  It's the -- it's the cover glass.

11:43:11   3   Q.  So I've just hovered my mouse cursor over Jolle Glass

11:43:20   4   Window.  You can see the substantial portion of the model

11:43:23   5   just lit up in neon blue.  The part that lit up in neon

11:43:27   6   blue, is that the Jolle Glass Window layer?

11:43:30   7   A.  Yes.

11:43:30   8   Q.  Okay.  I'm going to hide the board-to-board connector

11:43:37   9   now.  And next I'm going to ask you about the -- the Jolle

11:43:43  10   Touch Sensor Top Flex Element, where my mouse cursor has

11:43:50  11   hovered.

11:43:50  12          And, again, sir, if you -- at any point you want

11:43:53  13   to actually take control of my computer and, you know,

11:43:58  14   manipulate it yourself, just let me know.  Can you tell me

11:44:01  15   what the Jolle Touch Sensor Top Flex Element is?  In the

11:44:07  16   layout, it's the Jolle Touch Sensor Atmel.  Do you see

11:44:07  17   that.

11:44:07  18   A.  Yes.

11:44:08  19   Q.  Can you tell me what that is?

11:44:11  20   A.  That's the touch sensor.

11:44:13  21   Q.  By "touch sensor," do you mean the PET film on which

11:44:24  22   the copper metal mesh lines are laminated on both sides?

11:44:28  23   A.  Yes.

11:44:28  24   Q.  I'm going to move my mouse to a portion of the layout.

11:44:37  25   Can you see where my mouse is hovering right here?

11:44:40   1   A.   Yes.

11:44:40   2   Q.   Do you see that there is, from your perspective, a

11:44:44   3   north/south line extending from where my mouse cursor is

11:44:49   4   hovering to the bottom of the model where my mouse is now

11:44:53   5   hovering?

11:44:53   6   A.   Right.   Yes.

11:44:54   7   Q.   The side to the left of that line we discussed, is that

11:45:02   8   also part of the touch sensor?

11:45:04   9   A.   Yes.

11:45:14  10   Q.   Okay.   Same question with the line on the other side of

11:45:18  11   the model where my mouse is hovering, which is, you know,

11:45:21  12   just -- it's asymmetrical design.   But same question, is

11:45:26  13   the part to the right of the line where my mouse is

11:45:29  14   hovering now part of the touch sensor, as well, sir?

11:45:32  15   A.   Yes.

11:45:32  16   Q.   This line right here where my mouse is hovering, along

11:45:41  17   with the line that we just discussed on the other side of

11:45:44  18   the model where my mouse is hovering now, is that an

11:45:47  19   indication of where the radius of curvature of the design

11:45:51  20   begins, rather, on the left and right sides?

11:45:53  21   A.   I believe so.

11:45:58  22   Q.   Mr. Yilmaz, I'm also going to pull up something called

11:46:05  23   a GDS file for you in a moment.

11:46:07  24        But, first, can you tell me, do you know what a

11:46:10  25   GDS file is?

11:46:11  1  A.  Yes.  It's -- it's a file used by Cadence Software.

11:46:19  2  It's mainly used for semiconductor design, but it is also

11:46:26  3  used for metal mesh design by us.

11:46:29  4  Q.  So, Mr. Yilmaz, looking at the screen now, can you

11:46:35  5  confirm for me that this is a -- let's say a GDS layout?

11:46:39  6  A.  Yes, it is.

11:46:41  7  Q.  And was this the GDS layout used for the fabrication

11:46:51  8  for the prototypes in the Jolle project?

11:46:54  9  A.  Yes.

11:46:54  10  Q.  How do you know that?

11:46:55  11  A.  This was the Jolle1UP GDS file that we used to create

11:47:04  12  the touch sensors.

11:47:05  13  Q.  And can you just tell me what we're looking at here on

11:47:09  14  the screen?

11:47:09  15  A.  This is a portion of the touch sensor -- touch sensor

11:47:19  16  area.  We are looking at the mesh lines in green and cut.

11:47:25  17  Q.  The mesh lines are -- well, tell me, can you recall the

11:47:31  18  material used in the mesh lines for the Jolle project?

11:47:34  19  A.  Yes.  It would be copper.

11:47:39  20  Q.  So, earlier, you were saying that one of the

11:47:43  21  technological, let's say, innovations of the '311 patent

11:47:53  22  was to have the metal mesh sensor configured to go over

11:47:58  23  the -- the -- the edges of the display.  Is that -- is that

11:48:02  24  right?

11:48:03  25  A.  Yes.

11:48:03  1    Q.  Do you remember approximately when in the 2011 time

11:48:10  2    frame or 2010 time frame, or whatever time frame, that you,

11:48:14  3    Mr. Laub, or Mr. Shaikh actually came up with that concept?

11:48:24  4    Would it have been, let's say, before the company started

11:48:28  5    contemplating what it called the 2.5D product designs?

11:48:40  6         Mr. Yilmaz, speaking specifically with the month

11:48:49  7    January 2011 in mind, at the time had you or Mr. Laub or

11:48:59  8    Mr. Shaikh already been working on 2.5D designs, as we've

11:49:05  9    discussed?

11:49:06  10   A.  With the Jolle project, we were working on the 2.5D

11:49:14  11   designs.

11:49:14  12   Q.  Do you remember approximately when you, Mr. Shaikh, or

11:49:20  13   Mr. Laub first began working on the Jolle project?

11:49:22  14   A.  I think it would have been early 2011.

11:49:33  15   Q.  And bringing your attention back to the prototypes that

11:49:37  16   Atmel eventually created for the Jolle project, do you

11:49:41  17   recall approximately what time Atmel received those

11:49:44  18   prototypes?

11:49:48  19   A.  I think it would have been around July or August.

11:49:51  20   Q.  Do you recall the prototypes being, let's say,

11:49:59  21   functional?

11:50:11  22   A.  I mean, they -- they would have been.

11:50:27  23   Q.  And why would you think that?

11:50:29  24   A.  Personally, I don't recall testing them.  Yeah.

11:50:44  25   Q.  Mr. Yilmaz, speaking again specifically about the

11:50:50   1   prototypes that you testified you received in the July 2011

11:50:56   2   time frame, do you have any reason to believe that they

11:51:00   3   would not be functional, let's say, for, you know, sensing

11:51:09   4   touch on the display panel around the module?

11:51:14   5   A.   No.

11:51:14   6   Q.   You remember the -- the series of CAD drawings you were

11:51:21   7   shown, Mr. Yilmaz?

11:51:22   8   A.   Yes.

11:51:22   9   Q.   And I think you described that that Jolle had -- was --

11:51:30  10   consisted of a curved glass under which was a curved

11:51:38  11   sensor; is that correct?

11:51:39  12   A.   That's correct.

11:51:40  13          (Videoclip ends.)

11:51:44  14          THE COURT:  Does that complete this witness by

11:51:46  15   deposition, counsel?

11:51:48  16          MS. FAIR:  Yes, Your Honor.

11:51:48  17          THE COURT:  All right.  Ladies and gentlemen of

11:51:52  18   the jury, it's about 10 minutes until noon.  I'm advised by

11:51:55  19   the clerk's office that your lunch is waiting for you in

11:51:58  20   the jury room.  So we're going to break for lunch at this

11:52:01  21   time.

11:52:03  22          I'm going to ask you to take your juror notebooks

11:52:05  23   with you to the jury room over the lunch break.  Please

11:52:09  24   follow all the instructions I've given you, of course,

11:52:12  25   including the one not to discuss the case with each other

```
11:52:15    1   or anyone else in any way.
11:52:16    2           It is about eight minutes until noon.  We'll try
11:52:22    3   to reconvene promptly at 1:00 o'clock.
11:52:25    4           The jury is excused for lunch at this time.
11:52:27    5           COURT SECURITY OFFICER:  All rise.
11:52:29    6           (Jury out.)
11:52:29    7           THE COURT:  Counsel, so far, we've used two hours
11:53:07    8   and 50 minutes trial time this morning.
11:53:09    9           If you need further breakdowns, you can get them
11:53:15   10   from my staff over the lunch break.  Until 1:00 p.m. when
11:53:19   11   we reconvene, we stand in recess.
11:53:22   12           COURT SECURITY OFFICER:  All rise.
11:53:23   13           (Recess.)
01:06:51   14           (Jury out.)
01:06:52   15           COURT SECURITY OFFICER:  All rise.
01:06:57   16           THE COURT:  Be seated, please.
01:09:50   17           Counsel, I understand you've got recent updates on
01:09:57   18   your time from my staff.  I also understand there may need
01:10:00   19   to be a correction in the record with regard to deposition
01:10:04   20   exhibits that were put forward earlier; is that correct,
01:10:09   21   Ms. Fair?
01:10:10   22           MS. FAIR:  That's correct, Your Honor.
01:10:11   23           THE COURT:  Would you go to the podium, please?
01:10:13   24           MS. FAIR:  Yes, sir.
01:10:20   25           THE COURT:  Tell me what we need to do and what we
```

| | | |
|---|---|---|
| 01:10:22 | 1 | have. |
| 01:10:23 | 2 | MS. FAIR:  I misaligned up which PTX numbers go |
| 01:10:27 | 3 | with the Yilmaz exhibit number from the deposition, and so |
| 01:10:30 | 4 | I just wanted to get it corrected in the record since I |
| 01:10:33 | 5 | misspoke earlier. |
| 01:10:34 | 6 | THE COURT:  All right. |
| 01:10:34 | 7 | MS. FAIR:  Okay. |
| 01:10:35 | 8 | THE COURT:  Let's go ahead and correct the record. |
| 01:10:36 | 9 | MS. FAIR:  Thank you. |
| 01:10:37 | 10 | Yilmaz Exhibit No. 4 is PTX-003. |
| 01:10:43 | 11 | Yilmaz Exhibit 18 is PTX-701. |
| 01:10:50 | 12 | Yilmaz Exhibit 31 is PTX-702. |
| 01:10:56 | 13 | Yilmaz Exhibit 32 is PTX-690. |
| 01:11:02 | 14 | Yilmaz Exhibit 33 is PTX-692. |
| 01:11:09 | 15 | And Yilmaz Exhibit 34 is PTX-694. |
| 01:11:14 | 16 | And those are the exhibits that Plaintiff offered |
| 01:11:18 | 17 | through Mr. Yilmaz's deposition testimony. |
| 01:11:21 | 18 | THE COURT:  All right.  Any objection or problem |
| 01:11:25 | 19 | with that, Mr. Haslam? |
| 01:11:26 | 20 | MR. HASLAM:  No, Your Honor. |
| 01:11:30 | 21 | THE COURT:  All right.  Is Plaintiff prepared to |
| 01:11:32 | 22 | call their next witness? |
| 01:11:34 | 23 | MR. FENSTER:  We are, Your Honor, Mr. Credelle. |
| 01:11:37 | 24 | THE COURT:  All right.  Let's bring in the jury, |
| 01:12:13 | 25 | please. |

