```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   SOLAS OLED LTD.,              )(    CIVIL ACTION NO.
                                   )(    2:19-CV-152-JRG
 4        PLAINTIFF,               )(
                                   )(
 5        VS.                      )(
                                   )(
 6   SAMSUNG DISPLAY CO., LTD.,    )(
     SAMSUNG ELECTRONICS CO.,      )(    MARSHALL, TEXAS
 7   LTD., SAMSUNG ELECTRONICS     )(    MARCH 3, 2021
     AMERICA, INC.,                )(    8:37 A.M. - 6:30 P.M.
 8                                 )(
          DEFENDANTS.              )(

 9

10                   TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12             UNITED STATES CHIEF DISTRICT JUDGE

13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:

16   MR. MARC FENSTER
     MR. REZA MIRZAIE
17   MR. ADAM S. HOFFMAN
     MR. NEIL A. RUBIN
18   MR. JACOB R. BUCZKO
     MR. JAMES S. TSUEI
19   RUSS AUGUST & KABAT
     12424 Wilshire Boulevard, 12th Floor
20   Los Angeles, CA 90025

21   MR. T. JOHN WARD, JR.
     MS. CLAIRE ABERNATHY HENRY
22   MS. ANDREA L. FAIR
     WARD, SMITH & HILL, PLLC
23   1507 Bill Owens Parkway
     Longview, TX 75604
24

25
```

```
 1   FOR THE DEFENDANTS:

 2   MS. MELISSA R. SMITH
     GILLAM & SMITH, LLP
 3   303 South Washington Avenue
     Marshall, TX 75670
 4

 5   MR. JEFFREY H. LERNER
     MR. JARED R. FRISCH
 6   MR. DANIEL E. VALENCIA
     MR. DANIEL W. CHO
 7   MR. TAREK J. AUSTIN
     MR. ERIC T. O'BRIEN
 8   MR. DAVID J. CHO
     MR. JORDAN V. HILL
 9   COVINGTON & BURLING LLP
     One CityCenter
10   850 Tenth Street, NW
     Washington, DC 20001-4956
11

12   MR. ROBERT T. HASLAM
     COVINGTON & BURLING LLP
13   3000 El Camino Real
     5 Palo Alto Square, 10th Floor
14   Palo Alto, CA 94306-2112

15

16

17

18   COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
19                       United States District Court
                         Eastern District of Texas
20                       Marshall Division
                         100 E. Houston
21                       Marshall, Texas  75670
                         (903) 923-7464
22

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

| | | |
|---|---|---|
| 07:56:05 | 1 | P R O C E E D I N G S |
| 07:56:05 | 2 | (Jury out.) |
| 07:56:08 | 3 | COURT SECURITY OFFICER:  All rise. |
| 07:56:09 | 4 | THE COURT:  Be seated, please. |
| 08:37:09 | 5 | Are the parties prepared to read into the record |
| 08:37:16 | 6 | those items from the list of pre-admitted exhibits used |
| 08:37:19 | 7 | during yesterday's portion of the trial? |
| 08:37:22 | 8 | MS. HENRY:  Yes, Your Honor. |
| 08:37:22 | 9 | THE COURT:  Please make your offer in regard to |
| 08:37:26 | 10 | Plaintiff, please, Ms. Henry. |
| 08:37:27 | 11 | MS. HENRY:  Your Honor, Plaintiff offers -- and |
| 08:37:30 | 12 | I'll begin with the PTX numbers to try to make it a little |
| 08:37:33 | 13 | bit easier for the court reporter.  PTX-1, PTX-2, PTX-3, |
| 08:37:40 | 14 | PTX-15, PTX-16, PTX-26, PTX-30, PTX-95, PTX -- PTX-100_EN, |
| 08:37:54 | 15 | PTX-103, PTX-116, PTX-117, PTX-118, PTX-119, PTX-120, |
| 08:38:07 | 16 | PTX-122, PTX-123, PTX-124, PTX-126, PTX-129, PTX-131, |
| 08:38:20 | 17 | PTX-132, PTX-134, PTX-135, PTX-140, PTX-142, PTX-143, |
| 08:38:35 | 18 | PTX-144, PTX-159, PTX-160, PTX-163, PTX-168, PTX-270, |
| 08:38:48 | 19 | PTX-508, PTX-524, PTX-650, PTX-686, PTX-690, PTX-691, |
| 08:39:02 | 20 | PTX-692, PTX-694, PTX-701, PTX-702, PTX-703, PTX-714. |
| 08:39:16 | 21 | The remainder that I will read are DTX numbers. |
| 08:39:20 | 22 | DTX-634, DTX-664, DTX-681, DTX-733, DTX-741, DTX-750, |
| 08:39:36 | 23 | DTX-780, DTX-792, DTX-892, DTX-893, DTX-895, DTX-896, |
| 08:39:51 | 24 | DTX-902, DTX-903, DTX-912, DTX-960, DTX-973, DTX-981, |
| 08:40:07 | 25 | DTX-982, DTX-983, DTX-989, DTX-993, DTX-995, DTX-997, |

| | | |
|---|---|---|
| 08:40:22 | 1 | DTX-998, DTX-999, DTX-1045, DTX-1046, DTX-1047, DTX-1048, |
| 08:40:37 | 2 | DTX-1049, DTX-1050, and DTX-1208. |
| 08:40:45 | 3 | THE COURT:  Any objection from Defendants to that |
| 08:40:48 | 4 | rendition by Plaintiff? |
| 08:40:50 | 5 | MR. DANIEL CHO:  No, Your Honor. |
| 08:40:51 | 6 | THE COURT:  Do Defendants have a similar rendition |
| 08:40:54 | 7 | to offer? |
| 08:40:55 | 8 | MR. DANIEL CHO:  Good morning, Your Honor. |
| 08:40:56 | 9 | The Defendants offer DTX-633 into evidence. |
| 08:41:00 | 10 | THE COURT:  Any objection from Plaintiff? |
| 08:41:02 | 11 | MS. HENRY:  No, Your Honor. |
| 08:41:03 | 12 | THE COURT:  Does that complete the offer from both |
| 08:41:06 | 13 | sides? |
| 08:41:06 | 14 | MS. HENRY:  It does. |
| 08:41:08 | 15 | MR. DANIEL CHO:  Yes, sir. |
| 08:41:09 | 16 | THE COURT:  All right.  Then those exhibits are |
| 08:41:11 | 17 | deemed admitted exhibits and are no longer deemed |
| 08:41:18 | 18 | pre-admitted, per the Court's practice. |
| 08:41:20 | 19 | All right.  Plaintiff, I understand it's your |
| 08:41:22 | 20 | intention to call your damages expert next; is that |
| 08:41:25 | 21 | correct? |
| 08:41:25 | 22 | MS. HENRY:  That's correct, Your Honor. |
| 08:41:26 | 23 | THE COURT:  Are you prepared to go forward? |
| 08:41:27 | 24 | MS. HENRY:  We are, Your Honor. |
| 08:41:28 | 25 | THE COURT:  All right.  Is there anything the |

08:41:30  1  Court needs to hear from either party -- either side before

08:41:33  2  I bring in the jury?

08:41:35  3          MS. HENRY:  Not to my knowledge, Your Honor.

08:41:38  4          MR. HASLAM:  No, Your Honor.

08:41:39  5          THE COURT:  Okay.  We have, I understand, a

08:41:43  6  witness early in Defendants' case-in-chief that will need

08:41:47  7  an interpreter.  It's my intention to have the interpreter

08:41:50  8  sworn during a recess outside the presence of the jury, but

08:41:53  9  we'll get that done on the record.

08:41:55  10         And any other accommodations we can finish with

08:41:58  11  regard to the interpretation of that witness's testimony

08:42:05  12  either during a recess or at another break.

08:42:07  13         All right.  Let's bring in the jury, please.

08:42:58  14         COURT SECURITY OFFICER:  All rise.

08:43:00  15         (Jury in.)

08:43:01  16         THE COURT:  Good morning, ladies and gentlemen.

08:43:11  17  Welcome back.  Please have a seat.

08:43:13  18         When we finished for the day yesterday, Mr. Thomas

08:43:22  19  Credelle, the Plaintiff's technical expert, had finished

08:43:25  20  testifying.

08:43:25  21         We'll now proceed with the next witness by the

08:43:30  22  Plaintiffs as a part of their case-in-chief.

08:43:32  23         Plaintiff, call your next witness.

08:43:34  24         MS. HENRY:  Plaintiff calls Mr. Stephen Dell.

08:43:42  25         THE COURT:  All right.  If you'll come forward and

08:43:44   1   be sworn, please, Mr. Dell.

08:43:51   2          (Witness sworn.)

08:43:52   3          THE COURT:  Please come around, sir, have a seat

08:44:04   4   on the witness stand.

08:44:05   5          All right.  Ms. Henry, you may proceed with the

08:44:23   6   direct examination of the witness when you're ready.

08:44:25   7          MS. HENRY:  Thank you, Your Honor.

08:44:25   8            STEPHEN DELL, PLAINTIFF'S WITNESS, SWORN

08:44:25   9                    DIRECT EXAMINATION

08:44:25  10   BY MS. HENRY:

08:44:26  11   Q.  Good morning, my name is Claire Henry, and I am law

08:44:29  12   partners with Mr. Ward and Ms. Fair.

08:44:33  13          Mr. Dell, please introduce yourself.

08:44:34  14   A.  Hi, my name is Stephen Dell.

08:44:36  15   Q.  Can you tell us a little bit about yourself.  Where do

08:44:39  16   you live?

08:44:39  17   A.  I live in Houston, Texas, actually a suburb just north

08:44:42  18   of Houston called Willis.

08:44:42  19   Q.  And do you have a family?

08:44:43  20   A.  I do.  Married, going on 20 years.  I have two

08:44:48  21   children, two boys, ages 13 and 14.

08:44:52  22   Q.  And what do you do for a living?

08:44:55  23   A.  So I'm the president and founder of a company called

08:45:00  24   NOVUM Consulting Group.  We provide financial consulting

08:45:03  25   and valuation advisory services to corporate clients, both

08:45:06  1  privately held and publicly held companies, with respect to

08:45:10  2  their intellectual property assets and other business

08:45:12  3  matters.

08:45:13  4  Q.  Why are you here to testify today?

08:45:16  5  A.  So I've been retained to provide my opinion with

08:45:19  6  respect to the reasonable royalty damages owed to Solas as

08:45:23  7  a result of Samsung's infringement.

08:45:24  8  Q.  Did you prepare a set of slides to help walk us through

08:45:27  9  your analysis today?

08:45:28  10  A.  Yes, I did.

08:45:29  11      MS. HENRY:  Mr. Wietholter, could we get -- please

08:45:32  12  get Mr. Dell's slides?

08:45:34  13  Q.  (By Ms. Henry)  Mr. Dell, can you briefly explain your

08:45:37  14  educational background.  Where did you go to college?

08:45:39  15  A.  I went to the University of Texas at Austin.  Graduated

08:45:43  16  with a degree in economics with an emphasis in finance.

08:45:46  17  Q.  And do you have any certifications that are relevant to

08:45:49  18  your testimony today?

08:45:50  19  A.  I do.  I am a certified valuation analyst.

08:45:53  20  Q.  What's a certified valuation analyst?

08:45:56  21  A.  Similar to a Certified Public Accountant.  In the

08:46:00  22  accounting world where they're provided a certification

08:46:02  23  that attests to your preparing of taxes for the IRS, a

08:46:07  24  certified valuation analyst provides me the ability to

08:46:11  25  provide a certified opinion of value, both in litigation

08:46:14  1  context, such as this, but also business valuations in

08:46:16  2  other matters.

08:46:17  3  Q.  And how long have you been working in the area of

08:46:21  4  patent valuation and damages?

08:46:23  5  A.  It will be 20 years this year.

08:46:25  6  Q.  Have you received any recognition for that work?

08:46:28  7  A.  I have.  I've been recognized by Intellectual Asset

08:46:35  8  Management for my work in this field and been recognized as

08:46:38  9  one of the leading economic and patent damages experts in

08:46:41  10  the world.

08:46:41  11  Q.  Is all of the work you do for litigation like this

08:46:44  12  case?

08:46:45  13  A.  No, it's not.

08:46:46  14  Q.  Tell us a little bit about your real-world experience.

08:46:49  15  A.  So, as I mentioned, my firm also does advisory work.

08:46:53  16  So we are retained to provide opinions of value, as well as

08:46:57  17  assist in the licensing of intellectual property assets

08:47:02  18  both in licensing as well as receiving or outbound

08:47:05  19  licensing.

08:47:06  20  Q.  So have you ever negotiated licenses out in the real

08:47:08  21  world?

08:47:08  22  A.  I have, yes.

08:47:09  23  Q.  Mr. Dell, are you being compensated for the time that

08:47:14  24  you spent forming your opinions?

08:47:15  25  A.  Yes, I am.

08:47:16  1  Q.  And what's your hourly rate?

08:47:18  2  A.  $475 per hour.

08:47:20  3  Q.  And is that rate or your payment at all dependent on

08:47:24  4  the outcome of this case?

08:47:25  5  A.  Absolutely not.

08:47:27  6      MS. HENRY:  Your Honor, I tender Mr. Dell as an

08:47:29  7  expert in the area of patent damages and valuation.

08:47:31  8      THE COURT:  Is there objection?

08:47:33  9      MR. HASLAM:  No objection.

08:47:34  10      THE COURT:  Without objection, this witness will

08:47:37  11  be recognized by the Court as an expert in those designated

08:47:40  12  fields.

08:47:40  13      Please continue.

08:47:44  14  Q.  (By Ms. Henry)  Mr. Dell, before we get started, can

08:47:46  15  you please give us an overview of the types of information

08:47:48  16  that you considered in forming your damages opinion?

08:47:52  17  A.  Yes.  We reviewed a variety of information, starting

08:47:56  18  with the patents that we've been discussing over the last

08:47:58  19  several days.  I've also had discussions with Solas

08:48:02  20  representatives, including Mr. Padian, as well as

08:48:06  21  Mr. Shaikh, who we've heard from, as well as Mr. Credelle,

08:48:09  22  with respect to an understanding of the technology.

08:48:12  23      I've also reviewed thousands and thousands of

08:48:15  24  pages of documents, both from Solas, as well as from

08:48:19  25  Samsung, that have been produced in this matter.

08:48:22   1          I've reviewed license agreements as part of those

08:48:25   2   documents.

08:48:26   3          I've also reviewed the deposition testimony of

08:48:30   4   some of the witness that you've heard from, as well as

08:48:32   5   others, and reviewed the experts' reports from both sides,

08:48:38   6   in addition to the legal filings that have also been made

08:48:40   7   in the case.

08:48:41   8   Q.  You mentioned you reviewed thousands of pages of

08:48:43   9   documents.  Do you have any estimate of how many documents

08:48:46   10  you reviewed or how many pages of documents?

08:48:48   11  A.  Best -- it will be well over 10,000 pages.

08:48:52   12  Q.  And how many hours would you say that you and your team

08:48:55   13  spent forming your damages opinion in this case?

08:48:57   14  A.  I know me personally, I've spent between 250 and 300

08:49:04   15  hours, personally.

08:49:05   16  Q.  So after reviewing all those documents and after

08:49:07   17  spending all of those hours, were you ultimately able to

08:49:10   18  come to an opinion on what you believe the damages are that

08:49:15   19  Samsung owes Solas for its infringement of the patents in

08:49:18   20  this case?

08:49:19   21  A.  Yes, ma'am, I was.

08:49:20   22  Q.  And what is that opinion?

08:49:22   23  A.  So as shown on the slide, my opinion is that damages

08:49:27   24  for the '311 patent are 35.4 million.  Damages for the '450

08:49:33   25  patent are 25.8 million.  And damages for the '338 patent

| | | |
|---|---|---|
| 08:49:37 | 1 | are 27.3 million for a total reasonable royalty damages of |
| 08:49:42 | 2 | 88.6 million, roughly. |
| 08:49:45 | 3 | Q.  That's a whole lot of money. |
| 08:49:46 | 4 | A.  Yes, it is. |
| 08:49:47 | 5 | Q.  Why is that number so high? |
| 08:49:48 | 6 | A.  Because Samsung has made extensive use of the |
| 08:49:54 | 7 | patents-at-issue, and sold a lot of products that make use |
| 08:49:57 | 8 | of those inventions. |
| 08:49:58 | 9 | Q.  Mr. Dell, do you understand -- do you have an |
| 08:49:59 | 10 | understanding of whether or not Samsung continues to |
| 08:50:03 | 11 | infringe at least the '311 patent? |
| 08:50:04 | 12 | A.  Yes, that's my understanding. |
| 08:50:05 | 13 | Q.  And do these damages numbers we see on the screen take |
| 08:50:08 | 14 | into account any future use or infringement by Samsung of |
| 08:50:13 | 15 | these patents? |
| 08:50:13 | 16 | A.  No, they do not. |
| 08:50:14 | 17 | Q.  So if Samsung continues to infringe beyond the date of |
| 08:50:18 | 18 | this trial, is it your opinion that they should also pay |
| 08:50:21 | 19 | for that use of the patents? |
| 08:50:22 | 20 | A.  Yes, that's correct. |
| 08:50:23 | 21 | Q.  Mr. Dell, how did you start your damages analysis in |
| 08:50:29 | 22 | this case? |
| 08:50:29 | 23 | A.  Well, we start with the law and what the law guides in |
| 08:50:34 | 24 | determining a calculation of damages. |
| 08:50:35 | 25 | As shown on the screen, this is the patent damages |

08:50:39  1  statute, which indicates that damages shall be adequate to

08:50:42  2  compensate for the infringement, but in no event less than

08:50:46  3  a reasonable royalty for the use made of the invention by

08:50:50  4  the infringer.

08:50:51  5  Q.  I see that you've underlined in red that language, for

08:50:56  6  the use made of the invention by the infringer.  Why did

08:51:00  7  you do that?

08:51:01  8  A.  Because understanding the value is also understanding

08:51:03  9  the use and the benefits attributed to that use.  So the

08:51:06  10  extent of use is a very important aspect of tackling patent

08:51:10  11  damages.

08:51:10  12  Q.  And the patent damages statute always mentions a

08:51:16  13  reasonable royalty.  What is a royalty?

08:51:17  14  A.  As we've heard over the past couple days, patents are

08:51:21  15  property.  That's an analogy I often -- when I explain to

08:51:24  16  my friends what I do for a living, it's similar to you

08:51:27  17  would rent an apartment or you would rent a house.  You

08:51:30  18  have a rental agreement or a lease agreement, and you pay

08:51:33  19  for rights to use that property, such as rent.

08:51:37  20          And with patents, it's very similar, in that

08:51:40  21  patents are property.  You pay for rights to use that

08:51:42  22  property, and companies enter into what are called a

08:51:47  23  license agreement.  And in doing so, they pay royalties or

08:51:49  24  rent for rights to use that property.

08:51:51  25  Q.  And is there a formula that damages experts use in

08:51:55  1  order to determine reasonable royalties?

08:51:58  2  A.  Yes, there is.

08:51:59  3  Q.  Is that the formula that we see on Slide 7?

08:52:02  4  A.  Yes, it is.  It's the calculation of the royalty base

08:52:05  5  or the extent of use times a royalty rate, which

08:52:09  6  multiplying those two together gives you the royalty

08:52:12  7  damages.

08:52:12  8  Q.  Can you please explain for us at a high level what is a

08:52:16  9  royalty base?

08:52:17  10  A.  Well, as I indicated a moment ago, the royalty base is

08:52:21  11  the extent of use or the sales of the products that make

08:52:25  12  use of the invention of the patents.

08:52:26  13  Q.  And, again, at a high level, what is a royalty rate?  I

08:52:29  14  think you talked about this a little bit.

08:52:31  15  A.  So the royalty rate, as I indicated, is the payment for

08:52:35  16  rights to use that property.

08:52:36  17  Q.  Let's start with the royalty base.

08:52:39  18         What does the law tell you you have to consider

08:52:46  19  when determining the appropriate royalty base in a case

08:52:48  20  like this?

08:52:49  21  A.  We heard a little bit about this yesterday from

08:52:52  22  Mr. Credelle, but the first step is identification of

08:52:54  23  what's called the smallest salable patent practicing unit.

08:52:58  24  Q.  Still a mouthful today.  What does it mean?

08:53:01  25  A.  Generally, it is the identification of the smallest

08:53:06  1   product or component that is sold or salable that makes use

08:53:10  2   of the claims of the invention.

08:53:12  3   Q.  How do you go about determining what the smallest

08:53:19  4   salable patent practicing unit was for this case?

08:53:20  5   A.  Well, given there are some technical aspects to it, I

08:53:24  6   had discussions with Mr. Credelle.

08:53:25  7   Q.  And after your discussions with Mr. Credelle, did he

08:53:32  8   tell you what he believes, from a technical standpoint, is

08:53:36  9   the smallest salable patent practicing unit?

08:53:37  10  A.  Yes, he did.

08:53:38  11  Q.  And what is that?

08:53:38  12  A.  It is the OLED display module.

08:53:42  13  Q.  And we see a graphic here.  What is this -- what is

08:53:45  14  this graphic depicting?

08:53:47  15  A.  It's showing the OLED display module itself, separate

08:53:50  16  and apart from the overall phone or accused product.

08:53:54  17  Q.  Did Mr. Credelle determine that the OLED display module

08:53:58  18  was the smallest salable patent practicing unit for all

08:54:02  19  three of the patents?

08:54:03  20  A.  Yes, he did.

08:54:04  21  Q.  Are you aware that Samsung says that you should have

08:54:09  22  used something else --

08:54:12  23  A.  Yes.

08:54:12  24  Q.  -- as the smallest salable patent practicing unit?

08:54:14  25  A.  Yes, I am.

08:54:15  1    Q.  Do you agree with that?

08:54:16  2    A.  I do not.

08:54:16  3    Q.  Did you review Samsung's documents to determine what

08:54:25  4    Samsung Display sells to Samsung Electronics to go into

08:54:28  5    their phones that are accused of infringement?

08:54:29  6    A.  Yes, I did.

08:54:30  7    Q.  Can you please briefly remind us again what exactly is

08:54:37  8    the relationship between the various Samsung entities in

08:54:41  9    this case?

08:54:41  10   A.  Sure.

08:54:43  11        Samsung Display manufactures the OLED display,

08:54:48  12   sells that display to Samsung Electronics, who incorporates

08:54:54  13   the display into their mobile phones or accused products,

08:54:57  14   which then sells -- Samsung Electronics sells those

08:55:03  15   products into Samsung America's for sales into the United

08:55:07  16   States.

08:55:07  17   Q.  So did I understand that Samsung Display sells the

08:55:11  18   whole OLED display module to Samsung Electronics; is that

08:55:13  19   right?

08:55:13  20   A.  That's correct.

08:55:14  21   Q.  And did you see any testimony from Samsung's witnesses

08:55:22  22   talking about the OLED display module?

08:55:26  23   A.  I did, yes.

08:55:26  24   Q.  Is this some of that testimony from Mr. Kwak?

