```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   SOLAS OLED LTD.,              )(    CIVIL ACTION NO.
                                   )(    2:19-CV-152-JRG
 4        PLAINTIFF,               )(
                                   )(
 5        VS.                      )(
                                   )(
 6   SAMSUNG DISPLAY CO., LTD.,    )(
     SAMSUNG ELECTRONICS CO.,      )(    MARSHALL, TEXAS
 7   LTD., SAMSUNG ELECTRONICS     )(    MARCH 4, 2021
     AMERICA, INC.,                )(    8:31 A.M. - 6:31 P.M.
 8                                 )(
          DEFENDANTS.              )(
 9

10                     TRANSCRIPT OF JURY TRIAL

11         BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12            UNITED STATES CHIEF DISTRICT JUDGE

13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:

16   MR. MARC FENSTER
     MR. REZA MIRZAIE
17   MR. ADAM S. HOFFMAN
     MR. NEIL A. RUBIN
18   MR. JACOB R. BUCZKO
     MR. JAMES S. TSUEI
19   RUSS AUGUST & KABAT
     12424 Wilshire Boulevard, 12th Floor
20   Los Angeles, CA 90025

21   MR. T. JOHN WARD, JR.
     MS. CLAIRE ABERNATHY HENRY
22   MS. ANDREA L. FAIR
     WARD, SMITH & HILL, PLLC
23   1507 Bill Owens Parkway
     Longview, TX 75604
24

25
```

```
 1   FOR THE DEFENDANTS:

 2   MS. MELISSA R. SMITH
     GILLAM & SMITH, LLP
 3   303 South Washington Avenue
     Marshall, TX 75670
 4

 5   MR. JEFFREY H. LERNER
     MR. JARED R. FRISCH
 6   MR. DANIEL E. VALENCIA
     MR. DANIEL W. CHO
 7   MR. TAREK J. AUSTIN
     MR. ERIC T. O'BRIEN
 8   MR. DAVID J. CHO
     MR. JORDAN V. HILL
 9   COVINGTON & BURLING LLP
     One CityCenter
10   850 Tenth Street, NW
     Washington, DC 20001-4956
11

12   MR. ROBERT T. HASLAM
     COVINGTON & BURLING LLP
13   3000 El Camino Real
     5 Palo Alto Square, 10th Floor
14   Palo Alto, CA 94306-2112

15

16

17

18   COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
19                       United States District Court
                         Eastern District of Texas
20                       Marshall Division
                         100 E. Houston
21                       Marshall, Texas   75670
                         (903) 923-7464
22

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | P R O C E E D I N G S                                        |
| 08:13:35 | 2  | (Jury out.)                                                  |
| 08:13:35 | 3  | COURT SECURITY OFFICER:  All rise.                           |
| 08:13:38 | 4  | THE COURT:  Be seated, please.                              |
| 08:31:25 | 5  | Are the parties prepared to read into the record           |
| 08:31:31 | 6  | those items from the list of pre-admitted exhibits used     |
| 08:31:34 | 7  | during yesterday's portion of the trial?  If so, let's      |
| 08:31:37 | 8  | proceed?                                                     |
| 08:31:38 | 9  | MS. HENRY:  Good morning, Your Honor.                       |
| 08:31:41 | 10 | THE COURT:  Good morning.                                   |
| 08:31:42 | 11 | MS. HENRY:  Plaintiff reads into the record --             |
| 08:31:45 | 12 | I'll begin with the PTX numbers.  PTX-128_EN, PTX-506,      |
| 08:31:55 | 13 | PTX-509, PTX-516, PTX-517, PTX-519, PTX-522, and            |
| 08:32:08 | 14 | PTX-522_EN, PTX-529, PTX-534.                               |
| 08:32:13 | 15 | THE COURT:  Slow down just a little bit, please,            |
| 08:32:15 | 16 | Ms. Henry.                                                  |
| 08:32:15 | 17 | MS. HENRY:  Yes, Your Honor.                                |
| 08:32:17 | 18 | PTX-535, PTX-536, PTX-537, PTX-539, PTX-542,                |
| 08:32:30 | 19 | PTX-543, PTX-743, PTX-744, PTX-746, PTX-747, and DTX-1302.  |
| 08:32:45 | 20 | THE COURT:  All right.  Is there objection to that         |
| 08:32:48 | 21 | rendition from the Defendants?                              |
| 08:32:51 | 22 | MR. DANIEL CHO:  No objection, Your Honor.                  |
| 08:32:53 | 23 | THE COURT:  Do Defendants have a similar rendition         |
| 08:32:55 | 24 | to offer into the record?                                   |
| 08:32:56 | 25 | MR. DANIEL CHO:  Yes, Your Honor.  Good morning.           |

548

| | | |
|---|---|---|
| 08:32:58 | 1 | Defendants offer into evidence DTX-461, DTX-464, |
| 08:33:04 | 2 | DTX-468, DTX-469, DTX-749, DTX-1191, and DTX-1586. |
| 08:33:18 | 3 | THE COURT:  Any objection to that rendition by the |
| 08:33:20 | 4 | Plaintiff? |
| 08:33:21 | 5 | MS. HENRY:  No objection, Your Honor. |
| 08:33:22 | 6 | THE COURT:  Okay.  Thank you, counsel. |
| 08:33:23 | 7 | Counsel, is there anything that needs to be raised |
| 08:33:32 | 8 | with the Court before we bring in the jury? |
| 08:33:34 | 9 | Anything from Plaintiff? |
| 08:33:35 | 10 | MR. FENSTER:  Not from Plaintiff, Your Honor. |
| 08:33:36 | 11 | THE COURT:  From Defendant? |
| 08:33:40 | 12 | MR. LERNER:  Not from Defendants, Your Honor. |
| 08:33:42 | 13 | THE COURT:  Let's bring in the jury, please, |
| 08:33:46 | 14 | Mr. Johnston. |
| 08:34:17 | 15 | COURT SECURITY OFFICER:  All rise. |
| 08:34:19 | 16 | (Jury in.) |
| 08:34:20 | 17 | THE COURT:  Good morning, ladies and gentlemen. |
| 08:34:37 | 18 | Welcome back.  It's good to see you again.  Hope you had a |
| 08:34:41 | 19 | good evening.  Please have a seat. |
| 08:34:44 | 20 | All right.  We ended the day yesterday with |
| 08:34:51 | 21 | Mr. Kwak.  I understand Defendants have two relatively |
| 08:34:55 | 22 | short witnesses to present by deposition; is that correct? |
| 08:34:58 | 23 | MR. DANIEL CHO:  Good morning, Your Honor.  Daniel |
| 08:35:04 | 24 | Cho on behalf of Defendants Samsung Display, Samsung |
| 08:35:07 | 25 | Electronics, and Samsung Electronics America. |

549

| 08:35:09 | 1 | Defendants call their next witness, Mr. Ciaran |
| 08:35:13 | 2 | O'Gara, by deposition.  For the record, the time counted |
| 08:35:16 | 3 | against Defendants is 5 minutes 32 seconds.  O'Gara |
| 08:35:21 | 4 | Deposition Exhibit 12 is DTX-327.  O'Gara Deposition |
| 08:35:24 | 5 | Exhibit 13 is DTX-328. |
| 08:35:28 | 6 | THE COURT:  Are there any Plaintiff's |
| 08:35:29 | 7 | counter-designations, or is this all to Defendant? |
| 08:35:32 | 8 | MR. DANIEL CHO:  No counter-designations, |
| 08:35:34 | 9 | Your Honor. |
| 08:35:34 | 10 | THE COURT:  All right.  Please proceed with this |
| 08:35:38 | 11 | witness by deposition. |
| 08:35:39 | 12 | MR. DANIEL CHO:  Thank you, Your Honor. |
| 08:35:39 | 13 | CIARAN O'GARA, DEFENDANTS' WITNESS |
| 08:35:42 | 14 | PRESENTED BY VIDEO DEPOSITION |
| 08:35:42 | 15 | (Videoclip played.) |
| 08:35:43 | 16 | Q.  Could you please state your full name and current |
| 08:36:22 | 17 | address for the record, please? |
| 08:36:24 | 18 | A.  Sure.  My full name is Ciaran O'Gara, and my |
| 08:36:30 | 19 | residential address is Ballynagran, Craughwell, County |
| 08:36:31 | 20 | Galway, Ireland. |
| 08:36:31 | 21 | Q.  So beginning in October 2016, it's listed here that you |
| 08:36:37 | 22 | were managing director of Solas OLED Limited; is that |
| 08:36:40 | 23 | correct? |
| 08:36:40 | 24 | A.  That is correct, yes. |
| 08:36:43 | 25 | Q.  And you currently still hold that title as managing |

08:36:50  1   director of Solas?

08:36:51  2   A.  Correct.

08:36:53  3   Q.  And -- and you testified earlier that currently there

08:36:56  4   are no employees on Solas's direct payroll, correct?

08:36:59  5   A.  That is correct.

08:36:59  6   Q.  When -- okay.  So now I understand.  So Solas currently

08:37:03  7   has no employees?

08:37:04  8   A.  That is correct.

08:37:04  9   Q.  And do you recognize Exhibit No. 2?

08:37:09  10  A.  Yes, I do.

08:37:14  11  Q.  It's a press release provided by Solas OLED on May

08:37:20  12  23rd, 2018; is that correct?

08:37:22  13  A.  Yes, that is correct.

08:37:23  14  Q.  Going back to the second paragraph.  In the sentence --

08:37:31  15  second sentence it reads:  Solas's scientists continue to

08:37:35  16  file new intellectual property based on their research in

08:37:39  17  the OLED space.  Do you see that?

08:37:40  18  A.  Yes.

08:37:40  19  Q.  There has been no patent applications filed by Solas,

08:37:49  20  correct?

08:37:49  21  A.  Not that I'm aware of.

08:37:50  22  Q.  Has Solas ever designed any device?

08:37:54  23  A.  No.

08:37:56  24  Q.  And on the last -- on the same page that we're looking

08:38:00  25  at, the last paragraph of Exhibit No. 2, it reads:  Solas

08:38:05  1  is a leading licensor of technology focused on the OLED

08:38:08  2  market.

08:38:09  3       Correct?

08:38:10  4  A.  I can see that here.

08:38:13  5  Q.  But you testified that Solas has not entered into any

08:38:16  6  licenses for any technology since its conception.  That's

08:38:22  7  correct?

08:38:23  8  A.  That is correct.

08:38:23  9  Q.  And this is being marked as Exhibit No. 13.

08:38:30  10      Do you recognize this document?

08:38:31  11  A.  I do, yes.

08:38:34  12  Q.  And what is it?

08:38:35  13  A.  These are manufacturing patents.

08:38:37  14  Q.  Is this a list of the OLED manufacturing patents that

08:38:43  15  were -- that Solas had purchased from Casio and had sold to

08:38:51  16  Aris through the patent sale agreement which we just looked

08:38:54  17  at which was Exhibit No. 12?

08:38:59  18      And if we go to the next page, this is a KPMG

08:39:07  19  valuation report dated February 5th of 2018, addressed to

08:39:13  20  the directors of Solas OLED Limited, in relation to 42

08:39:18  21  manufacturing patents to Aris Technologies, Limited.  Is

08:39:23  22  that an accurate description of this document?

08:39:25  23  A.  Yes.  It seems to be, yes.

08:39:30  24  Q.  And it reads under the heading of Background at the

08:39:39  25  bottom of that page:  Solas OLED acquired a total of 725

| | | |
|---|---|---|
| 08:39:44 | 1 | patents from Casio on the 11th of April 2016.  The |
| 08:39:48 | 2 | acquisition price was agreed on a total of $1.5 million. |
| 08:39:54 | 3 | Correct? |
| 08:39:55 | 4 | A.  That's correct. |
| 08:39:55 | 5 | Q.  And you understand that the OLED manufacturing patents |
| 08:40:05 | 6 | were separated out from the full portfolio and sold to Aris |
| 08:40:13 | 7 | by Solas for $66,000, correct? |
| 08:40:18 | 8 | A.  That's correct. |
| 08:40:19 | 9 | Q.  So you -- you testified that all of the Atlantic IP |
| 08:40:25 | 10 | portfolio companies, including Solas OLED, is currently |
| 08:40:29 | 11 | housed in The Hyde Building, Suite 23, correct? |
| 08:40:32 | 12 | A.  That's correct. |
| 08:40:32 | 13 | Q.  How many rooms are there Suite 23? |
| 08:40:38 | 14 | A.  Office space, there's one open office space, one |
| 08:40:41 | 15 | conference room, a kitchen, and several bathrooms. |
| 08:40:46 | 16 | Q.  Is it fair to say that there's no OLED manufacturing |
| 08:40:50 | 17 | equipment or apparatus at Suite 23 of The Hyde Building? |
| 08:40:55 | 18 | A.  That is correct. |
| 08:40:56 | 19 | Q.  And you don't have any equipment capable of |
| 08:40:58 | 20 | manufacturing or designing any touch sensor device at the |
| 08:41:04 | 21 | Hyde building? |
| 08:41:07 | 22 | A.  That's correct. |
| 08:41:08 | 23 | Q.  Is it fair to say that at Suite 23 of the Hyde |
| 08:41:12 | 24 | building, Solas or any of the Atlantic IP portfolios do not |
| 08:41:17 | 25 | have a research lab? |

| | | |
|---|---|---|
| 08:41:21 | 1 | A.  That's correct, yes. |
| 08:41:23 | 2 | Q.  Are you aware of any product or device commercialized |
| 08:41:30 | 3 | by Casio that practices the asserted '338 and '450 patents? |
| 08:41:37 | 4 | A.  No, I'm not aware. |
| 08:41:43 | 5 | Q.  Are you aware of any device or product commercialized |
| 08:41:46 | 6 | by Microchip that practices the asserted '311 patent? |
| 08:41:49 | 7 | A.  No, I'm not aware. |
| 08:41:51 | 8 | (Videoclip ends.) |
| 08:41:55 | 9 | THE COURT:  Does that complete this witness by |
| 08:41:58 | 10 | deposition? |
| 08:41:58 | 11 | MR. DANIEL CHO:  Yes, Your Honor. |
| 08:41:59 | 12 | THE COURT:  Call your next witness. |
| 08:42:01 | 13 | MR. DANIEL CHO:  Your Honor, Defendants call our |
| 08:42:03 | 14 | next witness, Mr. Colm O'Riordan by deposition.  The time |
| 08:42:07 | 15 | counted against Defendants is 7 minutes and 58 seconds. |
| 08:42:10 | 16 | The time counted against Plaintiff Solas is 37 seconds. |
| 08:42:14 | 17 | And we're ready to proceed, Your Honor. |
| 08:42:16 | 18 | THE COURT:  Please proceed with this witness by |
| 08:42:19 | 19 | deposition. |
| 08:42:19 | 20 | COLM O'RIORDAN, DEFENDANTS' WITNESS |
| 08:42:20 | 21 | PRESENTED BY VIDEO DEPOSITION |
| 08:42:20 | 22 | (Videoclip played.) |
| 08:42:20 | 23 | Q.  Your full name and address for the record, please? |
| 08:42:24 | 24 | A.  Colm O'Riordan, 156 Castle Farm, Shankill, County |
| 08:42:33 | 25 | Dublin. |

08:42:34  1  Q.  Dr. O'Riordan, I retrieved this webpage from the Solas

08:42:39  2  OLED website.  So you're currently employed for -- by

08:42:42  3  Atlantic IP Services?

08:42:44  4  A.  That is correct.

08:42:45  5  Q.  Do you still perform work for Solas OLED?

08:42:47  6  A.  I do.

08:42:51  7  Q.  Your position at Solas OLED was the chief technical

08:42:55  8  officer?

08:42:56  9  A.  That is correct.

08:42:58  10  Q.  Solas ever file a patent application?

08:43:03  11  A.  That contained a specification that we drew up?  Not to

08:43:09  12  my knowledge, no.

08:43:10  13  Q.  Have you ever filed a patent application at all?

08:43:14  14  A.  Not to my knowledge.

08:43:15  15  Q.  Do you have a lab in your offices?

08:43:24  16  A.  I wouldn't say we have a lab, no.

08:43:26  17  Q.  You said, we have a TV, obviously, in the lab.  What

08:43:29  18  were you referring to?

08:43:30  19  A.  So, yeah, let me -- let me clarify that.

08:43:34  20      So we're currently in a new office.  We've just

08:43:37  21  moved here.  That's where I'm taking this deposition from

08:43:39  22  today.

08:43:39  23      In the old office, which was in Dublin, we had a

08:43:45  24  meeting room which Robert and I would refer to as the lab,

08:43:49  25  where we have carried out some technical work in that

08:43:54   1   environment.  So we've -- we've termed it the lab in that

08:44:03   2   context.  So that was the context of my answer.

08:44:06   3   Q.  You understand this is the deposition notice that was

08:44:08   4   served by Samsung Display, Samsung Electronics, and Samsung

08:44:11   5   Electronics America on Solas OLED requesting that Solas

08:44:14   6   provide a witness to testify at deposition on various

08:44:18   7   specific topics?

08:44:19   8   A.  Yes.

08:44:20   9   Q.  And you understand you have been designated by Solas to

08:44:24   10   testify on its behalf with regards to certain ones of those

08:44:28   11   topics?

08:44:29   12   A.  That's correct.

08:44:30   13   Q.  Has Solas ever designed an OLED device?

08:44:34   14   A.  We have not.

08:44:35   15   Q.  Have you -- has Solas ever manufactured an OLED device?

08:44:41   16   A.  We have not.

08:44:42   17   Q.  Has Solas ever designed any display device?

08:44:46   18   A.  We have not.

08:44:49   19   Q.  Has Solas ever manufactured any display device?

08:44:53   20   A.  We have not.

08:44:55   21   Q.  What about selling a display device, has Solas ever

08:45:00   22   done that?

08:45:01   23   A.  No, we have not.

08:45:03   24   Q.  Solas ever designed any touch sensor?

08:45:05   25   A.  No, we have not.

08:45:08 1   Q.  Has Solas ever manufactured any touch sensor device?

08:45:11 2   A.  No, we have not.

08:45:14 3   Q.  Solas ever sold any touch sensor device?

08:45:18 4   A.  No, we have not.

08:45:19 5   Q.  Does Solas have any plans to design a display device in

08:45:24 6   the future?

08:45:24 7   A.  I don't believe that we have.

08:45:28 8   Q.  What does Solas contend is the invention of the '338

08:45:31 9   patent?

08:45:31 10  A.  So the '338 patent discloses a means to, I guess,

08:45:43 11  satisfactorily drive an OLED display while minimizing, you

08:45:53 12  know, voltage drops and signal delay during that driving of

08:45:58 13  the OLED element.

08:45:59 14  Q.  The '338 patent describes minimizing voltage drops and

08:46:04 15  signaling delay through what it calls projecting

08:46:08 16  interconnections, correct?

08:46:08 17  A.  I believe interconnections play a part in the inventive

08:46:16 18  aspect of the patent.

08:46:18 19  Q.  What's your understanding of an interconnection in OLED

08:46:25 20  or LED design?

08:46:27 21  A.  Well, there are a number of ways of interpreting what

08:46:33 22  an interconnection is.

08:46:34 23        In the context of the '338 patent, it's a layer of

08:46:42 24  material that's used to deliver electrical signal to an

08:46:48 25  element of the pixel circuit.

| | | |
|---|---|---|
| 08:46:52 | 1 | Q.  The '450 patent wasn't the first patent to disclose an |
| 08:46:55 | 2 | OLED device, correct? |
| 08:46:56 | 3 | A.  I don't believe it was the first patent to disclose an |
| 08:47:02 | 4 | OLED device. |
| 08:47:03 | 5 | Q.  And does Solas have any knowledge regarding the |
| 08:47:12 | 6 | research and development that went into the invention of |
| 08:47:14 | 7 | the '338 patent? |
| 08:47:14 | 8 | A.  We do not, no. |
| 08:47:18 | 9 | Q.  And no one at Solas has any personal knowledge |
| 08:47:22 | 10 | regarding the research and development that went into the |
| 08:47:25 | 11 | invention of the '450 patent? |
| 08:47:27 | 12 | A.  I believe that is correct, yes. |
| 08:47:31 | 13 | Q.  And as we just looked at in Topic 7, you've been |
| 08:47:35 | 14 | designated to testify as Solas's representative on the |
| 08:47:38 | 15 | priority date it's asserting for each of the patents in |
| 08:47:41 | 16 | this case? |
| 08:47:41 | 17 | A.  That's correct.  So I believe this document was dated |
| 08:47:45 | 18 | the 17th of May.  I don't believe, you know -- I believe |
| 08:47:49 | 19 | that's correct as of that date. |
| 08:47:50 | 20 | Q.  As of today, the 18th, what's the priority date Solas |
| 08:47:53 | 21 | is asserting for the '311 patent? |
| 08:47:54 | 22 | A.  I believe the date as written in this document still |
| 08:47:58 | 23 | applies. |
| 08:47:59 | 24 | Q.  So Solas has never manufactured or sold a device that |
| 08:48:02 | 25 | practices the '311 patent? |

08:48:03   1   A.   That is correct.

08:48:04   2   Q.   Solas never manufactured or sold a device that

08:48:12   3   practices the '338 patent?

08:48:12   4   A.   That is correct.

08:48:13   5   Q.   And Solas has never manufactured or sold a device that

08:48:17   6   practices the -- the '450 patent?

08:48:19   7   A.   That is correct.

08:48:21   8   Q.   Does Solas believe that Casio has ever manufactured a

08:48:26   9   device that practiced the '450 patent?

08:48:27  10   A.   Solas does not have any knowledge that Casio practiced

08:48:34  11   any products -- produced any products that practiced the --

08:48:41  12   I think it was the '338 patent you mentioned.

08:48:44  13   Q.   It was the '450 patent.

08:48:46  14   A.   Right.

08:48:47  15   Q.   So I can ask, is Solas aware of any Casio products that

08:48:51  16   practiced the invention of the '450 patent?

08:48:53  17   A.   No.

08:48:56  18   Q.   Does Solas contend that Casio ever manufactured or sold

08:49:00  19   any products that practiced the invention of the '338

08:49:03  20   patent?

08:49:03  21   A.   We are not aware, no.

08:49:06  22   Q.   What about the '311 patent, does Solas contend that

08:49:11  23   Atmel ever manufactured or sold a device that practiced the

08:49:14  24   '311 patent?

08:49:14  25   A.   Again, at this moment in time, we -- we are not aware.

08:49:22   1   Solas is not aware of any product that Atmel produced that
08:49:26   2   practiced the '311 patent.
08:49:29   3   Q.   Before the lawsuit was filed, had Solas ever informed
08:49:35   4   any of the Samsung entities that Solas believed they
08:49:39   5   infringed the '311 patent?
08:49:39   6   A.   I -- I'm not aware of any communications of that
08:49:46   7   nature.
08:49:46   8   Q.   What about the '338 patent, had Solas ever communicated
08:49:50   9   to any of the Samsung entities that it believed any of them
08:49:55  10   infringed the '338 patent?
08:49:56  11   A.   Again, I'm not aware of any -- of any communications of
08:50:02  12   that -- of that sort.
08:50:03  13   Q.   But is Solas aware -- did Solas ever notify any of the
08:50:07  14   Samsung entities that Solas believed they were infringing
08:50:10  15   the '450 patent prior to the filing of this lawsuit?
08:50:12  16   A.   I'm not aware of any communications of that type.
08:50:21  17   Q.   And you've reviewed the prior art cited by the examiner
08:50:24  18   for the '311 patent?
08:50:25  19   A.   I have not, no.
08:50:29  20   Q.   You haven't looked at any of the prior art references,
08:50:32  21   right?
08:50:32  22   A.   I have not.
08:50:32  23   Q.   Has anyone at Solas looked at any of the prior art
08:50:37  24   references?
08:50:37  25   A.   Not apart from attorneys.

| | | |
|---|---|---|
| 08:50:41 | 1 | (Videoclip ends.) |
| 08:50:43 | 2 | THE COURT:  Does that complete this witness by |
| 08:50:46 | 3 | deposition? |
| 08:50:48 | 4 | MR. FRISCH:  Yes, Your Honor. |
| 08:50:51 | 5 | Defendants call the next witness -- Defendants |
| 08:50:59 | 6 | call our next witness, Adam Fontecchio. |
| 08:51:00 | 7 | THE COURT:  All right.  Dr. Fontecchio, if you'll |
| 08:51:02 | 8 | come forward and be sworn by our courtroom deputy. |
| 08:51:07 | 9 | (Witness sworn.) |
| 08:51:22 | 10 | THE COURT:  Please come around, sir, have a seat |
| 08:51:24 | 11 | at the witness stand. |
| 08:51:29 | 12 | MR. AUSTIN:  Your Honor, may I approach? |
| 08:51:30 | 13 | THE COURT:  You may approach. |
| 08:51:54 | 14 | Let me ask you, Mr. Frisch, is one of these for |
| 08:51:59 | 15 | the witness or all of them for the Court? |
| 08:52:02 | 16 | MR. FRISCH:  I believe they're all for the Court, |
| 08:52:03 | 17 | Your Honor. |
| 08:52:03 | 18 | THE COURT:  All right.  Thank you.  You may |
| 08:52:06 | 19 | proceed with your direct examination. |
| 08:52:08 | 20 | MR. FRISCH:  Good morning, Your Honor.  Good |
| 08:52:09 | 21 | morning, ladies and gentlemen of the jury.  My name is |
| 08:52:13 | 22 | Jared Frisch, and I have the pleasure of representing the |
| 08:52:16 | 23 | Defendants. |
| 08:52:16 | 24 | ADAM FONTECCHIO, DEFENDANTS' WITNESS, SWORN |
| 08:52:16 | 25 | DIRECT EXAMINATION |

08:52:17  1  BY MR. FRISCH:

08:52:17  2  Q.  Dr. Fontecchio, can you please introduce yourself to

08:52:21  3  the jury?

08:52:21  4  A.  Good morning.  My name is Adam Fontecchio.  I'm a

08:52:23  5  professor of electrical and computer engineering at Drexel

08:52:27  6  University.  I've earned the rank of full professor there.

08:52:27  7  I've been there almost 19 years.

08:52:30  8          I live in Pennsylvania, and I have two teenage

08:52:34  9  daughters, not yet in college.  That's coming soon.  Been

08:52:37  10  married about -- almost 20 years, 20 years this year.

08:52:41  11          And we have quite the little zoo at home.  My

08:52:44  12  daughters are into animal rescue, so we have four cats and

08:52:49  13  a dog and probably more by the time I get home.

08:52:51  14  Q.  And in addition to your teaching, do you carry out

08:52:56  15  research as part of your daily functions?

08:52:58  16  A.  I do, yes.  I'm responsible for teaching courses in

08:53:01  17  circuit design and our freshman and senior design courses,

08:53:05  18  advanced courses, in optics and photonics and electronic

08:53:09  19  circuits.

08:53:10  20          I also do research in two areas.  One of them is

08:53:13  21  in STEM education.  I actually direct our center for STEM

08:53:19  22  education, where we try and put in place and research best

08:53:20  23  practices.  Excuse me.

08:53:22  24          I also run my own research laboratory focused on

08:53:27  25  nanophotonics, where we understand how light interacts with

08:53:31   1   materials.

08:53:31   2   Q.  Does any of your research relate to display

08:53:36   3   technologies?

08:53:36   4   A.  It does, yes.  I've worked on a number of technologies

08:53:39   5   over the years.  One of my most recent projects, we're

08:53:42   6   working on integrating electroluminescent materials, like

08:53:47   7   we've been talking about in the OLED displays, into fibers,

08:53:51   8   which we actually are working to weave into clothing so

08:53:51   9   that you could have a display in the sleeve of your jacket

08:53:55  10   or your coat.

08:53:55  11   Q.  Can you explain a little bit more about how that would

08:53:57  12   work?

08:53:57  13   A.  Sure.  So what we've been doing is something called

08:54:01  14   electro-spinning.  We've been taking these same materials

08:54:05  15   that we've been talking about for displays,

08:54:09  16   phosphorus-based materials, and we've been actually

08:54:11  17   extruding them into long fibers, which we can then weave

08:54:15  18   into a pattern that creates a matrix in your sleeve.

08:54:17  19          And so we've been working through it such that it

08:54:20  20   would then be a fully flexible, fully wearable type of

08:54:24  21   display.

08:54:24  22   Q.  And in addition to your research, do you do any work

08:54:28  23   with industry?

08:54:28  24   A.  I do.  I've worked with a number of industries over the

08:54:31  25   years, Lockheed Martin, Boeing, L3 Communications right

08:54:35  1   here in Dallas.

08:54:36  2   Q.  Can you tell the jury a little bit about your work with

08:54:40  3   L3?

08:54:40  4   A.  Yes, for L3, I was working with their division that

08:54:44  5   makes goggles for soldiers.  When soldiers are in the

08:54:48  6   battlefield, they need their eyes protected, and so they

08:54:52  7   wear goggles that protect them from shrapnel.

08:54:52  8        We were working to integrate filters so that it

08:54:56  9   would also block laser light.  There's a lot of laser

08:54:57  10  targeting systems in the battlefield, and we work with them

08:55:00  11  so that soldiers would be protected from the laser light

08:55:04  12  but also not have their vision impaired while they were

08:55:08  13  normally on the battlefield.

08:55:09  14  Q.  Does that work in any way relate to displays?

08:55:11  15  A.  It does.  We use similar display technology to do the

08:55:16  16  laser blocking as what we've been talking about here.

08:55:19  17       We've been using color filtration systems, so red,

08:55:23  18  green, and blue.  We would make specific colors that would

08:55:27  19  block the laser wavelengths used in battlefields.

08:55:30  20  Q.  And if we take a step back, can you briefly explain

08:55:33  21  your education?

08:55:34  22  A.  Sure.  I went to Brown University.  I did my

08:55:37  23  undergraduate degree there in physics, I did a Master's

08:55:40  24  degree in physics, and a Ph.D. in physics working in an

08:55:46  25  electrical engineering laboratory.

08:55:47  1  Q.  Did you do any research as part of your Ph.D. program?

08:55:50  2  A.  I did.  For my master's degree, I did research

08:55:52  3  designing an imaging system that flew in a satellite.  It

08:55:55  4  was designed to measure and map the universe.  And I

08:55:58  5  actually built part of the detection system.  And I lived

08:56:01  6  right here in Palestine, Texas, for three months at the

08:56:05  7  Balloon Facility testing that system out.

08:56:07  8       For my Ph.D. portion of my work, I studied the

08:56:11  9  interaction of materials and liquid crystals at -- in

08:56:15  10  reflective displays.

08:56:17  11  Q.  Have you been awarded any grants to support your

08:56:19  12  research?

08:56:20  13  A.  I have, yes.  I've received grants from a number of

08:56:25  14  places, industry, philanthropy, the federal government.

08:56:29  15  I've had grants from the Department of Defense, from the

08:56:33  16  Department of Energy, NASA, the U.S. Army CERDEC, which is

08:56:36  17  their research laboratory.

08:56:37  18  Q.  What were you awarded a grant for from CERDEC?

08:56:40  19  A.  So for CERDEC, we were developing a device, once again,

08:56:44  20  for the battlefield.  We developed a device that allowed

08:56:47  21  soldiers to see through walls.  It was about a

08:56:51  22  briefcase-sized unit that they could carry into the

08:56:53  23  battlefield.  And when they were going in a building to

08:56:56  24  clear the room, they could hold it up to the wall and see

08:56:59  25  if there was anybody on the other side.  So that before

08:57:02   1   they went in the room, they knew what they needed to be
08:57:04   2   prepared for.
08:57:04   3   Q.  Have you published any papers related to display
08:57:07   4   technologies?
08:57:07   5   A.  I have, yes.
08:57:08   6   Q.  About how many?
08:57:09   7   A.  Probably about half my work has been related to display
08:57:13   8   technologies, so maybe 50 or 60 publications.
08:57:16   9   Q.  Have you consulted for other litigations related to
08:57:20  10   display technologies?
08:57:21  11   A.  I have, yes.
08:57:21  12   Q.  Are you being compensated for your time here today?
08:57:24  13   A.  I am, yes.
08:57:26  14   Q.  What is the rate at which you're being compensated?
08:57:29  15   A.  I have a standard rate of $500 per hour.
08:57:32  16   Q.  Is your compensation dependent on the outcome of the
08:57:35  17   case or on the opinions and testimony that you're providing
08:57:38  18   today?
08:57:38  19   A.  It is not.  Just for my time.
08:57:39  20   Q.  Are the opinions and testimony that you're providing
08:57:42  21   today your own?
08:57:43  22   A.  They are.
08:57:44  23          MR. FRISCH:  Your Honor, we tender Dr. Fontecchio
08:57:45  24   as an expert in Organic Light-Emitting Devices and display
08:57:51  25   technologies.

08:57:51  1          THE COURT:  Is there objection?

08:57:53  2          MR. FENSTER:  No objection.

08:57:53  3          THE COURT:  Without objection, the Court will

08:57:55  4  recognize this witness as an expert in those designated

08:57:59  5  fields.

08:57:59  6          Please continue, counsel.

08:58:01  7  Q.  (By Mr. Frisch)  Dr. Fontecchio, what were you asked to

08:58:03  8  do in this case?

08:58:04  9  A.  I was asked to analyze the '338 patent and the '450

08:58:07  10  patent.  For the '338 patent, I was asked to analyze

08:58:09  11  whether the accused products from Samsung infringe on it.

08:58:12  12  For the '450 patent, I was asked, once again, to study

08:58:16  13  whether the accused products infringe and also whether the

08:58:19  14  patent was valid.

08:58:20  15          THE COURT:  Dr. Fontecchio, would you slow down

08:58:23  16  just a little bit?

08:58:24  17          THE WITNESS:  I'm sorry, Your Honor.

08:58:25  18          THE COURT:  Not a big problem, but we've got a

08:58:28  19  long day to go.  So if you would slow down a little bit,

08:58:31  20  I'd appreciate it.

08:58:32  21          THE WITNESS:  Yes, sir.

08:58:33  22          THE COURT:  Go ahead, counsel.

08:58:33  23          MR. FRISCH:  Thank you, Your Honor.

08:58:34  24  Q.  (By Mr. Frisch)  Which claims are you providing

08:58:36  25  opinions on today with respect to the '338 patent?

08:58:38  1   A.  For the '338 patent, it's Claims 5 and 9.

08:58:42  2   Q.  And which claims are you providing opinions on today

08:58:44  3   with respect to the '450 patent?

08:58:45  4   A.  Claims 4 and 5.

08:58:47  5   Q.  In rendering the opinions that you're going to be

08:58:51  6   providing today, what materials did you consider?

08:58:53  7   A.  I considered the patents themselves, the patent file

08:59:00  8   histories, the expert reports in the case, the products

08:59:03  9   themselves, the blueprint and design files for the

08:59:10  10  products, other patents, and some of the patent portfolios

08:59:12  11  in this case.

08:59:13  12  Q.  About how many documents have you looked at in this

08:59:16  13  case?

08:59:16  14  A.  Too many to count.

08:59:21  15  Q.  What conclusions did you reach as to whether Claims 5

08:59:25  16  and 9 of the '338 patent are infringed by any accused

08:59:29  17  product?

08:59:29  18  A.  They do not infringe.

08:59:30  19  Q.  What conclusions did you reach as to whether Claims 4

08:59:34  20  and 5 of the '450 patent are infringed by any accused

08:59:38  21  product?

08:59:38  22  A.  They do not infringe.

08:59:39  23  Q.  Did you analyze whether Claims 4 and 5 of the '450

08:59:44  24  patent are anticipated in light of the prior art?

08:59:47  25  A.  I did.

08:59:47  1    Q.  And what conclusion did you reach?

08:59:49  2    A.  I found that they are anticipated.

08:59:51  3    Q.  Did you analyze whether Claims 4 and 5 are rendered

08:59:56  4    obvious in light of the prior art?

08:59:57  5    A.  I did.

08:59:58  6    Q.  And what conclusion did you reach?

08:59:59  7    A.  That they are obvious.

09:00:02  8            MR. FRISCH:  Mr. Beall, can you please bring up

09:00:05  9    DDX-6.003?

09:00:09  10   Q.  (By Mr. Frisch)  Now, Dr. Fontecchio, have you prepared

09:00:10  11   a set of slides to help walk the jury through your opinions

09:00:13  12   today?

09:00:14  13   A.  I have, yes.

09:00:14  14   Q.  And what are you showing in this particular slide?

09:00:17  15   A.  So we're going to talk about the '338 patent.  This is

09:00:20  16   Claims 5 and 9, which are the accused claims.

