```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3  SOLAS OLED LTD.,            )(   CIVIL ACTION NO.
                               )(   2:19-CV-152-JRG
 4      PLAINTIFF,             )(
                               )(
 5      VS.                    )(
                               )(
 6  SAMSUNG DISPLAY CO., LTD.,  )(
    SAMSUNG ELECTRONICS CO.,    )(   MARSHALL, TEXAS
 7  LTD., SAMSUNG ELECTRONICS   )(   MARCH 8, 2021
    AMERICA, INC.,             )(   7:59 A.M. - 2:22 P.M.
 8                             )(
        DEFENDANTS.            )(
 9

10                   TRANSCRIPT OF JURY TRIAL

11         BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12             UNITED STATES CHIEF DISTRICT JUDGE

13

14  APPEARANCES:

15  FOR THE PLAINTIFF:

16  MR. MARC FENSTER
    MR. REZA MIRZAIE
17  MR. ADAM S. HOFFMAN
    MR. NEIL A. RUBIN
18  MR. JACOB R. BUCZKO
    MR. JAMES S. TSUEI
19  RUSS AUGUST & KABAT
    12424 Wilshire Boulevard, 12th Floor
20  Los Angeles, CA 90025

21  MR. T. JOHN WARD, JR.
    MS. CLAIRE ABERNATHY HENRY
22  MS. ANDREA L. FAIR
    WARD, SMITH & HILL, PLLC
23  1507 Bill Owens Parkway
    Longview, TX 75604
24

25
```

```
 1  FOR THE DEFENDANTS:

 2  MS. MELISSA R. SMITH
    GILLAM & SMITH, LLP
 3  303 South Washington Avenue
    Marshall, TX 75670

 4

 5  MR. JEFFREY H. LERNER
    MR. JARED R. FRISCH
 6  MR. DANIEL E. VALENCIA
    MR. DANIEL W. CHO
 7  MR. TAREK J. AUSTIN
    MR. ERIC T. O'BRIEN
 8  MR. DAVID J. CHO
    MR. JORDAN V. HILL
 9  COVINGTON & BURLING LLP
    One CityCenter
10  850 Tenth Street, NW
    Washington, DC 20001-4956

11

12  MR. ROBERT T. HASLAM
    COVINGTON & BURLING LLP
13  3000 El Camino Real
    5 Palo Alto Square, 10th Floor
14  Palo Alto, CA 94306-2112

15

16

17

18  COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
19                       United States District Court
                         Eastern District of Texas
20                       Marshall Division
                         100 E. Houston
21                       Marshall, Texas   75670
                         (903) 923-7464

22

23
    (Proceedings recorded by mechanical stenography, transcript
24  produced on a CAT system.)

25
```

```
07:54:59    1              P R O C E E D I N G S
07:54:59    2              (Jury out.)
07:55:00    3              COURT SECURITY OFFICER:  All rise.
07:55:00    4              THE COURT:  Please be seated.
07:55:01    5              Be seated, please.
07:59:01    6              Are the parties prepared to read into the record
07:59:07    7    those items from Friday's portion of the trial that come
07:59:12    8    from the list of pre-admitted exhibits?
07:59:14    9              MS. HENRY:  Yes, Your Honor.
07:59:15   10              THE COURT:  Please proceed.
07:59:17   11              MS. HENRY:  Plaintiff's read into the record
07:59:20   12    PTX-535 and PTX-536, as well as DTX-249.
07:59:26   13              THE COURT:  Is there objection from Defendants?
07:59:29   14              MR. HILL:  No objection, Your Honor.
07:59:31   15              THE COURT:  Do Defendants have a similar
07:59:33   16    rendition?
07:59:34   17              MR. HILL:  Yes, Your Honor.
07:59:35   18              THE COURT:  Please proceed.
07:59:36   19              MR. HILL:  Defendants read DTX-244, DTX-248,
07:59:42   20    DTX-249, DTX-252, DTX-253, DTX-254, DTX-1301, DTX-1302,
07:59:53   21    DTX-1309, DTX-1310, DTX-1321, and PTX-509.
08:00:02   22              THE COURT:  All right.  Is there objection to that
08:00:04   23    rendition from Defendants [sic]?
08:00:07   24              MS. HENRY:  No objection, Your Honor.
08:00:09   25              THE COURT:  All right.  Thank you, counsel.
```

08:00:16   1              Counsel, have you decided whether you're going to

08:00:18   2    ask me to seal the courtroom during closing arguments?

08:00:22   3              MR. HASLAM:  This is Bob Haslam.  We've conferred

08:00:27   4    since we were in chambers.  I believe based on what we've

08:00:31   5    discussed that we don't need to seal the courtroom.

08:00:33   6              We would just like just as a safety valve the

08:00:36   7    option that if something does come out rather than

08:00:39   8    objecting during the -- during the closing arguments, we

08:00:43   9    would take up the Court on the possibility of redacting if

08:00:46   10   that happens.

08:00:46   11             THE COURT:  All right.  I don't anticipate that

08:00:50   12   being a problem, but should something be a surprise, I have

08:00:55   13   no problem discussing that with counsel after the fact.

08:00:57   14             MR. HASLAM:  Thank you.

08:00:58   15             THE COURT:  It's always important to the Court to

08:01:01   16   wherever humanly possible to avoid the need to object

08:01:04   17   during closing arguments.

08:01:05   18             Thank you, Mr. Haslam.

08:01:07   19             Let me say this to everyone present, including

08:01:12   20   those of you in the gallery.  The Court considers its final

08:01:15   21   instructions to the jury and counsel's closing arguments to

08:01:20   22   be the most serious part of a very serious process.

08:01:25   23             Therefore, I don't want people coming and going

08:01:27   24   unless unavoidable.  I don't want papers being rustled.  I

08:01:34   25   sure as heck don't want to hear any cell phones going off.

08:01:37   1   I don't want anything to happen that would be disruptive or

08:01:40   2   divert the jury's attention from my final instructions or

08:01:44   3   counsel's closing arguments.

08:01:46   4            If you need to leave, get up and leave now.  If

08:01:48   5   you need to move around, do whatever you need to do now.

08:01:51   6   But once the jury comes in the courtroom, I expect people

08:01:55   7   to be as quiet and respectful and as still as possible.

08:01:58   8            All right.  Is there anything from either

08:02:06   9   Plaintiff or Defendant that you're aware of that I need to

08:02:09  10   address with you before I bring the jury in and we proceed?

08:02:13  11            MR. FENSTER:  Not from Plaintiff, Your Honor.

08:02:15  12            MR. HASLAM:  Not for Defendant.

08:02:16  13            THE COURT:  All right.  And for the record per

08:02:19  14   counsel's request in chambers, supported by excessive

08:02:23  15   begging, I have expanding the closing time from 40 minutes

08:02:28  16   to 42 minutes per side.  And we will take that into account

08:02:32  17   in our time keeping.

08:02:34  18            All right.  Let's bring in the jury, please.

08:02:46  19            COURT SECURITY OFFICER:  All rise.

08:02:48  20            (Jury in.)

08:02:49  21            THE COURT:  Good morning, ladies and gentlemen.

08:03:19  22   Welcome back.  Please have a seat.

08:03:20  23            Ladies and gentlemen of the jury, you have now

08:03:31  24   heard all the evidence in this case, and I will now

08:03:34  25   instruct you on the law that you must apply.

08:03:38  1          Each of you are going to have your own personal
08:03:41  2   copy of these final jury instructions that I'm about to
08:03:44  3   give you orally.  You'll have these in written form for
08:03:48  4   your review in the jury room when you retire to deliberate
08:03:51  5   in a few minutes.
08:03:52  6          Accordingly, there is really no need for you to
08:03:55  7   take written notes on these final jury instructions unless
08:03:59  8   you particularly want to do so.
08:04:01  9          It's your duty to follow the law as I give it to
08:04:04  10   you.  On the other hand, and as I've said, you, the jury,
08:04:08  11   are the sole judges of the facts in this case.
08:04:12  12          Do not consider any statement that I have made
08:04:15  13   during the course of the trial or make during the course of
08:04:18  14   these instructions as an indication to you that I have any
08:04:22  15   opinion about the facts in this case.
08:04:25  16          Now, you are about to hear closing arguments from
08:04:29  17   the attorneys for the parties.  Statements and arguments of
08:04:34  18   the attorneys are not evidence, and they are not
08:04:38  19   instructions on the law.  They're intended only to assist
08:04:42  20   the jury in understanding the evidence and the parties'
08:04:46  21   contentions.
08:04:46  22          A verdict form has been prepared for you.  You
08:04:50  23   will take this verdict form to the jury room, and when
08:04:55  24   you've reached a unanimous agreement as to your verdict,
08:04:58  25   you will have your foreperson fill in the blanks in that

08:05:01 1  form to reflect your unanimous answers, date it, and it

08:05:05 2  should be signed by your jury foreperson.

08:05:07 3          Answer the questions in the verdict form as

08:05:11 4  directed and from the facts as you find them to be.  Do not

08:05:18 5  decide who you think should win this case and then answer

08:05:21 6  the questions accordingly to reach that result.  Your

08:05:26 7  answers and your verdict, ladies and gentlemen, must be

08:05:27 8  unanimous.

08:05:29 9          In determining whether any of the facts have been

08:05:33 10 proven in this case, you may, unless otherwise instructed,

08:05:38 11 consider the testimony of all the witnesses regardless of

08:05:42 12 who may have called them, and you may consider all the

08:05:48 13 exhibits received and admitted into evidence regardless of

08:05:52 14 who may have introduced them.

08:05:53 15         Now, some of the testimony you heard was

08:05:56 16 translated from another language, in this case Korean.  In

08:05:59 17 considering that witness's or witnesses' testimony, it's

08:06:06 18 not relevant whether their testimony was given in English

08:06:09 19 or translated from another language into English.  You

08:06:14 20 should consider the translated testimony in the same way

08:06:16 21 that you would consider testimony given in English.

08:06:19 22         Remember, ladies and gentlemen, you the jurors are

08:06:22 23 the sole and only judges of the credibility of all the

08:06:30 24 witnesses and the weight and effect to give to all of the

08:06:32 25 evidence.

08:06:32  1          Now, in deciding the facts in this case, you may
08:06:37  2  have to decide which testimony to believe and which
08:06:40  3  testimony not to believe.  You alone are to determine the
08:06:44  4  questions of credibility or truthfulness of the witnesses,
08:06:49  5  and in weighing the testimony of the witnesses, you may
08:06:51  6  consider the witness's manner and demeanor as reflected on
08:06:57  7  the witness stand.
08:06:59  8          You may consider any feelings or interest they may
08:07:02  9  have in the case and any bias or prejudice about the case
08:07:05  10  that the witness may have, and you may consider the
08:07:09  11  consistency or inconsistency of their testimony considered
08:07:14  12  in the light of the circumstances.
08:07:15  13          Has the witness been contradicted by other
08:07:19  14  evidence?  Has his or her made statements at other times in
08:07:25  15  other places contrary to what he or she said on the witness
08:07:30  16  stand?  You must give the testimony of each witness the
08:07:32  17  amount of credibility and weight that you think it
08:07:37  18  deserves.
08:07:39  19          You must also keep in mind, however, ladies and
08:07:42  20  gentlemen, that a simple mistake does not mean that a
08:07:44  21  witness is not telling the truth.  You must consider
08:07:47  22  whether any misstatement was an intentional falsehood or a
08:07:52  23  simple lapse of memory and what significance should be
08:07:55  24  attached to that testimony.
08:07:56  25          Now, unless I instruct you otherwise, you may

08:08:03  1  properly determine that the testimony of a single witness

08:08:07  2  is sufficient to prove any fact, even if a greater number

08:08:11  3  of witnesses may have testified to the contrary, if after

08:08:15  4  considering all of the evidence you believe that single

08:08:20  5  witness.

08:08:20  6      As I've told you previously, the attorneys in this

08:08:26  7  case are advocates for their competing clients, and they

08:08:31  8  have a duty to raise objections when they believe evidence

08:08:33  9  is being offered that should not be admitted under the

08:08:38  10  rules of the Court.

08:08:38  11      When the Court sustained an objection to a

08:08:41  12  question addressed to a witness, you must disregard the

08:08:44  13  question entirely, and you may draw no inference from its

08:08:47  14  wording, and you may not speculate about what the witness

08:08:50  15  would have said if he or she had been permitted to answer

08:08:54  16  the question by the Court.

08:08:55  17      On the other hand, ladies and gentlemen, if the

08:08:58  18  objection was overruled by the Court, then you should treat

08:09:01  19  the question and the answer just as you would treat any

08:09:04  20  other question and answer as if the objection had not been

08:09:09  21  made.

08:09:09  22      Also, by allowing testimony or other evidence to

08:09:14  23  be introduced over the objection of an attorney, the Court

08:09:18  24  did not indicate to you any opinion as to the weight or

08:09:21  25  effect of such evidence.

08:09:24   1              Now, at times, ladies and gentlemen, during the
08:09:28   2   trial, it's been necessary for the Court to talk with the
08:09:31   3   attorneys outside of your hearing by asking you to retire
08:09:34   4   to the jury room or by calling a recess and talking to them
08:09:38   5   outside of your hearing while we were in recess and you
08:09:42   6   were out of the courtroom.
08:09:44   7              This happens because during a trial, sometimes
08:09:47   8   things arise that do not involve the jury.  You should not
08:09:51   9   speculate about what was said during such discussions that
08:09:55  10   took place outside of your presence.
08:09:58  11              Now, there are two types of evidence that you may
08:10:02  12   consider in properly finding the truth as to the facts in
08:10:05  13   this case.  One is direct evidence, such as the testimony
08:10:10  14   of an eyewitness.  The other is indirect or circumstantial
08:10:14  15   evidence, that is, the proof of a chain of circumstances
08:10:20  16   that indicates the existence or nonexistence of certain
08:10:25  17   other facts.
08:10:26  18              As a general rule, ladies and gentlemen, the law
08:10:29  19   makes no distinction between direct evidence or
08:10:32  20   circumstantial evidence but simply requires that you find
08:10:36  21   the facts based on the evidence presented during the trial,
08:10:41  22   both direct and circumstantial.
08:10:43  23              Now, the parties may have agreed or stipulated to
08:10:48  24   some facts in this case, and when the lawyers for both
08:10:51  25   sides stipulate to the existence of a fact, you must,

08:10:54   1   unless otherwise instructed, accept the stipulation as

08:10:58   2   evidence and regard the facts as proven.

08:11:00   3          Also, certain testimony in this case has been

08:11:05   4   presented to you through depositions.  A deposition is the

08:11:10   5   sworn, recorded answers to questions asked to a witness in

08:11:14   6   advance of the trial.  If a witness cannot be personally

08:11:18   7   present to testify from the witness stand physically, the

08:11:22   8   witness's testimony may be presented under oath in the form

08:11:26   9   of a deposition.

08:11:29   10         Before this trial began, the attorneys

08:11:31   11  representing the parties in this case questioned these

08:11:34   12  deposition witnesses under oath.  The witnesses were sworn,

08:11:38   13  a court reporter was present and recorded the testimony,

08:11:42   14  both the questions and the answers.  Deposition testimony,

08:11:46   15  ladies and gentlemen, is entitled to the same consideration

08:11:50   16  as the testimony given by a witness in person from the

08:11:53   17  witness stand during the trial.

08:11:55   18         Accordingly, you should determine the credibility

08:11:59   19  and the importance of deposition testimony to the best of

08:12:03   20  your ability just as if the witness had testified in person

08:12:07   21  from the witness stand.

08:12:08   22         Now, while you should consider only the evidence

08:12:14   23  in this case, you are permitted to draw such reasonable

08:12:19   24  inferences from the testimony and the exhibits as you feel

08:12:24   25  are justified in the light of common experience.

08:12:28  1          Said another way, ladies and gentlemen, you may
08:12:32  2   make deductions and reach conclusions that reason and
08:12:35  3   common sense lead you to draw from the facts that have been
08:12:39  4   established by the testimony and the evidence in this case.
08:12:45  5          However, you should not base your decision on any
08:12:47  6   evidence not presented by the parties during the trial,
08:12:51  7   including your own personal experiences with any particular
08:12:54  8   mobile device.
08:12:55  9          Unless I instruct you otherwise, and as I have
08:13:01  10  told you, you may properly determine that the testimony of
08:13:05  11  a single witness may be sufficient to prove any fact, even
08:13:09  12  if a greater number of witnesses may have testified to the
08:13:13  13  contrary, if after you consider all the evidence you
08:13:16  14  believe that single witness.
08:13:17  15         Now, when knowledge of a technical subject matter
08:13:22  16  may be helpful to the jury, a person who has special
08:13:26  17  training or experience in that technical field, we call
08:13:30  18  them expert witnesses, they are permitted to testify and to
08:13:35  19  state opinions on those technical matters.
08:13:38  20         However, ladies and gentlemen, you're not required
08:13:40  21  to accept or believe any such opinion.  As with any other
08:13:45  22  witness, it's solely up to you to decide whether to rely on
08:13:49  23  an expert witness's testimony and opinions or not.
08:13:53  24         Now, certain things have been shown to you over
08:13:56  25  the course of the trial that were illustrations.  We call

08:14:00  1  these types of things demonstrative exhibits.  Often we

08:14:05  2  simply call them demonstratives.

08:14:08  3       Demonstratives, ladies and gentlemen, are a

08:14:10  4  party's description, picture, drawing, model, something to

08:14:16  5  describe an issue involved in the trial.  Many times these

08:14:20  6  demonstratives were shown to you as slides on the monitors

08:14:22  7  that are before you.

08:14:23  8       If your recollection of the evidence differs from

08:14:28  9  the demonstratives, you should rely on your recollection.

08:14:33 10  Demonstratives, which are sometimes called jury aids, they

08:14:37 11  themselves are not evidence, but a witness's testimony

08:14:41 12  concerning a demonstrative is evidence.

08:14:44 13       Demonstrative exhibits -- demonstratives will not

08:14:49 14  be available to you to view again during your deliberations

08:14:52 15  in the jury room.

08:14:53 16       Now, in any legal action, facts must be proven by

08:15:00 17  a required amount of evidence known as the burden of proof.

08:15:03 18  The burden of proof in this case is on the Plaintiff for

08:15:07 19  some issues, and it's on the Defendants for other issues.

08:15:12 20  And there are two burdens of proof that you will apply in

08:15:16 21  this case, the preponderance of the evidence and clear and

08:15:18 22  convincing evidence.

08:15:18 23       The Plaintiff, Solas OLED Ltd., who you've heard

08:15:27 24  referred to throughout the trial simply as Solas or as the

08:15:31 25  Plaintiff, has the burden of proving patent infringement by

08:15:34  1  a preponderance of the evidence.

08:15:36  2      Solas also has the burden of proving willful patent

08:15:40  3  infringement by a preponderance of the evidence.

08:15:44  4      Solas, additionally, has the burden of proving its

08:15:49  5  damages for patent infringement by a preponderance of the

08:15:53  6  evidence.

08:15:53  7      A preponderance of the evidence, ladies and

08:15:55  8  gentlemen, means evidence that persuades you, the jury,

08:16:00  9  that a claim is more probably true than not true.

08:16:04  10  Sometimes this is talked about as being the greater weight

08:16:07  11  and degree of credible testimony.

08:16:09  12      The Defendants in this case, Samsung Display

08:16:15  13  Company Ltd., Samsung Electronics Company, Ltd., and

08:16:22  14  Samsung Electronics America, Inc., these Defendants have

08:16:26  15  the burden of proving invalidity of patents -- excuse me,

08:16:29  16  of Solas's patent claims by clear and convincing evidence.

08:16:32  17      Clear and convincing evidence means evidence that

08:16:38  18  produces, in your mind, an abiding conviction that the

08:16:43  19  truth of the party's factual contentions are highly

08:16:46  20  probable.

08:16:48  21      Now, although proof to an absolute certainty is

08:16:52  22  not required, the clear and convincing evidence standard

08:16:55  23  requires a greater degree of persuasion than is necessary

08:17:00  24  for the preponderance of the evidence standard.

08:17:01  25      If proof establishes, in your mind, as the jury,

08:17:07   1   an abiding conviction in the truth of the matter, then the
08:17:10   2   clear and convincing evidence standard has been met.
08:17:13   3       Now, as I've previously told you, ladies and
08:17:18   4   gentlemen, these two burdens of proof are not to be
08:17:21   5   confused with the burden of proof known as beyond a
08:17:26   6   reasonable doubt, which is the burden of proof applied in a
08:17:28   7   criminal case.  It is never applied in a civil case like
08:17:32   8   this.
08:17:32   9       You should not confuse clear and convincing
08:17:35  10   evidence with beyond a reasonable doubt.  Clear and
08:17:39  11   convincing evidence is not as high a burden, but it is a
08:17:44  12   higher burden than the preponderance of the evidence.
08:17:46  13       Now, in determining whether any facts have been
08:17:50  14   proven by a preponderance of the evidence or by clear and
08:17:53  15   convincing evidence, you may, unless otherwise instructed,
08:17:58  16   consider any stipulations the parties may have entered
08:18:01  17   into, the testimony of all the witnesses, regardless of who
08:18:05  18   called them, and all the exhibits that were received into
08:18:08  19   evidence over the course of the trial, regardless of who
08:18:11  20   may have introduced them.
08:18:13  21       Now, as I did at the start of the case, I'll first
08:18:17  22   give you a summary of each side's contentions, and then
08:18:21  23   I'll provide you with detailed instructions on what each
08:18:24  24   side must prove to win on each of its contentions.
08:18:27  25       As I previously told you, this is an action for

08:18:33   1   patent infringement, and this case concerns three United

08:18:38   2   States patents.  U.S. Patent No. 6,072,450, which you've

08:18:45   3   heard referred to throughout the trial as the '450 or the

08:18:49   4   '450 patent; U.S. Patent No.7,446,338, which you've heard

08:18:57   5   referred to throughout the trial consistently as the '338

08:19:00   6   or the '338 patent; and U.S. Patent No. 9,256,311, which

08:19:07   7   you've heard referred to throughout the trial as the '311

08:19:11   8   patent or the '311 patent.