382

| | | |
|---|---|---|
| 01:12:13 | 1 | COURT SECURITY OFFICER:  All rise. |
| 01:12:13 | 2 | (Jury in.) |
| 01:12:14 | 3 | THE COURT:  Welcome back from lunch, ladies and |
| 01:12:15 | 4 | gentlemen.  Please have a seat. |
| 01:12:16 | 5 | Plaintiff, call your next witness. |
| 01:12:24 | 6 | MR. FENSTER:  Your Honor, the Plaintiff calls |
| 01:12:27 | 7 | Mr. Thomas Credelle. |
| 01:12:28 | 8 | THE COURT:  All right.  Mr. Credelle will come |
| 01:12:30 | 9 | forward and be sworn, please. |
| 01:12:49 | 10 | (Witness sworn.) |
| 01:12:50 | 11 | THE COURT:  If you'll come around, sir, and have a |
| 01:12:52 | 12 | seat on the witness stand. |
| 01:13:02 | 13 | THE WITNESS:  Thank you. |
| 01:13:03 | 14 | THE COURT:  All right.  Mr. Fenster, you may |
| 01:13:10 | 15 | proceed with direct examination. |
| 01:13:11 | 16 | MR. FENSTER:  Thank you, Your Honor. |
| 01:13:11 | 17 | Good afternoon, ladies and gentlemen. |
| 01:13:11 | 18 | THOMAS CREDELLE, PLAINTIFF'S WITNESS, SWORN |
| 01:13:11 | 19 | DIRECT EXAMINATION |
| 01:13:15 | 20 | BY MR. FENSTER: |
| 01:13:15 | 21 | Q.  (By Mr. Fenster)  Good afternoon, Mr. Credelle. |
| 01:13:16 | 22 | A.  Good afternoon. |
| 01:13:17 | 23 | Q.  Could you please introduce yourself to the jury? |
| 01:13:19 | 24 | A.  My name is Thomas Credelle. |
| 01:13:20 | 25 | Q.  And are you married, Mr. Credelle? |

01:13:22  1   A.  Yes, I am.  In fact, I celebrate my 40th wedding

01:13:27  2   anniversary in two months.  We hope COVID ends so we can

01:13:32  3   actually go someplace.

01:13:33  4         I have two boys that are age 36 and 38.  I have

01:13:37  5   one granddaughter and another one on the way in about a

01:13:40  6   month.

01:13:41  7   Q.  And were you retained as an expert witness in this

01:13:43  8   case?

01:13:43  9   A.  I was.

01:13:48  10  Q.  By whom?

01:13:49  11  A.  I was retained by Solas OLED.

01:13:50  12  Q.  And what were you asked to do?  What is your role in

01:13:53  13  this case?

01:13:54  14  A.  So my role was to analyze these three patents that are

01:13:59  15  in this case.  I was asked to look at the details of the

01:14:02  16  patent.  I was asked to look at Samsung documents and

01:14:07  17  products to match the claims of the asserted patents to the

01:14:13  18  Samsung products.

01:14:14  19  Q.  And are you being compensated for your work in this

01:14:17  20  case?

01:14:17  21  A.  I am.

01:14:18  22  Q.  How so?

01:14:19  23  A.  I'm paid $400 an hour for my consulting work.

01:14:22  24  Q.  And is that your normal hourly rate?

01:14:24  25  A.  Yes, it is.

01:14:25   1   Q.  And does your compensation depend in any way on the

01:14:28   2   outcome of this case?

01:14:28   3   A.  Absolutely not.

01:14:29   4   Q.  Did you prepare some presentation slides to help aid

01:14:36   5   your presentation to the jury today?

01:14:38   6   A.  Yes, I did.

01:14:39   7   Q.  And do you have the clicker right there with you?

01:14:41   8   A.  I do.

01:14:42   9   Q.  Terrific.

01:14:43  10           Would you please tell the jury a little bit about

01:14:45  11   the experience that you had that lends -- that lends to

01:14:49  12   your expertise in display technology?

01:14:50  13   A.  Yes, I think I've been very fortunate that when I got

01:14:54  14   out of school that I got into a field that was very

01:14:57  15   fascinating and has changed over the past now 50 years,

01:15:02  16   displays.

01:15:03  17           I worked in all aspects of displays.  The new

01:15:09  18   technology was going from the old CRTs -- some of you are

01:15:15  19   old enough to remember the old boxy tubes -- to the more

01:15:18  20   modern displays we have today.

01:15:20  21           I worked on many aspects of that in R&D for 20

01:15:25  22   years.  And I decided I wanted to get more into the action

01:15:29  23   and went to work for product companies that develop

01:15:32  24   products that use new display technology.

01:15:32  25           I also worked in touch, touch technology.

01:15:35   1          So it runs a broad spectrum.  My experience is

01:15:39   2   also with different companies, as I'll describe.

01:15:42   3   Q.  Okay.  And what do you do today?

01:15:44   4   A.  Today, I'm a consultant.  I do consulting, some

01:15:50   5   technical consulting and some business consulting for

01:15:53   6   companies.  But I do a lot of patent analysis like I was

01:15:59   7   retained to do in this case.

01:16:00   8   Q.  And do you have any patents yourself?  Are you a named

01:16:03   9   inventor on any patents?

01:16:04  10   A.  Yes.  I'm proud to say that I've earned over 80 U.S.

01:16:07  11   patents, quite a bit more foreign patents.  But this

01:16:13  12   is over the span of my career.  It wasn't just in the

01:16:17  13   beginning.  It was throughout my whole career.

01:16:19  14          I pride myself in being inventive and solving -- a

01:16:25  15   problem solver, so that resulted in quite a few patents.

01:16:28  16   Q.  Can you tell the jury about your educational

01:16:30  17   background?

01:16:30  18   A.  Yes.  I received my Bachelor of Science degree in

01:16:34  19   electrical engineering from Drexel University in 1969.  I

01:16:37  20   graduated at the top of my class and was given a full

01:16:43  21   scholarship to MIT.

01:16:44  22          And I spent a year at MIT and got my Master's

01:16:50  23   degree, also in electrical engineering.  But my emphasis

01:16:53  24   was electro-optics and solid-state physics and solid-state

01:16:56  25   materials.  And so I think it really prepared me well for

01:16:59   1   the career that I eventually fell into.

01:17:01   2   Q.  And can you tell the jury a little bit about your

01:17:03   3   real-world work experience related to touch sensor and

01:17:06   4   display technology?

01:17:07   5   A.  Yes, be happy to.

01:17:08   6        So the first company I joined was RCA.  And in the

01:17:13   7   '70s, RCA was the leading company in television.  They

01:17:17   8   actually invented color television.  They had a very large

01:17:21   9   research department that was looking at new products that

01:17:24   10  RCA would hopefully introduce in the next five to 10 years.

01:17:28   11       One of those products -- projects was -- we used

01:17:32   12  to call them flat-panel displays to distinguish them from

01:17:36   13  the big CRTs, but we now call it displays.

01:17:39   14       In those days, the technology didn't exist.  We

01:17:41   15  had to figure out how do we make a display that's only an

01:17:45   16  inch thick that you can hang on the wall, and that was what

01:17:48   17  the dream of the CEO was, of RCA.

01:17:52   18       And so I worked on that project doing development

01:17:54   19  myself and leading a group.  We developed some of the first

01:17:58   20  working models of flat displays, very small, but we were

01:18:03   21  very proud of the fact that we were able to make this with

01:18:06   22  our technology and our ideas.

01:18:08   23  Q.  And --

01:18:09   24  A.  After that, I joined General Electric, or GE actually

01:18:13   25  bought RCA about the time I moved.  And they were working

01:18:16  1  on also flat displays, but this time for cockpits.  GE had

01:18:23  2  a big business in supplying electronics for airplanes, and

01:18:26  3  they wanted to replace, again, the bulky displays that you

01:18:31  4  might have seen in old cockpits in movies with these sleek,

01:18:31  5  flat displays, which weigh less and give better picture

01:18:31  6  quality.

01:18:35  7       So we developed that technology, and that's flying

01:18:39  8  in airplanes still today.

01:18:41  9  Q.  What did you do after GE?

01:18:43 10  A.  So I spent 20 years in R&D.  And I was kind of itching

01:18:48 11  to get into product development.  And there was a small

01:18:51 12  company in California called Apple Computer that was

01:18:54 13  looking to build laptop displays -- or I should say laptop

01:18:59 14  computers with flat displays.

01:19:01 15       I was hired to run that group, and our job was to

01:19:04 16  look at the technology that could be appropriate for

01:19:06 17  Apple's PowerBooks -- that's what they called them -- and

01:19:09 18  we introduced -- introduced those products.  One of the

01:19:13 19  first companies to introduce light-weight laptops.  I guess

01:19:17 20  with Apple, the rest is history.  We all know about their

01:19:21 21  great products that come after that.