08:55:30  25   A.  Yes, it is.  Mr. Kwak, is, as I understand it, is a

08:55:36  1    vice president at Samsung Display.  And this is his -- and

08:55:38  2    when asked a question about the Y-OCTA, which I understand

08:55:41  3    to be the flexible metal mesh sensor at issue in this case,

08:55:46  4    his explanation of how Samsung incorporates the metal mesh

08:55:52  5    sensor into the AMOLED panel all the way up through the

08:55:57  6    touch sensor panel itself, so as a wholly integrated unit.

08:56:00  7    Q.  And I apologize, I think I mispronounced Mr. Kwak's

08:56:05  8    name earlier.  Thank you very much for correcting me.

08:56:07  9         So this term "wholly integrated," that's not a

08:56:10  10   term you came up with, that's a term that comes from

08:56:13  11   Samsung's witnesses?

08:56:13  12   A.  Yes.

08:56:14  13   Q.  Did you also look at what Samsung uses as the royalty

08:56:23  14   base or the smallest salable patent practicing unit in OLED

08:56:27  15   licenses that it enters into with other companies in the

08:56:31  16   real world?

08:56:32  17   A.  Yes.  In fact, as I mentioned, I've reviewed several

08:56:36  18   license agreements, one of which is a license agreement

08:56:38  19   with Samsung.  And in that license agreement, specifically

08:56:41  20   for OLED technology, Samsung itself used the OLED display

08:56:47  21   module as the royalty base for which they agreed to pay

08:56:50  22   royalty -- royalties on.

08:56:51  23   Q.  And is this license agreement PTX-509?

08:56:55  24   A.  Yes.

08:56:55  25   Q.  How do you know that the licenses in this Universal

08:57:04  1  Display, or UDC, license and Samsung are OLED patents?

08:57:08  2  A.  Well, I talked with Mr. Credelle about it, but the type

08:57:10  3  of agreement itself is OLED patent license.

08:57:12  4  Q.  And does this agreement further describe what they

08:57:16  5  meant by OLED display module?

08:57:20  6  A.  Yes, it further defines it, that's correct.

08:57:23  7  Q.  Is that what we see in Section 1.5 in PTX-509?

08:57:29  8  A.  Yes, ma'am, it is.

08:57:30  9  Q.  Can you tell us, at a high level, what they include in

08:57:35  10  the OLED display module in the UDC license?

08:57:38  11  A.  So as shown on the screen, two separate aspects of the

08:57:42  12  OLED display module are identified in the highlighted

08:57:45  13  colors, but the first being the glass substrate, as well as

08:57:49  14  filters and polarizers and other elements of the OLED

08:57:53  15  display module, as well as the driving circuitry,

08:57:56  16  controllers, and other components or guts, if you will, I

08:58:00  17  guess, of the OLED display module all incorporated into

08:58:04  18  that wholly integrated unit.

08:58:05  19  Q.  So when Samsung is negotiating licenses in a real world

08:58:11  20  to OLED patents, they're not just relying on the OLED panel

08:58:18  21  as the royalty base?

08:58:19  22  A.  That's correct.  It's incorporating the entire module.

08:58:27  23  Q.  Mr. Dell, how did you use the OLED display module now

08:58:31  24  that we know that it's the smallest salable patent

08:58:34  25  practicing unit to determine what the royalty base is in

08:58:37  1   this case?

08:58:37  2   A.   So the next step was analyzing, as we mentioned,

08:58:41  3   several documents that were produced by Samsung, but

08:58:44  4   analyzing confidential sales information from Samsung with

08:58:47  5   respect to the sales of OLED display modules in the United

08:58:47  6   States.

08:58:54  7   Q.   And you said you relied on underlying Samsung

08:58:57  8   documents.  Are those documents PTX-746 and PTX-747?

08:59:01  9   A.   Yes, ma'am, they are.

08:59:03  10              MS. HENRY:   And, Your Honor, I'll note that while

08:59:04  11  the parties have an agreement that what's on the slide is

08:59:07  12  public, but the exhibits themselves we would ask be entered

08:59:10  13  into the record under seal.

08:59:12  14              THE COURT:   Without objection, that's so noted.

08:59:16  15              MR. HASLAM:   No objection.

08:59:17  16              THE COURT:   You have no -- thank you.

08:59:19  17              MS. HENRY:   Thank you, Your Honor.

08:59:20  18  Q.   (By Ms. Henry)   Mr. Dell, what were you able to

08:59:22  19  determine for the number of infringing OLED -- OLED display

08:59:31  20  modules for the '311 patent?

08:59:32  21  A.   Based on my analysis for the '311 patent, we calculated

08:59:35  22  40,864,459 OLED display modules sold into the United

08:59:43  23  States.

08:59:43  24  Q.   And how about for the '338 patent?

08:59:45  25  A.   For the '338 patent, we calculated 84,788,447 OLED

08:59:52  1  display modules sold in the United States.

08:59:53  2  Q.  And what about the '450 patent?

08:59:55  3  A.  For the '450 patent, we've calculated 80,453,559 OLED

09:00:04  4  display modules in the United States.

09:00:05  5  Q.  What was the next step in your royalty base analysis?

09:00:09  6  A.  The next step was determining the revenues attributed

09:00:13  7  to the sales of those specific OLED display modules.

09:00:16  8  Q.  How did you go about doing that?

09:00:18  9  A.  So analyzing, again, Samsung confidential information,

09:00:21  10  I determined, based on that data, that the average price of

09:00:27  11  the OLED display modules for the '311 patent was $87.10;

09:00:32  12  for the '338 patent, the average OLED display module was

09:00:37  13  $65.86; and for the '450 patent, that the average price of

09:00:41  14  the OLED display module was $65.99.

09:00:44  15  Q.  Mr. Dell, did you see documents from Samsung suggesting

09:00:49  16  that Samsung Display sells OLED display modules for a

09:00:55  17  higher price to other companies that aren't Samsung

09:00:59  18  companies and even to consumers?

09:01:01  19  A.  Yes, I did.

09:01:02  20  Q.  Why didn't you rely on those higher prices?  Why did

09:01:06  21  you use the lower price that Samsung Display sells the

09:01:10  22  modules to Samsung Electronics?

09:01:12  23  A.  Because this is based on the data that Samsung produced

09:01:15  24  with respect to the accused products here.

09:01:16  25  Q.  After you did this analysis, after you calculated the

09:01:20  1  number of OLED modules sold and the average price, how did

09:01:24  2  you use that to determine the total revenue of OLED display

09:01:30  3  modules?

09:01:30  4  A.  The next step was a little bit simpler, but it was just

09:01:33  5  multiplying those two numbers together.

09:01:35  6  Q.  And after you multiplied those numbers together, what

09:01:38  7  did you get as the total revenue for the OLED display

09:01:40  8  modules for the '311 patent?

09:01:41  9  A.  For the '311 patent, the total revenues were

09:01:52  10  $3,541,204,565.

09:01:53  11  Q.  Did you say 3 billion with a B?

09:01:56  12  A.  Yes, ma'am, I did.

09:01:57  13  Q.  Hows about for the '338 patent?

09:01:58  14  A.  For the '338 patent the total revenues were

09:02:06  15  $5,465,299,346.

09:02:07  16  Q.  And what about for the '450 patent?

09:02:11  17  A.  For the '450 patent, the total revenues were

09:02:19  18  $5,164,983,847.

09:02:20  19  Q.  Are these revenue numbers from OLED display modules

09:02:26  20  what you used as the royalty base in your analysis?

09:02:29  21  A.  Yes, ma'am, that's correct.

09:02:30  22  Q.  So now we have the royalty base.  Is it okay if we talk

09:02:33  23  about the royalty rate?

09:02:35  24  A.  Yes.

09:02:35  25  Q.  How do you determine what the appropriate royalty rate

09:02:39   1   is in a case like this?

09:02:40   2   A.  Well, once again we look to the law.  And there's a set

09:02:44   3   of factors that are -- damages experts such as myself use

09:02:48   4   when determining reasonable royalty rates.  These factors

09:02:52   5   are known as the Georgia-Pacific factors.

09:02:53   6   Q.  Did you create this set of factors?

09:02:55   7   A.  No, I did not.

09:02:56   8   Q.  Where did they come from?

09:02:57   9   A.  They come from a case called the Georgia-Pacific case,

09:03:01   10   as we refer to it.

09:03:02   11   Q.  And it looks like here we've -- you've divided them

09:03:06   12   into three categories.  Why did you do that?

09:03:08   13   A.  Generally speaking, the factors -- each individual

09:03:12   14   factor, there are some similarities with respect to the --

09:03:16   15   what they relate to, so economic factors, there's licensing

09:03:20   16   factors, as I mentioned, as well as technical factors.

09:03:23   17   Q.  It looks like to me, from this slide, that Factor 15 is

09:03:28   18   sort of sitting off all by itself.  Why is that?

09:03:31   19   A.  Well, Factor 15 is the hypothetical negotiation, which

09:03:34   20   really looks at all of those factors sort of all together,

09:03:40   21   if you will.

09:03:40   22   Q.  What is a hypothetical negotiation?

09:03:42   23   A.  Well, the hypothetical negotiation is a recreation of a

09:03:50   24   negotiation that obviously didn't occur, but it's between a

09:03:52   25   patent owner and a patent user or an infringer at the

| | | |
|---|---|---|
| 09:03:56 | 1 | date -- at the time of first infringement. |
| 09:03:58 | 2 | Q.  Are there a set of assumptions or what we might call |
| 09:04:04 | 3 | ground rules that you have to take into account for this |
| 09:04:07 | 4 | hypothetical negotiation? |
| 09:04:07 | 5 | A.  Yes, there are. |
| 09:04:08 | 6 | Q.  What are those rules? |
| 09:04:09 | 7 | A.  Well, because it's a recreation, the parties would |
| 09:04:15 | 8 | acknowledge that the patents are valid and infringed.  As |
| 09:04:18 | 9 | part of that, Samsung, as the patent user, would |
| 09:04:25 | 10 | acknowledge that its patents infringe and that they must |
| 09:04:28 | 11 | pay for rights to use those technology; therefore, they |
| 09:04:33 | 12 | must enter into a license. |
| 09:04:34 | 13 | And because of that construct, the parties would |
| 09:04:36 | 14 | willingly negotiate, and we would have what we call the |
| 09:04:39 | 15 | cards -- cards dealt face up or all cards on the table, |
| 09:04:42 | 16 | fairly similar to what you may recall Mr. Ward in his |
| 09:04:46 | 17 | opening statements with this crystal ball kind of concept. |
| 09:04:49 | 18 | Q.  That means everyone knows what's going to happen in the |
| 09:04:51 | 19 | future? |
| 09:04:52 | 20 | A.  Yes. |
| 09:04:53 | 21 | Q.  Is this a license -- is this a negotiation that |
| 09:04:55 | 22 | actually happened? |
| 09:04:57 | 23 | A.  No, it is not. |
| 09:04:58 | 24 | Q.  Is it your opinion that there would have been a single |
| 09:05:04 | 25 | hypothetical negotiation for all three of the patents in |

| | | |
|---|---|---|
| 09:05:07 | 1 | this case? |
| 09:05:07 | 2 | A.  No. |
| 09:05:08 | 3 | Q.  Why not? |
| 09:05:09 | 4 | A.  Well, as we've heard, again, over the last couple of |
| 09:05:13 | 5 | days, the patents were previously owned by Casio on one |
| 09:05:17 | 6 | hand and Atmel on the other. |
| 09:05:18 | 7 | Q.  So did you determine that there would be two separate |
| 09:05:22 | 8 | hypothetical negotiations? |
| 09:05:23 | 9 | A.  Yes. |
| 09:05:23 | 10 | Q.  Let's talk first, please, about the '311 patent |
| 09:05:32 | 11 | hypothetical negotiation. |
| 09:05:32 | 12 | When does that hypothetical negotiation occur? |
| 09:05:34 | 13 | A.  In April of 2017. |
| 09:05:36 | 14 | Q.  And how did you get that date? |
| 09:05:38 | 15 | A.  That's based on the date of first infringement. |
| 09:05:41 | 16 | Q.  And who are the parties sitting down at this |
| 09:05:44 | 17 | negotiation table? |
| 09:05:45 | 18 | A.  At that time, it would have been Atmel as the patent |
| 09:05:49 | 19 | owner and Samsung as the patent user or infringer. |
| 09:05:52 | 20 | Q.  Can you help us understand, if Solas is the Plaintiff |
| 09:05:56 | 21 | in this case and they're the owner of the patent, why is it |
| 09:05:59 | 22 | Atmel that's sitting at the negotiation table? |
| 09:06:02 | 23 | A.  Because in April of 2017, Atmel had not yet sold the |
| 09:06:08 | 24 | patents, so they still owned them at that time. |
| 09:06:09 | 25 | Q.  What do you consider to help you understand and |

09:06:15    1    determine what the parties would have negotiated as a

09:06:18    2    royalty rate in April of 2017?

09:06:22    3    A.   Well, again, we go back to the Georgia-Pacific factors.

09:06:26    4    Q.   Now, this slide looks a little different than the one

09:06:29    5    that you used earlier for the Georgia-Pacific factors.   Why

09:06:32    6    is that?

09:06:32    7    A.   This is more of a summary of those factors, as well as

09:06:36    8    in their categories of the technical benefits factors,

09:06:40    9    economic factors, and licensing factors.

09:06:42   10    Q.   Where did you start in your analysis?

09:06:44   11    A.   So I started with the technical benefits.

09:06:47   12    Q.   How did you determine what the technical benefits were

09:06:51   13    for the '311 patent?

09:06:52   14    A.   Well, it gets a little bit outside of my area of

09:06:56   15    expertise, so I discussed that with Mr. Credelle.

09:06:58   16    Q.   And can you just remind us, at a high level, what is

09:07:04   17    the technology in the '311 patent?

09:07:07   18    A.   It is a flexible metal mesh touch sensor that's

09:07:10   19    configured to wrap around one or more edges of a display.

09:07:13   20    Q.   So that's what we've been calling the touch sensor

09:07:16   21    patent?

09:07:17   22    A.   Yes.

09:07:17   23    Q.   After your discussions with Mr. Credelle, what did he

09:07:21   24    tell you what were technical benefits of the '311 patent?

09:07:23   25    A.   And I believe he testified to this yesterday, as well,

09:07:27  1  but the benefits of the '311 patent are they provide a less

09:07:32  2  resistive sensor with better touch response.  Importantly,

09:07:37  3  they are lower cost.  They're more flexible, provide

09:07:42  4  greater surface area for touch, which also has some design

09:07:45  5  benefits of providing a slim or no border.  And then,

09:07:48  6  additionally, as I just mentioned, new form factors or new

09:07:52  7  designs that are enabled by that technology.

09:07:54  8  Q.  You said lower costs.  Does that end up being an

09:07:58  9  important part of your damages analysis for the '311

09:08:00  10  patent?

09:08:00  11  A.  Yes, it does, a very important part.

09:08:03  12          MS. HENRY:  Your Honor, at this time, we're going

09:08:05  13  to begin to get into confidential information.  I ask the

09:08:09  14  courtroom be sealed.

09:08:09  15          THE COURT:  All right.  Based on counsel's

09:08:12  16  request, I'll order the courtroom sealed.

09:08:14  17          Those present who are not subject to the

09:08:16  18  protective order that's been entered in this case should

09:08:19  19  excuse themselves and remain outside the courtroom until

09:08:21  20  it's reopened and unsealed.

09:08:23  21          (Courtroom sealed.)

09:08:23  22          (This portion of the transcript is sealed

09:08:23  23          and filed under separate cover as

09:08:23  24          Sealed Portion No. 8.)

09:44:52  25          (Courtroom unsealed.)

09:44:53  1          MS. HENRY:  Thank you, Your Honor.

09:44:54  2          THE COURT:  Please proceed.

09:44:54  3          MS. HENRY:  Thank you, Your Honor.

09:44:55  4  Q.  (By Ms. Henry)  Mr. Dell, before we unsealed the

09:44:57  5  courtroom, you talked, at a high level, about economic

09:45:00  6  factors.

09:45:01  7          How did you use the economic factors to help you

09:45:05  8  determine what the appropriate royalty rate is for the '450

09:45:09  9  and '338 patents?

09:45:10  10  A.  Again, similarly to the analysis for the '311 patent,

09:45:16  11  is looking at the relative bargaining positions, taking

09:45:20  12  into account Samsung's business risks, its manufacturing

09:45:23  13  capabilities, its brand name, and ultimately it's my

09:45:28  14  opinion based on the considerations of Casio at the time,

09:45:30  15  as well as Samsung at the time, that the parties would

09:45:33  16  agree to negotiate between the range of .35 and 7 --

09:45:37  17  sorry -- .35 percent and .7 percent.

09:45:41  18  Q.  And what did you determine the parties would have

09:45:44  19  agreed to within that range as the appropriate royalty rate

09:45:47  20  for each of those patents?

09:45:48  21  A.  It was my opinion that the appropriate royalty rate is

09:45:51  22  .5 percent for the '450 patent, as well as .5 percent for

09:45:56  23  the '338 patent.

09:45:56  24  Q.  Mr. Dell, did you also look at some other license

09:46:03  25  agreements between UDC and other companies for UDC's OLED

09:46:07    1  patents?

09:46:07    2  A.   Yes, I did.

09:46:08    3  Q.   Is PTX-744 one of those agreements?

09:46:13    4  A.   Yes, it is.

09:46:14    5  Q.   What company is PTX-744 with?

09:46:17    6  A.   With Konica Minolta.

09:46:27    7  Q.   I apologize.   That was a poorly worded question.

09:46:27    8       Who are the parties to this agreement?

09:46:28    9  A.   Well, the parties are Universal Display is the

09:46:32   10  licensor, as we've heard, and Konica Minolta is the

09:46:35   11  licensee.

09:46:35   12  Q.   And what were the royalty rates that Konica Minolta

09:46:38   13  agreed to pay UDC for UDC's patents?

09:46:42   14  A.   They agreed to pay royalty rates ranging from

09:46:47   15  2.3 percent up to 3 percent, based upon the amount of sales

09:46:48   16  or revenues, anywhere from a hundred to over $500 million

09:46:52   17  in revenues, as a part of that license.

09:46:53   18  Q.   And did you see even another UDC license agreement with

09:46:57   19  another company?

09:46:58   20  A.   Yes, I did.

09:46:58   21  Q.   Is PTX-743 that license agreement?

09:47:05   22  A.   Yes, it is.   This is a 2011 license agreement between

09:47:10   23  Universal Display and a company, Pioneer Corporation.

09:47:14   24  Q.   And similar to the Konica Minolta and the Samsung/UDC

09:47:20   25  agreements that we've talked about, was this also a license

09:47:22  1    to UDC's OLED patents?

09:47:25  2    A.  Yes, it was, that's my understanding.

09:47:27  3    Q.  And what was the royalty rate that Pioneer agreed to

09:47:31  4    pay for the UDC OLED patents?

09:47:34  5    A.  They agreed to pay 3 percent, and then in some

09:47:37  6    situations 4 percent.

09:47:38  7    Q.  Mr. Dell, you've got licenses where companies are

09:47:44  8    agreeing to pay 3 and 4 percent as a royalty rate for OLED

09:47:50  9    patents.  Why is your license rate only .5 percent for the

09:47:54  10   OLED patents at issue in this case?

09:47:55  11   A.  Because we have direct evidence or contemporaneous

09:48:00  12   business documents which indicate what Samsung has been

09:48:03  13   willing to pay for rights to use comparable technologies.

09:48:06  14   So I've relied upon that directly.

09:48:08  15   Q.  So you relied on the lower rate because you thought

09:48:11  16   that's what was required by the documents; is that right?

09:48:13  17   A.  I don't know that I would say it that way, as much as

09:48:18  18   it shows what Samsung has been willing to pay in actual

09:48:21  19   business transactions and how it's applied those rates in

09:48:24  20   the real world.

09:48:24  21   Q.  What is your opinion of the appropriate amount of

09:48:28  22   damages that Samsung owes Solas for its infringement of the

09:48:35  23   '450 patent?

09:48:35  24   A.  It's my opinion applying my reasonable royalty rate

09:48:41  25   opinion of .5 percent to the $5.16 billion in OLED display

09:48:44  1  module revenue results in reasonable royalty damages of

09:48:47  2  $25,824,919.

09:48:50  3  Q.  And what's your opinion of the amount of damages that

09:48:54  4  Samsung owes Solas for its infringement of the '338 patent?

09:48:58  5  A.  Applying my royalty rate of .5 percent to the

09:49:03  6  $5.46 billion in OLED display module revenue results in

09:49:10  7  royalty damages of $27,326,497.

09:49:15  8  Q.  Mr. Dell, we've talked about quite a few things in the

09:49:21  9  last hour or so, but the one thing we haven't really talked

09:49:25  10  about is the purchase agreements that -- when Solas bought

09:49:30  11  these patents.  Is it okay if we talk about those now?

09:49:34  12  A.  Of course.

09:49:34  13  Q.  And you were aware of these purchase agreements during

09:49:37  14  your analysis?

09:49:37  15  A.  Yes.

09:49:38  16  Q.  How much did Solas pay for the Microchip patents that

09:49:44  17  includes the '311 patent?

09:49:46  18  A.  $500,000.

09:49:48  19  Q.  And how many licenses were at issue in that purchase?

09:49:50  20  A.  I'm sorry?

09:49:52  21  Q.  Excuse me, how many patents were at issue in that

09:49:55  22  purchase?

09:49:55  23  A.  In that purchase, I believe it was nine patents -- or

09:50:00  24  patent applications.

09:50:01  25  Q.  Were there also some patent applications?

09:50:03   1   A.   Yes, that's correct.

09:50:04   2   Q.   And is that Microchip/Solas purchase agreement PTX-549?

09:50:10   3   A.   Yes.

09:50:10   4   Q.   And in PTX-550, is that the purchase agreement between

09:50:17   5   Casio and Solas that included the purchase of the '450 and

09:50:21   6   the '338 patents?

09:50:21   7   A.   Yes, ma'am, it is.

09:50:23   8   Q.   And do you recall how much money Solas paid to buy that

09:50:27   9   Casio portfolio?

09:50:28   10   A.   $1.15 million.

09:50:32   11   Q.   Did you consider those purchase prices as part of your

09:50:36   12   analysis?

09:50:36   13   A.   I considered them, yes.

09:50:37   14   Q.   Did they form the basis of your opinion on damages?

09:50:41   15   A.   No, they did not.

09:50:42   16   Q.   Why not?

09:50:43   17   A.   Because those purchases do not in any way take into

09:50:46   18   account Samsung's extent of use of the technologies that

09:50:51   19   were required.

09:50:51   20   Q.   Are you aware that Samsung has hired a damages expert

09:50:54   21   in this case?

09:50:55   22   A.   Yes.

09:50:55   23   Q.   And are you aware that he says that the appropriate

09:50:58   24   amount of damages is the amount that Solas paid for the

09:51:02   25   patents?

09:51:03  1   A.   Yes.

09:51:03  2   Q.   Do you agree with that?

09:51:04  3   A.   Not at all.

09:51:07  4   Q.   Tell us why not.