09:00:23  17   Q.  What type of claims are Claims 5 and 9?

09:00:26  18   A.  Claims 5 and 9 are dependent claims, so they depend on

09:00:29  19   the claims of Claim 1, as well.

09:00:32  20   Q.  So is that why you have limitations here for both

09:00:36  21   Claims 1 and then each of Claims 5 and 9?

09:00:39  22   A.  I do, yes.  So Claims 5 and 9 need to include all the

09:00:42  23   limitations from Claim 1, as well.

09:00:44  24   Q.  Can you explain, at a high level what the '338 patent

09:00:47  25   describes as its alleged invention?

| | | |
|---|---|---|
| 09:00:50 | 1 | A.  Yes.  At a high level, it invents -- it claims to |
| 09:00:55 | 2 | invent interconnections which connect to the pixels, and |
| 09:00:58 | 3 | these are coupled with the three-transistor circuit. |
| 09:01:01 | 4 | Q.  What is the purpose of that claimed interconnection? |
| 09:01:05 | 5 | A.  So the purpose of the interconnections is to improve |
| 09:01:09 | 6 | the flow of signal from the data lines into the pixels. |
| 09:01:14 | 7 | It's kind of like if you are driving on a highway, |
| 09:01:17 | 8 | that's kind of like a signal line.  It has multiple lanes, |
| 09:01:21 | 9 | and if you go to get off at your off-ramp, that's like a |
| 09:01:26 | 10 | connection to the pixel. |
| 09:01:26 | 11 | It can be limited if there's a slow driver and |
| 09:01:29 | 12 | there's only one lane, so the '338 patent increases the |
| 09:01:32 | 13 | sizes of the interconnections which would be like adding |
| 09:01:35 | 14 | lanes to the off-ramp so that more signal can get off into |
| 09:01:40 | 15 | the pixels easier. |
| 09:01:41 | 16 | MR. FRISCH:  Your Honor, I'm about to ask |
| 09:01:42 | 17 | questions that get into the confidential information, so |
| 09:01:45 | 18 | I'd request that the courtroom be sealed. |
| 09:01:47 | 19 | THE COURT:  Based on counsel's request and to |
| 09:01:50 | 20 | protect confidential and proprietary information of the |
| 09:01:53 | 21 | parties, I'll order the courtroom sealed at this time. |
| 09:01:56 | 22 | I'll direct that all persons present who are not |
| 09:01:58 | 23 | subject to the protective order that's been entered in this |
| 09:02:00 | 24 | case should excuse themselves and remain outside the |
| 09:02:03 | 25 | courtroom until the courtroom is reopened and unsealed. |

| | | |
|---|---|---|
| 09:02:13 | 1 | (Courtroom sealed.) |
| 09:02:13 | 2 | (This portion of the transcript is sealed |
| 09:02:13 | 3 | and filed under separate cover as |
| 09:02:14 | 4 | Sealed Portion No. 13.) |
| 09:37:52 | 5 | (Courtroom unsealed.) |
| 09:37:53 | 6 | THE COURT:  All right.  The courtroom is unsealed. |
| 09:38:04 | 7 | You may proceed. |
| 09:38:06 | 8 | MR. FRISCH:  Thank you, Your Honor. |
| 09:38:07 | 9 | Q.  (By Mr. Frisch)  Dr. Fontecchio, have you also been |
| 09:38:08 | 10 | asked to consider the validity of Claims 4 and 5 of the |
| 09:38:13 | 11 | '450 patent? |
| 09:38:13 | 12 | A.  I have, yes. |
| 09:38:15 | 13 | Q.  Did you consider whether Claims 4 and 5 are anticipated |
| 09:38:21 | 14 | by the prior art? |
| 09:38:21 | 15 | A.  I did consider that, yes. |
| 09:38:23 | 16 | Q.  And what was your conclusion? |
| 09:38:25 | 17 | A.  I found that they are anticipated. |
| 09:38:27 | 18 | Q.  And did you look at any particular prior art for that |
| 09:38:31 | 19 | conclusion? |
| 09:38:31 | 20 | A.  I did.  A patent by Utsugi. |
| 09:38:33 | 21 | Q.  And did you consider whether the claims were obvious in |
| 09:38:37 | 22 | view of Utsugi? |
| 09:38:38 | 23 | A.  I did, and I found that they are obvious. |
| 09:38:41 | 24 | Q.  As part of your analysis, did you form an opinion about |
| 09:38:45 | 25 | the proper definition of a person of ordinary skill in the |

09:38:49  1  art for the '450 patent?

09:38:49  2  A.  I did, yes.

09:38:50  3  Q.  And what, in your opinion, is the proper definition of

09:38:56  4  a person of ordinary skill in the art for this particular

09:38:58  5  patent?

09:38:58  6  A.  So as of November 1996, a person of ordinary skill in

09:39:03  7  the art would be someone with a technical degree in

09:39:09  8  electrical engineering or computer engineering or material

09:39:11  9  science or physics or the like, something similar.  And

09:39:14  10  they would also have experience in active matrix display

09:39:17  11  design and electroluminescence.

09:39:19  12  Q.  Now, in your understanding, has Mr. Credelle provided a

09:39:26  13  different set of qualifications for a person of ordinary

09:39:30  14  skill in the art?

09:39:30  15  A.  He has, yes.

09:39:31  16  Q.  If you were to apply Mr. Credelle's definition of a

09:39:35  17  person of ordinary skill in the art, would that change any

09:39:37  18  of your opinions?

09:39:37  19  A.  It would not.

09:39:44  20        MR. FRISCH:  Mr. Beall, will you please put up

09:39:47  21  DTX-110?

09:39:48  22  Q.  (By Mr. Frisch)  Dr. Fontecchio, do you recognize

09:39:51  23  DTX-110?

09:39:52  24  A.  I do.  This is the Utsugi patent.

09:39:53  25  Q.  What is the title of the Utsugi patent?

09:39:56   1   A.  Current-controlled luminous element array and method

09:40:02   2   for producing the same.

09:40:03   3   Q.  And in your understanding, at a high level, what is the

09:40:06   4   invention of the Utsugi patent?

09:40:08   5   A.  It's a specific type of current-controlled display and

09:40:11   6   a method for producing it.

09:40:12   7   Q.  And who was the Utsugi patent assigned to?

09:40:16   8   A.  It was the NEC Corporation in Japan.

09:40:20   9   Q.  And are you familiar with the NEC Corporation?

09:40:23   10  A.  I am.  They're a large display manufacturer.

09:40:25   11  Q.  And do they manufacture products that are commercially

09:40:27   12  sold?

09:40:27   13  A.  They do, yes.

09:40:28   14  Q.  And what is your understanding as to why the Utsugi

09:40:31   15  reference is prior art to the '450 patent?

09:40:33   16  A.  It was filed and issued prior to the '450 patent being

09:40:41   17  filed.

09:40:41   18  Q.  Was the Utsugi reference considered by the Patent

09:40:44   19  Office during the original prosecution of the '450 patent?

09:40:46   20  A.  It was not.

09:40:48   21  Q.  And how do you know that?

09:40:50   22  A.  I've examined the file history, and in the file history

09:40:54   23  of the patent -- of the '450 patent, it explains everything

09:40:59   24  that was looked at by the Patent Office, and Utsugi does

09:41:01   25  not appear there.

09:41:01  1   Q.  Now, in performing your analysis, what was your

09:41:07  2   understanding for the standard of anticipation?

09:41:09  3   A.  My understanding of anticipation is that every claim

09:41:13  4   limitation is met in the prior art.

09:41:14  5   Q.  And, in your opinion, does Utsugi disclose every

09:41:19  6   limitation of Claims 4 and 5 of the '450 patent?

09:41:21  7   A.  Yes, it does.

09:41:22  8   Q.  Now, in rendering your opinions, were there particular

09:41:25  9   portions of Utsugi that you focused on?

09:41:28  10  A.  There were, primarily Column 7 and 8 and Figures 4

09:41:34  11  and 5.

09:41:34  12  Q.  And why is it that you focused on Columns 7 and 8?

09:41:38  13  A.  7 and 8 describe the manufacturing process, and it

09:41:41  14  walks through the steps of making pixel circuits.

09:41:45  15          MR. FRISCH:  Mr. Beall, can you please put up

09:41:48  16  Figures 4 and 5 side-by-side?

09:41:51  17  Q.  (By Mr. Frisch)  Dr. Fontecchio, can you explain what

09:41:52  18  Utsugi is showing in Figure 4?

09:41:55  19  A.  Yes.  Figure 4 is a top-down view of a pixel circuit.

09:42:01  20  So this is a pixel schematic, similar to what we were

09:42:06  21  looking at before, the blueprint files, the GDS files.

09:42:12  22  This is a drawing, of course, but it lays out a top-down

09:42:14  23  view of what the pixel looks like.

09:42:17  24  Q.  And what does it show in Figure 5 of Utsugi?

09:42:19  25  A.  Figure 5 is a cross-section.  So if you take Figure 4,

09:42:23  1  you can see there's a Line A that goes across it, pointer,

09:42:28  2  this line.

09:42:29  3        If you were to take a slice, like cutting through

09:42:32  4  a layer cake, and then you look at the slice of cake that

09:42:35  5  you have, that's what you see on the right in Figure 5.

09:42:39  6  They call it a cross-section analysis.

09:42:41  7  Q.  And how are the layers that you see in Figure 5 formed?

09:42:44  8  A.  They are formed through micro-manufacturing techniques.

09:42:49  9  You put down layers, and you process them.  You can add

09:42:53  10  material, you can remove material, and build it out.

09:42:55  11  Q.  And is it built in a particular direction?

09:43:00  12  A.  It's built from the bottom up.

09:43:02  13  Q.  Have you prepared slides to help walk the jury through

09:43:06  14  your particular opinions with respect to Utsugi?

09:43:08  15  A.  I have, yes.

09:43:15  16  Q.  Dr. Fontecchio, what are you showing on this slide?

09:43:18  17  A.  So these are the claim limitations for Claim 4.

09:43:22  18  Claim 4 is dependent upon Claim 1, so I also have the

09:43:25  19  limitations for Claim 1.

09:43:27  20        So this is what needs to be demonstrated, all of

09:43:30  21  these limitations exist within Utsugi, for Utsugi to

09:43:33  22  anticipate the '450, Claim 4.

09:43:41  23  Q.  And --

09:43:43  24  A.  Oh, I'm sorry.

09:43:43  25  Q.  In particular, why have you highlighted the first three

09:43:46   1   elements?

09:43:46   2   A.  So I'm going to walk through each of these limitations

09:43:49   3   and show you where they exist within Utsugi.

09:43:51   4         And the first 1, [1a], and [1b] are bold because

09:43:55   5   that's where I'm going to start.

09:43:57   6   Q.  Now, can you explain your analysis to the jury?

09:43:59   7   A.  I can.  So in the upper left-hand corner, you'll see a

09:44:03   8   box, and this is the claim limitation that I'm talking

09:44:08   9   about.  So that's from the claim from '450, what I just

09:44:11  10   showed you on the previous page.

09:44:13  11         I then have some text from Utsugi in a box and a

09:44:17  12   figure on the right from Utsugi.  And I'm going to show you

09:44:21  13   where all of the elements from the claim appear within

09:44:25  14   Utsugi.

09:44:25  15         So let me start with a display apparatus.  We know

09:44:30  16   that it's a display because it says it's a display.  And it

09:44:34  17   starts with a substrate.

09:44:36  18         And in this case, a substrate is the bottom layer

09:44:39  19   that we're going to build our circuit on.  It's highlighted

09:44:41  20   in yellow.  It's a 50 glass -- No. 50, the glass base.  And

09:44:46  21   also in yellow is the text in DTX-110 that shows you glass

09:44:51  22   base 50.  And so we have our substrate that's required.

09:44:55  23         Next up is the active elements, in blue.  And the

09:44:59  24   active elements are formed over the substrate.

09:45:01  25         In the text, it describes the active elements as

| | | |
|---|---|---|
| 09:45:04 | 1 | switching transistor $Q_s$ and current-controlling transistor |
| 09:45:11 | 2 | $Q_1$.   Transistors are active elements. |
| 09:45:16 | 3 |         And over here on the right, in blue, in this |
| 09:45:19 | 4 | cross-section, we can see where they have built $Q_1$ which is |
| 09:45:23 | 5 | one of the transistors. |
| 09:45:24 | 6 |         We can also see that the active elements are |
| 09:45:27 | 7 | required to be performed over the substrate, and you can |
| 09:45:29 | 8 | see here that the transistor is formed over the substrate. |
| 09:45:36 | 9 | Q.  And does Claim -- or excuse me.  Does Figure 5 show |
| 09:45:41 | 10 | both of the transistors, $Q_s$ and $Q_1$, that you discussed? |
| 09:45:45 | 11 | A.  It does not.  There's a second transistor $Q_s$, it's just |
| 09:45:48 | 12 | not shown here. |
| 09:45:48 | 13 | Q.  Can you explain why it's not shown in this particular |
| 09:45:51 | 14 | figure, Figure 5? |
| 09:45:52 | 15 | A.  When they were doing -- designed the patent, they just |
| 09:45:54 | 16 | happened to pick a cross-section that shows one of the |
| 09:45:57 | 17 | transistors, not both of them. |
| 09:45:58 | 18 | Q.  And, Dr. Fontecchio, what's the next aspect of the |
| 09:46:00 | 19 | claim that you looked at? |
| 09:46:01 | 20 | A.  The next aspect is that the active elements are driven |
| 09:46:06 | 21 | by externally supplied signal.  So the active elements are |
| 09:46:10 | 22 | still in blue, the switching transistor $Q_s$ described in the |
| 09:46:15 | 23 | text from DTX-110.  And now we have the scan electrode line |
| 09:46:27 | 24 | $3_{N+1}$ and electrode line $1_M$.  This is the externally supplied |
| 09:46:27 | 25 | signal. |

09:46:29  1          Over here we see Figure 3, which is a circuit

09:46:33  2   diagram from Utsugi.  And I've highlighted in yellow the

09:46:36  3   signal electrode line $1_M$ and the $3_{N+1}$ line.  And here we can

09:46:43  4   see the two transistors, $Q_s$ and $Q_i$, and that they are being

09:46:47  5   driven by these external signals.

09:46:48  6   Q.  Can you explain what it means to be driven by

09:46:51  7   something?

09:46:51  8   A.  It means that the signal is applied to it.

09:46:57  9   Q.  Dr. Fontecchio, what is the next limitation that you

09:46:59  10  looked at?

09:46:59  11  A.  Next is [1c], insulation requirement.

09:47:04  12  Q.  And, in your opinion, does Utsugi disclose the [1c]

09:47:08  13  insulation requirement?

09:47:09  14  A.  It does, yes.

09:47:10  15  Q.  And then you provided a slide that demonstrates why you

09:47:13  16  believe that's the case?

09:47:14  17  A.  I have.

09:47:14  18  Q.  And can you walk the jury through that analysis?

09:47:17  19  A.  Yes.  So in the upper left, we have the claim

09:47:19  20  limitation, and it requires an insulation film, which I've

09:47:24  21  identified in yellow, and in the text from DTX-110 at

09:47:28  22  Column 7.  And it identifies a $SiO_2$ layer.  This is silicon

09:47:34  23  dioxide.  It's an insulating layer.

09:47:36  24          And over here in the figure, you can see $SiO_2$

09:47:40  25  highlighted in yellow.  You can see the requirement that it

09:47:43   1   needs to be formed so as to cover said active elements.

09:47:47   2   The active elements are in blue.  Source electrode $S_{01}$ of

09:47:55   3   the current-controlling transistor $Q_1$.  So these are the

09:47:58   4   active elements shown in the figure.  And you can see the

09:48:00   5   insulation layer covering them, there in blue.

09:48:03   6           It also requires that the insulation have at least

09:48:06   7   one of these contact holes that I've described, the

09:48:09   8   vertical wire.  And the text describes contact holes 56B.

09:48:15   9           And over here, in green, identified is the second

09:48:17   10  contact hole.

09:48:18   11          And so you can see that there is the blue

09:48:20   12  transistor and then a contact hole through the insulation

09:48:23   13  layer.

09:48:24   14  Q.  And the particular text that you're looking at from

09:48:26   15  Utsugi, is that from Column 7, Line 46 to 52?

09:48:29   16  A.  It is, yes.

09:48:35   17  Q.  Dr. Fontecchio, what was the next limitation that you

09:48:37   18  then had to look at?

09:48:39   19  A.  The next limitation was for a first electrode.

09:48:41   20  Q.  And, in your opinion, does Utsugi disclose the first

09:48:45   21  electrode that's required by the claims?

09:48:47   22  A.  It does, yes.

09:48:47   23  Q.  Can you walk the jury through that analysis?

09:48:49   24  A.  I can.

09:48:50   25          So the claim limitation requires a first

09:48:52  1  electrode, in purple.  In the text of Utsugi, at Column 7,

09:48:57  2  46 to 51, it describes an electron injection electrode 55

09:49:02  3  to be formed as a lower electrode of the organic thin-film

09:49:07  4  EL element in the subsequent process.  So this is our first

09:49:10  5  electrode layer.

09:49:11  6       He also describes in Column 6, 23 to 27, EL as a

09:49:16  7  layered organic thin-film EL element extends over the

09:49:19  8  capacitor C and the transistors $Q_r$ and $Q_s$.

09:49:23  9       So this purple layer here is the first electrode.

09:49:26  10  You can see it's labeled electron injection electrode.  You

09:49:32  11  can see it's formed on said insulation film.  You can see

09:49:34  12  it's formed on top of the yellow insulation film layer.

09:49:37  13       From the claim language, it's to cover said active

09:49:41  14  elements.  You can see that it covers the transistor, this

09:49:45  15  purple layer.  And it's connected to said active elements

09:49:48  16  through at least one contact hole.

09:49:51  17       So this was the purpose of the contact hole, was

09:49:53  18  to connect electrically this purple layer down through the

09:49:57  19  contact hole to the electrode.

09:50:01  20       The contact holes are once again described in the

09:50:04  21  text in green and so are the electrodes in blue -- the

09:50:09  22  transistors in blue.  Sorry, I misspoke.

09:50:12  23       There also is a requirement here that the first

09:50:15  24  electrode be made of a material which shields visible

09:50:17  25  light.

09:50:18  1         The first electrode layer is made out of a

09:50:20  2    material MgAg.  You can see it's labeled here.  MgAg is a

09:50:25  3    material which shields visible light.

09:50:27  4    Q.  And does that property of MgAg change over time?

09:50:31  5    A.  No, that's just the fundamental property of that metal.

09:50:35  6    Q.  And, Dr. Fontecchio, what is the next limitation of the

09:50:38  7    claim?

09:50:38  8    A.  Excuse me.

09:50:39  9         The next limitation is where -- is for the

09:50:42  10   electroluminescent layer.

09:50:43  11   Q.  And, in your opinion, does Utsugi also disclose the

09:50:47  12   electroluminescent layer that's required by the claim?

09:50:52  13   A.  It does.

09:50:52  14   Q.  And can you walk the jury through the analysis you

09:50:55  15   performed?

09:50:55  16   A.  I can.

09:50:56  17        So I'm adding in now this electroluminescent layer

09:50:58  18   in orange.  It's described as:  The organic

09:51:04  19   electroluminescent layer having an organic

09:51:06  20   electroluminescent material, and it's formed on the first

09:51:07  21   electrode.

09:51:08  22        In the text of Utsugi, at Column 6, 23 to 29, it

09:51:12  23   describes the luminescent element EL as a layered organic

09:51:17  24   thin-film EL element, extends to cover the capacitor and

09:51:22  25   transistors $Q_r$ and $Q_s$, and the electron injection electrode

09:51:27   1   55, in purple.

09:51:28   2         So this is adding in this orange layer with the

09:51:32   3   yellow-orange striped layer in the middle.  This is the

09:51:35   4   layered organic thin-film layer structure.  You can see

09:51:35   5   that it is on the first electrode and that it covers the

09:51:41   6   active elements, the transistor.

09:51:42   7   Q.  And the remainder of that limitation not highlighted

09:51:46   8   here says that it must:  Include at least one layer which

09:51:49   9   emits light in accordance with the voltage applied to said

09:51:53  10   at least one layer.

09:51:54  11         Does Utsugi disclose that aspect, in your opinion?

09:51:56  12   A.  It does, yes.

09:51:57  13   Q.  And can you explain why that is?

09:52:00  14   A.  Uh-huh, I can.

09:52:02  15         In the text, at Column 6, 59 to 63, it describes:

09:52:06  16   An electric field acting thereon, causing the organic

09:52:12  17   luminescent layer 52B to luminesce, externally emitting

09:52:18  18   flux of light.

09:52:18  19         So electric field is what is the result of

09:52:20  20   applying a voltage.  It creates the electric field, so we

09:52:22  21   have our voltage applied.  And the rest of this is saying

09:52:26  22   when we apply that voltage, that it will luminesce; it will

09:52:29  23   glow and emit light.

09:52:30  24         And we can see over here, in the figure, in the

09:52:34  25   yellow-striped layer, that we have this organic

09:52:38  1  luminescence layer, and this is where the light would be

09:52:40  2  emitted.

09:52:40  3  Q.  And the portion of text that you were just reading

09:52:43  4  from, is that from Column 6, Line 59 to 63?

09:52:46  5  A.  It is, yes.

09:52:47  6  Q.  So, in your opinion, Dr. Fontecchio, does Utsugi

09:52:50  7  disclose all the limitation of Claim [1e]?

09:52:53  8  A.  It does, yes.

09:52:54  9  Q.  And what was the next limitation that you then looked

09:52:56  10  at for your analysis?

09:52:57  11  A.  The next one is the second electrode.

09:53:00  12  Q.  And, in your opinion, does Utsugi also disclose the

09:53:03  13  second electrode that's claimed?

09:53:04  14  A.  It does, yes.

09:53:05  15  Q.  And can you explain to the jury why you believe that's

09:53:07  16  the case?

09:53:07  17  A.  Yes.  So the second electrode I've highlighted in

09:53:12  18  green.  In the text, at Column 6, 53 to 59, it describes:

09:53:17  19  A hole injection electrode 54.

09:53:20  20      And we can see here in the figure, hole injection

09:53:22  21  electrode 54, it's green, all on the top here.

09:53:27  22      It's required that it's formed on said organic

09:53:32  23  electroluminescent layer, and you can see that it's formed

09:53:33  24  on top of the orange and yellow electroluminescent layer.

09:53:39  25  And it covers said active elements, which are in blue.

09:53:42  1   Down here, the transistor, you can see that it covers --

09:53:45  2   excuse me.

09:53:46  3   Q.  And so, in your opinion, does Utsugi meet all of the

09:53:49  4   limitations of this particular claim element?

09:53:51  5   A.  It does, yes.

09:53:53  6   Q.  And, Dr. Fontecchio, what did you then look at next

09:53:57  7   with respect to the claim?

09:53:58  8   A.  Next, I moved on to [4a], which requires that the

09:54:04  9   active elements are a selection transistor.

09:54:07  10  Q.  And then what does it require of the selection

09:54:10  11  transistor for Limitation [4a]?

09:54:13  12  A.  That it's turned on in response to an externally

09:54:18  13  supplied address signal.

09:54:18  14  Q.  Does Utsugi describe that type of selection transistor?

09:54:22  15  A.  It does.

09:54:22  16  Q.  And can you walk the jury through your analysis?

09:54:24  17  A.  Yes.  So here is Claim [4a], which requires a selection

09:54:28  18  transistor, which is turned on.  In the text of Utsugi at

09:54:32  19  Column 7, 9 through 12, it describes the switching

09:54:35  20  transistor $Q_s$ and transistor $Q_s$.

09:54:40  21          And later in the text, Column 8, 12 to 13, it

09:54:44  22  describes the switching transistor $Q_s$ is turned on.

09:54:46  23          And you can see $Q_s$ identified over here in the

09:54:49  24  circuit diagram.

09:54:50  25  Q.  What type of line is the line that you've labeled

| | | |
|---|---|---|
| 09:54:54 | 1 | here -- or that has been labeled here, apologies, as $3_{N+1}$? |
| 09:55:00 | 2 | A.  So $3_{N+1}$ is a scan electrode line.  It's identified in |
| 09:55:04 | 3 | the text and this is used to externally supplied address |
| 09:55:07 | 4 | signal. |
| 09:55:08 | 5 | Q.  And within the display, what is the function of a scan |
| 09:55:12 | 6 | electrode line? |
| 09:55:12 | 7 | A.  It's to supply the signal to each of the transistors to |
| 09:55:16 | 8 | turn them on when you want the pixels to illuminate. |
| 09:55:21 | 9 | Q.  And how many scan electrode lines do you have in a |
| 09:55:22 | 10 | display? |
| 09:55:22 | 11 | A.  You'd have a whole lot of them.  I don't know how many |
| 09:55:23 | 12 | rows and columns you have, but there would be one for each |
| 09:55:26 | 13 | of the rows. |
| 09:55:26 | 14 | Q.  What's the next limitation that you then looked at, |
| 09:55:31 | 15 | Dr. Fontecchio? |
| 09:55:31 | 16 | A.  The next is a drive transistor. |
| 09:55:34 | 17 | Q.  And, in your opinion, does Utsugi disclose the |
| 09:55:38 | 18 | particular drive transistor required by the claims? |
| 09:55:41 | 19 | A.  It does, yes. |
| 09:55:42 | 20 | Q.  And can you walk the jury through your analysis of that |
| 09:55:46 | 21 | particular limitation? |
| 09:55:46 | 22 | A.  Yes.  So our drive transistor is highlighted in green. |
| 09:55:50 | 23 | You can see it over here in the figure as $Q_1$ in Figure 3. |
| 09:55:56 | 24 | It needs to be driven by a signal corresponding to image |
| 09:55:59 | 25 | data, in orange. |

09:56:01   1          The signal electrode line $1_m$ is described in Utsugi

09:56:05   2   at Column 8, 13 to 16.  And in Utsugi, at Column 1, 6

09:56:11   3   through 9, it describes this is for a display purpose.

09:56:14   4          So the signal electrode line is supplying image

09:56:17   5   data, and you can see this signal electrode line $1_m$ over

09:56:21   6   here in the figure.

09:56:22   7          And we can see the selection transistor that's

09:56:26   8   required in blue identified here in the text as switching

09:56:28   9   transistor $Q_s$, and that's right over here in the figure.

09:56:32  10   Q.  And, in your opinion, is the selection transistor

09:56:36  11   passing through an image data that was supplied externally?

09:56:40  12   A.  Yes, it is.

09:56:41  13   Q.  And can you explain why that is?

09:56:43  14   A.  Because the data is coming from this signal electrode

09:56:46  15   line, it's external, and then it enters the circuit here.

09:56:50  16   This is the circuit.

09:56:54  17          In fact, in this figure there are actually four

09:56:56  18   sub- pixel circuits, but we've just been focusing on one.

09:56:59  19   Q.  How many sub-pixels would you expect to find in a

09:57:04  20   normal display?

09:57:04  21   A.  Millions.

09:57:06  22   Q.  Dr. Fontecchio, what's required by the remainder of the

09:57:09  23   limitation?

09:57:09  24   A.  The remainder of the limitation requires while said

09:57:15  25   selection transistor is on for controlling a voltage to be

09:57:17  1  applied to said organic electroluminescent layer.

09:57:20  2  Q.  And did you also analyze that latter half with the

09:57:24  3  element?

09:57:24  4  A.  I did, yes.

09:57:25  5  Q.  And, in your opinion, does Utsugi disclose that, as

09:57:27  6  well?

09:57:28  7  A.  It does.

09:57:28  8  Q.  And can you explain?

09:57:29  9  A.  Yes.  So in the text of Utsugi at Column 6, 59 to 63,

09:57:35  10  it describes, there develops an electric field -- and

09:57:39  11  remember, electric field is the result of applying

09:57:43  12  voltage -- acting thereon, causing the organic luminescent

09:57:47  13  layer 52B to luminesce, externally emitting flux of light.

09:57:53  14  And so it's this external signal causing it to emit light.

09:57:53  15        It later goes on at Column 8, 20 to 28, to

09:57:57  16  describe, according to a drain current versus gate voltage

09:58:01  17  characteristic of the transistor $Q_1$, so this is the drive

09:58:05  18  transistor $Q_1$.

09:58:06  19        And then it describes for how the voltage is

09:58:08  20  applied, in yellow.  An electric current runs through a

09:58:14  21  specific established conducting route, the power source

09:58:16  22  electrode Line 5 to the luminescent element EL to the

09:58:20  23  transistor $Q_1$ to the scan electrode line causing the

09:58:24  24  luminescent element EL to luminesce.  So it's describing

09:58:30  25  what is required in Claim [4b].

09:58:32  1   Q.  And, in particular, can you explain how the two pieces

09:58:36  2   of text you just described relate back to the control gate

09:58:39  3   voltage?

09:58:39  4   A.  Yes.  So this text describes how the electric field is

09:58:42  5   applied and how the current flows through it, and voltage

09:58:45  6   is related to current and creates an electric field.

09:58:49  7   Q.  Dr. Fontecchio, did you also analyze the last

09:58:52  8   limitation of Claim 4?

09:58:53  9   A.  I did.  It requires that a selection transistor and

09:58:57  10  drive transistor form a pair.

09:58:58  11  Q.  And, in your opinion, does Utsugi disclose a selection

09:59:02  12  transistor and a drive transistor to form a pair?

09:59:04  13  A.  It does.

09:59:05  14  Q.  And can you walk the jury through that particular

09:59:10  15  analysis?

09:59:11  16  A.  Yes.  So we can see in the text at -- of Utsugi at

09:59:16  17  Column 5, 50 to 56, it describes a pair of reversely

09:59:22  18  staggered amorphous silicon TFTs have a switching

09:59:28  19  transistor and a current-controlling transistor.  And we

09:59:28  20  see over here in the figure, $Q_s$ and $Q_i$ are a pair within

09:59:33  21  this sub-pixel.

09:59:34  22  Q.  So, in your opinion, prior to the '450 patent, had

09:59:40  23  Utsugi disclosed all of the elements of Claims 4 of that

09:59:43  24  patent?

09:59:43  25  A.  It had, yes.

588

| | | |
|---|---|---|
| 09:59:45 | 1 | Q.  If we can move on to Claim 5.  What's required by |
| 09:59:51 | 2 | Claim 5, Dr. Fontecchio? |
| 09:59:52 | 3 | A.  Claim 5 requires that the first electrode is connected |
| 09:59:55 | 4 | to the drive transistor through said at least one contact |
| 09:59:59 | 5 | hole. |
| 09:59:59 | 6 | Q.  And, in your opinion, does Utsugi also disclose the |
| 10:00:03 | 7 | element of Claim 5? |
| 10:00:04 | 8 | A.  It does, yes. |
| 10:00:06 | 9 | Q.  And can you explain why that is? |
| 10:00:07 | 10 | A.  Yes.  So the first electrode that's required is in |
| 10:00:12 | 11 | purple.  It's described in the text of Utsugi at Column 6, |
| 10:00:17 | 12 | 50 to 52 as electrode 55.  That's this purple first |
| 10:00:21 | 13 | electrode layer we see here in the figure. |
| 10:00:23 | 14 | The drive transistor is in blue.  We can see in |
| 10:00:28 | 15 | the text.  It describes a drain electrode $Q_{QI}$ of the |
| 10:00:32 | 16 | current-controlling transistor $Q_1$, which is the transistor |
| 10:00:36 | 17 | in blue right here. |
| 10:00:37 | 18 | And then it requires it's connected through at |
| 10:00:39 | 19 | least one contact hole.  In the text it describes second |
| 10:00:42 | 20 | contact holes 56B.  And here in the figure we see the |
| 10:00:47 | 21 | second contact hole connecting this first electrode layer |
| 10:00:49 | 22 | and the transistor that's blue. |
| 10:00:51 | 23 | Q.  And so, in your opinion, prior to the '450 patent, had |
| 10:00:58 | 24 | Utsugi already disclosed all of the elements of Claim 5? |
| 10:01:01 | 25 | A.  In my opinion, it had, yes. |

10:01:03  1  Q.  Now, what aspects of the claims does Solas argue is not

10:01:08  2  disclosed by Utsugi?

10:01:10  3  A.  The insulation layer limitation.

10:01:12  4  Q.  In your understanding, do they dispute any other

10:01:16  5  limitations?

10:01:16  6  A.  My understanding, they do not.

10:01:18  7  Q.  And what is it about the insulation limitation that

10:01:24  8  Solas disputes?

10:01:25  9  A.  They dispute whether or not Utsugi describes the

10:01:28  10  insulation layer covering both transistors, the drive and

10:01:31  11  the selection transistor, since that cross-section only

10:01:35  12  shows one transistor.

10:01:36  13  Q.  Now, in your opinion, would a person of ordinary skill

10:01:40  14  in the art understand Utsugi to be disclosing that that

10:01:42  15  insulation layer covers both transistors that you

10:01:45  16  discussed?

10:01:45  17  A.  Yes, they would.

10:01:46  18  Q.  And what is the purpose of that insulating layer in

10:01:51  19  Utsugi?

10:01:51  20  A.  So the purpose of the insulating layer is to prevent

10:01:54  21  that first transistor -- or the transistor when you make

10:01:57  22  it, from electrically shorting with the purple first

10:02:01  23  electrode layer.  Those are both conducting materials, and

10:02:04  24  to prevent electrical shorting, you need to put an

10:02:07  25  insulating layer in between.

| | | |
|---|---|---|
| 10:02:08 | 1 | Q.  Can you explain what you mean by electrically shorting? |
| 10:02:12 | 2 | A.  Yes.  If -- if two pieces of metal that are carrying |
| 10:02:16 | 3 | electrical signal touch together, it causes the signals to |
| 10:02:19 | 4 | cancel out and for it to not work. |
| 10:02:21 | 5 | So the first electrode is doing -- is being |
| 10:02:23 | 6 | controlled by the transistor, and so you don't want them to |
| 10:02:27 | 7 | touch.  You want them to be connected in the right way and |
| 10:02:29 | 8 | be separated. |
| 10:02:31 | 9 | Just like you have a power wire for -- here for |
| 10:02:37 | 10 | this monitor, it has two wires running in it that are |
| 10:02:40 | 11 | insulated from each other.  It's the same idea.  You don't |
| 10:02:43 | 12 | want them to touch because it will cause an electrical |
| 10:02:46 | 13 | short. |
| 10:02:46 | 14 | MR. FRISCH:  Mr. Beall, can you please pull up |
| 10:02:49 | 15 | Figure 5 of Utsugi? |
| 10:02:52 | 16 | Q.  (By Mr. Frisch)  Is $Q_s$ shown -- $Q_s$ the transistor, the |
| 10:02:58 | 17 | second transistor, is that shown in Figure 5 of Utsugi, |
| 10:03:01 | 18 | Dr. Fontecchio? |
| 10:03:01 | 19 | A.  $Q_s$ is not shown. |
| 10:03:06 | 20 | Q.  And why is $Q_s$ not shown in Figure 5? |
| 10:03:10 | 21 | A.  So when Utsugi took the cross-section to make Figure 5, |
| 10:03:14 | 22 | they happened to have picked going through transistor Q as |
| 10:03:20 | 23 | shown here. |
| 10:03:20 | 24 | MR. FRISCH:  Mr. Beall, can you put up Figure 4 of |
| 10:03:24 | 25 | Utsugi next to Figure 5? |

| | | |
|---|---|---|
| 10:03:30 | 1 | Q.  (By Mr. Frisch)  And, Dr. Fontecchio, can you generally |
| 10:03:32 | 2 | identify in Figure 4 where transistor $Q_i$ is located? |
| 10:03:36 | 3 | A.  Yes.  That's this -- this is where the cross-section |
| 10:03:39 | 4 | was taken.  So the transistor $Q_i$ is here, which is why we |
| 10:03:43 | 5 | see it in Figure 5. |
| 10:03:44 | 6 | Q.  And, generally, on Figure 4, where is transistor $Q_s$ |
| 10:03:49 | 7 | located? |
| 10:03:50 | 8 | A.  It's located down here, generally. |
| 10:03:51 | 9 | Q.  And so can you explain again how the location of $Q_s$ |
| 10:03:57 | 10 | related to where this cross-section was taken? |
| 10:03:57 | 11 | A.  $Q_s$ happens to not be where we took a slice of our cake |
| 10:04:04 | 12 | to look at it. |
| 10:04:05 | 13 | Q.  Now, based on the manufacturing process that's |
| 10:04:07 | 14 | disclosed in Utsugi, if you took a cross-section in a |
| 10:04:10 | 15 | different location above transistor $Q_s$, what would you |
| 10:04:14 | 16 | expect to find? |
| 10:04:15 | 17 | A.  I would expect to find the insulation layer there. |
| 10:04:17 | 18 | Q.  And have you prepared a model to help demonstrate why |
| 10:04:22 | 19 | it is you believe that to be the case? |
| 10:04:23 | 20 | A.  I have, yes. |
| 10:04:24 | 21 | Q.  I'd like to walk through that model.  Can you take us |
| 10:04:31 | 22 | through the first slide? |
| 10:04:32 | 23 | THE COURT:  Let me interrupt just a minute. |
| 10:04:34 | 24 | Before we transition to this model, we're going to |
| 10:04:38 | 25 | take a short recess, and we'll come back to this as soon as |

| | | |
|---|---|---|
| 10:04:41 | 1 | we complete this recess for the jury. |
| 10:04:43 | 2 | Ladies and gentlemen of the jury, if you'll simply |
| 10:04:45 | 3 | close your notebooks and leave them in your chairs, follow |
| 10:04:48 | 4 | all the instructions I've given you, and we'll be back here |
| 10:04:52 | 5 | in a relatively short period of time to continue with this |
| 10:04:55 | 6 | direct examination.  But given that it's after 10:00 a.m., |
| 10:04:59 | 7 | we will have a short recess at this time. |
| 10:05:00 | 8 | The jury is excused for recess. |
| 10:05:02 | 9 | COURT SECURITY OFFICER:  All rise. |
| 10:05:03 | 10 | (Jury out.) |
| 10:05:35 | 11 | THE COURT:  Counsel, I'll do my best to keep this |
| 10:05:38 | 12 | short. |
| 10:05:38 | 13 | The Court stands in recess. |
| 10:05:40 | 14 | (Recess.) |
| 10:19:25 | 15 | (Jury out.) |
| 10:19:26 | 16 | COURT SECURITY OFFICER:  All rise. |
| 10:19:26 | 17 | THE COURT:  Be seated, please. |
| 10:21:47 | 18 | Mr. Frisch, are you prepared to continue with your |
| 10:22:02 | 19 | direct examination? |
| 10:22:04 | 20 | MR. FRISCH:  I am, Your Honor. |
| 10:22:04 | 21 | THE COURT:  All right.  Let's bring in the jury, |
| 10:22:06 | 22 | please, Mr. Johnston. |
| 10:22:17 | 23 | COURT SECURITY OFFICER:  All rise. |
| 10:22:19 | 24 | (Jury in.) |
| 10:22:22 | 25 | THE COURT:  Please be seated, ladies and |

10:22:46   1   gentlemen.