08:19:13   9          And I will refer to these patents as the

08:19:16   10   "patents-in-suit."  I may also refer to them as the

08:19:20   11   "asserted patents."

08:19:20   12          Now, Solas, the Plaintiff, contends that the

08:19:25   13   Samsung Defendants have infringed the following claims of

08:19:28   14   the patents-in-suit:  Claims 4 and 5 of the '450 patent,

08:19:34   15   Claims 5 and 9 of the '338 patent, and Claims 7 and 12 of

08:19:38   16   the '311 patent.

08:19:39   17          These are the asserted claims.

08:19:44   18          Solas seeks money damages from the Defendants for

08:19:48   19   allegedly infringing all of the asserted claims by making,

08:19:51   20   using, importing, selling, or offering for sale in the

08:19:55   21   United States certain smartphones and tablets, which I'll

08:20:01   22   refer to as the "accused products."

08:20:03   23          For the '450 patent, the accused products are:

08:20:10   24   The Samsung Galaxy S8, Galaxy Note 3, Galaxy Note 4, Galaxy

08:20:18   25   Note 4 Edge, Galaxy Note 5, Galaxy Note 8, Galaxy S4,

08:20:28   1    Galaxy S5, Galaxy S7, Galaxy S7 Edge, and Galaxy S8 Plus.

08:20:39   2           For the '338 patent, the accused products are:

08:20:43   3    The Samsung Galaxy S8, the Galaxy Note 3, Galaxy Note 4,

08:20:50   4    Galaxy Note 4 Edge, Galaxy Note 5, Galaxy Note 8, Galaxy

08:20:59   5    Note 9, Galaxy S4, Galaxy S5, Galaxy S6 Edge Plus, Galaxy

08:21:09   6    S8 Plus, Galaxy S9, and Galaxy S9 Plus.

08:21:14   7           And for the '311 patent, the accused products are:

08:21:20   8    The Samsung Galaxy S9, Galaxy Note 9, Galaxy Note 10,

08:21:27   9    Galaxy Note 10 Plus, Galaxy S8, Galaxy S9 Plus, Galaxy S10,

08:21:37  10    Galaxy S10 Plus, Galaxy S10 Plus 5G, Galaxy S20, Galaxy S20

08:21:46  11    Plus, Galaxy S20 Ultra, and the Galaxy Z Flip.

08:21:53  12           The Plaintiff, Solas, also contends that the

08:21:59  13    Defendants, Samsung Display Company Ltd. and Samsung

08:22:04  14    Electronics Company Ltd., have actively induced Samsung

08:22:11  15    Electronics America, Inc., to infringe the asserted claims

08:22:13  16    of the asserted patents.

08:22:15  17           Solas further contends that the Defendants'

08:22:22  18    alleged infringement of the '311 patent has been willful.

08:22:27  19    Solas seeks damages for the Defendants' alleged

08:22:31  20    infringement of the '450, the '338, and the '311 patents.

08:22:34  21           The Defendants deny that they have infringed the

08:22:40  22    asserted claims of the asserted patents.  The Defendants

08:22:43  23    contend, ladies and gentlemen, that during the terms of

08:22:46  24    these patents, they did not make, use, sell, or offer for

08:22:54  25    sale within the United States or import into the United

08:22:56  1    States any products that infringe any of the asserted

08:22:59  2    claims of the asserted patents.

08:23:01  3        The Defendants also deny that they have induced

08:23:05  4    others to infringe the asserted patents.  The Defendants

08:23:09  5    deny that they have willfully infringed the '311 patent.

08:23:15  6    And Defendants also deny that Solas is entitled to any

08:23:18  7    money damages.

08:23:19  8        The Defendants further contend that the asserted

08:23:24  9    claims of the '450 patent and the '311 patent are

08:23:27  10   anticipated by prior art and, therefore, that the asserted

08:23:33  11   claims of the '450 patent and the '311 patent are invalid.

08:23:37  12       The Defendants also contend that the asserted

08:23:42  13   claims of the '450 patent and the '311 patent are obvious

08:23:46  14   in light of the prior art and, therefore, that the asserted

08:23:51  15   claims of the asserted patents are invalid.

08:23:53  16       Now, the validity of the '338 patent is not at

08:24:01  17   issue in this trial.

08:24:02  18       Invalidity, ladies and gentlemen, is a defense to

08:24:06  19   infringement.  Invalidity and infringement, however, are

08:24:10  20   separate and distinct issues.  Your job is to decide

08:24:15  21   whether the Defendants have infringed the asserted claims

08:24:18  22   and whether those claims are invalid.

08:24:20  23       If you decide that any asserted claim has been

08:24:25  24   infringed and is not invalid, you will then need to decide

08:24:31  25   the amount of money damages to be awarded to the Plaintiff

08:24:34  1   to compensate it for that infringement.

08:24:37  2        If you decide that there was any infringement of

08:24:41  3   the '311 patent and that such infringement was willful,

08:24:47  4   your decision as to willfulness should not affect any

08:24:51  5   damages that you might award.  I will take willfulness into

08:24:56  6   account later.

08:24:56  7        Now, before you can decide many of the issues in

08:25:00  8   this case, you'll need to understand the role of the patent

08:25:03  9   claims.

08:25:04  10       The patent claims are the numbered sentences at

08:25:07  11  the end of each patent.  The claims are important because

08:25:12  12  it is the words of the claims that define what a patent

08:25:16  13  covers.

08:25:18  14       The figures and the text in the rest of the patent

08:25:21  15  provide a description and/or examples of the invention, and

08:25:25  16  they provide a context for the claims.  But it is the

08:25:29  17  claims that define the breadth of the patent's coverage.

08:25:32  18       Each claim is effectively treated as if it were a

08:25:37  19  separate patent, and each claim may cover more or cover

08:25:42  20  less than any other claim.  Therefore, what a patent covers

08:25:48  21  depends in turn on what each of its claims covers.

08:25:52  22       You'll first need to understand what each claim

08:25:55  23  covers in order to decide whether or not there is

08:25:59  24  infringement of the claim and to decide whether or not the

08:26:02  25  claim is invalid.

08:26:03   1              Now, the law says that it's my role to define the
08:26:08   2   terms of the claims, and it's your role to apply my
08:26:13   3   definitions to the issues that you're asked to decide in
08:26:15   4   this case.
08:26:16   5              Accordingly, as I've explained to you at the start
08:26:20   6   of the trial, I've already determined the meaning of
08:26:24   7   certain claim terms in this case, and I've provided you
08:26:28   8   with those definitions or constructions as to those
08:26:31   9   construed terms in your juror notebooks.
08:26:34  10              You must accept my definitions and my
08:26:39  11   constructions of these words in the claims as being
08:26:43  12   correct.  It's your job to take these definitions and apply
08:26:46  13   them to the issues that you're deciding, including the
08:26:50  14   issues of infringement and invalidity.
08:26:52  15              Now, ladies and gentlemen, you should disregard
08:27:01  16   any evidence presented at the trial that contradicts or is
08:27:06  17   inconsistent with the constructions and the definitions
08:27:09  18   that I have given you.  And, again, these are in your juror
08:27:14  19   notebooks.
08:27:14  20              For claim elements or limitation that is I have
08:27:18  21   not construed, that is, elements or limitations that I have
08:27:22  22   not interpreted or defined, you are to use and apply the
08:27:27  23   plain and ordinary meaning of the element or limitation as
08:27:31  24   understood by one of ordinary skill in the art, which is to
08:27:35  25   say in the field of technology of the patent at the time of

08:27:40  1  the alleged invention.

08:27:42  2        The meaning of the words of the patent claims must

08:27:46  3  be the same when deciding both the issue of infringement

08:27:50  4  and the issue of validity.

08:27:52  5        As I say, you've been -- as I've already told you,

08:27:58  6  rather, you've been provided with copies of each of the

08:28:01  7  three asserted patents, and these are inside your juror

08:28:04  8  notebooks, and you may use them and refer to them during

08:28:06  9  your deliberations.

08:28:08  10       I'll now explain how a claim defines what it

08:28:12  11  covers.

08:28:13  12       A claim sets forth in words a set of requirements.

08:28:19  13  Each claim sets forth its requirements in a single

08:28:27  14  sentence.  If a device satisfies each of these

08:28:31  15  requirements, then it is covered by and infringes the

08:28:36  16  claim.

08:28:36  17       Now, there can be several claims in a patent.

08:28:40  18  Each claim may be narrower or broader than another claim by

08:28:43  19  setting forth more or fewer requirements.  The coverage of

08:28:46  20  a patent is accessed on a claim-by-claim basis.

08:28:51  21       In patent law, the requirements of a claim are

08:28:54  22  often referred to as the claim elements or the claim

08:28:57  23  limitations.  When a product meets all of the requirements

08:29:03  24  of a claim, the claim is said to cover that product, and

08:29:07  25  that product is said to fall within the scope of that

08:29:10   1   claim.

08:29:11   2          In other words, a claim covers a product where

08:29:15   3   each of the claim elements or limitations is present in

08:29:19   4   that product.  If a product is missing even one limitation

08:29:23   5   or one element of a claim, the product is not covered by

08:29:28   6   the claim.  And if the product is not covered by the claim,

08:29:31   7   that product does not infringe that claim.

08:29:34   8          Now, the beginning portion or preamble of a claim

08:29:39   9   often uses the word comprising.  The word "comprising,"

08:29:44  10   when used in a preamble of a claim, means including but not

08:29:48  11   limited to or containing but not limited to.

08:29:53  12          When comprising is used in the preamble, if you

08:29:55  13   decide that an accused product includes all of the

08:29:58  14   requirements of that claim, the claim is infringed, and

08:30:02  15   that is true where the accused product or instrumentality

08:30:07  16   contains additional elements.

08:30:10  17          For example, a claim to a table comprising a

08:30:14  18   tabletop, legs, and glue would be infringed by a table that

08:30:19  19   includes a tabletop, legs, and glue, even if the table also

08:30:27  20   and additionally contains other structures, such as leaves

08:30:31  21   to expand the size of the tabletop or wheels to go on the

08:30:33  22   ends of the legs.

08:30:34  23          Now, this case involves two types of patent

08:30:38  24   claims, independent claims and dependent claims.  An

08:30:43  25   independent claim, ladies and gentlemen, sets forth all the

08:30:46  1  requirements that must be met in order to be covered by the

08:30:51  2  claim.  Thus, it's not necessary to look at any other claim

08:30:55  3  in the patent to determine what an independent claim

08:30:58  4  covers.  It is independent.

08:31:00  5          However, on the other hand, a dependent claim does

08:31:05  6  not itself recite all the requirements of the claim but

08:31:12  7  refers to another claim for some of its requirements.  In

08:31:16  8  this way, the claim depends on another claim.

08:31:20  9          A dependent claim incorporates all the

08:31:23  10  requirements of the claim to which it refers, or as we

08:31:30  11  sometimes say from which it depends, and it adds its own

08:31:34  12  additional requirements.

08:31:36  13          Now, to determine what a dependent claim covers,

08:31:39  14  it's necessary to look at both the dependent claim itself

08:31:44  15  and any other claim or claims from which it refers or from

08:31:47  16  which it depends.

08:31:48  17          A product that meets all the requirements of both

08:31:52  18  the dependent claim and the claim or claims to which it

08:31:56  19  refers is covered by that dependent claim.

08:32:01  20          Now, if a person or a corporation makes, uses,

08:32:06  21  sells, or offers to sell within the United States or

08:32:11  22  imports into the United States what is covered by a patent

08:32:15  23  claim without the patent owner's permission, that person or

08:32:19  24  corporation is said to infringe the patent.

08:32:24  25          In reaching your decision on infringement, keep in

08:32:27  1   mind, ladies and gentlemen, that only the claims of a

08:32:30  2   patent can be infringed.  You must compare the asserted

08:32:37  3   patent claims as I have construed them for you to the

08:32:41  4   accused products and determine whether or not there is

08:32:44  5   infringement.  This is the only correct comparison.

08:32:49  6        You should not compare the accused products with

08:32:53  7   any specific examples set out in the patent or with the

08:32:59  8   prior art in reaching your decision on infringement.

08:33:03  9        In deciding infringement, the only correct

08:33:06  10  comparison is between the accused products and the

08:33:09  11  limitations of the asserted claims as the Court has

08:33:14  12  construed any claim language.

08:33:15  13       You must reach your decision as to each assertion

08:33:20  14  of infringement based on my instructions about the meaning

08:33:23  15  and scope of the claims, the legal requirements for

08:33:26  16  infringement, and the evidence presented to you by both

08:33:30  17  sides during the course of the trial.

08:33:32  18       I'll now instruct you about the specific rules you

08:33:36  19  must follow to determine whether Solas has proven that the

08:33:40  20  Samsung Defendants have infringed one or more of the patent

08:33:44  21  claims involved in this case.

08:33:45  22       A patent can be directly infringed even if the

08:33:51  23  alleged direct infringer did not have knowledge of the

08:33:55  24  patent and without the direct infringer knowing that what

08:33:59  25  it was doing was infringement of the claim.

08:34:02  1          A patent may also be directly infringed even
08:34:06  2   though the accused direct infringer believes in good faith
08:34:12  3   that what it is doing is not infringement of the patent.
08:34:15  4          Now, in order to prove direct infringement of a
08:34:18  5   patent claim, the Plaintiff, Solas, must prove by a
08:34:22  6   preponderance of the evidence that the accused product
08:34:26  7   includes each and every limitation of the claim.
08:34:30  8          In determining whether an accused product directly
08:34:33  9   infringes a patent claim in this case, you must compare the
08:34:40  10  accused product with each and every one of the requirements
08:34:45  11  or limitations in that claim to determine whether the
08:34:48  12  accused product contains each and every requirement or
08:34:53  13  limitation recited in that claim.
08:34:54  14         A claim requirement is literally present if it
08:34:58  15  exists in an accused product, just as it is described in
08:35:01  16  the claim language, either as I've explained that language
08:35:05  17  to you, or if I did not explain it, as it would be
08:35:08  18  understood by its plain and ordinary meaning by one of
08:35:12  19  ordinary skill in the art.
08:35:12  20         If an accused product omits any element recited in
08:35:18  21  a claim, then you must find that that particular product
08:35:21  22  does not infringe that claim.
08:35:24  23         Now, you must decide separately and for each
08:35:28  24  asserted claim whether or not there is infringement.
08:35:32  25  However, if you find that an independent claim on which

08:35:35  1   other claims depend is not infringed, there cannot be

08:35:40  2   infringement of any dependent claim that refers or depends

08:35:46  3   directly or indirectly from that independent claim.

08:35:49  4        On the other hand, if you find that an independent

08:35:51  5   claim has been infringed, you must still decide separately

08:35:56  6   whether the product meets the additional requirements of

08:35:59  7   any claim that depends from or refers to that independent

08:36:04  8   claim, thus whether those dependent claims have also been

08:36:10  9   infringed.

08:36:10  10       As I've said, a dependent claim includes all the

08:36:14  11  requirements of any of the claims to which it refers or

08:36:18  12  depends, plus the additional requirements set forth in the

08:36:22  13  dependent claim itself.

08:36:24  14       Now, the -- Solas, the Plaintiff, alleges that

08:36:30  15  Samsung Display Company Limited, also referred to as SDC,

08:36:35  16  and Samsung Electronics Company Limited, also referred to

08:36:38  17  as SEC, are liable for infringement for actively inducing

08:36:46  18  Samsung Electronics America, Inc., also known as SEA, to

08:36:51  19  directly infringe the asserted patents.

08:36:53  20       As with direct infringement, ladies and gentlemen,

08:36:56  21  you must determine whether there has been active inducement

08:37:00  22  on a claim-by-claim basis.

08:37:03  23       SDC and SEC are liable for active inducement of a

08:37:07  24  claim only if Solas proves by a preponderance of the

08:37:13  25  evidence that:

08:37:15  1          1.  The alleged infringing acts were actually
08:37:19  2   carried out by SEA and directly infringe that claim.
08:37:22  3          2.  SDC and SEC took action during the time the
08:37:28  4   asserted patents were in force intending to cause
08:37:31  5   infringing acts by SEA.
08:37:34  6          And 3.  SDC and SEA were aware of the asserted
08:37:41  7   patents and knew that the acts, if taken, would constitute
08:37:45  8   infringement of those patents, or believed there was a high
08:37:49  9   probability the acts, if taken, would constitute
08:37:54  10  infringement of the asserted patents but deliberately
08:37:57  11  avoided confirming that belief, that is to say that SDC and
08:38:02  12  SEA believed there was a high probability that the acts, if
08:38:05  13  taken, would constitute infringement but were willfully
08:38:10  14  blind to that fact.
08:38:10  15         In order to establish active inducement of
08:38:15  16  infringement, it's not sufficient that SEA directly
08:38:18  17  infringes the claim, nor is it sufficient that the
08:38:21  18  Defendants were aware of the acts of SEA that allegedly
08:38:26  19  constitute direct infringement.
08:38:27  20         -- now, in this case, the Plaintiff, Solas, also
08:38:32  21  contends that the Samsung Defendants have willfully
08:38:36  22  infringed the asserted claims of the '311 patent --
08:38:41  23         If you decide that the Defendants have infringed a
08:38:43  24  valid claim of the '311 patent, you must go on and address
08:38:48  25  the additional issue of whether or not that infringement

08:38:52   1   was willful.

08:38:53   2          Solas must prove willfulness by a preponderance of

08:38:57   3   the evidence.

08:38:59   4          You may not determine that the infringement was

08:39:02   5   willful just because one of the Defendants knew of an

08:39:06   6   asserted patent and infringement -- and infringed it.

08:39:11   7          However, you may find that a particular Defendant

08:39:14   8   willfully infringed if you find that the Defendants'

08:39:18   9   behavior was malicious, wanton, deliberate, consciously

08:39:22  10   wrongful, flagrant, or in bad faith.

08:39:26  11          To determine whether a Defendant acted willfully,

08:39:30  12   consider all facts and assess the Defendants' knowledge at

08:39:35  13   the time of the challenged conduct.  Facts that may be

08:39:38  14   considered include whether or not the Defendant reasonably

08:39:41  15   believed that it did not infringe or that the asserted

08:39:46  16   patents were invalid.

08:39:46  17          You may find that a Defendant's actions were

08:39:53  18   egregious or wanton if the Defendant acted in reckless

08:39:58  19   disregard of or with deliberate indifference to Solas's

08:40:01  20   patent rights or if the Defendant was willfully blind to

08:40:07  21   Solas's patent rights.

08:40:07  22          Your determination, ladies and gentlemen, of

08:40:10  23   willfulness as to the '311 patent should incorporate the

08:40:14  24   totality of the circumstances based on the evidence

08:40:19  25   presented during the trial.

08:40:20   1          Willfulness can be established by circumstantial

08:40:23   2   evidence.  Knowledge of the existence of a patent can be

08:40:26   3   relevant to the question of willful infringement.

08:40:30   4          If you decide that any infringement was willful,

08:40:33   5   that decision should not affect any damages award that you

08:40:37   6   give.  I will take willfulness into account later if you

08:40:42   7   find it.

08:40:42   8          I'll now instruct you on the rules that you must

08:40:47   9   follow in deciding whether or not the Defendants have

08:40:51   10   proven that the asserted claims of the asserted patents are

08:40:53   11   invalid.

08:40:53   12          An issued United States patent is accorded a

08:40:59   13   presumption of validity based on the presumption that the

08:41:04   14   United States Patent and Trademark Office, which you've

08:41:06   15   heard referred to throughout the trial as the PTO or

08:41:10   16   sometimes simply called the Patent Office, that it acted

08:41:14   17   correctly in issuing the patent.  This presumption of

08:41:19   18   validity, ladies and gentlemen, extends to all issued

08:41:22   19   United States patents.

08:41:24   20          Now, in order to overcome this presumption, the

08:41:27   21   Defendants must establish by clear and convincing evidence

08:41:33   22   that the claim is invalid.  Like infringement, invalidity

08:41:37   23   is determined on a claim-by-claim basis.

08:41:40   24          You must determine separately for each claim

08:41:43   25   whether that claim is invalid.  If one claim of a patent is

08:41:48  1    invalid, that does not mean that any other claim is

08:41:52  2    necessarily invalid.

08:41:53  3          Claims are construed in the same way for

08:41:57  4    determining infringement as for determining invalidity.

08:42:01  5    You must apply the claim language consistently and in the

08:42:04  6    same manner for issues of infringement and for issues of

08:42:08  7    invalidity.  And in making your determination as to

08:42:11  8    invalidity, you should consider each claim separately.

08:42:17  9          Now, in patent law, a previous device, system,

08:42:23  10   method, publication or patent that predates the claimed

08:42:25  11   invention is generally called prior art or a prior art

08:42:28  12   reference.

08:42:32  13         Prior art may include items that were publicly

08:42:35  14   known or have been used or offered for sale or references

08:42:38  15   such as publications or patents that disclose the claimed

08:42:41  16   invention or elements of the claimed invention.