01:19:22 22  Q.  And what about after Apple?

01:19:24 23  A.  So after Apple, some people asked me, why did you

01:19:27 24  leave, but I had the opportunity to join a group at

01:19:30 25  Motorola that was actually going to manufacture flat-panel

01:19:33    1   displays or displays in the U.S.  And I was happy about

01:19:36    2   that because the business was kind of moving into Asia.

01:19:40    3   And Motorola made a major commitment; they hired me to help

01:19:43    4   with the engineering and marketing of this new product.

01:19:45    5        I also was quite involved with the cell phone

01:19:48    6   group of Motorola.  Obviously, they're well-known for

01:19:52    7   making cell phones, and they needed help on displays that

01:19:56    8   would go into cell phones, the new models, even including

01:20:02    9   Organic Light-Emitting Diodes, which we'll hear about

01:20:03   10   later -- later today.

01:20:04   11   Q.  Did you -- before we go on to the next slide, did you

01:20:07   12   gain any experience with patents working at any of these

01:20:12   13   companies?

01:20:12   14   A.  So, yeah, that's a great question.  I -- as a young

01:20:15   15   engineer coming out of MIT, I didn't know much about

01:20:18   16   patents.  I knew about patents, about the process and the

01:20:22   17   value.  And RCA put a lot of values in patents.  I think

01:20:25   18   they made a lot of money with their patents and protecting

01:20:28   19   their -- protecting their ideas.

01:20:30   20        The patent attorneys there gave us training as

01:20:32   21   young engineers on how to write down and how to document

01:20:36   22   patents and how to think about patents and their value.  So

01:20:38   23   it was really great training for me as a young engineer to

01:20:42   24   be able to kind of understand this aspect of my job.

01:20:46   25        So if I had a good idea, we would discuss it, we

01:20:50  1  would write it down, and they would file patents.  And I

01:20:52  2  saw the value to RCA, that these were protecting their

01:20:55  3  business against competition.  And at some point, if they

01:20:58  4  want to license that technology, that was revenue that

01:21:01  5  they -- that they got from those patents.

01:21:03  6        So throughout my whole career, I've worked at

01:21:07  7  other start-up companies where their idea was licensing,

01:21:12  8  and so patents are very important.  You really need to have

01:21:15  9  good, solid protection for your business.  It's probably

01:21:18  10  more true of small companies than it is for big companies.

01:21:21  11  Q.  Mr. Credelle --

01:21:22  12        THE COURT:  Mr. Credelle, pull the microphone a

01:21:24  13  little closer to you, please.

01:21:26  14        THE WITNESS:  Oh, I'm sorry.

01:21:26  15        THE COURT:  I want to make sure everybody in the

01:21:28  16  room has a chance to hear you.

01:21:30  17        Go ahead, counsel.

01:21:31  18        MR. FENSTER:  Thank you, Your Honor.

01:21:31  19  Q.  (By Mr. Fenster)  Mr. Credelle, did you gain any

01:21:34  20  real-world experience designing and developing touch

01:21:36  21  sensors?

01:21:36  22  A.  Yes, as a matter of fact one of the start-up companies

01:21:39  23  I joined about five years ago, maybe six years ago, was a

01:21:44  24  small company called Innova Dynamics.  Their technology was

01:21:50  25  metal nanowires.  Kind of a metal -- a metal sensor, and

01:21:54   1   they were fabricating these metal nanowires.

01:21:57   2         I was in charge of engineering, the VP of

01:22:00   3   engineering, to develop prototypes and work with the

01:22:02   4   production people in Taiwan to actually fabricate

01:22:08   5   prototypes using this new technology.

01:22:10   6         So part of my responsibility was to understand the

01:22:14   7   competition for this new technology, whether it's metal

01:22:18   8   mesh or you heard about ITO, indium tin oxide, and compare

01:22:24   9   that to the new technology and look at how to manufacture

01:22:27  10   them and then talk to customers about their needs.

01:22:30  11         So that was a very intense three years working on

01:22:34  12   touch sensors that gave me a lot of background, which

01:22:36  13   actually helped me in understanding the details of this

01:22:39  14   case.

01:22:39  15   Q.  Thank you, Mr. Credelle.

01:22:43  16         MR. FENSTER:  And, Your Honor, at this time, I'd

01:22:44  17   like to offer Mr. Credelle as an expert in the field of

01:22:50  18   OLED and AMOLED display and touch sensor technology.

01:22:52  19         THE COURT:  Is there objection?

01:22:53  20         MR. HASLAM:  No objection, Your Honor.

01:22:55  21         THE COURT:  Without objection, the Court will

01:22:58  22   recognize the witness as an expert in those designated

01:23:00  23   fields.

01:23:00  24         Please continue.

01:23:02  25   Q.  (By Mr. Fenster)  Mr. Credelle, can you give the jury

01:23:05   1    kind of an overview of the broad topics that we'll be

01:23:09   2    covering today?

01:23:09   3    A.   Sure.  As I mentioned, and you've heard, I think, in

01:23:16   4    the opening, there are three patents in this case, the

01:23:20   5    '311, the '450, and the '338.  I will start with the '311.

01:23:25   6    I think it's fresh in our minds because we heard from the

01:23:29   7    inventors of the '311 this morning.  So, hopefully.  It

01:23:32   8    will tie together, and I'll go into the patents that talk

01:23:35   9    about OLED technology.

01:23:36  10    Q.   Can you tell the jury some of the materials that you

01:23:40  11    reviewed in preparing your -- and doing your analysis in

01:23:45  12    this case?

01:23:46  13    A.   Yes, this is a really long list.  Actually, it's a lot

01:23:49  14    of pages.

01:23:50  15         Starting with the patents, of course, that's Step

01:23:53  16    No. 1.  Any person with my assignment needs to really

01:24:00  17    understand the details of the patent.  That's the

01:24:04  18    specification and most importantly the claims.

01:24:06  19         There's documentation when these -- when these

01:24:11  20    patents are filed.  I think we heard something about this

01:24:13  21    yesterday, that they're filed, and there's a lot of back

01:24:15  22    and forth discussion before it gets actually issued as a

01:24:18  23    patent.  That documentation is informative.  I can learn

01:24:22  24    things from those file histories, they're called.  I

01:24:25  25    studied those.

01:24:26  1          And then the documents about the invention of the

01:24:28  2    '311.  I think you heard this morning from one of the

01:24:31  3    inventors personally, that he -- how he invented -- what

01:24:36  4    the process was and then when is the patent filed and such.

01:24:41  5    I studied that.

01:24:42  6          And then several documents that are from Samsung.

01:24:48  7    I'll put them up on the screen.  Then I'll talk about them.

01:24:51  8    Deposition testimony by Samsung experts, witnesses.

01:24:56  9          Samsung has documents called panel design reviews.

01:24:59  10   This is basically -- think of it as a blueprint for how to

01:25:04  11   make an OLED panel or a touch sensor.  All the details that

01:25:07  12   an engineer would need to know or the factory engineer

01:25:10  13   would need to know how to make the product.  How big is it,

01:25:13  14   thick is it, those kind of details.

01:25:15  15         The graphic design files are -- I think we saw

01:25:20  16   some maybe this morning, but the graphic design files are

01:25:23  17   actual blueprints.  So these are files that would allow a

01:25:28  18   machine to actually make the layers that are in the recipe.

01:25:31  19   Q.  And are these -- are you talking about the documents

01:25:33  20   describing the accused Samsung phones?

01:25:35  21   A.  Yes, yes, I should have made that clear.  So for each

01:25:38  22   of these -- these list of documents, there's a set of these

01:25:42  23   documents for each phone.  And there are a lot of phones,

01:25:45  24   so I've looked at a lot of documents.

01:25:47  25         The drawing files are mechanical drawings, so how

01:25:51  1  big is it?  Is there any mechanical frame?  How is it

01:25:54  2  mounted together?  The drawing files help me understand

01:25:57  3  those points.  If it was a shaped curve, what's the shape

01:26:02  4  of that curve?

01:26:03  5         And, finally, product specification documents,

01:26:05  6  which starts out with some basic specification, and then it

01:26:08  7  has two to 3,000 pages of documentation of different

01:26:13  8  testing and different specifications for products.

01:26:16  9         Basically, everything down to the screws that are

01:26:19  10  used in putting together the product are in the

01:26:21  11  specification document.

01:26:22  12         Not that I needed to read all 3,000 pages, but

01:26:27  13  there was documents -- there was information in there that

01:26:29  14  was very useful for me to understand how the phone is made,

01:26:31  15  how the part is made.

01:26:32  16  Q.  And so can you just give the jury some kind of sense of

01:26:36  17  the overall volume of materials that you reviewed in this

01:26:40  18  case regarding the accused products?

01:26:42  19  A.  Yeah, I probably should have added it up in terms of

01:26:46  20  how many feet of paper.  I don't tend to print it out

01:26:49  21  myself, but law firms do.  And, literally, it's probably

01:26:52  22  50 feet of notebooks or more.  It's a lot of information.

01:26:59  23         When you multiply all of those things I described

01:27:01  24  times about 15 or 20, I think 24 phones, maybe 24 phones,

01:27:08  25  it kept me busy for a lot of last year.

01:27:10  1  Q.  How much time did you spend analyzing the documents to

01:27:14  2  learn about Samsung's phone and do the comparison to the

01:27:17  3  claims that you'll tell the jury about?

01:27:19  4  A.  It's between three and 400 hours I spent over the last

01:27:24  5  year on this -- on this effort.

01:27:26  6  Q.  Okay.  So let's turn to the '311 patent.  And can you

01:27:31  7  give us an overview of how you're going to organize your

01:27:36  8  talk -- actually, instead of doing -- well, yeah, go ahead.