09:51:08  5   A.   Again, it doesn't in any way look at what the law

09:51:10  6   requires, which is the extent of use for the use made of

09:51:14  7   the invention.  It is in no way tied to Samsung's actual

09:51:18  8   use of the technology.

09:51:19  9   Q.   Does the purchase price take into account all of the

09:51:23  10  investment that Solas has made to attempt to determine

09:51:27  11  infringement -- who's infringing, the value of that

09:51:30  12  infringement, and the money they've expended to attempt to

09:51:34  13  enforce those patents?

09:51:34  14  A.   No, it does not.

09:51:35  15  Q.   Does the purchase price take into account in any way

09:51:39  16  Samsung's use of the patents at issue in this case?

09:51:43  17  A.   No, not -- none whatsoever.

09:51:45  18  Q.   Mr. Dell, what was the very first thing we talked about

09:51:49  19  that you used to determine your opinion on damages?

09:51:54  20  A.   The damages statute.

09:51:57  21  Q.   Does the damages statute say that Solas should get

09:52:04  22  damages of a reasonable royalty, and in no event less than

09:52:06  23  the purchase price paid for the patents?

09:52:08  24  A.   No, it does not say that.

09:52:10  25  Q.   What does it say?

09:52:11  1   A.  It says, in no event less than a reasonable royalty for

09:52:16  2   the use made of the invention by the infringer.

09:52:18  3   Q.  Mr. Dell, for the final time, can you please summarize

09:52:22  4   for the jury one more time what your opinion is for the

09:52:25  5   damages that Samsung owes Solas for each of the patents at

09:52:28  6   issue in this case?

09:52:29  7   A.  Yes.  For the '311 patent, the reasonable royalty

09:52:32  8   damages are $35.4 million; for the '450 patent, the

09:52:37  9   reasonable royalty damages are $25.8 million; and for the

09:52:44  10  '338 patent, royalty damages are $27.3 million.  For a

09:52:48  11  total reasonable royalty damages of $88,563,462.

09:52:53  12  Q.  Thank you, Mr. Dell.

09:52:55  13         MS. HENRY:  I pass the witness.

09:52:56  14         THE COURT:  All right.  Ladies and gentlemen,

09:52:58  15  before we proceed with cross-examination, we're going to

09:53:01  16  take a short recess.  If you will simply leave your

09:53:04  17  notebooks in your chairs and follow all the instructions

09:53:07  18  I've given you about your conduct throughout the trial,

09:53:10  19  including, of course, not to discuss the case with each

09:53:12  20  other, we'll have you back in here shortly, at which time

09:53:16  21  the Defendants will cross-examine this witness.

09:53:18  22         The jury is excused for recess at this time.

09:53:20  23         COURT SECURITY OFFICER:  All rise.

09:53:22  24         (Jury out.)

09:53:22  25         THE COURT:  Be seated, please.

| | | |
|---|---|---|
| 09:53:58 | 1 | Do we have the interpreter present who will be |
| 09:54:04 | 2 | used with the Samsung witnesses later in the trial?  I'd |
| 09:54:08 | 3 | like to get him sworn on the record if he's available or |
| 09:54:11 | 4 | she's available. |
| 09:54:24 | 5 | And am I correct we have just one interpreter; is |
| 09:54:27 | 6 | that right? |
| 09:54:27 | 7 | MR. HASLAM:  Yes. |
| 09:54:30 | 8 | MR. LERNER:  Yes. |
| 09:54:31 | 9 | MS. HENRY:  Your Honor, we have a check |
| 09:54:32 | 10 | interpreter present in the courtroom, but we understand |
| 09:54:34 | 11 | that she will not sit up here. |
| 09:54:36 | 12 | THE COURT:  That's your benefit and tool, not the |
| 09:54:38 | 13 | Court's. |
| 09:54:39 | 14 | MS. HENRY:  Thank you, Your Honor. |
| 09:54:44 | 15 | THE COURT:  If the interpreter will come forward, |
| 09:54:46 | 16 | please, I'm going to ask the courtroom deputy to administer |
| 09:54:50 | 17 | the oath. |
| 09:54:52 | 18 | (Interpreter sworn.) |
| 09:55:08 | 19 | THE COURT:  And could we get the interpreter's |
| 09:55:10 | 20 | name for the record, please? |
| 09:55:11 | 21 | THE INTERPRETER:  Janie Wright, sir. |
| 09:55:17 | 22 | THE COURT:  Thank you, ma'am. |
| 09:55:18 | 23 | We'll consider the interpreter sworn, and then |
| 09:55:20 | 24 | when we get to that witness, we won't have that to do. |
| 09:55:23 | 25 | We're going to take a short recess, about ten |

| | | |
|---|---|---|
| 09:55:27 | 1 | minutes, and we'll be back for cross-examination. |
| 09:55:29 | 2 | Do you have something, Mr. Haslam? |
| 09:55:30 | 3 | MR. HASLAM:  While we're on the break, can we |
| 09:55:33 | 4 | distribute the binders and save some time? |
| 09:55:36 | 5 | THE COURT:  That would be a good idea. |
| 09:55:38 | 6 | The Court stands in recess. |
| 09:55:42 | 7 | COURT SECURITY OFFICER:  All rise. |
| 09:55:42 | 8 | (Recess.) |
| 10:13:38 | 9 | (Jury out.) |
| 10:13:39 | 10 | COURT SECURITY OFFICER:  All rise. |
| 10:13:39 | 11 | THE COURT:  Be seated, please. |
| 10:13:41 | 12 | All right.  Are you prepared to go forward with |
| 10:13:52 | 13 | cross-examination, Mr. Haslam? |
| 10:13:53 | 14 | MR. HASLAM:  I am, Your Honor.  And to save time |
| 10:13:57 | 15 | about sealing and unsealing, I think it's probably best if |
| 10:14:02 | 16 | we go on the sealed record and start.  We'll save time |
| 10:14:07 | 17 | people going in and out. |
| 10:14:09 | 18 | THE COURT:  All right.  Well, make that request |
| 10:14:12 | 19 | once the jury is in the box. |
| 10:14:13 | 20 | MR. HASLAM:  Yes, sir. |
| 10:14:14 | 21 | THE COURT:  Let's bring in the jury, please. |
| 10:14:44 | 22 | COURT SECURITY OFFICER:  All rise. |
| 10:14:45 | 23 | (Jury in.) |
| 10:15:13 | 24 | THE COURT:  Please be seated. |
| 10:15:13 | 25 | Before we proceed with cross-examination, I |

| | | |
|---|---|---|
| 10:15:31 | 1 | noticed, Mr. Talton, you have a mask on as well as a |
| 10:15:36 | 2 | shield.  Are you not comfortable with just the shield, or |
| 10:15:39 | 3 | would you prefer a clear mask?  It's important that the |
| 10:15:42 | 4 | lawyers be able to see -- see your face. |
| 10:15:46 | 5 | JUROR:  I'm comfortable without it, like that. |
| 10:15:48 | 6 | Thank you. |
| 10:15:49 | 7 | THE COURT:  Are you comfortable, sir? |
| 10:15:51 | 8 | JUROR:  Oh, yeah. |
| 10:15:52 | 9 | THE COURT:  Okay.  Thank you very much. |
| 10:15:53 | 10 | Mr. Haslam, proceed with cross-examination. |
| 10:15:56 | 11 | MR. HASLAM:  Your Honor, I'd ask that the |
| 10:15:57 | 12 | courtroom be sealed. |
| 10:15:59 | 13 | THE COURT:  Based on counsel's request to protect |
| 10:16:02 | 14 | confidential and proprietary information, I will order the |
| 10:16:05 | 15 | courtroom sealed at this time. |
| 10:16:06 | 16 | Those present not subject to the protective order |
| 10:16:08 | 17 | that's been entered in this case should excuse themselves |
| 10:16:11 | 18 | and remain outside until the courtroom is unsealed and |
| 10:16:14 | 19 | reopened. |
| 10:16:28 | 20 | All right.  The courtroom is sealed, as is the |
| 10:16:32 | 21 | transcript. |
| 10:16:32 | 22 | (Courtroom sealed.) |
| 10:16:32 | 23 | (This portion of the transcript is sealed |
| 10:16:32 | 24 | and filed under separate cover as |
| 10:16:33 | 25 | Sealed Portion No. 9.) |

| | | |
|---|---|---|
| 10:16:33 | 1 | (Courtroom unsealed.) |
| 11:28:06 | 2 | THE COURT:  Mr. Dell, you may step down, sir. |
| 11:28:09 | 3 | THE WITNESS:  Thank you. |
| 11:28:13 | 4 | Would you like me to take these now? |
| 11:28:16 | 5 | THE COURT:  Just leave everything there, except |
| 11:28:17 | 6 | your bottle of water. |
| 11:28:20 | 7 | All right.  For the record, the courtroom is |
| 11:28:38 | 8 | unsealed.  The public has returned. |
| 11:28:43 | 9 | Plaintiff, call your next witness. |
| 11:28:45 | 10 | MR. FENSTER:  Your Honor, I'm pleased to report |
| 11:28:49 | 11 | that Plaintiff Solas rests its case-in-chief at this time. |
| 11:28:52 | 12 | THE COURT:  Plaintiff having rested its |
| 11:28:55 | 13 | case-in-chief, is Defendant prepared to go forward with its |
| 11:28:59 | 14 | case-in-chief? |
| 11:29:01 | 15 | MR. HASLAM:  Yes, we are, Your Honor. |
| 11:29:03 | 16 | THE COURT:  Please call your first witness. |
| 11:29:22 | 17 | MR. LERNER:  Your Honor, Defendants' first witness |
| 11:29:25 | 18 | will be Mr. Joseph Repice. |
| 11:29:28 | 19 | THE COURT:  Mr. Repice, if you'll come forward and |
| 11:29:31 | 20 | be sworn by the courtroom deputy, please. |
| 11:29:33 | 21 | (Witness sworn.) |
| 11:29:34 | 22 | THE COURT:  Please come around, sir, have a seat |
| 11:29:37 | 23 | on the witness stand. |
| 11:29:45 | 24 | THE WITNESS:  Should these binders be returned to |
| 11:29:47 | 25 | someone? |

| | | |
|---|---|---|
| 11:29:48 | 1 | THE COURT:  Mr. Johnston will take them. |
| 11:29:53 | 2 | Yes, Mr. Lerner? |
| 11:29:57 | 3 | MR. LERNER:  We have two physical exhibits for |
| 11:30:00 | 4 | Mr. Repice.  May I hand those up? |
| 11:30:02 | 5 | THE COURT:  You may approach the witness. |
| 11:30:10 | 6 | All right.  Counsel, you may proceed with your |
| 11:30:12 | 7 | direct examination. |
| 11:30:15 | 8 | MR. LERNER:  Thank you, Your Honor. |
| 11:30:15 | 9 | JOSEPH REPICE, DEFENDANT'S WITNESS, SWORN |
| 11:30:15 | 10 | DIRECT EXAMINATION |
| 11:30:19 | 11 | BY MR. LERNER: |
| 11:30:19 | 12 | Q.  Good morning, Mr. Repice. |
| 11:30:21 | 13 | A.  Morning. |
| 11:30:22 | 14 | Q.  Can you please introduce yourself to the jury? |
| 11:30:24 | 15 | A.  My name is Joseph Repice. |
| 11:30:25 | 16 | Q.  Where do you work? |
| 11:30:26 | 17 | A.  I actually work for Samsung Electronics America. |
| 11:30:29 | 18 | Q.  And why are you testifying today? |
| 11:30:31 | 19 | A.  Well, I've been in the telecom industry for almost |
| 11:30:34 | 20 | 25 years.  I've been at Samsung for the last nine of those. |
| 11:30:38 | 21 | I've had the, I guess you'd say, the privilege of working |
| 11:30:41 | 22 | across multiple disciplines within the organization.  So |
| 11:30:43 | 23 | I've ranged from strategy to technical marketing to product |
| 11:30:47 | 24 | planning, and I've got a pretty good understanding of what |
| 11:30:51 | 25 | it takes to commercialize our products for the U.S. |

11:30:53   1   Q.   What's your position at Samsung Electronics America?

11:30:55   2   A.   I'm currently the director of advanced product

11:30:57   3   planning.

11:30:59   4   Q.   And can you explain to the jury about what that is?

11:31:02   5   A.   Sure.  So, to keep it simple, I mean, our team

11:31:07   6   primarily looks for consumer unmet needs.  So that's

11:31:11   7   basically things that can't be done with the phone or areas

11:31:13   8   where the consumer wants to do something that doesn't exist

11:31:17   9   yet.

11:31:17  10        And our team looks for ways to resolve that or

11:31:20  11   basically solve those issues and then get them integrated

11:31:24  12   into the products that we would consider launching within

11:31:27  13   the U.S. market.

11:31:28  14   Q.   Do you like your job?

11:31:29  15   A.   Yeah, absolutely.  I get to work on phones, get to

11:31:34  16   launch something new every year.  It's always a challenge.

11:31:37  17   And then, you know, I get to see phones in other people's

11:31:39  18   hands, and, you know, I've worked on a lot of them.  So

11:31:42  19   it's nice to see my product in the hands of other people.

11:31:45  20        THE COURT:  Mr. Repice, pull the microphone a

11:31:47  21   little closer to you, sir.  And, like Mr. Dell, try to slow

11:31:50  22   down a little bit.

11:31:50  23        THE WITNESS:  Okay.  I'm sorry, sir.

11:31:52  24        THE COURT:  That's all right.

11:31:53  25        THE WITNESS:  I wasn't here for most of his

11:31:55   1    testimony.

11:31:56   2            THE COURT:  That's all right.  Just try to slow

11:31:59   3    down.

11:31:59   4            Go ahead, counsel.

11:32:00   5            MR. LERNER:  Thank you.

11:32:01   6    Q.  (By Mr. Lerner)  Can you tell the jury a bit about

11:32:03   7    yourself?

11:32:03   8    A.  Sure.  I'm married, be 25 years next month.  I've got

11:32:07   9    two boys, one who's a senior at the University of Texas in

11:32:11   10   Austin, who will be graduating in May.  And my younger one

11:32:14   11   is a sophomore actually, and he swims for Duke University.

11:32:19   12   Q.  And can you tell us a little about your background --

11:32:24   13   your educational background?

11:32:25   14   A.  Sure.  So I'm actually an engineer by training.  I have

11:32:32   15   two electrical engineering degrees.  I have a Bachelor's of

11:32:36   16   Science in electrical from Syracuse University, and I have

11:32:39   17   a Master's of electrical also from Syracuse University.

11:32:43   18   Q.  And what was your job experience before you joined

11:32:45   19   Samsung Electronics America?

11:32:46   20   A.  So I first started out actually working for GE

11:32:51   21   Aerospace, which is now Lockheed Martin, and then from

11:32:56   22   there I went to work at Ericsson.  And prior to Samsung, I

11:33:02   23   was at a company called Spirent Communications.

11:33:05   24   Q.  What was your work at GE Aerospace?

11:33:09   25   A.  When I was at GE Aerospace, I worked in electronic

11:33:13  1  warfare actually.  So I worked on the F-22 tactical

11:33:14  2  fighter, but that's kind of all I'm allowed to say.

11:33:16  3  Q.  How about at Ericsson, what did you work on there?

11:33:19  4  A.  So it takes years to get a plane out the door,

11:33:22  5  literally years, and I kind of wanted to work on something

11:33:25  6  that was a little bit more, let's just say, released

11:33:28  7  products on a more yearly basis, so I moved into telecom.

11:33:34  8      At Ericsson, I was primarily working on radio base

11:33:38  9  station communications, basically the other end of a cell

11:33:40  10  phone in terms of what actually completes the call when you

11:33:43  11  dial.

11:33:43  12  Q.  What was your work at Spirent?

11:33:45  13  A.  At Spirent, I actually shifted over to testing cell

11:33:51  14  phones.  So Spirent is a test and measurement company that

11:33:55  15  basically builds equipment to test cell phone products, as

11:33:55  16  well as other parts of the telecom network.

11:34:00  17      And then obviously at Samsung, I work on the

11:34:01  18  phones themselves.

11:34:01  19  Q.  What brought you to Samsung Electronics America?

11:34:06  20  A.  It's actually a funny story.  They actually hired my

11:34:10  21  wife about 10 years ago, and they then hired me nine months

11:34:14  22  later.

11:34:14  23      My wife has since left the company, and the

11:34:18  24  running joke in HR is that they hired a Repice, and they

11:34:23  25  ended up with me.

| | | |
|---|---|---|
| 11:34:24 | 1 | Q.  Where is your office? |
| 11:34:25 | 2 | A.  Currently in my house, but normally, prior to COVID, it |
| 11:34:31 | 3 | was in Plano, Texas. |
| 11:34:32 | 4 | Q.  And how many employees does Samsung Electronics America |
| 11:34:34 | 5 | have in the Texas area? |
| 11:34:36 | 6 | A.  In the Texas area we're about 2,000. |
| 11:34:38 | 7 | Q.  How many employees is it overall in the United States? |
| 11:34:41 | 8 | A.  In the U.S., we're in the neighborhood of 5,500. |
| 11:34:43 | 9 | Q.  How long have Samsung Electronics America been around? |
| 11:34:48 | 10 | A.  So SEA, if I'm not mistaken, was founded in 1978, so be |
| 11:34:54 | 11 | a little over 40 years. |
| 11:34:56 | 12 | Q.  All right.  I know it's enough when you said SEA, can |
| 11:34:59 | 13 | you just explain to the jury what that acronym refers to? |
| 11:35:02 | 14 | A.  Sure.  I'm sorry.  So I actually work for one of the |
| 11:35:06 | 15 | defendants that has been named, Samsung Electronics |
| 11:35:07 | 16 | America.  I may refer to it as SEA for short, if that's |
| 11:35:11 | 17 | okay? |
| 11:35:12 | 18 | Q.  That's okay with me, just wanted everyone to be on the |
| 11:35:15 | 19 | same page. |
| 11:35:15 | 20 |         What does Samsung Electronics America do? |
| 11:35:18 | 21 | A.  Well, I guess you could say that our main focus is to |
| 11:35:27 | 22 | commercialize the products that SEC, which is Samsung |
| 11:35:37 | 23 | Electronics Company, makes for the U.S. market. |
| 11:35:38 | 24 |         And I guess the best way to describe that would be |
| 11:35:41 | 25 | to give you some highlights of sort of what that involves. |

11:35:44   1   So that's going to go from importing the phone to the

11:35:47   2   United States, there'll be testing of the devices, there'll

11:35:50   3   be marketing of the devices.  We'll sell the devices.

11:35:54   4         Now, most of the time that's going to be through a

11:35:56   5   carrier, like an AT&T or a Verizon that you're all familiar

11:36:01   6   with, or a retailer, like Best Buy.  And then, obviously,

11:36:04   7   we offer services, you know, when something goes wrong on

11:36:06   8   the device.  But, in essence, we're commercializing a

11:36:10   9   product made by SEC within the U.S.

11:36:12  10   Q.  Are you attending the trial on behalf of both Samsung

11:36:18  11   Electronics America and Samsung Electronics Company?

11:36:19  12   A.  I am.  I'm here for SEA and SEC.

11:36:22  13   Q.  And what's their relationship?

11:36:24  14   A.  SEC is the parent company of SEA.

11:36:27  15   Q.  What kind of products does Samsung Electronics make?

11:36:31  16   A.  So Samsung Electronics as a whole is a global tech

11:36:36  17   leader.  I mean, obviously we make mobile products, that's

11:36:39  18   why we all are here today and what we've heard about over

11:36:43  19   the last few days.

11:36:45  20         In addition, we make appliances, so washing

11:36:47  21   machines, refrigerators, dishwashers, TVs obviously, and

11:36:52  22   down to the chip level.  So we have fabs within the United

11:36:55  23   States, as well as other countries, that produce

11:36:58  24   components, like memory chips or processor chips.

11:37:01  25   Q.  And in your experience, how would you describe the work

| | | |
|---|---|---|
| 11:37:03 | 1 | that Samsung Electronics does? |
| 11:37:04 | 2 | A.  I mean, in simple terms, we try to make innovative |
| 11:37:09 | 3 | products that people love.  I mean, you've seen our |
| 11:37:12 | 4 | commercials, right, we're looking for the next big thing |
| 11:37:15 | 5 | or -- to try and enable you to be able to do something you |
| 11:37:18 | 6 | weren't able to do before.  So we're basically trying to |
| 11:37:21 | 7 | use technology as it rolls out, to make your life simpler. |
| 11:37:25 | 8 | Q.  How long has Samsung Electronics been in the mobile |
| 11:37:28 | 9 | phone business? |
| 11:37:29 | 10 | A.  So Samsung Electronics was actually formed in 1969 in |
| 11:37:35 | 11 | Korea.  And I believe they -- I believe they started |
| 11:37:40 | 12 | producing phones in the mid-'80s, and then we, SEA, started |
| 11:37:46 | 13 | to sell them around 1996. |
| 11:37:49 | 14 | Q.  Do you have a slide that shows some of the mobile |
| 11:37:54 | 15 | products that Samsung Electronics America sells? |
| 11:37:57 | 16 | A.  Yes, I understand there should be one. |
| 11:37:59 | 17 |         MR. LERNER:  Mr. Beall, can we please have |
| 11:38:04 | 18 | DDX-3-001? |
| 11:38:06 | 19 | Q.  (By Mr. Lerner)  Mr. Repice, can you please explain |
| 11:38:08 | 20 | what's shown on this slide? |
| 11:38:10 | 21 | A.  Sure.  So this is -- starting in the upper left-hand |
| 11:38:13 | 22 | corner, this is actually one of our newer products.  It's |
| 11:38:16 | 23 | actually one of the foldable smartphone devices.  This is |
| 11:38:19 | 24 | actually the Z Flip 5G. |
| 11:38:24 | 25 |         Going across the top, it's actually one of the |

11:38:26  1   tablets that we support within SEA.  This one looks to be a
11:38:31  2   little bit more durable, given the kid playing with it.
11:38:34  3        And then on the bottom of the slide, it is sort of
11:38:40  4   a ruggedized version of one of our newer flagships, the
11:38:44  5   S20, that's basically meant for use in the military, as
11:38:48  6   well as public safety.
11:38:49  7   Q.  Earlier, you had mentioned identifying unmet customer
11:38:54  8   needs and developing products to meet those needs.  How
11:38:57  9   does your team go about doing that?
11:38:59 10   A.  I'll try and keep it at a high level just to make it
11:39:05 11   simple.
11:39:05 12        So just kind of three areas that we'll focus on,
11:39:08 13   one will be market and consumer.  So what are the trends
11:39:12 14   currently going on?  What are the changes in the
11:39:14 15   environment?
11:39:15 16        Next, we're actually look at some research, which
11:39:19 17   will be third-party research, it may be consumer surveys,
11:39:23 18   anything along those lines.
11:39:24 19        And then, lastly, we're going to look at
11:39:26 20   technology itself, meaning what's coming out, what's
11:39:30 21   emerging, what's actually happening in the market.  And we
11:39:32 22   take all of that combined, as well as our years of
11:39:36 23   experience within telecom, and we try to use that
11:39:38 24   information to generate a solution.
11:39:40 25   Q.  Who manufactures the Galaxy smartphones?