10:22:46   2          We'll continue with Defendants' direct examination

10:22:50   3   of the witness.

10:22:51   4          You may proceed, counsel.

10:22:55   5   Q.  (By Mr. Frisch)  Dr. Fontecchio, to reorient ourselves,

10:22:59   6   how many limitations of the asserted claims does Solas

10:23:02   7   believe were not shown in the Utsugi reference?

10:23:06   8   A.  Just one, the insulation layer limitation.

10:23:09   9   Q.  And, in your opinion, does Utsugi disclose that

10:23:12   10   particular limitation?

10:23:13   11   A.  In my opinion, it does.

10:23:15   12   Q.  And have you prepared a model to show why you believe

10:23:21   13   that's the case?

10:23:22   14   A.  I have, yes.

10:23:23   15   Q.  And how did you go about preparing this model?

10:23:27   16   A.  So I went through, and I used the specification, the

10:23:31   17   description in the patent, and I also used some of the

10:23:34   18   figures in the patent to follow the instructions that are

10:23:37   19   written for how to make the structure.  And I went and I

10:23:41   20   built the model of what the structure would look like.

10:23:45   21   Q.  And can you explain the first aspect of your model

10:23:48   22   here?

10:23:48   23   A.  Yes.  So the first aspect that's required is that it be

10:23:52   24   built on a substrate, a glass base 50.  And so this first

10:23:56   25   yellow layer is our glass base that I'm going to build the

10:24:01   1   circuit on.

10:24:02   2   Q.  What does Utsugi say happens next in the manufacturing

10:24:05   3   process?

10:24:05   4   A.  So next in the manufacturing process, a layer of Cr is

10:24:12   5   grown, chromium, is grown on the glass base.  You can see

10:24:18   6   this on the left, and it is grown across the glass base

10:24:21   7   surface.  Growing means that you grow everywhere.

10:24:24   8         And then on the right, we have a patterning

10:24:27   9   process.  So what we do is we remove some parts of this red

10:24:32   10  chromium layer to leave the structures that we want for our

10:24:35   11  electronic circuits.

10:24:36   12        The patterning process is executed, it creates the

10:24:39   13  scan lines, a lower electrode of the charge holding

10:24:42   14  capacity C, gate electrode of the switching transistor $Q_s$,

10:24:46   15  and the gate electrode of the current-controlling

10:24:50   16  transistor $Q_1$.  So this is describing the process for both

10:24:54   17  transistors.

10:24:54   18        And you can see down here that this

10:24:57   19  pattern-process has left us with this structure.

10:24:59   20        So, essentially, what's happening in a

10:25:03   21  pattern-process or any kind of patterning is that we're

10:25:06   22  using a mask.  It's almost like doing lithography on a

10:25:10   23  t-shirt.  Like when you screen print a t-shirt, and you

10:25:14   24  have a pattern and you put ink through the pattern and

10:25:19   25  you're left with letters or your image, it's similar to

10:25:19  1   that.  You use that concept to pattern and etch away

10:25:23  2   material or deposit material where you want it.

10:25:24  3   Q.  How did you know which portions of the chromium layer,

10:25:27  4   that you've seen here in red, to take away and what to

10:25:30  5   leave?

10:25:30  6   A.  So I used this description in the upper right corner in

10:25:33  7   combination with the figure that Utsugi has of what the

10:25:36  8   structure will look like and the map view that shows where

10:25:41  9   things are laid out.

10:25:42  10  Q.  What is the next step according to the Utsugi

10:25:45  11  manufacturing process?

10:25:45  12  A.  So the next step is, in the upper left corner, we

10:25:49  13  deposit an $SiO_2$ layer.  It's let to grow 400 nanometers to

10:25:53  14  provide gate insulation.

10:25:55  15       So this is the first insulation layer, in light

10:25:57  16  green, it's grown over the surface.  It's not thicker than

10:26:00  17  the previous layer particularly, and so you wind up with

10:26:04  18  some texture there.

10:26:08  19       Then what we're going to do is etch to open the

10:26:10  20  first contact holes over here on the right.  So this

10:26:13  21  insulation layer on the left here, you can see it went over

10:26:16  22  the conductive chromium layer.  So we need to open this up.

10:26:19  23       So for those contact holes, if you recall, I said

10:26:21  24  it was making a hole in an insulation layer and then

10:26:24  25  filling it with metal.  We need to empty it out that so we

596

10:26:26  1  can put the metal in there.

10:26:28  2  Q.  You've identified a second set of contact holes,

10:26:30  3  towards the bottom.  How did you know that those contact

10:26:33  4  holes existed?

10:26:34  5  A.  So those are in the figure, Figure 4, from Utsugi.  It

10:26:38  6  shows where they are, and they would be etched at the same

10:26:42  7  time in the process.

10:26:42  8  Q.  What is the next step that Utsugi says occurs in the

10:26:45  9  manufacturing process?

10:26:46  10  A.  So now we're going to put down some semiconducting

10:26:51  11  layers.

10:26:51  12          So the next one is -- sorry, I lost my dot, there

10:26:54  13  it is -- is that -- next is an intrinsic amorphous silicon

10:26:59  14  layer is grown on the $SiO_2$.  So this amorphous silicon

10:27:04  15  layer in orange is grown across the surface.

10:27:07  16  Q.  And what's the purpose of that layer?

10:27:08  17  A.  That's going to be a semiconducting layer to make the

10:27:12  18  channels in our transistors.

10:27:12  19  Q.  And then what happens next in the manufacturing

10:27:15  20  process?

10:27:15  21  A.  So next we're going to grow an $n^+$ doped amorphous

10:27:22  22  silicon layer for ohmic contact use.  It's grown on the

10:27:23  23  top.  This will be part of the channels, as well.

10:27:27  24          Then what we're going to do is the grown layers

10:27:29  25  are concurrently pattern-processed to define small islands

10:27:33  1   of this amorphous silicon.

10:27:35  2        So what we've done here is we've removed all the

10:27:38  3   parts of the silicon that we don't need, and we've left

10:27:41  4   these islands, which are combinations of those two layers I

10:27:45  5   put down of silicon, which is why they're kind of this

10:27:52  6   striped color.

10:27:53  7   Q.  What are those two islands used for?

10:27:56  8   A.  So these will be the channels and the transistors.  So

10:27:58  9   between the two metal gates -- sorry, the two source and

10:28:03  10  drain electrodes, this is what's going to control the flow

10:28:03  11  through the switch.  This is the valve, if you will.

10:28:05  12  Q.  And then what does Utsugi say happens next?

10:28:11  13  A.  So next we deposit -- another chromium layer is

10:28:14  14  deposited, and then we will pattern-process it again over

10:28:16  15  here on the right.  And this is going to provide our signal

10:28:20  16  line electrode, our source electrode, $S_{QI}$, a drain

10:28:25  17  electrode, $D_{QI}$, so we've built $Q_i$, and then the drain

10:28:30  18  electrode and source electrode of the switching transistor

10:28:32  19  $Q_s$ and the upper electrode of the charge holding capacitor

10:28:36  20  C and the first contacts.

10:28:38  21        So you can see we're left with all this blue

10:28:40  22  structure here, which is made out of metal, so it's

10:28:42  23  conductive.

10:28:43  24  Q.  How did you know where to pattern-process this blue

10:28:46  25  chromium layer?

10:28:47   1   A.   I used the figures from the patent to show me where the

10:28:51   2   structures would be.

10:28:51   3   Q.   And then what happens next in the process?

10:28:55   4   A.   So next what we have is the channels are formed.  So

10:28:59   5   the channels of both transistors, $Q_1$ and $Q_s$, are formed by

10:29:03   6   etching the islands.

10:29:05   7        And so we can etch them to an intermediate layer

10:29:09   8   depth using the pattern-process chromium, and we are left

10:29:12   9   with these channels here exposed in the transistors.

10:29:16   10  Q.   And after you form the channels, what do you do?

10:29:19   11  A.   So then we grow a second insulating layer of $SiO_2$

10:29:24   12  across the surface.  It's like grown.  And then it is

10:29:27   13  etched to open up the second set of contact holes, 56B, for

10:29:30   14  intercommunication between the source electrode $S_{QT}$ and the

10:29:35   15  controlling transistor $Q_1$.

10:29:37   16       So this is the layer that Solas contends doesn't

10:29:40   17  cover the second set -- the second transistor, which is

10:29:43   18  down here.

10:29:43   19  Q.   And why, in your opinion, according to the

10:29:45   20  manufacturing steps, does that insulation layer cover both

10:29:47   21  transistors?

10:29:48   22  A.   Well, it describes it quite clearly as letting the

10:29:52   23  layer grow.  And in micro-manufacturing, "grow" means that

10:29:55   24  you grow across the entire surface.  That's what the term

10:29:58   25  means.

10:29:59   1          Also, you can see here that when you're putting it

10:30:02   2    down and you're growing it, it just makes sense to grow it

10:30:05   3    everywhere since you need insulator everywhere.

10:30:08   4    Q.  And when does that growth occur within the

10:30:11   5    manufacturing steps with respect to building the

10:30:13   6    transistors themselves?

10:30:14   7    A.  It occurs after the transistors are built so that it

10:30:16   8    protects them from the next -- the first electrode.

10:30:19   9    Q.  So what is the next step in the manufacturing process

10:30:23  10    of Utsugi?

10:30:23  11    A.  So next we're going to grow an MgAg layer, which is our

10:30:29  12    first electrode, and then we're going to process it.  So

10:30:31  13    it's processed using a lift-off method, which is just

10:30:34  14    another method of patterning, to form our first electron

10:30:38  15    injection electrode here.

10:30:42  16    Q.  And, again, how did you know how to pattern this

10:30:44  17    particular layer?

10:30:44  18    A.  I used the figures from the patent to show me what the

10:30:49  19    shapes would look like.

10:30:50  20    Q.  What would be the next layer that Utsugi said is added?

10:30:52  21    A.  Next we put down a spacer layer 52C to put over the

10:30:57  22    surface.  This is just to provide space material between

10:31:01  23    the first electrode and the electroluminescent layers we're

10:31:04  24    going to put down.

10:31:04  25    Q.  And what is the next manufacturing step?

10:31:06   1   A.  So now we're putting down the organic luminescent

10:31:10   2   layer 52B across the surface.  This the layer that will

10:31:15   3   eventually emit light.

10:31:16   4   Q.  And what is formed after the organic electroluminescent

10:31:18   5   layer?

10:31:18   6   A.  So now we form a hole injection layer 52A across the

10:31:22   7   surface.  This will just give us better connection, if you

10:31:25   8   will, between the second electrode and the

10:31:28   9   electroluminescent layer.

10:31:28   10   Q.  And what comes after the hole injection layer?

10:31:31   11   A.  Now, we get the hole injection electrode 54.  This is

10:31:34   12   the second electrode on the top.

10:31:36   13   Q.  And are there any more layers in the device described

10:31:39   14   by Utsugi?

10:31:40   15   A.  There are not.

10:31:40   16   Q.  Dr. Fontecchio, what did you do next with your model?

10:31:45   17   A.  So next I wanted to verify my model was right that I

10:31:49   18   built.

10:31:49   19        So I went back and I used the same cross-section

10:31:53   20   from Figure 4 to cut through to see if what I built looks

10:31:57   21   like the same cross-section from -- in Figure 5, which is

10:32:01   22   what Utsugi had put in Figure 5.

10:32:04   23        MR. FRISCH:  Mr. Beall, can you take the slide

10:32:07   24   that we're seeing now and put it up next to Figure 4 of

10:32:11   25   Utsugi?

10:32:11  1   A.  Great, thank you.

10:32:12  2   Q.  (By Mr. Frisch)  So using these two figures,

10:32:14  3   Dr. Fontecchio, can you explain what you mean when you said

10:32:17  4   you took the same cross-section?

10:32:18  5   A.  Yes.  So I built this layer cake, I guess I built a

10:32:22  6   rectangular layer cake.  And I basically built it like the

10:32:25  7   same as this figure on the right.

10:32:27  8        This Line A is where Utsugi makes the cut to look

10:32:31  9   at the slice of the layer cake for Figure 5, the

10:32:35  10  cross-section.  So I took the same one.  And I wanted to

10:32:39  11  verify that what I built looks like what Utsugi built in

10:32:43  12  Figure 5.

10:32:44  13       MR. FRISCH:  Mr. Beall, can we go back to the

10:32:46  14  slides?

10:32:47  15  Q.  (By Mr. Frisch)  And so what do we see here?

10:32:50  16  A.  So here I've taken that slice.  I cut a slice out of it

10:32:54  17  like cutting a slice of cake, and then I made some of it to

10:32:59  18  be semitransparent, and we can rotate it to see it a little

10:33:04  19  bit better.

10:33:04  20       Okay.  So on the left, we have my model, the

10:33:07  21  cross-section that I just took following Line A, and on the

10:33:10  22  right is Utsugi 5, which is from Line A.  The only

10:33:14  23  annotation I did was add colors so that they match the

10:33:18  24  layers.

10:33:18  25       You can see that the structure that I've built on

10:33:20  1   the left matches the figure on the right from Utsugi.

10:33:24  2   Q.  And so what does that tell you about your model?

10:33:28  3   A.  It tells me that I put down the layers correctly and

10:33:32  4   that the instructions do indeed teach you how to make this

10:33:36  5   layer structure of Utsugi, that it shows you in Figure 5.

10:33:38  6   Q.  What did you do next with your model?

10:33:40  7   A.  So now I'm going to take a different cross-section and

10:33:43  8   look at the other transistor.  I am going to cut along this

10:33:47  9   dotted line, and it's going to show me what the other

10:33:51  10  transistor looks like, and I can take a look and see if

10:33:54  11  there's an insulation layer there.

10:33:57  12  Q.  So what's shown here?

10:33:58  13  A.  So here I've taken that slice, and it's a little easier

10:34:01  14  if we rotate it.  And we can see it from the side.  We

10:34:05  15  definitely have structure.  Over here on the left is the

10:34:08  16  transistor we're interested in.  Over here on the right, we

10:34:11  17  have some cross-section through contact holes, I believe,

10:34:16  18  just because it happens to be there.

10:34:17  19          But let's zoom in on the left.

10:34:19  20  Q.  And what do you see when you zoom in on the particular

10:34:24  21  transistor?

10:34:24  22  A.  So here I see this second transistor.  I have my gate

10:34:30  23  electrodes at the bottom, I have my source and drain

10:34:33  24  electrodes in blue on the sides.  And then I have my

10:34:36  25  channel region.  I have my first electrode in gray.  And

10:34:39   1   here in between you can see this purple insulation layer.

10:34:42   2   This is the layer that Solas contends isn't there.

10:34:47   3   Q.  And so what, in your opinio,n does your model show

10:34:51   4   about whether there's insulation layer over the second

10:34:54   5   transistor if you are to follow the manufacturing steps

10:34:57   6   provided in Utsugi?

10:34:58   7   A.  My model shows that if a person there -- a person of

10:35:01   8   ordinary skill in the art follows the instructions in

10:35:04   9   Utsugi, it shows you that there is an insulation layer over

10:35:08   10  both transistors.

10:35:09   11  Q.  So, Dr. Fontecchio, in your opinion, does Utsugi

10:35:14   12  disclose every limitation of Claims 4 and 5 of the '450

10:35:17   13  patent?

10:35:17   14  A.  In my opinion, it does, yes.

10:35:21   15  Q.  Dr. Fontecchio, let's just say, for the sake of

10:35:24   16  argument, that Utsugi doesn't explicitly disclose the $SiO_2$

10:35:30   17  layer over the second transistor.  In your opinion, would

10:35:33   18  it be obvious to form that insulation material in that

10:35:36   19  location?

10:35:37   20  A.  It would, yes.  You'd have to have an insulation layer

10:35:43   21  there or the circuit would not work.  So you would have to

10:35:46   22  form one.

10:35:46   23  Q.  At the time Utsugi was filed, would a person of

10:35:50   24  ordinary skill in the art know how to form an $SiO_2$ layer in

10:35:54   25  that particular location?

10:35:55  1   A.  Yes, they would.  That would be a common technique.

10:35:57  2   Q.  Would a person of ordinary skill in the art have an

10:36:01  3   expectation of success in laying that insulation film down

10:36:05  4   in that location?

10:36:06  5   A.  They would, yes; especially since they're laying it

10:36:11  6   down in the other location at the same time.

10:36:13  7   Q.  With respect to the particular limitation we've been

10:36:16  8   discussing, the insulation layer being over the

10:36:20  9   transistors, are you aware of any commercial success of any

10:36:24  10  product that's tied to this particular limitation of the

10:36:27  11  claims?

10:36:28  12  A.  No, I'm not.

10:36:30  13  Q.  Are you aware of any long-felt but unfulfilled need in

10:36:36  14  the industry tied to this particular limitation?

10:36:38  15  A.  No.

10:36:38  16  Q.  Are you aware of any failure by others tied to this

10:36:42  17  particular limitation of putting insulation and film over

10:36:46  18  transistors?

10:36:46  19  A.  I am not, no.

10:36:52  20         MR. FRISCH:  Your Honor, I'm going to now ask a

10:36:54  21  few more questions related to confidential information, so

10:36:57  22  I'd ask if we could seal the courtroom.

10:36:59  23         THE COURT:  Based on counsel's request and

10:37:02  24  representations, I'll order the courtroom sealed.

10:37:04  25         Those present not subject to the protective order

| | | |
|---|---|---|
| 10:37:06 | 1 | in this case should excuse themselves and remain outside |
| 10:37:10 | 2 | the courtroom until it's reopened and unsealed. |
| 10:37:34 | 3 | (Courtroom sealed.) |
| 10:37:34 | 4 | (This portion of the transcript is sealed |
| 10:37:34 | 5 | and filed under separate cover as |
| 10:37:34 | 6 | Sealed Portion No. 14.) |
| 10:47:46 | 7 | (Courtroom unsealed.) |
| 10:47:46 | 8 | THE COURT:  All right.  Mr. Fenster, you may |
| 10:48:40 | 9 | proceed with cross-examination of the witness. |
| 10:48:42 | 10 | MR. FENSTER:  Thank you, Your Honor. |
| 10:48:42 | 11 | CROSS-EXAMINATION |
| 10:48:43 | 12 | BY MR. FENSTER: |
| 10:48:43 | 13 | Q.  Good morning, Dr. Fontecchio. |
| 10:48:53 | 14 | A.  Good morning, Mr. Fenster. |
| 10:48:56 | 15 | MR. FENSTER:  Good morning, ladies and gentlemen. |
| 10:48:57 | 16 | Q.  (By Mr. Fenster)  Dr. Fontecchio, you're serving as an |
| 10:49:00 | 17 | expert witness in this case, right? |
| 10:49:02 | 18 | A.  Yes, sir. |
| 10:49:02 | 19 | Q.  And in connection with your work in this case, you had |
| 10:49:05 | 20 | to submit a report setting forth all of your opinions on |
| 10:49:08 | 21 | infringement and all of your opinions on validity, correct? |
| 10:49:11 | 22 | A.  Two reports, yes. |
| 10:49:13 | 23 | Q.  And you included -- and you made sure that those |
| 10:49:16 | 24 | reports were complete and accurate, right? |
| 10:49:18 | 25 | A.  To the best of my ability. |

10:49:19  1   Q.  And you also sat for a deposition in this case where

10:49:22  2   you testified under oath like you are today; is that

10:49:24  3   correct?

10:49:24  4   A.  Yes.

10:49:26  5   Q.  Now, you agree that since you've done both infringement

10:49:33  6   and validity, you have to apply the claims consistently

10:49:38  7   when you do infringement and validity, correct?

10:49:41  8   A.  Yes.

10:49:42  9   Q.  You can't apply them one way for infringement and

10:49:45  10  another for validity, right?

10:49:46  11  A.  Correct.

10:49:49  12  Q.  Okay.  Let's talk about what the proper infringement

10:49:53  13  analysis is.

10:49:53  14          So just to orient you, since we bounced around,

10:49:58  15  I'm going to talk about the '450 first because -- so we can

10:50:02  16  do that unsealed.  We'll talk about the '450 first.  We'll

10:50:04  17  talk about your infringement opinions and then validity and

10:50:08  18  then the '338.  Okay?

10:50:09  19  A.  Okay.

10:50:09  20  Q.  Okay.

10:50:10  21  A.  Thank you.

10:50:10  22  Q.  So you've been here throughout trial?

10:50:16  23  A.  Mostly.

10:50:16  24  Q.  Okay.  So you've heard Mr. Haslam ask Mr. Credelle and

10:50:21  25  Mr. Dell if they looked at various teardowns that Solas did

| | | |
|---|---|---|
| 10:50:25 | 1 | in this case before the case started.  Do you recall that? |
| 10:50:29 | 2 | A.  I do. |
| 10:50:30 | 3 | Q.  In fact, they kind of made a big deal out of the fact |
| 10:50:34 | 4 | that teardowns weren't looked at or something, from before |
| 10:50:37 | 5 | the case, right? |
| 10:50:38 | 6 | A.  I've heard it discussed.  I don't know if it was a big |
| 10:50:42 | 7 | deal, but... |
| 10:50:43 | 8 | Q.  Okay.  So those teardowns were done before this |
| 10:50:45 | 9 | litigation and before Samsung produced its confidential GDS |
| 10:50:50 | 10 | and PDR documents to Solas, correct? |
| 10:50:52 | 11 | A.  I don't know.  I don't know when the teardowns were |
| 10:50:58 | 12 | done. |
| 10:50:58 | 13 | Q.  Now, Mr. Credelle testified that he based his analysis |
| 10:51:01 | 14 | on Samsung's GDS and PDR files for each accused phone that |
| 10:51:06 | 15 | were produced in this case.  Do you recall that? |
| 10:51:08 | 16 | A.  I do recall that. |
| 10:51:09 | 17 | Q.  And the Samsung GDS files, the confidential GDS files |
| 10:51:15 | 18 | that they produced, is the actual graphic design layout for |
| 10:51:18 | 19 | the accused products.  It's like, as you described, a |
| 10:51:21 | 20 | blueprint for the product, correct? |
| 10:51:23 | 21 | A.  Yes. |
| 10:51:23 | 22 | Q.  And you agree that the GDS files that Mr. Credelle |
| 10:51:27 | 23 | relied on and based his infringement analysis on accurately |
| 10:51:31 | 24 | describe the accused products, right? |
| 10:51:33 | 25 | A.  The GDS files accurately describe the products, yes. |

10:51:37   1   That's my understanding.

10:51:38   2           THE COURT:  Slow down a little bit, please --

10:51:41   3           THE WITNESS:  Oh, I'm sorry.

10:51:42   4           THE COURT:  -- Dr. Fontecchio.

10:51:49   5   Q.  (By Mr. Fenster)  And Mr. Credelle also testified that

10:51:53   6   he relied on the preliminary design review, the PDR files,

10:51:56   7   produced by Samsung?

10:51:57   8   A.  Yes.

10:51:58   9   Q.  And the PDR files produced by Samsung and relied upon

10:52:01   10  by Mr. Credelle also accurately describe the accused

10:52:04   11  products, correct?

10:52:05   12  A.  I have no reason to question their accuracy.

10:52:08   13  Q.  Now, infringement, the only proper analysis for

10:52:23   14  infringement is comparing the accused products to the

10:52:27   15  actual claim language, correct?

10:52:29   16  A.  That's my understanding.

10:52:31   17  Q.  You saw opening statements by -- you were here for the

10:52:40   18  opening statements?

10:52:40   19  A.  I was.

10:52:41   20  Q.  You've seen Mr. Haslam show that diagram from Figure 7

10:52:45   21  of the patent, and he used that with some of the witnesses.

10:52:49   22  You recall that?

10:52:50   23  A.  I was here for opening.  I don't recall which figure

10:52:52   24  you mean.

10:52:55   25          MR. FENSTER:  Can we just show opening DDX-1.006?

10:53:08  1   I'm sorry, it's the opening slide.  That's okay.

10:53:19  2   Q.  (By Mr. Fenster)  You agree that for infringement, it

10:53:22  3   is absolutely improper to compare the accused products to

10:53:26  4   figures from the asserted patent, right?

10:53:30  5   A.  My understanding is you need to compare to the claim

10:53:33  6   limitation language.

10:53:34  7   Q.  It's improper to compare the accused products to the

10:53:39  8   specification of the accused products, right?

10:53:42  9   A.  So I think you can compare them, but for infringement,

10:53:47  10  you need to show that they match the claim limitations.

10:53:50  11  Q.  And so for infringement, the only proper comparison is

10:53:56  12  to the actual language of the claims, right?

10:53:57  13  A.  Yes.

10:53:58  14  Q.  And the same is true for validity, right?

10:54:02  15  A.  Yes.

10:54:04  16  Q.  Now, you were here for the testimony of Mr. Kwak?

10:54:16  17  A.  Yes.

10:54:17  18  Q.  And Mr. Kwak was asked to testify about two of his

10:54:23  19  patents.  Do you recall that?

10:54:24  20  A.  I recall that.

10:54:25  21  Q.  His patents have nothing to do with the technical

10:54:29  22  issues of infringement or validity in this case, correct?

10:54:32  23  A.  I believe that's true.

10:54:39  24  Q.  Mr. Kwak's patents that he testified about are totally

10:54:44  25  irrelevant to whether Samsung infringes Solas's asserted

10:54:48  1  patents in this case, correct?

10:54:51  2          MR. FRISCH:  Objection, Your Honor.

10:54:53  3          THE COURT:  What's your objection?

10:54:54  4          MR. FRISCH:  I don't believe there's any

10:54:56  5  foundation for -- laid for whether Dr. Fontecchio knows

10:54:59  6  even what these patents are about.

10:55:03  7          MR. FENSTER:  He knows that the proper comparison

10:55:06  8  is the product to the claims and not to anything related to

10:55:10  9  the product.

10:55:10  10         THE COURT:  He apparently does because we've gone

10:55:12  11 over it about three times.  Let's move on.

10:55:16  12         MR. FENSTER:  Okay.

10:55:16  13 Q.  (By Mr. Fenster)  Now, Samsung has also referenced some

10:55:23  14 patents that Samsung has that related to their patents.  Do

10:55:27  15 you recall that?

10:55:27  16 A.  I'm not sure what you mean.

10:55:29  17 Q.  Mr. Kwak testified and Mr. Haslam suggested that

10:55:32  18 Samsung is very innovative; they have their own patents.

10:55:38  19 Do you recall all that?

10:55:39  20 A.  I do recall that.

10:55:40  21 Q.  Whether Samsung has their own patents has nothing to do

10:55:43  22 with whether they infringe the asserted patents in this

10:55:45  23 case, right?

10:55:46  24 A.  Yes.

10:55:47  25 Q.  If the accused products match the asserted claims, the

| | | |
|---|---|---|
| 10:55:54 | 1 | elements of the asserted patents, they infringe regardless |
| 10:55:59 | 2 | of whether Samsung has patents or not, right? |
| 10:56:01 | 3 | A.  If they match all of the claims. |
| 10:56:03 | 4 | Q.  That's right. |
| 10:56:08 | 5 | Okay.  Let's turn to your infringement opinions, |
| 10:56:13 | 6 | non-infringement opinions with respect to the '450 patent. |
| 10:56:14 | 7 | So, as I understand it, you had two reasons that |
| 10:56:17 | 8 | the accused products, in your opinion, do not infringe the |
| 10:56:22 | 9 | '450 patent, correct?  One was [1d], connected, and the |
| 10:56:25 | 10 | other was the external signal related to the switch -- to |
| 10:56:29 | 11 | the selection transistor, right? |
| 10:56:36 | 12 | A.  Yes. |
| 10:56:36 | 13 | MR. FENSTER:  Can I have Plaintiff's Demo-504, |
| 10:56:43 | 14 | please? |
| 10:56:43 | 15 | Q.  (By Mr. Fenster)  Okay.  So this is the element that |
| 10:56:45 | 16 | you were referring to, correct? |
| 10:56:46 | 17 | A.  I'm not sure what you mean by "element." |
| 10:56:52 | 18 | Q.  Element [1d], that the electrode is connected to said |
| 10:56:58 | 19 | active elements through at least one contact hole. |
| 10:57:02 | 20 | A.  Okay. |
| 10:57:02 | 21 | Q.  Right, that was the basis for your opinion? |
| 10:57:05 | 22 | A.  Yes. |
| 10:57:05 | 23 | Q.  Okay.  And you had no opinions on Elements [1a], [b], |
| 10:57:10 | 24 | or [c], right? |
| 10:57:11 | 25 | A.  I didn't render opinions in my discussion today -- in |

10:57:16   1   my testimony.

10:57:17   2   Q.  You didn't dispute those today?

10:57:19   3   A.  That's correct.

10:57:21   4   Q.  Okay.  Now, Element [1d] requires that the electrode be

10:57:24   5   connected to said active elements through the contact hole,

10:57:28   6   correct?

10:57:28   7   A.  That's correct.

10:57:31   8   Q.  And the contact hole is in the insulation layer, right?

10:57:34   9   A.  Yes.

10:57:34   10  Q.  And the insulation layer is between the active elements

10:57:38   11  and the pixel electrode, correct?

10:57:40   12  A.  Yes.

10:57:44   13  Q.  And the insulation layer is insulating, meaning it does

10:57:48   14  not conduct electric signals, right?

10:57:51   15  A.  Yes, that's what that means.

10:57:53   16  Q.  In fact, as you just explained in connection with

10:57:55   17  Utsugi, the whole point of the contact hole is to allow

10:57:58   18  electrical communication between the circuit and the

10:58:02   19  electrode, correct?

10:58:03   20  A.  That's correct.

10:58:09   21  Q.  Now, on Plaintiff's Slide 4, you see the accused

10:58:19   22  circuit in the Samsung products during the light-emission

10:58:25   23  period, correct?

10:58:25   24  A.  I do.