08:42:44  17         To be prior art, an item or reference must have

08:42:49  18   been made, known, used, sold, offered for sale, published,

08:42:55  19   or patented before the date of the invention or more than

08:42:59  20   one year before the filing of the patent application to

08:43:03  21   which the patent claims priority.

08:43:11  22         However, ladies and gentlemen, prior art does not

08:43:12  23   include a publication that describes the inventor's own

08:43:17  24   work and was published less than one year before the date

08:43:20  25   of the invention.

08:43:21  1          Now, in evaluating the prior art to determine

08:43:23  2  whether an invalidity defense has been proved by clear and

08:43:26  3  convincing evidence, you may consider whether that prior

08:43:31  4  art was or was not before the Patent Office.

08:43:37  5          The priority dates of the '450 patent, the '338

08:43:42  6  patent, and the '311 patent are as follows:  November the

08:43:45  7  28th, 1996, for the '450 patent and September the 29th,

08:43:51  8  2004, for the '338 patent.

08:43:55  9          For the '311 patent, Solas and Samsung disagree on

08:44:02  10  the priority date.  Samsung contends that the priority date

08:44:06  11  is August 28th, 2011.  Solas contends that the priority

08:44:09  12  date is no earlier than January of 2011.

08:44:13  13          I will now explain to you how to determine the

08:44:18  14  priority date for the '311 patent.

08:44:21  15          There are two parts of making an invention.  One

08:44:24  16  is conception, the other is reduction to practice.  First,

08:44:31  17  the inventor has the idea of the invention.  This is

08:44:34  18  referred to as the conception of the invention.

08:44:37  19          Conception is the mental part of the inventive

08:44:41  20  act, that is to say, the formation in the mind of the

08:44:44  21  inventor of a definite and permanent idea of the complete

08:44:47  22  and operative invention as it is thereafter to be applied

08:44:51  23  in practice, even if the inventor did not know at the time

08:44:56  24  that the invention would actually work.

08:44:57  25          Conception of the invention is complete when the

08:45:01  1   idea is so clearly defined in the inventor's mind that if
08:45:06  2   the idea were communicated to a person having ordinary
08:45:11  3   skill in the field of the technology, he or she would be
08:45:15  4   able to reduce the invention to practice without undue
08:45:18  5   research or experimentation.
08:45:21  6        Secondly, the invention must have been reduced to
08:45:26  7   practice.  A reduction to practice can take one of two
08:45:31  8   forms, actual reduction to practice or constructive
08:45:35  9   reduction to practice.
08:45:37  10       The actual making of the invention is referred to
08:45:39  11  as actual reduction to practice.  An invention is said to
08:45:44  12  be actually reduced to practice when it's made and shown to
08:45:48  13  work for its intended purpose.
08:45:50  14       The actual reduction to practice of a claim must
08:45:55  15  include all the limitations recited by the claim.  The
08:46:00  16  invention must have been sufficiently tested to demonstrate
08:46:04  17  that it will work for its intended purpose.
08:46:06  18       Now, absent proof of actual reduction to practice,
08:46:13  19  the date of reduction to practice is the date that the
08:46:17  20  patent application was filed.  This is referred to as the
08:46:21  21  constructive reduction to practice date.
08:46:22  22       In the case of the '311 patent, the patent
08:46:26  23  application was filed on October the 28th, 2011.
08:46:31  24  Ordinarily, a reference dated before the patent application
08:46:35  25  filing date is prior art to the patent claims.

08:46:40  1          There are two, however, circumstances under which
08:46:42  2  a reference dated before the application filing date would
08:46:46  3  not be prior art.
08:46:50  4          The first occurs when the inventor on the patent
08:46:53  5  actually reduced the invention to practice before the date
08:46:56  6  of the reference.  A reference dated after the actual
08:47:00  7  reduction to practice date is not prior art as to the
08:47:04  8  patent claims.
08:47:04  9          The second circumstance under which a reference
08:47:14  10  dated before the application filing date is not prior art
08:47:18  11  occurs when the inventor conceived of the invention before
08:47:21  12  the date of the prior art and exercised reasonable
08:47:24  13  diligence from just before the date of the reference up to
08:47:28  14  the date of the inventor's actual reduction to practice.
08:47:31  15          In that case -- or in that case, a reference date
08:47:35  16  after the conception date would not be prior art as to the
08:47:39  17  patent claims.
08:47:40  18          Now, reasonable diligence means that the inventor
08:47:44  19  worked continuously on reducing the invention to practice.
08:47:49  20  Merely asserting diligence is not enough.  A party must
08:47:53  21  account for the entire period during which diligence is
08:47:56  22  required.
08:47:56  23          However, interruptions necessitated by every day
08:48:01  24  problems or obligations of the inventor or others working
08:48:04  25  with him or her do not prevent a finding of diligence.

08:48:08   1            A party may seek to establish that the date of the

08:48:13   2   invention of a patent is earlier than the filing date of

08:48:18   3   the application of the patent.  That party may seek to

08:48:22   4   establish the date of invention through the testimony of

08:48:26   5   the inventors of the patent, documents, and physical

08:48:29   6   evidence.

08:48:31   7            Circumstantial evidence of an independent nature,

08:48:34   8   as well as testimony from someone other than the inventors,

08:48:37   9   may also be considered.  An inventor's own testimony

08:48:42  10   regarding conception and reduction to practice of the

08:48:46  11   claimed invention must be sufficiently corroborated by

08:48:49  12   independent evidence.

08:48:52  13            In deciding whether the inventor's testimony has

08:48:56  14   been sufficiently corroborated, you must evaluate all

08:48:59  15   pertinent evidence.  Reliable evidence of corroboration

08:49:04  16   preferably comes in the form of records made

08:49:07  17   contemporaneously with the inventive and reduction to

08:49:10  18   practice process.

08:49:11  19            You must decide what prior art would have

08:49:16  20   disclosed or taught to one of ordinary skill in the field

08:49:20  21   of the technology of the patent at the date of the

08:49:24  22   invention.

08:49:25  23            In order for someone to be entitled to a patent,

08:49:30  24   the invention must actually be new and the inventor must

08:49:35  25   not have lost his or her rights by delaying the filing of

08:49:40  1   an application claiming the invention.

08:49:42  2          In general, inventions are new when the identical

08:49:47  3   apparatus, system, or method has not been made, used, or

08:49:51  4   disclosed before.

08:49:52  5          Samsung contends that the asserted claims of the

08:49:59  6   '450 patent and the '311 patent are invalid because the

08:50:03  7   claimed inventions are not new.  In other words, Samsung

08:50:07  8   contends that the '450 patent and the '311 patents are

08:50:12  9   anticipated by prior art.

08:50:16  10         Anticipation, ladies and gentlemen, requires that

08:50:19  11  all the requirements of a patent claim must be disclosed in

08:50:24  12  a single prior art reference.  Also, the single prior art

08:50:29  13  reference must disclose all of the elements of the claim

08:50:34  14  arranged and combined in the same way as the claim -- in

08:50:39  15  that claim as the claim has been construed or interpreted

08:50:46  16  by the Court.

08:50:46  17         Samsung must prove by clear and convincing

08:50:46  18  evidence that an asserted claim was anticipated by the

08:50:55  19  prior art reference.  Anticipation must be determined on a

08:50:56  20  claim-by-claim basis.

08:50:58  21         Now, for the claim to be invalid because it is not

08:51:01  22  new, Defendants must show by clear and convincing evidence

08:51:07  23  that all of the requirements of the claim were present in a

08:51:11  24  single previous device or method that was known of, used,

08:51:15  25  or described in a single previous printed publication or

08:51:19  1   patent.  We call these things anticipating prior art.

08:51:26  2            To anticipate the invention, the prior art does

08:51:28  3   not have to use the same words as the claim, but all the

08:51:31  4   requirement of the claim must have been disclosed, either

08:51:36  5   stated expressly or implied to a person having ordinary

08:51:39  6   skill in the art in the technology of the invention, so

08:51:45  7   that looking at that one reference, that person of ordinary

08:51:48  8   skill could make or use the claimed invention.

08:51:52  9            An item of prior art may anticipate without

08:51:54  10  expressly disclosing a feature of the claimed invention if

08:51:58  11  that missing characteristic is necessarily present or

08:52:03  12  inherent in the single anticipating reference.

08:52:07  13           Prior art may include items that were publicly

08:52:11  14  known or that have been used or offered for sale or

08:52:15  15  references, such as publications or patents, that disclose

08:52:19  16  the claimed invention or elements of the claimed invention.

08:52:23  17           To be prior art, the item or reference must have

08:52:27  18  been made, known, used, published or patented either before

08:52:34  19  the invention was made -- before the invention was made or

08:52:38  20  more than one year before the filing date of the patent

08:52:40  21  application.

08:52:40  22           However, prior art does not include a publication

08:52:44  23  that describes the inventor's own work and was published

08:52:47  24  less than one year before the date of the invention.

08:52:50  25           Now, in determining whether or not the invention

08:52:54  1   is valid, you must determine the scope and content of the

08:52:58  2   prior art reference at the time the invention was made.

08:53:02  3        For prior art to anticipate a claim of a patent,

08:53:06  4   the disclosure of the single prior art reference does not

08:53:10  5   have to be in the same words as the claims, but all the

08:53:16  6   elements of the claim must be there, either stated or

08:53:19  7   necessarily implied so that someone of ordinary skill in

08:53:23  8   the field of the invention looking at that single prior art

08:53:28  9   reference would be able to make and use at least one

08:53:31  10  embodiment of the claimed invention.

08:53:33  11       Now, the Defendants also contend that all asserted

08:53:40  12  claims of the '311 and '450 patent are invalid as being

08:53:46  13  obvious.  Even though an invention may not have been

08:53:48  14  identically disclosed or identically described in a single

08:53:52  15  prior art reference before it was made by an inventor, in

08:53:56  16  order to be patentable, the invention must also not have

08:54:00  17  been obvious to a person of ordinary skill in the field of

08:54:05  18  the technology of the patent at the time the invention was

08:54:07  19  made.

08:54:08  20       The Defendants in this case have the burden of

08:54:12  21  establishing obviousness by showing by clear and convincing

08:54:16  22  evidence that the claimed invention would have been obvious

08:54:20  23  to persons having ordinary skill in the art at the time the

08:54:24  24  invention was made in the field of the technology of the

08:54:27  25  patent.

08:54:28  1          Now, in determining whether the claimed invention

08:54:31  2  was obvious, you must consider the level of ordinary skill

08:54:36  3  in the field that someone would have had at the time the

08:54:40  4  invention was made, the scope and content of the prior art,

08:54:44  5  and any differences between the prior art and the claimed

08:54:47  6  invention.

08:54:48  7          You should keep in mind, ladies and gentlemen,

08:54:52  8  that the existence of each and every element of the claimed

08:54:55  9  invention in the prior art does not necessarily prove

08:54:59  10  obviousness.

08:55:01  11          Most, if not all, inventions rely on the building

08:55:06  12  blocks of prior art.  The skill of the actual inventor is

08:55:09  13  not necessarily relevant because inventors may possess

08:55:13  14  something that distinguishes them from persons having

08:55:15  15  ordinary skill in the art.

08:55:19  16          Additionally, teachings, suggestions, and

08:55:22  17  motivations may also be found within the knowledge of

08:55:26  18  persons -- of a person of ordinary skill in the art,

08:55:30  19  including inferences and creative steps that a person of

08:55:33  20  ordinary skill in the art would employ.

08:55:36  21          A person of ordinary skill may be able to fit the

08:55:40  22  teachings of multiple pieces of prior art together like a

08:55:44  23  puzzle.  The person of ordinary skill in the art would have

08:55:47  24  the capability of understanding the scientific and

08:55:52  25  engineering principles applicable to the pertinent art.

08:55:56  1          In considering whether a claimed invention is
08:56:00  2  obvious, you may but you are not required to find
08:56:04  3  obviousness if you find at the time of the claimed
08:56:07  4  invention there was a reason that would have prompted a
08:56:11  5  person having ordinary skill in the field to combine the
08:56:16  6  known elements in a way the claimed invention does, taking
08:56:19  7  into account such factors as:
08:56:22  8          1.  Whether the claimed invention was merely the
08:56:25  9  predictable result of using prior art elements according to
08:56:29 10  their known function;
08:56:30 11          2.  Whether the claimed invention provides an
08:56:34 12  obvious solution to a known problem in the relevant field;
08:56:38 13          3.  Whether the prior art teaches or suggests to
08:56:43 14  the desirability of combining elements in the claimed
08:56:47 15  invention;
08:56:47 16          4.  Whether the prior art teaches away from
08:56:53 17  combining elements in the claimed invention;
08:56:56 18          5.  Whether it would have been obvious to try the
08:56:59 19  combination of elements in the claimed invention, such as
08:57:03 20  when there is a design need or market pressure to solve a
08:57:07 21  problem, and there are a finite number of identified
08:57:09 22  predictable solutions; and
08:57:14 23          6.  Whether the change resulted more from design
08:57:18 24  incentives or other market forces.
08:57:20 25          To find it rendered the invention obvious, you

08:57:24  1   must find that the prior art provided a reasonable

08:57:29  2   expectation of success.  Obvious to try is not sufficient

08:57:33  3   in unpredictable technologies.

08:57:35  4          In determining whether the claimed invention was

08:57:39  5   obvious, consider each claim separately.  Do not use

08:57:44  6   hindsight.  Consider only what was known at the time of the

08:57:48  7   invention.

08:57:49  8          In other words, you should not consider what a

08:57:52  9   person of ordinary skill in the art would know now or what

08:57:56  10  has been learned by the teachings of the patents-in-suit.

08:58:00  11         In making these assessments, ladies and gentlemen,

08:58:04  12  you should take into account any objective evidence,

08:58:08  13  sometimes called secondary considerations, that may have

08:58:11  14  existed at the time of the invention and afterwards that

08:58:16  15  shed light on the obviousness or not of the claimed

08:58:19  16  invention.

08:58:20  17         The following are possible secondary

08:58:23  18  considerations, but it's up to you to decide whether

08:58:26  19  secondary considerations of non-obviousness exist at all:

08:58:32  20         1.  Whether the invention was commercially

08:58:35  21  successful as the result of the merits of the claimed

08:58:38  22  inventions rather than the result of design needs or market

08:58:42  23  pressure, advertising, or similar activities;

08:58:46  24         2.  Whether the invention satisfied a long-felt

08:58:50  25  need;

08:58:50   1            3.   Whether the inventor proceeded contrary to
08:58:55   2   accepted wisdom in the field;
08:58:57   3            4.   Whether others tried but failed to solve the
08:59:01   4   problem solved by the claimed invention;
08:59:02   5            5.   Whether others invented the invention at
08:59:07   6   roughly the same time;
08:59:08   7            6.   Whether others copied the claimed invention;
08:59:12   8            7.   Whether others accepted licenses under the
08:59:17   9   patents-in-suit because of the merits of the claimed
08:59:19  10   invention;
08:59:20  11            8.   Whether the claimed invention achieved
08:59:25  12   unexpected results;
08:59:26  13            9.   Whether others in the field praised the
08:59:31  14   claimed invention;
08:59:32  15           10.   Whether there were changes or related
08:59:36  16   technologies or market needs contemporaneous with the
08:59:40  17   invention; and
08:59:45  18           11.   Whether persons having ordinary skill in the
08:59:48  19   art in the invention expressed surprise or disbelief
08:59:51  20   regarding the invention.
08:59:52  21            These factors are relevant only if there was a
08:59:54  22   connection or a nexus between the factors and what
08:59:58  23   differentiates the claimed invention from the prior art.
09:00:02  24            Solas, the Plaintiff, has the burden of
09:00:05  25   establishing this connection or nexus.

09:00:10  1          Moreover, even if you conclude that some of the

09:00:11  2   above indicators of objective evidence have been

09:00:15  3   established, those factors should be considered along with

09:00:19  4   all the other evidence in the case determining whether the

09:00:23  5   Defendants have proven that the claimed invention would

09:00:26  6   have been obvious.

09:00:27  7          In support of obviousness, you may also consider

09:00:33  8   whether others independently invented the claimed invention

09:00:37  9   before or at about the same time as the named inventor

09:00:42  10  thought of it.

09:00:43  11         In making these determinations, a person of

09:00:48  12  ordinary skill uses simple common sense and can rely upon

09:00:48  13  the inferences and creative steps that a person of ordinary

09:00:55  14  skill in the art would employ.

09:00:55  15         Also, the Defendants do not need to show that one

09:00:58  16  of ordinary skill would actually have combined the physical

09:01:03  17  structures of two references.  One need only combine the

09:01:07  18  teachings.

09:01:08  19         Remember, as stated above, the prior art is not

09:01:11  20  limited to patents and published materials but includes the

09:01:16  21  general knowledge that would have been available to one of

09:01:19  22  ordinary skill in the field of the invention.

09:01:21  23         If you find the Defendants have proven the

09:01:24  24  obviousness of a claim by clear and convincing evidence,

09:01:28  25  then you must find that that claim is invalid.

09:01:31  1          Now, several times in these instructions, ladies
09:01:37  2  and gentlemen, I refer to a person of ordinary skill in the
09:01:40  3  field of the invention.  It's up to you to decide the level
09:01:44  4  of ordinary skill in the field of technology of the patent
09:01:48  5  and what it is.
09:01:50  6          In deciding this, you should consider all the
09:01:53  7  evidence introduced at trial, including but not limited to:
09:01:58  8          1.  The levels of education and experience of
09:02:02  9  persons working in the field;
09:02:03  10          2.  The types of problems encountered in the
09:02:07  11  field;
09:02:08  12          3.  Prior art solutions to those problems;
09:02:11  13          4.  The rapidity of which innovations are made;
09:02:19  14  and
09:02:19  15          5.  The sophistication of the technology.
09:02:22  16          A person of ordinary skill in the art is a
09:02:27  17  hypothetical person who is presumed to have known all of
09:02:30  18  the relevant prior art at the time of the claimed
09:02:36  19  invention.
09:02:36  20          In this case, a person of ordinary skill in the
09:02:38  21  art for the '450 and the '338 patents would have at least a
09:02:45  22  bachelor's degree in electrical engineering and/or
09:02:48  23  materials science and engineering or equivalent training
09:02:51  24  and approximately two years of experience working in design
09:02:54  25  and development related to the Active Matrix OLED Displays.

09:03:01  1          For the '311 patent, a person of ordinary skill in

09:03:05  2   the art would have at least a bachelor's degree in

09:03:08  3   electrical engineering or mechanical engineering or

09:03:11  4   equivalent training and approximately two years experience

09:03:13  5   working in design and development related to capacitive

09:03:19  6   touch sensors.

09:03:19  7          In considering whether the claimed invention was

09:03:26  8   obvious, you should first decide the scope and content of

09:03:29  9   the prior art.  The scope and content of the prior art for

09:03:33  10  deciding whether the invention was obvious includes at

09:03:37  11  least prior art in the same field as the claimed invention.

09:03:42  12         It also includes prior art from different fields

09:03:46  13  that a person of ordinary skill in the art would have

09:03:48  14  considered when trying to solve the problem that is

09:03:51  15  addressed by the invention.

09:03:54  16         If you find that the Defendants infringed any

09:03:58  17  valid claim of the asserted patents, you must then consider

09:04:03  18  what amount of damages to award to the Plaintiff.

09:04:07  19         If you do not find infringement by the Defendants

09:04:10  20  or you find that all the infringed claims are invalid, you

09:04:15  21  will not consider patent damages at all.

09:04:17  22         However, remember, in this case, one of the three

09:04:21  23  patents is not challenged by the Defendants as to

09:04:24  24  invalidity.

09:04:24  25         Now, I will now instruct you on the measure of

09:04:30  1  damages.  By instructing you on damages, ladies and

09:04:33  2  gentlemen, I'm not suggesting which party should win this

09:04:36  3  case on any issue.

09:04:38  4         If you find that the Defendants have not infringed

09:04:40  5  any valid claim of the patents-in-suit, then Solas is not

09:04:45  6  entitled to any money damages.

09:04:47  7         The damages you award must be adequate to

09:04:51  8  compensate Solas for any infringement you may find.  You

09:04:56  9  may not award Solas more damages than are adequate to

09:05:00  10  compensate for the infringement.  You must not include any

09:05:04  11  additional amount for purposes of punishing the Defendants

09:05:07  12  or setting an example.

09:05:09  13         The patent laws specifically provide that damages

09:05:13  14  for infringement may not be less than a reasonable royalty.

09:05:18  15  Solas, the Plaintiff, has the burden to establish the

09:05:23  16  amount of its damages by a preponderance of the evidence.

09:05:26  17         In other words, you should award only those

09:05:29  18  damages that Solas establishes as more likely than not that

09:05:34  19  it suffered.

09:05:35  20         Solas seeks damages in the form of a reasonable

09:05:39  21  royalty.  A reasonable royalty is defined as the money

09:05:43  22  amount the parties would have agreed upon for the

09:05:46  23  Defendants to use the asserted patents at the time the

09:05:50  24  infringement began.

09:05:52  25         The determination, ladies and gentlemen, of a

09:05:55   1   damages award is not an exact science, and the amount need

09:05:59   2   not be proven with unerring precision.  You may

09:06:06   3   approximate, if necessary.

09:06:07   4        Now, while the Plaintiff is not required to prove

09:06:09   5   the amount of its damages with mathematical precision, it

09:06:13   6   must prove them with reasonable certainty, and you may not

09:06:16   7   award damages that are speculative.