01:27:39  9  Give us an overview of what you'll tell us.

01:27:41 10  A.  Okay.  So, you know, very briefly, it's on the screen.

01:27:44 11  We'll start with the invention.  You've heard a lot about

01:27:46 12  that this morning, and so some of this we can go through

01:27:50 13  more quickly than if I had to start from scratch.  But I'll

01:27:53 14  remind you some of the key points.

01:27:55 15       We'll look to see how the claim language claimed

01:27:57 16  in the patents that are asserted compare to the Galaxy

01:28:00 17  phones.

01:28:01 18  Q.  And is that -- is that part -- the second one, is that

01:28:04 19  actually the infringement analysis comparing the phones to

01:28:07 20  the claim -- the asserted claims?

01:28:09 21  A.  Yeah, that's another -- another way to say it.  It's an

01:28:12 22  infringement analysis.  Claim/product, these are a match.

01:28:17 23  So I'll be doing that analysis for all of these phones.

01:28:24 24       An investigation of when the invention actually

01:28:26 25  occurred.  You heard a lot about that this morning, so

01:28:29   1   we'll summarize the key points there.

01:28:31   2          And, finally, what was Samsung's knowledge of this

01:28:35   3   '311 patent throughout this process -- this time -- time

01:28:39   4   frame?

01:28:39   5   Q.  Okay.  Can you give us a little bit of background on

01:28:43   6   the invention of the '311?

01:28:44   7   A.  Yeah.  So the '311 patent was issued February 9th,

01:28:53   8   2016.  It was actually filed in October 28th of 2011.  The

01:28:59   9   date of invention, I think you heard this morning, was

01:29:02  10   roughly in January of 2011.  So that's going to be

01:29:05  11   important for some other aspects I'll discuss later.

01:29:08  12   You've heard from two of the inventors, one by -- by video

01:29:12  13   and one in person.

01:29:15  14   Q.  Okay.  And what are you showing here?  Is this some of

01:29:19  15   the background technology related to the '311 patent?

01:29:22  16   A.  Yes.  So to remind you, the '311 patent is about the

01:29:27  17   touch sensor that we have on our phones.  I think it was

01:29:30  18   mentioned this morning, Apple was probably the first

01:29:32  19   company to put this so-called capacitance sensor on a cell

01:29:37  20   phone.  It was kind of a breakthrough.  If you think about

01:29:39  21   it, before we had buttons, all of a sudden we could touch

01:29:43  22   the screen anywhere and interact with an icon or we could

01:29:46  23   turn things up and down.

01:29:47  24          It all starts with an electrode on top of the --

01:29:51  25   on top of your screen.  So you have -- whether it's an LCD

01:29:54  1  or an OLED, it's a display.  You have an invisible, at

01:29:59  2  least to the human eye, screen or electrode -- I should say

01:30:04  3  several electrodes.  Kind of think of a grid of electrodes

01:30:07  4  on your phone, and it has some voltages on those

01:30:10  5  electrodes.

01:30:10  6        When you touch this screen, your body has a small

01:30:13  7  amount of charge, a small amount of electricity that will

01:30:17  8  actually kind of disturb the force field of this sensor.

01:30:22  9  And when that happens, there's a controller chip, and the

01:30:26  10  controller chip is sitting there waiting for something to

01:30:28  11  happen.  So nothing is happening, nothing is happening, I

01:30:31  12  put my finger there and it says, ah-ha, I see something,

01:30:35  13  and then it decides where -- where did I touch.  It sends

01:30:37  14  that information to the computer, and that tells the

01:30:39  15  computer to do something, maybe open a file.

01:30:41  16  Q.  And is this an illustration of what Mr. Shaikh was

01:30:44  17  describing on the stand about capacitive touch and sending

01:30:51  18  the signal back to this controller?

01:30:52  19  A.  Yeah, exactly.  Just another view of that idea.  I

01:30:54  20  don't think he had the luxury of having graphics like I do.

01:30:57  21  Q.  Mr. Shaikh also told us about the different types of

01:31:00  22  conductive materials, ITO versus metal mesh.  Do you have

01:31:04  23  an illustration of that?

01:31:05  24  A.  Yes.  So around 2007, I think Apple introduced the

01:31:11  25  iPhone.  The only metal -- the only mesh that they could

01:31:14   1   use for their sensor was something called indium tin oxide.

01:31:17   2   We've heard a little bit about that.

01:31:19   3           Just think about it as a transparent conductor.

01:31:22   4   So it's like a metal, but you can see through it.  And if

01:31:25   5   you can make a pattern of diamonds like is shown on the

01:31:29   6   left side of this screen, it will interact with your

01:31:31   7   finger, and you can -- you can make a signal.  So that's

01:31:34   8   the old way of doing things.

01:31:35   9           That -- that technology had some issues, but it

01:31:39   10  did work.

01:31:42   11          MR. FENSTER:  Mr. Wietholter, if we could skip to

01:31:44   12  Slide 19.

01:31:48   13  Q.  (By Mr. Fenster)  And, Mr. Credelle, if you could just

01:31:50   14  give us an overview of --

01:31:54   15          MR. FENSTER:  Skip one more.

01:31:55   16  Q.  (By Mr. Fenster)  And can you just give us an overview

01:31:57   17  of the invention of the '311 patent?

01:32:00   18  A.  Yes.  So the metal mesh, which you heard about this

01:32:03   19  morning and is shown in this slide, the touch sensor, which

01:32:09   20  is really a metal mesh on a substrate, it's configured to

01:32:11   21  wrap around the edge of a display.

01:32:13   22          So I'm illustrating here a touch sensor on a

01:32:15   23  substrate.  We have a display on the bottom, which happened

01:32:19   24  to have some curved edges, and there's a cover glass,

01:32:23   25  basically the front of your phone.

```
01:32:25   1        If we assemble them, now we have basically the top
01:32:29   2   of your phone, and it now has a touch sensor on the flat
01:32:34   3   surface.  It has a touch sensor on the edge.  So it's a
01:32:36   4   very new kind of concept, and it's the concept Samsung uses
01:32:40   5   in many of their phones now.
01:32:42   6   Q.  And what are some of the benefits of the '311
01:32:45   7   invention?
01:32:45   8   A.  So the '311 invention, because it's based on metal
01:32:48   9   mesh, what -- that allows the sensor to work better.  I
01:32:53  10   think you heard this morning if the resistance is lower, it
01:32:58  11   will move faster, so less sluggish.  If you touch it, it
01:33:01  12   will respond.
01:33:02  13        It allows these new form factors.  It's very hard
01:33:05  14   to make ITO bend around edges and corners.  It can be done,
01:33:09  15   but it's very expensive.  So if you want that kind of
01:33:12  16   feature, the metal mesh, the flexibility of that will allow
01:33:16  17   you to make these new form factors.  It could be lower
01:33:20  18   cost.
01:33:23  19        And, finally, you can have phones with very small
01:33:25  20   borders.  If you put -- if you wrap around the sensor, then
01:33:29  21   you can hide all the other connections underneath.
01:33:32  22   Q.  Okay.  Let's move on to the infringement analysis.
01:33:35  23   A.  Let's.
01:33:40  24   Q.  Okay.  So can you give us an overview or identify for
01:33:44  25   the jury which phones are infringing the '311 patent?
```

01:33:46  1  A.  Yes.  So, as I mentioned, some of the Samsung phones

01:33:50  2  still use the old technology, but the transition was made

01:33:54  3  to this metal mesh sensor.  Starting with the S8, then the

01:33:59  4  S9, the S9 Plus, the S10, the S10 Plus, the S10 5G, the

01:34:09  5  S20, the S20 Plus, the S20 Ultra, the Z-Flip, the Note 9,

01:34:17  6  the Note 10, and Note 10 Plus.  Samsung does have a lot of

01:34:21  7  phone models.

01:34:22  8  Q.  And can we refer -- actually, I'll withdraw.

01:34:25  9  A.  Yeah.

01:34:25  10  Q.  Did you analyze each of the phones that you just read

01:34:28  11  into the record and compare them to the asserted claims of

01:34:33  12  the '311 patent?

01:34:33  13  A.  Yes, I did that.  And all of these devices infringe

01:34:41  14  Claim 7 and 12.  And I'll probably refer to these and this

01:34:45  15  group of products as the '311 infringing devices.

01:34:50  16        MR. FENSTER:  Your Honor, at this time, we're

01:34:51  17  going to move into confidential material, and I'd ask that

01:34:53  18  the courtroom be sealed.

01:34:54  19        THE COURT:  Based on that request from counsel,

01:34:57  20  I'll order the courtroom sealed.

01:34:59  21        Those of you that are present and not subject to

01:35:01  22  the protective order in this case should excuse yourselves

01:35:04  23  and remain outside the courtroom until it is reopened and

01:35:08  24  unsealed.

01:35:11  25        (Courtroom sealed.)

```
01:35:11   1          (This portion of the transcript is sealed
01:35:11   2          and filed under separate cover as
01:35:24   3          Sealed Portion No. 3.)
02:34:41   4          (Courtroom unsealed.)
02:34:42   5          THE COURT:  If you'll leave your notebooks in your
02:34:44   6   chairs, follow all my instructions, use this opportunity to
02:34:47   7   stretch your legs, get a drink of water, and we'll be back
02:34:50   8   shortly to continue with the rest of this direct testimony.
02:34:52   9          The jury is excused for recess at this time.
02:34:54   10         COURT SECURITY OFFICER:  All rise.
02:34:57   11         (Jury out.)
02:34:58   12         THE COURT:  The Court stands in recess.
02:35:37   13         COURT SECURITY OFFICER:  All rise.
02:35:38   14         (Recess.)
02:50:26   15         (Jury out.)
02:50:27   16         COURT SECURITY OFFICER:  All rise.
02:50:28   17         THE COURT:  Be seated, please.
02:50:30   18         Mr. Fenster, are you prepared to continue with
02:50:37   19   your direct examination of Mr. Credelle?
02:50:39   20         MR. FENSTER:  Yes, Your Honor.
02:50:40   21         THE COURT:  And am I correct you see no problems
02:50:46   22   with starting with the remainder of your direct with the
02:50:49   23   courtroom unsealed?  You'll let me know when you need to
02:50:52   24   return to the sealed posture?
02:50:54   25         MR. FENSTER:  I will, and counsel for Samsung just
```

02:50:57    1    asked that I advise.  So I'm going to tell the Court when

02:51:00    2    I'm going to go into technical information and ask that the

02:51:03    3    court be sealed.