| | | |
|---|---|---|
| 11:39:44 | 1 | A.   So the Galaxy smartphones are manufactured by SEC, |
| 11:39:50 | 2 | Samsung Electronics Corporation. |
| 11:39:51 | 3 | Q.   Where does Samsung Electronics get the OLED displays |
| 11:39:55 | 4 | that are used in some of those products? |
| 11:39:57 | 5 | A.   So Samsung Electronics Corporation will get their OLED |
| 11:40:01 | 6 | displays from SDC, which is Samsung Display Corporation. |
| 11:40:05 | 7 | Q.   Can you describe the relationship between Samsung |
| 11:40:09 | 8 | Electronics on the one hand and Samsung Display on the |
| 11:40:11 | 9 | other? |
| 11:40:11 | 10 | A.   Sure.   So I'll just -- similar to the charts you guys |
| 11:40:18 | 11 | have seen, I'll just go left to right. |
| 11:40:20 | 12 | So Samsung Display Company is actually an |
| 11:40:23 | 13 | independent company, and they are a component manufacturer |
| 11:40:26 | 14 | and they manufacture the OLED displays that we've heard |
| 11:40:29 | 15 | about in the case. |
| 11:40:30 | 16 | SEC is actually Samsung Electronics, and they will |
| 11:40:35 | 17 | purchase those displays from SDC, but the companies are |
| 11:40:41 | 18 | actually independent, which is why every time we talk about |
| 11:40:44 | 19 | SDC I actually have to leave the courtroom. |
| 11:40:47 | 20 | Q.   Does Samsung Display sell OLED displays to other |
| 11:40:50 | 21 | companies that compete with Samsung Electronics? |
| 11:40:52 | 22 | A.   Yes.   Samsung Display is a component vendor that |
| 11:40:56 | 23 | actually sells to multiple companies.   I think in the |
| 11:40:59 | 24 | opening, we heard both Apple and Google were customers of |
| 11:41:05 | 25 | Samsung Display.   So it is not that they just sell to |

| | | |
|---|---|---|
| 11:41:11 | 1 | Samsung.  They can sell to anyone. |
| 11:41:13 | 2 | Q.  Does Samsung Electronics have some ownership share in |
| 11:41:15 | 3 | Samsung Display? |
| 11:41:15 | 4 | A.  Yes, I believe SEC is a shareholder within SDC.  And I |
| 11:41:19 | 5 | think the percentage is in the neighborhood of 80 percent. |
| 11:41:22 | 6 | I may not have the exact number, but it's in that ballpark. |
| 11:41:25 | 7 | Q.  But does Samsung Electronics have access to the |
| 11:41:29 | 8 | confidential information of Samsung Display? |
| 11:41:30 | 9 | A.  No, we do not. |
| 11:41:31 | 10 | Q.  Why not? |
| 11:41:32 | 11 | A.  Well, they sell to our competitors.  I mean, they can |
| 11:41:36 | 12 | sell displays to anybody who is looking to purchase a |
| 11:41:38 | 13 | display.  But in particular to SEA, obviously Apple and |
| 11:41:43 | 14 | Google are both competitors within the phone space.  So we |
| 11:41:45 | 15 | have to do business at arm's length.  And, in essence, |
| 11:41:48 | 16 | there's a wall between the companies. |
| 11:41:50 | 17 | Q.  Why did Samsung Electronics select Samsung Display to |
| 11:41:54 | 18 | supply its OLED displays? |
| 11:41:55 | 19 | A.  Samsung Display is an innovator in display technology, |
| 11:42:01 | 20 | and, you know, we're always trying to innovate.  And |
| 11:42:04 | 21 | they're well-known for what they do, and they have some of |
| 11:42:08 | 22 | the best displays in the market.  So we integrate them into |
| 11:42:11 | 23 | our phones. |
| 11:42:11 | 24 | Q.  Is innovation important to Samsung Electronics? |
| 11:42:14 | 25 | A.  Yes, absolutely.  You know, in the nine years that I've |

11:42:19  1  been at Samsung, just to name a few of the sort of

11:42:22  2  top-level innovations, I mean, the original idea for a

11:42:26  3  larger phone, what used to be referred to as a tablet, came

11:42:29  4  from Samsung.

11:42:30  5      And then, you know, water resistance, the ability

11:42:31  6  to do wireless charging, charge the phone without cables,

11:42:35  7  power share, you know, having the phone charge other

11:42:38  8  components once again without cables.  And then now, in

11:42:41  9  that recent slide, you know, having a foldable smartphone.

11:42:44  10  Those are all areas where we've tried to innovate over the

11:42:48  11  years.

11:42:48  12  Q.  Have Galaxy -- Samsung's Galaxy phones received awards

11:42:54  13  and recognition?

11:42:55  14  A.  Yeah, in my time at Samsung, we've received a number of

11:42:58  15  awards.  Just looking at the last Consumer Electronics Show

11:43:05  16  which was in Vegas in January, I think, across our product

11:43:09  17  portfolio, we received over 40.

11:43:10  18  Q.  Are those awards for innovation?

11:43:12  19  A.  It depends, but on a number of products, yes.

11:43:15  20  Q.  What is the Consumer Electronics Show?  Can you explain

11:43:21  21  that to the jury?

11:43:22  22  A.  Sure.  So once a year a lot of vendors across multiple

11:43:25  23  industries get together in Vegas, and they actually will

11:43:29  24  either demonstrate new technology, new products, in some

11:43:32  25  cases demonstrations of products that don't quite exist

| | | |
|---|---|---|
| 11:43:35 | 1 | yet, so prototypes.  And it's basically to sort of show the |
| 11:43:39 | 2 | world what's coming and what will eventually end up in |
| 11:43:42 | 3 | consumer's hands. |
| 11:43:43 | 4 | Q.  And over the years, has Samsung Electronics received |
| 11:43:46 | 5 | awards for innovation in other Consumer Electronics Shows |
| 11:43:52 | 6 | for its Galaxy phones? |
| 11:43:54 | 7 | A.  Yes. |
| 11:43:55 | 8 | Q.  Do you have a general familiarity with the Galaxy |
| 11:43:57 | 9 | phones that are at issue in this case? |
| 11:43:59 | 10 | A.  Yes, I've worked on some of them. |
| 11:44:00 | 11 | Q.  Before this case was filed, were you familiar with OLED |
| 11:44:04 | 12 | technology? |
| 11:44:04 | 13 | A.  Yeah, OLED's -- it's actually been around since the |
| 11:44:10 | 14 | '80s. |
| 11:44:10 | 15 | Q.  How long has Samsung Electronics been offering phones |
| 11:44:13 | 16 | with OLED displays? |
| 11:44:14 | 17 | A.  It's been over a decade.  I think we started selling |
| 11:44:20 | 18 | OLED displays in -- around 2009. |
| 11:44:22 | 19 | Q.  Before this case, were you familiar with touch sensor |
| 11:44:27 | 20 | technology, generally? |
| 11:44:27 | 21 | A.  Yes, absolutely. |
| 11:44:29 | 22 | Q.  How long has Samsung Electronics been selling phones |
| 11:44:33 | 23 | with touch sensors? |
| 11:44:34 | 24 | A.  So that's actually even longer.  Touch sensors have |
| 11:44:40 | 25 | been around, you know, going back to, like, 2001.  But |

| | | |
|---|---|---|
| 11:44:43 | 1 | specific to this case with capacitive touch sensors, I want |
| 11:44:47 | 2 | to say it's 2008. |
| 11:44:48 | 3 | Q.  Do you know how many different cell phone models |
| 11:44:52 | 4 | Samsung Electronics has made over the years? |
| 11:44:53 | 5 | A.  Oh, over the years, hundreds, if not thousands. |
| 11:44:56 | 6 | Q.  Why so many different ones? |
| 11:44:58 | 7 | A.  Well, unfortunately, there's no average consumer.  I |
| 11:45:02 | 8 | mean, we basically try to address all of the needs that are |
| 11:45:07 | 9 | existing, and we make phones globally.  So there's a number |
| 11:45:10 | 10 | of things that have to get considered.  So, as a result, |
| 11:45:14 | 11 | we've made a number of models over the years. |
| 11:45:18 | 12 | Q.  How does Samsung Electronics America decide which |
| 11:45:21 | 13 | features of phones to market to consumers? |
| 11:45:23 | 14 | A.  So the phone itself is made up of hundreds of features |
| 11:45:27 | 15 | and functions, if not thousands.  And it'd be next to |
| 11:45:31 | 16 | impossible to talk about them all. |
| 11:45:32 | 17 | So we basically have to fit -- pick a few -- let's |
| 11:45:36 | 18 | just call them key attributes, and we will choose those for |
| 11:45:40 | 19 | a particular model or a particular price gear, and then, |
| 11:45:44 | 20 | you know, maybe what the target segment or target audience |
| 11:45:49 | 21 | might be, and we'll combine all of that together to |
| 11:45:51 | 22 | determine these are what we want to talk about for this |
| 11:45:54 | 23 | particular product launch. |
| 11:45:55 | 24 | Q.  Are there multiple components that are essential or |
| 11:45:59 | 25 | necessary to have a working smartphone these days? |

| | | |
|---|---|---|
| 11:46:02 | 1 | A.  Oh, absolutely. |
| 11:46:03 | 2 | Q.  How do you decide which of those to focus on? |
| 11:46:06 | 3 | A.  Well, it depends on sort of what the functionality that |
| 11:46:11 | 4 | we're trying to pitch, whether or not we're going to have a |
| 11:46:14 | 5 | differentiation story between a product we've already |
| 11:46:17 | 6 | launched and a new technology.  So it varies based on a |
| 11:46:22 | 7 | number of different factors. |
| 11:46:23 | 8 | Q.  Has Samsung Electronics America ever focused marketing |
| 11:46:28 | 9 | on the transistor structure or layout in a display? |
| 11:46:31 | 10 | A.  No, not -- not while I've been there.  I mean, |
| 11:46:35 | 11 | traditionally our marketing is done at a much higher level. |
| 11:46:39 | 12 | Q.  Has Samsung Electronics America ever marketed the types |
| 11:46:43 | 13 | of materials or the structure of a touch sensor used in its |
| 11:46:46 | 14 | phone? |
| 11:46:46 | 15 | A.  Once again, not to my knowledge, no. |
| 11:46:48 | 16 | Q.  Now, you have in front of you two physical exhibits. |
| 11:46:56 | 17 | You should have DTX-468 and DTX-469. |
| 11:47:03 | 18 | A.  Yes, those numbers match. |
| 11:47:05 | 19 | Q.  Can you -- they're in plastic bags? |
| 11:47:09 | 20 |         MR. LERNER:  With Your Honor's permission, can |
| 11:47:12 | 21 | Mr. Repice take them out one at a time from those -- |
| 11:47:15 | 22 |         THE COURT:  Certainly. |
| 11:47:19 | 23 | A.  Okay.  This is -- apologies.  This is DTX-0468. |
| 11:47:27 | 24 | Q.  (By Mr. Lerner)  Can you explain to the jury what that |
| 11:47:31 | 25 | is? |

476

11:47:31   1   A.   Sure.   This is one of our Galaxy products, and this is

11:47:34   2   actually the GS8 phone.

11:47:37   3   Q.   The Galaxy S8?

11:47:39   4   A.   The Galaxy S8, sorry.

11:47:42   5   Q.   That's okay.

11:47:43   6        And can you take out for the jury DTX-469?

11:47:46   7   A.   This is DTX-469, and this is actually the Galaxy S8

11:48:00   8   Plus.

11:48:00   9   Q.   Can you hold the two next to one another?

11:48:02   10  A.   I can.

11:48:06   11       THE COURT:   Just make sure the right one goes in

11:48:09   12  the right bag with the numbers on it.

11:48:10   13       THE WITNESS:   Yes, sir.   I've got a

11:48:13   14  left/right-hand thing going on, so I should be okay.

11:48:17   15       THE COURT:   Go ahead, counsel.

11:48:18   16       MR. LERNER:   Thank you, Your Honor.

11:48:19   17  Q.   (By Mr. Lerner)   Do you understand from this case that

11:48:21   18  there are different touch sensors used between these two

11:48:23   19  different phones?

11:48:24   20  A.   Yes, there are.

11:48:24   21  Q.   From the user perspective, is there any difference in

11:48:28   22  the responsiveness of the touch sensing of those two

11:48:31   23  phones?

11:48:31   24  A.   No, there would not be.

11:48:32   25  Q.   Is there any difference from the user perspective, or

11:48:35  1   any apparent difference, in the curvature or the form

11:48:39  2   factor of those two phones?

11:48:40  3   A.  Other than the size, which is physically obvious, and

11:48:45  4   the S8 Plus has a larger battery, they're basically the

11:48:49  5   same.

11:48:49  6   Q.  Is there any noticeable difference in the size of the

11:48:52  7   borders of the phone?

11:48:53  8   A.  They're both -- my fingers are probably in the way, but

11:48:59  9   they're both Infinity screens, which means they pretty much

11:49:04  10  go all the way to the edge, top and bottom, left to right.

11:49:07  11  Q.  And based on your research, your team's research, what

11:49:08  12  leads people to select one or the other of those phones?

11:49:12  13  A.  Well, that's actually a much more complicated question

11:49:15  14  because it's going to depend on the individual.

11:49:17  15       Can I put these down?

11:49:19  16  Q.  You can, yes.

11:49:22  17  A.  Yes.  So a typical -- let's say a typical consumer

11:49:29  18  purchase journey, it actually starts before you even get to

11:49:31  19  the phone.  One of the first questions I might ask myself

11:49:34  20  if I'm going to buy a phone is, what kind of operating

11:49:37  21  system would I want to use, Android or iOS?

11:49:41  22       And the next thing I might go to is brand.  So

11:49:44  23  what type of phone would I like?

11:49:46  24       Then I might look at the weight of the device.  I

11:49:47  25  might see how it fits in my hand.  You know, can I actually

11:49:50  1   use it one-handed?  Does my thumb go all the way across?

11:49:53  2           And then I might look at some of the functionality

11:49:55  3   or the technology on the device.  How many cameras does it

11:49:58  4   have?

11:49:59  5           I'll go, you know, look at possibly how big the

11:50:01  6   display is.  You know, do I like to watch movies on a

11:50:06  7   plane?

11:50:06  8           You know, and then ultimately it comes down to the

11:50:09  9   question we all hate when we go to buy something, how much

11:50:13  10  does it cost?

11:50:14  11  Q.  And so why does Samsung -- why does Samsung Electronics

11:50:18  12  offer S8 and S8 Plus?  Why not just one?

11:50:22  13  A.  Well, like I said earlier, there's a number of

11:50:26  14  consumers out there, and, you know, these are just two

11:50:29  15  models within our flagship offering which are our more

11:50:33  16  high-end phones.  We actually offer a number of other

11:50:36  17  products.  So, once again, we try to offer something for

11:50:38  18  everyone.

11:50:38  19  Q.  How often does Samsung Electronics typically release

11:50:42  20  new models of smartphones?

11:50:43  21  A.  Typically, and more recently in my frame -- time frame,

11:50:48  22  we've been releasing pretty much throughout the year,

11:50:51  23  depending on the product year.

11:50:53  24  Q.  Why come out with new phones that frequently?

11:50:56  25  A.  Well, technology is changing in, you know, practically

| | | |
|---|---|---|
| 11:51:00 | 1 | daily or almost monthly nowadays.  You know, we want to try |
| 11:51:06 | 2 | and stay on top of things, and we want to try and offer |
| 11:51:08 | 3 | what's out there to the world. |
| 11:51:09 | 4 | Q.  Thank you, Mr. Repice. |
| 11:51:11 | 5 | MR. LERNER:  Pass the witness. |
| 11:51:12 | 6 | THE COURT:  All right.  Cross-examination? |
| 11:51:16 | 7 | MS. FAIR:  Yes, Your Honor. |
| 11:51:17 | 8 | THE COURT:  Ms. Fair, do you have any estimate of |
| 11:51:19 | 9 | the length of your cross-examination? |
| 11:51:22 | 10 | MS. FAIR:  30 minutes, maybe. |
| 11:51:24 | 11 | THE COURT:  Well, then we'll cross-examine this |
| 11:51:25 | 12 | witness after lunch. |
| 11:51:27 | 13 | MS. FAIR:  Yes, Your Honor. |
| 11:51:28 | 14 | THE COURT:  We've got about eight minutes until |
| 11:51:30 | 15 | noon, and the clerk's office has advised the Court that the |
| 11:51:35 | 16 | lunch for the ladies and gentlemen of the jury is in the |
| 11:51:38 | 17 | jury room.  So we won't delay that process. |
| 11:51:40 | 18 | Ladies and gentlemen of the jury, we're going to |
| 11:51:43 | 19 | break for lunch.  If you will, take your notebooks with you |
| 11:51:46 | 20 | to the jury room.  Follow all my instructions, including, |
| 11:51:48 | 21 | of course, not to discuss the case among yourselves.  And |
| 11:51:51 | 22 | we'll be back as close to 1:00 o'clock as possible.  And |
| 11:51:56 | 23 | we'll begin with the Plaintiff's cross-examination of |
| 11:51:58 | 24 | Mr. Repice at that point. |
| 11:51:59 | 25 | The jury is excused for lunch at this time. |

| | | |
|---|---|---|
| 11:52:02 | 1 | COURT SECURITY OFFICER:  All rise. |
| 11:52:07 | 2 | (Jury out.) |
| 11:52:08 | 3 | THE COURT:  Counsel, I may need to take up with |
| 11:52:36 | 4 | you some of the matters we did not get to this morning.  So |
| 11:52:41 | 5 | I assume you will be in the vicinity of the courthouse or |
| 11:52:46 | 6 | close by.  And if you're not close by, I will call you. |
| 11:52:50 | 7 | But I expect to need to meet with you in chambers before we |
| 11:52:53 | 8 | reconvene at 1:00.  But I'll let you know. |
| 11:52:56 | 9 | In the meantime, we stand in recess for lunch. |
| 11:53:01 | 10 | COURT SECURITY OFFICER:  All rise. |
| 11:53:02 | 11 | (Recess.) |
| 12:54:10 | 12 | (Jury out.) |
| 12:54:11 | 13 | COURT SECURITY OFFICER:  All rise. |
| 12:54:11 | 14 | THE COURT:  Be seated, please. |
| 01:59:04 | 15 | Mr. Haslam? |
| 01:59:14 | 16 | MR. HASLAM:  Your Honor, there were several |
| 01:59:16 | 17 | rulings that were made in chambers relating to the |
| 01:59:19 | 18 | testimony of Dr. Fontecchio, and I would like to put on the |
| 01:59:23 | 19 | record those rulings to preserve it for the record for |
| 01:59:26 | 20 | whatever use that may be made. |
| 01:59:30 | 21 | THE COURT:  All right.  To avoid any further |
| 01:59:33 | 22 | delays in getting the jury back in the courtroom, my |
| 01:59:37 | 23 | inclination would be to take those up at the end of the |
| 01:59:40 | 24 | day, get them on the record, and at least from my |
| 01:59:43 | 25 | standpoint, since the Court's asking not to go into it |

| | | |
|---|---|---|
| 01:59:46 | 1 | right now as a matter of time management, that that would |
| 01:59:49 | 2 | not rise to the level of any kind of waiver on your part. |
| 01:59:52 | 3 | MR. HASLAM:  Thank you, Your Honor. |
| 01:59:53 | 4 | THE COURT:  Does Plaintiff have any objection to |
| 01:59:55 | 5 | that process? |
| 01:59:56 | 6 | MR. FENSTER:  No objection, Your Honor. |
| 01:59:57 | 7 | THE COURT:  All right.  We'll take them up at the |
| 01:59:59 | 8 | end of the day.  There will be no waiver. |
| 02:00:03 | 9 | MR. HASLAM:  Thank you. |
| 02:00:03 | 10 | THE COURT:  Also, counsel, for the record, before |
| 02:00:05 | 11 | the trial started, I gave both parties clear instructions |
| 02:00:09 | 12 | on the communicating of disputes through the |
| 02:00:13 | 13 | meet-and-confer process with the Court.  You were |
| 02:00:16 | 14 | instructed to advise the Court not later than 10:00 p.m. |
| 02:00:19 | 15 | each evening of disputes that arose overnight that should |
| 02:00:24 | 16 | be taken up with the Court the next day. |
| 02:00:27 | 17 | At no time during this trial have I gotten |
| 02:00:30 | 18 | anything from you anywhere close to 10:00 o'clock.  I've |
| 02:00:34 | 19 | gotten them at 2:00 in the morning, I've got them at 12:45 |
| 02:00:38 | 20 | in the morning.  And especially with what we've had to deal |
| 02:00:40 | 21 | with today, they're of such a size and duration that |
| 02:00:43 | 22 | there's no way the Court could be as fully prepared as it |
| 02:00:46 | 23 | needed to be because of the inexcusable delay in you |
| 02:00:51 | 24 | complying with my instructions. |
| 02:00:53 | 25 | I cannot get prepared to give you guidance if I |

| | | |
|---|---|---|
| 02:00:56 | 1 | don't know what the problems are.  And if I don't find out |
| 02:00:58 | 2 | what they are at 10:00 p.m. and I don't find out about them |
| 02:01:02 | 3 | at 2:00 in the morning -- and despite your assumptions to |
| 02:01:06 | 4 | the contrary, I'm not by my computer at 2:00 in the morning |
| 02:01:10 | 5 | looking for your email -- that puts the Court in the |
| 02:01:13 | 6 | position where time is not available for the Court to |
| 02:01:20 | 7 | consider and digest your disputes so that I can give you |
| 02:01:24 | 8 | prompt guidance. |
| 02:01:24 | 9 | We've taken an hour beyond what I told the jury we |
| 02:01:29 | 10 | would be back.  I told the jury we would be back at 1:00. |
| 02:01:33 | 11 | It's one minute after 2:00 p.m.  I'm going to penalize both |
| 02:01:35 | 12 | sides 30 minutes from your trial time to make up that hour, |
| 02:01:38 | 13 | because I'm convinced that if I don't invoke a penalty, |
| 02:01:41 | 14 | this conduct is not going to get better and may well get |
| 02:01:44 | 15 | worse.  It has been non-compliant the entire trial, and we |
| 02:01:49 | 16 | still have a lot of trial to go. |
| 02:01:50 | 17 | So I expect you to comply with my instructions in |
| 02:01:52 | 18 | this regard.  And if I need to invoke and apply additional |
| 02:01:56 | 19 | penalties later, I will do so. |
| 02:01:58 | 20 | But at this point, I am deducting 30 minutes of |
| 02:02:02 | 21 | trial time from each side as a penalty for your continued |
| 02:02:06 | 22 | failure to comply with my instructions during the pre-trial |
| 02:02:09 | 23 | conference and in advance of this trial with regard to |
| 02:02:12 | 24 | communicating to the Court disputes that have not been |
| 02:02:16 | 25 | resolved through the meet-and-confer process between the |

02:02:18   1   parties and which require the Court's understanding,

02:02:22   2   attention, and guidance, much of which we have, as I say,

02:02:27   3   just spent an extra hour in my chambers trying to go

02:02:31   4   through.

02:02:31   5        And as a part of that, Mr. Haslam, some of those

02:02:34   6   rulings did not go the way you wanted them to, and you want

02:02:37   7   to put those on the record.  We'll do that at the end of

02:02:40   8   the day.  That's fine.

02:02:41   9        All right.  Ms. Fair, are you going to

02:02:43  10   cross-examine this witness?

02:02:45  11        MS. FAIR:  Yes, Your Honor.

02:02:46  12        THE COURT:  Why don't you go to the podium and

02:02:47  13   prepare?

02:02:49  14        While she's doing that, let's bring in the jury,

02:02:53  15   please.