10:58:26   25  Q.  And during the light-emission period, T1, the driving

| | | |
|---|---|---|
| 10:58:34 | 1 | transistor, is electrically connected to the pixel |
| 10:58:36 | 2 | electrode, correct? |
| 10:58:36 | 3 | A.  It's electrically connected. |
| 10:58:42 | 4 | Q.  And during the emission period, the drain of T3 is also |
| 10:58:51 | 5 | electrically connected to the pixel electrode, correct, for |
| 10:58:59 | 6 | the same reason? |
| 10:58:59 | 7 | A.  It's electrically connected. |
| 10:59:01 | 8 | Q.  Now, you agree that infringement depends on the actual |
| 10:59:06 | 9 | words of the claim, right? |
| 10:59:07 | 10 | A.  Yes. |
| 10:59:09 | 11 | Q.  It is absolutely improper in doing an infringement |
| 10:59:14 | 12 | analysis to import or add limitations into the claim that |
| 10:59:18 | 13 | are not there, correct? |
| 10:59:19 | 14 | A.  Okay. |
| 10:59:22 | 15 | Q.  Do you understand that? |
| 10:59:24 | 16 | A.  Yes. |
| 10:59:24 | 17 | Q.  Okay.  So, here, the claim says "connected," right? |
| 10:59:33 | 18 | A.  It does. |
| 10:59:34 | 19 | Q.  It does not say "physically connected," correct? |
| 10:59:38 | 20 | A.  It doesn't use those words. |
| 10:59:40 | 21 | Q.  It does not say "directly connected," correct? |
| 10:59:43 | 22 | A.  I agree, it doesn't use those words. |
| 10:59:45 | 23 | Q.  And there's nothing in Judge Gilstrap's claim |
| 10:59:53 | 24 | construction for this term that would require physical or |
| 10:59:56 | 25 | direct connection, correct? |

| | | |
|---|---|---|
| 10:59:58 | 1 | A.  Not in the claim construction. |
| 11:00:03 | 2 | Q.  And, in fact, the context of this claim is that the |
| 11:00:10 | 3 | circuits are being separated by an insulation film, and the |
| 11:00:15 | 4 | whole point of the contact hole is to allow an electrical |
| 11:00:20 | 5 | connection between the electrode and the transistors, |
| 11:00:26 | 6 | correct? |
| 11:00:26 | 7 | A.  Yes. |
| 11:00:27 | 8 | Q.  And you agree that T1 and T3 are electrically connected |
| 11:00:35 | 9 | to the electrode through the contact hole during the |
| 11:00:41 | 10 | light-emission period, correct? |
| 11:00:42 | 11 | A.  Electrically connected, yes. |
| 11:00:43 | 12 | Q.  Okay.  Your second argument had to do with -- |
| 11:00:48 | 13 | MR. FENSTER:  You can take that down. |
| 11:00:49 | 14 | Q.  (By Mr. Fenster)  Your second argument had to do with |
| 11:00:55 | 15 | the selection transistor and external elements, right? |
| 11:01:00 | 16 | A.  I wouldn't put it that way -- |
| 11:01:03 | 17 | Q.  I'm sorry.  External -- external signal, I apologize. |
| 11:01:05 | 18 | A.  That's okay. |
| 11:01:07 | 19 | Q.  Okay. |
| 11:01:07 | 20 | MR. FENSTER:  So if I can have Claim 4, the |
| 11:01:13 | 21 | elements of Claim 4. |
| 11:01:18 | 22 | Q.  (By Mr. Fenster)  Now, selection transistor appears in |
| 11:01:28 | 23 | Claim 4, right? |
| 11:01:30 | 24 | A.  It does. |
| 11:01:31 | 25 | Q.  Okay.  So Claim 4 is dependent on Claim 1, and it adds |

| | | |
|---|---|---|
| 11:01:36 | 1 | additional limitations to Claim 1, right? |
| 11:01:39 | 2 | A.  Yes. |
| 11:01:41 | 3 | Q.  Okay.  Selection transistor does not appear anywhere in |
| 11:01:47 | 4 | Claim 1.  Would you agree? |
| 11:01:48 | 5 | A.  I would agree. |
| 11:01:51 | 6 | Q.  In fact, the selection transistor is one of the |
| 11:01:55 | 7 | additional elements that's added by Claim 4, correct? |
| 11:01:59 | 8 | A.  Yes. |
| 11:02:02 | 9 | Q.  Now, you do not dispute that the Samsung '450 accused |
| 11:02:15 | 10 | products meet all the additional elements of Claim 4 beyond |
| 11:02:20 | 11 | the fact that it is dependent on Claim 1, correct? |
| 11:02:23 | 12 | A.  I'm not sure I understand your question. |
| 11:02:35 | 13 | Q.  You do not dispute that the accused products meet all |
| 11:02:47 | 14 | of the additional elements that are added by Claim 4, other |
| 11:02:54 | 15 | than the fact that they are dependent upon Claim 1, |
| 11:03:04 | 16 | correct? |
| 11:03:04 | 17 | A.  No. |
| 11:03:05 | 18 | Q.  That is different than your previous sworn testimony at |
| 11:03:12 | 19 | your deposition, isn't it? |
| 11:03:13 | 20 | A.  Maybe I should clarify.  I do not agree with your |
| 11:03:16 | 21 | previous statement.  I do not believe that all the other |
| 11:03:20 | 22 | claim limitations are met.  However, I've not discussed |
| 11:03:23 | 23 | them in these proceedings. |
| 11:03:25 | 24 | Q.  You're changing your testimony.  The way you've |
| 11:03:32 | 25 | testified here today is different than your previous sworn |

| | | |
|---|---|---|
| 11:03:36 | 1 | testimony, correct? |
| 11:03:39 | 2 | A.  Yes. |
| 11:03:40 | 3 | Q.  At your deposition, you testified under oath, just like |
| 11:03:46 | 4 | you're under oath here, that you have not rendered an |
| 11:03:50 | 5 | opinion to dispute the additional elements of Claim 4 |
| 11:03:55 | 6 | beyond the fact that it is dependent on Claim 1. |
| 11:04:00 | 7 | You testified to that in your deposition, correct? |
| 11:04:02 | 8 | A.  I don't recall. |
| 11:04:07 | 9 | MR. FENSTER:  Can we pull up Demonstrative 12, |
| 11:04:13 | 10 | please? |
| 11:04:13 | 11 | Q.  (By Mr. Fenster)  This is from your deposition at |
| 11:04:14 | 12 | Page 55, Lines 11 through 22. |
| 11:04:19 | 13 | You were asked: |
| 11:04:21 | 14 | Question:  And so am I right that you don't |
| 11:04:25 | 15 | dispute that the '450 Samsung accused products satisfy the |
| 11:04:28 | 16 | additional words of Claim 4 here on Column 18, Lines, let's |
| 11:04:35 | 17 | say, 11 through 18, fair? |
| 11:04:37 | 18 | And I started on Claim 11, to be clear, with the |
| 11:04:40 | 19 | words "said active elements." |
| 11:04:46 | 20 | And what he was referring to are the elements of |
| 11:04:48 | 21 | Claim 4 that are shown on the left, right? |
| 11:04:50 | 22 | A.  Yes. |
| 11:04:51 | 23 | Q.  Okay.  And you answered -- okay.  I'm just reading it. |
| 11:04:56 | 24 | Answer:  So I've not rendered an opinion to |
| 11:04:59 | 25 | dispute the additional elements of Claim 4 beyond the fact |

| | | |
|---|---|---|
| 11:05:02 | 1 | that it's dependent upon Claim 1. |
| 11:05:04 | 2 | That was your testimony, correct? |
| 11:05:06 | 3 | A.  Yes. |
| 11:05:06 | 4 | Q.  And you're telling a different story here today, aren't |
| 11:05:13 | 5 | you? |
| 11:05:13 | 6 | A.  I don't think so. |
| 11:05:14 | 7 | Q.  Well, we've established that selection -- you're -- |
| 11:05:23 | 8 | you -- you're disputing selection transistor here today, |
| 11:05:28 | 9 | right? |
| 11:05:28 | 10 | A.  Yes. |
| 11:05:28 | 11 | Q.  We established that selection transistor is one of the |
| 11:05:31 | 12 | additional elements that is only added in Claim 4, right? |
| 11:05:36 | 13 | A.  It's defined in Claim 4. |
| 11:05:37 | 14 | Q.  All right.  So let's go through what you did present |
| 11:05:48 | 15 | today. |
| 11:05:55 | 16 | MR. FENSTER:  So let's go to '450 -- I'm sorry, |
| 11:05:59 | 17 | can I bring up Credelle's Slide 219, please? |
| 11:06:05 | 18 | Q.  (By Mr. Fenster)  And this is the element that you did |
| 11:06:11 | 19 | discuss today as your second opinion, contrary to your |
| 11:06:15 | 20 | first deposition, right? |
| 11:06:15 | 21 | A.  I don't think I put it that way, but this is the |
| 11:06:23 | 22 | element I described today. |
| 11:06:24 | 23 | Q.  Fair enough. |
| 11:06:25 | 24 | Okay.  So just to orient the -- okay. |
| 11:06:44 | 25 | So this says "the display apparatus."  And it |

| | | |
|---|---|---|
| 11:06:47 | 1 | says:  Wherein said active elements are a selection |
| 11:06:50 | 2 | transistor which is turned on in response to an externally |
| 11:06:55 | 3 | supplied address signal. |
| 11:06:58 | 4 | Right. |
| 11:06:58 | 5 | A.  That's correct. |
| 11:06:58 | 6 | Q.  And Mr. Credelle testified that T3 is the selection |
| 11:07:02 | 7 | transistor that meets this limitation, correct? |
| 11:07:04 | 8 | A.  Yes. |
| 11:07:05 | 9 | Q.  And you agree that all of the accused products have T3 |
| 11:07:10 | 10 | and that T3 is turned on in response to an externally |
| 11:07:15 | 11 | supplied address signal, just like the claim requires, |
| 11:07:18 | 12 | right? |
| 11:07:18 | 13 | A.  I agree. |
| 11:07:28 | 14 | MR. FENSTER:  Now, if I can have Slide 2 -- |
| 11:07:34 | 15 | Credelle Slide 220, please. |
| 11:07:38 | 16 | Q.  (By Mr. Fenster)  Okay.  So Claim 4 talks about a drive |
| 11:08:01 | 17 | transistor which is driven by a signal corresponding to |
| 11:08:04 | 18 | image data supplied externally through said selection |
| 11:08:15 | 19 | transistor, right? |
| 11:08:16 | 20 | A.  It does. |
| 11:08:16 | 21 | Q.  And during the data -- and this happens during the data |
| 11:08:22 | 22 | writing period that we've talked about with respect to the |
| 11:08:25 | 23 | Samsung products? |
| 11:08:26 | 24 | A.  Yes. |
| 11:08:26 | 25 | Q.  And during the data writing period, T2 and T3 both |

| | | |
|---|---|---|
| 11:08:33 | 1 | turned on, right? |
| 11:08:34 | 2 | A.  They do. |
| 11:08:34 | 3 | Q.  And the image data signal comes in from this external |
| 11:08:41 | 4 | data line, right? |
| 11:08:42 | 5 | A.  Yes. |
| 11:08:43 | 6 | Q.  And that signal comes in, and it goes through T2, |
| 11:08:50 | 7 | right? |
| 11:08:50 | 8 | A.  Yes. |
| 11:08:50 | 9 | Q.  It goes through T -- that same signal -- strike that. |
| 11:08:55 | 10 |         The signal goes from the data line, through T2, |
| 11:09:00 | 11 | through T1, through, T3 and up to the capacitor, correct? |
| 11:09:09 | 12 | A.  Yes.  It also goes to the gate of T1. |
| 11:09:13 | 13 | Q.  Fair enough.  And you're referring to this gate right |
| 11:09:16 | 14 | here, right? |
| 11:09:17 | 15 | A.  Correct. |
| 11:09:19 | 16 | Q.  Okay. |
| 11:09:26 | 17 |         MR. FENSTER:  Now, if we can go to Fontecchio |
| 11:09:29 | 18 | Slide 25. |
| 11:09:35 | 19 | Q.  (By Mr. Fenster)  Now, this is what you showed the jury |
| 11:09:38 | 20 | to make your point to the jury, right? |
| 11:09:42 | 21 | A.  It's one of the things I showed them, yes. |
| 11:09:44 | 22 | Q.  To show them that the image data was not supplied |
| 11:09:48 | 23 | through the transistor T3, right? |
| 11:09:50 | 24 | A.  Correct. |
| 11:09:50 | 25 | Q.  And you did not show the jury that this data line comes |

| | | |
|---|---|---|
| 11:09:55 | 1 | in, goes through T2, through T1, to -- through T3, and up |
| 11:10:01 | 2 | to the capacitor and the gate, correct? |
| 11:10:03 | 3 | A.  I think I showed that in a different slide. |
| 11:10:08 | 4 | Q.  You did not show it in connection with this limitation, |
| 11:10:11 | 5 | did you? |
| 11:10:12 | 6 | A.  Maybe not. |
| 11:10:25 | 7 | MR. FENSTER:  All right.  So let's go back to |
| 11:10:27 | 8 | Slide 220. |
| 11:10:28 | 9 | Q.  (By Mr. Fenster)  So you agree that, as shown in the |
| 11:10:52 | 10 | red line, that that signal that represents the data comes |
| 11:10:59 | 11 | in from the data line, goes through T2, through T1, through |
| 11:11:04 | 12 | T3 the selection transistor that Mr. Credelle identified, |
| 11:11:07 | 13 | before going out to the gate and the capacitor, correct? |
| 11:11:10 | 14 | A.  No.  Would you like me to explain? |
| 11:11:20 | 15 | Q.  I think your testimony is inconsistent with what you |
| 11:11:35 | 16 | just said but -- |
| 11:11:37 | 17 | THE COURT:  Counsel. |
| 11:11:37 | 18 | MR. FENSTER:  I'm sorry, I apologize. |
| 11:11:39 | 19 | THE COURT:  That kind of sidebar comment is not |
| 11:11:42 | 20 | appropriate. |
| 11:11:42 | 21 | And it's the attorney's decision as to whether to |
| 11:11:46 | 22 | ask for an explanation or not.  If he wants one, he'll ask |
| 11:11:50 | 23 | for it.  If he doesn't, he won't. |
| 11:11:52 | 24 | Let's move on to the next question. |
| 11:11:55 | 25 | MR. FENSTER:  Yes, Your Honor. |

11:11:55  1   Q.  (By Mr. Fenster)  You agree that image data is supplied

11:11:57  2   by the data line, right?

11:11:59  3   A.  Yes.

11:11:59  4   Q.  And you agree that image data is provided as a current

11:12:03  5   that flows through the circuit as shown in -- by the red

11:12:07  6   line, correct?

11:12:07  7   A.  No.

11:12:08  8   Q.  You agree that it is supplied as a signal that is

11:12:20  9   shown -- the path of the signal from the data line is shown

11:12:24  10  by the red line, right?

11:12:25  11  A.  No.

11:12:27  12  Q.  Okay.  All right.  Mr. -- Dr. Fontecchio.

11:12:33  13       Do you dispute that the image data signal goes

11:12:52  14  through T2, through T1, through T3 and up to the capacitor?

11:12:56  15  A.  I agree with that.

11:12:59  16  Q.  All right.  Those are -- those were your two

11:13:07  17  non-infringement opinions, the only elements that you

11:13:10  18  challenged with respect to '450, right?

11:13:11  19  A.  Yes.

11:13:13  20  Q.  And you had no other arguments challenging any of the

11:13:17  21  other elements of the '450, right?  You covered them both?

11:13:20  22  A.  Uh-huh.

11:13:21  23  Q.  Okay.  So now let's go to your --

11:13:24  24       THE COURT:  Just a minute.  Non-verbalized

11:13:27  25  responses, "uh-huh," won't work for the record.  So please

| | | |
|---|---|---|
| 11:13:30 | 1 | say yes or no. |
| 11:13:32 | 2 | THE WITNESS:  I apologize. |
| 11:13:34 | 3 | THE COURT:  That's all right. |
| 11:13:36 | 4 | And please speak up a little bit, Mr. Fenster. |
| 11:13:40 | 5 | MR. FENSTER:  Yes, Your Honor. |
| 11:13:40 | 6 | Q.  (By Mr. Fenster)  So let's go to your validity opinion |
| 11:13:40 | 7 | with respect to the '450, okay? |
| 11:13:40 | 8 | A.  Okay. |
| 11:13:41 | 9 | Q.  You are aware that Solas's patents are entitled to a |
| 11:13:45 | 10 | presumption of validity, correct? |
| 11:13:46 | 11 | A.  Yes. |
| 11:13:46 | 12 | Q.  You're aware that to prove invalidity, invalidity has |
| 11:13:51 | 13 | to be proven by a higher standard of proof called a clear |
| 11:13:56 | 14 | and convincing evidence standard, correct? |
| 11:13:57 | 15 | A.  Yes. |
| 11:13:58 | 16 | Q.  Now, you assert that Solas's '450 patent is invalid for |
| 11:14:06 | 17 | anticipation, correct? |
| 11:14:08 | 18 | A.  Correct. |
| 11:14:08 | 19 | Q.  Meaning that the '450 patent is anticipated by the |
| 11:14:13 | 20 | Utsugi reference, right? |
| 11:14:15 | 21 | A.  Yes. |
| 11:14:16 | 22 | Q.  And you, Samsung, has the burden of proving |
| 11:14:22 | 23 | anticipation by clear and convincing evidence for every |
| 11:14:24 | 24 | single element, correct? |
| 11:14:25 | 25 | A.  Yes. |

11:14:25  1   Q.  To meet that burden for anticipation, you have to show

11:14:30  2   that every element of the asserted claims are either

11:14:35  3   explicitly or inherently in Utsugi and that the elements

11:14:41  4   are arranged in Utsugi as in the claim, correct?

11:14:44  5   A.  That's my understanding.

11:14:47  6   Q.  It has to -- and you have no opinion as to inherency,

11:14:54  7   right?  We can take that off the table?

11:14:55  8   A.  I'm not sure.  It might play into obviousness.

11:15:02  9   Q.  For anticipation, it has to be either explicit or

11:15:06  10  inherent, and you did not present any opinion in your

11:15:08  11  report or today that Utsugi inherently teaches any of the

11:15:12  12  elements, correct?

11:15:13  13  A.  Right.  I think Utsugi is explicit.

11:15:23  14  Q.  Okay.  So you have to prove to the jury by clear and

11:15:26  15  convincing evidence that every single element is explicitly

11:15:29  16  in Utsugi for anticipation, correct?

11:15:31  17  A.  Yes, and I think I've done that.

11:15:33  18  Q.  If any element of the asserted claims is not explicitly

11:15:39  19  disclosed in Utsugi, you agree that there's no invalidity

11:15:44  20  for anticipation, correct?

11:15:45  21  A.  Yes.

11:15:46  22  Q.  Now, you also offered an obviousness opinion in this

11:15:50  23  case, but only with respect to one element, Element [1c],

11:15:54  24  right?

11:15:54  25  A.  Yes.

624

| | | |
|---|---|---|
| 11:15:54 | 1 | Q.  So for all of the other elements, including |
| 11:15:59 | 2 | Element [1d], you only have an anticipation opinion, |
| 11:16:04 | 3 | correct? |
| 11:16:04 | 4 | A.  I believe so. |
| 11:16:09 | 5 | Q.  You have no back-up plan.  If it doesn't anticipate, |
| 11:16:12 | 6 | you've got no obviousness back-up, catchall, or anything |
| 11:16:17 | 7 | like that for other elements, including Element [1d], |
| 11:16:20 | 8 | right? |
| 11:16:20 | 9 | A.  I think it's pretty explicit.  It meets anticipation. |
| 11:16:23 | 10 | Q.  Can you answer my question, sir?  You have no back-up |
| 11:16:25 | 11 | plan -- |
| 11:16:26 | 12 | THE COURT:  Counsel, if you think the witness's |
| 11:16:28 | 13 | answer was non-responsive, raise it with the Court.  Don't |
| 11:16:30 | 14 | redirect the witness. |
| 11:16:31 | 15 | MR. FENSTER:  Thank you, Your Honor. |
| 11:16:33 | 16 | THE COURT:  And, Dr. Fontecchio, you need to |
| 11:16:35 | 17 | answer the questions as presented.  And you don't need to |
| 11:16:38 | 18 | insert anything that the question doesn't call for in your |
| 11:16:41 | 19 | answer.  Understood? |
| 11:16:42 | 20 | THE WITNESS:  Yes, sir. |
| 11:16:43 | 21 | THE COURT:  All right.  Let's proceed, gentlemen. |
| 11:16:44 | 22 | Q.  (By Mr. Fenster)  So, Dr. Fontecchio, it is true that |
| 11:16:48 | 23 | you have -- your only opinion for anticipate -- for |
| 11:16:52 | 24 | Element [1d] is anticipation, correct? |
| 11:16:58 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:16:58 | 1 | Q.  You have no back-up plan, no catchall, no obviousness |
| 11:17:02 | 2 | for [1d], right? |
| 11:17:03 | 3 | A.  I wouldn't put it that way. |
| 11:17:06 | 4 | Q.  If the jury finds that you did not meet your burden by |
| 11:17:15 | 5 | clear and convincing evidence of proving every element of |
| 11:17:18 | 6 | Element [1d], the patent will not be invalid for |
| 11:17:20 | 7 | anticipation, correct? |
| 11:17:21 | 8 | A.  Correct. |
| 11:17:23 | 9 | Q.  And it wouldn't be invalid for obviousness either |
| 11:17:27 | 10 | because that element would be missing, correct? |
| 11:17:30 | 11 | A.  I guess so. |
| 11:17:32 | 12 | Q.  Okay.  All right.  Element [1c] -- |
| 11:18:00 | 13 |         MR. FENSTER:  Can I have the '450 patent, |
| 11:18:02 | 14 | Element [1c]?  Thank you. |
| 11:18:14 | 15 | Q.  (By Mr. Fenster)  So Element [1c] requires an |
| 11:18:19 | 16 | insulation film formed over said substrate so as to cover |
| 11:18:24 | 17 | said active elements, right? |
| 11:18:27 | 18 | A.  It does. |
| 11:18:28 | 19 | Q.  Said active elements is plural, right? |
| 11:18:31 | 20 | A.  It is. |
| 11:18:32 | 21 | Q.  And those active elements are both the selection |
| 11:18:39 | 22 | transistor and the driving transistor, correct? |
| 11:18:41 | 23 | A.  Not according to this limitation, but, yes. |
| 11:18:46 | 24 | Q.  So you agree that the -- this element requires covering |
| 11:19:02 | 25 | two active elements, right? |

11:19:04  1   A.  Yes.

11:19:05  2   Q.  Okay.  And the only active elements that you've mapped

11:19:08  3   to are $Q_s$ and $Q_r$ in Utsugi, right?

11:19:13  4   A.  Yes.

11:19:13  5   Q.  You would agree that to meet -- to show the jury that

11:19:17  6   this element -- element is met, you have to show that

11:19:21  7   Utsugi expressly describes the insulation layer covering

11:19:27  8   both $Q_s$ and $Q_r$, correct?

11:19:31  9   A.  Yes.

11:19:38  10  Q.  Okay.

11:19:38  11         MR. FENSTER:  Now, can we bring up DDX-6.033?

11:19:42  12  Q.  (By Mr. Fenster)  This is the slide that you showed the

11:19:50  13  jury for anticipation of Element [1c], correct?

11:19:59  14  A.  Yes.

11:19:59  15  Q.  This is the only element -- the only slide that you

11:20:04  16  showed to show evidence that [1c] is met for anticipation,

11:20:08  17  correct?

11:20:08  18  A.  No.

11:20:17  19  Q.  For anticipation?

11:20:21  20  A.  No.

11:20:21  21  Q.  Okay.  Other than your model, these are the only

11:20:29  22  portions of Utsugi that you identified in your direct

11:20:33  23  examination as meeting the elements of [1c] for

11:20:36  24  anticipation, correct?

11:20:37  25  A.  Yes.

11:20:38  1  Q.  Got it.  Okay.  So we'll come back to your model in a

11:20:42  2  minute.

11:20:42  3  A.  Okay.

11:20:42  4  Q.  There is no -- so to meet Element [1c], you have to

11:20:50  5  show that Utsugi expressly discloses that the insulation

11:20:56  6  layer covers both $Q_s$ and $Q_I$, right?

11:21:01  7  A.  Correct.

11:21:01  8  Q.  There is no figure in Utsugi that shows the insulation

11:21:07  9  layer covering $Q_s$, correct?

11:21:10  10  A.  Correct.

11:21:11  11  Q.  5 -- you showed Figure 5 on your slide.  And Figure 5

11:21:18  12  does not show the $Q_s$ transistor at all, correct?

11:21:22  13  A.  Figure 5 does not.

11:21:24  14  Q.  So Figure 5 does not show explicitly the insulation

11:21:27  15  layer over $Q_s$, correct?

11:21:30  16  A.  Figure 5 does not.

11:21:32  17  Q.  Okay.

11:21:33  18      MR. FENSTER:  Can we put a red X over that?

11:21:38  19  Q.  (By Mr. Fenster)  Now, let's look at the -- let's look

11:21:45  20  at the text that you cited from Utsugi.

11:21:47  21      That's on the left in the lower left-hand box,

11:21:52  22  right?

11:21:52  23  A.  Okay.

11:21:52  24  Q.  And you quote one sentence from Utsugi, correct?

11:21:57  25  A.  Yes.

628

| | | |
|---|---|---|
| 11:21:58 | 1 | Q.  And that sentence does not mention $Q_s$ at all, right? |
| 11:22:04 | 2 | A.  Not that sentence, no. |
| 11:22:10 | 3 | Q.  This is the only sentence you showed the jury for |
| 11:22:13 | 4 | anticipation, right? |
| 11:22:14 | 5 | A.  No. |
| 11:22:23 | 6 | Q.  This sentence on your slide does not explicitly |
| 11:22:28 | 7 | describe the insulation layer covering $Q_s$, correct? |
| 11:22:32 | 8 | A.  I think it does.  Would you like me to explain? |
| 11:22:37 | 9 | Q.  The word transistor $Q_s$ is not mentioned in this |
| 11:22:43 | 10 | sentence on the left, correct?  $Q_T$ is, but not $Q_s$? |
| 11:22:49 | 11 | A.  That's correct. |
| 11:22:50 | 12 | THE COURT:  And one more time, Dr. Fontecchio, the |
| 11:22:53 | 13 | lawyers will decide which witnesses and in which context |
| 11:22:57 | 14 | they want to ask for an explanation.  You don't need to |
| 11:23:00 | 15 | keep offering it.  If he wants you to explain, he'll ask |
| 11:23:04 | 16 | you to explain.  If he chooses not to, he won't.  But it's |
| 11:23:08 | 17 | his decision, it's not yours, and you don't need to |
| 11:23:11 | 18 | continue to offer.  Understood? |
| 11:23:14 | 19 | THE WITNESS:  Understood. |
| 11:23:15 | 20 | THE COURT:  All right.  Let's proceed. |
| 11:23:16 | 21 | Q.  (By Mr. Fenster)  $Q_s$ is not shown in that sentence, |
| 11:23:18 | 22 | correct? |
| 11:23:18 | 23 | A.  Correct. |
| 11:23:20 | 24 | Q.  Okay.  Let's go on to Element [1d], okay? |
| 11:23:32 | 25 | Now, Element [1d] requires at least one electrode |

| | |
|---|---|
| 11:23:35 | 1 | formed on the insulation to cover the active elements and |
| 11:23:39 | 2 | connected to said active elements. |
| 11:23:45 | 3 |            MR. FENSTER:  Can you highlight "connected to said |
| 11:23:47 | 4 | active elements," please? |
| 11:23:50 | 5 | Q.  (By Mr. Fenster)  And as you've mapped the claim, this |
| 11:23:56 | 6 | requires showing that the electrode is connected to both $Q_s$ |
| 11:23:59 | 7 | and $Q_I$, correct? |
| 11:24:03 | 8 | A.  Yes. |
| 11:24:04 | 9 | Q.  Through the contact hole, correct? |
| 11:24:10 | 10 | A.  Yes. |
| 11:24:10 | 11 | Q.  To show anticipation, you have to show to the jury by |
| 11:24:15 | 12 | clear and convincing evidence that Utsugi expressly |
| 11:24:20 | 13 | discloses connecting the electrode to both $Q_I$ and $Q_s$ |
| 11:24:25 | 14 | through that electric -- the contact hole, correct? |
| 11:24:41 | 15 | A.  No. |
| 11:24:47 | 16 | Q.  Said active elements in this Element [1d] are the same |
| 11:24:53 | 17 | said active elements that were in [1c], right? |
| 11:24:57 | 18 | A.  They are. |
| 11:24:57 | 19 | Q.  And the said active elements that you are pointing |
| 11:25:04 | 20 | to -- mapping to are both $Q_I$ and $Q_s$, correct? |
| 11:25:08 | 21 | A.  That's correct. |
| 11:25:09 | 22 | Q.  And the Claim Element [1d] requires that the electrode |
| 11:25:15 | 23 | be connected to said active elements that you've mapped to |
| 11:25:20 | 24 | both $Q_I$ and $Q_s$ through the contact hole, correct? |
| 11:25:34 | 25 | A.  No. |

| | | |
|---|---|---|
| 11:25:48 | 1 | MR. FENSTER:  Let's bring up DDX-6.058.  Oh, I'm |
| 11:25:59 | 2 | sorry, 35, my apologies.  Changed the numbering. |
| 11:26:05 | 3 | Q.  (By Mr. Fenster)  Okay.  So this is the slide that you |
| 11:26:07 | 4 | presented for Element [1d] for anticipation, correct? |
| 11:26:13 | 5 | A.  Yes. |
| 11:26:13 | 6 | Q.  And these are the disclosures from Utsugi that you |
| 11:26:18 | 7 | relied on to show the jury to show that the electrode is |
| 11:26:23 | 8 | connected to said active elements to meet Element [1d], |
| 11:26:28 | 9 | correct? |
| 11:26:28 | 10 | A.  Yes. |
| 11:26:28 | 11 | Q.  Okay.  Now, Figure 5 on the right doesn't show $Q_s$ at |
| 11:26:36 | 12 | all, correct? |
| 11:26:36 | 13 | A.  Correct. |
| 11:26:38 | 14 | Q.  So you would agree with me that Figure 5 does not |
| 11:26:42 | 15 | explicitly show the electrode connected to $Q_s$ through the |
| 11:26:47 | 16 | contact hole, fair? |
| 11:26:48 | 17 | A.  I agree. |
| 11:26:49 | 18 | Q.  Okay.  Now, here, you've quoted two sentences from |
| 11:26:54 | 19 | Utsugi.  Let's look at the first one first. |
| 11:26:58 | 20 | In the middle box, this is the sentence from |
| 11:27:07 | 21 | Column 7, Lines 46 through 52, correct? |
| 11:27:12 | 22 | A.  Yes. |
| 11:27:12 | 23 | Q.  And that sentence does not mention $Q_s$ at all, correct? |
| 11:27:17 | 24 | A.  It does not. |
| 11:27:20 | 25 | Q.  And the next box that you showed, it's showing a |

11:27:27  1  sentence from Column 6, Lines 23 through 27, correct?

11:27:33  2  A.  Yes.

11:27:33  3  Q.  And that sentence doesn't mention the electrode

11:27:37  4  connecting to anything at all, right?  Doesn't even mention

11:27:44  5  electrode.

11:27:44  6  A.  It does not mention electrode.

11:27:46  7  Q.  This is talking about the luminescent layer covering

11:27:52  8  the transistors, right?

11:27:53  9  A.  It is.

11:27:55  10  Q.  And, Dr. Fontecchio, you agree that if the jury finds

11:28:05  11  that you failed to prove by clear and convincing evidence

11:28:10  12  that Utsugi explicitly discloses the elements, all of the

11:28:16  13  claim language of [1d], that the asserted claims are not

11:28:20  14  invalid for anticipation, correct?

11:28:22  15  A.  Correct.

11:28:23  16  Q.  And they would not be invalid for obviousness either,

11:28:33  17  correct?  Because you have -- you have no -- you had no

11:28:36  18  element -- strike that.  I'll withdraw it.

11:28:37  19       If the jury finds that you did not prove by clear

11:28:43  20  and convincing evidence that [1d] is met by anticipation,

11:28:48  21  you have no other opinion -- you've offered no other

11:28:50  22  opinion with respect to [1d], correct?

11:28:52  23  A.  That's correct.

11:28:53  24  Q.  And for obviousness, you have to show that [1d] is met,

11:28:57  25  as well as all of the other elements, correct?

11:28:59  1    A.  Yes.

11:29:04  2    Q.  Okay.  All right.

11:29:05  3          MR. FENSTER:  Let's go to the model.

11:29:11  4    Q.  (By Mr. Fenster)  So you showed a model to try to

11:29:15  5    address the obviousness -- obvious question -- obviousness

11:29:21  6    question for Element [1c], correct?

11:29:24  7    A.  Yes.

11:29:24  8    Q.  Now, for anticipation, you have to show that a single

11:29:28  9    reference explicitly teaches every element from within the

11:29:32  10   four corners of that document, right?

11:29:34  11   A.  I do.

11:29:35  12   Q.  For anticipation, it would be absolutely improper to

11:29:41  13   rely on anything outside the four corners of the single

11:29:45  14   prior art reference that you're asserting for anticipation,

11:30:00  15   correct?

11:30:00  16   A.  I would say no.

11:30:02  17   Q.  Now, none of the figures in your model -- that model is

11:30:13  18   something you created, right?

11:30:14  19   A.  I created the model, yes.

11:30:15  20   Q.  Those figures that you made up in your model are not

11:30:18  21   figures from Utsugi, right?

11:30:19  22   A.  Correct.

11:30:20  23   Q.  None of those figures are in Utsugi, right?

11:30:27  24   A.  Right.

11:30:28  25   Q.  Now, you prepared a report --

11:30:30  1    A.  Actually, no, I have to say no to that.

11:30:32  2    Q.  You're right.  There was one cross-section that you had

11:30:35  3    in your model slides; is that what you're referring to?

11:30:37  4    A.  Yes, it is.

11:30:38  5    Q.  Fair enough.

11:30:39  6         Now, in your report -- you had to prepare a report

11:30:44  7    to disclose all of your invalidity opinions for Solas for

11:30:49  8    fair disclosure, right?

11:30:50  9    A.  I did.

11:30:50  10   Q.  And that model that you showed the jury today, that was

11:30:53  11   the first time we've seen it, right?

11:30:58  12        Let me -- let me withdraw it.

11:31:02  13        You did not include that in your report, did you?

11:31:05  14   A.  Correct.

11:31:05  15   Q.  And there is no figure in Utsugi that expressly

11:31:12  16   discloses the insulation layer covering $Q_s$, correct?

11:31:18  17   A.  There is not a figure.

11:31:19  18   Q.  And there is no figure that explicitly discloses the

11:31:24  19   electrode connected to $Q_s$ through the contact hole,

11:31:28  20   correct?

11:31:28  21   A.  That's correct, there is not a figure that shows that.

11:31:32  22   Q.  Now, you also made a point in connection with your

11:31:36  23   obviousness -- or with your invalidity opinion to tell the

11:31:39  24   jury that Utsugi was not before the Patent Office, that the

11:31:43  25   Patent Office had not seen that reference before.  Do you

| | | |
|---|---|---|
| 11:31:47 | 1 | recall that? |
| 11:31:47 | 2 | A.  I do. |
| 11:31:47 | 3 | Q.  For validity, it is also relevant -- strike that. |
| 11:32:03 | 4 | The Patent Office did consider prior art in |
| 11:32:07 | 5 | examining the '450 patent, correct? |
| 11:32:10 | 6 | A.  Yes, they did. |
| 11:32:11 | 7 | MR. FENSTER:  Can we bring up the '450 patent, the |
| 11:32:15 | 8 | face cover?  And can you show the -- |
| 11:32:26 | 9 | Q.  (By Mr. Fenster)  Do you see this "References Cited"? |
| 11:32:30 | 10 | A.  I do. |
| 11:32:31 | 11 | Q.  Okay.  Those are the references that the Patent Office |
| 11:32:33 | 12 | examined in connection with examining the '450 patent to |
| 11:32:37 | 13 | determine whether it meets the requirements for |
| 11:32:40 | 14 | patentability, right? |
| 11:32:40 | 15 | A.  Yes. |
| 11:32:42 | 16 | Q.  And the Patent Office reviewed all of these patents, |
| 11:32:46 | 17 | correct? |
| 11:32:46 | 18 | A.  Correct. |
| 11:32:48 | 19 | Q.  Now, on direct examination, you offered no analysis or |
| 11:32:56 | 20 | opinions to the jury comparing Utsugi to any of those prior |
| 11:33:00 | 21 | art references that the Patent Office did look at, did you? |
| 11:33:04 | 22 | A.  No, I didn't. |
| 11:33:08 | 23 | Q.  So you didn't offer any analysis or opinion to the jury |
| 11:33:13 | 24 | trying to tell them that Utsugi disclosed something |
| 11:33:17 | 25 | different or something more than the prior art that the |

| | | |
|---|---|---|
| 11:33:19 | 1 | Patent Office did look at, correct? |
| 11:33:23 | 2 | MR. FRISCH:  Objection, Your Honor.  This is |
| 11:33:24 | 3 | calling for an improper analysis. |
| 11:33:27 | 4 | THE COURT:  Overruled. |
| 11:33:30 | 5 | You can answer the question. |
| 11:33:31 | 6 | A.  I did not offer that testimony. |
| 11:33:33 | 7 | Q.  (By Mr. Fenster)  And the Patent Office, after |
| 11:33:37 | 8 | examining all of the prior art listed on the screen here |
| 11:33:41 | 9 | and listed on the face of the '450 patent, determined that |
| 11:33:46 | 10 | the '450 patent was valid, it was new, it was non-obvious, |
| 11:33:50 | 11 | and it met all of the requirements for patentability. |
| 11:33:53 | 12 | Correct? |
| 11:33:53 | 13 | A.  They issued the patent, so I assume so. |
| 11:33:57 | 14 | Q.  We're now going to turn to the '338 patent. |
| 11:34:03 | 15 | MR. FENSTER:  And, Your Honor, at this time, I |
| 11:34:04 | 16 | would be getting into confidential material.  I'm going to |
| 11:34:07 | 17 | ask that you seal the courtroom. |
| 11:34:09 | 18 | THE COURT:  All right.  Based on that request and |
| 11:34:11 | 19 | representation, I'll order the courtroom sealed at this |
| 11:34:14 | 20 | time. |
| 11:34:14 | 21 | Those present who are not subject to the |
| 11:34:17 | 22 | protective order that's been entered in this case should |
| 11:34:21 | 23 | excuse themselves and remain outside until the courtroom is |
| 11:34:24 | 24 | reopened and unsealed. |
| 11:34:26 | 25 | (Courtroom sealed.) |

| | | |
|---|---|---|
| 11:34:26 | 1 | (This portion of the transcript is sealed |
| 11:34:26 | 2 | and filed under separate cover as |
| 11:34:26 | 3 | Sealed Portion No. 15.) |
| 12:01:45 | 4 | (Courtroom unsealed.) |
| 12:01:46 | 5 | THE COURT:  Ladies and gentlemen, we're about to |
| 12:01:47 | 6 | break for lunch.  I'm going to ask you, consistent with |
| 12:01:51 | 7 | what we've done throughout the trial, to take your |
| 12:01:53 | 8 | notebooks with you to the jury room during the lunch hour. |
| 12:01:53 | 9 | I'm informed by the clerk's office your lunch should be |
| 12:01:56 | 10 | ready there. |
| 12:01:57 | 11 | Please follow all the instructions I've given you |
| 12:01:59 | 12 | throughout your -- throughout the trial regarding your |
| 12:02:01 | 13 | conduct, including, of course, not to discuss the case |
| 12:02:05 | 14 | among each other or with anyone else. |
| 12:02:07 | 15 | And with that, we'll try to reconvene as close to |
| 12:02:12 | 16 | 1:00 o'clock as possible. |
| 12:02:14 | 17 | The jury is excused for lunch at this time. |
| 12:02:16 | 18 | COURT SECURITY OFFICER:  All rise. |
| 12:02:18 | 19 | (Jury out.) |
| 12:02:18 | 20 | THE COURT:  Counsel, for your information, we've |
| 12:02:47 | 21 | used 3 hours and almost 5 minutes today so far. |
| 12:02:58 | 22 | Allocating that between the parties, the |
| 12:03:02 | 23 | Plaintiffs have 3 hours and 6 minutes remaining. |
| 12:03:05 | 24 | And the Defendants have 4 hours and 38 minutes |
| 12:03:09 | 25 | remaining. |

| | | |
|---|---|---|
| 12:03:10 | 1 | With that, the Court stands in recess. |
| 12:03:15 | 2 | COURT SECURITY OFFICER:  All rise. |
| 12:03:16 | 3 | (Recess.) |
| 12:03:18 | 4 | (Jury out.) |
| 12:03:18 | 5 | COURT SECURITY OFFICER:  All rise. |
| 12:03:18 | 6 | THE COURT:   Be seated, please. |
| 01:07:04 | 7 | Mr. Fenster, are you prepared to continue with |
| 01:07:17 | 8 | your cross-examination? |
| 01:07:18 | 9 | MR. FENSTER:  I am, Your Honor, and it will remain |
| 01:07:21 | 10 | under seal for the short remainder of the cross. |
| 01:07:22 | 11 | THE COURT:  Once the jury is in the box, if you'll |
| 01:07:24 | 12 | ask me to seal the courtroom because we're unsealed at the |
| 01:07:27 | 13 | moment. |
| 01:07:27 | 14 | MR. FENSTER:  Thank you. |
| 01:07:28 | 15 | THE COURT:  All right.  Let's bring in the jury, |
| 01:07:32 | 16 | please. |
| 01:07:32 | 17 | COURT SECURITY OFFICER:  All rise. |
| 01:07:33 | 18 | (Jury in.) |
| 01:08:00 | 19 | THE COURT:  Welcome back from lunch, ladies and |
| 01:08:06 | 20 | gentlemen.  Please have a seat. |
| 01:08:08 | 21 | We'll continue with the cross-examination of |
| 01:08:14 | 22 | Dr. Adam Fontecchio by the Plaintiff. |
| 01:08:16 | 23 | Mr. Fenster, you may proceed. |
| 01:08:18 | 24 | MR. FENSTER:  Thank you, Your Honor. |
| 01:08:20 | 25 | And, Your Honor, may I ask that the courtroom be |

01:08:22  1   resealed at this time?