09:06:21   8        If you find that Solas has established patent

09:06:24   9   infringement and the Defendants have not established patent

09:06:26   10  invalidity, Solas is entitled to at least a reasonable

09:06:32   11  royalty to compensate it for that infringement.

09:06:35   12       A royalty is a payment made to a patent holder in

09:06:40   13  exchange for the right to make, use, sell, or import a

09:06:44   14  claimed invention.

09:06:46   15       A reasonable royalty is the royalty payment that a

09:06:49   16  patent owner and an alleged infringer would have agreed to

09:06:54   17  in a hypothetical negotiation taking place at a time prior

09:06:59   18  to when the infringement first began.

09:07:01   19       In considering this hypothetical negotiation, you

09:07:06   20  should focus on what the expectations of the patentholder

09:07:09   21  and the alleged infringer would have been had they entered

09:07:13   22  into an agreement at that time and had they been acting

09:07:18   23  reasonably in their negotiations.

09:07:19   24       In determining this, you must assume both parties

09:07:22   25  believed the patents-in-suit were valid and infringed and

09:07:27   1   that both parties were willing to enter into an agreement.

09:07:30   2        The reasonable royalty you determine must be --

09:07:36   3   must be a royalty that would have resulted from the

09:07:40   4   hypothetical negotiation and not simply a royalty that

09:07:42   5   either party would have preferred.

09:07:44   6        Evidence of things that happened after

09:07:47   7   infringement first began can be considered in evaluating

09:07:50   8   the reasonable royalty only to the extent that the evidence

09:07:55   9   aids in assessing what royalty would have resulted from the

09:08:00   10   hypothetical negotiation.

09:08:00   11        The law requires that any damages awarded to Solas

09:08:06   12   correspond to the value of the alleged inventions within

09:08:10   13   the accused products as distinct from other unpatented

09:08:14   14   features of the accused product or other factors, such as

09:08:19   15   marketing or advertising or Defendants' size or market

09:08:23   16   position.

09:08:24   17        This is particularly true where the accused

09:08:27   18   product has multiple features and multiple components not

09:08:30   19   covered by the patent or where the accused product works in

09:08:35   20   conjunction with other non-patented items.

09:08:39   21        The amount you find as damages must be based on

09:08:42   22   the value attributable to the patented technology as

09:08:46   23   distinct from other unpatented features of the accused

09:08:52   24   product.

09:08:52   25        If the unpatented features contribute to an

09:08:55  1  accused product, you must apportion that value to exclude

09:08:58  2  any valuable -- value attributable to unpatented features.

09:09:05  3           You must determine an appropriate royalty rate and

09:09:07  4  an appropriate royalty base that reflect the value

09:09:11  5  attributable to the patented invention alone.

09:09:14  6           Solas bears the burden to establish the amounts

09:09:19  7  attributable to the patented features.

09:09:23  8           A reasonable royalty, if any, may be calculated as

09:09:27  9  either a running royalty, which represents a string of

09:09:31  10  payments over time determined by multiplying a royalty rate

09:09:35  11  times a royalty base, or in the alternative, a reasonable

09:09:41  12  royalty may be calculated as a one-time, lump sum payment.

09:09:45  13           If you find that Solas is entitled to damages, you

09:09:50  14  must decide, ladies and gentlemen, whether the parties

09:09:52  15  would have agreed to a running royalty or a fully paid-up

09:09:57  16  lump sum royalty at the time of the hypothetical

09:10:02  17  negotiation.

09:10:02  18           If you decide that a running royalty is

09:10:04  19  appropriate, then the damages you award, if any, should

09:10:08  20  reflect the total amount necessary to compensate Solas for

09:10:12  21  Defendants' past infringement.

09:10:15  22           However, the lump sum royalty is when the

09:10:18  23  infringer pays a single price for a license covering both

09:10:22  24  past and future infringing sales.

09:10:25  25           If you decide that a lump sum is appropriate, then

09:10:28  1  the damages you award, if any, should reflect the total

09:10:32  2  amount necessary to compensate Solas for Defendants' past

09:10:37  3  and future infringement.

09:10:40  4       You should select the method of calculating a

09:10:43  5  reasonable royalty in this case that you believe is

09:10:46  6  appropriate considering all the evidence that's been

09:10:50  7  presented to you during the course of the trial.

09:10:52  8       In determining the reasonable royalty, you should

09:10:57  9  consider all the facts known and available to the parties

09:11:00  10  at the time the infringement began.

09:11:03  11       The parties to this hypothetical negotiation are

09:11:06  12  the owner of the patent at the time the infringement began

09:11:10  13  and the Defendants.  Some of the kinds of factors that you

09:11:15  14  may consider in making your determination are as follows:

09:11:21  15       1.  The royalties received by the patentee for

09:11:25  16  licensing of the patents-in-suit proving or tending to

09:11:27  17  prove an established royalty.

09:11:28  18       2.  The rates paid by the licensee for the use of

09:11:32  19  other patents comparable to the patents-in-suit.

09:11:37  20  Comparable license agreements include those covering the

09:11:41  21  use of the claimed invention or similar technology.

09:11:44  22       3.  The nature and scope of the license as

09:11:46  23  exclusive or non-exclusive or as restricted or

09:11:50  24  non-restricted in terms of territory or with respect to

09:11:55  25  whom the manufactured products may be sold.

09:11:57  1            4.   The licensor's established policy and

09:12:02  2  marketing program to maintain his or her patent exclusivity

09:12:08  3  by not licensing others to use the invention or by granting

09:12:12  4  licenses under special positions designed to preserve that

09:12:15  5  exclusivity.

09:12:16  6            5.   The commercial relationship between the

09:12:20  7  licensor and licensee, such as whether or not they are

09:12:26  8  competitors in the same territory, in the same line of

09:12:30  9  business or whether they are inventor and promoter.

09:12:34  10           6.   The effect of selling the patented specialty

09:12:37  11  in promoting sales of other products of the licensee, the

09:12:41  12  existing value of the invention to the licensor as a

09:12:44  13  generator of sales of his non-patented -- his or her

09:12:49  14  non-patented items and the extent of such derivative or

09:12:52  15  convoyed sales.

09:12:53  16           7.   The duration of the patent and the term of the

09:12:58  17  license.

09:12:58  18           8.   The established profitability of the product

09:13:03  19  made under the patents, its commercial success, and its

09:13:07  20  current popularity.

09:13:08  21           9.   The utility and advantages of the patented

09:13:13  22  invention over the old modes or devices that had been used

09:13:17  23  for achieving similar results.

09:13:19  24           10.  The nature of the patented invention, the

09:13:24  25  character of the commercial embodiment of it as owned and

09:13:29  1  produced by the licensor and the benefits of those who have

09:13:32  2  used the invention.

09:13:34  3      11.  The extent to which the infringer has made

09:13:38  4  use of the invention and any evidence probative of the

09:13:40  5  value of that use.

09:13:41  6      12.  The portion of the profit or selling price

09:13:46  7  that may be customary in the particular business or in

09:13:50  8  comparable businesses to allow for the use of the invention

09:13:53  9  or analogous inventions.

09:13:55  10      13.  The portion of the realizable profits that

09:14:00  11  should be credited to the invention as distinguished from

09:14:03  12  non-patented elements, the manufacturing process, business

09:14:07  13  risks, or significant features or improvements added by the

09:14:12  14  infringer.

09:14:12  15      14.  The testimony and opinions of qualified

09:14:17  16  experts.

09:14:17  17      15.  The amount that a licensor, such as the

09:14:25  18  patentee, and a licensee, such as the infringer, would have

09:14:29  19  agreed upon at the time the infringement began if both had

09:14:34  20  been reasonably and voluntarily trying to reach an

09:14:37  21  agreement, that is, the amount which a prudent licensee who

09:14:41  22  desired as a business proposition to obtain a license to

09:14:44  23  manufacture and sell a particular article embodying the

09:14:49  24  patented invention would have been willing to pay as a

09:14:53  25  royalty and yet be able to make a reasonable profit which

09:14:57  1  amount would have been acceptable to a prudent patentee who

09:15:01  2  was willing to grant a license.

09:15:04  3         Now, none of these factors, ladies and gentlemen,

09:15:07  4  are dispositive, and you can and you should consider the

09:15:10  5  evidence that's been presented to you in this case on each

09:15:14  6  of these factors.

09:15:15  7         You may have heard these factors referred to

09:15:22  8  during the trial as the Georgia-Pacific factors.  You may

09:15:26  9  consider any other factors that in your minds would have

09:15:29  10  increased or decreased the royalty the infringer would have

09:15:33  11  been willing to pay, and the patent owner would have been

09:15:35  12  willing to accept acting as normally prudent business

09:15:38  13  people.

09:15:39  14         Now, when determining a reasonable royalty, you

09:15:46  15  may consider evidence concerning the amounts that other

09:15:50  16  parties have paid for rights to the patent in question or

09:15:54  17  for rights to similar technologies.

09:15:57  18         Thus comparable license agreements are one factor

09:16:00  19  that may inform your decision as to the proper amount and

09:16:04  20  form of the reasonable royalty award, similar to the way in

09:16:10  21  which the value of a house is determined relative to

09:16:12  22  comparable houses sold in the same neighborhood.

09:16:15  23         Such licenses may indicate the patented

09:16:19  24  inventions' economic value in the marketplace, and they may

09:16:23  25  indicate the proper form of the royalty structure, such as

09:16:26  1   a lump sum, or a running royalty.

09:16:29  2           A license agreement need not be perfectly

09:16:32  3   comparable to a hypothetical license that would be

09:16:36  4   negotiated between the patent owner and alleged infringer

09:16:41  5   in order for you to consider it.

09:16:43  6           However, if you choose to rely upon evidence from

09:16:45  7   any other license agreements, you must account for any

09:16:50  8   differences between those licenses and the hypothetically

09:16:53  9   negotiated license in terms of the technologies and

09:16:56  10  economic circumstances of the contracting parties when you

09:17:02  11  make your reasonable royalty determination.

09:17:03  12          Now, for purposes of determining a reasonable

09:17:09  13  royalty, you may consider whether at the time of the

09:17:12  14  hypothetical negotiation Defendants had acceptable,

09:17:19  15  non-infringing alternatives to taking a license.

09:17:22  16          To be an acceptable, non-infringing alternative, a

09:17:25  17  product must have the advantages of the patented invention

09:17:30  18  that were important to the purchasers of the infringing

09:17:34  19  product and the relevant components thereof.

09:17:37  20          Defendants bear the burden of proof to show that

09:17:41  21  any non-infringing, acceptable alternative was available at

09:17:46  22  the time of the hypothetical negotiation.

09:17:46  23          In determining the amount of damages, you must

09:17:51  24  determine when the damages began.  Where you find that an

09:17:55  25  asserted claim is both infringed and not invalid, you may

09:17:59  1  not award any damages for activities occurring before the

09:18:04  2  damages start.

09:18:06  3          A patentee is not entitled to damages for any

09:18:10  4  infringement committed more than six years prior to the

09:18:14  5  filing of the claim for infringement.

09:18:17  6          The parties in this case agree that the damages

09:18:20  7  period for the '450 patent and the '338 patent would have

09:18:27  8  begun on August 23rd, 2013.

09:18:30  9          A patentee is not entitled to damages after the

09:18:35  10  expiration of an asserted patent.  The '450 patent expired

09:18:39  11  on November the 21st, 2017.  So the damages period for the

09:18:46  12  '450 patent would have ended on November the 21st, 2017.

09:18:51  13          Now, with those instructions, ladies and

09:18:56  14  gentlemen, we're ready to hear closing arguments from the

09:18:59  15  attorneys in the case.

09:19:00  16          Plaintiff, you may now present your first closing

09:19:07  17  argument.  Would you like a warning on your time?

09:19:10  18          MR. FENSTER:  No, Your Honor.  I'll watch the

09:19:13  19  clock.  Thank you.

09:19:14  20          THE COURT:  All right.  Then you may proceed,

09:19:18  21  Mr. Fenster.

09:20:00  22          Please proceed.

09:20:01  23          MR. FENSTER:  Good morning, ladies and gentlemen.

09:20:06  24          And may it please the Court.

09:20:06  25          On behalf of Solas, I want to start by thanking

09:20:11  1  you for the sacrifices that you've made throughout this

09:20:15  2  week, especially in these times, and for the diligence and

09:20:19  3  attention that you've paid throughout this week and last.

09:20:21  4      As you've heard, this case is about Solas's

09:20:28  5  constitutionally-protected patent rights and Samsung's use

09:20:34  6  of these inventions without permission.

09:20:36  7      This trial, though, like all trials, is about

09:20:44  8  credibility, credibility of the parties and of the

09:20:48  9  witnesses.

09:20:49  10      As Judge Gilstrap just instructed you, you are the

09:20:54  11  sole judge of the credibility of the parties and the

09:20:59  12  witnesses in this case.  It's because of your collective

09:21:04  13  wisdom.

09:21:05  14      We presented Mr. Padian, who told you about Solas

09:21:10  15  and the investment they've made in the patents.  He told

09:21:14  16  you about their efforts to license those patents and their

09:21:19  17  recent success in getting a license -- in licensing the

09:21:24  18  patents to LG, Samsung's competitor.

09:21:27  19      We can't say this in open court, but you remember

09:21:30  20  that large sum of money.

09:21:34  21      And, ladies and gentlemen, I submit to you that

09:21:38  22  when Samsung's competitor paid such a large sum of money

09:21:43  23  for the license to Solas's patents, that that tells you

09:21:49  24  something about the credibility of Mr. Padian and about

09:21:52  25  Solas.

09:21:52  1          Now, there's a reason why highly technical patent

09:21:59  2  cases like this are submitted to jurors.  It's because they

09:22:03  3  come down to weighing the credibility of expert witnesses.

09:22:11  4  And you, the jury, are uniquely qualified to do so because

09:22:15  5  of your collective life experience.

09:22:19  6          In this case, the issues of infringement and

09:22:21  7  validity with respect to the '450 and '338 patents come

09:22:26  8  down to your assessment of the credibility of Mr. Tom

09:22:30  9  Credelle, who we presented, and that of Dr. Fontecchio,

09:22:33  10  presented by Mr. -- by Samsung.

09:22:35  11          Mr. Credelle was -- he showed you his hard work.

09:22:45  12  He did the hard work to show you infringement, took you

09:22:48  13  through the evidence, element-by-element, of every one of

09:22:51  14  those asserted claims.  He was clear, forthcoming,

09:22:56  15  consistent on the stand.  He didn't hold anything back from

09:22:58  16  you.  He gave you the whole story right upfront.

09:23:02  17          Now, I want to talk to you a minute about

09:23:06  18  cross-examination.

09:23:08  19          The purpose of cross-examination is to test the

09:23:12  20  testimony to see if it holds up under scrutiny.  Anyone can

09:23:19  21  come in and just say something, but it's only under the

09:23:22  22  bright light of cross-examination that you can test whether

09:23:26  23  or not that testimony holds up.

09:23:27  24          In fact, cross-examination is so important that

09:23:30  25  you are not allowed to consider testimony that was not

09:23:33  1  presented to you under oath and subject to

09:23:37  2  cross-examination.

09:23:37  3        So how did Mr. Credelle do on cross-examination?

09:23:45  4  He was rock solid.  He was the same straight-shooter on

09:23:49  5  cross as he was on direct.  In fact, Mr. Haslam, who's a

09:23:53  6  very experienced advocate, couldn't come up -- he struggled

09:23:58  7  to come up with a line of attack.  And ultimately, he gave

09:24:02  8  up in the middle of the cross-examination.

09:24:05  9        It was pretty unusual.

09:24:09  10        On the other side, Samsung presented

09:24:12  11  Dr. Fontecchio.  Dr. Fontecchio, I have to admit, he

09:24:21  12  sounded pretty good on direct, didn't he?  But what

09:24:27  13  happened on cross-examination?  His demeanor changed.  He

09:24:31  14  was no longer affable and forthcoming and direct.  He was

09:24:37  15  repeatedly impeached.  He admitted to changing his

09:24:42  16  testimony.  He admitted that he didn't show you important

09:24:46  17  information.  He showed you part of the story, but I had

09:24:49  18  kept getting to admit that he didn't show you this and he

09:24:54  19  didn't show you that.

09:24:54  20        He admitted that his infringement opinions were

09:24:57  21  based on importing limitations into the claims, just after

09:25:03  22  admitting that it's absolutely improper to do so.

09:25:05  23        Ladies and gentlemen, I submit to you that the

09:25:10  24  difference between Mr. Credelle and Dr. Fontecchio

09:25:13  25  highlights the difference between real-world experience,

09:25:17  1  where Mr. Credelle learned to back up his opinions, and

09:25:21  2  that of a -- and that of a college professor, who is used

09:25:25  3  to standing up in front of a kid -- in front of kids who

09:25:30  4  don't push back, they don't test him.

09:25:33  5        On the '311 patent, this comes down to

09:25:37  6  Mr. Credelle versus Dr. Sierros.

09:25:41  7        All of the issues regarding the '311 come down to

09:25:47  8  that credibility assessment.  Dr. Sierros is clearly very

09:25:54  9  smart, but Samsung put him in a terrible position.

09:25:59  10       Ladies and gentlemen, Samsung took advantage of a

09:26:02  11 young professor, they fed him positions that he didn't

09:26:06  12 fully believe, put him on the stand to testify under oath.

09:26:10  13 We all remember the exchange that's on your slide before

09:26:12  14 you.

09:26:13  15       At best, Dr. Sierros was confused.  At worst -- at

09:26:19  16 worst, Samsung was just using him as a mouthpiece to try to

09:26:24  17 invalidate Mr. Shaikh's patent and Solas's

09:26:28  18 constitutionally-protected patent.

09:26:29  19       I submit to you that Mr. Credelle's credibility

09:26:38  20 stands in stark contrast to that of the young professor on

09:26:42  21 the positions that Samsung asked him to testify about.

09:26:46  22       I'd like to start with the '311 patent.

09:26:53  23       So the '311 patent was Mr. Shaikh is the -- is the

09:26:57  24 one that Mr. Shaikh testified about.  This is the one with

09:26:59  25 flexible -- with the metal mesh sensor, flexible substrate,

09:27:04  1  wrap around the edge.

09:27:06  2        Mr. Shaikh testified about his big idea in January

09:27:10  3  2011, that he came up with the idea to get rid of the

09:27:14  4  border altogether, to extend the sensor across the display

09:27:18  5  so you didn't have to have that border hiding the

09:27:22  6  connections.  He testified what that patent meant to him,

09:27:26  7  that this was his Ph.D.

09:27:27  8        And we showed you infringement.  Mr. Credelle

09:27:31  9  walked you through step-by-step showing you every single

09:27:34  10 element, backing it up with evidence.

09:27:38  11       This shows the three key elements of the claim.

09:27:41  12 There was the metal mesh touch sensor, the flexible

09:27:43  13 substrate, and wrap around the edge.  And we've already

09:27:49  14 talked about these, and I don't have time to go through all

09:27:53  15 of it, but I'll talk about a few.

09:27:55  16       One is whether the TFE is a sub- -- a flexible

09:27:58  17 substrate.  We showed you that the touch sensor is built on

09:28:04  18 a substrate.  That substrate is TFE.  Samsung denies it.

09:28:09  19       They try it say it's part of the display.  The

09:28:11  20 evidence, though, was overwhelming that the TFE is, in

09:28:14  21 fact, a substrate.  All of these witnesses and Samsung's

09:28:18  22 own document confirm it.

09:28:19  23       First, PTX-123, this is the confidential document

09:28:26  24 from Samsung that shows their sensor process.  It's not the

09:28:30  25 display.  It's the sensor process, and it starts with the

09:28:34  1  TFE.  The TFE is the substrate.  Their own documents show

09:28:38  2  that it is so.

09:28:39  3       Mr. Credelle testified that the metal mesh is

09:28:44  4  formed on a substrate called TFE.  Mr. Kwak, their witness,

09:28:49  5  came and testified that TFE may serve as the substrate.

09:28:53  6  There is no question that we met this element in the burden

09:28:57  7  of proof.

09:28:57  8       Now, the next issue is wrap around.  So we have to

09:29:04  9  show that the flexible substrate -- that the sensor on the

09:29:07 10  flexible substrate is configured to wrap around the edge,

09:29:10 11  which is the intersection between a flat surface and a

09:29:13 12  curved surface.

09:29:14 13       And Mr. Credelle walked you through all that

09:29:17 14  analysis, and you remember that in evidence.

09:29:19 15       So, ladies and gentlemen, we think that we've

09:29:23 16  presented our evidence to you and met every one of our

09:29:26 17  elements for the '311 patent and ask you to find

09:29:30 18  infringement.

09:29:30 19       There's a second issue, though, with respect to

09:29:33 20  the '311 patent that I talked to you about in opening, and

09:29:36 21  that is that we believe that Samsung's infringement of the

09:29:41 22  '311 patent was willful.

09:29:41 23       So Mr. Shaikh told you that they came up with the

09:29:51 24  idea in January of 2011.  The three core elements of their

09:29:55 25  invention was metal mesh, flexible substrate, wrap around

09:29:58   1   an edge.

09:29:59   2          He testified that over the next six months, they

09:30:03   3   diligently built a working prototype, the Jolle project,

09:30:08   4   which they shipped working units of in July -- on July 8th,

09:30:13   5   2011.

09:30:13   6          They then filed a patent, and that patent covered

09:30:19   7   the essential elements, those core three elements, metal

09:30:23   8   mesh, flexible substrate, wrap around an edge.

09:30:27   9          The embodiment that they had built, Atmel, did use

09:30:32   10  copper wires, and it used PET, and those were the

09:30:36   11  embodiments, an example.  Atmel was trying to sell sensors,

09:30:41   12  and they happened to use that in their embodiment.