02:51:04    4        There is -- later in the process, I'll be going

02:51:09    5    into licenses for a comparability analysis.  I will

02:51:12    6    separately advise Your Honor at that point because Samsung

02:51:16    7    has requested that one of their corporate reps who can hear

02:51:20    8    the technical but not the licensing information.  So I'll

02:51:23    9    advise you when it's time to seal, and then I'll advise you

02:51:26   10    when I'm going to go into the licenses if that's okay?

02:51:30   11        THE COURT:  All right.  Let me make sure I

02:51:32   12    understand you.  You're going to let me know when you're

02:51:35   13    going into technical testimony, and you're going to request

02:51:39   14    that I seal the courtroom.

02:51:39   15        MR. FENSTER:  Yes.

02:51:40   16        THE COURT:  And at some point when you finish the

02:51:43   17    technical testimony, you're going to request that I unseal

02:51:45   18    the courtroom?

02:51:47   19        MR. FENSTER:  No, it will remained sealed, but

02:51:50   20    Samsung has asked, and I've agreed, that their corporate

02:51:54   21    rep can stay in during the sealed portion that I'm going to

02:51:57   22    deal with only the technical matters, and then I'll advise

02:52:00   23    the Court so that Samsung can have her exit when I --

02:52:04   24    before I get into the licensing.

02:52:05   25        THE COURT:  All right.

| 02:52:05 | 1 | MR. FENSTER:  But it will remain sealed throughout |
|---|---|---|

02:52:05    1         MR. FENSTER:  But it will remain sealed throughout

02:52:09    2    that time.

02:52:09    3         THE COURT:  And that raises a good point.  I have

02:52:12    4    in the past trials had problems with people getting up,

02:52:16    5    going out, coming back in while the courtroom is sealed,

02:52:20    6    and those that are outside see people come and go and

02:52:23    7    wonder why they have to stay outside and everybody else can

02:52:28    8    seem to come and go with impunity.

02:52:31    9         So I'll certainly permit this per your agreement

02:52:33   10    with defense counsel, but as a general rule, once the

02:52:37   11    courtroom is sealed, I don't expect support staff to be

02:52:41   12    coming and going in and out of the door.

02:52:44   13         As a matter of fact, many of our Court Security

02:52:45   14    Officers lock the door during sealing.  They don't leave it

02:52:48   15    open.  All right?

02:52:49   16         MR. FENSTER:  Very good.

02:52:50   17         THE COURT:  All right.  Let's bring in the jury,

02:52:54   18    please.

02:52:54   19         COURT SECURITY OFFICER:  All rise.

02:53:15   20         (Jury in.)

02:53:17   21         THE COURT:  Please be seated, ladies and

02:53:36   22    gentlemen.

02:53:36   23         We'll continue with the Plaintiff's direct

02:53:41   24    examination of Mr. Thomas Credelle.

02:53:45   25         Mr. Fenster, you may proceed.

02:53:47   1            MR. FENSTER:  Thank you, Your Honor.

02:53:47   2   Q.  (By Mr. Fenster)  So, Mr. Credelle, we just went

02:53:51   3   through the '311 patent.

02:53:53   4            Now we're going to turn to the '450 and '338

02:53:55   5   patents.  Can you give the jury an idea -- just sort of the

02:54:00   6   overview bullet points of the topics that we're going to

02:54:03   7   cover in this next section?

02:54:04   8   A.  Yes, certainly.

02:54:05   9            This -- we've switched gears now.  We were talking

02:54:09  10   about the touch sensor, that's the '311 patent.  Now we're

02:54:11  11   going to talk about the display.  In this case, it's the

02:54:16  12   so-called OLED display, and it has a lot of stuff inside.

02:54:20  13            So we're going to start with a little technology

02:54:22  14   background that will hopefully allow you to make a little

02:54:25  15   bit more sense of the claims as we go through them.  Then

02:54:28  16   we'll talk about the invention of the '450 patent.

02:54:30  17            But, first, I'll do my infringement analysis for

02:54:34  18   the '450, I'll move on to the '338 patent, which is another

02:54:37  19   patent related to the display, and then talk about the

02:54:43  20   infringement analysis for the '338.

02:54:45  21   Q.  Okay.  Can you give us a little bit of technical --

02:54:49  22   technical background to orient the jury for these next

02:54:51  23   patents?

02:54:51  24   A.  Yes.  So we're talking about Organic Light-Emitting

02:54:56  25   Diodes.  It's abbreviated OLED.  You may have seen that --

02:54:59   1   that word advertised on some displays for phones or TVs if

02:55:04   2   you go to Best Buy.  This is a new type of display

02:55:08   3   technology, which I'll describe.

02:55:11   4   Q.  Okay.  And can you give us a little bit of an overview

02:55:19   5   of the -- how the OLEDs work in terms of the pixels and the

02:55:25   6   circuits?

02:55:25   7   A.  I'll be happy to.  This is the stuff I really love, so

02:55:29   8   I'll hopefully get the message across.

02:55:31   9        I mentioned that I started with RCA Labs in the

02:55:35   10   '70s.  And these CRTs, these big, bulky TV sets that we all

02:55:39   11   had in our rooms, if you're old enough.  And that was the

02:55:42   12   good technology of the day.

02:55:44   13        Moved into liquid crystal displays, starting

02:55:47   14   putting them in small products, then laptops, then TV sets,

02:55:51   15   still in use today.

02:55:53   16        It's progressed now, though, in the last several

02:55:55   17   years to the next generation, which is called OLED, and

02:55:59   18   it's a superior technology, which I'll describe some of its

02:56:05   19   features.

02:56:05   20   Q.  Go ahead.

02:56:06   21   A.  Okay.  So, first, how do they work?  If we had several

02:56:14   22   days, I could give you really good lessons, but I'll try to

02:56:18   23   keep -- keep it short.

02:56:19   24        If you were to look under a microscope at this

02:56:22   25   Samsung Galaxy phone, you would see a series of red, green,

02:56:26  1  and blue dots.  Sometimes when you look under a microscope,

02:56:30  2  you may see pictures with displays with stripes, but this

02:56:34  3  is a different type of pattern.

02:56:36  4        Each of those dots is an LED.  So you're probably

02:56:41  5  familiar with LEDs in flashlights or even in light bulbs.

02:56:41  6  An LED is a very simple device.  But if you want to make a

02:56:44  7  display out of LEDs, you have to figure out some way to

02:56:48  8  spread them out over a big piece of glass or such.

02:56:52  9        To make light -- to make a picture, each LED

02:56:56  10  brightness has to be controlled.  So if it was a dark

02:56:59  11  picture, it would be black, it would be off.  If it's a

02:57:03  12  bright picture, it would be on.  If you wanted a red glob,

02:57:07  13  you would just turn on the red dots.

02:57:09  14        If you look more closely under a more high-powered

02:57:15  15  microscope, you'd see these dots.  They're kind of funny

02:57:18  16  shapes, but maybe in this picture you can kind of see,

02:57:21  17  underneath those dots are circuits.

02:57:23  18        So somehow we have to let the computer tell each

02:57:26  19  pixel how bright to be, and that's done with an array of

02:57:29  20  circuitry, which I'll show the kind of main components.

02:57:33  21  And they drive all of these pixels -- it means picture

02:57:37  22  element, but the dots are sometimes called pixels, to

02:57:40  23  create an image.

02:57:44  24        So I said the LED is a pretty simple device.  If

02:57:48  25  you put a voltage across an LED, like in a flashlight, you

02:57:52   1   push the switch, voltage is applied, light comes out.  You

02:57:55   2   turn it off, light's done.

02:57:58   3        Same thing with this OLED in a display, except now

02:58:01   4   there's red, green, and blue patches.  But they're all

02:58:05   5   still controlled with a low voltage, just a few volts, and

02:58:05   6   they'll turn on and be nice and bright.  And if you turn

02:58:10   7   down the voltage, it will get dimmer.  If you turn up the

02:58:13   8   voltage, it'll get brighter.

02:58:13   9   Q.  And what makes this an Organic Light-Emitting Diode?

02:58:16  10   A.  Yeah.  So the LEDs we use in our flashlights and light

02:58:22  11   bulbs are made in a semiconductor process.  So it's -- it's

02:58:26  12   called an inorganic LED.  It's not -- the distinction isn't

02:58:32  13   so important, but these are made out of organic materials

02:58:35  14   that are evaporated onto a piece of glass, so it's a

02:58:40  15   different process.  But the process is more compatible with

02:58:43  16   large sizes.

02:58:44  17        So these days you can buy OLED TVs that are

02:58:48  18   80 inches or more.  And it uses these Organic

02:58:52  19   Light-Emitting Diodes, but the principle of operation is

02:58:54  20   the same.

02:58:54  21   Q.  So you mentioned that there are circuits behind each of

02:58:58  22   the pixels to control the voltage going into each and every

02:59:02  23   single OLED.  Can you illustrate that for us?