02:02:53  16        MS. FAIR:  Your Honor, may I provide the binder --

02:02:57  17        THE COURT:  You can pass those out while the jury

02:02:59  18   is being brought in.

02:03:01  19        MS. FAIR:  I've given one to opposing counsel

02:03:03  20   already.  I want to make sure the witness has one.

02:03:08  21        THE COURT:  Let's bring in the jury, Mr. Johnston.

02:03:13  22        COURT SECURITY OFFICER:  All rise.

02:03:29  23        (Jury in.)

02:03:30  24        THE COURT:  Ladies and gentlemen, welcome back.

02:03:33  25   Please have a seat.

| | | |
|---|---|---|
| 02:03:35 | 1 | I apologize.  I told you we'd reconvene at |
| 02:03:40 | 2 | 1:00 o'clock.  It's now 2:00 o'clock.  I've had issues I |
| 02:03:43 | 3 | had to deal with counsel on that I did not anticipate would |
| 02:03:47 | 4 | take this long.  But we are glad to have you back with us, |
| 02:03:50 | 5 | and we'll proceed with the Plaintiff's cross-examination of |
| 02:03:53 | 6 | Defendants' first witness, Mr. Repice. |
| 02:03:55 | 7 | Ms. Fair, you may proceed with cross-examination. |
| 02:03:59 | 8 | MS. FAIR:  Thank you, Your Honor. |
| 02:03:59 | 9 | CROSS-EXAMINATION |
| 02:03:59 | 10 | BY MS. FAIR: |
| 02:03:59 | 11 | Q.  Mr. Repice, we've met before, right? |
| 02:04:02 | 12 | A.  Yes, we have. |
| 02:04:03 | 13 | Q.  Mr. Repice, I know that you've had to step out of the |
| 02:04:07 | 14 | courtroom periodically when the courtroom has been sealed |
| 02:04:11 | 15 | for confidential information. |
| 02:04:13 | 16 | Are you aware that there has been some discussion |
| 02:04:15 | 17 | about teardowns that Solas did before this lawsuit? |
| 02:04:19 | 18 | A.  Only in brief mentioning.  I can't be here for any of |
| 02:04:24 | 19 | the SDC discussions, so I haven't heard any testimony. |
| 02:04:27 | 20 | Q.  So I'll represent to you that it's been insinuated that |
| 02:04:32 | 21 | Solas has done teardowns that haven't been looked at by |
| 02:04:36 | 22 | Solas's expert, and there's been some concern about where |
| 02:04:40 | 23 | those teardown images are. |
| 02:04:41 | 24 | You understand in a lawsuit, there is a discovery |
| 02:04:45 | 25 | process, right? |

| | | |
|---|---|---|
| 02:04:47 | 1 | A.  Yes, ma'am. |
| 02:04:48 | 2 | Q.  And each side produces documents that are relevant to |
| 02:04:53 | 3 | the case, right? |
| 02:04:53 | 4 | A.  I'd like to think so, yes. |
| 02:04:55 | 5 | Q.  Would it surprise you if Solas produced over 300 images |
| 02:05:02 | 6 | of teardowns that were done of the accused Samsung phones |
| 02:05:05 | 7 | in this case? |
| 02:05:07 | 8 | MR. LERNER:  Objection, Your Honor. |
| 02:05:08 | 9 | THE COURT:  State your objection. |
| 02:05:10 | 10 | MR. LERNER:  Calls for speculation. |
| 02:05:12 | 11 | MS. FAIR:  Your Honor, may I respond? |
| 02:05:14 | 12 | THE COURT:  You may respond. |
| 02:05:15 | 13 | MS. FAIR:  This is the corporate representative |
| 02:05:16 | 14 | for two of the Defendants in this case, and I want to ask |
| 02:05:18 | 15 | him about what he knows about the discovery that's been |
| 02:05:21 | 16 | produced in this lawsuit.  His company knows what's been |
| 02:05:28 | 17 | produced.  He is the representative. |
| 02:05:30 | 18 | THE COURT:  I'm going to overrule the objection. |
| 02:05:32 | 19 | Q.  (By Ms. Fair)  So, Mr. Repice, would it surprise you to |
| 02:05:35 | 20 | find out that Samsung has over 300 images from the |
| 02:05:39 | 21 | teardowns that Solas did of the Samsung phones before this |
| 02:05:42 | 22 | lawsuit was filed? |
| 02:05:43 | 23 | A.  So I can't attest for the amount of teardown documents, |
| 02:05:52 | 24 | but would it be surprising that there are some?  No.  But I |
| 02:05:56 | 25 | don't know how many there are. |

02:05:57   1   Q.   Do you know who Mr. Credelle is?

02:05:58   2   A.   I believe he was your technical expert.

02:06:01   3   Q.   And you know that Mr. Credelle, as part of the

02:06:05   4   discovery process, was provided confidential technical

02:06:09   5   information from Samsung Display Company, right?

02:06:13   6   A.   I understand that to be the case, yes.

02:06:15   7   Q.   And Mr. Credelle relied on the confidential technical

02:06:20   8   information produced by Samsung Display in this case,

02:06:24   9   right?

02:06:24   10   A.   I'd have to take your word for it.  I was out of the

02:06:27   11   courtroom for most of his testimony.

02:06:28   12   Q.   Would it surprise you if your own experts relied on the

02:06:33   13   confidential information, the technical information, that

02:06:37   14   Samsung Display produced in this case?

02:06:39   15   A.   I would assume that both sides relied on information

02:06:42   16   from Samsung Display.  I'm just not authorized to see it.

02:06:46   17   Q.   Your experts, there are two of them, right?

02:06:50   18   A.   Yes, sir -- I'm so sorry.  Yes, ma'am.

02:06:52   19   Q.   It's okay.

02:06:53   20        And neither of those experts relied on teardowns

02:06:59   21   that they had done for this case, right?

02:07:01   22   A.   Once again, I'm not in a position to answer that

02:07:05   23   because the teardowns are specific to SDC, which is

02:07:08   24   documents I don't have access to.  I'm not allowed to see

02:07:12   25   any of the design documentation specific to the display.

02:07:15  1  Q.  You would be able to see teardowns that your experts

02:07:19  2  would have done in this case had they done them, right?

02:07:22  3  A.  To be honest, I'm not sure, based on the rules of

02:07:26  4  confidentiality and proprietary.  If the teardowns include

02:07:33  5  proprietary information specific to SDC, I would not be

02:07:36  6  privy to that information.

02:07:37  7  Q.  And so you wouldn't find it unusual or you wouldn't be

02:07:41  8  critical of your own experts for having relied on the

02:07:43  9  confidential technical information that was provided in

02:07:45  10  this case, right?

02:07:46  11  A.  I'm not sure I follow the question.  You're asking me

02:07:50  12  about documentations that I haven't seen and I'm not

02:07:55  13  authorized to see.  I don't know how I can provide an

02:07:58  14  answer.

02:07:58  15  Q.  Are you confident in the opinions that you believe your

02:08:00  16  technical experts are going to offer in this case?

02:08:02  17  A.  Yes.  I believe that following their analysis based on

02:08:05  18  the documentation, that we do not believe we infringe.

02:08:08  19  Q.  And if that analysis doesn't include teardowns, you're

02:08:17  20  not saying that you would have to have these teardowns to

02:08:21  21  know whether or not there's infringement?

02:08:22  22  A.  I didn't participate in the technical evaluations.

02:08:26  23  Teardown may or may not be possible.  Once again, you're

02:08:29  24  asking me about technology I can't see.  So being an

02:08:31  25  engineer and wanting to have data and numbers, it's hard

02:08:34  1  for me to assess one way or the other without actually

02:08:37  2  being able to see the information you're asking.

02:08:39  3  Q.  If Samsung has a teardown that demonstrates

02:08:46  4  non-infringement, we would expect to see it, right?

02:08:49  5        MR. LERNER:  Objection to form, Your Honor.  This

02:08:52  6  is trying to shift the burden of proof.  This is an

02:08:54  7  improper line of questions.

02:08:58  8        THE COURT:  I'm going to overrule that objection.

02:09:00  9        However, Ms. Fair, there is an order in limine

02:09:04  10  from the Court with regard to discovery issues.  And I am

02:09:08  11  concerned that this line of questioning may cross that line

02:09:10  12  if it continues much further.

02:09:13  13        Are you in a position to move on, or are you

02:09:16  14  intending to press this issue further?

02:09:18  15        MS. FAIR:  Your Honor, I just wanted to -- I made

02:09:22  16  no suggestion about inappropriate conduct in the discovery

02:09:26  17  process.  The suggestion is, as was agreed in the limine,

02:09:30  18  that we can comment on the lack of evidence, and that's my

02:09:33  19  only point.

02:09:40  20        THE COURT:  All right.  Well, I'll overrule the

02:09:43  21  objection.  As I say, to the extent this witness has

02:09:46  22  knowledge and can speak for his corporate client on these

02:09:49  23  issues, that's fine.  To the extent he doesn't know, he

02:09:52  24  doesn't know.

02:09:52  25        MS. FAIR:  Yes, Your Honor.

02:09:53  1          THE COURT:  Let's proceed.

02:09:56  2  Q.  (By Ms. Fair)  If Samsung's experts had done teardowns

02:09:59  3  and had a teardown that showed non-infringement, you would

02:10:04  4  expect those experts to present that to this jury, right?

02:10:07  5  A.  If the documents would have existed, I would have

02:10:10  6  expected that.  But I don't know if they exist, once again

02:10:14  7  because I have no access to the SDC information.

02:10:18  8  Q.  You have a couple of phones in front of you?

02:10:20  9  A.  Actually, I don't.  I gave them to the court officer,

02:10:26  10  and he gave them back to our legal team.  They're over

02:10:29  11  there.

02:10:29  12  Q.  Do you remember what phones you had?

02:10:30  13  A.  Yes.  I can't give you the DTX numbers, but it was the

02:10:34  14  Galaxy S8 and Galaxy S8 Plus.

02:10:38  15          MS. FAIR:  Mr. Wietholter, can we pull up the

02:10:42  16  demonstrative, please?

02:10:44  17  Q.  (By Ms. Fair)  These look like pictures of those

02:10:47  18  phones?

02:10:47  19  A.  Yes, ma'am.

02:10:48  20  Q.  And they were released in the same year, right?

02:10:51  21  A.  Yes, that's correct.

02:10:52  22  Q.  And you showed the jury that they have the same curved

02:10:56  23  display, right?

02:10:56  24  A.  Yes.

02:10:57  25  Q.  That was the point you were making?

02:10:58  1   A.  I believe what I was saying is that one -- the S8 Plus

02:11:03  2   was bigger and had a larger battery, but fundamentally

02:11:06  3   they're -- outside of that, they're pretty much the same.

02:11:09  4   Q.  And you're saying that one of them has an ITO sensor

02:11:13  5   and one has a metal mesh?

02:11:14  6   A.  Actually, I didn't testify to that.  I said that one

02:11:19  7   is -- one is alleged of potential infringing and one is

02:11:23  8   not.

02:11:23  9   Q.  Okay.  If we put these on a timeline, you remember what

02:11:29  10  year these were released?

02:11:31  11  A.  If I had to guess, I would say 2017.  But I'm not a

02:11:38  12  hundred percent sure.

02:11:41  13       Okay.  Good guess.

02:11:43  14  Q.  So if we put these on a timeline, there were a series

02:11:47  15  of phones that came before these, right?

02:11:50  16  A.  Yes, ma'am.

02:11:52  17  Q.  Those phones look familiar?

02:11:53  18  A.  Yeah.

02:11:54  19  Q.  Note --

02:11:56  20  A.  Yes.

02:11:56  21  Q.  -- 3, Note 4, S6.

02:12:02  22  A.  I've worked on a few, yes.

02:12:04  23  Q.  And then there's been phones released after the S8 and

02:12:08  24  the S8 Plus, right?

02:12:09  25  A.  That's also correct.

02:12:10   1   Q.  Those phones look familiar?

02:12:12   2   A.  Yes, they also do.

02:12:13   3   Q.  You generally agree this is the timeline of releases of

02:12:16   4   phones, some of the flagship phones that Samsung has,

02:12:20   5   right?

02:12:20   6   A.  It depends on how you're laying this out.  Typically,

02:12:25   7   the Galaxy or the S Series lines would launch in

02:12:31   8   conjunction with each other.  So having the S10 shown after

02:12:34   9   the -- sorry, the S10 Plus shown after the S10 is

02:12:39  10   technically inaccurate in terms of the timeline that's

02:12:43  11   represented here.

02:12:44  12           But, in general, we would have an S Series

02:12:47  13   launched, let's say, in the first quarter of the year.  And

02:12:50  14   then a Note Series launch would be later in, say, Q3 of

02:12:55  15   that same year.

02:12:56  16   Q.  Do you know why these are separated in two groups?

02:12:59  17   A.  If I had to guess, I would say that -- well, no, that

02:13:09  18   can't be it, because some of the curved models are on top,

02:13:14  19   as well.

02:13:15  20           THE COURT:  Why don't we do this, Mr. Repice, why

02:13:17  21   don't you say:  Yes, I know, or, no, I don't know?

02:13:21  22   A.  No, I don't know.

02:13:22  23   Q.  (By Ms. Fair)  The ones on the top are not accused of

02:13:25  24   infringing the '311 patent, and the ones on the bottom are

02:13:28  25   accused of infringing the '311 patent.  That's the touch

02:13:33   1   sensor patent, right?

02:13:33   2   A.   Yes.

02:13:34   3   Q.   Does it look like Samsung transitioned from one touch

02:13:40   4   sensor to another?

02:13:40   5   A.   Well, it looks like when we went to the S8, which is on

02:13:54   6   the line, the two models launched at the same time.  So it

02:13:59   7   looks like one launched with one implementation and another

02:14:03   8   launched with a different implementation.  And then it

02:14:05   9   looks like some of the models after that used a similar

02:14:08  10   implementation.  But without having access to detailed

02:14:12  11   specs, I can't attest to more than that.

02:14:16  12   Q.   Did you know before this case that these

02:14:19  13   phones' sensors went from ITO to metal mesh around the 2017

02:14:23  14   time period?

02:14:24  15   A.   Prior to this case, no.

02:14:25  16   Q.   So you at SEA, Samsung Electronics, the cell phone

02:14:31  17   company, you're not involved in what sensor -- touch sensor

02:14:36  18   goes into the phones, right?

02:14:37  19   A.   I think when I testified earlier, I indicated that the

02:14:40  20   phones are actually produced by SEC and then they are sold

02:14:44  21   by SEA.  And I actually work for SEA.  So I'm not directly

02:14:47  22   involved with component selection.

02:14:49  23   Q.   You're here as the representative for both SEC and SEA,

02:14:56  24   right?

02:14:56  25   A.   That's correct.

02:14:56   1   Q.   The two companies involved with making and selling the

02:15:00   2   cell phones, right?

02:15:00   3   A.   Yes, that's correct.

02:15:01   4   Q.   And the decision of what sensor goes into the display

02:15:05   5   is made by SDC, right?

02:15:07   6   A.   I'm sorry.  You have to repeat the question because I

02:15:11   7   think you had one of the acronyms incorrect.

02:15:13   8   Q.   The decision of which sensor, which touch sensor goes

02:15:19   9   into the display is made by SDC, Samsung Display Company?

02:15:24  10   A.   So the display is purchased by SEC.  If the touch

02:15:30  11   sensor is included in the display as a complete offering,

02:15:34  12   then it would be made by SEC.  But once again, I -- you'd

02:15:37  13   have to know the underlying details there.

02:15:39  14   Q.   Do you know Minuk Kim?

02:15:46  15   A.   No, ma'am, I can't say that I do.

02:15:48  16   Q.   That was a 30(b)(6) witness in this case on behalf of

02:15:51  17   SEC, the company that you're sitting on the stand

02:15:54  18   testifying for as a corporate representative.

02:15:57  19   A.   Samsung has over 300,000 employees.  I don't know all

02:16:03  20   of them.

02:16:04  21   Q.   Would it surprise --

02:16:06  22         THE COURT:  Let's ask questions rather than make

02:16:09  23   statements to the witness.

02:16:09  24         MS. FAIR:  Yes, Your Honor.

02:16:10  25         THE COURT:  He said he didn't know.  And then you

02:16:11  1    told him who the person was.  You're not here to make

02:16:13  2    statements.  You're here to ask questions.

02:16:15  3              MS. FAIR:  Yes, Your Honor.

02:16:16  4              THE COURT:  And in this context they may be

02:16:20  5    leading questions, but they still need to be questions.

02:16:23  6    Q.  (By Ms. Fair)  Would it surprise you if the corporate

02:16:29  7    representative testifying for SEC in this case said that

02:16:34  8    SDC is the company that selects the touch sensor that goes

02:16:39  9    into the display module?

02:16:40  10   A.  I think I already answered your first question when I

02:16:43  11   said it depends on the selection of the module whether or

02:16:48  12   not the sensor is included in the display.  It's not part

02:16:50  13   of my day-to-day responsibilities in my regular job.  I'm

02:16:56  14   trying to answer as best as I can to my personal knowledge.

02:17:00  15   Q.  We were told in opening -- you were here, right?

02:17:04  16   A.  Yes, for the opening, I was.

02:17:05  17   Q.  And we were told that Samsung came out with a new touch

02:17:09  18   sensor in 2017.  Did you hear that?

02:17:11  19   A.  Yes, ma'am, I did.

02:17:12  20   Q.  Does that look consistent with this timeline as to what

02:17:16  21   happened with the touch sensors in Samsung's phones?

02:17:19  22   A.  I would say it's consistent with the timeline, but I

02:17:23  23   don't know details specific to the touch sensor.

02:17:24  24   Q.  Samsung is, as you testified on direct and as we've

02:17:28  25   heard, an innovative company, cutting edge, right?

02:17:32  1   A.  Yes, I believe I said that.

02:17:34  2   Q.  The next big thing, I think, is the phrase you used on

02:17:42  3   your direct, right?

02:17:43  4   A.  It's been in a few of our commercials, yes.

02:17:46  5   Q.  And, in fact, you've told this jury that the reason

02:17:49  6   that SEC and SEA source their displays from Samsung Display

02:17:54  7   is because Samsung Display is so advanced in their

02:17:57  8   technology, right?

02:17:58  9   A.  I said they were an innovative display component

02:18:02  10  manufacturer, yes.

02:18:04  11  Q.  So you would expect when they switched touch sensors,

02:18:08  12  that they moved to a better touch sensor, right?

02:18:10  13  A.  I would assume that they moved to a different touch

02:18:13  14  sensor.  You'd have to quantify "better."  Remember, the

02:18:17  15  touch sensor is actually being integrated into a full

02:18:19  16  product.  Until it gets integrated into a phone --

02:18:22  17          THE COURT:  Mr. Repice, you're way beyond the

02:18:25  18  questions that she asked.

02:18:26  19          THE WITNESS:  Okay.  I'm sorry, Your Honor.

02:18:27  20          THE COURT:  You need to limit your answers to the

02:18:31  21  questions that she asks.  Okay.

02:18:32  22          THE WITNESS:  Yes, sir.

02:18:33  23          THE COURT:  Let's proceed, Ms. Fair.

02:18:34  24  Q.  (By Ms. Fair)  So you think Samsung Display would

02:18:37  25  change sensors to a worse touch sensor?

02:18:38   1   A.   No, that's not what I said.   I said it would be

02:18:41   2   different.   I just said I couldn't quantify "better"

02:18:44   3   without results.

02:18:45   4   Q.   When you make changes in the phones that SEA sells, do

02:18:48   5   you generally make changes to make the phone better?

02:18:50   6   A.   We attempt to, and sometimes it works, and sometimes it

02:18:53   7   doesn't.

02:18:54   8           THE WITNESS:   Am I allowed to give an example,

02:18:57   9   Your Honor?

02:18:57   10           THE COURT:   Not unless she asks you to.

02:18:59   11           THE WITNESS:   Okay.   Thank you.

02:19:00   12   Q.   (By Ms. Fair)   And when it works, you continue with

02:19:02   13   what choice you made to make the phone better, right?

02:19:04   14   A.   Once again, it will depend on the technology at the

02:19:09   15   time and where we're going.

02:19:10   16   Q.   So you're saying if you make a change to your phone and

02:19:13   17   it doesn't make the phone better, you're going to stick

02:19:15   18   with that change anyway?

02:19:16   19   A.   What I'm saying is, when you make an evaluation of

02:19:20   20   choosing technology, you're making the evaluation at a

02:19:25   21   specific point in time based on the information that you

02:19:27   22   have at your disposal.   If the technology hasn't gotten

02:19:30   23   better, you may have to keep your current choice.

02:19:33   24   Q.   And when the technology options get better, you switch

02:19:36   25   to the better option?

02:19:37  1   A.   Potentially.   When you choose new technology, you also

02:19:40  2   have to spend money.   You have to integrate it.   You have

02:19:44  3   to actually develop incorporations of the new feature.   You

02:19:48  4   have to spend non-recurring engineering costs.   So it's all

02:19:52  5   going to depend on the time.   You can't make a decision

02:19:55  6   without knowing all the parameters.

02:19:56  7          MS. FAIR:   Objection, nonresponsive.

02:19:59  8          THE COURT:   Sustained.

02:20:03  9          The question was:   And when the technology options

02:20:06  10  get better, you switch to the better option?

02:20:08  11          You answered:   Potentially.

02:20:10  12          And then without prompting, you started to explain

02:20:13  13  to everybody in the room what you mean by the word

02:20:16  14  "potentially" and give examples for it.   That is -- that is

02:20:20  15  not within the scope of what the question calls for.   You

02:20:23  16  answered the question when you said the first word, and I'm

02:20:26  17  going to strike everything of your answer, except

02:20:29  18  "potentially."

02:20:30  19          I'm going to remind you again, Mr. Repice, to

02:20:33  20  limit your answers to the questions asked.

02:20:35  21          Mr. Lerner is going to get another chance to go to

02:20:37  22  that same podium and ask you any other questions he wants

02:20:41  23  to.   So don't feel you have to correct everything as you

02:20:44  24  sit there on the stand.

02:20:45  25          Your job is not to correct the questions.   Your

02:20:49  1   job is to answer the questions within the scope of the way

02:20:51  2   they're presented.  And if there's correction that's

02:20:54  3   needed, if there's revisiting that's needed, if there are

02:20:57  4   examples or further explanation that's needed, that's

02:21:01  5   Mr. Lerner's job, and he'll call for that when he goes back

02:21:04  6   to the podium.  That's the way this process works.

02:21:07  7           Is that clear?

02:21:09  8           THE WITNESS:  Yes, sir.

02:21:09  9           THE COURT:  Okay.  Let's go forward on that basis.

02:21:14  10          MS. FAIR:  Mr. Wietholter, can we please have

02:21:16  11  Slide 33, I believe it is, from the opening?

02:21:22  12          MR. LERNER:  Objection, Your Honor.  This is a

02:21:24  13  Samsung Display confidential document.  As Mr. Repice

02:21:27  14  explained, he left the room because he's not entitled to

02:21:30  15  access it.

02:21:31  16          MS. FAIR:  Your Honor, may I respond?