01:08:23  2        THE COURT:  All right.  Based on that request, the

01:08:26  3   Court's going to order the courtroom sealed.  Those of you

01:08:29  4   that are present not subject to the protective order in

01:08:32  5   this case should exit the courtroom and remain outside

01:08:36  6   until it's reopened and unsealed.

01:08:43  7        (Courtroom sealed.)

01:08:43  8        (This portion of the transcript is sealed.

01:08:43  9        and filed under separate cover as

01:08:44 10        Sealed Portion No. 16.)

01:51:20 11        (Courtroom unsealed.)

01:51:21 12        THE COURT:  All right.  Mr. Frisch, you may

01:51:48 13   continue.

01:51:50 14   Q.  (By Mr. Frisch)  Dr. Fontecchio, did the Patent and

01:51:51 15   Trademark Office have the benefit of looking at Utsugi when

01:51:56 16   it issued the '450 patent?

01:51:58 17   A.  No, it did not.

01:51:59 18        MR. FRISCH:  Mr. Beall, can you pull up

01:52:02 19   Demonstrative 6.035?

01:52:09 20   Q.  (By Mr. Frisch)  And, Dr. Fontecchio, do you remember

01:52:13 21   being asked a number of questions about Claim [1d] of the

01:52:16 22   '450 patent and specifically if it was disclosed by Utsugi?

01:52:19 23   A.  Yes.

01:52:20 24   Q.  And can you explain, again, why you believe that Claim

01:52:23 25   Element [1d] is disclosed by Utsugi?

01:52:26  1  A.  Yes.  Because the text from Column 7 and 8 inside

01:52:31  2  Utsugi, that teaches you how to make the circuit that is

01:52:33  3  demonstrated in Figure 5, explains the process of --

01:52:37  4           MR. FENSTER:  Objection, Your Honor.

01:52:38  5           THE COURT:  Just a moment.  What's the objection?

01:52:40  6           MR. FENSTER:  This is beyond the scope of his

01:52:43  7  report.  On direct, he testified, consistent with his

01:52:46  8  report, that the Utsugi describes the electrode connected

01:52:51  9  to $Q_1$, the transistor, singular, which is what he said on

01:52:56 10  direct.  That's consistent with his report.

01:52:58 11           He had no discussion in connection with

01:53:01 12  Element [1d] in his report about the method of manufacture

01:53:07 13  or anything like that, and there is no obviousness opinion

01:53:09 14  with respect to [1d].

01:53:11 15           This is going beyond the scope of his report,

01:53:13 16  Your Honor.

01:53:13 17           THE COURT:  Mr. Frisch, response?

01:53:15 18           MR. FRISCH:  Your Honor, my question was how he

01:53:17 19  believes Claim [1d] is disclosed by Utsugi.  I didn't ask,

01:53:21 20  to be honest, anything related to what Mr. Fenster just

01:53:25 21  said.

01:53:25 22           MR. FENSTER:  His answer was going into that, and

01:53:28 23  the disclosures that he relies on in his report are

01:53:32 24  limited -- this is the sum total of the disclosures that

01:53:34 25  are from Utsugi that he describes in his report in

01:53:37   1   connection with [1d].

01:53:39   2        THE COURT:  Well, it's clear to the Court that

01:53:43   3   we've all seen this before.  We saw it on direct, and now

01:53:46   4   we're seeing it on redirect.

01:53:48   5        Given that it's being offered by the Defendants

01:53:53   6   again through redirect, the testimony should be the same as

01:53:57   7   it was on direct.

01:54:00   8        It's your choice as to whether to go over the same

01:54:03   9   ground again or to show the jury something they haven't

01:54:05  10   seen before.  But if you're going to show them what they've

01:54:08  11   seen before, it needs to be the same picture, it needs to

01:54:11  12   be the same position, it needs to say the same thing.

01:54:13  13        MR. FENSTER:  I'm not objecting to the slide.  The

01:54:15  14   slide is --

01:54:16  15        THE COURT:  I understand that, counsel.  You're

01:54:19  16   objecting to what the witness's testimony would be.

01:54:21  17        MR. FENSTER:  Yes.

01:54:21  18        THE COURT:  He needs to testify consistent with

01:54:24  19   the way he testified when this was presented to him before.

01:54:27  20        Now, as is somewhat your tendency, Mr. Fenster,

01:54:35  21   you're up on your feet before he's said the thing you're

01:54:39  22   afraid he's going to say.  He's beginning to get there.  I

01:54:42  23   don't know that he's completely there or not.

01:54:43  24        MR. FENSTER:  His answer was getting into it,

01:54:45  25   Your Honor.  His answer was getting into based on how it's

01:54:48  1  made, as opposed to the specific disclosures.

01:54:51  2          THE COURT:  Just a minute.  This is not a

01:54:54  3  round-robin discussion.  It's a legal objection to a

01:54:56  4  question in the middle of a redirect examination.

01:54:59  5          I'm going to overrule the objection.  But I'm

01:55:02  6  instructing Mr. Frisch and the witness that the testimony

01:55:06  7  should be in all respects what it was previously with

01:55:10  8  regard to this topic and this chart, okay?

01:55:14  9          MR. FENSTER:  Okay.

01:55:14  10          MR. FRISCH:  Understood, Your Honor.

01:55:16  11          THE COURT:  I don't expect any substantive

01:55:18  12  differences.  If there are, then I expect I'll hear about

01:55:21  13  it from the Plaintiff.

01:55:23  14          Let's proceed.

01:55:23  15          MR. FRISCH:  Thank you, Your Honor.

01:55:24  16  Q.  (By Mr. Frisch)  Dr. Fontecchio, let me ask you a

01:55:27  17  different question.  You provided reports in this case that

01:55:31  18  set out your invalidity opinions, right?

01:55:34  19  A.  Yes.

01:55:35  20  Q.  And Mr. Credelle, Solas's expert, he had an opportunity

01:55:42  21  to submit expert reports that countered your opinions,

01:55:46  22  correct?

01:55:46  23  A.  Yes.

01:55:47  24  Q.  And so he had an opportunity to explain reasons why he

01:55:50  25  thought Utsugi, for instance, does not disclose locations

01:55:57   1    and --

01:55:57   2         MR. FENSTER:  Objection, Your Honor.  I may be one

01:56:00   3    question premature.  I apologize if I am, but counsel's

01:56:03   4    suggestion is contrary to the burden of proof.

01:56:07   5         Defendant bears the burden of proof as to

01:56:09   6    invalidity.  We do not bear the burden with respect to

01:56:14   7    anticipation.

01:56:15   8         What he's suggesting -- what he's about to suggest

01:56:18   9    is -- would be contrary to the burden of proof.

01:56:20  10         THE COURT:  Well, that's not an evidence-based

01:56:24  11    objection to the question and the answer.  It may run

01:56:27  12    contrary -- if, in fact, that's what it is, it may run

01:56:31  13    contrary to my instructions.  It may run contrary to what

01:56:33  14    the law requires as the burden of proof.  And to the extent

01:56:39  15    the burden of proof is misstated, that can be dealt with.

01:56:42  16         I think the Court's made the burden of proof very

01:56:44  17    clear in my instructions to the jury, that the burden of

01:56:48  18    proof for invalidity is on the Defendants by clear and

01:56:51  19    convincing evidence.

01:56:53  20         And the burden of proof for infringement is on the

01:56:56  21    Plaintiff by a preponderance of the evidence.

01:56:59  22         And the burden of proof for damages related to

01:57:02  23    infringement is on the Plaintiff by a preponderance of the

01:57:05  24    evidence.

01:57:06  25         I don't want any testimony that contradicts the

01:57:08   1   Court's instructions to the jury on the burden of proof.

01:57:15   2          But the problem, Mr. Fenster, is you're seeing --

01:57:20   3   you're seeing the question and the answer as something

01:57:23   4   other than a direct statement contrary to the burden of

01:57:36   5   proof.  And I've reiterated what the burden of proof is for

01:57:39   6   the jury.

01:57:39   7          I'm going to allow the examination.  You can

01:57:41   8   address anything of this nature that you believe needs to

01:57:44   9   be addressed in additional cross-examination, but we're not

01:57:49  10   going to have a law school discussion in the middle of the

01:57:52  11   examination about what's proper and what's not proper.

01:57:57  12          If there is an objection based on the Rules of

01:58:00  13   Evidence, based on the limine orders that I have entered,

01:58:05  14   based on the matters set forth in the pre-trial conference,

01:58:07  15   raise it.  But if you don't like the substance of it

01:58:10  16   because you think it's confusing, that's what you address

01:58:12  17   on cross-examination again.

01:58:15  18          All right.  Let's proceed.

01:58:16  19          MR. FRISCH:  Thank you, Your Honor.

01:58:17  20          THE COURT:  And see if we can streamline this.

01:58:20  21          MR. FRISCH:  I'm trying, Your Honor.

01:58:22  22   Q.  (By Mr. Frisch)  Did -- you know, Dr. Fontecchio, in

01:58:25  23   your understanding, did Mr. Credelle ever provide an

01:58:28  24   opinion in this case that Claim Limitation [1d] was not

01:58:33  25   disclosed by Utsugi?

01:58:35  1          MR. FENSTER:  Objection, Your Honor.  Calls for
01:58:37  2    hearsay.
01:58:42  3          THE COURT:  He's entitled to rely on hearsay as
01:58:44  4    part of forming his opinion as an expert witness.
01:58:48  5          Overruled.
01:58:51  6          He's not to parrot hearsay and be an end-round to
01:58:57  7    the hearsay rule.  But he can certainly consider it a part
01:59:00  8    of forming his opinions.  But he needs to -- he needs to
01:59:04  9    testify as to what his opinions are.
01:59:06  10         He can identify the sources of information that
01:59:08  11   went into those opinions, but he's not to offer direct,
01:59:12  12   out-of-court statements by third parties.
01:59:16  13         MR. FENSTER:  It's also beyond the scope of his
01:59:18  14   report, Your Honor.  What happened in Mr. Credelle's report
01:59:20  15   was in response to this.  There's been nothing in his
01:59:22  16   report about what Mr. Credelle said.
01:59:24  17         THE COURT:  All right.  Ladies and gentlemen of
01:59:27  18   the jury, it appears to me I need to have a discussion with
01:59:31  19   counsel that goes further than what we've already
01:59:33  20   discussed.
01:59:34  21         I'm going to do this outside your presence.  I'm
01:59:38  22   going to ask you to retire to the jury room.
01:59:40  23         I'm going to ask you to leave your notebooks in
01:59:42  24   your chairs, follow all the rules I've given you about your
01:59:45  25   conduct, including not to discuss the case with each other,

| | | |
|---|---|---|
| 01:59:48 | 1 | and I hope to have you back in here shortly so that we can |
| 01:59:51 | 2 | go forward from there. |
| 01:59:52 | 3 | The jury is excused to the jury room at this time. |
| 01:59:54 | 4 | COURT SECURITY OFFICER:  All rise. |
| 01:59:56 | 5 | (Jury out.) |
| 02:00:30 | 6 | THE COURT:  Be seated. |
| 02:00:30 | 7 | Mr. Fenster, we need to get something straight. |
| 02:00:34 | 8 | This is not an opportunity for you to stand up and make a |
| 02:00:38 | 9 | speech to the jury on a repetitive basis, and that's what |
| 02:00:41 | 10 | we are evolving into, and that's not fair, and I'm not |
| 02:00:44 | 11 | going to allow it. |
| 02:00:45 | 12 | If you have a concise, succinct objection that you |
| 02:00:50 | 13 | can give me in a matter of one sentence or a few words that |
| 02:00:53 | 14 | relates to the Rules of Evidence, the Rules of Procedure, |
| 02:00:56 | 15 | my rulings in the pre-trial conference, including my limine |
| 02:01:01 | 16 | orders, you can certainly make it.  And I will get a |
| 02:01:04 | 17 | response from opposing counsel in as equally a succinct |
| 02:01:10 | 18 | manner, and I will give you a ruling. |
| 02:01:11 | 19 | But this is not a platform for you to get up in |
| 02:01:14 | 20 | the middle of Mr. Frisch's redirect and give a speech to |
| 02:01:18 | 21 | the jury.  And that's going to stop. |
| 02:01:21 | 22 | MR. FENSTER:  I understand. |
| 02:01:22 | 23 | THE COURT:  If it continues, I'm going to penalize |
| 02:01:24 | 24 | you. |
| 02:01:25 | 25 | And, Mr. Frisch, we're just seeing your direct |

02:01:29  1  recycled over and over and over again.  I don't know of any

02:01:35  2  rule that prohibits you from doing that, but part of the

02:01:38  3  problem we're having is that the same material is being put

02:01:41  4  up before the same witness, and I think there's an anxiety

02:01:46  5  on the Plaintiff's part that he's going to try and say

02:01:49  6  something differently the second time than he said the

02:01:52  7  first time.  And if that's where you're headed, you know,

02:01:55  8  that's not where we need to go.

02:01:57  9       MR. FRISCH:  If I may, Your Honor.  That's not at

02:01:59  10  all what I'm trying to do here.

02:02:00  11       THE COURT:  Redirect is not meant to be an

02:02:03  12  opportunity to replow the same exact ground in the same

02:02:07  13  exact way with the same exact witness.  It's meant to bring

02:02:10  14  additional information to the jury.

02:02:11  15       MR. FRISCH:  There were implications during the

02:02:13  16  questioning about whether or not certain elements had been

02:02:16  17  shown.  And so I was going back --

02:02:19  18       THE COURT:  You need to focus on those areas of

02:02:21  19  difference and not start at the beginning of the issue and

02:02:24  20  work all the way through the steps that are not in dispute

02:02:27  21  or are not in a different posture.

02:02:28  22       MR. FRISCH:  Yes, Your Honor.

02:02:29  23       MR. FENSTER:  Your Honor, I really am so sorry.

02:02:33  24  But I -- this is important, and I am -- it is improper for

02:02:43  25  them to ask Dr. Fontecchio what Mr. Credelle said in order

02:02:49   1   to raise the implication that Solas somehow admitted [1d]

02:02:55   2   by not challenging it in their report.  And that -- there

02:02:59   3   is no evidence that there's been an admission, and that is

02:03:03   4   deeply prejudicial --

02:03:04   5        THE COURT:  And you can deal with that on

02:03:07   6   additional cross-examination.  He is entitled as an expert

02:03:12   7   witness to rely on hearsay information.

02:03:18   8        MR. FENSTER:  But there is no hearsay -- he --

02:03:24   9   there is no -- what they're trying to establish by the

02:03:26   10   hearsay, Your Honor, is just that we didn't challenge it,

02:03:31   11   and, therefore, he should assume that it's admitted and

02:03:34   12   that meets their burden of proof.

02:03:35   13        THE COURT:  And if you can't deal with it now,

02:03:38   14   that's why the rules allow you to call rebuttal witnesses,

02:03:41   15   and you can call Mr. Credelle in rebuttal.

02:03:46   16        But I'm not going to keep the man from testifying.

02:03:50   17   And unless he goes outside the bounds of his report in a

02:03:54   18   clear or substantive way or unless the question is improper

02:03:59   19   and I get the kind of objection I've made clear, I'm not

02:04:03   20   going to -- I'm not going to circumscribe this process any

02:04:07   21   further.

02:04:07   22        They're entitled to put their case on to the jury

02:04:09   23   just as you are.  And you're -- in my view, you're asking

02:04:14   24   me to edit their redirect as they go, and I'm not going to

02:04:19   25   do that.  And these continual speeches to the jury from you

02:04:24   1   are not welcomed by the Court.

02:04:25   2        MR. FENSTER:  Understood.

02:04:26   3        THE COURT:  And I don't want any more of them.

02:04:28   4        MR. FENSTER:  Understood.

02:04:28   5        THE COURT:  And if you want to have time to have a

02:04:31   6   rebuttal case, then don't do that anymore, or you won't

02:04:33   7   have enough time to have a rebuttal case, if you understand

02:04:36   8   where I'm headed.

02:04:38   9        MR. FENSTER:  I do.

02:04:38  10        THE COURT:  Now, is there anything else either of

02:04:40  11   you gentlemen are unsure or unclear on about how the Court

02:04:45  12   expects this witness's continuing examination to go forward

02:04:48  13   before I bring the jury back in?

02:04:51  14        MR. FRISCH:  No, Your Honor.

02:04:52  15        THE COURT:  I'm going to charge this time the jury

02:04:54  16   has been out of the room to the Plaintiff because I feel

02:04:57  17   like Mr. Fenster's jury speeches are the largest part of

02:05:00  18   why they're there -- or why they've had to be sent out.

02:05:04  19        All right.  Let's bring the jury back in.

02:05:06  20        COURT SECURITY OFFICER:  All rise.

02:05:07  21        (Jury in.)

02:06:26  22        THE COURT:  Be seated, please.

02:06:37  23        Thank you, ladies and gentlemen, for your

02:06:42  24   indulgence.  We'll proceed with the redirect examination of

02:06:46  25   the witness by the Defendants.

02:06:47  1          Continue, Mr. Frisch.

02:06:51  2          MR. FRISCH:  Yes, Your Honor.

02:06:52  3  Q.  (By Mr. Frisch)  I believe, Dr. Fontecchio, I had just

02:06:58  4  asked you the question of whether in your understanding

02:07:01  5  Mr. Credelle had ever said that he disagreed with your

02:07:03  6  opinion with respect to Claim [1d]?

02:07:05  7  A.  In my understanding, he has not.

02:07:08  8  Q.  Now, I'd like to talk about your opinion with respect

02:07:12  9  to [1c], the insulation layer over the transistors?

02:07:22  10  A.  Yes.

02:07:22  11  Q.  With respect to that opinion, are you only relying on

02:07:25  12  the figures of Utsugi?

02:07:27  13  A.  No, I am not.  I'm also relying on the text.

02:07:29  14  Q.  And what is it about the text that also informed your

02:07:32  15  opinion?

02:07:33  16  A.  It describes the growing of the insulation layer, which

02:07:35  17  is a term that's common in micro-manufacturing to mean that

02:07:39  18  it's grown over the entire surface.

02:07:41  19          In addition, the manufacturing steps that are in

02:07:44  20  the text explain to you how to go about putting the

02:07:47  21  insulation layer down so that it covers all of the

02:07:51  22  transistors.

02:07:53  23          MR. FRISCH:  I pass the witness, Your Honor.

02:07:54  24          THE COURT:  Additional cross-examination?

02:07:59  25          MR. FENSTER:  Yes, Your Honor.

650

```
02:08:01    1          THE COURT:  Let's proceed.
02:08:01    2                    RECROSS-EXAMINATION
02:08:02    3   BY MR. FENSTER:
02:08:02    4   Q.  Dr. Fontecchio, the Defendant, Samsung, has the burden
02:08:08    5   of proof of proving every single element by clear and
02:08:10    6   convincing evidence for invalidity, correct?
02:08:14    7   A.  Yes.
02:08:14    8   Q.  And if the Defendant fails to meet that proof, we don't
02:08:18    9   have to respond, correct?
02:08:22   10   A.  I guess not.
02:08:23   11   Q.  Okay.  Now, you were here -- you were here for opening
02:08:27   12   statements, right?
02:08:27   13   A.  I was.
02:08:28   14   Q.  And during the opening statements, both counsel had the
02:08:31   15   opportunity to tell the jury what we expect the evidence to
02:08:34   16   show and what we think we'll be able to prove, right?
02:08:39   17   A.  Yes.
02:08:39   18   Q.  And during the opening statement, Mr. Haslam did not
02:08:41   19   even mention invalidity of the '450 or Utsugi, did he?
02:08:45   20   A.  I don't recall.
02:08:50   21          MR. FENSTER:  Pass the witness, Your Honor.
02:08:51   22          THE COURT:  All right.  Further redirect
02:08:52   23   examination?
02:08:53   24          MR. FRISCH:  No further questions, Your Honor.
02:08:54   25          THE COURT:  All right.  In that case,
```

| | | |
|---|---|---|
| 02:08:58 | 1 | Dr. Fontecchio, you may step down. |
| 02:09:00 | 2 | THE WITNESS:  Thank you, Your Honor. |
| 02:09:05 | 3 | Should I take the book with me? |
| 02:09:07 | 4 | THE COURT:  Leave it there, please. |
| 02:09:10 | 5 | THE WITNESS:  Okay. |
| 02:09:10 | 6 | THE COURT:  Defendants, are you prepared to call |
| 02:09:13 | 7 | your next witness? |
| 02:09:14 | 8 | MR. HASLAM:  Yes, we are. |
| 02:09:18 | 9 | THE COURT:  Call your next witness then. |
| 02:09:21 | 10 | MR. HASLAM:  Call Dr. Konstantinos Sierros. |
| 02:09:25 | 11 | THE COURT:  Dr. Sierros, if you'll come forward |
| 02:09:28 | 12 | and be sworn by the courtroom deputy, please. |
| 02:09:44 | 13 | (Witness sworn.) |
| 02:09:50 | 14 | THE COURT:  Please come around, sir, have a seat |
| 02:09:53 | 15 | on the witness stand. |
| 02:09:58 | 16 | MR. HASLAM:  Your Honor, may I have permission to |
| 02:10:00 | 17 | pass out the binders? |
| 02:10:01 | 18 | THE COURT:  Yes. |
| 02:10:35 | 19 | MR. HASLAM:  May I give them to the courtroom |
| 02:10:38 | 20 | deputy? |
| 02:10:40 | 21 | THE COURT:  You may. |
| 02:10:41 | 22 | MR. HASLAM:  Three per person. |
| 02:11:01 | 23 | THE COURT:  All right.  Mr. Haslam, you may |
| 02:11:04 | 24 | proceed with your direct examination of this witness. |
| 02:11:04 | 25 | KONSTANTINOS SIERROS, DEFENDANTS' WITNESS, SWORN |

DIRECT EXAMINATION

02:11:04  1

02:11:07  2  BY MR. HASLAM:

02:11:07  3  Q.  Dr. Konstantinos, can you introduce yourself to the

02:11:14  4  jury the way most witnesses have been doing?

02:11:16  5  A.  Good afternoon.  My name is Konstantinos Sierros.  I

02:11:20  6  originally come from Greece.  I -- after I finished high

02:11:24  7  school, I went to England to do my Bachelor's in mechanical

02:11:29  8  engineering at the University of Newcastle in the north of

02:11:32  9  England.

02:11:33  10        Then I moved to University of Birmingham.  I did

02:11:36  11  my polymers engineering and science at Birmingham, my

02:11:40  12  Master's degree in materials science and then I moved to --

02:11:42  13  and then --

02:11:42  14        THE COURT:  All right.  Just a minute, please,

02:11:44  15  Dr. Sierros.  You are going to have to slow way down.  You

02:11:47  16  obviously have an accent.

02:11:49  17        THE WITNESS:  I am sorry.

02:11:49  18        THE COURT:  There's nothing wrong with having an

02:11:51  19  accent, but it means you have to talk slower, so those of

02:11:55  20  us who don't speak with the same accent can understand you.

02:11:58  21        THE WITNESS:  I'm sorry.

02:11:59  22        THE COURT:  And if you would pull the microphone a

02:12:01  23  little closer.  It's a large courtroom.  Everybody in here

02:12:05  24  entitled -- the people on the back row are entitled to hear

02:12:06  25  you.  Everyone in here is.

02:12:07  1          THE WITNESS:  I'm sorry, Your Honor.

02:12:07  2          THE COURT:  It's not a problem.  We just want to

02:12:09  3  get it straight at the beginning.  So please slow down.

02:12:11  4          THE WITNESS:  Yes.

02:12:12  5          THE COURT:  And please speak into the microphone.

02:12:17  6  Q.  (By Mr. Haslam) Is it -- you're a professor at West

02:12:17  7  Virginia University?

02:12:19  8  A.  I'm a professor at West Virginia University and --

02:12:19  9  Q.  What do you teach there?

02:12:20 10  A.  I teach mechanical engineering.  And I'm a

02:12:20 11  first-generation college student.

02:12:31 12          And I teach mechanical engineering to

02:12:34 13  undergraduates and graduate students.  And, mainly, I'm

02:12:39 14  teaching mechanics of materials and design.  So I teach

02:12:43 15  students how to bend things, how to design new things.

02:12:47 16  Q.  And I think you mentioned that your education was in

02:12:53 17  England?

02:12:53 18  A.  Yes, my education was in England at University of

02:12:57 19  Newcastle.  I did my Bachelor in mechanical engineering,

02:13:02 20  and then I moved to Birmingham where I did my Master's in

02:13:09 21  polymers engineering.

02:13:09 22          And then I did my Ph.D. in -- at the University of

02:13:14 23  Birmingham at the same place in the middle of England --

02:13:19 24  Midlands, and that was materials science and engineering.

02:13:21 25  Q.  What were the subjects of your Ph.D. theses?

02:13:27   1   A.   In my Ph.D. theses I started the mechanics of flexible

02:13:32   2   films, like the ones that we're discussing here, with films

02:13:38   3   on top of conductive materials like the ITO that you have

02:13:41   4   probably heard so many times in this case.

02:13:46   5           And I did a lot of testing of them to categorize

02:13:52   6   into properties, how you can look through them, the

02:13:56   7   mechanics of them, like how they bend, how they stretch,

02:14:00   8   and how they are used in different related devices.  For

02:14:07   9   example, the touchscreens that we're discussing here.

02:14:10   10  Q.   Okay.  Have you done work relating to touchscreens in

02:14:14   11  the past?

02:14:14   12  A.   Yes.  So those components that I described to you,

02:14:22   13  those -- the films with ITO, probably you have heard

02:14:25   14  already that they're called flexible electrodes, and those

02:14:28   15  are used in numerous applications.  For example, in

02:14:33   16  touchscreens, they're used in flexible lighting, they're

02:14:39   17  used in displays.  They're used in many different

02:14:43   18  applications.

02:14:44   19          THE COURT:  Let me ask everybody to pause just a

02:14:46   20  minute, too.  One other thing that will help him -- will

02:14:51   21  help, Dr. Sierros, is if you will limit your answers to the

02:14:56   22  questions asked.

02:14:57   23          He asked if you had done work relating to

02:15:00   24  touchscreens in the past.  You said yes.  You then

02:15:04   25  proceeded to describe the work that you've done with

02:15:07  1   touchscreens in the past.  You answered the question when

02:15:09  2   you said yes, because that's all that was called for, have

02:15:13  3   you done work on touchscreens in the past?

02:15:15  4          If you will limit your answers to just the

02:15:18  5   question asked, I'll let Mr. Haslam ask as many questions

02:15:22  6   as he needs to to cover his material, but if we can break

02:15:26  7   this up into shorter answers to more questions instead of

02:15:30  8   longer answers into fewer questions, I'll follow your

02:15:35  9   testimony much better, and I suspect the jury will follow

02:15:39  10  your testimony better as well.  So let's try to follow that

02:15:42  11  approach.

02:15:43  12          THE WITNESS:  I'm sorry, again.

02:15:44  13          THE COURT:  That's not a problem.  I'm not

02:15:46  14  criticizing.  I'm just trying to facilitate clear

02:15:49  15  understanding by the people that need to hear and

02:15:51  16  understand.

02:15:51  17          Mr. Haslam, please continue.

02:15:52  18          MR. HASLAM:  Yes.

02:15:53  19  Q.  (By Mr. Haslam)  Did any of your work deal with metal

02:15:57  20  mesh electrodes?

02:15:57  21  A.  Yes.  Around -- yes.

02:16:01  22  Q.  "Yes" was the answer?

02:16:02  23  A.  Yes.

02:16:03  24  Q.  Can you describe briefly the kind of work you've done

02:16:09  25  with respect to metal mesh electrodes?

02:16:12   1   A.   Yes.   Around 2010 to 2011 time frame, I was working on

02:16:23   2   metal meshes for flexible lighting.

02:16:25   3   Q.   Do you have any papers that have been published?

02:16:27   4   A.   I have more than 100 technical publications, including

02:16:32   5   patents and peer-reviewed articles.

02:16:35   6   Q.   If you could keep your voice up.

02:16:37   7          How many patents do you have?

02:16:38   8   A.   I have three patents and one patent application.

02:16:41   9   Q.   Are any of your publications peer-reviewed?

02:16:46  10   A.   I have more than 50 peer-reviewed publications.

02:16:50  11   Q.   Can you briefly tell the jury what it means to have a

02:16:53  12   peer-reviewed publication?

02:16:57  13   A.   So when you have -- as a professional, you have to

02:17:03  14   publish your work so other scientists and engineers will

02:17:08  15   read your work and refer to your work.   So this is called

02:17:11  16   peer-reviewed.

02:17:13  17          So you send your papers out for review, and other

02:17:17  18   professors, we don't know their name, they review your

02:17:20  19   work.   And then it's a pretty rigorous process; it takes

02:17:25  20   some time.   And this is how -- it's hard work to publish

02:17:30  21   papers.

02:17:30  22   Q.   Have you done any work with capacitive or resistive

02:17:36  23   touch sensors?

02:17:36  24   A.   Yes, I have done work with touchscreens, and I have a

02:17:42  25   few publications.

| | | |
|---|---|---|
| 02:17:44 | 1 | Q.  And do those deal with both capacitive and resistive? |
| 02:17:48 | 2 | A.  No, I have worked mostly with touchscreens, but it's |
| 02:17:53 | 3 | similar technology. |
| 02:17:54 | 4 | Q.  Are you familiar with capacitive touch sensors? |
| 02:17:57 | 5 | A.  Yes, I am familiar with capacitive touch sensors. |
| 02:18:00 | 6 | Q.  Is this the first time you've served as an expert in |
| 02:18:03 | 7 | litigation? |
| 02:18:04 | 8 | A.  Yes. |
| 02:18:04 | 9 | Q.  A little nervous? |
| 02:18:05 | 10 | A.  A little bit, yeah. |
| 02:18:07 | 11 | Q.  Okay.  Relax.  No one's going to bite. |
| 02:18:11 | 12 | Are you being compensated for your time here? |
| 02:18:14 | 13 | A.  Yes. |
| 02:18:14 | 14 | Q.  What is the rate you're being compensated? |
| 02:18:16 | 15 | A.  $350 per hour. |
| 02:18:21 | 16 | Q.  Is your compensation in any way dependent on the |
| 02:18:23 | 17 | outcome of the case or on the opinions and testimony that |
| 02:18:27 | 18 | you provide? |
| 02:18:28 | 19 | A.  No. |
| 02:18:28 | 20 | Q.  Are the opinions and testimony you're going to provide |
| 02:18:34 | 21 | your own technical opinions? |
| 02:18:36 | 22 | A.  Yes. |
| 02:18:38 | 23 | MR. HASLAM:  Your Honor, we offer Dr. Sierros as |
| 02:18:40 | 24 | an expert in flexible touch sensor and display technology. |
| 02:18:43 | 25 | THE COURT:  Is there objection? |

02:18:44   1           MR. MIRZAIE:  No objection, Your Honor.
02:18:45   2           THE COURT:  Then, without objection, the Court
02:18:48   3  will recognize this witness as an expert in the designated
02:18:51   4  fields.
02:18:52   5           Please proceed.
02:18:54   6  Q.  (By Mr. Haslam)  What patent have you been asked to
02:18:57   7  analyze?
02:18:57   8  A.  The '311 patent.
02:18:58   9  Q.  And that's the touch sensor patent?
02:18:59  10  A.  It is the touch sensor patent.
02:19:00  11  Q.  Okay.  Can you tell us what -- just generally, what did
02:19:05  12  you do to prepare to render the opinions you've given in
02:19:08  13  this case?
02:19:08  14  A.  I have, of course, written my reports, and I also
02:19:14  15  reviewed other reports from other experts.  I reviewed a
02:19:19  16  lot of documents.  I didn't count the volume, but there
02:19:26  17  were a lot of -- thousands of pages.  And I have also
02:19:34  18  reviewed deposition transcripts and all the related papers
02:19:38  19  and documents for this case.
02:19:40  20  Q.  Now, are you aware that the Court, in connection with
02:19:44  21  prior proceedings before this trial, has interpreted
02:19:49  22  certain claims -- certain terms in the '311 patent?
02:19:52  23  A.  Yes.
02:19:54  24  Q.  And are you -- did you and will you today use those
02:19:58  25  constructions in the opinions and testimony you give today?

02:20:03    1    A.   Yes.

02:20:04    2    Q.   Now, you understand that patents are -- infringement

02:20:12    3    and validity analysis is done from the perspective of a

02:20:15    4    person of ordinary skill in the art?

02:20:16    5    A.   Correct.

02:20:17    6    Q.   And the person of ordinary skill in the art is a

02:20:23    7    hypothetical person, right?

02:20:24    8    A.   Correct.

02:20:26    9    Q.   Okay.  And what was the definition of a person of

02:20:29   10    ordinary skill in the art, as you determined it having read

02:20:33   11    the patent?

02:20:34   12    A.   So person of ordinary skill in the art is a person that

02:20:39   13    has a Bachelor's degree in electrical engineering, computer

02:20:46   14    science, or a material science engineering or related --

02:20:49   15    closely-related field, and two to three years experience in

02:20:54   16    flexible display sort of screen industry.

02:20:58   17    Q.   Now, you read Mr. Credelle's report in this litigation?

02:21:04   18    A.   Yes.

02:21:05   19    Q.   And you read his definition of a person of ordinary

02:21:09   20    skill in the art?

02:21:09   21    A.   Yes.

02:21:09   22    Q.   Were there differences between your opinion and his?

02:21:13   23    A.   Correct.

02:21:14   24    Q.   If you applied Mr. Credelle's definition of a person of

02:21:20   25    ordinary skill in the art, would it change any of the

02:21:24  1  opinions that you've rendered or will testify to here

02:21:28  2  today?

02:21:28  3  A.  No.

02:21:28  4  Q.  Now, you're aware that the claims that are asserted in

02:21:31  5  the '311 are Claims 7 and 12?

02:21:35  6  A.  Claim 7 and 12, correct.

02:21:38  7  Q.  And have you reached a conclusion as to whether, in

02:21:41  8  your view, the accused products that are accused of

02:21:44  9  infringing Claims 7 and 12, in fact, do infringe those

02:21:48  10  claims?

02:21:48  11  A.  They do not infringe.

02:21:51  12  Q.  And have you reached any conclusions as to whether

02:21:55  13  Claims 7 and 12 are valid or invalid?

02:21:59  14  A.  They're invalid.

02:22:03  15  Q.  Okay.  Just briefly, because we've been over a lot of

02:22:07  16  the background here, but how long have touch sensors been

02:22:12  17  around?