09:30:43   13         But the claims covered everything above the line,

09:30:48   14  and I've drawn that line because it's important.

09:30:50   15  Everything above the line matters.  Everything below the

09:30:53   16  line does not.

09:30:54   17         The judge has been telling you throughout trial,

09:30:57   18  it's the claims, it's the claims, it's the claims, not the

09:30:59   19  embodiments.

09:31:00   20         So then we saw evidence that Atmel disclosed their

09:31:07   21  invention throughout 2011, 2012, all the way through 2016.

09:31:13   22  Why did they do that?  Because Atmel was trying to sell

09:31:17   23  sensors to Samsung Display.  This evidence was unrebutted.

09:31:24   24  Samsung did not provide anyone with personal knowledge to

09:31:27   25  say they did not get this information.

09:31:32  1          And one of those documents was PTX-650, which
09:31:36  2  Mr. Shaikh testified about.  And Mr. Shaikh showed them,
09:31:39  3  showed Samsung, what could happen if you -- with a flexible
09:31:45  4  sensor on a flexible substrate that you wrap around the
09:31:47  5  edge.  You can get rid of the border altogether.  He called
09:31:50  6  it "zero border."  He called it "edge to edge."  But he
09:31:54  7  showed this to Samsung.

09:31:57  8          He testified that he was concerned about
09:32:02  9  disclosing his invention to Samsung, that it might leak
09:32:06  10  out, but that he was genuinely -- he genuinely believed
09:32:12  11  that Samsung was interested in buying sensors.

09:32:15  12          We learned later, through Mr. Kwak in this trial,
09:32:18  13  that they had no intention of buying sensors from Atmel at
09:32:22  14  all, but they led Atmel to believe that they did.  Why?  So
09:32:26  15  that they would continue to disclose their invention over
09:32:29  16  those years.  And they did.

09:32:33  17          Throughout 2016, we saw unrebutted evidence that
09:32:37  18  Atmel made presentation after presentation.  Then the
09:32:40  19  patent issues on February 2016.  And then Samsung finds out
09:32:48  20  about the patent.

09:32:48  21          PTX-103, we showed you unrebutted evidence and
09:32:53  22  they admitted that they had the patent in March 2016.

09:32:57  23          And then they came up with their first infringing
09:33:02  24  product, the S8 in 2017.  And what were the features of
09:33:06  25  that?  It had a metal mesh sensor, it had a flexible

09:33:12   1   substrate that wrapped around the edge.

09:33:13   2         Now, it happened to also use aluminum titanium

09:33:21   3   wires and a TFE substrate.  But look at what they took.

09:33:26   4   Out of the things on the left, what did they take?  Only

09:33:29   5   the invention.  They didn't want the embodiment.  They only

09:33:32   6   took what mattered, Mr. Shaikh's patent, the patented

09:33:39   7   invention.

09:33:39   8         Their response is to try to distract you.  Well,

09:33:43   9   we didn't take it because we didn't take the copper, we

09:33:46  10   didn't take the PAT -- PET.  That is all stuff below the

09:33:50  11   line, stuff that doesn't matter.  All they took was the

09:33:53  12   invention.  And why?  Because it is these essential

09:33:57  13   elements that Mr. Shaikh said give them the zero border,

09:34:01  14   edge to edge display, and that is exactly what Mr. Repice,

09:34:06  15   from Samsung, said gives Samsung its signature infinity

09:34:12  16   display.

09:34:12  17         That's what they took.

09:34:14  18         Now, they deny it.  They say, well, we didn't take

09:34:19  19   it from Atmel.  Okay.  So let's see what the evidence

09:34:25  20   showed.  And here I'm going to point you to a lack of

09:34:28  21   evidence.  Samsung is the most innovative Mobile Display

09:34:33  22   Company in the world.  They told you so.

09:34:35  23         Samsung is a company of tens of thousands of

09:34:39  24   inventors.  They told you so.

09:34:41  25         If they had come up with this idea of wrapping

09:34:47  1  around an edge using metal mesh -- metal mesh to wrap

09:34:51  2  around an edge and get rid of the border altogether, they

09:34:54  3  would be holding it up screaming at the top of their lungs,

09:34:58  4  we had it first.

09:34:59  5        No.  Absolute silence.  They did not bring a

09:35:05  6  single witness here, did not show you a single document to

09:35:08  7  show you that they had that idea first.  Thousands of

09:35:13  8  engineers, thousands of inventors.  They were working on

09:35:17  9  substrates.  They were working on OLED.  They were working

09:35:20  10  in this space.  And it wasn't until Mr. Shaikh walked into

09:35:25  11  their office and showed them the '650 [sic] and what it

09:35:31  12  could do that they got that idea.

09:35:35  13        Now, once they got that idea, they used it

09:35:40  14  continuously.  The S8 was the first, and they have

09:35:43  15  continued to use it.  And this is important, they will

09:35:45  16  continue to use it.  The '311 patent goes on, doesn't

09:35:50  17  expire until 2031.

09:35:57  18        So when you get to the question on the verdict

09:36:00  19  form about lump sum versus running royalty, it's really

09:36:04  20  important that you check running royalty because that's the

09:36:05  21  only way to compensate Solas for Samsung's continued use of

09:36:11  22  the '311 patent all the way until the '311 -- until 2031.

09:36:15  23        All right.  Let's talk about the other two

09:36:21  24  patents.

09:36:23  25        The '450, we showed you -- this is the stacking

09:36:25  1  patent, and we showed you -- Mr. Credelle walked you

09:36:29  2  through every single element of this.  They have questioned

09:36:34  3  two of these.  I'm going to focus on one of them, that the

09:36:37  4  image data is supplied externally.

09:36:39  5         First they questioned the connected --

09:36:45  6  Mr. Credelle showed you that it's connected through the

09:36:47  7  contact hole.  Dr. Fontecchio admitted it was electrically

09:36:50  8  connected.

09:36:51  9         The next issue that they challenge is whether

09:36:55  10  there is image data supplied externally through the

09:37:00  11  selection transistor.  We showed you that the image data

09:37:04  12  comes in through this data line, that it comes in through

09:37:08  13  T2, through T1, and through the selection transistor, just

09:37:12  14  like the claim requires.

09:37:13  15         Mr. Credelle testified that it does, as well.

09:37:19  16  Image data supplied externally through that selection

09:37:23  17  transistor?

09:37:23  18         Yes, it is.

09:37:24  19         And Dr. Fontecchio admitted on cross-examination

09:37:27  20  that the image data signal is an external data line, and it

09:37:30  21  goes through T3.

09:37:31  22         We've met every element of the '450 patent, and

09:37:34  23  we're going to ask you to find that it was infringed.

09:37:37  24         On the '338, this is that complicated circuit

09:37:42  25  diagram that had the driving transistor, the holding

09:37:45  1   transistor, and the switch transistor.  We showed you every

09:37:48  2   element.

09:37:48  3          Mr. Credelle walked you through step-by-step, and

09:37:52  4   I -- we did our level best to teach you that circuit and

09:37:57  5   why these elements are met.

09:37:58  6          They challenged several of these, and I'll go

09:38:03  7   through them real quick.  They challenged whether it's

09:38:07  8   connected.  We've already talked about that.  Mr. Credelle

09:38:09  9   and Dr. Fontecchio admitted they're electrically connected.

09:38:14  10         I do want to spend one minute on the write

09:38:17  11  current.

09:38:17  12         So Mr. Credelle testified that the switch

09:38:20  13  transistor makes a write current flow between the drain and

09:38:25  14  source of the driving transistor.  And remember, we saw

09:38:27  15  that timing diagram that had the data-writing period, and

09:38:31  16  it is during the data-writing period that data gets written

09:38:35  17  to the voltage on that lower capacitor.

09:38:43  18         And this write current is a pull-out current. Why?

09:38:45  19  Because the data comes in, and instead of going down to the

09:38:52  20  OLED, instead, it goes this way and up.  It does not go

09:38:58  21  down to the OLED.  And that's what we showed you.  That's

09:39:04  22  why this is a pull-out current that meets the Court's claim

09:39:06  23  construction.  That's what Mr. Credelle testified.

09:39:07  24         He said -- we asked him:  Why is this a pull-out

09:39:11  25  current?

09:39:11  1          Because it's pulled out of the current in the
09:39:15  2  step, this writing step, as opposed to going through the
09:39:18  3  OLED material.
09:39:18  4          Dr. Fontecchio said:  Well, it's not a pull-out
09:39:25  5  current.  It's a push-in current.
09:39:27  6          But he told you he'd never even used that term
09:39:30  7  before, had no idea what pull-out meant.
09:39:33  8          And going back one step.  Remember his diagram
09:39:37  9  didn't show you that it went up to the capacitor.  His
09:39:40  10  diagram stopped there, and I had to elicit on
09:39:42  11  cross-examination that he failed to show you that?  And
09:39:46  12  then he admitted that, well, an equal -- an equal current
09:39:50  13  also goes up, just like Dr. -- Mr. Credelle said.  He
09:39:57  14  admitted that on cross-examination and admitted that that
09:39:59  15  was not something that he showed you.
09:40:01  16          The next element that they challenge is holding
09:40:12  17  transistor.  The holding transistor, we explained, is T3,
09:40:14  18  and it holds the voltage on Vcap because when it turns off,
09:40:21  19  the voltage can't leak out.  That's what we showed you.
09:40:25  20  That's what Mr. Credelle testified.  Why is it a holding
09:40:28  21  transistor?  Because when it's turned off, the voltage
09:40:32  22  can't leak out.
09:40:33  23          And Dr. Fontecchio admitted the exact same thing,
09:40:35  24  when it turns off, it holds that voltage on Vcap because
09:40:40  25  there's no place to go?

| | | |
|---|---|---|
| 09:40:42 | 1 | And he said:  Approximately. |
| 09:40:44 | 2 | He also hid the ball and failed to show you |
| 09:40:48 | 3 | information.  You remember that testimony. |
| 09:40:50 | 4 | Ladies and gentlemen, we showed you all of the |
| 09:40:51 | 5 | elements of the '338, the '450 and the -- and the '311. |
| 09:40:58 | 6 | So when you get to the verdict form, we are going |
| 09:41:00 | 7 | to ask you to check yes, have we proven by preponderance of |
| 09:41:04 | 8 | the evidence that Samsung infringed any of the claims. |
| 09:41:08 | 9 | And when you get to Question 3, we are going to |
| 09:41:11 | 10 | ask you to find, yes, that Samsung acted willfully because |
| 09:41:17 | 11 | the evidence supports that finding, as well. |
| 09:41:19 | 12 | Now, I'll talk to you briefly about damages. |
| 09:41:22 | 13 | Damages also comes down to credibility, the credibility of |
| 09:41:26 | 14 | Mr. Dell versus that of Mr. Martinez. |
| 09:41:29 | 15 | Mr. Dell was clear, he was forthright with you, |
| 09:41:35 | 16 | both on direct and cross, and he applied the law.  He |
| 09:41:40 | 17 | awarded damages -- calculated damages in accordance with |
| 09:41:46 | 18 | Judge's instructions. |
| 09:41:47 | 19 | Mr. Martinez, did not follow the law.  Instead he |
| 09:41:51 | 20 | gave you the ludicrous, ludicrous assertion that the |
| 09:41:56 | 21 | purchase price that Solas paid for these patents is an |
| 09:42:01 | 22 | absolute ceiling on damages.  That does not comport with |
| 09:42:04 | 23 | the Judge's instructions, it does not comport with the law, |
| 09:42:07 | 24 | and most importantly, it does not comport with your common |
| 09:42:09 | 25 | sense.  That is an absurd assertion. |

09:42:13  1          The Court's instructions tell you you have to base

09:42:19  2   damages.  The only way to properly do it is based on the

09:42:23  3   Defendants' use.  Mr. Martinez didn't do that.

09:42:26  4          With respect to the smallest salable patent

09:42:34  5   practicing unit, we presented Mr. Credelle to testify that

09:42:36  6   the smallest unit that practices those elements is the OLED

09:42:39  7   display module.  We put him up there.  He was there to

09:42:46  8   defend his opinion on cross-examination.  And, importantly,

09:42:50  9   this is just a small sliver of the phone.  This is a small

09:42:54  10  portion of the total cost of the phone, the total revenue

09:42:57  11  of the phone, and it's only this small sliver on which

09:43:04  12  Mr. Dell uses as the base to apply the small royalty later.

09:43:08  13         For cost savings, we presented Samsung's own

09:43:12  14  documents because Mr. Dell relied on that for cost savings

09:43:16  15  for the '311 damages.  It was unrebutted, and they

09:43:19  16  presented no documents in response.  Mr. Martinez says

09:43:23  17  they're just wrong but presented nothing in response.

09:43:26  18         On the patent as to whether -- UDC versus Casio,

09:43:34  19  this came down to the experts.  Mr. Credelle said UDC.

09:43:39  20  Mr. -- Dr. Fontecchio says Casio.  It's a credibility

09:43:43  21  determination.  The UDC were OLED patents, and Casio were

09:43:48  22  LCD.

09:43:48  23         The damages statute says you have to look at use,

09:43:54  24  and that's what Mr. Dell did.  You've seen these before.

09:43:56  25  He looked at how many modules, the average price and

09:44:00  1   revenue, and that's what he used as his base.  He applied

09:44:03  2   the royalty, and that gave you these damages that was

09:44:07  3   supported by the evidence.

09:44:08  4        And, ladies and gentlemen, when you get to the

09:44:11  5   question on damages, these are the numbers we're going to

09:44:13  6   ask you to write in.

09:44:14  7        The damages support -- the evidence supports a

09:44:17  8   finding that the proper damages for the '450 patent are

09:44:25  9   $25,824,919.  Those for the '338 patent are $27,326,497.

09:44:34  10  And those for the '311 are $35,412,046.

09:44:42  11       Thank you very much. Ladies and gentlemen, I'll be

09:44:45  12  back after Mr. Credelle -- Mr. Haslam.

09:44:55  13       THE COURT:  Defendants may now present their

09:44:57  14  closing argument.  Would you like a warning on your time,

09:45:00  15  counsel.

09:45:00  16       MR. HASLAM:  10 minutes, please.

09:45:02  17       THE COURT:  I will give you a warning when you

09:45:04  18  have 10 minutes remaining.  You may proceed with your

09:45:09  19  closing when you're ready.

09:45:21  20       MR. HASLAM:  Good morning.  I want to add my

09:45:23  21  thanks to the hard work that you've put in the last week.

09:45:28  22  This has been a trying time, and being on a jury when you

09:45:31  23  hear evidence sort of from the end of a fire hose is not

09:45:36  24  easy.  You put in long days, you stayed late in the

09:45:42  25  evening, and you've been here every day listening intently.

09:45:45  1   And on behalf of myself, my client, and my team, we thank

09:45:49  2   you for helping us decide a dispute that a week ago you

09:45:52  3   knew nothing about.

09:45:54  4          When I had a chance to speak to you at the

09:45:58  5   beginning of the case, I said this was a case about

09:46:01  6   innovation.  Not the innovation of Solas and not the

09:46:07  7   innovation of Casio or Atmel, but the innovation of Samsung

09:46:11  8   Display.

09:46:11  9          We showed you that Samsung Display made the first

09:46:17  10  OLED display for smartphones.  They had the first flexible

09:46:26  11  OLED display, and they had the first integrated touch

09:46:29  12  sensor.

09:46:29  13         That technology is world class and world leading.

09:46:37  14  The proof of that is not only the success of the Galaxy

09:46:40  15  smartphones, but also the fact that those displays are used

09:46:45  16  in the Apple iPhone and the Google Pixel.

09:46:51  17         The innovation that led to Samsung's

09:46:57  18  seven-transistor design required new designs, new

09:47:00  19  structures, and new materials.

09:47:02  20         Now, we brought Mr. Kwak here who was the engineer

09:47:09  21  at Samsung who had spent 20 years working on OLED displays,

09:47:16  22  got awarded 160 patents.  He designed the seven-transistor

09:47:23  23  circuit, and he led the SDC team that designed the Y-OCTA

09:47:28  24  display with integrated touch sensors.

09:47:30  25         It's no surprise, then, that the experts all

09:47:32   1   relied on his testimony.  He was here.

09:47:39   2          Solas could have asked him about the parts, about

09:47:44   3   how they operated, what were the individual transistors,

09:47:50   4   and what did they do.  Think back on the cross-examination,

09:47:54   5   they didn't ask him about that circuit, they didn't.

09:48:00   6          Now, Mr. Fenster, just said this is a case about

09:48:07   7   credibility.  And I sort of agree with him.  But the case

09:48:11   8   you heard from Solas wasn't based on fact.  Solas told you

09:48:16   9   in opening that Mr. Credelle would slowly walk you through

09:48:21   10  the case, and he previewed that it was going to take a long

09:48:26   11  time.

09:48:26   12         When it came for them time to make their case,

09:48:29   13  what did you see?  A lot of slides.  And the slides had

09:48:36   14  Samsung documents on it, but the next slide had just

09:48:42   15  Mr. Credelle's drawings not based on those.

09:48:48   16         Instead of actual pictures, Mr. Credelle time and

09:48:50   17  time again put up his rendition of the Samsung documents.

09:48:58   18  He didn't rely on the documents themselves.

09:48:59   19         Suppose your neighbor sells their house and moves

09:49:06   20  and somebody moves in.  About a month later, they come over

09:49:11   21  to your house, and they say, hey, half your property is

09:49:15   22  on -- is on my property.  And they say I've got 10 surveys

09:49:22   23  to show you to prove it.  You might say, well, let me see

09:49:26   24  the surveys.

09:49:27   25         So the new neighbor goes home, comes back with a

09:49:32  1  map and a Crayon on it that says, well, here's that shows

09:49:38  2  your property is on mine.

09:49:42  3         That's what we saw time and time again from

09:49:46  4  Mr. Credelle.

09:49:49  5         And I want to start as one example, the '450,

09:49:55  6  Mr. Fenster didn't talk about this limitation, but we spent

09:49:59  7  a lot of time on it, the organic luminescent layer formed

09:50:03  8  on said at least one first electrode.  A mouthful.  But the

09:50:09  9  issue is, where was the electroluminescent layer?  It had

09:50:15  10  to be over or covering certain transistors.

09:50:19  11         And what did Mr. Credelle show you?  He showed you

09:50:27  12  the picture on the right.  We showed you the picture on the

09:50:32  13  left.  The picture on the left was in Mr. Credelle's expert

09:50:38  14  report that he provided to us before trial.

09:50:42  15         He swore under oath when he signed that report

09:50:47  16  that this was true and accurate, and you can see the

09:50:52  17  electroluminescent layer, which is the red, the green, and

09:50:57  18  the blue, is inside the little lines that it's supposed to

09:51:02  19  be in.  That's where the electroluminescent layer is, and

09:51:08  20  that doesn't infringe.

09:51:09  21         Mr. Credelle had to demonstrate that the

09:51:16  22  electroluminescent layer was outside of those boxes, and

09:51:22  23  that's what he drew on the right.  And you can see in

09:51:27  24  his -- he still has those little red and blue boxes, but he

09:51:33  25  drew the layer outside it.

09:51:36    1         But what did he say on cross-examination?  I don't
09:51:39    2    have any direct evidence of that.  I don't have any direct
09:51:45    3    evidence of that.
09:51:46    4         You're asking for $88 million, and you don't have
09:51:50    5    any direct evidence of that?
09:51:52    6         Who did have the direct evidence of that?
09:52:00    7         You heard Mr. Padian say that before this lawsuit,
09:52:04    8    they hired two of the best companies to tear down the
09:52:08    9    Samsung phones, and he even said they tore it down
09:52:15   10    layer-by-layer.
09:52:20   11         If they wanted to show you where the
09:52:23   12    electroluminescent material was in fact, why didn't they
09:52:31   13    show you those teardowns?  He spent millions of dollars on
09:52:36   14    it.  We didn't see it, and Mr. Credelle didn't see it.
09:52:39   15         Why not?  Mr. Credelle knew that the teardown
09:52:47   16    would show where it was.  Remember, he said, I'll give you
09:52:52   17    my Samsung phone, and you can tear it down.  What was the
09:52:57   18    response?  It's too expensive.
09:53:02   19         Too expensive?  In a lawsuit where you're seeking
09:53:07   20    $88 million, it's too expensive?  And in any event, they
09:53:12   21    had already spent million of dollars doing it.  Why do you
09:53:17   22    think that they didn't give those drawings -- those
09:53:20   23    teardowns to Mr. Credelle?  Because they wouldn't support
09:53:24   24    the hand-drawn figures that he put in what he showed you.
09:53:33   25         You want to talk about credibility, there it is.

09:53:41  1   They're probably still in his office.  And I think the

09:53:45  2   reason that you didn't see them is because they support

09:53:49  3   what Samsung is saying.  The electroluminescent layer --

09:53:52  4   material is right where it's supposed to be, not where

09:53:55  5   Mr. Credelle drew it in order to prove infringement.

09:53:57  6          And if you believe that, then there is no

09:54:02  7   infringement of the '450 patent.

09:54:05  8          Let me give you another example.  Claim 7 -- I'm

09:54:14  9   going to move to the '311 patent.  Claim 7 requires two

09:54:23  10  things, a substantially flexible substrate and a touch

09:54:28  11  sensor on that substrate.  And those two features wrap

09:54:37  12  around the edge of the display.

09:54:40  13         The display is not part of the claim.  The two

09:54:46  14  features, the substrate and the touch sensor, have to wrap

09:54:50  15  around the edge of the display.