02:59:05  24   A.  Yes.  One more point in this slide.  On the left is a

02:59:11  25   symbol that electrical engineers use to indicate a diode.

| | | |
|---|---|---|
| 02:59:15 | 1 | This is -- it won't be so important, but I just wanted |
| 02:59:18 | 2 | to -- if you see this later, that's where the light comes |
| 02:59:20 | 3 | out.  I'll try to make that clear. |
| 02:59:21 | 4 | So I showed you a picture that had some circuitry. |
| 02:59:26 | 5 | And as Mr. Fenster said, if you want to control all of |
| 02:59:29 | 6 | these dots, you have to have some extra circuits.  You |
| 02:59:34 | 7 | can't put two wires to every pixel.  You'd have, you know, |
| 02:59:37 | 8 | millions of miles of wire. |
| 02:59:39 | 9 | So you have a -- what's called a matrix.  It's a |
| 02:59:43 | 10 | grid of transistors and capacitors and electrodes that will |
| 02:59:50 | 11 | drive all of these pixels to the right brightness, and it's |
| 02:59:53 | 12 | all going to take information from a computer to tell the |
| 02:59:56 | 13 | screen what brightness to be.  And I'll try to show you how |
| 02:59:59 | 14 | that works. |
| 02:59:59 | 15 | Q.  And what does active matrix refer to? |
| 03:00:03 | 16 | A.  So I think engineers like to come up with buzz words |
| 03:00:09 | 17 | and names.  It's a matrix, it's like a grid, and it uses |
| 03:00:14 | 18 | what engineers call active components.  So a transistor is |
| 03:00:20 | 19 | an example of an active component.  So active matrix would |
| 03:00:23 | 20 | have transistors in addition to the OLED material and some |
| 03:00:26 | 21 | other components that I'll show. |
| 03:00:27 | 22 | Q.  And do these individual tiny circuits individually |
| 03:00:31 | 23 | control the voltage going through every one of these |
| 03:00:34 | 24 | millions of points of light or pixels? |
| 03:00:37 | 25 | A.  Absolutely.  It amazes even me sometimes that it works. |

03:00:41  1   Q.  And this Active-Matrix OLED, is that something that
03:00:44  2   you've heard -- I probably jumped the gun -- with an
03:00:51  3   acronym an AMOLED?
03:00:51  4   A.  Yes.  Sometimes -- again engineers like to make up
03:00:54  5   acronyms, but AMOLED is sometimes used as an acronym.  But
03:01:00  6   I'll try to minimize the use of acronyms because it gets
03:01:02  7   confusing.
03:01:03  8   Q.  So can you -- in the opening statement and through some
03:01:08  9   of the claims, we've seen that the claims require something
03:01:10  10  called a transistor.  Can you tell the jury what that is?
03:01:13  11  A.  Yes.  So one of the components we need in this circuit
03:01:16  12  is a transistor.  Transistors come in all flavors and
03:01:20  13  shapes and sizes, but fortunately for displays, it's a
03:01:24  14  pretty simple device.
03:01:26  15         All transistors have three electrodes, but two of
03:01:31  16  them have current flow and one of them is a control valve,
03:01:36  17  if you will.  So we have a gate.  It's called a gate and a
03:01:40  18  source and a drain.
03:01:41  19         But if you think of a pipe with a gate valve, if
03:01:44  20  you have a transistor, and this is what the side view of a
03:01:49  21  transistor would look like.  It has what's called a source,
03:01:51  22  think of that as source of water in a pipe or a source of
03:01:55  23  current.  It has a drain.  You would think of water.  A
03:01:59  24  channel is an area that's going to be kind of where the
03:02:04  25  gate valve is located.  There's also an insulator, and

| | | |
|---|---|---|
| 03:02:09 | 1 | there's a gate.  A gate is an electrode, so there's three |
| 03:02:12 | 2 | electrodes. |
| 03:02:12 | 3 | So if I want to control how much current is |
| 03:02:15 | 4 | flowing in the transistor or how much water is flowing in |
| 03:02:18 | 5 | the pipe, I can open the valve, and a certain amount of |
| 03:02:22 | 6 | water will flow through and, likewise, a certain amount of |
| 03:02:26 | 7 | current will go through this device.  I can open the gate |
| 03:02:29 | 8 | farther, and more current will flow.  So just think of |
| 03:02:31 | 9 | water in a pipe and a gate valve. |
| 03:02:34 | 10 | Having this -- this function in a display will |
| 03:02:40 | 11 | allow us to adjust the current, which controls the |
| 03:02:44 | 12 | brightness of every pixel.  Low current, low brightness; |
| 03:02:47 | 13 | high current, high brightness. |
| 03:02:49 | 14 | Q.  And is there another circuit element that you'd like to |
| 03:02:51 | 15 | tell the jury about -- |
| 03:02:51 | 16 | A.  Yes. |
| 03:02:52 | 17 | Q.  -- before we get into the patent analysis? |
| 03:02:54 | 18 | A.  Yes.  So the second -- the second requirement or need |
| 03:02:56 | 19 | for any display is the ability to tell the display what |
| 03:03:03 | 20 | picture you want to -- you want to make.  And it's helpful |
| 03:03:06 | 21 | if you can store that information someplace. |
| 03:03:07 | 22 | And a real handy device for storing information in |
| 03:03:10 | 23 | this kind of a display is called a capacitor.  It's another |
| 03:03:17 | 24 | component that electrical engineers use in their circuits. |
| 03:03:19 | 25 | And it's pretty simple.  It's -- if you put some |

03:03:22    1    current into a capacitor, it will charge up.  It will get
03:03:25    2    to a high -- it will get to a voltage.  A little bit of a
03:03:28    3    current will get a low voltage.  A higher current will get
03:03:31    4    a higher voltage.
03:03:33    5          And once the -- once the current or charges are
03:03:38    6    put on the capacitor, it will stay there until you take it
03:03:41    7    away.  So it does kind of act like a memory.
03:03:46    8          If you think of a display like a big memory, what
03:03:50    9    I'd like to be able to do is have the computer tell me what
03:03:52   10    every dot of brightness is supposed to be.  So I put that
03:03:56   11    information -- sorry -- put that information into the
03:03:59   12    capacitors, and then the capacitors are going to control
03:04:02   13    that gate, and it's going to allow current to flow through
03:04:06   14    every pixel.
03:04:07   15          So that's the concept of how these displays work.
03:04:10   16    Q.  Okay.  Can you just explain to the jury in a very
03:04:13   17    simple way how the capacitor and the transistor work
03:04:15   18    together to control an individual OLED pixel?
03:04:19   19    A.  Right.  So -- so here's a transistor in these patents,
03:04:30   20    and it's pretty typical for OLED displays as they talk
03:04:34   21    about a drive transistor.  Think about it as the transistor
03:04:37   22    that's going to control the current that goes to the OLED,
03:04:40   23    which is this device at the bottom.
03:04:43   24          So I have my current flowing through here, it's
03:04:47   25    controlled by how much signal I have on that capacitor.  So

03:04:51  1   if I store a little bit of charge, a little bit of signal,

03:04:53  2   it will be dim.  If I make a high signal here, it will be

03:04:58  3   brighter.

03:04:59  4        And I think maybe the next slide shows that.

03:05:03  5        So by increasing the gate, increasing the charge,

03:05:11  6   the control signal on the gate, more current is going to

03:05:14  7   flow.

03:05:15  8        So if I have -- if I have some way with some extra

03:05:18  9   wires to put these signals on these capacitors and then let

03:05:22  10  the current flow, I'll be able to create a picture.

03:05:24  11  Q.  And if you -- and I think the next one shows --

03:05:28  12  A.  High brightness, yeah.  Low, medium, high.

03:05:31  13  Q.  Okay.  So now let's turn to the '450 patent.  And can

03:05:35  14  you give the jury an overview of what the '450 patent

03:05:38  15  invention relates to?

03:05:39  16  A.  Yes.  So the '450 patent, as I mentioned, is about

03:05:43  17  OLEDs.  And it's -- it's more about the structure, and it's

03:05:47  18  more of a structure patent than it is like a circuit

03:05:51  19  patent, if you will.  I'll try to describe that.

03:05:53  20        The '450 patent, 6,072 -- the date of the patent

03:06:00  21  is June 6th of 2000.  It's PTX-001.

03:06:08  22        And we're going to -- we're going to discover --

03:06:11  23  we're going to consider Claim 4 and Claim 5 in this

03:06:16  24  infringement analysis.  They're both dependent on Claim 1.

03:06:19  25  And I'll go through those line-by-line in the same way I

```
03:06:23    1   did for the '311 patent.
03:06:25    2   Q.  Before we do that, can you give the jury just an
03:06:28    3   overview conceptually of what the '450 relates to --
03:06:31    4   A.  Yes.
03:06:31    5   Q.  -- or that invention?
03:06:34    6   A.  So I just described two components, a capacitor and a
03:06:39    7   transistor.  A typical simple OLED circuit would have two
03:06:43    8   transistors and one capacitor.  And they take up some
03:06:46    9   space.  Here's kind of a lay -- a top view of those
03:06:50   10   transistors.
03:06:53   11        And when the resolution of the display gets really
03:06:55   12   high, so the pixels get really small, it really doesn't
03:06:58   13   leave a lot of room for this light-emitting area.  So as
03:07:02   14   that gets squeezed, it's going to be lower brightness.  So
03:07:07   15   this is kind of the old way of making an Active-Matrix OLED
03:07:11   16   screen.
03:07:13   17        Thank you.
03:07:13   18        The new way, as described in the '450 patent, is
03:07:18   19   to think about making a two-level circuit.  I like to think
03:07:24   20   of it as kind of a two-story house.  On the first floor,
03:07:28   21   we're going to take away the light-emitting part.  Just
03:07:31   22   leave the circuits.
03:07:32   23        And it's not only the circuits, I mentioned there
03:07:35   24   are wires that have to bring the signals into those
03:07:37   25   circuits.  They take up room, as well.  So if you can get
```

03:07:40   1   rid of that light-emitting material, you have more room for

03:07:43   2   that stuff.