02:21:32  17          THE COURT:  Yes.

02:21:33  18          MR. LERNER:  Put the slide down, please --

02:21:35  19          THE COURT:  The slide is down.

02:21:37  20          MS. FAIR:  What we put on the screen was the

02:21:38  21  opening slide that was shown in open court intentionally

02:21:42  22  because we know that Mr. Repice cannot see Samsung

02:21:45  23  Display's confidential information.

02:21:47  24          THE COURT:  If it was shown during opening

02:21:50  25  statements in open court, then it's fair game.  If it's

02:21:53  1   confidential and marked confidential and has been protected

02:21:57  2   through the sealing process in its earlier use before the

02:22:01  3   jury, then it certainly can't be presented in open court

02:22:05  4   right now.

02:22:06  5        I will have to rely on you all to look at it and

02:22:09  6   tell me, is this the slide that was used in opening or not?

02:22:12  7   If it is, then it's fair game.

02:22:15  8        Do you have any basis to tell me this is not the

02:22:17  9   slide used in opening, Mr. Lerner?

02:22:19  10       MR. LERNER:  I don't, Your Honor.  It also lacks

02:22:21  11  foundation because the witness --

02:22:23  12       THE COURT:  I didn't ask you if you had another

02:22:24  13  objection.  I'll get to that in a minute.

02:22:26  14       MR. LERNER:  Thank you.

02:22:27  15       THE COURT:  Do you have a hard copy of it,

02:22:29  16  Ms. Fair?  Of the slide?

02:22:30  17       MS. FAIR:  Yes, sir.

02:22:31  18       THE COURT:  You show it to Mr. Lerner, and then

02:22:34  19  we'll determine if there's any dispute about whether it was

02:22:37  20  used in opening statements.

02:22:51  21       MR. LERNER:  I'll take your representation if

02:22:53  22  that's the case.

02:22:53  23       THE COURT:  All right.  It appears that we're now

02:22:56  24  clear that it was used in opening statements; therefore,

02:22:58  25  it's properly used with cross-examination of this witness.

02:23:00  1          Once she puts it up and purports to use it, if you

02:23:04  2   have other objections, you can make them at that time,

02:23:06  3   Mr. Lerner.

02:23:07  4          MR. LERNER:  Thank you.

02:23:08  5          THE COURT:  Let's proceed, Ms. Fair.

02:23:10  6          MS. FAIR:  Thank you, Your Honor.

02:23:11  7   Q.  (By Ms. Fair)  You were here for opening statements,

02:23:13  8   right, Mr. Repice?

02:23:14  9   A.  Yes, ma'am.  Yes, I was.

02:23:16  10  Q.  And you saw this slide in opening statements, right?

02:23:19  11  A.  I believe so, yes.

02:23:19  12  Q.  And one of the things you were just telling us about

02:23:23  13  when you switched technology, when you make a change in a

02:23:27  14  product, that you might consider would be costs, right?

02:23:31  15  A.  I said that is one of the possible things to consider,

02:23:35  16  yes.

02:23:35  17  Q.  And you told this jury on direct that Samsung

02:23:43  18  Electronics America, when it's marketing the phone, doesn't

02:23:45  19  market the transistor structure of the display, right?

02:23:48  20  A.  Not typically, but I was speaking for SEA at the time.

02:23:52  21  The question was asked in my capacity for the U.S. market,

02:23:55  22  which would be SEA.

02:23:56  23  Q.  And when you are marketing phones for SEA, you do

02:24:01  24  market that you have a better display, right?

02:24:04  25  A.  A display is one of the components that we market, yes.

02:24:08  1   Q.  Samsung tells its customers, we make better pictures,

02:24:12  2   better graphics, right?

02:24:14  3   A.  That's part of the story.

02:24:16  4   Q.  You have better colors on your screen, right?

02:24:21  5   A.  Once again, that's -- display is part of that

02:24:25  6   component.  There's underlying software to generate those

02:24:27  7   photos.  But display is how it's seen.

02:24:30  8   Q.  And that's what you market to your customers?

02:24:32  9   A.  We also market the size of the display, as well, once

02:24:37  10  again, and the brightness and the resolution.

02:24:39  11  Q.  And the shape of the display, right?

02:24:40  12  A.  At times, yes.

02:24:42  13          MS. FAIR:  Mr. Wietholter, can we have the opening

02:24:45  14  slide that shows the benefits of the '338 patent?

02:24:52  15  Q.  (By Ms. Fair)  You understand in this case, the

02:24:54  16  benefits that Solas identifies for the '338 patent are

02:25:03  17  accurate brightness, uniform display, greater contrast

02:25:08  18  ratio, right?

02:25:08  19  A.  I understand that's your -- the position you're

02:25:13  20  claiming, but I've seen no quantitative data to prove these

02:25:18  21  benefits.  I don't have the results.

02:25:19  22  Q.  You're not allowed to see Samsung Display's

02:25:22  23  confidential information --

02:25:23  24          THE COURT:  Wait a minute.

02:25:24  25          Mr. Repice, you obviously didn't get my

02:25:27   1   instruction a few minutes ago about going beyond the scope
02:25:30   2   of the question that was asked.
02:25:31   3           She asked you:  Did you know that these were the
02:25:35   4   benefits claim by Solas?
02:25:37   5           And you said:  Yes, I know you claimed those,
02:25:40   6   but...
02:25:40   7           And then you started to explain how you didn't
02:25:42   8   know whether that was right or not.
02:25:44   9           She didn't ask you to go beyond the answer of,
02:25:48   10  were you aware those were the benefits claimed by Solas.
02:25:51   11          You're injecting information and answers that are
02:25:54   12  not called for, and that's not proper in a court of law.
02:25:58   13  It may be perfectly proper in a laboratory where engineers
02:26:02   14  are working on a scientific problem, but that is not the
02:26:04   15  way a trial before a jury in a United States District
02:26:09   16  Court, consistent with the Federal Rules of Civil
02:26:11   17  Procedure, is to be conducted.
02:26:13   18          And that's part of why I'm sitting up here, to
02:26:16   19  make sure it's done the way the Rules of Federal -- of
02:26:19   20  Civil Procedure require.
02:26:21   21          And so I'm telling you again, sir, limit your
02:26:23   22  answers to the scope of the question asked.  Your counsel
02:26:26   23  is going to get a chance to reexplore any and all these
02:26:29   24  issues he thinks necessary.  But if you continue to be
02:26:33   25  non-responsive, I'll have to assume you're intentionally

02:26:36    1    disregarding my instruction.

02:26:37    2            So having given it to you twice and having made it

02:26:40    3    as simple and as straightforward as I can make it, I'll

02:26:43    4    trust that you don't do it in the future.  If you continue

02:26:46    5    to, I'll have to assume it's an intentional disregarding of

02:26:49    6    my instructions to you.

02:26:51    7            Do you understand me, sir?

02:26:52    8            THE WITNESS:  Yes, sir.

02:26:53    9            THE COURT:  Okay.

02:26:54   10            THE WITNESS:  Sorry.

02:26:54   11            THE COURT:  It's not that hard.  Just answer the

02:26:56   12    question and stop.

02:26:57   13            THE WITNESS:  I'm sorry.

02:26:58   14            THE COURT:  All right.  Counsel, let's go forward.

02:27:00   15            MS. FAIR:  Thank you, Your Honor.

02:27:01   16            Mr. Wietholter, can we see the benefits of the

02:27:04   17    '450 patent?  The slide that was shown in opening.

02:27:08   18    Q.  (By Ms. Fair)  You saw this slide, too, right,

02:27:11   19    Mr. Repice?

02:27:11   20    A.  Yes, ma'am.

02:27:11   21    Q.  And you understand the benefits that Solas is claiming

02:27:17   22    the '450 patent offers are brighter display, a longer

02:27:20   23    display lifetime, and avoiding performance degradation for

02:27:25   24    light-hitting transistor, right?

02:27:28   25    A.  Yes, I understand those are the benefits that Solas is

02:27:31   1   claiming.

02:27:33   2   Q.   And I understand that Samsung Electronics America -- I

02:27:36   3   haven't seen y'all marketing metal mesh touch sensors.

02:27:40   4   Sound right?

02:27:42   5   A.   No, ma'am, I don't believe we do.

02:27:44   6   Q.   But you do market having an Infinity Display, right?

02:27:48   7   A.   That's the marketing name for the display we're

02:27:52   8   currently using, yes.

02:27:55   9         MS. FAIR:   Mr. Wietholter, can we go back to the

02:27:57   10   timeline with the phones, please?

02:28:00   11   Q.   (By Ms. Fair)   The display you're currently using that

02:28:03   12   you've been using for a while, right?

02:28:05   13   A.   Yes.

02:28:05   14   Q.   And you understand in this case, more importantly, the

02:28:13   15   advantage that Solas is talking about, that the touch

02:28:17   16   sensor patent offers, is cost savings provided to Samsung

02:28:21   17   Display and the manufacturer, right?

02:28:24   18   A.   I understand that's the claim you're making, yes.

02:28:26   19   Q.   We're not telling this jury that the use -- the

02:28:32   20   infringement of Samsung is based on marketing of a metal

02:28:37   21   mesh touch sensor to consumers, right?

02:28:38   22   A.   No, I don't believe it is.

02:28:40   23   Q.   In the S10 lineup of phones -- you see three S10s on

02:29:01   24   this screen?

02:29:02   25   A.   Yes, ma'am, I do.

| | | |
|---|---|---|
| 02:29:03 | 1 | Q. There's another S10 phone, right? |
| 02:29:05 | 2 | A. There's an S10e that's not listed. |
| 02:29:07 | 3 | Q. And it was released around the same time as these S10 |
| 02:29:11 | 4 | phones? |
| 02:29:11 | 5 | A. It was released at the same time as the S10 and the S10 |
| 02:29:16 | 6 | Plus.  I believe the S10 5G was launched a little later. |
| 02:29:21 | 7 | Q. This look like the S10e phone on the screen right now? |
| 02:29:25 | 8 | A. Yes, it does. |
| 02:29:37 | 9 | Q. Do you know whether the S10e -- well, let me ask this: |
| 02:29:43 | 10 | If someone were to suggest that the S10e has a curved |
| 02:29:49 | 11 | display just like the other phones that we saw, that are on |
| 02:29:54 | 12 | the bottom half of this slide, would that be accurate? |
| 02:29:56 | 13 | A. No, it would not be. |
| 02:29:58 | 14 | Q. The S10e has a flat screen, right? |
| 02:30:05 | 15 | A. Yes, that's correct. |
| 02:30:07 | 16 | Q. And you understand that the '311 patent, the touch |
| 02:30:11 | 17 | sensor patent that we're talking about here, Solas's |
| 02:30:17 | 18 | allegations relate to a curved display, right? |
| 02:30:20 | 19 | A. I understand that's part of the claims in the patent, |
| 02:30:22 | 20 | yes. |
| 02:30:23 | 21 | Q. That's right.  And the other part is using a metal mesh |
| 02:30:26 | 22 | touch sensor, right? |
| 02:30:26 | 23 | A. I believe from the opening, yes. |
| 02:30:33 | 24 | MS. FAIR:  Mr. Wietholter, can we go to the slide |
| 02:30:36 | 25 | from opening that shows the damages calculation? |

506

02:30:49  1   Q.  (By Ms. Fair)  On the left, this column here, the

02:30:57  2   amount -- the $1 amounts that we see there are not for

02:31:03  3   sales of the phone itself, right?

02:31:04  4   A.  From what I understand during the brief part I could

02:31:09  5   attend, that's correct.  It was for the display sales.

02:31:11  6   Q.  So you understand that Solas is seeking a royalty on

02:31:17  7   the display modules of the phones, right?

02:31:20  8   A.  Yes, I understand that.

02:31:22  9   Q.  And so the marketing that Samsung Electronics has to

02:31:26  10  its customers about -- distancing yourself from the

02:31:32  11  marketing of metal mesh or the structure of transistors,

02:31:36  12  we're not talking about the phones when we're talking about

02:31:39  13  the royalty, are we?

02:31:40  14  A.  I believe in the slides that Mr. Dell presented, he was

02:31:44  15  speaking to the displays.

02:31:46  16  Q.  The royalty that we're seeking here is based off of

02:31:52  17  revenues from the OLED display modules, right?

02:31:55  18  A.  That's my understanding, yes.

02:31:56  19  Q.  Would you expect the $3.54 billion to go up or down if

02:32:02  20  we were to use the actual cell phone cost instead of the

02:32:08  21  display?

02:32:08  22  A.  I'm sorry, can you repeat the question?

02:32:10  23  Q.  For each of these display modules that were sold of the

02:32:16  24  $3.5 billion, would you expect that amount to go up or down

02:32:20  25  if we would have instead used the entire phone?

02:32:24  1         MR. LERNER:  Objection, relevance.

02:32:26  2         THE COURT:  Overruled.

02:32:28  3  Q.  (By Ms. Fair)  Would you have expected the $5.1 billion

02:32:33  4  in OLED display module revenues to go up or down if we were

02:32:37  5  looking at the phone instead of the display?

02:32:42  6  A.  Well, the phone as a whole would cost more than just

02:32:45  7  the display.

02:32:46  8  Q.  Samsung Display makes the displays, right?

02:33:05  9  A.  Yes, ma'am.

02:33:08  10  Q.  Samsung Electronics Company puts the phone together,

02:33:11  11  right?

02:33:11  12  A.  That's also correct.

02:33:12  13  Q.  And then imports it into the United States?

02:33:15  14  A.  Actually, SEA imports it into the U.S. from SEC.

02:33:19  15  Q.  And so you know that SEA, as the company that sells the

02:33:25  16  phones in the United States, is liable for its own

02:33:29  17  infringement for those sales, right?

02:33:31  18  A.  I understand that if the company imports the phone,

02:33:34  19  then, yes, they are liable.

02:33:36  20  Q.  You know what Solas's business model is, right?

02:33:43  21  A.  I was here for the -- sorry, the intro, as well as

02:33:52  22  Mr. Padian's introduction, so, yes.

02:33:54  23  Q.  I'm going to read you a sentence, and I want you to

02:34:04  24  tell me if it sounds right to be reminiscent of Solas's

02:34:10  25  business model, okay?

02:34:11  1    A.   Okay.

02:34:11  2    Q.   "Our highly capable team of experts continues to

02:34:16  3    identify, develop, and aggregate IP portfolios that are

02:34:19  4    critical and indispensable to technology companies, and

02:34:23  5    offers them fair and reasonable licensing or acquisition

02:34:27  6    opportunities, thereby spreading IP risks and costs across

02:34:32  7    our extensive network of technology companies."

02:34:35  8              MR. LERNER:  Objection, Your Honor.  Lacks

02:34:37  9    foundation, calls for opinions.  There's no information the

02:34:42  10   witness has.

02:34:42  11             THE COURT:  The question is:  Does it sound

02:34:45  12   reminiscent of Solas's business model?  He can either say,

02:34:50  13   yes, it does, or, no, it doesn't, or I don't have any idea,

02:34:53  14   but he can answer the question.

02:34:55  15             Objection is overruled.

02:34:57  16   A.   I'm sorry to make you read it again, but can you read

02:34:59  17   it again?

02:35:00  18   Q.   (By Ms. Fair)  Sure.

02:35:01  19             "Our highly capable team of experts continues to

02:35:07  20   identify, develop, and aggregate IP portfolios that are

02:35:13  21   critical and indispensable to technology companies, and

02:35:17  22   offers them fair and reasonable licensing or acquisition

02:35:20  23   opportunities, thereby spreading IP risks and costs across

02:35:24  24   our extensive network of technology companies."

02:35:28  25   A.   Well, I don't have details of what Solas does outside

02:35:31  1  of what was introduced in the court, so I don't really know

02:35:36  2  their business model.  So I don't -- I don't really know.

02:35:41  3  Q.  You know that Mr. Padian testified that they acquire

02:35:46  4  patents and negotiate licenses using experts to help them

02:35:50  5  in that process, right?

02:35:51  6  A.  I heard that part, yes.

02:35:52  7  Q.  You've heard of Intellectual Keystone Technology?

02:36:04  8  A.  I'm sorry, can you give me the name again?

02:36:06  9  Q.  Intellectual Keystone Technology.

02:36:09  10  A.  Actually, I don't think I'm familiar with that company.

02:36:12  11  Q.  You're here as the corporate representative of Samsung

02:36:16  12  Electronics Company, right?

02:36:16  13  A.  That's correct.

02:36:17  14  Q.  And Samsung Electronics America, right?

02:36:19  15  A.  That's also correct.

02:36:20  16  Q.  You were here for Mr. Padian's testimony?

02:36:26  17  A.  Yes.

02:36:26  18  Q.  You heard him tell us that Intellectual Keystone goes

02:36:31  19  out and buys patents to seek to license those patents and

02:36:35  20  enforce those patents, right?

02:36:36  21  A.  I don't remember hearing if that was the name.  But if

02:36:42  22  you're telling me that's was what said during opening, but

02:36:45  23  I wasn't familiar with that company before.

02:36:53  24       MS. FAIR:  Mr. Wietholter, can we pull up

02:36:56  25  Samsung's first quarter 2013 interim consolidated financial

02:37:01  1   statements?

02:37:08  2         MR. LERNER:  Objection, Your Honor.  This is not

02:37:09  3   on the exhibit list, and this is not impeachment.

02:37:11  4         MS. FAIR:  It's cross-examination of a corporate

02:37:14  5   representative with an SEC statement, their own financial

02:37:18  6   statements publicly available on their website.

02:37:20  7         THE COURT:  Is there any potential order in limine

02:37:23  8   that would impact this that you're aware of, Mr. Lerner?

02:37:26  9   If not, I'm going to let her go forward.

02:37:28  10        MR. LERNER:  Depends where she goes with this,

02:37:31  11  Your Honor.

02:37:31  12        THE COURT:  Well, I guess we need to see it first.

02:37:39  13  You're welcome to reurge any additional objections you

02:37:41  14  think are appropriate once it's visible.

02:37:47  15  Q.  (By Ms. Fair)  At the very top you see, Samsung

02:37:50  16  Electronics Company, Limited, and Subsidiaries?

02:37:52  17  A.  Yes.

02:37:52  18  Q.  And Samsung provides to the public financial statements

02:37:58  19  every quarter, right?

02:37:59  20  A.  That's also true, yes.

02:38:00  21  Q.  You can go get them off Samsung's website?

02:38:04  22  A.  Yes, I believe that's correct.

02:38:05  23  Q.  And in the third paragraph under Company Overview, the

02:38:16  24  second sentence, SEC, that's Samsung Electronics Company,

02:38:20  25  right?

511

02:38:20   1    A.  Yes.

02:38:21   2    Q.  As the controlling company, consolidates its 164

02:38:27   3    subsidiaries.  And the two that are identified here are the

02:38:30   4    two subsidiaries sitting in this courtroom, right?  Samsung

02:38:36   5    Display, Samsung Electronics America?

02:38:38   6    A.  Yes.

02:38:38   7    Q.  And then if we go further down on that same page, we

02:38:41   8    see a table.  And one of the subsidiaries that's 100

02:38:52   9    percent owned by Samsung is Intellectual Keystone

02:38:59   10   Technology, right?

02:39:00   11   A.  It's on the list, yes.

02:39:02   12   Q.  Would it surprise you to know that Intellectual

02:39:12   13   Keystone Technology bought OLED patents from Seiko, the

02:39:17   14   watch company?

02:39:17   15   A.  I'm not familiar with what they purchased, so I don't

02:39:20   16   know if I can say that I'm surprised or not.

02:39:22   17         MS. FAIR:  Mr. Wietholter, can we go to the first

02:39:26   18   half 2013 business report?

02:39:34   19   Q.  (By Ms. Fair)  And if we look at the bottom of this

02:39:36   20   page, the very bottom right, you know what that number is?

02:39:44   21   A.  I would assume it's a number for -- a Bates number

02:39:48   22   maybe, produced in the case.

02:39:49   23   Q.  And you know what SEC means?

02:39:50   24   A.  Samsung Electronics Company?

02:39:52   25   Q.  So this is a document produced in this case by Samsung

02:39:56  1  Electronics Company.

02:39:59  2  A.  It would appear to be so, yes.

02:40:00  3  Q.  And if we go to the second page of this document, this

02:40:07  4  is a start of a table that goes for several pages, and we

02:40:09  5  see the headings we're looking at are Subsidiary,

02:40:15  6  Established In, and Major Business, and there's others

02:40:19  7  there.  But there's at least those first three columns,

02:40:23  8  right?

02:40:23  9  A.  Yes, that's correct.

02:40:24  10  Q.  If we go to Page 8, we see Intellectual Keystone

02:40:44  11  Technology, right?

02:40:45  12  A.  Yes.

02:40:45  13  Q.  Established in March 2013?

02:40:47  14  A.  Yes.

02:40:49  15  Q.  New technology investment is the major business of that

02:40:56  16  company, right?

02:40:56  17  A.  Yes, that's what the document says.

02:40:58  18  Q.  Document produced by Samsung Electronics Corporation,

02:41:02  19  the company that you're the corporate representative --

02:41:05  20  representative of today, right?

02:41:07  21  A.  Yes, that's correct.

02:41:22  22  Q.  If we go -- well --

02:41:27  23        MS. FAIR:  Mr. Wietholter, may we please have the

02:41:31  24  2014 first quarter Business Report?

02:41:37  25  Q.  (By Ms. Fair)  We see in the bottom right again the

02:41:41  1  Bates label that shows this is another document produced by

02:41:45  2  Samsung Electronics Company, right?

02:41:46  3  A.  Yes.

02:41:47  4  Q.  The company that you're the corporate representative

02:41:48  5  of?

02:41:48  6  A.  Also true.

02:41:50  7        MS. FAIR:  And if we go to Bates Page 0671847,

02:42:02  8  please.

02:42:02  9  Q.  (By Ms. Fair)  We see headings of a table that starts

02:42:05  10  on this page Investor, Investee, and Stake.  Right?

02:42:13  11  A.  Yes.

02:42:13  12  Q.  And so that tells us the company listed in the far left

02:42:18  13  column is the one that owns some portion of the company

02:42:21  14  listed in the second column, right, investor, investee?

02:42:26  15  A.  I would assume that's what those terms mean, yes.

02:42:28  16        MS. FAIR:  Mr. Wietholter, can we please go to

02:42:31  17  Bates Page 0671854?

02:42:41  18  Q.  (By Ms. Fair)  And right there at the top, we see,

02:42:43  19  Intellectual Keystone Technology LLC, right?

02:42:44  20  A.  That's the highlighted portion, yes.

02:42:47  21  Q.  And who is it that is reflected as having ownership

02:42:51  22  interest in that company?

02:42:52  23  A.  SEA, or Samsung Electronics America.

02:43:04  24        MS. FAIR:  Thank you, Mr. Wietholter.

02:43:06  25  Q.  (By Ms. Fair)  But you're not aware that Intellectual

02:43:08  1  Keystone Technology has purchased patents from Seiko, the

02:43:11  2  watch company, patents in the OLED space?