02:22:13  18  A.  They were -- since the first touchscreen was

02:22:16  19  demonstrated in the '60s.  Then in the '70s, there was some

02:22:22  20  work at Elographics, at the time, Elo TouchSystems now, and

02:22:25  21  they developed resistive touchscreens.

02:22:28  22       And then in the '80s, 3M -- MicroTouch then, 3M

02:22:32  23  now, developed the capacity technology.

02:22:35  24       And in the '90s, there were significant

02:22:37  25  developments.

02:22:38  1         And around 2011, at the time of this -- of the

02:22:47  2  '311 -- 11 patent, there were capacity touchscreens that

02:22:53  3  were establishing a major competitor in the industry with

02:23:00  4  7 billion revenue.

02:23:01  5  Q.   What kind of electrodes could be used in capacitive

02:23:10  6  touch sensors?

02:23:10  7  A.   There are different types.  The first one is --

02:23:16  8  different generations.  They were ITO based, three of them

02:23:19  9  that we discussed before that I was working with on my

02:23:23  10 Ph.D. thesis.  And then there were different materials,

02:23:26  11 such as the metal mesh materials.  But they were developed

02:23:36  12 later.

02:23:37  13 Q.   When, to your knowledge, were metal mesh-based sensors

02:23:42  14 being developed?

02:23:43  15 A.   The first patent was -- that was a published patent, it

02:23:52  16 was 2009.

02:23:54  17 Q.   And do you recall who that was issued to?

02:23:57  18 A.   That was from a company, 3M.  It was one of the largest

02:24:03  19 companies that were working on touchscreens and it was

02:24:07  20 Frey.

02:24:08  21 Q.   And was that patent one that the Patent Office

02:24:11  22 considered in...

02:24:14  23 A.   Yes, it was considered, and it was part of the

02:24:22  24 prosecution history.

02:24:23  25 Q.   And was it considered by the examiner as prior art?

02:24:27  1   A.   It was considered as prior art.

02:24:29  2   Q.   Does that mean that metal mesh touch sensors existed

02:24:33  3   prior to the '311 application being filed or the '311

02:24:38  4   patent being issued?

02:24:39  5   A.   Correct.

02:24:40  6              MR. HASLAM:   Could we have Exhibit 3?   Exhibit 3?

02:24:47  7   Exhibit DTX-3?

02:24:52  8   Q.   (By Mr. Haslam)   This is the '311 patent.   You see

02:24:59  9   "References Cited" here?

02:25:00  10  A.   Yes, I see them.

02:25:01  11  Q.   And I see here one to a Mr. Frey on the first page.

02:25:07  12  A.   Yes.

02:25:07  13             MR. HASLAM:   Can we go to the second page?

02:25:09  14  A.   Yes, the first one --

02:25:13  15  Q.   (By Mr. Haslam)   And there's another one here in

02:25:15  16  2009 --

02:25:15  17  A.   Yes.

02:25:15  18  Q.   -- and then I think there is another one here that was

02:25:20  19  published in 2010.

02:25:23  20             Is the 2009 Frey patent the one you were referring

02:25:26  21  to that has the metal mesh?

02:25:27  22  A.   Yes, this is the first one here.

02:25:31  23  Q.   Now, I notice over here on the right-hand side of the

02:25:36  24  References Cited, there is a Yilmaz reference.   Is that the

02:25:42  25  same Yilmaz who was an inventor on the '311 patent?

02:25:44  1   A.   Yes.

02:25:48  2   Q.   And his prior work can be prior art to the '311 patent?

02:25:54  3   A.   Correct.

02:25:57  4   Q.   And you are rendering an opinion in this case -- you've

02:26:01  5   rendered an opinion in this case about some obviousness

02:26:06  6   opinions you have, based on some work that Mr. Yilmaz did

02:26:12  7   before, combined with another reference.

02:26:15  8        Is the Yilmaz reference that you're discussing the

02:26:18  9   one that was cited here?

02:26:20  10  A.   No, this is different.

02:26:22  11  Q.   So the Yilmaz reference you're going to refer to was

02:26:25  12  not reviewed by the examiner?

02:26:27  13  A.   Correct.

02:26:33  14       MR. HASLAM:   Can we take that down?

02:26:41  15  Q.   (By Mr. Haslam)   Okay.   Now, the jury's heard a lot

02:26:44  16  about PET, but -- what is PET?

02:26:51  17  A.   PET stands for polyethylene terephthalate.   It's a

02:26:56  18  polyester.   It's -- plastic bottles are made of PET.   But

02:27:03  19  the thinner films, such as used in the touchscreen

02:27:06  20  technology, is coming as a flexible roll.

02:27:14  21  Q.   And did you, before coming to trial, buy some PET?

02:27:18  22  A.   Yes.

02:27:20  23       MR. HASLAM:   May I hand the witness DDX-5.110?

02:27:39  24       THE COURT:   You may approach the witness.

02:27:43  25  Q.   (By Mr. Haslam)   Can you tell us what that is?

02:27:44  1    A.  Yes, so this is a PET film, PET roll.  This is what you

02:27:51  2    used in these touch sensors and where you put the metal

02:27:56  3    mesh on top.  And this is around 125 microns -- oh, this is

02:28:03  4    105 microns.  This is like the human hair, the size of a

02:28:08  5    human hair.

02:28:09  6           And as you can see, it's very flexible.  You can

02:28:13  7    wrap it around edges -- sorry, edges, for the jury.  And

02:28:20  8    it's rolled up when it's produced, so it starts from one

02:28:28  9    roll maybe and it goes all the way, and there's subsequent

02:28:31  10   processes.

02:28:31  11   Q.  You can put that down.

02:28:40  12          Okay.  We've heard a lot about the '311 patent.

02:28:42  13          MR. HASLAM:  Can we put up the '311, Claim 7?

02:28:53  14   Q.  (By Mr. Haslam)  Okay.  First, I'm going to ask you if

02:28:58  15   there are any of these limitations in the claim that -- as

02:29:03  16   to which you have an opinion that they are not present in

02:29:07  17   the accused Samsung devices?

02:29:08  18   A.  Yes, there are two.

02:29:11  19   Q.  Can you underline them or point to them?

02:29:15  20   A.  Okay.  There's no substantially flexible substrate, and

02:29:23  21   there's some orientation, but then there's also this last

02:29:28  22   limitation, configured to wrap around one or more edges of

02:29:32  23   a display.

02:29:32  24   Q.  Okay.  And what is it that's supposed to wrap around

02:29:35  25   one or more edges of a display?

| | | |
|---|---|---|
| 02:29:37 | 1 | A.  Excuse me? |
| 02:29:38 | 2 | Q.  What is it that is supposed to wrap around? |
| 02:29:41 | 3 | A.  Oh, yes. |
| 02:29:42 | 4 | Q.  One or more edges -- wait. |
| 02:29:45 | 5 | A.  I'm sorry, I'm sorry. |
| 02:29:46 | 6 | Q.  I have to finish my question, and then you answer, and |
| 02:29:49 | 7 | I won't step on you. |
| 02:29:50 | 8 |         What is it that has to wrap around the one or more |
| 02:29:54 | 9 | edges of a display? |
| 02:29:55 | 10 | A.  It's a touch sensor, small substantially flexible |
| 02:30:02 | 11 | substrate. |
| 02:30:02 | 12 | Q.  Okay.  Is it this substantially flexible substrate and |
| 02:30:05 | 13 | the touch sensor? |
| 02:30:05 | 14 | A.  And the touch sensor. |
| 02:30:06 | 15 |         THE COURT:  All right.  Let's just be real clear. |
| 02:30:12 | 16 | One person talks at a time. |
| 02:30:13 | 17 |         And, Dr. Sierros, make sure he's finished with his |
| 02:30:18 | 18 | question before you answer. |
| 02:30:20 | 19 |         And, Mr. Haslam, make sure he's finished with his |
| 02:30:22 | 20 | answer before you ask the next question. |
| 02:30:25 | 21 |         And it's perfectly fine for counsel to instruct |
| 02:30:27 | 22 | their witnesses in preparation for their testimony, but not |
| 02:30:32 | 23 | in the courtroom.  If he needs instruction, I'll give him |
| 02:30:35 | 24 | instruction. |
| 02:30:35 | 25 |         Let's continue. |

02:30:37   1   Q.   (By Mr. Haslam)   So the -- the substantially flexible

02:30:46   2   substrate and the touch sensor are configured to wrap

02:30:49   3   around one or more edges of the display?

02:30:51   4   A.   Correct.

02:30:51   5   Q.   And is that an element that you believe is present or

02:30:54   6   not present in the accused devices?

02:30:56   7   A.   It's not present.

02:31:00   8   Q.   Does -- does the patent have a figure that is an

02:31:09   9   example that would help you explain how you put together

02:31:13   10  the elements of Claim 7?

02:31:15   11  A.   Yes.  If we turn to Figure 7 --

02:31:20   12          MR. MIRZAIE:  Your Honor?

02:31:21   13          THE COURT:  Yes, sir.

02:31:21   14          MR. MIRZAIE:  I object.  Counsel is referring to

02:31:27   15  the figure, and his question was, did that help you put the

02:31:29   16  elements of the claims together?  So he's doing a direct

02:31:33   17  comparison between the figure and the elements of the

02:31:36   18  claim.

02:31:37   19          THE COURT:  Overruled.

02:31:39   20          MR. HASLAM:  Can we put up Figure 7?

02:31:42   21  Q.   (By Mr. Haslam)   Now, I want to be clear, the claim

02:31:45   22  isn't limited to Figure 7; is that right?

02:31:48   23  A.   Yes, it's just an example.

02:31:50   24  Q.   Just an example.

02:31:51   25          Okay.  Using this as an example, can you tell us

| | | |
|---|---|---|
| 02:31:54 | 1 | what is being shown here in Figure 7?  What is Element 601? |
| 02:32:00 | 2 | A.  This is the cover of an mobile phone. |
| 02:32:05 | 3 | Q.  And by cover, what would it typically be? |
| 02:32:07 | 4 | A.  It can be a glass window. |
| 02:32:11 | 5 | Q.  Okay. |
| 02:32:11 | 6 | A.  Like -- |
| 02:32:12 | 7 | Q.  And is that an element of the claim, in your opinion? |
| 02:32:14 | 8 | A.  No, it's not. |
| 02:32:17 | 9 | Q.  Okay. |
| 02:32:19 | 10 | A.  So I can -- |
| 02:32:22 | 11 | Q.  Where you put a yellow X.  If 601 is a cover, that |
| 02:32:27 | 12 | would go on top of what the two surfaces below are, |
| 02:32:31 | 13 | correct? |
| 02:32:31 | 14 | A.  That's correct. |
| 02:32:31 | 15 | Q.  Okay.  Now, there's a gray structure just below 601, |
| 02:32:40 | 16 | the cover, and it has on the left side the No. 602 pointing |
| 02:32:45 | 17 | to it.  And on the upper right side, it has 612 pointing to |
| 02:32:54 | 18 | what looks like to the top of it. |
| 02:32:56 | 19 | Can you tell us what is being shown by 602 and |
| 02:32:59 | 20 | 612? |
| 02:33:00 | 21 | A.  Yes.  602 is the substrate -- the substantially |
| 02:33:06 | 22 | flexible substrate that is described in the claim.  And 612 |
| 02:33:10 | 23 | is sensor, the metal sensor.  And there's some subsequent |
| 02:33:18 | 24 | claims. |
| 02:33:20 | 25 | Q.  Okay.  Now, as depicted in Figure 7, the substrate and |

02:33:26  1  the touch sensor have a relatively long, wide top surface,

02:33:34  2  correct?

02:33:34  3  A.  Correct.

02:33:35  4  Q.  And then it has on the right-hand side of the figure

02:33:40  5  what appears to be at roughly a right angle, a portion of

02:33:46  6  it which hangs down perpendicular to the top surface,

02:33:50  7  correct?

02:33:50  8  A.  Correct.

02:33:51  9  Q.  Okay.  And what is being depicted by the fact that

02:33:56  10  there's a top surface and a side surface?

02:34:00  11  A.  So they're two distinct surfaces.  I describe the claim

02:34:11  12  construction of this particular --

02:34:14  13  Q.  And what do you mean by as shown by -- as described by

02:34:18  14  the claim construction?

02:34:19  15  A.  So the last limitation of -- in this claim requires

02:34:31  16  that substantially flexible substrate and the touch sensor

02:34:36  17  to wrap around one or more cover edge of a display, and

02:34:40  18  that was construed by the Court to mean to wrap around one

02:34:44  19  or more intersections between two or more surfaces of a

02:34:49  20  substrate -- of a display.  Sorry.

02:34:51  21  Q.  And is there in Figure 7 an example of how Figure 7

02:35:00  22  might meet that claim limitation?

02:35:02  23  A.  Yes.  So there's an example here because we see the top

02:35:08  24  surface.  So that's one surface.  We see the side surface.

02:35:13  25  So that's -- it's perpendicular in this case.  It forms a

02:35:18  1  sharp edge.  And this wraps around the display, which is

02:35:27  2  613 underneath.  So it's required to wrap around a display.

02:35:33  3  Q.  And what are the two surfaces that you see in the

02:35:37  4  flexible substrate and the touch sensor?

02:35:38  5  A.  They're -- can you ask --

02:35:43  6  Q.  What are the -- do you see two surfaces --

02:35:48  7  A.  Yes.

02:35:48  8  Q.  -- in the flexible touch sensor and the -- and the

02:35:52  9  substrate?

02:35:52  10  A.  Yes, they're perpendicular to some, and they have an

02:35:57  11  intersection between them.

02:35:58  12  Q.  And is that where it forms a right angle between the

02:36:02  13  top and the side?

02:36:02  14  A.  Yeah, it forms -- it forms a right angle.

02:36:05  15          THE COURT:  One at a time, please.  Make sure he's

02:36:07  16  finished with the question.  And make sure he's finished

02:36:11  17  with the answer.

02:36:12  18          Go ahead, Mr. Haslam.

02:36:13  19  Q.  (By Mr. Haslam)  And down at the bottom -- now, I want

02:36:20  20  to talk about the third thing down, 603.  What is that?

02:36:23  21  A.  That's a display, and that 603 and 613 is a display.

02:36:32  22  Q.  Does -- is the -- is the display an element of the

02:36:37  23  claim?

02:36:38  24  A.  No, the substantially flexible substrate and the --

02:36:45  25  with the touch sensor supposed to meet -- they're required

02:36:49  1  to wrap around the display, but the display is not part

02:36:52  2  of -- is not required by the claim.

02:36:55  3        MR. HASLAM:   Okay.  Can we go back now to Claim 7?

02:36:59  4  Q.  (By Mr. Haslam)  And so there's a substantially

02:37:05  5  flexible substrate and then a touch sensor, and then the

02:37:11  6  next two limitations talk about the features of the touch

02:37:15  7  sensor, correct?

02:37:16  8  A.  Correct.

02:37:16  9  Q.  They have electrodes, it's configured to bend, it has

02:37:21  10  got a metal mesh, correct?

02:37:21  11  A.  Correct.

02:37:22  12  Q.  And then it's got the substantially flexible substrate

02:37:25  13  and the touch sensor are configured to wrap around one or

02:37:28  14  more edges of the display, correct?

02:37:30  15  A.  Correct.

02:37:30  16  Q.  And now the Atmel devices that were being sold that

02:37:35  17  we've heard about had a flexible substrate and a flexible

02:37:40  18  touch sensor on top of it, correct?

02:37:41  19  A.  Correct.

02:37:41  20  Q.  And that was sold as the flexible touch sensor,

02:37:46  21  correct?

02:37:46  22  A.  Correct.

02:37:47  23  Q.  And Atmel's touch sensor was configured -- could be

02:37:50  24  configured to wrap around the edge of a display, correct?

02:37:53  25  A.  Correct.

02:37:53   1   Q.  But Atmel didn't sell displays, did it?

02:37:59   2   A.  No.

02:37:59   3          THE COURT:  Just a minute.  I know this is a

02:38:02   4   trying situation for defense counsel, but you can't testify

02:38:06   5   from the podium and just continue to talk and have the

02:38:10   6   witness say, yes, yes, yes.

02:38:12   7          I'm going to give you some latitude with regard to

02:38:17   8   leading, but the last minute or two was a soliloquy.  So

02:38:24   9   you're going to have to ask questions, and he's going to

02:38:27  10   have to give answers.

02:38:32  11   Q.  (By Mr. Haslam)  Did Atmel sell displays?

02:38:35  12   A.  No.

02:38:36  13   Q.  Was Atmel selling the claimed invention?

02:38:39  14   A.  No.

02:38:41  15          MR. MIRZAIE:  Your Honor.

02:38:41  16          THE COURT:  Yes.

02:38:42  17          MR. MIRZAIE:  This -- none of this material was in

02:38:45  18   the witness's expert reports, either one.

02:38:51  19          THE COURT:  Your objection is that this testimony

02:38:53  20   which calls for -- or it's calling for testimony beyond the

02:38:58  21   scope of his report?

02:38:59  22          MR. MIRZAIE:  Correct.  We were provided with two

02:39:01  23   reports from Dr. Sierros, and neither one of them have

02:39:05  24   anything resembling the substance of this testimony about

02:39:08  25   what Atmel sold and whether --

02:39:10  1      MR. HASLAM:  I'll withdraw the question and move

02:39:12  2  on.

02:39:12  3      THE COURT:  All right.  This witness needs to

02:39:15  4  testify within the four corners of the reports he's

02:39:18  5  generated as an expert witness, and not beyond.

02:39:22  6      MR. HASLAM:  Okay.

02:39:22  7  Q.  (By Mr. Haslam)  Now, moving --

02:39:24  8      MR. HASLAM:  We can take that down, please.

02:39:26  9  Q.  (By Mr. Haslam)  Moving to the accused devices now, can

02:39:32  10  you just refresh the jury on how Samsung's displays were

02:39:37  11  modified to what they are that are now being accused of

02:39:42  12  infringement?

02:39:44  13  A.  Yes.  So there's an evolution of the technology for

02:39:50  14  Samsung.  They started with -- they started with external

02:39:57  15  touch sensors, that they were VD basically or ITO, and they

02:40:05  16  were -- they were glued on top of the display, and then

02:40:14  17  assembly with the rest of the patent.

02:40:18  18      And then they moved to use metal mesh that was

02:40:22  19  integrated -- the touch sensor was a metal mesh touch

02:40:25  20  sensor that was integrated with the display, and that was

02:40:29  21  their latest technology, and this is the accused

02:40:32  22  technology.

02:40:33  23  Q.  Okay.

02:40:33  24  A.  So by that, it would not use anymore.  They removed the

02:40:41  25  need for a substrate and the glue, which the substrate is

02:40:45  1   one of the required -- in this claim, it was one of the

02:40:53  2   limitations.

02:40:54  3   Q.  Now, you're aware that Mr. Credelle has rendered an

02:40:59  4   infringement opinion based on the touch sensor that is on

02:41:06  5   the display and the TFE layer which he refers to the

02:41:11  6   substrate of Claim 7, correct?

02:41:13  7   A.  Correct.

02:41:13  8   Q.  Do you agree with him?

02:41:14  9   A.  No.

02:41:23  10         MR. HASLAM:  Can I have DDX- -- DTX-633?

02:41:31  11  Q.  (By Mr. Haslam)  What is this?

02:41:31  12  A.  This is a PDR document for -- this is a PDR document

02:41:42  13  from Samsung.  And -- and...

02:41:49  14  Q.  It's a PDR document?

02:41:51  15  A.  Yes.

02:41:53  16         MR. HASLAM:  Can I seal -- request the courtroom

02:41:55  17  to be sealed?  I'm going into confidential information.

02:41:58  18         THE COURT:  Based on counsel's request, I'll order

02:42:02  19  the courtroom sealed.  I'll direct those present and not

02:42:05  20  subject to the protective order which has been entered in

02:42:07  21  this case to excuse themselves and remain outside the

02:42:11  22  courtroom until it's unsealed and reopened by the Court.

02:42:16  23         (Courtroom sealed.)

02:42:16  24         (This portion of the transcript is sealed

02:42:16  25         and filed under separate cover as

02:42:17   1          Sealed Portion No. 17.)

02:42:17   2          (Courtroom unsealed.)

02:52:09   3          THE COURT:  Ladies and gentlemen of the jury, if

02:52:10   4   you'll simply leave your notebooks closed and in your

02:52:13   5   chairs, that will be fine.  Please follow all the

02:52:16   6   instructions I've given you about your conduct during the

02:52:19   7   trial, including, of course, not to discuss the case among

02:52:21   8   yourselves.

02:52:22   9          And we'll be back in here shortly to continue with

02:52:26  10   the direct examination of this witness.  But the jury is

02:52:29  11   excused for recess at this time.

02:52:32  12          COURT SECURITY OFFICER:  All rise.

02:52:34  13          (Jury out.)

02:52:37  14          THE COURT:  During this recess, I want Mr. Haslam

02:53:14  15   and Dr. Sierros to have a discussion, not at all about

02:53:20  16   anything related to the substance of this case, but I want

02:53:23  17   you two gentlemen to discuss how you can better coordinate

02:53:26  18   the questions and the answers through the remainder of this

02:53:29  19   direct examination.  You're continuing to talk over each

02:53:33  20   other.

02:53:34  21          Dr. Sierros, you are mumbling a little bit.  I

02:53:40  22   am -- I have real concerns about the ability of the jury to

02:53:44  23   follow this testimony.  And I think if you two can

02:53:48  24   coordinate the interplay between yourselves and discuss

02:53:53  25   that and only that during the recess, it might be

```
02:53:56   1   beneficial.
02:53:57   2          I understand this is your first time to testify,
02:53:59   3   and I'm not criticizing you, but my job as the presiding
02:54:05   4   Judge in this courtroom is to ensure that the jury hears
02:54:08   5   and receives the evidence that's a part of this trial for
02:54:12   6   both sides of the case, the Plaintiff and the Defendant.
02:54:16   7   And I have real concerns that this is not landing with the
02:54:20   8   jury.
02:54:21   9          They're free to accept it.  They're free to
02:54:23  10   disregard it.  But they can't do either if they don't get
02:54:26  11   it, and right now it's not landing at all.
02:54:28  12          So during this recess, counsel and the witness
02:54:32  13   need to discuss how they can better coordinate the
02:54:36  14   questions and answers in this examination.
02:54:40  15          And we'll try to be back in 10 or 12 minutes, and
02:54:47  16   we'll continue with the examination of this witness.
02:54:49  17          If at that time, I need reseal the courtroom,
02:54:53  18   Mr. Haslam, you simply have to ask.
02:54:55  19          MR. HASLAM:  Thank you.
02:54:55  20          THE COURT:  The Court stands in recess.
03:18:00  21          (Recess.)
03:18:02  22          (Jury out.)
03:18:03  23          COURT SECURITY OFFICER:  All rise.
03:18:04  24          THE COURT:  Be seated, please.
03:21:14  25          Mr. Haslam, have you and Dr. Sierros had an
```

03:21:22  1   opportunity to talk about how we could proceed with a

03:21:31  2   little less bumpiness in the road?

03:21:33  3          MR. HASLAM:  I have had that discussion.

03:21:35  4          THE COURT:  All right.  Are you ready to proceed?

03:21:37  5          MR. HASLAM:  I'm ready to proceed.

03:21:38  6          THE COURT:  Then let's bring in the jury, please.

03:21:42  7          COURT SECURITY OFFICER:  All rise.

03:21:43  8          (Jury in.)

03:21:43  9          THE COURT:  Please be seated, ladies and

03:22:17  10  gentlemen.

03:22:17  11         We'll continue with the Defendants' direct

03:22:22  12  examination of Dr. Sierros.

03:22:23  13         Mr. Haslam, you may continue.

03:22:32  14  Q.   (By Mr. Haslam)  I put up DDX-5.019.  Can you tell us

03:22:36  15  what's on this screen?

03:22:37  16  A.   So these are three more accused products, Galaxy S10,

03:22:44  17  S20 Plus, and S20 Ultra.

03:22:48  18         MR. HASLAM:  Can I have the courtroom sealed,

03:22:50  19  please?

03:22:50  20         THE COURT:  All right.  Based on counsel's

03:22:52  21  request, I'll order the courtroom sealed and direct all

03:22:56  22  present who are not subject to the protective order to

03:22:58  23  excuse themselves and remain outside until the courtroom is

03:23:01  24  reopened and unsealed.

03:23:03  25         (Courtroom sealed.)

| | | |
|---|---|---|
| 03:23:03 | 1 | (This portion of the transcript is sealed |
| 03:23:03 | 2 | and filed under separate cover as |
| 03:23:03 | 3 | Sealed Portion No. 18.) |
| 04:03:03 | 4 | (Courtroom unsealed.) |
| 04:03:36 | 5 | Q.  (By Mr. Haslam)  What are we looking at here in -- |
| 04:03:38 | 6 | THE COURT:  Just a minute, counsel. |
| 04:03:40 | 7 | MR. HASLAM:  Oh. |
| 04:03:42 | 8 | THE COURT:  Let's let the public get a seat before |
| 04:03:44 | 9 | we go forward. |
| 04:03:45 | 10 | Now we're unsealed. |
| 04:03:47 | 11 | Next question, please. |
| 04:03:48 | 12 | Q.  (By Mr. Haslam)  What are we looking at in Figure 14? |
| 04:03:51 | 13 | A.  We look at the drive and sense electrodes and the metal |
| 04:03:54 | 14 | mesh structure. |
| 04:03:54 | 15 | Q.  What does Chen describe as the material that makes up |
| 04:04:00 | 16 | the metal mesh -- the mesh? |
| 04:04:02 | 17 | A.  Copper. |
| 04:04:02 | 18 | Q.  Are there any other figures? |
| 04:04:08 | 19 | A.  Figure 21. |
| 04:04:17 | 20 | Q.  Now, you have prepared a slide to help you discuss |
| 04:04:21 | 21 | this? |
| 04:04:21 | 22 | A.  Correct. |
| 04:04:22 | 23 | MR. HASLAM:  Can we have DDX-5.038? |
| 04:04:33 | 24 | Q.  (By Mr. Haslam)  Is this a slide that you prepared? |
| 04:04:35 | 25 | A.  This is a slide I prepared and I annotated here.  And |

| | | |
|---|---|---|
| 04:04:43 | 1 | this shows the bottom display -- this is a display panel |
| 04:04:50 | 2 | with red, green, blue light-emitting diodes, the substrate, |
| 04:04:56 | 3 | the OLED layer and the TFE layer.  And this is the |
| 04:05:00 | 4 | polarizer -- |
| 04:05:01 | 5 | MR. MIRZAIE:  Your Honor? |
| 04:05:02 | 6 | THE COURT:  Yes, counsel. |
| 04:05:03 | 7 | MR. MIRZAIE:  This opinion is outside of his |
| 04:05:05 | 8 | report. |
| 04:05:06 | 9 | In his report, he had a completely different |
| 04:05:09 | 10 | opinion on this. |
| 04:05:10 | 11 | THE COURT:  Response? |
| 04:05:12 | 12 | MR. HASLAM:  He relied on this figure, and he's |
| 04:05:15 | 13 | referred to 82 -- |
| 04:05:20 | 14 | MR. MIRZAIE:  Your Honor, I can show you, if I |
| 04:05:22 | 15 | may, in his report he relied on 82 to map it to the |
| 04:05:27 | 16 | display, and that's all he relied on. |
| 04:05:33 | 17 | THE COURT:  Ladies and gentlemen of the jury, I |
| 04:05:34 | 18 | can't address this with you in the courtroom.  I'm going to |
| 04:05:37 | 19 | have to ask you to step into the jury room.  I'll have you |
| 04:05:41 | 20 | back in here as quickly as I can. |
| 04:05:44 | 21 | Please close and leave your notebooks in the |
| 04:05:46 | 22 | chairs, please follow all my instructions, including not to |
| 04:05:49 | 23 | discuss the case, and if you'll bear with me, we'll have |
| 04:05:52 | 24 | you back in here as soon as possible. |
| 04:05:54 | 25 | The jury is excused to the jury room. |

| | | |
|---|---|---|
| 04:05:56 | 1 | COURT SECURITY OFFICER:  All rise. |
| 04:05:58 | 2 | (Jury out.) |
| 04:05:58 | 3 | THE COURT:  Be seated, please. |
| 04:06:33 | 4 | Mr. Mirzaie, it's your objection.  If you will, |
| 04:06:43 | 5 | show me how the witness has testified beyond the scope of |
| 04:06:47 | 6 | his report. |
| 04:06:48 | 7 | MR. MIRZAIE:  Yes, Your Honor.  If I may approach? |
| 04:06:51 | 8 | THE COURT:  I'm going to ask you to go to the |
| 04:06:53 | 9 | document camera, and whatever you have to show me, put it |
| 04:06:56 | 10 | on the document camera, that way opposing counsel can see |
| 04:06:59 | 11 | it at the same time. |
| 04:07:01 | 12 | MR. MIRZAIE:  Sure.  And this is -- |
| 04:07:06 | 13 | THE COURT:  You don't have to move all your stuff, |
| 04:07:08 | 14 | Mr. Haslam, just step away, please. |
| 04:07:11 | 15 | Go ahead. |
| 04:07:11 | 16 | MR. MIRZAIE:  Thank you, Your Honor. |
| 04:07:12 | 17 | This is Paragraph 147 and 148 of his report. |
| 04:07:27 | 18 | So on Paragraph 147, it says clearly, contrary to |
| 04:07:40 | 19 | the testimony he was about to give, that the red, green, |
| 04:07:44 | 20 | and blue pixels of that light-emitting diode layer 82 |
| 04:07:50 | 21 | correspond to the claimed display. |
| 04:07:54 | 22 | Nowhere here does it say that the next layer, the |
| 04:07:59 | 23 | TFE layer, 84, is within the claimed display.  This is not |
| 04:08:02 | 24 | a mistake. |
| 04:08:03 | 25 | In 148, he clearly says it again. |

04:08:10  1         He equates the display with light-emitting diodes

04:08:15  2  82, and we can go through the rest of the section.  It's

04:08:17  3  not long.  Nowhere else does he have the TFE as part of the

04:08:22  4  claimed display.  We've never been put on notice on this.

04:08:26  5         THE COURT:  What's the response for Defendants?

04:08:35  6         MR. HASLAM:  Paragraph 152 of the report --

04:08:42  7         THE COURT:  Show it to me, please.  Put it on the

04:08:46  8  document camera.

04:08:47  9         MR. HASLAM:  -- is responding to --

04:08:49  10        THE COURT:  Turn it so I can read it, counsel.

04:08:52  11        MR. HASLAM:  -- is responding to their allegation

04:08:58  12  that it contains a touch sensor layered on top of a

04:09:02  13  flexible panel.

04:09:04  14        THE COURT:  Wait a minute.

04:09:05  15        MR. HASLAM:  Oh, sorry.

04:09:06  16        THE COURT:  All right.

04:09:17  17        MR. HASLAM:  And then he goes on:  I will address

04:09:23  18  in a later report my opinions on the issue of infringement.

04:09:26  19  However, I note here that this encapsulation layer would be

04:09:29  20  considered to be a substantially flexible substrate in

04:09:32  21  Claims 1 and 7.  Then for the same reasons, the thin --

04:09:37  22  thin-film encapsulation layer in Chen would also be a

04:09:41  23  substantially flexible substrate as required by Claims 1

04:09:44  24  and 7, in Chen's embodiment in which the metal mesh touch

04:09:49  25  sensor is formed on the thin-film encapsulation layer.

04:09:53   1          So he did offer an opinion under the construction

04:09:56   2    that they're proposing, which is the TFE is the substrate

04:10:00   3    of the claim.

04:10:02   4          MR. MIRZAIE:  Your Honor, if I may?

04:10:04   5          THE COURT:  You may.

04:10:04   6          MR. MIRZAIE:  Your Honor --

04:10:07   7          Can you leave that there?

04:10:09   8          MR. HASLAM:  Yeah.

04:10:09   9          MR. MIRZAIE:  So a few things about this,

04:10:12   10   Your Honor.  First off, I just showed you the sum total of

04:10:15   11   his opinions under his application of the claims.  This

04:10:19   12   entire section is about some other application of the

04:10:22   13   claims under the supposed application that Solas made for

04:10:29   14   infringement.  So already we have a TiVo Federal Circuit

04:10:32   15   problem.

04:10:33   16          But the second issue is even within this whole

04:10:36   17   section, you're not going to see any part of it in which he

04:10:39   18   says that the claimed display of -- of Chen includes the 84

04:10:45   19   TFE layer.  That -- that is -- that sentence isn't here in

04:10:49   20   form or in substance, even in this section.

04:10:52   21          MR. HASLAM:  He's going to -- he's going to read

04:10:54   22   the claim on their reading of the application of the claim

04:11:00   23   of the accused devices.

04:11:02   24          MR. MIRZAIE:  And --

04:11:03   25          MR. HASLAM:  And that's what -- that's what the

04:11:05  1   RGB, that's what he referred to as the display and the TFE

04:11:10  2   layer in the display, the substrate as they call it, then

04:11:15  3   Chen shows their substrate.

04:11:16  4        MR. MIRZAIE:  Which is problematic under the TiVo

04:11:19  5   Federal Circuit.  He has this other section.  But even in

04:11:22  6   this section, there's no words -- and my colleague did not

04:11:26  7   show them to you right now, Your Honor, that the display

04:11:28  8   includes the TFE.  That sentence isn't here.

04:11:31  9        MR. HASLAM:  All right.  Well, then we'll go back,

04:11:36  10  and we'll -- I'll ask him:  If the TFE layer is the

04:11:39  11  substrate, does Chen anticipate?  Which is what he put

04:11:43  12  there and what I've shown you.

04:11:44  13        MR. MIRZAIE:  Your Honor --

04:11:45  14        THE COURT:  We're not discussing going back and

04:11:48  15  trying to cure something.  We're trying to determine -- I'm

04:11:51  16  trying to determine if this witness has, in response to the

04:11:56  17  question from counsel, testified outside of the scope of

04:11:58  18  his report.

04:12:00  19        I have made it abundantly clear throughout this

04:12:05  20  case, and we talked about it explicitly at pre-trial, that

04:12:09  21  the expert witnesses are limited and confined to the four

04:12:13  22  corners of their reports.

04:12:14  23        We talked about this very type of objection being

04:12:17  24  highly disruptive and only being appropriate where there's

04:12:21  25  little or no doubt in the mind of the party raising the

04:12:25  1  objection, that these were not objections to be offered

04:12:28  2  flippantly or without serious belief in their merit.

04:12:32  3         So we're going to answer that question.  Whether

04:12:37  4  there needs to be anything curative or not, will depend on

04:12:41  5  what the Court's ruling is and what I think may be

04:12:43  6  necessary.

04:12:45  7         Do you -- either of you have anything further on

04:12:47  8  the underlying objection offer?

04:12:49  9         MR. MIRZAIE:  Yes, Your Honor.  So in the primary

04:12:56  10  part of his opinion, the only one in which he purports to

04:13:01  11  apply the construed claim to the prior art, again, 82 is

04:13:04  12  his only claim display.  And for the substrate, he points

04:13:08  13  to polarizer layer 92.

04:13:13  14         And -- and in the section -- in the section that

04:13:18  15  Mr. Haslam just showed you, he still is pointing to 82

04:13:21  16  only.  He does not change that whatsoever.  He just

04:13:27  17  instead, under an improper TiVo argument, he still points

04:13:32  18  to 82.  He just moves his substrate down to the TFE layer

04:13:36  19  for the first time.

04:13:38  20         But the testimony that was about to take place was

04:13:48  21  the witness expanding his display 82 into layers that he's

04:13:53  22  never had in his Chen opinions.  And, of course, as we know

04:13:56  23  this whole week, it's because he's got a strict

04:13:59  24  contradiction on this issue.

04:14:01  25         This has been a confusing issue for the jury this

04:14:04  1   whole week, and they need to expand it now not to have a

04:14:09  2   contradiction.

04:14:10  3              THE COURT:  Anything additional, Mr. Haslam?

04:14:13  4              MR. HASLAM:  No.

04:14:13  5              THE COURT:  Give me a minute to look at these

04:14:42  6   paragraphs one more time.

04:14:44  7              MR. MIRZAIE:  Thank you, Your Honor.