09:54:55  16         Let me sort of try to give you a sense, I think,

09:55:00  17  of what we believe the difference is between what the '311

09:55:03  18  patent claims and what's -- Samsung does.

09:55:07  19         Think of wallpaper.  Wallpaper, you have the

09:55:12  20  paper, and then you put a print on top of it.  And then you

09:55:17  21  take it and you put glue on it and you hang it on the wall.

09:55:22  22  And if you've ever tried to do wallpaper, it's sometimes

09:55:25  23  difficult to line up the seams and line up the prints, and

09:55:30  24  it's messy.

09:55:35  25         Samsung did away with the wallpaper.  They paint

09:55:38  1  the wall.  The two are different.  The two are very

09:55:41  2  different.

09:55:45  3        I've shown you Figure 7, which is an example just

09:55:49  4  to demonstrate this.  Figure 7 shows the substrate and the

09:55:54  5  touch sensor, which are in yellow, and you can see the

09:55:59  6  display, which is below, and the cover above, which are not

09:56:02  7  part of the claim.

09:56:06  8        The touch sensor and the substrate are separate

09:56:09  9  from the display.  And in the Samsung products, the touch

09:56:15  10  sensor is on top of the display, and the substrate is part

09:56:20  11  of the phone -- part of the display.  And if it's part of

09:56:24  12  the display, it is not the separate substrate and touch

09:56:28  13  sensor of the patent.

09:56:29  14        So the issue really is:  What is this thin-film

09:56:36  15  encapsulation layer?

09:56:38  16        We showed you a document from the Samsung

09:56:43  17  documents that specifically talks about the panel, the

09:56:47  18  display.  And it shows you that the TFE layer, the first

09:56:53  19  CVD layer, the second CVD layer, the monomer, the TFE, is

09:57:02  20  actually the top part of the display.

09:57:05  21        And Mr. Kwak told you that if the TFE layer is not

09:57:12  22  on the display, that within an hour, that material will

09:57:17  23  stop working, and there will be no light emitted from it.

09:57:23  24  It is the -- it is the part of the display which protects

09:57:27  25  the OLED.

09:57:28  1          Now, you heard from Mr. Credelle that the TFE is

09:57:34  2  not part of the display because it doesn't emit light.

09:57:39  3  Well, that's like saying the glass around the light bulb,

09:57:46  4  which protects the filament inside, isn't part of the light

09:57:50  5  bulb because it doesn't emit light, but we all know the

09:57:54  6  glass is a part of the light bulb.  It protects it from the

09:57:57  7  air, from moisture, and from dirt getting into it, just

09:58:03  8  like the TFE layer protects the display in the Samsung

09:58:11  9  devices.

09:58:11 10          Now, Dr. Sierros also talked to you about the TFE

09:58:16 11  layer, and he told you that it is an essential integral

09:58:20 12  part.  Now, Dr. Sierros is a professor.  We took him out of

09:58:25 13  the classroom and put him in the courtroom, and it didn't

09:58:28 14  go very well.  This may not be what he's cut out for.  But

09:58:34 15  the one thing I submit to you is he is an expert in the

09:58:38 16  field.  The judge accepted him as an expert, and they

09:58:42 17  didn't quibble about it.

09:58:47 18          And the one other thing is, I think we all can

09:58:52 19  agree that what he said was honest, and what he said is:

09:58:55 20  You had to have the TFE layer as part of the display in

09:58:58 21  order to protect it and protect the luminescent material

09:59:05 22  from being destroyed.

09:59:06 23          Now, what did Mr. Credelle show you?  Mr. Credelle

09:59:13 24  showed you the document on the left.  Notice on that slide,

09:59:16 25  there is no citation to a Samsung document.  That's because

09:59:21  1  this is another drawing he made up.  There is no document

09:59:28  2  that shows the OLED display being separate from the TFE.

09:59:31  3  We just see, on the right, the document where it shows it

09:59:34  4  as part of the display.

09:59:37  5        And the document he's relying on, which is the

09:59:40  6  touch sensor, simply is discussing that here are the

09:59:44  7  layers, the colored layers.  The YL -- YILD in the blue and

09:59:53  8  the red, that's the touch sensor, and it's showing simply

09:59:55  9  that it happens to be on top of the TFE layer.  But that's

10:00:03  10  natural.  Because as we see on the right-hand side, the TFE

10:00:05  11  is the top part of the display.

10:00:07  12        So if you're going to tell somebody in a document

10:00:11  13  where to put the touch sensor, you're going to tell them to

10:00:14  14  put it on top of the display, which happens to be on top of

10:00:16  15  the TFE layer.  That document doesn't support the fact that

10:00:18  16  the TFE layer is not part of the display.

10:00:21  17        The second issue in the -- we're talking about

10:00:28  18  with the '311 is wrapping around an edge.  I've got my --

10:00:36  19  just a pad of paper here, and if you flex the edges, the

10:00:42  20  edge really doesn't move.  I don't think you can see two

10:00:48  21  separate surfaces when you just bend the edges.  And even

10:00:57  22  if you could and even if that wraps around the edge, is

10:01:01  23  that worth $35 million?  I don't think so.

10:01:04  24        Finally, you also heard about the Z Flip.  That's

10:01:13  25  the phone, and it's DTX-471.

| | | |
|---|---|---|
| 10:01:17 | 1 | The flat display when you open it up, touch sensor |
| 10:01:23 | 2 | is on the display, the display is underneath.  What happens |
| 10:01:29 | 3 | when you fold it up?  The display wraps around the touch |
| 10:01:38 | 4 | sensor, not the other way around. |
| 10:01:39 | 5 | And on this one, I'd just ask you to remember the |
| 10:01:42 | 6 | example about wrapping a Christmas present, where the paper |
| 10:01:46 | 7 | goes on the outside, not the inside. |
| 10:01:49 | 8 | Now I'm going to turn briefly and I'm going to run |
| 10:01:57 | 9 | through the '338 patent. |
| 10:01:58 | 10 | You repeatedly heard this week, it's the words of |
| 10:02:07 | 11 | the claim which matter.  The words are what define the |
| 10:02:10 | 12 | boundaries of the claim.  By focusing on the words, I'm |
| 10:02:16 | 13 | going to show you why we don't infringe. |
| 10:02:18 | 14 | I'm going to start with a switch transistor, which |
| 10:02:31 | 15 | makes a write current flow between the drain and the source |
| 10:02:36 | 16 | of the driving transistor.  And the Court told you the |
| 10:02:39 | 17 | write current is a pull-out current, pull-out.  Out isn't |
| 10:02:45 | 18 | in.  It's as simple as that. |
| 10:02:49 | 19 | Mr. Kwak showed you that what happens with the |
| 10:02:55 | 20 | selection transistor -- the switch transistor is the |
| 10:03:00 | 21 | current comes in from outside, and it goes around to the |
| 10:03:11 | 22 | capacitor.  It doesn't leave the circuit. |
| 10:03:16 | 23 | Mr. -- Dr. Fontecchio also said they have a |
| 10:03:19 | 24 | push-in current.  Think of this as a highway with an |
| 10:03:23 | 25 | on-ramp and an off-ramp.  The off-ramp takes cars off the |

10:03:30  1  highway.  The on-ramp puts cars on the highway.

10:03:34  2        The '338 took cars off the highway on the

10:03:39  3  off-ramp, the pull-out ramp.

10:03:43  4        Samsung uses the on-ramp, it puts current into the

10:03:47  5  circuit.

10:03:48  6        Boy, you don't want to get those mixed up if

10:03:53  7  you're on the highway.

10:03:54  8        So it's clear, I think, that a pull-out current is

10:04:01  9  not a push-in current.  And Mr. Credelle himself told you

10:04:05  10  the significance of this.

10:04:08  11        He said:  Every word can be important.  Sometimes

10:04:14  12  it's the difference between "on" and "in" that can make a

10:04:22  13  difference in a claim.  He said that to you on March 2nd.

10:04:25  14        Well, this is one of those cases.  In isn't out.

10:04:37  15        Now, I'm going to take a look at the -- another

10:04:40  16  limitation, the holding transistor which holds a voltage

10:04:44  17  between the gate and the source.  A transistor has two

10:04:50  18  ends, a left and a right end and a gate on top, a switch on

10:04:55  19  top.

10:04:56  20        In this field, they happen to call them the source

10:04:59  21  and the drain.  It's left and right.  The question is:  In

10:05:03  22  this case, what does the holding transistor, which they say

10:05:08  23  is T3, connect to?

10:05:09  24        T3 is connected to the gate and the drain of T1,

10:05:23  25  not the gate and the source, which is up on top.  It's as

10:05:28  1   simple as that.  They've got the wrong end connected, and

10:05:32  2   the reason this is important is Samsung's seven-transistor

10:05:37  3   design had to come up with a different concept in order to

10:05:39  4   make it work.

10:05:40  5        Dr. Fontecchio also confirmed that it's located

10:05:54  6   between the gate and the drain, not the gate and the

10:05:57  7   source.

10:05:57  8        Next in the '338 is a driving transistor, one

10:06:06  9   of -- one of the source and drain, which is connected to

10:06:10  10  the pixel electrode.

10:06:15  11        In the Samsung circuit, Mr. Kwak told you that T6,

10:06:20  12  which is a transistor between the driving transistor T1 and

10:06:27  13  the electrode, is there to disconnect T1 from T6.

10:06:32  14        Dr. Fontecchio said the same thing.

10:06:41  15        What was the argument you heard to try to satisfy

10:06:43  16  this claim limitation?  Mr. Credelle added the word

10:06:49  17  "electrically connected."  He said, well, it's electrically

10:06:54  18  connected.  But if it's electrically connected, he

10:06:58  19  admitted, it is connected to both the source and drain

10:07:01  20  because T1 is on.

10:07:03  21        Well, if you're connected to both, you're not

10:07:06  22  connected to one of.

10:07:10  23        When I take my seven-year-old grandson across the

10:07:14  24  street, I tell him to take one of my hands.  He takes one.

10:07:18  25  He doesn't take both.

10:07:20   1          But that's what their argument is, that it's

10:07:23   2   electrically connected in -- connected to both, but the

10:07:27   3   claim requires being connected to just one of.

10:07:30   4          Now, I want to go back just briefly to the '450

10:07:35   5   patent, again.  I've heard a lot about the selection

10:07:38   6   transistor, it gets image data supplied externally through

10:07:44   7   the selection transistor.

10:07:46   8          Let me put it this way:  Suppose a circuit is a

10:07:51   9   house.  It's got a front door, T2.  It's got a door to the

10:07:58   10  bathroom, T3.  It's got a door inside the bedroom, T1.  The

10:08:04   11  claim requires an external signal.  How does somebody get

10:08:10   12  into a house from outside?  How do you get into a house

10:08:13   13  from an external source?  You go through the front door.

10:08:17   14          Once you're inside, you can go through the door to

10:08:21   15  the bedroom or the door to a den or the door to an office.

10:08:26   16  But now you're inside the house.  This claim is talking

10:08:30   17  about:  How do you get into the house?  How do you take

10:08:35   18  something from outside or external and put it inside?

10:08:40   19          Mr. Credelle focused on T3.  That's an inside

10:08:48   20  door.  It's not the external door that receives people from

10:08:51   21  outside with the external signal.

10:08:53   22          Both Mr. Fontecchio -- Dr. Fontecchio and

10:09:05   23  Mr. Credelle both agreed that the external connection is to

10:09:08   24  T2.  It does, which means it's connected.

10:09:13   25          Now, you heard the allegation about copying, but I

10:09:20  1  think Mr. Kwak said there was no copying of the Atmel

10:09:25  2  technology.  He testified to that.  They really didn't

10:09:30  3  cross-examine him on it.

10:09:32  4        He also said:  I'm prepared to talk and answer any

10:09:36  5  questions on that topic.  Did they ask him any?  No.

10:09:42  6        I put a timeline up here which shows the

10:09:47  7  development by Samsung Display of its integrated touch

10:09:56  8  sensor, patented in 2009, flat-panel display integrated

10:09:59  9  with touchscreen panel, September 14th, 2010.  And as he

10:10:06  10  said, there was no information on Atmel's metal mesh that

10:10:09  11  was used to design Y-OCTA.  Y-OCTA as an internal mesh is

10:10:15  12  their own technology.

10:10:16  13        And, remember, Mr. Fenster told you in opening

10:10:26  14  that Atmel didn't invent metal mesh sensors.  You heard

10:10:29  15  about the patent, the 3M, Mr. Frey, which the examiner

10:10:33  16  cited which showed before Atmel a metal mesh touch sensor.

10:10:37  17        We showed you the two patents that Samsung Display

10:10:45  18  had on the integrated touch sensor, both one in 2009 filed

10:10:51  19  and the other in 2010, that came before Atmel.

10:10:54  20        And, Mr. Beall, can we pull up the March 3rd

10:11:01  21  sealed transcript at Pages -- Page 96, 7 to 10?

10:11:05  22        Mr. Fenster told you that Samsung didn't know

10:11:13  23  about metal meshes until Atmel told them.

10:11:17  24        Mr. Kwak was asked:  In 2010, did Samsung Display

10:11:23  25  have other publications about using metal mesh for the

10:11:28  1  touch electrodes?

10:11:30  2        Yes, that's correct.

10:11:31  3        Want credibility of the presentations, there it

10:11:38  4  is.  Their whole case on copying and their whole case on

10:11:41  5  willfulness rests on, we taught Samsung metal mesh.  They

10:11:50  6  didn't.  Samsung was already thinking about that back in

10:11:56  7  2009 and 2010 when they were getting ready and developing

10:12:04  8  and trying to develop the integrated touch sensor.

10:12:06  9        And how did their innovation accomplish that?

10:12:10  10  They removed the separate substrate that would attach to

10:12:14  11  the display.  Remember, you had a separate substrate and a

10:12:19  12  separate touch sensor and you would glue it on the display.

10:12:24  13  They got rid of the separate substrate, and that's one of

10:12:27  14  the elements of the claim, flexible substrate.  They got

10:12:30  15  rid of it.  They put that directly on top of the display.

10:12:36  16  And they removed the gluing step.

10:12:38  17        So there's no infringement, we believe, on

10:12:45  18  multiple grounds on these patents.  And if you agree with

10:12:49  19  that, then you should answer Question 1, no.

10:12:54  20        Now, we did present two arguments, but before I

10:13:00  21  get there, I apologize.  I put up some testimony from

10:13:04  22  Mr. Shaikh asking him:  Did you ever try to print a touch

10:13:11  23  sensor directly on a display?

10:13:12  24        No.

10:13:12  25        They couldn't have because Atmel didn't make

10:13:16  1  displays.  They had to sell a separate touch sensor on a

10:13:20  2  separate substrate because they didn't make displays.

10:13:23  3          And when Samsung Display told them that they were

10:13:28  4  going to try to print the touch sensor on the display, he

10:13:31  5  knew that was something that he hadn't tried.

10:13:35  6          And on credibility, remember this, when I asked

10:13:41  7  him, Mr. Shaikh, did Samsung tell you that they were going

10:13:46  8  to print it directly on the substrate?  What did he say?

10:13:50  9  No.

10:13:50  10         When I confronted him with his testimony, he said,

10:13:53  11  oh, well, I was talking about Samsung Electronics, not

10:13:57  12  Samsung Display.

10:13:57  13         That's not a forthright answer.  He should have

10:14:03  14  just fessed up, yeah, they told me.  And I knew I couldn't

10:14:08  15  do that.

10:14:09  16         I'm going to go over quickly the invalidity of

10:14:12  17  Claims 4 and 5 of the '450 patent.

10:14:14  18         You saw Dr. Fontecchio checked every box that was

10:14:18  19  present in Utsugi.

10:14:21  20         The two issues they contest are whether the

10:14:24  21  electrode limitation was there, at least the first

10:14:27  22  electrode.  Dr. Fontecchio said it was.

10:14:30  23         The second limitation is whether or not the

10:14:33  24  insulation covered both transistors.  And as Dr. Fontecchio

10:14:39  25  indicated, he built a model based on the words that were

10:14:44  1  exactly in Utsugi that told him how he was making his

10:14:49  2  product, and he made a model that followed that.

10:14:53  3          And he confirmed, which is up on the top

10:14:56  4  right-hand side, he confirmed that his model looked just

10:15:03  5  like the Figure 5 in the patent.  And that's the one that

10:15:10  6  was taken along the horizontal cut.

10:15:11  7          And as he indicated, the second transistor is down

10:15:13  8  here at the bottom.  So the lower picture shows the

10:15:16  9  vertical cut.  And you can see the second transistor there.

10:15:19  10         So there were two transistors.  And that was the

10:15:21  11  big fight on cross-examination, did Utsugi have the second

10:15:30  12  transistor, and was there an insulation layer over it?

10:15:34  13         Now, this is about the -- Mr. Credelle's testimony

10:15:39  14  about the '450.  But as he described, in the '450, you have

10:15:45  15  to have that insulation layer over the transistors or they

10:15:51  16  don't work.  Now, he was talking about the '450, but that

10:15:54  17  principle applies to any semiconductor.  There has to be

10:15:59  18  insulation over the transistors or they don't work.

10:16:02  19         So Utsugi anticipates or at a minimum renders

10:16:09  20  obvious Claims 1, 4, and 5 of the '450 patent.

10:16:12  21         And Utsugi was not before the Patent Office.  They

10:16:20  22  didn't have it.  You're the first people to see it.

10:16:25  23         Now, let's look at the '311.

10:16:27  24         We showed you a patent application by Mr. Yilmaz

10:16:31  25  and four other engineers who were working in England.  And

10:16:36   1   he -- in that patent, as Mr. Yilmaz testified, he was

10:16:41   2   showing putting a copper metal mesh touch sensor on a PET

10:16:49   3   flexible substrate.

10:16:51   4           I showed you -- Dr. Sierros showed you what PET

10:16:58   5   looks like.  And they were printing thin copper lines on

10:17:02   6   this in England, less than the thickness of a human hair.

10:17:08   7   And he said that what they were using was flexible.

10:17:11   8           You think it would be obvious if you just looked

10:17:15   9   at that, that that would wrap around the edge of a display.

10:17:21   10   It would wrap around the edge of this podium.

10:17:24   11           Now, we didn't rely just on Yilmaz.

10:17:29   12           THE COURT:  You have 10 minutes remaining,

10:17:31   13   counsel.

10:17:31   14           MR. HASLAM:  10 minutes?  Okay.

10:17:33   15           We didn't -- we didn't rely just on that.  We

10:17:36   16   showed you another patent from 2009, the Joo, where he

10:17:42   17   actually shows the benefits of wrapping a touch sensor 94

10:17:45   18   on a substrate 96 from the top, around the edge, through

10:17:49   19   the side.

10:17:50   20           So I think it is -- it is in our view, in Yilmaz's

10:17:57   21   own work, coupled with Joo, renders obvious the '311

10:18:02   22   patent.

10:18:02   23           Now, I think based on what I've said that you

10:18:09   24   don't need to get to the damage issues.  There is no

10:18:14   25   infringement, and the two claims of the '450 -- the three

10:18:17  1   claims of the '450 and the two claims of the '311 are not

10:18:21  2   valid.

10:18:22  3        But if you do get to the issue of having to answer

10:18:25  4   Question 3, I'm going to give you some pointers, I think,

10:18:28  5   that might help you on determining what the valuation is.

10:18:32  6   And I'm going to start with Atmel.

10:18:38  7        The negotiation between Atmel and Samsung that

10:18:42  8   would have taken place was -- would have been in 2017.  As

10:18:49  9   you heard from Mr. Duvenhage and Mr. Martinez that the '311

10:18:55  10  patent had been extensively studied and analyzed by

10:18:59  11  experts, brokers, lawyers, and shopped around twice to a

10:19:05  12  hundred -- to over 170 companies.  And, remember, those

10:19:09  13  brokers are like real estate brokers.  If they can sell

10:19:12  14  that portfolio for more, they make more.

10:19:14  15       And what did the market say?  The market said that

10:19:22  16  you can only get $500,000.00  for the 12 patents, including

10:19:28  17  the '311.

10:19:29  18       Now, Mr. Dell also relied on a cost savings

10:19:37  19  analysis.  And what he compared were metal mesh touch

10:19:45  20  sensors being looked at by Samsung in 2014, not 2017.

10:19:50  21       Well, what did Mr. Kwak tell you about the touch

10:19:54  22  sensors that they were looking at in that time frame?

10:19:59  23  Atmel, 3M, from Samsung Electro-Mechanical?  None of them

10:20:08  24  worked with the Samsung product.  None of them were

10:20:12  25  suitable to use with the Samsung product.

10:20:15  1            Is it a fair cost comparison to say that this is

10:20:19  2   what it costs you to do what you're doing now, that you

10:20:23  3   could use this junk that really won't work, but it costs a

10:20:28  4   lot less?  That's not a fair comparison.  That's not a real

10:20:32  5   cost analysis.  He should be embarrassed for that.

10:20:39  6            I doubt he would tell any of his paying customers

10:20:47  7   that that's a relevant way to do a cost analyst.

10:20:50  8            Now, I want to talk about Casio.  Casio would be

10:20:54  9   been Casio and Samsung Display at the table, not Solas.

10:20:57  10  And Mr. Kim testified here, actually sat down across the

10:21:01  11  table from Casio right around this time frame.  And what

10:21:09  12  were the relevant facts at that time?  Samsung Display had

10:21:13  13  sold its displays, the ones accused of infringement here,

10:21:18  14  to Casio before the hypothetical negotiation.