03:07:44   3          So to do that, though, you have to deposit some

03:07:46   4   insulator.  You don't want things to short out.  So you put

03:07:50   5   an insulator.  You have to actually make some holes so you

03:07:54   6   can put a wire connection between the first floor and the

03:07:56   7   second floor, and then you can create electrodes and

03:08:01   8   light-emitting material and a second electrode.

03:08:05   9          And now you have the ability -- now, you can

03:08:08   10  actually have more room for the light-emitting material, so

03:08:12   11  you can have a brighter display or it can even last longer.

03:08:17   12  You can have -- you can put in more transistors.  You can

03:08:20   13  put in more -- you can go to higher resolution displays.

03:08:24   14         So these are very key advancements to think about

03:08:28   15  going from low resolution to high resolution, where today

03:08:33   16  all phones have high resolution.  That means there's lots

03:08:36   17  of dots per inch.  And it has other benefits.

03:08:39   18  Q.  Okay.  Now, I think the next part of your analysis is

03:08:41   19  going to move into the infringement analysis.

03:08:44   20         MR. FENSTER:  And at this point, Your Honor, I

03:08:45   21  would ask that the courtroom be sealed, as we're going to

03:08:47   22  get into confidential material.

03:08:50   23         THE COURT:  Then based on counsel's request, I'll

03:08:53   24  order the courtroom sealed at this time.

03:08:54   25         And I'll direct those who are present but not

| | | |
|---|---|---|
| 03:08:57 | 1 | subject to the protective order to excuse themselves and |
| 03:08:59 | 2 | remain outside the courtroom until it's reopened and |
| 03:09:02 | 3 | unsealed. |
| 03:09:03 | 4 | (Courtroom sealed.) |
| 03:09:03 | 5 | (This portion of the transcript is sealed |
| 03:09:03 | 6 | and filed under separate cover as |
| 03:09:04 | 7 | Sealed Portion No. 4.) |
| 04:20:09 | 8 | (Courtroom unsealed.) |
| 04:20:09 | 9 | THE COURT:  When I come back, I'll reseal the |
| 04:20:12 | 10 | courtroom.  This individual can remain outside when the |
| 04:20:14 | 11 | courtroom is resealed per your agreement. |
| 04:20:16 | 12 | MR. FENSTER:  Thank you. |
| 04:20:17 | 13 | THE COURT:  Ladies and gentlemen of the jury, |
| 04:20:18 | 14 | simply close your notebooks, if you will, and leave them in |
| 04:20:21 | 15 | your chairs.  Please follow all my instructions, including |
| 04:20:24 | 16 | not to discuss the case among yourselves or with anyone. |
| 04:20:28 | 17 | And we'll be back here -- I'm going to try to keep this |
| 04:20:31 | 18 | short, so approximately 10 minutes, and we'll continue with |
| 04:20:34 | 19 | the direct examination of this witness at that time. |
| 04:20:36 | 20 | All right.  The court stands in recess. |
| 04:20:40 | 21 | COURT SECURITY OFFICER:  All rise. |
| 04:20:40 | 22 | (Recess.) |
| 04:38:34 | 23 | (Jury out.) |
| 04:38:35 | 24 | COURT SECURITY OFFICER:  All rise. |
| 04:38:36 | 25 | THE COURT:  Be seated, please. |

| | | |
|---|---|---|
| 04:38:37 | 1 | Let's bring in the jury, please. |
| 04:38:53 | 2 | COURT SECURITY OFFICER:  All rise, please. |
| 04:38:57 | 3 | THE COURT:  It won't hurt you to get up and down |
| 04:39:01 | 4 | in the middle of the afternoon. |
| 04:39:02 | 5 | THE WITNESS:  Exercise.  Exercise. |
| 04:39:07 | 6 | (Jury in.) |
| 04:39:31 | 7 | THE COURT:  Please be seated. |
| 04:39:32 | 8 | Counsel, as we previously discussed, I'm going to |
| 04:39:35 | 9 | order the courtroom sealed at this juncture and direct that |
| 04:39:38 | 10 | all persons not subject to the protective order in this |
| 04:39:40 | 11 | case that might be present in the courtroom, you should |
| 04:39:44 | 12 | excuse yourselves and remain outside the courtroom until |
| 04:39:46 | 13 | it's reopened and unsealed. |
| 04:39:47 | 14 | (Courtroom sealed.) |
| 04:39:47 | 15 | (This portion of the transcript is sealed |
| 04:39:47 | 16 | and filed under separate cover as |
| 04:39:48 | 17 | Sealed Portion No. 5.) |
| 04:39:48 | 18 | (Courtroom unsealed.) |
| 04:50:52 | 19 | THE COURT:  All right.  Sir, proceed with your |
| 04:51:33 | 20 | cross-examination, please. |
| 04:51:35 | 21 | MR. HASLAM:  Could we pull up Plaintiff's |
| 04:51:37 | 22 | Demonstrative 242 that was used during the direct? |
| 04:51:52 | 23 | 242.  It's in the Plaintiff's deck.  Do you have |
| 04:52:11 | 24 | that?  242. |
| 04:52:11 | 25 | CROSS-EXAMINATION |

04:52:21  1   BY MR. HASLAM:

04:52:21  2   Q.  Okay.  You recognize this as one of the demonstratives

04:52:25  3   that you used?

04:52:26  4   A.  Yes.

04:52:26  5   Q.  Okay.  And I think you were asked a question at some

04:52:29  6   point about how this circuit operated.  I want to focus on

04:52:35  7   T3 here for a moment.

04:52:37  8   A.  Okay.

04:52:37  9   Q.  T3 is connected between the drain of T1 and the gate of

04:52:44  10  T1 and the lower plate of the capacitor Cst, correct?

04:52:56  11  A.  Yes.

04:52:56  12  Q.  And the claim that you were addressing with this slide,

04:53:04  13  the '338, required that when T3 is off, it holds the

04:53:09  14  voltage between the gate and source of T1, correct?

04:53:14  15  A.  Yes.

04:53:16  16  Q.  Okay.  Now, you recall you were -- you gave us a

04:53:19  17  report, right?  You prepared a report, all the experts

04:53:23  18  prepared a report, very voluminous, that set forth all of

04:53:27  19  your opinions that you were going to testify to?

04:53:29  20  A.  Yes.

04:53:29  21  Q.  And then we had an opportunity to ask you questions at

04:53:32  22  a deposition, correct?

04:53:33  23  A.  Correct.

04:53:34  24  Q.  And we asked you at your deposition about T3.  And I

04:53:40  25  just want to make sure, that during the light-emission

| | | |
|---|---|---|
| 04:53:44 | 1 | period, T3 is off, correct? |
| 04:53:46 | 2 | A.  During the light-emission period, T3 is off. |
| 04:53:52 | 3 | Q.  And you were asked at your deposition:  And when T3 is |
| 04:53:55 | 4 | off, T3 is holding a voltage between the gate and drain of |
| 04:53:59 | 5 | T1, the driving transistor, correct? |
| 04:54:03 | 6 | And you said:  Yes. |
| 04:54:04 | 7 | Do you recall that testimony, or do you want to |
| 04:54:09 | 8 | see it? |
| 04:54:09 | 9 | A.  No, I recall. |
| 04:54:11 | 10 | Q.  Thank you. |
| 04:54:31 | 11 | MR. HASLAM:  Can we pull up -- I think it's |
| 04:54:42 | 12 | Slide -- well, I lost myself here.  Hang on. |
| 04:54:47 | 13 | Can you pull up DTX-633? |
| 04:54:57 | 14 | Q.  (By Mr. Haslam)  Do you recognize this document? |
| 04:54:58 | 15 | A.  Yes, I -- it looks familiar. |
| 04:55:03 | 16 | Q.  It's a -- do you know what the PDR is? |
| 04:55:07 | 17 | A.  I know what the PDR is.  I don't remember what model MQ |
| 04:55:11 | 18 | relates to, but it's one of the ones I analyzed -- |
| 04:55:15 | 19 | THE COURT:  Just a minute. |
| 04:55:16 | 20 | Mr. Fenster, do you have some reason why you're |
| 04:55:18 | 21 | standing? |
| 04:55:19 | 22 | MR. FENSTER:  I apologize.  We did not receive any |
| 04:55:21 | 23 | cross-examination binders, if there are such. |
| 04:55:23 | 24 | THE COURT:  If we have one to cross out -- pass |
| 04:55:25 | 25 | out, rather, we need to do that. |

04:55:28   1          MR. FENSTER:  Apologize for the interruption.

04:55:36   2   Q.  (By Mr. Haslam)  Okay.  This is the kind of document

04:55:38   3   you relied on?

04:55:39   4   A.  Yes, it's an example.

04:55:41   5          MR. HASLAM:  Can we go to Page 8 in this document?

04:55:43   6   Q.  (By Mr. Haslam)  This is a page that's called -- it's

04:55:48   7   4.3.

04:55:52   8          MR. HASLAM:  I guess we need to seal the

04:55:54   9   courtroom.  I apologize.

04:55:55   10          THE COURT:  That's all right.  Based on counsel's

04:55:58   11   request, I'll order the courtroom sealed.  Those present

04:56:00   12   not subject to the protective order should excuse

04:56:03   13   themselves until the courtroom is reopened and unsealed.

04:56:10   14          (Courtroom sealed.)

04:56:10   15          (This portion of the transcript is sealed

04:56:10   16          and filed under separate cover as

04:56:11   17          Sealed Portion No. 6.)

05:31:01   18          (Courtroom unsealed.)

05:31:01   19          THE COURT:  Now, that we're unsealed, based on

05:31:04   20   Defendants' request, we'll take a short recess, not more

05:31:10   21   than 20 minutes.