02:43:13  3  A.  In my personal capacity at my job, no, I'm not aware.

02:43:18  4  Q.  Would it surprise you to find out that the statement I

02:43:25  5  read of the business model of aggregating an IP portfolio

02:43:28  6  and licensing it came from Intellectual Keystone

02:43:31  7  Technology's website?

02:43:31  8  A.  Once again, I wasn't aware of the company, as I

02:43:35  9  attested to, so I don't know.

02:43:36  10  Q.  Samsung is proud of their products, right?

02:43:42  11  A.  Yes, ma'am.

02:43:43  12  Q.  Innovative company?

02:43:44  13  A.  We try to be.

02:43:45  14  Q.  You told us about all the CES awards?

02:43:52  15  A.  I mentioned CES and that we received a number of them,

02:43:54  16  yes.

02:43:54  17  Q.  But Samsung doesn't have a monopoly on good ideas?

02:43:58  18  A.  No, we don't corner the market on good ideas.

02:44:01  19  Q.  One of the ideas that we've heard about that Samsung

02:44:08  20  showed in its owning was curved displays, right?

02:44:11  21  A.  I believe that was part of the opening.

02:44:13  22  Q.  And I think it was 2009/2014 was the time period where

02:44:19  23  they were looking at curved displays?

02:44:22  24  A.  I don't recall the specific dates from the opening.

02:44:24  25         MS. FAIR:  Mr. Wietholter, can we have PTX-650,

02:44:29  1  please?

02:44:31  2  Q.  (By Ms. Fair)  You were here for Mr. Shaikh's

02:44:32  3  testimony, right?

02:44:33  4  A.  Yes, I was.

02:44:34  5  Q.  And you remember he worked for a company called Atmel?

02:44:37  6  A.  Yes.

02:44:38  7  Q.  And he testified that he was visiting Samsung over and

02:44:42  8  over and over in 2012, 2011, 2013, for several years.  Do

02:44:49  9  you remember him testifying to that?

02:44:51  10  A.  I remember him saying that he had visited Samsung.  I

02:44:54  11  believe -- I think he mentioned two divisions, but one of

02:44:58  12  them, I think, was specific to the display.

02:45:00  13  Q.  And he was showing Samsung his technology over and over

02:45:02  14  and over again, right?

02:45:04  15        MR. LERNER:  Objection, Your Honor, lacks

02:45:05  16  foundation.  She's just asking the witness what he's heard

02:45:09  17  attending trial.

02:45:10  18        MS. FAIR:  He's the corporate representative,

02:45:12  19  Your Honor.

02:45:12  20        THE COURT:  I'm well aware of that, counsel.

02:45:14  21        Restate your question, Ms. Fair.

02:45:20  22  Q.  (By Ms. Fair)  You heard Mr. Shaikh testifying that he

02:45:23  23  was visiting Samsung over and over and over, right?

02:45:27  24        MR. LERNER:  Same objection.

02:45:29  25        THE COURT:  I'll allow her to ask what he heard in

02:45:33   1   the courtroom.

02:45:33   2        But the -- this witness is not going to be a

02:45:38   3   device by which prior testimony is going to be replayed to

02:45:41   4   the jury.  You need to make a point and move on, Ms. Fair.

02:45:44   5        MS. FAIR:  Yes, Your Honor.

02:45:45   6   Q.  (By Ms. Fair)  You heard that, right?

02:45:46   7   A.  I heard that he visited Samsung as part of his

02:45:50   8   testimony, yes.

02:45:51   9   Q.  And this is one of the presentations he showed us,

02:45:54  10   right?

02:45:54  11   A.  I believe this is one of the presentations that we used

02:45:57  12   when he was on the stand, yes.

02:45:59  13   Q.  This was from 2012?

02:46:00  14   A.  According to the document, yes.

02:46:06  15        MS. FAIR:  Mr. Wietholter, can we go to Page 3,

02:46:09  16   please?  Can we go to the next page, please?

02:46:23  17   Q.  (By Ms. Fair)  Samsung wasn't the only one thinking and

02:46:27  18   working on flexible curved displays in 2012, were they?

02:46:33  19   A.  No.  The date on this page, though, says 2013.  I don't

02:46:47  20   know.

02:46:47  21   Q.  So Samsung wasn't the only one in 2011, 2012, 2013,

02:46:52  22   these years that Mr. Shaikh was visiting Samsung showing

02:46:55  23   them this technology, they weren't the only ones with

02:46:58  24   flexible technology in mind, right?

02:47:01  25   A.  No, like I said, we were not the only ones with

| | | |
|---|---|---|
| 02:47:04 | 1 | flexible technology. |
| 02:47:05 | 2 | Q.  You have patents, right? |
| 02:47:06 | 3 | A.  I do.  I actually have four. |
| 02:47:08 | 4 | Q.  You're proud of those patents? |
| 02:47:09 | 5 | A.  Absolutely. |
| 02:47:10 | 6 | Q.  And you have faith in the Patent and Trademark Office |
| 02:47:14 | 7 | to go back to them to get more patents, right? |
| 02:47:16 | 8 | A.  In product and marketing now, but, yes, I have faith in |
| 02:47:21 | 9 | the product and technology office -- sorry, the PTO office. |
| 02:47:24 | 10 | Q.  And Samsung has a number of patents, right? |
| 02:47:28 | 11 | A.  Yes, we do. |
| 02:47:29 | 12 | Q.  I think I've read they're vying with IBM for the most |
| 02:47:35 | 13 | number of patents.  Sound right to you? |
| 02:47:37 | 14 | A.  Specific to the country, but in the U.S., yeah, it's |
| 02:47:39 | 15 | typically Samsung and IBM in that neighborhood for 1 and 2. |
| 02:47:44 | 16 | Q.  Is it fair to say, then, that Samsung has faith in the |
| 02:47:47 | 17 | Patent and Trademark Office or they wouldn't keep going |
| 02:47:50 | 18 | back for all of those patents if they didn't believe in the |
| 02:47:53 | 19 | good work that was being done there? |
| 02:47:55 | 20 | A.  Yes, we have faith in the Patent Office. |
| 02:47:58 | 21 | Q.  It wasn't easy to be granted your four patents, right? |
| 02:48:00 | 22 | A.  No, it took a little bit of time. |
| 02:48:03 | 23 | Q.  And you understand here that Samsung is asserting that |
| 02:48:08 | 24 | two of the patents in this case are invalid, right? |
| 02:48:11 | 25 | A.  My understanding is they're challenging two of the |

518

| | |
|---|---|
| 02:48:15 | 1 | claims on some of the -- two of the claims of those |
| 02:48:18 | 2 | patents, yes. |
| 02:48:18 | 3 | Q.  That's a pretty serious charge, right? |
| 02:48:21 | 4 | A.  Yes. |
| 02:48:21 | 5 | Q.  I mean, you know that if there's an invalidity finding, |
| 02:48:27 | 6 | that's not just for this case, that's for all time? |
| 02:48:30 | 7 | A.  If there's an invalidity finding, then those claims |
| 02:48:33 | 8 | would be gone for all times, yes, that's correct. |
| 02:48:35 | 9 | Q.  You have a number of competitors in the cell phone |
| 02:48:42 | 10 | industry? |
| 02:48:42 | 11 | A.  Just a few. |
| 02:48:43 | 12 | Q.  We've heard about Apple.  We know about Apple? |
| 02:48:46 | 13 | A.  That one would be obvious, yes. |
| 02:48:49 | 14 | Q.  LG? |
| 02:48:50 | 15 | A.  Also true. |
| 02:48:51 | 16 | Q.  Motorola? |
| 02:48:52 | 17 | A.  Yes. |
| 02:48:52 | 18 | Q.  Maybe less so these days? |
| 02:48:54 | 19 | A.  Yeah, less so these days. |
| 02:48:55 | 20 | Q.  But in the OLED display industry, you know as a company |
| 02:48:59 | 21 | representative of a cell phone company that's in the market |
| 02:49:02 | 22 | buying OLED displays, there's two main players, right? |
| 02:49:07 | 23 | A.  I don't know exactly how many OLED display |
| 02:49:11 | 24 | manufacturers or components are there, but I know there's |
| 02:49:15 | 25 | more than one, yes. |

02:49:16   1   Q.   There's LG and Samsung, big competitors?

02:49:19   2   A.   Are you asking about the phones or the displays?  Can

02:49:22   3   you clarify?

02:49:23   4   Q.   I'm talking about the displays.

02:49:25   5   A.   So from a display perspective, yes, SEC makes displays

02:49:30   6   as well as LG.

02:49:31   7   Q.   And like Samsung, LG is a sophisticated company, right?

02:49:35   8   A.   I'd like to think so, yes.

02:49:37   9   Q.   They have smart engineers?

02:49:41   10   A.   Also agree.

02:49:42   11   Q.   In-house counsel?

02:49:43   12   A.   I would assume so.  I don't work for them, but, yes.

02:49:46   13   Q.   Outside lawyers?

02:49:47   14   A.   Potentially, yes.

02:49:48   15   Q.   And they apply for patents?

02:49:51   16   A.   I would assume so.

02:49:51   17   Q.   They seek patent protection, just like Samsung?

02:49:57   18   A.   Yes.

02:49:57   19   Q.   But there's a big difference between LG and Solas -- LG

02:50:00   20   and Samsung, right?

02:50:03   21   A.   You have to quantify what you're asking.  I don't

02:50:07   22   understand.

02:50:07   23   Q.   Well, LG took a license to the Solas portfolio.  You're

02:50:13   24   aware of that, right?

02:50:13   25   A.   Actually, I'm not sure that I am, because I wasn't here

02:50:19  1   for the licensing portion.

02:50:20  2   Q.  Well, you were here for opening statement, right?

02:50:23  3   A.  Yes.

02:50:23  4   Q.  When Mr. Ward showed the jury that LG -- showed them in

02:50:27  5   open court that they're a license -- a licensee of Solas's

02:50:31  6   portfolio, right?

02:50:32  7   A.  I think the numbers were blacked out when that was

02:50:36  8   shown.  But, yes, I learned about that here.

02:50:38  9   Q.  That's right.  You couldn't see the number that LG paid

02:50:40  10  for Solas's portfolio, right?

02:50:42  11  A.  No, I believe it was blacked out.

02:50:44  12  Q.  You think it's fair for this jury to consider what a

02:50:48  13  sophisticated company thought Solas's patents were worth,

02:50:52  14  whether they're a mangy mare or a Kentucky Derby horse?

02:50:58  15  A.  I didn't follow the question, I'm sorry.

02:51:00  16  Q.  Do you think it's fair for this jury to consider what

02:51:04  17  LG, a sophisticated company, thought of Solas's patent

02:51:08  18  portfolio?

02:51:08  19          MR. LERNER:  Objection, Your Honor.  That was a

02:51:10  20  settlement agreement involving litigation over unasserted

02:51:13  21  patents in this case.  It's irrelevant and prejudicial.

02:51:16  22          THE COURT:  Are you telling me the LG license

02:51:21  23  doesn't cover the patents in this case?

02:51:23  24          MR. LERNER:  It settled lawsuits that involved

02:51:26  25  different patents of the portfolio, so it included these --

02:51:28  1        THE COURT:  But it wasn't limited to these.

02:51:30  2        MR. LERNER:  It wasn't limited to these.

02:51:32  3        THE COURT:  All right.  That's all been brought

02:51:35  4  out, and the jury is aware of it.  The objection is

02:51:38  5  overruled.

02:51:38  6  A.  One more time, I'm sorry.

02:51:42  7  Q.  (By Ms. Fair)  Do you think it's fair for this jury to

02:51:44  8  consider the amount that LG, a sophisticated company, like

02:51:49  9  Samsung, evaluated and paid to license to Solas's

02:51:55  10  portfolio?

02:51:55  11  A.  I don't know what that amount is or what the

02:51:57  12  investigation that was done.  So I don't know.

02:51:59  13        MS. FAIR:  I'll pass the witness.

02:52:00  14        THE COURT:  All right.  Redirect, Mr. Lerner?

02:52:00  15                REDIRECT EXAMINATION

02:52:31  16  BY MR. LERNER:

02:52:31  17  Q.  Mr. Repice, do you have any understanding as to whether

02:52:36  18  when LG reached an agreement with Solas, it concerned

02:52:39  19  televisions or mobile phones?

02:52:41  20  A.  I don't know.

02:52:41  21  Q.  Do you know if the OLED technology used in televisions

02:52:46  22  is similar to what's used in mobile phones?

02:52:50  23  A.  It could be, but I don't know.

02:52:52  24  Q.  Do you know what technology LG uses and how that

02:52:55  25  differs from what Samsung Electronics and Samsung Display

02:52:59   1   use?

02:52:59   2   A.  Once again, I don't know.

02:53:00   3   Q.  Do you have any understanding of the circumstances that

02:53:06   4   led to the LG lawsuit settlement agreement with Solas?

02:53:07   5   A.  No.

02:53:08   6   Q.  You were asked some questions about corporate structure

02:53:11   7   and people you talked to.  Is it possible for any one

02:53:15   8   person at a company the size of Samsung Electronics America

02:53:18   9   or Samsung Electronics to know everything the company has?

02:53:20   10   A.  No, sir.

02:53:21   11   Q.  Can you explain?

02:53:22   12   A.  I mean, we're a team, and it typically takes hundreds

02:53:28   13   of engineers and people to actually launch a phone.  You

02:53:31   14   know, I do my job, and I expect other people on the team to

02:53:34   15   do theirs.  I'm not going to know everyone that touches a

02:53:36   16   phone from the minute it actually leaves the production

02:53:39   17   floor until the time it ends up in the consumer's hand.

02:53:43   18   That's just too many people.

02:53:45   19   Q.  So you were shown an exhibit from Atmel from 2013 that

02:53:49   20   showed a picture of a curved display.  Do you recall that?

02:53:52   21   A.  Yes, I believe I do.

02:53:53   22   Q.  And you were asked if other people wanted curved

02:53:57   23   displays -- wanted to make them.  Do you recall that?

02:53:59   24   A.  I believe that was the question, yes.

02:54:00   25   Q.  And who succeeded in actually doing that?

02:54:02   1   A.  Well, Samsung was one of them, obviously.

02:54:04   2   Q.  And who introduced the world's first curved OLED

02:54:09   3   displays?

02:54:09   4   A.  I believe we did.

02:54:10   5   Q.  Is there a difference between having an idea, creating

02:54:14   6   a picture, and actually making a working device that can be

02:54:16   7   made for customers?

02:54:17   8   A.  Typically, it takes a lot of time to go from, let's

02:54:21   9   say, concept or idea into production and commercialization.

02:54:26  10   Q.  You were asked some questions about the material for

02:54:28  11   touch sensors and whether you had heard about a change from

02:54:32  12   ITO to metal mesh at some point?

02:54:33  13   A.  Yes, I believe that was one of the questions.

02:54:37  14   Q.  If the material of the touch sensor were important to

02:54:39  15   the customer experience, would you have heard about it,

02:54:41  16   given your role at the company?

02:54:43  17   A.  Potentially.

02:54:44  18   Q.  And did you ever hear about anything like that?

02:54:46  19   A.  No, I did not hear.

02:54:49  20        MR. LERNER:  Can we pull up Repice 2?

02:54:54  21   Q.  (By Mr. Lerner)  This is the Defendants' -- the

02:54:56  22   Plaintiff's demonstrative used with you.

02:55:01  23        Well, let me just ask you:  Do you know if the

02:55:09  24   Galaxy Note 7 used a metal mesh or an ITO touch sensor?

02:55:13  25   A.  Off the top of my head, I don't know, no.

02:55:16   1   Q.  Was it released before or after the Galaxy S8?

02:55:19   2   A.  I think it was actually after.

02:55:24   3   Q.  Have you seen any evidence to support the claims that

02:55:34   4   Plaintiff has made about the benefits of the '338, '450, or

02:55:39   5   '311 patents?

02:55:39   6   A.  I haven't seen any quantifiable data, no.

02:55:42   7   Q.  Now, you were asked about Solas's teardowns and the

02:55:46   8   extensive teardowns that they said they did.

02:55:49   9        If Solas had teardowns that actually showed

02:55:54   10   infringement, would you expect them to have provided that

02:55:57   11   to their expert for his analysis?

02:55:59   12   A.  I would have expected.

02:56:00   13   Q.  And if those teardowns actually showed evidence of

02:56:03   14   infringement, would you expect Solas in this case to show

02:56:05   15   them to the jury?

02:56:06   16   A.  Potentially.  I mean, their case.

02:56:10   17   Q.  Would it surprise you if they had evidence directly

02:56:13   18   showing infringement from actual products if they didn't

02:56:15   19   use it?

02:56:16   20   A.  It might be surprising.  I don't know their case

02:56:19   21   strategy.

02:56:21   22   Q.  Thank you.

02:56:22   23        MR. LERNER:  Pass the witness.

02:56:23   24        THE COURT:  Further cross-examination?

02:56:42   25        Please proceed, Ms. Fair.

RECROSS-EXAMINATION

02:56:42  1

02:56:44  2   BY MS. FAIR:

02:56:44  3   Q.  Mr. Repice, are you suggesting that it would be

02:56:51  4   unreasonable to rely on the actual information provided by

02:56:56  5   Samsung Display in this case to prove the infringement by

02:57:00  6   Samsung?

02:57:01  7   A.  I believe that the documents that they've provided were

02:57:05  8   shared on both sides.

02:57:14  9   Q.  You don't know whether specific phone has metal mesh or

02:57:21  10  indium tin oxide in it, right?

02:57:22  11  A.  Off the top of my head, no.

02:57:25  12  Q.  That's not important to you, right?

02:57:27  13  A.  It is not part of my day-to-day responsibilities, no.

02:57:30  14  Q.  It's not important to consumers; would you agree with

02:57:33  15  that?

02:57:33  16  A.  I would agree that a general consumer may not

02:57:36  17  understand that level of detail, no.

02:57:37  18  Q.  But as a manufacturing company making a sale of

02:57:45  19  something, lowering costs and increasing profits would be

02:57:48  20  important, right?

02:57:49  21  A.  It's one of the things that we would consider, yes.

02:57:52  22  Q.  I mean, Samsung is in the business to make money,

02:57:55  23  right?

02:57:55  24  A.  As well as phones, yes.

02:57:57  25  Q.  And one way to make money is to reduce your costs?

02:58:02  1   A.  That is a potential way to make money.

02:58:04  2   Q.  So if you could save a dollar or $2 on every display,

02:58:11  3   and you sell millions of phones, that could be important to

02:58:17  4   Samsung, right?

02:58:17  5   A.  It could be, yes.

02:58:20  6           MS. FAIR:  I'll pass the witness.

02:58:22  7           THE COURT:  Additional direct, Mr. Lerner?

02:58:24  8           MR. LERNER:  No, Your Honor.

02:58:25  9           THE COURT:  All right.  Mr. Repice, you may step

02:58:28  10  down, sir.

02:58:28  11          THE WITNESS:  Thank you.

02:58:29  12          THE COURT:  Thank you.

02:58:31  13          THE WITNESS:  My binder?

02:58:32  14          THE COURT:  Just leave it there.

02:58:34  15          THE WITNESS:  Okay.  Thank you, sir.

02:58:36  16          THE COURT:  Plaintiff, call your next witness --

02:58:39  17  excuse me, Defendant, call your next witness.

02:58:46  18          MR. LERNER:  Thank you, Your Honor.  Our next

02:58:48  19  witness would be Mr. Won-Kyu Kwak of Samsung Display.

02:58:55  20          THE COURT:  All right.  Ladies and gentlemen, it's

02:58:57  21  my understanding that this witness is not a native English

02:59:01  22  speaker and will testify with the aid and benefit of an

02:59:07  23  interpreter.

02:59:07  24          That interpreter has been sworn by the Court

02:59:09  25  previously.  And so that you'll understand that this is a

| | | |
|---|---|---|
| 02:59:12 | 1 | little bit different procedure, but you should listen to |
| 02:59:15 | 2 | the answers given and translated into English, and you |
| 02:59:19 | 3 | should treat them just as if any other witness were giving |
| 02:59:21 | 4 | them. |
| 02:59:22 | 5 | If the witness and the interpreter will come |
| 02:59:25 | 6 | forward, please. |
| 02:59:42 | 7 | (Witness sworn.) |
| 02:59:43 | 8 | THE COURT:  All right.  Please come around, and |
| 03:00:17 | 9 | we'll have Mr. Kwak to have a seat on the witness stand. |
| 03:00:22 | 10 | Mr. Johnston, we're going to need an additional |
| 03:00:27 | 11 | chair for the interpreter to sit next to the witness.  Do |
| 03:00:31 | 12 | you have that? |
| 03:00:31 | 13 | MR. LERNER:  Your Honor, permission to approach |
| 03:00:33 | 14 | with the binders? |
| 03:00:34 | 15 | THE COURT:  Yes, please do. |
| 03:00:35 | 16 | MR. LERNER:  We have physical exhibits, may we |
| 03:00:37 | 17 | approach with those, as well? |
| 03:00:38 | 18 | THE COURT:  Let's wait until I have a Court |
| 03:00:41 | 19 | Security Officer back in the room.  Go ahead and pass out |
| 03:00:44 | 20 | your binders. |
| 03:00:44 | 21 | MR. LERNER:  I can wait until later for those. |
| 03:01:41 | 22 | THE COURT:  Feel free to -- ma'am, feel free to |
| 03:01:44 | 23 | move the chair wherever you need to. |
| 03:02:04 | 24 | All right.  Do you have something to deliver to |
| 03:02:06 | 25 | the witness, Mr. Lerner? |

| | | |
|---|---|---|
| 03:02:08 | 1 | MR. LERNER:  I do.  I have three physical |
| 03:02:10 | 2 | exhibits. |
| 03:02:11 | 3 | THE COURT:  If you'll hand them to the Court |
| 03:02:13 | 4 | Security Officer, he'll hand them to the witness. |
| 03:02:23 | 5 | All right.  You may proceed with your direct |
| 03:02:25 | 6 | examination, sir. |
| 03:02:27 | 7 | MR. LERNER:  Thank you, Your Honor. |
| 02:58:53 | 8 | WON-KYU KWAK, DEFENDANT'S WITNESS, SWORN |
| 02:58:53 | 9 | (INTERPRETED) |
| 02:58:53 | 10 | DIRECT EXAMINATION |
| 03:02:29 | 11 | BY MR. LERNER: |
| 03:02:29 | 12 | Q.  Good afternoon, Mr. Kwak.  Can you please introduce |
| 03:02:34 | 13 | yourself to the jury? |
| 03:02:37 | 14 | A.  Good afternoon, everyone.  My name is Won-Kyu Kwak. |
| 03:02:46 | 15 | Q.  Where do you work? |
| 03:02:47 | 16 | A.  I work at Samsung Display. |
| 03:02:55 | 17 | THE COURT:  Just a moment.  If the interpreter |
| 03:02:57 | 18 | does not mind, I think the jury will hear much better if |
| 03:03:00 | 19 | you can remove your mask while you're interpreting. |
| 03:03:07 | 20 | THE INTERPRETER:  Oh, sure, sir. |
| 03:03:09 | 21 | THE COURT:  Just pull it down.  Whatever's most |
| 03:03:12 | 22 | comfortable.  Thank you. |
| 03:03:13 | 23 | Let's continue. |
| 03:03:15 | 24 | Q.  (By Mr. Lerner)  What is your position, sir? |
| 03:03:16 | 25 | A.  I am a vice president. |

| | | |
|---|---|---|
| 03:03:17 | 1 | Q.  What do you do as a vice president? |
| 03:03:19 | 2 | A.  I am the leader of design team, and I'm in charge of |
| 03:03:40 | 3 | AMOLED panel and touch design. |
| 03:03:43 | 4 | Q.  Have you ever testified in court before? |
| 03:03:45 | 5 | A.  No, I have not. |
| 03:03:49 | 6 | Q.  Can you please describe your education? |
| 03:04:15 | 7 | THE INTERPRETER:  Your Honor, I'm just going to |
| 03:04:17 | 8 | ask what the witness just said about his detailed major. |
| 03:04:31 | 9 | A.  So I have a Master's degree in physics, and in more |
| 03:04:36 | 10 | detail, I majored in display element, which specifically -- |
| 03:04:42 | 11 | specifically means amorphous silicon transistor and |
| 03:04:48 | 12 | polysilicon transistor. |
| 03:04:49 | 13 | Q.  When did you start work at Samsung Display? |
| 03:04:58 | 14 | A.  It's 2000. |
| 03:04:58 | 15 | Q.  When did Samsung Display start its work on the research |
| 03:05:03 | 16 | and development of OLEDs? |
| 03:05:14 | 17 | A.  That was January of 2000. |
| 03:05:17 | 18 | Q.  Who was the first company in the world to bring to |
| 03:05:21 | 19 | market an OLED display for smartphones? |
| 03:05:26 | 20 | A.  It was Samsung Display. |
| 03:05:35 | 21 | Q.  When was that first display introduced? |
| 03:05:39 | 22 | A.  The mass production started in January of 2007. |
| 03:05:53 | 23 | Q.  Have you heard of a company called Casio? |
| 03:05:55 | 24 | A.  Yes, I have. |
| 03:06:01 | 25 | Q.  When Casio needed to put OLED displays in products, who |

03:06:09    1    did it turn to for those displays?