04:15:26  8              THE COURT:  While I see the basis of Plaintiff's

04:15:28  9   objection and while I think the particular language in the

04:15:30  10  expert's report is less than crystal clear, it might even

04:15:35  11  be characterized as somewhat lazy, I don't think there's a

04:15:42  12  direct, material deviation from what the Plaintiff has been

04:15:47  13  put on notice of.

04:15:48  14             Therefore, I'm -- in an abundance of caution, I'm

04:15:55  15  going to overrule the objection, and I'll allow this area

04:15:58  16  of inquiry to go forward.

04:16:00  17             But, Mr. Haslam, I want to caution you, you may

04:16:02  18  not stray from the ultimate conclusions in this expert's

04:16:06  19  report.

04:16:06  20             MR. HASLAM:  Understood.

04:16:07  21             THE COURT:  All right.  Let's take your

04:16:10  22  appropriate places at the bar, counsel.

04:16:12  23             Let's bring in the jury.

04:16:13  24             COURT SECURITY OFFICER:  All rise.

04:16:15  25             MR. HASLAM:  I apologize.

| | | |
|---|---|---|
| 04:16:19 | 1 | THE COURT:  I'm going to charge this time that's |
| 04:16:22 | 2 | been expended to the Plaintiff. |
| 04:16:36 | 3 | (Jury in.) |
| 04:16:55 | 4 | THE COURT:  Please be seated. |
| 04:17:01 | 5 | Thank you again, ladies and gentlemen, for your |
| 04:17:06 | 6 | indulgence. |
| 04:17:07 | 7 | Are you ready to proceed, counsel? |
| 04:17:10 | 8 | MR. HASLAM:  Yes. |
| 04:17:10 | 9 | THE COURT:  Ask your next question. |
| 04:17:12 | 10 | MR. HASLAM:  Can we put -- can we put up Figure 21 |
| 04:17:16 | 11 | of Chen?  Blow that up. |
| 04:17:27 | 12 | Q.  (By Mr. Haslam)  Now, you'll see something that's been |
| 04:17:31 | 13 | referred to as R, G, and B.  As discussed in your report, |
| 04:17:35 | 14 | what did you -- what did you call that layer? |
| 04:17:38 | 15 | A.  We said that it's the OLED layer with red, green, and |
| 04:17:44 | 16 | blue LEDs. |
| 04:17:45 | 17 | Q.  And what is 84? |
| 04:17:46 | 18 | A.  84 is the TFE layer -- |
| 04:17:49 | 19 | Q.  And what is 90 -- |
| 04:17:52 | 20 | A.  -- of encapsulation. |
| 04:17:54 | 21 | Q.  What is 90? |
| 04:17:54 | 22 | A.  It's an adhesive -- |
| 04:17:56 | 23 | THE COURT:  Just a minute.  Dr. Sierros, he's |
| 04:17:58 | 24 | trying to ask you questions one at a time.  Let him ask the |
| 04:18:02 | 25 | question, answer it.  Let me him ask the next question. |

04:18:06   1                THE WITNESS:  I'm sorry.

04:18:07   2                THE COURT:  Allow him to walk you through this

04:18:09   3   rather than to launch into a narrative about it, all right?

04:18:13   4                THE WITNESS:  Yes.

04:18:14   5                THE COURT:  Go ahead, counsel.

04:18:16   6   Q.  (By Mr. Haslam)   What is 90?

04:18:17   7   A.  90 is an adhesive.

04:18:20   8   Q.  What is 92?

04:18:21   9   A.  92 is a polarizer.

04:18:23   10  Q.  And what is 44?

04:18:25   11  A.  44 is the electrode, the touch electrode.

04:18:30   12  Q.  The what?

04:18:31   13  A.  This is the electrode.

04:18:33   14  Q.  Is that the touch sensor?

04:18:35   15  A.  The touch sensor, yeah, touch electrode.

04:18:38   16  Q.  Now, the TFE layer has a blue layer on top of it?

04:18:42   17  A.  That's correct.

04:18:42   18  Q.  And then a polarizer?

04:18:46   19  A.  Correct.

04:18:47   20  Q.  And 44 is the touch sensor?

04:18:52   21  A.  Correct.

04:18:52   22  Q.  Now, if you assume that the TFE layer is the substrate,

04:19:04   23  do you have an opinion as to whether Chen anticipates?

04:19:07   24  A.  If 84 is the substrate -- so the TFE is part of the

04:19:21   25  display, so then it does not anticipate.

| | | |
|---|---|---|
| 04:19:26 | 1 | Q.  If the TFE layer is part of the substrate, could 92 |
| 04:19:40 | 2 | also be part of the substrate? |
| 04:19:43 | 3 | A.  Correct. |
| 04:19:45 | 4 | Q.  If 92 and 84 were the substrate and 44 is a touch |
| 04:19:51 | 5 | sensor on top of it, would that be a substrate with a touch |
| 04:19:57 | 6 | sensor? |
| 04:19:57 | 7 | A.  Correct. |
| 04:19:57 | 8 | Q.  And just to be clear, you referred, just in your |
| 04:20:02 | 9 | analysis, that 82 was the OLED display? |
| 04:20:06 | 10 | A.  OLED.  I said corresponds to the OLED, but that was in |
| 04:20:11 | 11 | the context of that particular portion of the report where |
| 04:20:18 | 12 | we were -- I was applying the Plaintiff's interpretation of |
| 04:20:31 | 13 | the claim. |
| 04:20:31 | 14 | Q.  Okay.  And by that, you were then referring to the R, |
| 04:20:35 | 15 | G, and B, and not including 84, the TFE layer as part -- as |
| 04:20:42 | 16 | part of the display? |
| 04:20:42 | 17 | A.  I -- correct. |
| 04:20:44 | 18 | Q.  And did you -- do you, with that understanding, have |
| 04:20:50 | 19 | any opinion one way or the other as to whether Chen does or |
| 04:20:55 | 20 | does not anticipate Claim 7 and 12 of the '311 patent? |
| 04:21:00 | 21 | A.  Claim 7 anticipates. |
| 04:21:04 | 22 | Q.  What -- |
| 04:21:07 | 23 | A.  Excuse me?  Oh, sorry, I didn't hear your question. |
| 04:21:10 | 24 | Q.  Well, I didn't hear your answer. |
| 04:21:11 | 25 |         THE COURT:  Well, then let's start over. |

| | | |
|---|---|---|
| 04:21:13 | 1 | MR. HASLAM:  Okay. |
| 04:21:14 | 2 | A.  Can you repeat your -- |
| 04:21:20 | 3 | Q.  (By Mr. Haslam)  If 82 is the OLED display, as you |
| 04:21:22 | 4 | referred to it, and 84, the TFE layer, is not part of the |
| 04:21:28 | 5 | display, do 84 through 92 and 44, the touch sensor, under |
| 04:21:35 | 6 | that reading of this figure, does or does not Chen |
| 04:21:40 | 7 | anticipate Claim 7 and 12 of the '311 patent? |
| 04:21:44 | 8 | A.  He does not. |
| 04:21:55 | 9 | THE COURT:  Next question. |
| 04:22:04 | 10 | A.  He does.  He does.  I'm sorry, I misspoke.  He does |
| 04:22:10 | 11 | anticipate. |
| 04:22:11 | 12 | Q.  (By Mr. Haslam)  Why? |
| 04:22:12 | 13 | A.  Can you repeat the question?  I'm sorry. |
| 04:22:15 | 14 | Q.  If 82 is the OLED display and the TFE layer 84 is not |
| 04:22:25 | 15 | part of the display, which is one of the alternative |
| 04:22:28 | 16 | opinions you rendered, correct? |
| 04:22:33 | 17 | A.  Correct. |
| 04:22:33 | 18 | Q.  And if 84, the glue 90 and 92, are considered a |
| 04:22:43 | 19 | substrate and 44 is the touch sensor, under that reading of |
| 04:22:45 | 20 | Chen, does it or does it not anticipate? |
| 04:22:48 | 21 | A.  It does not. |
| 04:22:54 | 22 | THE COURT:  All right.  Let's move on. |
| 04:23:17 | 23 | A.  Sorry, it does anticipate.  I'm sorry. |
| 04:23:19 | 24 | THE COURT:  Dr. Sierros, this is the -- |
| 04:23:21 | 25 | THE WITNESS:  I'm sorry, I was confused.  I'm |

04:23:22   1   sorry.

04:23:23   2          THE COURT:  Well, this is the second time --

04:23:24   3          THE WITNESS:  I'm sorry, I was confused about the

04:23:26   4   question.

04:23:27   5          THE COURT:  Well, there's been three attempts at

04:23:29   6   this.  You've answered it three different times.  The last

04:23:33   7   two times you answered it, you gave an answer, and then

04:23:37   8   after a long pause, you said you misspoke.

04:23:41   9          THE WITNESS:  I thought --

04:23:43   10         MR. HASLAM:  Let the Judge finish.

04:23:45   11         THE COURT:  Let me finish.

04:23:46   12         I do not want to hamper either side's part of this

04:23:53   13  trial.

04:23:57   14         Mr. Haslam, we're going to make one more attempt

04:24:00   15  at this back-and-forth on this question.  And whatever the

04:24:03   16  answer is, we're going to move on after this answer to this

04:24:06   17  question one more time.

04:24:09   18         Ask the same question for the fourth time, and

04:24:12   19  then we will get an answer.  And then we will move on.

04:24:16   20         MR. HASLAM:  Yes.

04:24:18   21  Q.  (By Mr. Haslam)  Okay.  You said 82 is the -- in this

04:24:26   22  is the OLED display, correct?

04:24:33   23  A.  82 --

04:24:34   24         MR. MIRZAIE:  Your Honor, he's leading the

04:24:36   25  witness.

| | | |
|---|---|---|
| 04:24:36 | 1 | THE COURT:  I'm going to allow it. |
| 04:24:39 | 2 | Overruled. |
| 04:24:40 | 3 | Move on.  Ask -- ask the question. |
| 04:24:44 | 4 | Q.  (By Mr. Haslam)  In your report, you referred to 82 -- |
| 04:24:47 | 5 | A.  You're referring to my report now?  It wasn't clear. |
| 04:24:52 | 6 | Q.  In your -- |
| 04:24:52 | 7 | THE COURT:  Wait a minute. |
| 04:24:53 | 8 | Dr. Sierros, do not speak until he finishes with |
| 04:24:57 | 9 | this question.  When he finishes, you should give your |
| 04:25:02 | 10 | answer to this question as clearly as you can. |
| 04:25:05 | 11 | THE WITNESS:  Okay.  Okay. |
| 04:25:07 | 12 | THE COURT:  If you do not understand his question, |
| 04:25:09 | 13 | do not attempt to answer it.  Tell him you do not |
| 04:25:12 | 14 | understand it.  If you understand it, answer it after he |
| 04:25:15 | 15 | finishes it, and once that answer is given, we are going to |
| 04:25:19 | 16 | move on. |
| 04:25:21 | 17 | Mr. Haslam, ask the question. |
| 04:25:24 | 18 | Q.  (By Mr. Haslam)  If 82 is the OLED display and 84 the |
| 04:25:31 | 19 | TFE layer is not part of the display, but 84, 90, and 92 |
| 04:25:38 | 20 | are the substrate for 44, does Chen anticipate or not? |
| 04:25:54 | 21 | A.  Does not anticipate. |
| 04:26:19 | 22 | THE COURT:  Now, let's move on.  Next topic. |
| 04:26:25 | 23 | MR. HASLAM:  I have already moved to that in my -- |
| 04:26:28 | 24 | THE COURT:  Then ask it. |
| 04:26:29 | 25 | MR. HASLAM:  Okay.  Can we have DTX-167? |

691

| | | |
|---|---|---|
| 04:26:38 | 1 | Q.  (By Mr. Haslam)  Can you tell us what this document is? |
| 04:26:40 | 2 | A.  This is a DDX document.  The Patent No. is |
| 04:26:50 | 3 | 2010/0045632. |
| 04:26:51 | 4 | Q.  And when was this published? |
| 04:26:54 | 5 | A.  It was published in February -- this patent |
| 04:27:00 | 6 | application, February 25, 2010. |
| 04:27:05 | 7 | Q.  And who were the inventors on this patent? |
| 04:27:08 | 8 | A.  Esat Yilmaz, Peter Sleeman, Samuel Brunet, Matthew |
| 04:27:21 | 9 | Trend, and Harald Philipp. |
| 04:27:26 | 10 | Q.  And where were they located?  Does it indicate? |
| 04:27:29 | 11 | A.  They were at Atmel Corporation. |
| 04:27:30 | 12 | Q.  And when was this application filed? |
| 04:27:32 | 13 | A.  This application was filed April 10, 2009. |
| 04:27:34 | 14 | Q.  And do you have an opinion in this case as to whether |
| 04:27:41 | 15 | or not Claims 7 and 12 of the '311 patent are obvious in |
| 04:27:47 | 16 | light of the Yilmaz reference and another reference to Joo? |
| 04:27:51 | 17 | A.  They're obvious. |
| 04:27:52 | 18 | Q.  Can you tell us what -- can you tell us what -- |
| 04:28:16 | 19 | MR. HASLAM:  No, take that down.  Can we move on |
| 04:28:24 | 20 | to -- can we go to -- |
| 04:28:33 | 21 | Q.  (By Mr. Haslam)  Can you tell us what the Yilmaz patent |
| 04:28:36 | 22 | discloses? |
| 04:28:37 | 23 | A.  A capacitive touch sensor. |
| 04:28:40 | 24 | Q.  And where does it describe that? |
| 04:28:42 | 25 | MR. HASLAM:  Can we put the patent back up? |

04:28:45  1   A.  Capacitive position sensor.

04:28:58  2          MR.  HASLAM:  Can we put up DDX-5.064?

04:29:24  3   Q.  (By Mr. Haslam)  This is Claim 7?

04:29:25  4   A.  Correct.

04:29:25  5   Q.  Okay.

04:29:30  6          MR.  HASLAM:  Can we go to 5.065?

04:29:33  7   Q.  (By Mr. Haslam)  All right.  I put up in the left-hand

04:29:35  8   corner the preamble, "device comprising."  Does Yilmaz show

04:29:41  9   that?

04:29:41  10  A.  Yes, it shows in Figure 1B a capacitive touchscreen as

04:29:50  11  the device.

04:29:51  12  Q.  So that element you found?

04:29:52  13  A.  Yes.

04:29:55  14         MR.  HASLAM:  Now, let's go to the substantially

04:29:57  15  flexible substrate.

04:29:58  16  Q.  (By Mr. Haslam)  Does Yilmaz show a substantially

04:30:02  17  flexible substrate?

04:30:02  18  A.  Yes, Figure 1A we see in orange here the substrate,

04:30:09  19  flexible substrate, the substrate.  And Yilmaz in

04:30:15  20  Paragraph 75 discusses about an deisolating substrate, and

04:30:23  21  it guess further to discuss that different panels relative

04:30:28  22  to an LCD placed below the touchscreen.  So it's slightly

04:30:35  23  flexible.

04:30:35  24  Q.  Does Figure -- does Claim 7 of the '311 patent apply

04:30:40  25  only to OLED displays?

04:30:42  1  A.  It applies to -- this is -- this is -- excuse me, can

04:30:51  2  you -- can you repeat your question?

04:30:54  3  Q.  Does Claim 7 of the '311 patent apply only to OLED

04:30:59  4  displays?

04:31:02  5  A.  It doesn't require a display.

04:31:04  6  Q.  Okay.  I put up D -- DDX-5.068.

04:31:15  7         Does Yilmaz describe any particular substrate?

04:31:18  8  A.  It discuss -- it discusses a PET, polyethylene

04:31:25  9  terephthalate, substrate.

04:31:26  10  Q.  In 2009, was PET used for these kinds of applications

04:31:33  11  flexible?

04:31:33  12  A.  We heard Mr. Yilmaz also during his deposition video

04:31:41  13  discussing about, and the '311 patent, I have an excerpt

04:31:49  14  here that discusses the PET substrate, similar.

04:31:55  15         MR. HASLAM:  Okay.  That's DDX-5.068.

04:31:59  16  Q.  (By Mr. Haslam)  So did you find a substantially

04:32:02  17  flexible substrate disclosed in Yilmaz?

04:32:03  18  A.  Correct.

04:32:05  19  Q.  Now, the next element is a touch sensor disposed on a

04:32:10  20  substantially flexible substrate, what is on this slide

04:32:14  21  DDX-5.070?

04:32:15  22  A.  So we have the substrate and in the green here, we

04:32:20  23  see -- on top and bottom we see the touch sensor

04:32:24  24  electrodes.  So the layers made of conductive material, and

04:32:32  25  on the substrate, on the PET substrate as discussed in

694

| | | |
|---|---|---|
| 04:32:36 | 1 | Yilmaz, Paragraph 75. |
| 04:32:42 | 2 | Q.  What are we seeing on DDX-5.071? |
| 04:32:46 | 3 | A.  On the -- this is the touch sensor that's required -- |
| 04:32:52 | 4 | required -- this limitation requires a touch sensor |
| 04:32:54 | 5 | disclosed on substantially flexible substrate, and we see |
| 04:32:58 | 6 | the touch sensor 10 here and the substrate 40. |
| 04:33:04 | 7 | So the touch sensor is disclosed on the |
| 04:33:06 | 8 | substantially flexible substrate.  Here in Figure 12, we |
| 04:33:10 | 9 | see the top view of the sensor. |
| 04:33:14 | 10 | Q.  Can you please slow down a little? |
| 04:33:18 | 11 | And that is -- again, we're looking at DTX-0167, |
| 04:33:27 | 12 | the Yilmaz patent? |
| 04:33:28 | 13 | A.  Correct. |
| 04:33:29 | 14 | Q.  What paragraphs are those? |
| 04:33:31 | 15 | A.  Paragraph 119 to 120. |
| 04:33:34 | 16 | Q.  Do you find the touch sensor disclosed on the |
| 04:33:38 | 17 | substantially flexible substrate? |
| 04:33:39 | 18 | A.  Correct. |
| 04:33:40 | 19 | Q.  Element [c], the touch sensor comprising a plurality of |
| 04:33:47 | 20 | capacitive nodes formed from drive or sense electrodes made |
| 04:33:51 | 21 | of flexible conductive material configured to bend with the |
| 04:33:54 | 22 | substantially flexible substrate. |
| 04:33:56 | 23 | I've put up Slide DDX-5.073, relating to this |
| 04:34:03 | 24 | particular limitation. |
| 04:34:04 | 25 | What are we looking at on 5.073? |

04:34:07  1  A.  So we look at the -- it requires -- this limitation

04:34:11  2  requires the touch sensor comprising a plurality of

04:34:14  3  capacitive nodes from drive or sense electrodes made of

04:34:19  4  flexible conductive material configured to bend with

04:34:24  5  substantially flexible substrate.

04:34:25  6        This is a long limitation, so we start with the

04:34:29  7  touch sensor, as Yilmaz points out in Paragraph 1.  This

04:34:35  8  invention lists capacitive position sensors, and those --

04:34:41  9  they have to comprise a plurality of capacitive nodes

04:34:47  10 formed from drive or sense electrodes.

04:34:49  11        And in Paragraph 130 of Yilmaz, it's disclosed

04:34:56  12 drive and sense electrodes forming nodes.

04:34:58  13        And we can continue to the next slide.

04:35:01  14 Q.  What is -- you've referred several times to position

04:35:05  15 sensors.  Does the Yilmaz reference describe what the

04:35:09  16 position sensor is?

04:35:10  17 A.  It is a touch sensor.

04:35:15  18 Q.  I put up DDX-5.074.  What is the take-away from this

04:35:22  19 slide?

04:35:23  20 A.  So here, we have the drive or sense electrodes, and we

04:35:32  21 see that the Yilmaz in Paragraph 155 explains the drive and

04:35:39  22 sense electrodes, as shown also in Figure 12 and 17.  And

04:35:47  23 those are the 60 and 62.  60 is the drive electrodes, and

04:35:55  24 62 are the sense electrodes.

04:35:56  25 Q.  I noticed it says in Paragraph 155, the drive and sense

04:36:03  1  electrodes shown in the figure are made up of thin wires or

04:36:07  2  a mesh of wire?

04:36:08  3  A.  Correct.

04:36:08  4  Q.  Instead of a continuous layer of electrode material?

04:36:12  5  A.  Correct.

04:36:12  6  Q.  We'll get to that later, I guess?

04:36:14  7  A.  Yes.  So this is -- continuing, the drive and sense

04:36:22  8  electrodes, and we see here on Paragraph 155 the wire

04:36:30  9  mesh -- the thin wires are made of -- thin wires or mesh

04:36:39  10  of wire instead of the continuous layer --

04:36:40  11       THE COURT:  Dr. Sierros, you're going to have to

04:36:42  12  talk slower, please.

04:36:44  13       THE WITNESS:  I'm sorry.

04:36:45  14       THE COURT:  Please slow down.

04:36:46  15       Go ahead.

04:36:47  16  A.  On Paragraph -- on Paragraph 155, Yilmaz describes the

04:36:53  17  drive and sense electrodes shown in the figure are made up

04:36:56  18  of thin wires or a mesh of wire instead of the -- and this

04:37:04  19  is an excerpt from the '311 patent.

04:37:07  20  Q.  (By Mr. Haslam)  What -- what metal is being used for

04:37:10  21  the wires or mesh?

04:37:11  22  A.  The wires or mesh are manufactured from metal wires,

04:37:16  23  such as copper, but could also be gold or silver and

04:37:23  24  copper.  And the '311 patent uses copper, too.

04:37:27  25       So this is exactly the same technology material.

04:37:35  1   Q.  DDX-5.075, you put on the right-hand side, Line --

04:37:41  2   Column 7, Lines 44 through 47 from the '311 patent and

04:37:46  3   compared it to the Yilmaz Paragraph 155.

04:37:51  4         THE COURT:  Is that a question?

04:37:53  5   Q.  (By Mr. Haslam)  Is that right?

04:37:54  6   A.  Yes, correct, I explained that.

04:37:57  7   Q.  So did you find Element [c], the touch sensor

04:38:00  8   comprising a plurality of capacitive nodes formed from

04:38:04  9   drive or sense electrodes made of flexible conductive

04:38:07 10   material configured to bend with the substantially flexible

04:38:11 11   substrate?

04:38:11 12   A.  Yes.

04:38:11 13   Q.  The next one is the flexible conductive material of the

04:38:16 14   drive or sense electrodes comprise a first and second

04:38:20 15   conductive lines that electrically contact one another at

04:38:25 16   an intersection to form a mesh grid?

04:38:32 17         MR. HASLAM:  Let's look at DDX-5.077.

04:38:35 18   Q.  (By Mr. Haslam)  What are we looking at on this that

04:38:38 19   relates to that particular claim limitation?

04:38:41 20   A.  Yes.  As we see on the top left box, the drive or sense

04:38:45 21   electrodes comprise first and second conductive lines -- so

04:38:50 22   the information here -- comprises first and second

04:39:00 23   conductive lines that -- comprises first and second

04:39:02 24   electrically contact one another at an intersection to form

04:39:05 25   a mesh grid.

04:39:07  1          So as we see in Yilmaz Paragraph 22, it's made of

04:39:14  2   the mesh or filigree pattern of the interconnected lines of

04:39:17  3   highly conductive material.  So this is satisfying --

04:39:22  4   Q.  And in Paragraph 156, it states:  It will be understood

04:39:26  5   that the mesh or filligrane approach to forming each

04:39:32  6   electrode out of a plurality of interconnected fine lines

04:39:36  7   of connected -- fine lines of highly conducting wire or

04:39:38  8   traces may be used for either Layer 1 or Layer 2 drive and

04:39:47  9   sense?

04:39:47  10  A.  Yes.

04:39:48  11  Q.  What is being referred to there?

04:39:48  12  A.  Drive and sense electrodes.

04:39:49  13  Q.  And what is mesh or filligrane?

04:39:50  14  A.  Mesh filligrane is similar, like that is the same as

04:39:53  15  the mesh pattern, similar mesh pattern.

04:39:59  16  Q.  So Claim Limitation [7d], the flexible conductive

04:40:06  17  material of the drive or sense electrodes comprises first

04:40:09  18  and second conductive lines that electrically contact one

04:40:12  19  another at an intersection to form a mesh grid.  Did you

04:40:15  20  find that?

04:40:16  21  A.  Yes.

04:40:17  22  Q.  Okay.  The next limitation is the substantially

04:40:20  23  flexible substrate and the touch sensor are configured to

04:40:22  24  wrap around one or more edges of a display.  Did you find

04:40:26  25  that in the Yilmaz reference?

04:40:28  1   A.  Yes.  So this is -- this is part of what a POSA will

04:40:39  2   understand to combine between Yilmaz and Joo in light of

04:40:47  3   Joo.

04:40:47  4   Q.  What is the Joo reference?

04:40:49  5   A.  The Joo reference is about -- so the Joo reference

04:40:58  6   discuss about the cover for a mobile device that one of the

04:41:04  7   characteristics is that there is a -- there's a sensor that

04:41:11  8   wraps distinct surfaces and the top surface and the side

04:41:17  9   surface.  So there -- so display different information.

04:41:24  10       And in the -- on the side, the display can show

04:41:33  11  information.  So instead of having, for example, mechanical

04:41:38  12  patterns of a display, you can just press the screen and

04:41:42  13  display the information.

04:41:43  14       So if Yilmaz satisfies all the claims, except this

04:41:51  15  claim that requires a substantially flexible substrate and

04:41:55  16  touch sensor configured to wrap around one or more edges of

04:41:59  17  a display, so if we take Yilmaz and we apply to Joo, then

04:42:06  18  we satisfy Claims 7 and 12.

04:42:11  19       MR. HASLAM:  Can we look at DTX-169?

04:42:20  20  Q.  (By Mr. Haslam)  Okay.  This is a patent -- it's a

04:42:23  21  cover for a mobile device and the mobile device having

04:42:26  22  same.  Who is the inventor?

04:42:27  23  A.  Joo.

04:42:28  24  Q.  And is this prior art to the '311 patent?

04:42:31  25  A.  It is prior art.

04:42:32  1  Q.  When was this patent application -- this patent issued?

04:42:37  2  A.  This was a patent application that was published in

04:42:42  3  September 18th, 2008.

04:42:44  4  Q.  And as of that date, it became available to the public?

04:42:48  5  A.  Correct.

04:42:49  6  Q.  And it was filed in the Patent Office?

04:42:53  7  A.  It was filed August 2007.

04:43:06  8  Q.  Was the -- this was reference to Mr. Joo before the

04:43:11  9  Patent Office during prosecution of the '311?

04:43:14  10 A.  No.

04:43:15  11 Q.  What does Joo describe?

04:43:17  12 A.  Joo describes a cover of --

04:43:23  13       MR. HASLAM:  Can we go back to Joo?  Can we go

04:43:26  14 to --

04:43:27  15 A.  So if we go to Figure 4.

04:43:35  16       MR. HASLAM:  Figure 4.

04:43:36  17 A.  So we see in Figure 4, the cover -- we see the cover

04:43:43  18 32, and there's the -- that's a device -- that's a

04:43:49  19 particular device 34 that wraps around the side to form a

04:43:55  20 side surface 48.

04:43:57  21 Q.  And what is -- what is 48?

04:44:05  22 A.  48 is side surface of the display.

04:44:13  23 Q.  Did you prepare some slides that will assist you in

04:44:19  24 pointing out the elements in Joo that you find important?

04:44:22  25 A.  Yes, so --

04:44:31  1              MR. HASLAM:  Look at DDX-5.080.

04:44:34  2  Q.  (By Mr. Haslam)  What are we looking at here?

04:44:36  3  A.  So this is for the Limitation [e] for Claim 7 --

04:44:42  4              THE COURT:  Slow down, please.  Please.

04:44:46  5              THE WITNESS:  Yes, sir.

04:44:46  6              THE COURT:  This is about the fourth or fifth time

04:44:49  7  I've asked you.  I really want to follow what you're

04:44:52  8  saying, but I cannot do it if you're going to talk at this

04:44:55  9  high rate of speed.  Please slow down.

04:44:55  10             THE WITNESS:  Yes, sir.

04:44:55  11 A.  Substantially flexible substrate in a touch sensor

04:45:01  12 configured to wrap around one or more edges of a display.

04:45:03  13 So --

04:45:05  14 Q.  (By Mr. Haslam)  What are we looking at on the

04:45:07  15 right-hand side of this -- you've got a figure from Joo 7

04:45:12  16 that you say is annotated and two paragraphs out of the Joo

04:45:16  17 reference, Joo 0063 and Joo 0067.  What is the significance

04:45:24  18 of what you're depicting on this Slide DDX-5.080?

04:45:28  19 A.  So if we see Joo Paragraph 63, and we see that the --

04:45:34  20 it discusses about the side display that displays

04:45:38  21 information that is different than the information that is

04:45:44  22 displayed on the upper display portion.

04:45:47  23             And, accordingly, Joo explains in Paragraph 67

04:45:51  24 that a separate key is not required to be mounted at the

04:45:56  25 side surface of the terminal for generating input, thereby

04:46:00  1  simplifying the manufacturing process to reduce the

04:46:03  2  manufacturing cost and make the enhanced appearance of the

04:46:07  3  terminal.

04:46:08  4        So there's this feature is very important in this

04:46:13  5  case.  And --

04:46:15  6  Q.  What is shown in the annotated Figure 7?

04:46:19  7  A.  So the bottom part of here is the display so it's --

04:46:30  8  Q.  What number is the display?

04:46:32  9  A.  It's 110, and the side display portion is 112.  And

04:46:36  10  then we have a cover, and then 94 is the touch input

04:46:41  11  portion.  There's a top and a side that wraps around the

04:46:49  12  touch input portion, and then we have the cover.

04:46:57  13  Q.  So 94 in Figure 7 is the touch sensor?

04:47:00  14  A.  Is the touch sensor, correct.

04:47:02  15  Q.  And it goes along the top flat surface?

04:47:05  16  A.  Yes.

04:47:06  17  Q.  Bends around?

04:47:07  18  A.  Yeah, bends around on the side surface here of -- of

04:47:15  19  the side display portion.

04:47:16  20  Q.  Does that -- does Figure 7 meet the Court's claim

04:47:21  21  construction for wrapping around one or more edges of a

04:47:25  22  display?

04:47:27  23  A.  Correct.

04:47:28  24  Q.  And just once more, point out why.

04:47:31  25  A.  It means because we have a top surface here and it

04:47:41   1   wraps around an intersection, and then we have a separate

04:47:46   2   and distinctive second surface.  So this is in my view --

04:47:54   3   in my opinion satisfies the claim construction.

04:47:57   4   Q.  And what is the significance of Joo in light of the

04:48:01   5   Yilmaz reference?

04:48:02   6   A.  So the significance of Joo here is the motivation of a

04:48:09   7   person of ordinary skill in the art to take Yilmaz touch

04:48:18   8   sensor that has -- that's satisfying all the other

04:48:22   9   limitations and wrap it around the display.  Because to

04:48:27  10   enable this new feature for display information on the top,

04:48:37  11   different information on the top and different information

04:48:39  12   on the side.

04:48:42  13   Q.  And does -- does Yilmaz -- I'm sorry, does Joo discuss

04:48:50  14   at all what the benefits of having the display, as it's

04:48:55  15   depicted in Figure 7, with the top portion bending around

04:48:59  16   and then going down to a side portion 108?

04:49:04  17   A.  Correct.

04:49:04  18   Q.  And what did he say?

04:49:06  19   A.  So in Paragraph 67, right down here:  Accordingly, a

04:49:13  20   separate side key is not required to be mounted at the side

04:49:17  21   surface of the terminal for generating input.

04:49:19  22          So we don't need a mechanical button, for example.

04:49:26  23          Thereby simplifying the manufacturing process thus

04:49:29  24   to reduce the manufacturing cost and make the enhanced

04:49:33  25   appearance of the terminal.

04:49:35  1   Q.  Why would a person of ordinary skill in the art at the

04:49:38  2   time of the '311 invention have been motivated to combine

04:49:43  3   the teaching of Joo with respect to the touch sensor on the

04:49:49  4   substrate 96 that is depicted in Figure 7 and described on

04:49:54  5   Slide 5.080 with the Yilmaz touch sensor as you've

04:49:59  6   previously described it?

04:50:00  7   A.  Because of this -- of this attribute, of this feature,

04:50:07  8   of this new feature to display information on the side and

04:50:12  9   on the top of the display.  So the touch sensor would be

04:50:20  10  wrapped around two distinct surfaces to display different

04:50:25  11  information on the top and side.

04:50:27  12        And, in my opinion, this is -- this is -- this

04:50:32  13  would motivate a person of ordinary skill in the art to

04:50:38  14  perform this.

04:50:39  15  Q.  If a person of ordinary skill in the art took the

04:50:42  16  teaching of Joo and combined it with Yilmaz, would there

04:50:49  17  be -- would that person have any reasonable expectation

04:50:53  18  that the combination would be successful?

04:50:56  19  A.  Yes.

04:50:57  20  Q.  Why?

04:50:57  21  A.  Because of the touch sensor from Yilmaz is -- it

04:51:08  22  satisfies all the different claims.  So they're all

04:51:13  23  different limitations, the other limitations of this

04:51:16  24  Claim 7.  So it was configured to wrap around one or more

04:51:19  25  edges of the display.  This would be -- this, this is what

04:51:26   1   is missing.

04:51:29   2   Q.   Does Joo have any -- talk about a particular way of

04:51:34   3   making the device that he describes?

04:51:36   4   A.   Yes.

04:51:36   5   Q.   Okay.  And are you relying on the manufacturing process

04:51:42   6   of Joo in your obviousness opinion?

04:51:45   7   A.   No.  Here -- here the -- for obviousness, it's the

04:51:51   8   wrapping around one or more edges of the display that is --

04:51:58   9   that will motivate a person of ordinary skill in the art to

04:52:03  10   perform this.  And it's to display the different

04:52:10  11   information on top and side, as I explained earlier.

04:52:14  12   Q.   So you're not relying on the manufacturing methods?

04:52:19  13   A.   No.

04:52:19  14   Q.   Now, we've just gone through the substantially flexible

04:52:25  15   substrate and the touch sensor are configured to wrap

04:52:32  16   around one or more edges of a display.

04:52:35  17          And did you find that element in the Joo

04:52:43  18   reference?

04:52:43  19   A.   Yes.

04:52:44  20   Q.   And can you just summarize, again, your opinion as to

04:52:48  21   why you can combined Yilmaz and Joo to satisfy that

04:52:57  22   particular limitation, Preamble [E]?

04:53:02  23   A.   Because Yilmaz satisfies all the previous limitations

04:53:07  24   of this claim and, combined in light of Joo, satisfies also

04:53:18  25   the fifth limitation.

04:53:19  1   Q.  The last limitation is:  One or more computer-readable

04:53:24  2   non-transitory storage media embodying logic that is

04:53:26  3   configured when executed to control the touch sensor.

04:53:28  4        Did you find that in -- where did you find that?

04:53:36  5   A.  This is also satisfied by Yilmaz.  And we see here -- I

04:53:43  6   believe I understand this has been construed between the

04:53:48  7   parties and was adopted by the Court at claim construction.

04:53:52  8   Q.  And I've shown DDX-5.083?

04:53:57  9        MR. HASLAM:  And if you put the Court's claim

04:53:59  10  construction up there for a computer-readable

04:54:02  11  non-transitory storage media.

04:54:04  12  A.  Correct.  So the claim construction is a tangible

04:54:11  13  computer-readable storage media to mean:  A tangible

04:54:16  14  computer-readable storage media possession structure,

04:54:19  15  which, (1), maybe volatile, non-volatile, or a combination

04:54:24  16  of volatile and non-volatile, but, (2), may not be

04:54:28  17  propagating electrical or electromagnetic signal per se,

04:54:33  18  including, but not limited to, semiconductor-based

04:54:36  19  integrated circuits.

04:54:37  20  Q.  Okay.  And did you find a computer-readable

04:54:41  21  non-transitory storage media as the Court construed it in

04:54:44  22  Yilmaz?

04:54:44  23  A.  Yes.  A computer-readable -- the part of the -- of this

04:54:54  24  limitation that requires one or more computer-readable

04:54:58  25  non-transitory storage media is -- is in Yilmaz, it's the

04:55:06  1   controller.

04:55:07  2        And this requires embodying logic that's

04:55:11  3   configured when executed to control the touch sensor.  And

04:55:14  4   here Yilmaz, in Paragraph 94, clearly states that the

04:55:20  5   controller controls the operation of the drive and sense

04:55:25  6   unit, which comprise the touch sensor.