10:21:24  15           But Casio knew Samsung Display's OLED technology,

10:21:29  16  and Casio and Samsung had a history of licensing and

10:21:36  17  selling patents.  And I put down here 2012, license for

10:21:39  18  169 patents, and you see the amount.  That was a lump sum

10:21:46  19  because that's the way Samsung licenses.  The only one I'm

10:21:50  20  going to get to in a moment that wasn't is different and

10:21:53  21  not relevant to this case.

10:21:55  22           They also bought 85 patents for 1.35 million.

10:22:00  23  That's around the time of the hypothetical negotiation.

10:22:02  24  That shows you what the value and what Casio and Samsung

10:22:06  25  would have negotiated back then.

| | | |
|---|---|---|
| 10:22:07 | 1 | And what ultimately happened is years later, Casio |
| 10:22:10 | 2 | sold 724 patents for 1.15 million, after having valued by |
| 10:22:19 | 3 | Quinn Pacific. |
| 10:22:20 | 4 | Now, what Mr. Dell relies on is this UDC license |
| 10:22:27 | 5 | from 2005, eight years before the hypothetical negotiation. |
| 10:22:33 | 6 | And you heard from Mr. Kim what Samsung needed was the |
| 10:22:39 | 7 | luminescent material to make its products.  But UDC said we |
| 10:22:43 | 8 | won't sell you that unless you take a license.  So Samsung |
| 10:22:45 | 9 | had to take a license. |
| 10:22:47 | 10 | And on the issue of comparability, you heard |
| 10:22:52 | 11 | Mr. Dell say that Mr. Credelle told him he'd reviewed all |
| 10:22:57 | 12 | 144 patents.  Mr. Credelle put a slide up in the begin -- |
| 10:23:01 | 13 | in his direct examination that he had reviewed 144 patents. |
| 10:23:05 | 14 | Well, what did he say?  I only reviewed about 70 of the |
| 10:23:10 | 15 | 144.  Two -- 60 percent of them he didn't bother to review. |
| 10:23:15 | 16 | Talk about credibility, that's -- that's not credible. |
| 10:23:21 | 17 | So the final thing about the UDC, you remember |
| 10:23:26 | 18 | Mr. Dell said the license had a royalty based on how many |
| 10:23:33 | 19 | colors you used.  If you use one color, it was one rate. |
| 10:23:38 | 20 | If you used two, it was two.  And he testified on direct, |
| 10:23:42 | 21 | well, somebody told me they used two colors. |
| 10:23:45 | 22 | Mr. Kim came on and told you, in fact, during that |
| 10:23:49 | 23 | license, they only used one color. |
| 10:23:55 | 24 | And Mr. Dell admitted if he was wrong on his two |
| 10:23:58 | 25 | colors, you had to cut his number at least in half. |

10:24:04   1   Remember that, at least in half, because they only used one

10:24:10   2   color. And that's unrebutted.

10:24:14   3           They didn't cross-examine Mr. Kim to try to get

10:24:16   4   him again to say, no, we really used two or three colors.

10:24:21   5           So now let me talk just briefly about the verdict

10:24:26   6   form.  I just put these up and the judge read it to you,

10:24:32   7   whether it's a comprising claim or not, you have to find

10:24:36   8   each and every element.  And I believe what I've just gone

10:24:39   9   through demonstrates there are multiple elements missing.

10:24:43   10          Can we put up the verdict form?

10:24:45   11          So I believe that when you've come to Question 1,

10:24:48   12   the answer should be no.  There's at least one element, if

10:24:53   13   not multiple elements, that are missing in these accused

10:24:56   14   devices.

10:24:58   15          Can we have the next?

10:25:02   16          When you get to Question 2, we believe that we

10:25:11   17   have carried -- it's a heavier burden, I recognize, but we

10:25:17   18   think that the evidence is pretty clear in front of you

10:25:20   19   that Claim 4 and 5 of the '450 patent are invalid, and

10:25:23   20   Claim 7 and 12 of the '311 -- I want to just say something

10:25:29   21   about the '311.

10:25:30   22          The '311 has 20 claims in it.  This invalidity

10:25:36   23   challenge is to only two of them.  If you find that Claim 7

10:25:40   24   and 12 are invalid, there are still 18 claims left in the

10:25:45   25   patent.  That patent would still be in existence, and Solas

10:25:48  1  could still enforce those other 18 claims.

10:25:52  2        You only get to Question -- Question 4, the

10:25:59  3  damages, if you find that you've answered Question 1, yes,

10:26:06  4  and Question 2, no.

10:26:08  5        But the damages number that you may fill out for

10:26:13  6  Question 4 is only if you find one patent valid and not

10:26:18  7  infringed.  If you believe that two of the patents aren't

10:26:21  8  infringed, the number of damages for that is zero.  And

10:26:25  9  that's how you would fill out --

10:26:28  10        Can we go to Question 4?

10:26:32  11        THE COURT:  You have one minute remaining,

10:26:35  12  counsel.

10:26:35  13        MR. HASLAM:  You'll see you do it by patent.

10:26:38  14        Now, I can't talk to you again after they get up.

10:26:41  15  They can say whatever they want.  I trust you to sort fact

10:26:46  16  from fiction.  But here's some answers that I think you

10:26:48  17  should ask them to give you.  Is wallpaper the same as

10:26:52  18  paint?  That's the '311.

10:26:54  19        How is -- how is out the same as in?  How is the

10:26:59  20  source the same as the drain?  Is one of both of?  How is

10:27:06  21  external the same as internal?  And where is the

10:27:11  22  electroluminescent layer?  Where is it?

10:27:12  23        Make them show you that.  They're going to throw

10:27:19  24  some big numbers up there, and they're going to talk about

10:27:21  25  why you should find that Solas is entitled to that money.

10:27:25  1  But the case rests on the facts --

10:27:28  2          THE COURT:  Your time is expired, counsel.  Take a

10:27:30  3  couple seconds and finish up.

10:27:32  4          MR. HASLAM:  -- make sure they answer those

10:27:34  5  questions and that they try to prove to you why what I said

10:27:38  6  is wrong.

10:27:39  7          Thank you.

10:27:41  8          THE COURT:  All right.  Plaintiff, you may now

10:27:44  9  present your final closing argument.

10:27:59  10         Would you like a warning on your time before it

10:28:01  11  expires?

10:28:02  12         MR. FENSTER:  At 13 minutes remaining, Your Honor.

10:28:08  13         THE COURT:  All right.  Anything further?

10:28:18  14         If not, proceed with Plaintiff's final closing

10:28:21  15  argument.

10:28:21  16         MR. FENSTER:  Thank you.

10:28:22  17         Ladies and gentlemen, Mr. Haslam got up here and

10:28:29  18  he talked about on ramps and wallpaper and paint, houses

10:28:33  19  and legal pads, Christmas presents and grand-kids.  Those

10:28:39  20  are all fun to talk about, but none of them have anything

10:28:42  21  to do with the claims.  What you need to do is judge the

10:28:45  22  credibility of the parties before you.

10:28:46  23         And one thing to consider is whether Samsung kept

10:28:49  24  their promises.  At the beginning of this case, they told

10:28:52  25  you that they told you that they were going to show you

10:28:56  1   that the '311 patent was invalid for Chen.  He didn't even

10:29:02  2   mention it.  Complete, complete broken promise.

10:29:05  3         I do want to go to validity first -- actually,

10:29:08  4   let's go to electroluminescent material.  This will be

10:29:10  5   Slide 66.

10:29:12  6         This was the first time we'd heard that argument.

10:29:14  7   That was kind of new.  Dr. Fontecchio had never raised it.

10:29:17  8   Mr. Haslam just argued it for the first time.

10:29:21  9   Dr. Fontecchio never challenged it.  Mr. Credelle showed

10:29:23  10  you exactly what it was.  He put up a slide saying direct

10:29:26  11  versus indirect evidence.

10:29:27  12        Well, this is some additional testimony reminding

10:29:31  13  you from Mr. Credelle's direct that he had the electro- --

10:29:37  14  electroluminescent material lying over the surface.

10:29:39  15        Next slide.

10:29:40  16        And he studied the process extensively.  And the

10:29:45  17  Court's instructions say indirect, direct, you have to

10:29:49  18  consider both.

10:29:50  19        Now, let's go to the validity section, please.

10:29:53  20        So I want to talk to you about the validity.  We

10:29:58  21  have a -- these patents are presumed valid.  You can only

10:30:02  22  overcome them with clear and convincing evidence.

10:30:05  23        That means that it -- they have to present

10:30:07  24  sufficient evidence to give you an abiding conviction that

10:30:11  25  these patents are invalid.

10:30:12  1        Dr. Fontecchio admitted that he didn't apply the
10:30:16  2  law.  The Court's instructions on anticipation requires
10:30:20  3  that all claims be in a single reference.  And he said:  I
10:30:26  4  would say no.
10:30:26  5        Now, this is the slide that Samsung just presented
10:30:31  6  to you, and I almost can't believe it.  This was on [1d].
10:30:37  7  You remember [1d] of Utsugi, so the claim element for the
10:30:43  8  '450 requires that it be connected -- the electrode be
10:30:46  9  connected to both transistors.  And he says unrebutted
10:30:51 10  evidence.
10:30:52 11        Was he not here for cross-examination?  We
10:30:56 12  dismantled Dr. Fontecchio's opinion on this.  He said it,
10:31:01 13  but he provided no backup.
10:31:04 14        He admitted that to show this element, [1d], it
10:31:09 15  requires showing that the electrode is connected to both $Q_s$
10:31:12 16  and $Q_1$.
10:31:14 17        This was the disclosure that he showed to you, the
10:31:19 18  sum slide, one slide that Dr. Fontecchio showed you that
10:31:22 19  Mr. Haslam couldn't even show you because we Xed it all
10:31:26 20  out.  This was the disclosure that he showed.
10:31:28 21        And he admitted that every one of these
10:31:29 22  disclosures does not explicitly show the electrode
10:31:33 23  connected to $Q_s$.  You remember this testimony.  I went
10:31:36 24  through it one by one.  Figure 5 didn't show it.  The first
10:31:42 25  sentence didn't show it.  The second sentence didn't show

10:31:45  1  it.

10:31:45  2       That is the sum total of what Samsung showed you

10:31:50  3  about Utsugi expressly disclosing Element [1d], that the

10:31:56  4  electrode is connected to both active elements.  In other

10:32:00  5  words, they had no evidence.  I dismantled all of it.

10:32:06  6  Mr. Haslam had no response on redirect then, and he had

10:32:09  7  nothing to say to you now.

10:32:11  8       This is a complete and utter failure of proof and

10:32:16  9  a broken promise.  It's no wonder that Mr. Haslam didn't

10:32:20 10  mention the Utsugi reference in the beginning.

10:32:22 11       He knew there was this hole in the case.  He

10:32:25 12  didn't want to make a promise he couldn't -- he couldn't

10:32:28 13  keep.  Didn't even mention it.

10:32:29 14        Got nervous during the trial, and they put it in,

10:32:33 15  see if we can get one by them.

10:32:36 16       They did make a promise on Chen, and that utterly

10:32:40 17  fell apart.

10:32:41 18       Now, if 1 -- and [1c] was not there either.

10:32:48 19       THE COURT:  13 minutes remaining.

10:32:49 20       MR. FENSTER:  Thank you, Your Honor.

10:32:50 21       He admitted that -- that that was out.

10:32:53 22       And most importantly admitted that if [1d] was

10:32:56 23  missing, the patent was not invalid for anticipation or

10:33:00 24  validity.

10:33:01 25       Yilmaz and Joo relies solely on Mr. Sierros.  The

10:33:07  1  only thing that's clear about Dr. Sierros is that his

10:33:10  2  testimony was not clear and convincing, sufficient to

10:33:13  3  invalidate the '311 patent.

10:33:15  4        Now, let's go back to willfulness.

10:33:21  5        Can you take me to the willfulness section?

10:33:26  6        Ladies and gentlemen, this is what we showed you

10:33:31  7  that Samsung took.  They took the invention.

10:33:37  8        They say that they didn't take anything from

10:33:42  9  Atmel.  But, ladies and gentlemen, at the bottom is Jolle,

10:33:45 10  the embodiment, and at the right is Samsung's first

10:33:47 11  infringing product, the S8.

10:33:52 12        Do you believe that they didn't take any

10:33:54 13  information from Atmel?

10:33:58 14        Now, Mr. Ward is going to address damages.

10:34:03 15        MR. WARD:  And, Your Honor, could I have a

10:34:09 16  two-minute warning?

10:34:09 17        THE COURT:  Yes.

10:34:10 18        MR. WARD:  Thank you.

10:34:10 19        Good morning.  I, too, want to thank you for your

10:34:20 20  time and your attention, and I also want to start off doing

10:34:24 21  something a little bit different this morning and that is

10:34:26 22  to confess something to you.  I made a mistake.

10:34:31 23        Now, you were told it was a misrepresentation, but

10:34:34 24  you also learned the difference between a misrepresentation

10:34:37 25  and a mistake because a misrepresentation is something

10:34:40  1  that's intentional, done to deceive.

10:34:43  2          When I was cross-examining Mr. Martinez, I

10:34:45  3  honestly believed that his damages number was 1.15 million

10:34:51  4  for the '450 and the '338 and 500,000 for the '311.  That's

10:35:00  5  what I thought, but then I was corrected.

10:35:03  6          It's up to, up to 1.15.  Up to 500,000.  So

10:35:10  7  Samsung is saying, that's not the right amount.  You can

10:35:13  8  actually award less.  They want a deal in here, ladies and

10:35:19  9  gentlemen.

10:35:19  10         Now, they talked about the spec of saw dust in my

10:35:25  11  eye, but I'd like to talk about the plank in theirs.

10:35:29  12         You've heard a lot about credibility.  And I think

10:35:33  13  all you need to know about credibility is what we learned

10:35:36  14  that Samsung tried to do in front of you, in front of us.

10:35:42  15         Remember this slide from opening?  They said we've

10:35:45  16  got these three brokers that reviewed the value of this

10:35:50  17  portfolio.  And I'm not really caring what these brokers

10:35:54  18  reviewed and what their opinions were.

10:35:57  19         We've got the LG license, PTX-745, that tells you

10:36:01  20  a good idea of what this patent portfolio was worth.  But

10:36:06  21  then you learned they changed it.  They removed Sagacious

10:36:11  22  because, you know what, they felt like that -- that

10:36:13  23  reference said something good about these patents.  That

10:36:16  24  reference to Sagacious was, you know what, it's No. 8 out

10:36:22  25  of 461 assets.

10:36:25  1          Again, I don't really care what Sagacious says.
10:36:28  2  What I want to point out to you is that they tried to
10:36:30  3  change that slide and thought that nobody would notice.
10:36:36  4          And think about this, Samsung is probably on their
10:36:39  5  best behavior in this courtroom in front of you, their best
10:36:43  6  behavior.  Think about how Mr. Padian, Solas, would be
10:36:47  7  treated if they went and knocked on Samsung's door.  We've
10:36:51  8  got some valuable patents we'd like to you take a look at.
10:36:55  9          Mr. Padian told that you this is the one place
10:36:58 10  that for five days, turns out it took six days, that we'll
10:37:03 11  be on a level playing field.
10:37:05 12          And I asked you back in voir dire, all we want is
10:37:07 13  a level playing field.  You're to treat us the same no
10:37:13 14  matter -- regardless of size.  And I think you have.
10:37:15 15          But you see that we have a Defendant that says:
10:37:22 16  We don't trespass, we don't infringe; but if we're wrong,
10:37:26 17  your patents are all invalid.  And if we're wrong about
10:37:29 18  that, well, we only owe you what you paid for your
10:37:35 19  property, or up to -- up to what you paid for this
10:37:39 20  portfolio.
10:37:39 21          That kind of makes about as much sense if
10:37:39 22  ExxonMobil had trespassed on Solas's real estate, they cut
10:37:44 23  their fences, they went in and drilled a well, they started
10:37:46 24  pumping out billions of dollars of oil and gas.  Solas
10:37:51 25  catches them and said, wait a minute, I think you ought to

10:37:54  1  pay me for my property.

10:37:57  2          Well, Exxon could say, wait a minute, we're not on

10:38:00  3  your property.  Well, you've proved that.  Well, your deed

10:38:03  4  is no good.  They failed to prove that.

10:38:09  5          Well, Solas, you don't have your own oil well,

10:38:12  6  your own pipelines, you don't have drilling crews, you

10:38:16  7  don't have a refinery, you don't have gas stations.  You

10:38:20  8  know what, we'll just pay you what you paid for your

10:38:23  9  property, not for what we used.

10:38:27  10          You all learned that that was not the law.  Now

10:38:32  11  they want to get a lump sum.  They want a deal.  They say

10:38:36  12  check lump sum so that we don't have to pay for the rest of

10:38:40  13  infringement on the '311 patent.  That's a box you've got

10:38:43  14  to check, choose between a lump sum and running royalty.

10:38:47  15  Running royalty is paying for the use because there's still

10:38:50  16  11 years left on this patent.

10:38:52  17          We showed you the smallest salable patent

10:38:57  18  practicing unit.  Those are the units, how much use did

10:39:00  19  they get out of it?

10:39:03  20          And when Mr. Sierros was asked about that smallest

10:39:07  21  salable patent practicing unit, Mr. Haslam said:  I didn't

10:39:10  22  touch that subject.  Well, of course, they didn't touch

10:39:15  23  that subject.  They don't want to talk about use.

10:39:19  24          Only Mr. Dell touched that subject.  He told you

10:39:22  25  exactly what the revenue was based upon the average price

10:39:25  1  of those displays, the amount that they were using them,

10:39:32  2  and that's unrebutted.  They didn't say those numbers were

10:39:35  3  wrong, average price or units.

10:39:36  4        And he gave you the rate and damages.  He did the

10:39:45  5  same ting for the '450 and the '338, and he told you those

10:39:50  6  total damages.  He did the hard work.

10:39:53  7        Mr. Martinez said:  Well, no, no, no, let's be

10:39:57  8  reasonable.  Let's be reasonable here.  He only wants to

10:40:01  9  look at part of the statute.  He didn't look at the

10:40:07  10  smallest salable patent practicing unit.

10:40:09  11        But then you learned that Mr. Martinez pretty much

10:40:10  12  does what he needs to do, depending on who pays him.  When

10:40:14  13  he's working for plaintiffs, it's a reasonable royalty.

10:40:18  14  That's the eloquent approach.

10:40:20  15        Then he works for defendants, he uses a lump sum,

10:40:27  16  and that's the eloquent approach.  I think that tells you

10:40:30  17  what you need to know about Mr. Martinez.

10:40:32  18        I do want to talk to you about that UDC patent

10:40:34  19  license agreement because this is the other debate on

10:40:37  20  damages.  Do you use UDC, or do you use Casio?

10:40:42  21        Mr. Credelle told you that that this was the

10:40:48  22  comparable license, that he was able to discard some of the

10:40:52  23  patents just based on a quick review because they dealt

10:40:55  24  with the materials and not with the architecture.

10:40:57  25        And right in the -- in the heading of this

10:41:00 1   license, it says "OLED Patent License Agreement."

10:41:05 2          And in 2005, Mr. Kim did say, we were only using

10:41:08 3   one color.  But I'm not sure Mr. Haslam was here or if he

10:41:13 4   missed it, because subsequent to that time period, he said,

10:41:19 5   oh, yeah -- remember on cross -- oh, yeah, we were using

10:41:20 6   two colors.  And that's why Mr. Dell relied upon this

10:41:22 7   license.

10:41:23 8          And we know it wasn't just 2005 that they

10:41:27 9   repeatedly renewed this agreement, it started as a running

10:41:31 10  royalty, and you all saw the numbers, how much they paid.

10:41:34 11  Samsung says, oh, that's not related to usage.  We just

10:41:37 12  paid that because we were told to pay that by UDC.

10:41:41 13         But think about these things, because they relate

10:41:47 14  very closely to the hypothetical negotiation:

10:41:51 15  Dr. Fontecchio said that these were fundamental patents,

10:41:54 16  and Mr. Martinez had to admit that they had to have a

10:41:55 17  license to the patents or they would infringe UDC's

10:41:59 18  portfolio.

10:42:01 19         So you have infringement of a comparable

10:42:04 20  technology, and we also note that in the very agreement,

10:42:09 21  they admit that they wouldn't challenge validity.  So it is

10:42:14 22  a unique agreement.

10:42:15 23         They admit infringement, they admit that it's

10:42:17 24  valid, it's a running royalty, it's all around the

10:42:20 25  hypothetical negotiation when they're renewing it.  It is

10:42:25  1   the most comparable license.

10:42:27  2          They say use Casio, but what happened when we

10:42:31  3   said, let's look at Casio?  70 out of 120 patents have

10:42:36  4   liquid crystal display in the title.  Mr. Kim tried to say,

10:42:43  5   well, liquid crystal display, LTPS, that's -- that's only

10:42:46  6   for AMOLED at the time period.

10:42:49  7          But we showed them a document from that very time

10:42:53  8   where internally Samsung was saying, well, AMOLED is in

10:42:58  9   tough price competition with LTPS (LCD).

10:43:03  10         So we know that many of those -- many of those

10:43:09  11  patents were not relating to AMOLED technology, which is

10:43:12  12  why we say UDC, that you admit you infringe, that you admit

10:43:16  13  is valid, that deals with the running royalty is the most

10:43:20  14  comparable.

10:43:20  15         And if there's any dispute about the value of

10:43:22  16  these patents, you know, we were called or compared to

10:43:26  17  mangy old horses in voir dire, that these are worthless

10:43:31  18  patents.