05:31:12   22          Ladies and gentlemen of the jury, if you'll take

05:31:14   23   your notebooks with you, if you'll return to the jury room,

05:31:18   24   I don't know if it will be exactly that length of time, but

05:31:22   25   as soon as counsel is prepared to go forward, I'll have you

```
05:31:24    1   back in here to continue with the cross-examination of

05:31:26    2   Mr. Credelle.

05:31:27    3           Follow all my instructions, including not to

05:31:31    4   discuss the case.

05:31:31    5           The jury is excused to the jury room.

05:31:34    6           COURT SECURITY OFFICER:  All rise.

05:31:35    7           THE COURT:  Ms. Hux, why don't you lead the way?

05:31:47    8   Well, okay.

05:31:55    9           (Jury out.)

05:31:55   10           THE COURT:  All right.  The Court's going to stand

05:32:15   11   in recess.

05:32:16   12           Mr. Haslam, when you're ready to proceed some time

05:32:20   13   in the next 20 minutes, let me know.

05:32:22   14           MR. HASLAM:  Will do.

05:32:23   15           THE COURT:  The Court's in recess.

05:32:30   16           (Recess.)

05:32:31   17           (Jury out.)

05:32:34   18           COURT SECURITY OFFICER:  All rise.

05:32:35   19           THE COURT:  Be seated, please.

05:48:49   20           Mr. Haslam, are you prepared to have the Court

05:48:54   21   bring the jury back in and continue with your

05:48:57   22   cross-examination?

05:48:57   23           MR. HASLAM:  Well, as I'm ever going to be on

05:49:00   24   this.

05:49:03   25           THE COURT:  All right.
```

| | | |
|---|---|---|
| 05:49:06 | 1 | MR. HASLAM:  When they come in, just to save time, |
| 05:49:08 | 2 | I will ask to have the courtroom sealed. |
| 05:49:10 | 3 | THE COURT:  Okay.  That's fine. |
| 05:49:11 | 4 | Let's bring the jury in, please. |
| 05:49:20 | 5 | COURT SECURITY OFFICER:  All rise. |
| 05:49:23 | 6 | (Jury in.) |
| 05:49:23 | 7 | THE COURT:  Welcome back, ladies and gentlemen. |
| 05:49:50 | 8 | Please be seated. |
| 05:49:50 | 9 | Is it my understanding, Mr. Haslam, you would like |
| 05:49:57 | 10 | to request the Court to seal the courtroom? |
| 05:50:00 | 11 | MR. HASLAM:  Please. |
| 05:50:01 | 12 | THE COURT:  Then based on that, I will order the |
| 05:50:03 | 13 | courtroom sealed.  I'll direct the Court Security Officer |
| 05:50:04 | 14 | to enforce the sealing of the courtroom. |
| 05:50:08 | 15 | Those present who are not subject to the Court's |
| 05:50:11 | 16 | protective order in this case should exit the courtroom and |
| 05:50:14 | 17 | remain outside until the courtroom is unsealed. |
| 05:50:18 | 18 | (Courtroom sealed.) |
| 05:50:18 | 19 | (This portion of the transcript is sealed |
| 05:50:18 | 20 | and filed under separate cover as |
| 05:50:18 | 21 | Sealed Portion No. 7.) |
| 06:06:30 | 22 | (Courtroom unsealed.) |
| 06:06:31 | 23 | THE COURT:  I've excused the jury for the evening. |
| 06:06:33 | 24 | Counsel, please be seated. |
| 06:06:35 | 25 | I'm showing that today, we have used seven hours |

421

06:06:49  1   and almost two minutes of trial time.

06:06:52  2          The Plaintiff has used five hours and, rounding

06:07:01  3   the seconds -- to minutes, 15 minutes.

06:07:04  4          And the Defendant has used two hours and,

06:07:07  5   following the same procedure, 47 minutes.

06:07:11  6          Also, I've reviewed the current state of what you

06:07:17  7   have previously submitted as a proposed charge to the jury

06:07:21  8   and verdict form.  And I find that the Court could benefit

06:07:27  9   by a renewed effort on your part.

06:07:29  10         I'm ordering both sides to meet and confer and

06:07:32  11  jointly resubmit a revised and updated proposed final jury

06:07:39  12  instruction and verdict form by 3:00 o'clock tomorrow

06:07:43  13  afternoon.

06:07:43  14         In those areas where you have differing positions

06:07:47  15  or you disagree, your competing proposals should be

06:07:55  16  submitted in that single joint submission.  Either use a

06:07:58  17  different font, use a different color highlighting, but

06:08:01  18  make it so that clearly I can see Plaintiff's version

06:08:05  19  throughout the documents and Defendants' version throughout

06:08:07  20  the documents at any place where you don't agree.  Where

06:08:10  21  you agree, I expect to see plain print without highlighting

06:08:14  22  or a change in font.

06:08:15  23         And you should submit that to my staff directly by

06:08:21  24  email with a Word version.  And, again, I'd like to have

06:08:26  25  that in my possession by no later than 3:00 p.m. tomorrow.

06:08:29   1        I'll remind you to continue to meet and confer
06:08:34   2   strenuously and diligently overnight.  I'll be available by
06:08:38   3   7:30 tomorrow if there are disputes that are otherwise
06:08:42   4   unresolved.
06:08:44   5        And I'll look for an up-to-date binder at 7:00
06:08:49   6   o'clock at chambers outlining any surviving disputes.
06:08:54   7   Hopefully, there will be few or none.  But to the extent
06:08:58   8   there are, showing me what is in dispute and giving me a
06:09:02   9   clear but concise position in writing of each party's
06:09:07  10   position, not only the offering party or the party that
06:09:10  11   intends to use it but the objecting party.
06:09:12  12        As I told you in chambers this morning, your work
06:09:16  13   in this regard improved from Monday to Tuesday.  I would
06:09:18  14   expect the same amount of improvement from Tuesday to
06:09:21  15   Wednesday.
06:09:23  16        All right.  Are there questions from either
06:09:28  17   Plaintiff or Defendant or other issues we need to take up
06:09:30  18   before we recess for the evening?
06:09:34  19        MR. FENSTER:  Yes, Your Honor.
06:09:34  20        THE COURT:  Go to the podium.  Yes, let me hear
06:09:37  21   from you, Mr. Fenster.
06:09:40  22        MR. FENSTER:  Your Honor, I would just like to
06:09:42  23   clarify.  So during the cross-examination of Mr. Credelle,
06:09:48  24   the Court mentioned that it was not a previously disclosed
06:09:54  25   demonstrative.

06:09:55  1          It is the parties' understanding that --

06:09:57  2          THE COURT:  Wait a minute.  What was not a

06:09:59  3   previously disclosed demonstrative?

06:10:00  4          MR. FENSTER:  I apologize.  The report, when

06:10:04  5   Mr. Haslam meant to show the report.  The report was

06:10:08  6   improper to show because it was hearsay, not because it was

06:10:11  7   a demonstrative.

06:10:12  8          The parties' understanding is that demonstratives

06:10:16  9   do not need to be -- for cross-examination do not need to

06:10:20  10  be previously disclosed.  And so I just wanted to clarify

06:10:22  11  that for the Court.

06:10:24  12         THE COURT:  Well, as I think I said on the record,

06:10:26  13  the report is not evidence.  The witness's testimony based

06:10:30  14  on the report and supported by the report is evidence.

06:10:33  15         MR. FENSTER:  Yes, Your Honor.  But one of the

06:10:37  16  Court's comments, I may have misheard, but -- was that you

06:10:42  17  asked Mr. Haslam is this in evidence or a previously

06:10:47  18  disclosed demonstrative.

06:10:48  19         So I just wanted to clarify that cross-examination

06:10:51  20  demonstratives do not need to be previously disclosed in

06:10:55  21  order to show them to the Court.

06:10:57  22         THE COURT:  Well, part of any possible confusion

06:11:04  23  may be that everything either side puts on the screen

06:11:08  24  during this trial either has an exhibit number on it or it

06:11:11  25  has a DDX or a PTX demonstrative number on it, and even if

06:11:16   1   it's been disclosed or not disclosed, it's marked.

06:11:20   2        And I saw -- I saw counsel flipping through a

06:11:23   3   document that was not marked as either a demonstrative, it

06:11:26   4   was not marked as an exhibit, and the author of that

06:11:30   5   document was being questioned about it, particularly with

06:11:32   6   regard to drawings and figures that seem to be available

06:11:35   7   through other means that were admitted exhibits,

06:11:40   8   particularly some of them coming from the patents-in-suit.

06:11:42   9        So that's where I questioned why we were doing

06:11:48  10   what we were doing.

06:11:50  11        MR. FENSTER:  I understand, Your Honor.

06:11:51  12        So, just to be clear, demonstratives will be

06:11:53  13   marked before being shown on cross-examination --

06:11:56  14        THE COURT:  And whether they're disclosed or not

06:11:58  15   is a different matter.  And it not being marked is what

06:12:02  16   raised the issue with me.

06:12:03  17        MR. FENSTER:  Thank you for the clarification.

06:12:05  18        THE COURT:  All right.  Mr. Haslam, is the

06:12:06  19   Defendant aware of anything that needs to be taken up

06:12:08  20   before we recess for the evening?

06:12:10  21        MR. HASLAM:  No, Your Honor.

06:12:12  22        THE COURT:  All right.  Counsel, be productive as

06:12:15  23   you meet and confer overnight.  And I will see you in the

06:12:17  24   morning.

06:12:18  25        The Court stands in recess until tomorrow morning.

425

06:12:25    1                COURT SECURITY OFFICER:  All rise.

06:12:26    2                (Recess.)

            3

            4                         CERTIFICATION

            5

            6          I HEREBY CERTIFY that the foregoing is a true and

            7    correct transcript from the stenographic notes of the

            8    proceedings in the above-entitled matter to the best of my

            9    ability.

           10

           11

           12    _/S/ Shelly Holmes_____                3/2/2021___
                 SHELLY HOLMES, CSR, TCRR                   Date
           13    FEDERAL OFFICIAL REPORTER

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25