03:06:12    2    A.  We supplied OLED displays.

03:06:29    3    Q.  Beginning when?

03:06:30    4    A.  Between 2008 and 2010, we supplied one million display

03:06:49    5    in the size of 3.1-inch.

03:06:51    6    Q.  And that was all to Casio?

03:06:53    7    A.  Yes.

03:06:57    8    Q.  How many engineers do you supervise?

03:07:00    9    A.  There are 140 engineers.

03:07:11   10    Q.  How many engineers work at Samsung Display on the

03:07:15   11    research and development of OLED displays or touch sensors?

03:07:20   12    A.  There are about 11,000 engineers.

03:07:36   13    Q.  Is innovation important to Samsung Display?

03:07:39   14    A.  Yes, it is very important.

03:07:47   15    Q.  Has Samsung Display received awards for innovations

03:07:52   16    specifically with its OLED displays?

03:07:54   17    A.  Yes, there were many.

03:08:10   18         MR. LERNER:  Mr. Beall, can we please pull up

03:08:12   19    DDX-4.001?

03:08:20   20    Q.  (By Mr. Lerner)  Mr. Kwak, can you briefly explain to

03:08:23   21    the jury what these particular awards related to?

03:08:26   22    A.  So regarding display, some organization called SID, or

03:09:08   23    Society of Information Display, awarded us Gold Award for

03:09:16   24    OLED, more specifically flexible OLED, in year 2014 and

03:09:22   25    2015.

| | | |
|---|---|---|
| 03:09:23 | 1 | Q.  Is the Society for Information Display a well-known |
| 03:09:28 | 2 | organization in the field of display technology? |
| 03:09:30 | 3 | A.  Yes. |
| 03:09:42 | 4 | Q.  How long have you personally been involved in the |
| 03:09:47 | 5 | research and development of OLED displays? |
| 03:09:50 | 6 | A.  I have been involved in the research and development |
| 03:10:09 | 7 | for 20 years since I joined my company in 2000. |
| 03:10:13 | 8 | Q.  Are you an inventor yourself? |
| 03:10:16 | 9 | A.  Yes, of course. |
| 03:10:21 | 10 | Q.  How many U.S. patents have you been awarded for your |
| 03:10:25 | 11 | work? |
| 03:10:25 | 12 | A.  I have about 160 patents registered in the United |
| 03:10:43 | 13 | States for U.S. patents. |
| 03:10:44 | 14 | Q.  How many of those relate to OLED technology and touch |
| 03:10:48 | 15 | sensors? |
| 03:10:48 | 16 | A.  Almost all of them are related to OLED and touch |
| 03:11:10 | 17 | sensors. |
| 03:11:10 | 18 |         MR. LERNER:  Your Honor, we're going to now move |
| 03:11:12 | 19 | to confidential technical information, and I'd request to |
| 03:11:15 | 20 | seal the courtroom. |
| 03:11:16 | 21 |         THE COURT:  Based on counsel's request, I'll order |
| 03:11:18 | 22 | the courtroom sealed. |
| 03:11:20 | 23 |         All persons present not subject to the protective |
| 03:11:23 | 24 | order that's been entered in this case should excuse |
| 03:11:26 | 25 | themselves and remain outside the courtroom until it's |

| | | |
|---|---|---|
| 03:11:30 | 1 | reopened and unsealed. |
| 03:12:00 | 2 | (Courtroom sealed.) |
| 03:12:00 | 3 | (This portion of the transcript is sealed |
| 03:12:00 | 4 | and filed under separate cover as |
| 03:12:00 | 5 | Sealed Portion No. 10.) |
| 04:03:58 | 6 | (Courtroom unsealed.) |
| 04:03:58 | 7 | THE COURT:  Having unsealed the courtroom -- |
| 04:04:00 | 8 | having unsealed the courtroom, I'm going to instruct the |
| 04:04:04 | 9 | ladies and gentlemen of the jury to simply close your |
| 04:04:05 | 10 | notebooks and leave them in your chairs, follow all the |
| 04:04:08 | 11 | instructions I've given you, and we'll be back shortly to |
| 04:04:12 | 12 | continue with the Defendants' direct examination of |
| 04:04:15 | 13 | Mr. Kwak. |
| 04:04:16 | 14 | The jury is excused for recess at this time. |
| 04:04:19 | 15 | COURT SECURITY OFFICER:  All rise. |
| 04:04:51 | 16 | (Jury out.) |
| 04:04:52 | 17 | THE COURT:  Let me see Mr. Lerner, Mr. Haslam, and |
| 04:04:55 | 18 | Ms. Smith, together with Mr. Fenster, Ms. Fair, and |
| 04:05:02 | 19 | Mr. Mirzaie in chambers, please. |
| 04:05:05 | 20 | We stand in recess. |
| 04:05:07 | 21 | COURT SECURITY OFFICER:  All rise. |
| 04:05:09 | 22 | (Recess.) |
| 04:24:38 | 23 | (Jury out.) |
| 04:24:38 | 24 | COURT SECURITY OFFICER:  All rise. |
| 04:24:40 | 25 | THE COURT:  Be seated, please. |

04:24:53   1          Are you prepared to continue with your direct
04:24:57   2   examination, Mr. Lerner?
04:24:59   3          MR. LERNER:  Yes, I am, Your Honor.
04:25:00   4          THE COURT:  All right.  If you'll take your mask
04:25:04   5   off, I'll bring the jury in.
04:25:06   6          MR. LERNER:  Thank you.
04:25:07   7          THE COURT:  Let's bring in the jury, Mr. Latham.
04:25:11   8          COURT SECURITY OFFICER:  All rise.
04:25:19   9          MS. FAIR:  Your Honor, may we clarify, is the
04:25:22  10   courtroom currently sealed or unsealed?
04:25:25  11          THE COURT:  Unsealed.  I don't usually recess and
04:25:29  12   walk out of a sealed courtroom, at least I try not to.
04:25:48  13          (Jury in.)
04:25:51  14          THE COURT:  Welcome back, ladies and gentlemen.
04:25:53  15   Please have a seat.
04:25:54  16          We'll continue with the Defendants' direct
04:25:57  17   examination of Mr. Kwak.
04:26:03  18          Counsel, you may continue.
04:26:05  19          MR. LERNER:  Thank you, Your Honor.  I request to
04:26:06  20   seal the courtroom for technical information.
04:26:09  21          THE COURT:  All right.  Based on counsel's
04:26:11  22   request, I'll order the courtroom sealed.  Those present
04:26:13  23   not subject to the protective order in this case should
04:26:16  24   excuse yourselves and remain outside of the courtroom until
04:26:19  25   it's reopened and unsealed.

| | | |
|---|---|---|
| 04:26:22 | 1 | (Courtroom sealed.) |
| 04:26:22 | 2 | (This portion of the transcript is sealed |
| 04:26:22 | 3 | and filed under separate cover as |
| 04:26:34 | 4 | Sealed Portion No. 11.) |
| 04:31:52 | 5 | (Courtroom unsealed.) |
| 04:31:53 | 6 | THE COURT:  I just sent the jury out.  We have an |
| 04:31:56 | 7 | IT problem, we'll get that addressed, and then we'll bring |
| 04:31:59 | 8 | the jury back in. |
| 04:32:01 | 9 | Let's go off the record. |
| 04:32:06 | 10 | (Recess.) |
| 04:43:29 | 11 | (Jury out.) |
| 04:43:33 | 12 | THE COURT:  All right.  If everybody will take |
| 04:43:36 | 13 | their place, we'll go back on the record, and I will bring |
| 04:43:42 | 14 | in the jury. |
| 04:44:13 | 15 | All right.  Counsel, take your places.  We're back |
| 04:44:16 | 16 | on the record. |
| 04:44:17 | 17 | Mr. Latham, bring in the jury, please. |
| 04:44:20 | 18 | COURT SECURITY OFFICER:  All rise. |
| 04:44:21 | 19 | (Jury in.) |
| 04:44:23 | 20 | THE COURT:  Please be seated. |
| 04:45:07 | 21 | I apologize for the interruption. |
| 04:45:10 | 22 | Mr. Lerner, please continue with your direct |
| 04:45:14 | 23 | examination. |
| 04:45:15 | 24 | MR. LERNER:  Your Honor, is the courtroom sealed, |
| 04:45:17 | 25 | or may I request that it be sealed, if it's not? |

04:45:20   1            THE COURT:  It is not, but I will grant your

04:45:23   2   request and order the courtroom sealed at this time.

04:45:26   3            Anyone present not subject to the protective order

04:45:30   4   in this case should excuse themselves and remain outside

04:45:34   5   until the courtroom is unsealed and reopened.

04:45:40   6            (Courtroom sealed.)

04:45:40   7            (This portion of the transcript is sealed

04:45:40   8            and filed under separate cover as

04:45:40   9            Sealed Portion No. 12.)

06:17:37  10            (Courtroom unsealed.)

06:17:37  11       THE COURT:  Ladies and gentlemen, we're going to

06:17:40  12   stop for the day at this juncture.  I'll ask you to close

06:17:45  13   and leave your notebooks on the table in the jury room as

06:17:48  14   you leave the courthouse.  Please travel safely to your

06:17:52  15   homes.

06:17:53  16            Please be back tomorrow morning ready to go by

06:17:55  17   8:30, as you have, and I want to thank you for that.

06:17:58  18            Please follow all the instructions I've given you

06:18:01  19   about your conduct during the course of the trial,

06:18:05  20   including, of course, not to discuss the case with anyone

06:18:07  21   or among the eight of you.

06:18:08  22            With those instructions, together with all the

06:18:11  23   other instructions I've given you, I wish you a safe trip

06:18:16  24   home, and I'll see you in the morning.

06:18:19  25            The jury is excused for the evening at this time.

06:18:22    1              COURT SECURITY OFFICER:  All rise.

06:18:23    2              (Jury out.)

06:18:24    3              THE COURT:  Be seated, please.

06:19:01    4              Counsel, according to my records, the Plaintiff

06:19:21    5    has 4 hours and 23 minutes of trial time remaining.  The

06:19:26    6    Defendant has 6 hours and 34 minutes of trial time

06:19:31    7    remaining.

06:19:31    8              Now, as mentioned earlier on the record,

06:19:34    9    Mr. Haslam, I'm going to afford you an opportunity on

06:19:37   10    behalf of Defendants to make a record with regard to the

06:19:41   11    guidance I've given the parties concerning Dr. Fontecchio,

06:19:47   12    his expert report, executed and rendered prior to the

06:19:52   13    Court's supplemental claim construction, and the issues

06:19:57   14    that have arisen as disputes between the parties as to the

06:20:00   15    proper areas of his testimony at this trial.

06:20:03   16              You may proceed.

06:20:04   17              MR. HASLAM:  Thank you, Your Honor.

06:20:04   18              I just want to put three things on the record that

06:20:08   19    occurred in chambers.

06:20:10   20              As I understand it, the Court said that we cannot

06:20:14   21    present the written description argument, that if -- not

06:20:18   22    all active elements have to be covered, that the inventors

06:20:22   23    were not in possession of that invention.

06:20:25   24              I also understood, and that the ruling was, is

06:20:29   25    that we were not permitted in this case, in our

06:20:34  1  non-infringement case, to be able to discuss the pull-out

06:20:40  2  current as it is shown and described in the '338 patent,

06:20:45  3  and that we must only address the position taken by the

06:20:51  4  Plaintiff.

06:20:52  5       I also understand that with respect to another

06:20:57  6  dispute with the '450 patent, that we are not permitted to

06:21:00  7  argue that T3 is -- T2 is, in fact, the selection

06:21:06  8  transistor that meets the claim limitation, but we are

06:21:11  9  limited to trying to establish and only arguing that T3

06:21:14  10  isn't it.

06:21:15  11       And I think those unfairly -- the written

06:21:18  12  description, I understand the Court's argument.

06:21:20  13       The other two, I think, unfairly hamper our

06:21:25  14  ability to argue to the jury that the claim limitation and

06:21:27  15  how it's -- how it is intended -- how it is described and

06:21:31  16  construed by the Court is based on the specification and

06:21:35  17  the description in the claim is T2, and it is not T3.

06:21:40  18       And I think it hampers us that we have to say it's

06:21:43  19  not T3 without being able to tell the jury not that there

06:21:48  20  is no selection transistor in the device, but it is over

06:21:51  21  here.

06:21:52  22       And that's the basis of the objection.

06:21:54  23       THE COURT:  All right.  Well, as I noted in our

06:21:57  24  discussion in chambers when the parties brought me these

06:22:03  25  disputes regarding Dr. Fontecchio's testimony at this

06:22:07 1   trial, Dr. Fontecchio rendered his expert report as a

06:22:11 2   technical expert for the Defendants -- I believe it was

06:22:15 3   September of last year.

06:22:18 4       His report took the position, and Samsung

06:22:22 5   strenuously argued to the Court as a part of the pre-trial

06:22:26 6   process, that the term "covers" from the claim language

06:22:31 7   must mean covering all of the surface and coverage of any

06:22:36 8   area less than a complete coverage was not covering.

06:22:40 9       The parties also argued -- in fact, both parties

06:22:46 10  took the position with the Court late in the trial at a

06:22:49 11  time and date when we thought we were weeks away from

06:22:52 12  selecting a jury and going to trial, that under the

06:22:55 13  precedent established by 02 Micro, the Court had an

06:22:59 14  obligation to construe that term.

06:23:03 15      The Court entered a supplemental claim

06:23:06 16  construction order, having accepted its obligations under

06:23:11 17  02 Micro, and found that "cover" or "covering" did not

06:23:14 18  require complete and total coverage but only required that

06:23:20 19  it lie on the surface of.  That construction was given to

06:23:23 20  the parties.

06:23:24 21      That construction did not confirm the position of

06:23:33 22  Samsung, which led to the subsequent claim construction or

06:23:40 23  the amended claim construction.  In fact, it was contrary

06:23:42 24  to and opposite of what Samsung strenuously argued at

06:23:47 25  pre-trial.

06:23:48  1          And the portions of the opinion of

06:23:55  2   Dr. Fontecchio -- there was no request by Samsung,

06:23:57  3   subsequent to the Court's amended claim construction, to

06:24:00  4   reopen expert discovery to amend in any way his report.

06:24:08  5   Samsung has held to and sat on that original report, which

06:24:12  6   was issued before the supplemental claim construction, ever

06:24:15  7   since.

06:24:16  8          And the argument came to the Court, as raised by

06:24:20  9   Solas, that to allow Dr. Fontecchio to testify to the full

06:24:24  10  range of his report, given that it is clearly inconsistent

06:24:29  11  with the subsequent claim construction, at least to some

06:24:33  12  extent inconsistent with the Court's claim construction --

06:24:36  13  the subsequent claim construction that I entered into,

06:24:39  14  would be permitting this expert to testify contrary to the

06:24:41  15  Court's claim construction.

06:24:42  16         I will note, in hindsight, it would have been

06:24:47  17  better if Solas had moved under Daubert to attack the

06:24:52  18  direct portions of his report that they now complain about

06:24:55  19  as being contrary to the claim construction.

06:24:58  20         But after the Court rendered its supplemental

06:25:02  21  claim construction last fall, Samsung did nothing and Solas

06:25:06  22  did nothing.  And months went by because of the pandemic,

06:25:10  23  and now we have a trial and we have a jury in the box, and

06:25:13  24  I'm confronted with a disagreement as to the propriety of

06:25:17  25  his original opinions subject to the -- and in comparison

06:25:23  1  to the supplemental claim construction that I was pushed

06:25:27  2  and shoved into rendering by both parties against my

06:25:32  3  wishes.

06:25:32  4      MR. HASLAM:  I recall.

06:25:34  5      THE COURT:  I think that the original report of

06:25:36  6  Dr. Fontecchio as it stands and his position that the

06:25:40  7  entirety must be covered -- there must be total coverage to

06:25:44  8  have "cover" at all is improper.

06:25:50  9      I'm not going to permit him to testify to that.

06:25:53  10  It is in direct contravention of the subsequent claim

06:25:58  11  construction opinion of the Court, and I think that taints

06:26:00  12  his enablement and lack of possession by the inventor

06:26:04  13  arguments.  And I'm going to, as I told you in chambers,

06:26:08  14  prevent him from offering those opinions or that testimony

06:26:11  15  at this trial.

06:26:12  16      I also think with regard to his non-infringement

06:26:17  17  arguments, given that these are claims that are not limited

06:26:23  18  to the elements but are open to additional elements, it is

06:26:32  19  not -- it is not the purview of the Defendant to take

06:26:37  20  elements that have not been asserted by the Plaintiff as

06:26:42  21  reading on the claim language to establish infringement and

06:26:47  22  take those non-accused elements and analyze them and say:

06:26:51  23  This shows we don't infringe.  And, in essence, I believe

06:26:56  24  that's what Dr. Fontecchio's opinion does in large part.

06:26:59  25      And it is clear from the expert reports of the

06:27:02    1    Plaintiff that it is T3 that they believe is the

06:27:07    2    appropriate transistor.

06:27:09    3          You have tried to get them -- you've tried to get

06:27:12    4    Mr. Credelle, during this trial, to say it was T2.  He said

06:27:15    5    T2 has some of the same characteristics, but he never did

06:27:21    6    adopt T2 as the accused functionality.

06:27:23    7          And it's clear from his testimony and his report,

06:27:27    8    that was furnished in advance of the trial, that it is

06:27:29    9    Plaintiff's position that it's T3.

06:27:32   10          It is certainly appropriate for you try and show

06:27:36   11    T3 doesn't meet the elements of the claim and, therefore,

06:27:39   12    there's no infringement.

06:27:40   13          But it's not proper to take an unaccused element

06:27:44   14    and then argue that that doesn't meet the elements of the

06:27:46   15    claim and establish as non-infringement.

06:27:51   16          With regard to Dr. Fontecchio's art-based

06:27:55   17    invalidity grounds, I do not find that they contravene the

06:27:59   18    supplemental claim construction.

06:28:02   19          The Court said that "cover" does not mean it has

06:28:05   20    to be full coverage.  It did not say what amount less than

06:28:08   21    full coverage had to be present.  It was silent on that.

06:28:11   22          To the extent Dr. Fontecchio has opinions in his

06:28:14   23    report that rely on art-based invalidity references that

06:28:19   24    contain some amount of coverage, even if it's complete

06:28:23   25    coverage, they're appropriate, and I'm not going to

06:28:26  1  constrain his testimony in that regard.

06:28:29  2       That, I think, is the gist of the instructions I

06:28:35  3  gave you in chambers.  It certainly includes a recitation

06:28:39  4  into the record as to why the Court reached his

06:28:42  5  conclusions.

06:28:43  6       Your objections, Mr. Haslam, are certainly noted

06:28:46  7  and are preserved.  You were worried that you were going to

06:28:49  8  waive them, and he never got close to the witness stand

06:28:55  9  today, so these objections are clearly before he ever takes

06:28:57  10  the stand, and they're certainly preserved and not waived.

06:28:57  11       MR. HASLAM:  Thank you, Your Honor.

06:28:57  12       THE COURT:  All right.  Thank you.  I think that

06:29:00  13  completes that bit of housekeeping.

06:29:02  14       I understand we will start tomorrow with some

06:29:04  15  short depositions, and then go to Dr. Fontecchio; is that

06:29:07  16  correct?

06:29:08  17       MR. HASLAM:  Yes.

06:29:09  18       THE COURT:  All right.

06:29:10  19       MR. HASLAM:  Followed by Dr. Sierros -- Sierros,

06:29:18  20  and then our damage expert, and then we will rest.

06:29:20  21       THE COURT:  All right.  Let me remind the parties

06:29:22  22  that I expect to hear from you as to the serious result of

06:29:25  23  your meet-and-confer efforts by 10:00 o'clock this evening.

06:29:31  24       If I get the same email report at 2:00 a.m. or

06:29:36  25  1:00 a.m. or at some late date in the wee hours as I have

06:29:41   1   the last two days, I will take similar action to what I

06:29:44   2   took today.

06:29:45   3        There is a lot to be done before this trial is

06:29:48   4   complete, and there's a lot of work left on both sides of

06:29:54   5   the docket.  And I want to make it clear to everybody, we

06:29:56   6   are going to get this trial finished either this week or

06:30:00   7   Monday at the latest.

06:30:01   8        Are there issues that need to be addressed to the

06:30:05   9   Court from the Plaintiff at this juncture?

06:30:06   10       MR. FENSTER:  No, Your Honor.

06:30:08   11       THE COURT:  Are there additional issues that need

06:30:08   12   to be addressed to the Court from the Defendants at this

06:30:10   13   juncture?

06:30:10   14       MR. HASLAM:  No, Your Honor.

06:30:11   15       THE COURT:  We stand in recess until tomorrow

06:30:13   16   morning.

06:30:13   17       COURT SECURITY OFFICER:  All rise.

06:30:14   18       (Recess.)

           19

           20

           21

           22

           23

           24

           25

<u>CERTIFICATION</u>

    I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


_/S/ Shelly Holmes_____          3/3/2021___
SHELLY HOLMES, CSR, TCRR          Date
FEDERAL OFFICIAL REPORTER