04:55:28  7        And in general -- the last paragraph, to discuss:

04:55:34  8   In general, the functionality of all these elements will be

04:55:38  9   provided by a single integrated circuit chip, for example a

04:55:41 10   suitably programmed general purpose microprocessor, or

04:55:46 11   field programmable gate array, or an application specific

04:55:51 12   integrated circuit, especially in microcontroller format.

04:55:55 13        And this is Element 20 in Figure 7B.

04:56:03 14   Q.  So what was your opinion as to whether or not Claim

04:56:07 15   Limitation [f], one or more computer-readable

04:56:11 16   non-transitory storage media embodying logic that is

04:56:13 17   configured when executed to control the touch sensor, was

04:56:16 18   or was not found in Yilmaz?

04:56:18 19   A.  It satisfies this limitation.

04:56:24 20   Q.  So with the combination of Yilmaz and Joo, you believe

04:56:28 21   all the elements of Claim 7 can be found in that

04:56:33 22   combination?

04:56:34 23   A.  This is correct.

04:56:35 24   Q.  And this is an obviousness opinion, not an anticipation

04:56:39 25   opinion?

04:56:39  1   A.  This is obviousness because it combines two different

04:56:43  2   prior art.

04:56:44  3   Q.  And have you given us your opinions on why one would be

04:56:48  4   motivated to combine those references?

04:56:51  5   A.  Correct.

04:56:51  6   Q.  Let's go to Claim 12:  The device of Claim 12 [sic],

04:57:01  7   wherein the touch sensor further comprises

04:57:05  8   electrically-isolated structures made of conductive

04:57:07  9   material comprising a conductive mesh.

04:57:09  10          I've put up DDX-5.086.  What is shown on this

04:57:21  11  slide?

04:57:21  12  A.  So this claim, which is a dependent claim on Claim 7,

04:57:32  13  requires:  The device of Claim 7, wherein the touch sensor

04:57:36  14  further comprises electrically-isolated structures made of

04:57:39  15  conductive material comprising a conductive mesh.

04:57:45  16          And here, Yilmaz, in Paragraph 22, discusses --

04:57:50  17  explains:  In other embodiments, each drive and/or sense

04:57:55  18  electrode is made of a mesh or filigree pattern of

04:57:59  19  interconnected lines of highly conductive material.

04:58:03  20          And in Paragraph 155, it explains that "the

04:58:10  21  position sensor," which consists of the drive and sense

04:58:14  22  electrodes, "shown in the figure are made up of thin wires

04:58:18  23  or a mesh of wire."

04:58:20  24  Q.  And they have to be electrically-isolated structures?

04:58:24  25  A.  They have to be electrically-isolated structures, which

04:58:27  1   we show on the next slide.

04:58:29  2          And those in Figure 8A, we'll see the

04:58:34  3   electrically-isolated structures.  They're what's called

04:58:39  4   diamond electrodes.  And those are -- in Paragraph 98,

04:58:47  5   these are infilling electrodes with isolated squares of

04:58:49  6   conductor and are separated with gaps, and those isolated

04:58:54  7   elements or islands -- they're also described as isolated

04:58:58  8   elements or islands.

04:59:00  9   Q.  So did you find:  The device of Claim 7, wherein the

04:59:09  10  touch sensor further comprises electrically-isolated

04:59:11  11  structures made of conductive material comprising a metal

04:59:18  12  mesh [sic] in Claim 12?

04:59:21  13  A.  Satisfied.

04:59:23  14  Q.  So have -- you've given us your opinions on

04:59:27  15  non-infringement?

04:59:27  16  A.  Correct.

04:59:30  17  Q.  And you gave us one of your opinions on invalidity?

04:59:32  18  A.  Correct.

04:59:38  19          MR. HASLAM:  Before I pass the witness, I just

04:59:40  20  want to read some exhibits that we went through that I

04:59:43  21  apparently skipped.  DTX-989, DDX-5.024, DTX-749,

05:00:04  22  DTX-0719-0009, DTX-0732-0009, and DTX-0740-0010.

05:00:17  23          I pass the witness.

05:00:19  24          THE COURT:  All right.  Ladies and gentlemen,

05:00:20  25  we've been in here over an hour and a half.  We're going to

05:00:23   1   take a short recess, and then we'll continue with this

05:00:27   2   witness, assuming Plaintiffs have cross-examination.

05:00:31   3           Please follow all the instructions I've given you

05:00:34   4   about your conduct during the trial.  Please leave your

05:00:36   5   notebooks in your chairs.  Don't discuss the case among

05:00:39   6   each other, and we'll be back in here shortly.

05:00:42   7           I'll try to keep this as a short break, if

05:00:45   8   possible.  The jury is excused for recess at this time.

05:00:48   9           COURT SECURITY OFFICER:  All rise.

05:00:55   10          (Jury out.)

05:00:56   11          THE COURT:  The Court stands in recess.

05:22:55   12          (Recess.)

05:22:57   13          (Jury out.)

05:22:57   14          COURT SECURITY OFFICER:  All rise.

05:22:58   15          THE COURT:  Be seated, please.

05:22:59   16          Are Plaintiffs prepared to proceed with

05:23:01   17   cross-examination of Dr. Sierros?

05:23:04   18          MR. MIRZAIE:  Yes, Your Honor.

05:23:05   19          THE COURT:  All right.  Let's bring in the jury,

05:23:07   20   please, Mr. Latham.

05:23:09   21          COURT SECURITY OFFICER:  All rise.

05:23:10   22          (Jury in.)

05:23:41   23          THE COURT:  Please be seated.

05:23:42   24          We'll proceed with the Plaintiff's

05:23:47   25   cross-examination of the witness.

| | | |
|---|---|---|
| 05:23:48 | 1 | All right.  Counsel, you may proceed. |
| 05:23:51 | 2 | MR. MIRZAIE:  Thank you, Your Honor. |
| 05:23:52 | 3 | May I approach with the cross-examination binder |
| 05:23:54 | 4 | for the witness? |
| 05:23:55 | 5 | THE COURT:  You may.  If you'll hand it to the |
| 05:24:01 | 6 | Court Security Officer, please. |
| 05:24:03 | 7 | MR. MIRZAIE:  Thank you. |
| 05:24:04 | 8 | THE COURT:  He'll hand it to the witness. |
| 05:24:07 | 9 | All right.  Let's proceed. |
| 05:24:13 | 10 | MR. MIRZAIE:  Mr. Wietholter, can I have the slide |
| 05:24:16 | 11 | presentation? |
| 05:24:16 | 12 | CROSS-EXAMINATION |
| 05:24:24 | 13 | BY MR. MIRZAIE: |
| 05:24:24 | 14 | Q.  Good afternoon, Professor. |
| 05:24:26 | 15 | A.  Good afternoon. |
| 05:24:27 | 16 | Q.  We've met before, right?  A few months ago, indeed, at |
| 05:24:34 | 17 | your deposition that was videotaped? |
| 05:24:36 | 18 | A.  Yes. |
| 05:24:36 | 19 | Q.  A court reporter was there? |
| 05:24:38 | 20 | Now, Professor Sierros, on the question of |
| 05:24:47 | 21 | infringement, the only correct comparison is between the |
| 05:24:51 | 22 | accused products and the limitations under the Court's |
| 05:24:55 | 23 | claim constructions, right? |
| 05:24:56 | 24 | A.  Correct. |
| 05:24:57 | 25 | Q.  And only expert witnesses can provide testimony on that |

| | | |
|---|---|---|
| 05:25:02 | 1 | comparison, right? |
| 05:25:03 | 2 | A.  Correct. |
| 05:25:04 | 3 | Q.  And you are Samsung's only expert witness on the '311, |
| 05:25:11 | 4 | right? |
| 05:25:11 | 5 | A.  Correct. |
| 05:25:11 | 6 | Q.  And so on the question of infringement and invalidity, |
| 05:25:14 | 7 | the jury has to decide on infringement whether to go with |
| 05:25:19 | 8 | your opinions or Mr. Credelle's, right? |
| 05:25:24 | 9 | A.  Correct. |
| 05:25:24 | 10 | Q.  Now, you were here for Mr. Credelle's testimony, right? |
| 05:25:28 | 11 | A.  Correct. |
| 05:25:28 | 12 | Q.  And I have a slide in front of you, Slide 16. |
| 05:25:36 | 13 | Do you see that slide, sir? |
| 05:25:40 | 14 | A.  Yes. |
| 05:25:40 | 15 | Q.  Now, Mr. Credelle, Solas's expert, says that the OLED |
| 05:25:44 | 16 | display is -- comprises the layers below the TFE, correct? |
| 05:25:51 | 17 | A.  This is what I understand from Mr. Credelle. |
| 05:26:01 | 18 | MR. MIRZAIE:  And, actually, Your Honor, we may |
| 05:26:03 | 19 | need to seal the courtroom for this. |
| 05:26:04 | 20 | THE COURT:  All right.  Are you requesting that I |
| 05:26:06 | 21 | seal the courtroom? |
| 05:26:10 | 22 | MR. MIRZAIE:  Yes. |
| 05:26:11 | 23 | THE COURT:  All right.  Then, based on counsel's |
| 05:26:13 | 24 | request, I'll order the courtroom sealed and direct that |
| 05:26:16 | 25 | anyone present who's not subject to the protective order in |

| | | |
|---|---|---|
| 05:26:19 | 1 | this case should excuse themselves and remain outside the |
| 05:26:24 | 2 | courtroom until it is reopened and unsealed. |
| 05:26:27 | 3 | (Courtroom sealed.) |
| 05:26:27 | 4 | (This portion of the transcript is sealed. |
| 05:26:27 | 5 | and filed under separate cover as |
| 05:26:27 | 6 | Sealed Portion No. 19.) |
| 06:04:41 | 7 | (Courtroom unsealed.) |
| 06:04:42 | 8 | THE COURT:  All right.  The courtroom is unsealed. |
| 06:05:10 | 9 | Proceed with redirect. |
| 06:05:11 | 10 | MR. HASLAM:  Can we put up DDX-5-038?  DDX-5.038. |
| 06:05:11 | 11 | REDIRECT EXAMINATION |
| 06:05:56 | 12 | BY MR. HASLAM: |
| 06:05:56 | 13 | Q.  Now, I put up Figure 21, which you were shown on |
| 06:06:02 | 14 | cross-examination.  And this is -- you put on the |
| 06:06:06 | 15 | right-hand side what -- |
| 06:06:06 | 16 | MR. MIRZAIE:  Your Honor? |
| 06:06:07 | 17 | THE COURT:  Just a minute. |
| 06:06:08 | 18 | Yes, counsel. |
| 06:06:09 | 19 | MR. MIRZAIE:  Yeah, I did not show this figure on |
| 06:06:12 | 20 | cross-examination. |
| 06:06:13 | 21 | THE COURT:  Your objection is overruled. |
| 06:06:15 | 22 | MR. MIRZAIE:  Okay. |
| 06:06:16 | 23 | THE COURT:  The door to this has been opened. |
| 06:06:19 | 24 | Go ahead, counsel. |
| 06:06:22 | 25 | Q.  (By Mr. Haslam)  And you were asked about Display 14 by |

| | | |
|---|---|---|
| 06:06:29 | 1 | Mr. Mirzaie, correct? |
| 06:06:29 | 2 | A.  Right. |
| 06:06:30 | 3 | Q.  And on this slide you've annotated on the right-hand |
| 06:06:35 | 4 | side, is that your notation -- it is your notation.  Is |
| 06:06:38 | 5 | that what was described in the Chen reference? |
| 06:06:41 | 6 | A.  The letters are mine.  The numbers are in the patent. |
| 06:06:45 | 7 | Q.  And have you labeled the numbered layers the way Chen |
| 06:06:51 | 8 | refers to them? |
| 06:06:54 | 9 | A.  Correct. |
| 06:06:54 | 10 | Q.  So it refers to a substrate, an OLED layer, a TFE |
| 06:06:59 | 11 | layer, an adhesive, a polarizer, a touch sensor, an |
| 06:07:06 | 12 | adhesive, and a cover glass.  And that's what Chen refers |
| 06:07:10 | 13 | to as a display, correct? |
| 06:07:11 | 14 | A.  That's correct. |
| 06:07:13 | 15 |           MR. MIRZAIE:  Your Honor, it's leading. |
| 06:07:14 | 16 |           THE COURT:  Restate the question, counsel. |
| 06:07:20 | 17 | Q.  (By Mr. Haslam)  What does Chen call No. 14 in the |
| 06:07:22 | 18 | patent? |
| 06:07:22 | 19 | A.  A display. |
| 06:07:26 | 20 | Q.  Now, in Chen -- |
| 06:07:34 | 21 |           MR. HASLAM:  If you can pull up Exhibit DTX-0163. |
| 06:07:59 | 22 | If we go to Column 1, Line 42. |
| 06:08:18 | 23 | Q.  (By Mr. Haslam)  This paragraph reads:  The Organic |
| 06:08:22 | 24 | Light-Emitting Diodes may be encapsulated with a thin-film |
| 06:08:25 | 25 | encapsulation layer.  A touch sensor may be formed from |

06:08:29  1   capacitive touch electrodes.  The electrodes may be formed

06:08:34  2   on thin-film encapsulation layer, on one or more sides of a

06:08:38  3   polarizer, or on a touch sensor panel substrate in a

06:08:43  4   single-sided or double-sided touch sensor -- touch sensor.

06:08:49  5        Your opinions -- were your opinions based on one

06:08:53  6   of these three embodiments?

06:08:55  7   A.  Correct.

06:08:55  8   Q.  Which one?

06:08:56  9   A.  The Organic Light-Emitting Diodes may be encapsulated

06:09:01  10  with a thin-film encapsulation layer.  So that's --

06:09:05  11  Q.  There are -- go ahead.

06:09:07  12  A.  This is for encapsulating the LEDs.  And a touch sensor

06:09:15  13  may be formed -- and electrodes may be -- and the

06:09:25  14  electrodes may be formed on a thin-film encapsulation

06:09:27  15  layer --

06:09:28  16        THE COURT:  Slow down.  Slow down, please.

06:09:31  17  A.  -- and the second one is the electrodes may be formed

06:09:36  18  on the thin-film encapsulation layer on one or more sides

06:09:39  19  of the polarizer.

06:09:40  20  Q.  (By Mr. Haslam)  It says it can be formed on the

06:09:44  21  thin-film encapsulation layer or on one or more sides of a

06:09:48  22  polarizer or on a touch panel substrate in a single-sided

06:09:52  23  or double-sided touch sensor panel.

06:09:56  24        Were your opinions on Chen based on one of those

06:10:00  25  particular descriptions?

06:10:04    1    A.  They were -- so the way that this structure works is

06:10:22    2    you have the display that is formed -- the polarizer is

06:10:25    3    formed on a -- separately from the display.  This is how

06:10:32    4    it's explained by Chen.  And a thin-film encapsulation

06:10:35    5    layer is needed to encapsulate the display.

06:10:41    6            MR. HASLAM:  Can we go back to Figure 21?  I'm

06:10:47    7    sorry, Slide DDX-5-038.

06:10:56    8    Q.  (By Mr. Haslam)  There is a polarizer?

06:10:58    9    A.  Correct.

06:10:59   10    Q.  And a touch sensor on it, correct?

06:11:02   11    A.  Correct.

06:11:03   12    Q.  Does Chen talk about that particular aspect of the --

06:11:10   13    of his invention, the polarizer and touch sensor?

06:11:13   14    A.  He -- it describes how it's formed, how the electrodes

06:11:20   15    are formed on the polarizer separately from the display.

06:11:24   16    Q.  And how does it -- how does Chen talk about how the

06:11:28   17    polarizer and touch sensor is attached to the display?

06:11:32   18    A.  It's using adhesive.

06:11:38   19    Q.  So is the -- is the touch sensor and polarizer, as

06:11:43   20    depicted in Chen Figure 21, an external touch sensor?

06:11:47   21    A.  It is separate from the bottom three layers that form

06:11:55   22    the display.

06:11:56   23    Q.  And it is glued against the display?

06:12:02   24    A.  Yes, it is glued using adhesive.

06:12:05   25    Q.  And is the polarizer in Chen a flexible substrate?

| | | |
|---|---|---|
| 06:12:12 | 1 | A.  It is -- the polarizer is -- it's made of a plastic |
| 06:12:18 | 2 | carrier and may be other -- may be other plastic film, but |
| 06:12:26 | 3 | it's a plastic carrier. |
| 06:12:28 | 4 | Q.  Is it flexible? |
| 06:12:30 | 5 | A.  According to my knowledge, it's flexible. |
| 06:12:35 | 6 | Q.  And does Chen have -- does the touch sensor have drive |
| 06:12:43 | 7 | and sense electrodes? |
| 06:12:44 | 8 | A.  It does have mesh electrodes. |
| 06:12:46 | 9 | Q.  And does it have metal mesh? |
| 06:12:50 | 10 | A.  Yes. |
| 06:12:56 | 11 | MR. HASLAM:  And can we put up Claim 7 |
| 06:13:00 | 12 | side-by-side with this display? |
| 06:13:03 | 13 | Q.  (By Mr. Haslam)  Does Chen have a device? |
| 06:13:08 | 14 | A.  It has a device. |
| 06:13:11 | 15 | Q.  And what is the device? |
| 06:13:13 | 16 | A.  The device is a mobile phone. |
| 06:13:15 | 17 | Q.  Does it have a touch sensor disposed on a flexible -- |
| 06:13:21 | 18 | substantially flexible substrate -- |
| 06:13:22 | 19 | A.  This is the polarizer. |
| 06:13:24 | 20 | THE COURT:  Let him finish the question, please -- |
| 06:13:26 | 21 | THE WITNESS:  Oh, I'm sorry. |
| 06:13:27 | 22 | THE COURT:  -- Dr. Sierros. |
| 06:13:31 | 23 | THE WITNESS:  I'm sorry. |
| 06:13:32 | 24 | THE COURT:  Ask your question, Mr. Haslam. |
| 06:13:34 | 25 | Q.  (By Mr. Haslam)  The touch sensor is disposed on the |

06:13:37   1   polarizer?

06:13:37   2   A.   Correct.

06:13:38   3   Q.   And that's -- is that substantially flexible?

06:13:40   4   A.   It's a plastic carrier --

06:13:42   5   Q.   Is it substantially flexible?

06:13:43   6   A.   It is, it is, yes.

06:13:45   7   Q.   The touch sensor comprising a plurality of capacitive

06:13:49   8   nodes formed from drive and sense electrodes made of

06:13:52   9   flexible conductive -- conductive material configured to

06:13:55  10   bend with a substantially flexible substrate.  Does Chen

06:13:58  11   disclose that?

06:13:59  12   A.   It does.

06:14:04  13   Q.   And does -- are the flexible conductive material of the

06:14:07  14   drive or sense electrodes comprised first and second

06:14:10  15   conductive lines that electrically contact one another at

06:14:13  16   an intersection to form a mesh grid?

06:14:16  17   A.   Correct.

06:14:17  18   Q.   Does it disclose that?

06:14:19  19   A.   It does disclose it.

06:14:21  20   Q.   And is that in the touch sensor electrodes 44?

06:14:26  21   A.   This is the 44, the green layer.

06:14:31  22   Q.   And is the -- does Chen disclose that the substantially

06:14:37  23   flexible substrate and the touch sensor are configured to

06:14:39  24   wrap around one or more edges of a display?

06:14:41  25   A.   Yes.

06:14:42  1    Q.  And does Chen show that?

06:14:45  2    A.  Yes, Figure 34.

06:14:55  3            MR. HASLAM:  Can we show Figure 24?

06:14:57  4            THE WITNESS:  34.

06:14:58  5            MR. HASLAM:  34.  Can we show Figure 34?

06:15:03  6    Q.  (By Mr. Haslam)  And there we see Figure -- we see the

06:15:06  7    No. 14.  That's -- is that the same display?

06:15:09  8    A.  It's on -- this is the same as this layer that wraps

06:15:14  9    around the side here.  And, again, is for enabling the

06:15:22  10   original patents instead of having mechanical patents.

06:15:24  11   Q.  And so in this Figure 34, among other things, the

06:15:31  12   display wraps -- goes from the top surface around a curve

06:15:37  13   and down a side surface, correct?

06:15:41  14   A.  Correct.

06:15:42  15   Q.  And, actually, what is SW?

06:15:43  16   A.  SW, it's sidewall.  It's for sidewall.

06:15:49  17   Q.  So it goes from the top around to the sidewall?

06:15:55  18   A.  Correct.

06:15:55  19   Q.  And does the -- 14 includes the polarizer and the touch

06:15:59  20   sensor electrodes?

06:15:59  21   A.  It includes the -- yeah.

06:16:02  22   Q.  And does the polarizer and the touch sensor go from the

06:16:10  23   top surface around the corner down on the sidewall?

06:16:13  24   A.  Correct.

06:16:14  25   Q.  And does that show one or more intersections of two or

```
06:16:22   1   more surfaces?
06:16:23   2   A.   Correct.
06:16:24   3   Q.   And what is the intersection?
06:16:28   4   A.   The intersection is the surface between.
06:16:33   5   Q.   Between --
06:16:34   6   A.   Between -- between the side and the top surface.
06:16:37   7   Q.   And does Chen show one or more computer-readable
06:16:43   8   non-transitory storage media embodying logic that is
06:16:46   9   configured when executed to control the touch sensor?
06:16:49  10   A.   Yes.
06:16:49  11   Q.   And is --
06:16:58  12              MR. HASLAM:   Can we go back to the slides?
06:17:20  13   DDX-5.038.   Can you advance it?   My clicker is not working.
06:17:37  14   Okay.   It's not working.   Can you just advance it, please?
06:17:47  15   Okay.   Go -- it's gone.
06:17:54  16              Can you go back to DDX-5.038?   Right here.
06:18:02  17   Q.   (By Mr. Haslam)   We saw the substantially flexible
06:18:04  18   substrate.   Is this a touch sensor disposed on the
06:18:06  19   substantially flexible substrate?   If you go to the next
06:18:10  20   slide.
06:18:10  21   A.   Yes.
06:18:16  22              MR. HASLAM:   Go to the next slide.
06:18:18  23   Q.   (By Mr. Haslam)   There's a touch sensor comprising a
06:18:21  24   plurality of capacitive nodes Element --
06:18:26  25              THE COURT:   Slow down, Mr. Haslam.   It's been a
```

06:18:27   1   long day.  If you're going to read, you're going to have to

06:18:30   2   read it at a normal pace so the court reporter can take it

06:18:35   3   down.

06:18:36   4        MR. HASLAM:  I apologize to the court reporter and

06:18:37   5   to the Court and to the jury.

06:18:38   6        THE COURT:  All right.  Let's go forward.

06:18:40   7   Q.  (By Mr. Haslam)  Element [1c] is:  The touch sensor

06:18:43   8   comprising a plurality of capacitive nodes formed from

06:18:46   9   drive or sense electrodes made of flexible conductive

06:18:50  10   material configured to bend with a substantially flexible

06:18:53  11   substrate.

06:18:53  12        Did you find that in Chen?

06:18:55  13   A.  Yes.

06:18:55  14        MR. HASLAM:  Can we go to the next slide?

06:18:57  15   Q.  (By Mr. Haslam)  What is being --

06:19:00  16        MR. HASLAM:  Just the next slide, please?  Can we

06:19:08  17   go back a slide?

06:19:09  18        THE WITNESS:  No, the previous one.

06:19:16  19   A.  Yes.

06:19:16  20   Q.  (By Mr. Haslam)  [7c] is up here.  You got Chen

06:19:20  21   Figure 5 and something in Chen.  What is being described

06:19:23  22   here?

06:19:24  23   A.  The drive and sense electrodes, that they form nodes

06:19:27  24   where the drive and sense electrodes aligns here.  These

06:19:33  25   are the nodes.

06:19:34  1  Q.  And those are -- in Chen, they're on the polarizer, the

06:19:41  2  plastic substrate?

06:19:41  3  A.  The touch sensor is on top of the polarizer.

06:19:48  4       MR. HASLAM:  Go to the next slide.  Okay.

06:20:00  5  Q.  (By Mr. Haslam)  Let's go to the next [1d]:  The

06:20:05  6  flexible conductive material of the drive and sense

06:20:07  7  electrodes comprises first and second conductive lines that

06:20:10  8  electrically contact one another at an intersection to form

06:20:14  9  a mesh grid."

06:20:15  10       Did you find that?

06:20:16  11  A.  Yes.

06:20:17  12       MR. HASLAM:  Can we see the next slide?

06:20:19  13       Can we go back one?  There.

06:20:22  14  A.  These are the drive electrodes, these are the sense

06:20:25  15  electrodes, and these are the grades that they're forming

06:20:33  16  first and second lines, that they intersect directly with

06:20:38  17  one another, intersect to form the mesh.

06:20:41  18  Q.  (By Mr. Haslam)  And in Column 8, Lines 49 to 52, what

06:20:45  19  does Chen say?

06:20:47  20  A.  Forming drive lines and sense lines may be formed from

06:20:52  21  a series of horizontally and vertically linked mesh (grid)

06:20:58  22  structures.

06:20:58  23       MR. HASLAM:  Can we go to the next slide?

06:21:01  24  Q.  (By Mr. Haslam)  The next one is:  A substantially

06:21:03  25  flexible substrate and the touch sensor are configured to

06:21:06  1  wrap around one or more edges of a display.

06:21:08  2      Did you find that in Chen?

06:21:11  3  A.  Yes.

06:21:13  4      MR. HASLAM:  Can we have the next slide?

06:21:17  5  Q.  (By Mr. Haslam)  This is the Court's construction.  I

06:21:20  6  think we've all seen that.

06:21:21  7      MR. HASLAM:  Can we have the next slide?

06:21:24  8  A.  This is the figure we were just discussing.

06:21:28  9      THE COURT:  Just a minute.  You don't need to

06:21:29 10  start talking, Dr. Sierros, until Mr. Haslam has asked you

06:21:34 11  a question.

06:21:35 12      THE WITNESS:  I'm sorry.

06:21:36 13      THE COURT:  And you need to let him ask a complete

06:21:39 14  question, and when he's finished, then you can give the

06:21:39 15  answer that that question calls for.

06:21:44 16      Now, between Mr. Haslam giving verbal instructions

06:21:45 17  to the IT person and you talking before he's asked a

06:21:48 18  question, the record is going to be, I'm afraid,

06:21:53 19  irrevocably confused.

06:21:55 20      Now, we're going to do this the right way.  I know

06:21:58 21  everybody's tired, I know it's been a long day, but we're

06:22:01 22  going to finish this witness, and we're going to do it the

06:22:04 23  right way.

06:22:04 24      If you can give your instructions in a less

06:22:07 25  audible way so that they become part of the record, you

06:22:10  1  need to be aware everything you say is a part of the

06:22:13  2  record.

06:22:13  3      And if you will wait until the question has been

06:22:16  4  asked and then answer the question, I'll be happier.

06:22:20  5      All right?

06:22:23  6  Q.  (By Mr. Haslam)  We've got Slide DDX-055.  We've seen

06:22:37  7  the figure.  What is the description -- the two

06:22:41  8  descriptions from Chen, 13, 23 to 27, and Chen, 13, 42 to

06:22:48  9  46, what, if anything, do they say about this particular

06:22:52  10  description?

06:22:52  11  A.  On-screen options such as virtual button may be

06:22:58  12  presented in active portion A' of active region A that

06:22:58  13  folded over to cover sidewall SW.

06:23:02  14      So it's forming virtual buttons.

06:23:06  15      And at Column 13, 23 to 27, the structure --

06:23:18  16  display 14 has been folded over the side of the housing

06:23:23  17  structure.  So it continues to wrap around one or more

06:23:27  18  intersection between two or more surfaces of a display.

06:23:31  19      MR. HASLAM:  Can we have the next slide?

06:23:35  20  Q.  (By Mr. Haslam)  Limitation [f] of Claim 7 is:  One or

06:23:40  21  more computer-readable non-transitory storage media

06:23:43  22  embodying logic that is configured when executed to control

06:23:46  23  the touch sensor.

06:23:47  24      Now, without reading the claim limitation again on

06:23:55  25  the next slide, can you tell us what, if anything, on this

06:23:59  1   slide does or does not, in your view, meet the claim

06:24:03  2   limitation?

06:24:03  3   A.  (No answer.)

06:24:04  4   Q.  And we put up, again, on DDX-057, the Court's claim

06:24:13  5   construction.  It's in the upper right-hand corner.

06:24:13  6           On DDX-5.058, what on here, if anything, does or

06:24:19  7   does not support your opinion that the one or more

06:24:22  8   computer-readable -- the last limitation, [7f], is met or

06:24:25  9   not met in Chen?

06:24:26 10   A.  It is met by Chen.  It requires:  Volatile or

06:24:36 11   non-volatile, or a combination of volatile and

06:24:36 12   non-volatile --

06:24:37 13           THE COURT:  Slow down, please.

06:24:40 14           THE WITNESS:  I'm sorry.

06:24:40 15   A.  So Chen discloses that storage and processing circuitry

06:24:44 16   28 may include volatile and non-volatile memory and solid

06:24:51 17   state drives.  And as we see from the claim construction,

06:24:53 18   these are described in claim construction,

06:24:59 19   semiconductor-based integrated circuits, for example.

06:24:59 20           And then:  The storage and processing circuitry

06:25:03 21   may handle tasks associated with displaying images for a

06:25:06 22   user, processing touch commands...

06:25:14 23   Q.  (By Mr. Haslam)  Did you or did you not find that

06:25:17 24   particular claim limitation in Chen?

06:25:19 25   A.  Yes, it satisfies the claim.

06:25:21   1          MR. HASLAM:  Can we go to the next slide, please?

06:25:23   2   Q.  (By Mr. Haslam)  You found in Chen, as you've just

06:25:26   3   pointed out, all of the elements of Claim 7 of the '311

06:25:30   4   patent?

06:25:30   5   A.  Correct.

06:25:31   6          MR. HASLAM:  Go to the next slide.

06:25:34   7   Q.  (By Mr. Haslam)  The device -- this is Claim 12:  The

06:25:37   8   device of Claim 7, wherein the touch sensor further

06:25:40   9   comprises electrically-isolated structures made of

06:25:43  10   conductive material comprising a conductive mesh.

06:25:46  11          Did you find that or not find that in Chen?

06:25:50  12   A.  It was in Chen.

06:25:52  13          MR. HASLAM:  Can we have the next slide?

06:25:54  14   Q.  (By Mr. Haslam)  Can you explain what's depicted on

06:25:56  15   this slide?

06:25:56  16   A.  The device of Claim 7, wherein the touch sensor further

06:26:02  17   comprises electrically-isolated structures made of

06:26:06  18   conductive material comprising a conductive mesh.

06:26:09  19          So these are conductive mesh here, and they're

06:26:12  20   electrically-isolated, the drive and sense electrodes.

06:26:17  21          Then with this structure here, which is like a

06:26:19  22   bridge, I would say, to maintain isolation, it's described

06:26:24  23   in the sentence structures 46 and 48.

06:26:28  24          And, also, the diamond-shaped mesh electrodes are

06:26:35  25   discussed and the drive and sense electrodes.  The yellow,

| | | |
|---|---|---|
| 06:26:43 | 1 | drive electrodes; and the brown, sense electrodes. |
| 06:26:47 | 2 | Q.  Now, on DDX-5-061, on the figure on the right, you have |
| 06:26:50 | 3 | two yellow squares and two brown squares.  Are those |
| 06:26:59 | 4 | electrically -- all electrically connected? |
| 06:27:00 | 5 | A.  The sense and the drive are connected.  But the drive |
| 06:27:03 | 6 | electrodes and the sense electrodes, they're electrically |
| 06:27:07 | 7 | isolated. |
| 06:27:08 | 8 | Q.  So did you find the elements of Claim 12 in Chen? |
| 06:27:16 | 9 | A.  Correct. |
| 06:27:18 | 10 | MR. HASLAM:  No further questions. |
| 06:27:19 | 11 | THE COURT:  You pass the witness? |
| 06:27:22 | 12 | MR. HASLAM:  Pass the witness. |
| 06:27:23 | 13 | MR. MIRZAIE:  Your Honor, just three or four |
| 06:27:24 | 14 | questions, and I'll get out of here. |
| 06:27:26 | 15 | THE COURT:  All right.  Additional |
| 06:27:28 | 16 | cross-examination. |
| 06:27:28 | 17 | MR. MIRZAIE:  Mr. Wietholter, can we have |
| 06:27:31 | 18 | cross-examination Slide 21? |
| 06:27:31 | 19 | RECROSS-EXAMINATION |
| 06:27:33 | 20 | BY MR. MIRZAIE: |
| 06:27:33 | 21 | Q.  I just wanted to clear up one thing, Professor Sierros. |
| 06:27:38 | 22 | As you testified earlier today, you've never provided any |
| 06:27:41 | 23 | rebuttal to any of the conception or reduction to practice |
| 06:27:46 | 24 | evidence from the inventors in this case, any of the facts |
| 06:27:51 | 25 | you see on this slide?  You never provided a written |

06:27:55   1   rebuttal to that, correct?

06:28:01   2   A.  I don't -- I don't recall, no.

06:28:11   3   Q.  And the invention date or conception date listed here

06:28:15   4   is January 2011, correct?

06:28:16   5   A.  This is --

06:28:19   6   Q.  Did I read --

06:28:20   7   A.  -- what is claimed, yes.

06:28:23   8   Q.  And Chen's invention date, as shown on your own slides,

06:28:28   9   over six months later, in July 19, 2011, correct?

06:28:32  10   A.  Correct.

06:28:32  11          MR. MIRZAIE:  No further questions, Your Honor.

06:28:34  12          THE COURT:  Further redirect?

06:28:38  13          MR. HASLAM:  No, no more redirect.

06:28:42  14          THE COURT:  All right.  Dr. Sierros, you may step

06:28:44  15   down.

06:28:49  16          Ladies and gentlemen, I'm going to recess for the

06:29:02  17   day.  I'm going to ask you to leave your notebooks closed

06:29:04  18   on the table in the jury room as you exit the courthouse.

06:29:08  19          Please follow all the instructions that I've given

06:29:10  20   you about your conduct over the course of the trial,

06:29:13  21   including, of course, not to discuss this case or anything

06:29:15  22   about it with anyone, including the eight -- the seven of

06:29:20  23   you.

06:29:21  24          Please travel safely.  Please be back tomorrow so

06:29:25  25   we can start at 8:30.  I appreciate your punctuality

| | | |
|---|---|---|
| 06:29:29 | 1 | throughout the trial.  Travel safely to your homes, and we |
| 06:29:33 | 2 | will see you tomorrow.  The jury is excused at this time. |
| 06:29:36 | 3 | COURT SECURITY OFFICER:  All rise. |
| 06:30:15 | 4 | (Jury out.) |
| 06:30:15 | 5 | THE COURT:  Counsel, the Plaintiff has 1 hour and |
| 06:30:19 | 6 | 26 minutes remaining, and the Defendant 1 hour and 55 |
| 06:30:22 | 7 | minutes remaining. |
| 06:30:24 | 8 | Is there anything that needs to be raised with the |
| 06:30:26 | 9 | Court before we recess for the evening? |
| 06:30:28 | 10 | MR. MIRZAIE:  No, Your Honor. |
| 06:30:29 | 11 | MR. HASLAM:  No, Your Honor. |
| 06:30:30 | 12 | THE COURT:  All right.  I'll expect your continued |
| 06:30:32 | 13 | improvement in the area of meeting and conferring |
| 06:30:35 | 14 | overnight.  I understand you're continuing to work jointly |
| 06:30:38 | 15 | with regard to the proposed charge and verdict form.  I |
| 06:30:43 | 16 | instruct you to continue those efforts.  Hopefully, they |
| 06:30:46 | 17 | will narrow any problems or issues we'll have to address |
| 06:30:48 | 18 | after the evidence is complete. |
| 06:30:50 | 19 | I'll be in chambers by 7:30 if there are issues |
| 06:30:55 | 20 | that need to be taken up with me before I bring the jury in |
| 06:30:58 | 21 | tomorrow. |
| 06:30:59 | 22 | And with that, counsel, we stand in recess until |
| 06:31:02 | 23 | tomorrow morning. |
| 06:31:03 | 24 | (Recess.) |
| | 25 | |

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes        _____          3/4/2021   ___
     SHELLY HOLMES, CSR, TCRR                    Date
10   FEDERAL OFFICIAL REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25