10:43:32  19         Look at PTX-745 and see what LG, a competitor to

10:43:38  20  Samsung, paid.  And they've got engineers, they've got

10:43:43  21  patent lawyers --

10:43:44  22         THE COURT:  Two minutes remaining.

10:43:46  23         MR. WARD:  Thank you, Your Honor.

10:43:47  24         They've got sophisticated people doing business.

10:43:53  25  They saw value, and they paid.

10:43:55  1          Cost savings documents, you've seen these.

10:44:02  2  Mr. Martinez says, oh, those can't be right.  Just ignore

10:44:06  3  those.  Don't believe your lying eyes, right.  Well, then

10:44:10  4  where's the evidence that contradicts this?  We used the

10:44:13  5  best evidence that Samsung produced.

10:44:15  6          Don't you know if they had documents that compared

10:44:18  7  the cost of these sensors that were different than these?

10:44:22  8  I wonder if these might be a little bit low.  I wish I

10:44:26  9  could ask you for more because I think these facts would

10:44:29  10  warrant it, but I can't.  We've based this case -- we've

10:44:33  11  argued this case based on the evidence.

10:44:36  12          You've seen these slides.  I told you at the

10:44:39  13  beginning that we weren't going to ask you for these

10:44:43  14  damages numbers thinking you'd give us half.  You've seen

10:44:46  15  royalty agreements -- or license agreements that actually

10:44:48  16  have higher rates of 3 and 4 percent.

10:44:51  17          But Mr. Dell said, I'm going to look for the

10:44:53  18  comparable licenses, the license that Mr. Credelle tells me

10:44:57  19  to rely upon, and I'm going to base my opinion upon that

10:45:01  20  evidence, and that's what he did.

10:45:03  21          Mr. Fenster told you at the start of this case

10:45:07  22  talking about what all I need to know I learned in

10:45:11  23  kindergarten.  You all remember that?  And I think you take

10:45:15  24  that back to the jury room because I don't think that

10:45:17  25  Samsung ever read that book.  They don't know what to take

10:45:21  1  that doesn't belong to them.

10:45:23  2      And when you fill out that verdict form, you'll be

10:45:25  3  letting them know that they've got to pay for what does not

10:45:28  4  belong to them.  When you find them liable for infringement

10:45:32  5  that these patents are not invalid, that they willfully

10:45:36  6  infringe and that they owe a reasonable royalty for the use

10:45:43  7  made of Solas's protected patented technology.

10:45:47  8      Thank you very much for your time.  We'll await

10:45:50  9  your verdict.

10:45:50  10      THE COURT:  All right.  Counsel, you may return to

10:45:58  11  the counsel table.

10:45:58  12      Ladies and gentlemen, I have a few final

10:46:00  13  instructions that I need to give you before you begin your

10:46:03  14  deliberations.

10:46:04  15      You must perform your duty as jurors without bias

10:46:09  16  or prejudice as to any party.  The law does not permit you

10:46:13  17  to be controlled by sympathy, prejudice, or public opinion.

10:46:17  18      All parties in this case expect that you will

10:46:20  19  carefully and impartially consider all the evidence, follow

10:46:25  20  the law as I have given it to you, and reach a just

10:46:30  21  verdict, regardless of the consequences.

10:46:33  22      Answer the questions in the verdict form based on

10:46:35  23  the fact as you find them from the evidence presented in

10:46:39  24  this case and following all the instructions that the Court

10:46:43  25  has given you.  Do not decide who you think should win and

10:46:47  1  then answer the questions to reach that result.

10:46:50  2       I remind you, ladies and gentlemen, your answers

10:46:53  3  to the questions in the verdict form must be unanimous.

10:46:58  4       You should consider and decide this case as a

10:47:01  5  dispute between persons of equal standing in the community,

10:47:08  6  equal worth and holding the same or similar stations in

10:47:12  7  life.

10:47:12  8       This is true in patent cases between corporations,

10:47:15  9  partnerships, or individuals.  The law recognizes no

10:47:19  10  distinction between the types of parties, and all

10:47:23  11  corporations, partnerships, and organizations -- other

10:47:26  12  organizations stand equal before the law, regardless of

10:47:30  13  their size, regardless of who owns them or the country of

10:47:35  14  their origin, and they're all to be treated as equals.

10:47:38  15       Now, when you retire to the jury room to

10:47:41  16  deliberate on your verdict, you're going to each, as I told

10:47:43  17  you, have your own individual printed copy of these final

10:47:46  18  jury instructions.

10:47:49  19       If you desire to review any of the exhibits that

10:47:53  20  the Court has admitted into evidence over the course of the

10:47:56  21  trial, then you should advise me by sending me a written

10:48:00  22  note signed by your foreperson and delivered through the

10:48:04  23  Court Security Officer.

10:48:05  24       I will then, upon receiving such a request, send

10:48:08  25  you the exhibit or the exhibits you've asked for.

10:48:12  1          Let me remind you again, demonstratives are not

10:48:15  2  exhibits, and I cannot send demonstratives to you in the

10:48:20  3  jury room.

10:48:20  4          Now, once you retire, you should first select your

10:48:25  5  foreperson and then conduct your deliberations.  And if you

10:48:29  6  recess during your deliberations, follow all the

10:48:32  7  instructions the Court has given you about your conduct

10:48:35  8  during the trial.

10:48:37  9          After you've reached a unanimous verdict, your

10:48:41  10  foreperson is to fill in those answers to the questions in

10:48:44  11  the verdict form in a way that reflects those unanimous

10:48:49  12  answers.

10:48:50  13          The foreperson should then date and sign the

10:48:52  14  verdict form on the last page and then deliver the verdict

10:48:57  15  form to the Court Security Officer or advise the Court

10:49:00  16  Security Officer that you've reached a verdict.

10:49:02  17          You should not reveal your answers until such time

10:49:05  18  as you are discharged by me, unless I direct otherwise.

10:49:10  19  And you must never disclose to anyone, not even to me, your

10:49:14  20  numerical division on any question.

10:49:16  21          Any notes that you've taken over the course of the

10:49:20  22  trial are aids to your memory only.  If your memory should

10:49:23  23  differ from your notes, you should rely on your memory and

10:49:26  24  not your notes.

10:49:27  25          The notes are not evidence, and a juror who has

10:49:31  1  not taken notes should rely on his or her own independent

10:49:34  2  recollection of the evidence and not be unduly influenced

10:49:39  3  by the notes of other jurors.  Notes are not entitled to

10:49:43  4  any greater weight than the recollection or impression of

10:49:46  5  each juror about the testimony.

10:49:48  6       If during your deliberations you want to

10:49:53  7  communicate with me at any time, please give a written

10:49:56  8  message or a question signed by your jury foreperson to the

10:50:00  9  Court Security Officer who'll bring it to me.

10:50:04  10       I'll then respond as promptly as possible, either

10:50:07  11  in writing or by having you brought back into the courtroom

10:50:10  12  where I can address you orally.

10:50:13  13       I will always first disclose to the attorneys in

10:50:16  14  the case your question and my answer before I answer any

10:50:21  15  question you might send me.

10:50:22  16       After you have reached a unanimous verdict and

10:50:26  17  after I have discharged you from your position as jurors in

10:50:30  18  this case, please understand, ladies and gentlemen, you're

10:50:34  19  not required to discuss with anyone your service as a juror

10:50:38  20  in this case.

10:50:41  21       However, at that juncture, after I have discharged

10:50:44  22  you from your responsibility as jurors and accepted your

10:50:48  23  verdict, then you are perfectly free to discuss your

10:50:50  24  service in this case with anyone if you would like to.

10:50:53  25       The choice at that time is yours 100 percent and

10:50:56  1    yours alone.

10:50:57  2         I'll now hand -- hand one clean copy of the

10:51:01  3    verdict form and seven copies of these final jury

10:51:05  4    instructions to the Court Security Officer to deliver to

10:51:08  5    you in the jury room.

10:51:14  6         Ladies and gentlemen of the jury, you may now

10:51:22  7    retire to the jury room to deliberate.  We await your

10:51:25  8    verdict.

10:51:26  9         COURT SECURITY OFFICER:  All rise.

10:51:28  10         (Jury out.)

10:51:30  11         THE COURT:  Please be seated.

10:52:19  12         Counsel, while the jury deliberates, you are

10:52:24  13    welcome to wait here in the courtroom.  Assuming you may

10:52:29  14    elect to wait off premises, please make sure you're not far

10:52:34  15    away so that if I receive a note or return of a verdict, I

10:52:37  16    can reach you promptly.

10:52:39  17         I believe we have current cell phone numbers to

10:52:42  18    reach lead and local counsel on both sides of the case.  If

10:52:45  19    we don't, make sure my law clerks have those before you

10:52:48  20    would leave the building.

10:52:49  21         With that and awaiting either a note from the jury

10:52:54  22    or the return of a verdict, the Court stands in recess.

10:52:59  23         COURT SECURITY OFFICER:  All rise.

10:53:01  24         (Recess.)

01:53:30  25         (Jury out.)

01:53:31   1              COURT SECURITY OFFICER:  All rise.

02:06:50   2              THE COURT:  Be seated, please.

02:06:54   3              Counsel, I've received the following note from the

02:07:08   4   jury.  I'll read it for the record.

02:07:12   5              "The jury has reached a verdict."

02:07:15   6              And it's signed by Felecia Hux, who I believe is

02:07:20   7   Juror No. 3 -- originally No. 4 before we lost

02:07:26   8   Ms. Carpenter.

02:07:28   9              And it's dated with today's date.

02:07:30   10             I'll mark this as Item 1.  And I'll hand it to the

02:07:34   11  courtroom deputy to be included in the papers of this

02:07:37   12  cause.

02:07:37   13             Let's bring in the jury, please.

02:08:05   14             (Jury in.)

02:08:06   15             THE COURT:  Please be seated, ladies and

02:08:33   16  gentlemen.

02:08:33   17             Ms. Hux, I am told that you are the foreperson of

02:08:43   18  the jury; is that correct?

02:08:44   19             THE FOREPERSON:  Yes.

02:08:44   20             THE COURT:  Has the jury reached a verdict?

02:08:47   21             THE FOREPERSON:  Yes, Your Honor.

02:08:48   22             THE COURT:  Would you hand the completed verdict

02:08:49   23  form to the Court Security Officer who will bring it to me?

02:08:52   24             Ladies and gentlemen, I am going to announce the

02:10:14   25  verdict into the record at this time.  And I'd like to ask

02:10:17  1   each of the members of the jury to listen particularly

02:10:22  2   carefully as I do that, because once I've done that, I'm

02:10:25  3   going to poll the members of the jury to determine and

02:10:29  4   confirm on the record that this is the unanimous verdict of

02:10:32  5   all seven members of our jury.

02:10:37  6          Turning to the verdict form and beginning on Page

02:10:45  7   4 wherein Question 1 is found:

02:10:49  8          Did Solas prove by a preponderance of the evidence

02:10:52  9   that Samsung infringed any of the asserted claims?

02:10:55  10         The jury's answer is yes.

02:10:59  11         Turning to Page 2 -- excuse me, Page 5 where

02:11:08  12  Question 2 is located:

02:11:10  13         Did Samsung prove by clear and convincing evidence

02:11:13  14  that any of the following asserted claims are invalid?

02:11:16  15         As to Claim 4 of the '450 patent, the jury's

02:11:25  16  answer is:  Yes.

02:11:26  17         As to Claim 5 of the '450 patent, the jury's

02:11:32  18  answer is:  Yes.

02:11:34  19         As to Claim 7 of the '311 patent, the jury's

02:11:42  20  answer is:  No.

02:11:44  21         As to Claim 12 of the '311 patent, the jury's

02:11:47  22  answer is:  No.

02:11:49  23         Turning next to Page 6 of the verdict form where

02:11:56  24  Question 3 is located:

02:11:59  25         Did Solas prove by a preponderance of the evidence

02:12:03  1   that Samsung willfully infringed any of the asserted claims

02:12:06  2   of the '311 patent that you found were infringed?

02:12:10  3          The jury's answer is:  Yes.

02:12:12  4          Turning next to Page 7 of the verdict form wherein

02:12:21  5   Question 4A is located:

02:12:25  6          What sum of money, if any, paid now in cash has

02:12:30  7   Solas proven by a preponderance of the evidence would

02:12:32  8   compensate Solas for its damages resulting from

02:12:36  9   infringement?

02:12:36  10          As to the '450 patent, the answer is:  Zero.

02:12:43  11          As to the '338 patent, the answer is:

02:12:56  12   $27,326,497.00.  I'll say that again.  $27,326,497.00.

02:13:07  13          As to the '311 patent, the jury's answer is:

02:13:17  14   $35,412,046.00.  Likewise, I'll repeat that answer.

02:13:30  15   $35,412,046.00.

02:13:39  16          Turning next to Page 8 of the verdict form where

02:13:42  17   Question 4B is located:

02:13:44  18          Are each of the amounts awarded in Question 4A a

02:13:48  19   lump sum representing damages for past and future sales, or

02:13:52  20   are each of the amounts you awarded in Question 4A a

02:13:56  21   running royalty representing damages through January of

02:14:01  22   2021?

02:14:02  23          The jury is:  Lump sum.

02:14:04  24          Turning to Page 9, the final page of the verdict

02:14:11  25   form, I find that it is dated with today's date and is

02:14:16   1   signed by Ms. Hux as foreperson of the jury.

02:14:18   2         Ladies and gentlemen of the jury, let me poll you

02:14:22   3   to make sure this verdict, as I have read it into the

02:14:26   4   record, unanimously reflects the decision of all seven

02:14:30   5   members of the jury.

02:14:30   6         If this is your verdict as I have read it, would

02:14:35   7   you please stand at this time?

02:14:37   8         (Jury polled.)

02:14:42   9         THE COURT:  Thank you.  Please be seated.

02:14:43   10        Let the record reflect that all seven members of

02:14:48   11   the jury immediately stood and rose in response to the

02:14:53   12   Court's question to poll the jury.

02:14:54   13        This confirms that this is the unanimous verdict

02:14:58   14   of all seven members of the jury.  The Court accepts the

02:15:03   15   verdict.  And I will now deliver the original verdict form

02:15:06   16   to the court security -- the courtroom deputy to be

02:15:11   17   included in the documents of this case.

02:15:12   18        Ladies and gentlemen, this now completes the trial

02:15:15   19   of this case.  From the very beginning, I've instructed you

02:15:19   20   repeatedly about not discussing this case with anyone,

02:15:23   21   including the members of the jury itself, until all the

02:15:26   22   evidence was heard and only then during your deliberations.

02:15:32   23        I'm now releasing you from that obligation, and

02:15:35   24   I'm releasing you from all the obligations and instructions

02:15:39   25   that I've given you as a part of your service as the jury

02:15:42  1   in this case.

02:15:42  2          That means you are free to talk about this case

02:15:45  3   with anyone of your choosing.  That also means that you're

02:15:48  4   free not to discuss this case or your experience in this

02:15:51  5   trial with anyone.  That, too, is solely of your choosing.

02:15:56  6   It's up to you.

02:15:57  7          Now, for at least three decades, because my

02:16:05  8   actual practice in this courthouse goes back that far, at

02:16:10  9   least for three decades, the practice and custom in the

02:16:13  10  Marshall Division of the Eastern District of Texas has

02:16:15  11  always been that the lawyers and the trial teams on each

02:16:21  12  side could not initiate a conversation with the members of

02:16:24  13  the jury.

02:16:24  14         But if the members of the jury, after they have

02:16:29  15  been released by the Court, wanted to discuss their service

02:16:33  16  as a part of the trial of this case, you were certainly

02:16:37  17  free to do so.

02:16:38  18         As a practical matter, what that usually means is

02:16:42  19  one or more people from each trial team is going to

02:16:46  20  strategically position themselves at the bottom of the

02:16:49  21  front steps.  So that when you leave the courthouse, if you

02:16:52  22  want to stop and talk, they're going to be available to you

02:16:55  23  and right there.

02:16:56  24         They're not going to initiate a conversation with

02:16:58  25  you.  If you want to talk to one side or the other side or

02:17:02  1  both sides and there's somebody there available, stop and

02:17:05  2  have as long a conversation as you want to.  But, again, it

02:17:09  3  is solely your choice.  They will not try to initiate a

02:17:12  4  conversation with you.  But I promise you, they will make

02:17:17  5  themselves available to you in case you want to initiate a

02:17:20  6  conversation with them.

02:17:21  7        That's always been the practice in this court, and

02:17:25  8  I assume it will be the case with this trial.

02:17:28  9        However, in the last couple of years, I have added

02:17:33  10  an additional aspect to that process.  During the trial, I

02:17:39  11  get both sides to give me a single contact person for the

02:17:43  12  Plaintiff and a cell phone number that that person has, and

02:17:50  13  I get a contact person for the Defendants and a cell phone

02:17:55  14  number for that person.

02:17:56  15        And in this case, I have Mr. Ward's name and phone

02:18:01  16  number for the Plaintiff and Ms. Smith's name and phone

02:18:03  17  number for the Defendants.  And I have those names and

02:18:08  18  phone numbers printed on slips of paper that I'm going to

02:18:11  19  give you in a few minutes.

02:18:13  20        And that means if you don't want to stop today and

02:18:16  21  have a conversation on the sidewalk in the front of this

02:18:20  22  building but next week or next month all the sudden you

02:18:26  23  decide you'd like to talk to one or both of them, you'll

02:18:29  24  have their numbers, you can call them, and I am confident

02:18:33  25  they will take your call.  Because I know having practiced

02:18:36   1   here, lawyers on either side of the case, no matter what

02:18:39   2   the result is, are always interested in getting feedback

02:18:42   3   from the jury.

02:18:43   4          Again, you have to initiate it.  They will not

02:18:45   5   initiate it.  They will not call you.  They will not

02:18:48   6   contact you.  It's up to you.  And if you never contact

02:18:51   7   anybody about this trial at all, that is perfectly fine.

02:18:55   8   Again, let me reiterate, it is 100 percent up to you and

02:19:00   9   nobody else.

02:19:00  10          Also, ladies and gentlemen, since I have been on

02:19:12  11   the bench here, I have always followed one other practice

02:19:19  12   at this point, and that is as the trial comes to a

02:19:25  13   conclusion, as the verdict is accepted, as the jury is

02:19:28  14   excused, I've always asked the jury to do me a personal

02:19:34  15   favor.  And that is instead of immediately leaving the

02:19:38  16   building, if you would leave the jury box in just a few

02:19:42  17   minutes when I tell you and if you would meet me back in

02:19:46  18   the jury room, I'd like to come off of the bench, I will

02:19:50  19   put on a mask, and I'd like to thank each one of you

02:19:54  20   face-to-face, person-to-person for your service as jurors

02:19:57  21   in this case.

02:19:57  22          What you've done is very real and important public

02:20:01  23   service of the highest type.  And I think it warrants a

02:20:07  24   personal word of thanks from the Court to each of you.

02:20:10  25          I have a certificate and a letter of appreciation

02:20:13   1   I'd like to give you from the Court.  And you can take it

02:20:16   2   with you.  And I promise you, I will not keep you very

02:20:22   3   long.  I know this trial has gone longer than I told you I

02:20:27   4   thought it would go when you appeared for jury selection.

02:20:30   5   But if you would do me that personal honor, I would

02:20:33   6   appreciate it.

02:20:35   7          I have suspended that practice through most of

02:20:40   8   last year because of the pandemic.  But, thankfully, I've

02:20:44   9   had the vaccine, and I have a mask, and if you don't mind,

02:20:48  10   I'd like to come in and at a reasonable distance at least

02:20:52  11   tell you personally how much the Court and the Court staff

02:20:55  12   and these officers of the court, the lawyers on both sides

02:20:58  13   of the case, appreciate what you've done.

02:21:02  14          Because all of us recognize that we could not

02:21:08  15   function and we could not do what the law and the

02:21:10  16   Constitution require us to do without ordinary citizens who

02:21:15  17   step forward, are responsible, and present themselves to

02:21:21  18   serve and do serve as jurors in a trial like this.  You are

02:21:25  19   an absolutely indispensable part of the process, and you've

02:21:28  20   made a very real and personal sacrifice to serve on this

02:21:31  21   jury.  And I think that's worthy of a personal and a direct

02:21:36  22   word of thanks.

02:21:37  23          So if you don't mind and if you would do me that

02:21:41  24   privilege without me keeping you very long at all, I'd ask

02:21:44  25   that you do that.

02:21:45  1          And if, ladies and gentlemen, you would meet me in

02:21:49  2   the court -- in the jury room, I'll be there in just a

02:21:52  3   second to thank you and then let you be on your way.

02:21:55  4          The jury is excused to the jury room.

02:21:58  5          COURT SECURITY OFFICER:  All rise.

02:21:59  6          (Jury out.)

02:21:59  7          THE COURT:  Counsel, that completes the trial of

02:22:34  8   this case.  You are excused.

02:22:36  9          COURT SECURITY OFFICER:  All rise.

02:22:40  10          (Court adjourned.)

           11

           12                        CERTIFICATION

           13

           14          I HEREBY CERTIFY that the foregoing is a true and

           15   correct transcript from the stenographic notes of the

           16   proceedings in the above-entitled matter to the best of my

           17   ability.

           18

           19

           20    /S/ Shelly Holmes_____                3/8/2021___
                 SHELLY HOLMES, CSR, TCRR                   Date
           21   OFFICIAL REPORTER
                State of Texas No.: 7804
           22   Expiration Date: 10/31/2021

           23

           24

           25